1
2
3
4

Elizabeth J. Cabraser (State Bar No. 83151)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
Email:  ecabraser@lchb.com

5

*Plaintiffs' Lead Counsel*

6

*(Plaintiffs' Steering Committee Members Listed on
Signature Page)*

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11
12
13

IN RE CHRYSLER-DODGE-JEEP
ECODIESEL® MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

14

This Document Relates to:

15

ALL ACTIONS

16

17
18

DORU BALI, *et al.*, on behalf of themselves and
all others similarly situated,

19

Plaintiffs,

20

v.

21
22
23

FIAT CHRYSLER AUTOMOBILES N.V., FCA
US LLC, SERGIO MARCHIONNE, VM MOTORI
S.p.A., VM NORTH AMERICA, INC., ROBERT
BOSCH GmbH, ROBERT BOSCH LLC, and
VOLKMAR DENNER,

24

Defendants.

MDL 2777 EMC

**AMENDED CONSOLIDATED
CONSUMER CLASS ACTION
COMPLAINT**

JURY TRIAL DEMANDED

The Honorable Edward M. Chen

25
26
27
28

1

**TABLE OF CONTENTS**

2

**Page**

3    INTRODUCTION .................................................................................................... 1

4    PARTIES ................................................................................................................. 4

     I.    DEFENDANTS ........................................................................................... 4

5          A.    Fiat Chrysler Defendants.................................................................. 4

6          B.    VM Motori Defendants ..................................................................... 6

7          C.    Bosch Defendants ............................................................................. 7

     II.   PLAINTIFFS .............................................................................................. 9

8    JURISDICTION AND VENUE .............................................................................. 52

9    INTRADISTRICT ASSIGNMENT........................................................................ 53

10   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS .................................. 54

     I.    FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S.
11         "CLEAN" DIESEL MARKET ................................................................ 54

12   II.   DEFENDANTS' DIRTY "ECODIESEL®" SCHEME ............................. 56

13   III.  FCA'S MISLEADING ADVERTISING CAMPAIGN ............................. 67

           A.    "Dieselgate" Scandalizes The Global Auto Industry........................ 70

14         B.    Defendants Are Caught Cheating. .................................................... 73

15               1.    Plaintiffs' Testing Reveals Cheating....................................... 73

16               2.    The EPA Issues A Notice Of Violation to Fiat and FCA. ....... 74

17               3.    Bosch Software Documentation Further Verifies the Violations ............ 76

                       a.    AECDs 1 and 2:  Reducing or Disabling EGR at Highway
                             Speeds .......................................................................... 76
18
                       b.    AECD 3: EGR Shut-Off for Exhaust Valve Cleaning ................ 77
19
                       c.    AECD 7: Alternative SCR Dosing Modes.................................. 77

20               4.    West Virginia University Testing of the Class Vehicles ........... 78

21               5.    European Investigation and Testing......................................... 79

                 6.    Joint  University of California, San Diego and German Study of the
22                     Fiat 500X...................................................................................... 80

           C.    The Damage Caused By Defendants' Dirty Diesel Scheme................ 81
23
     CLASS ACTION ALLEGATIONS ........................................................................ 82

24   I.    CLASS DEFINITIONS .............................................................................. 82

25   II.   CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF CIVIL
           PROCEDURE 23 ....................................................................................... 88

26   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED...................... 91

27   I.    DISCOVERY RULE .................................................................................. 91

     II.   FRAUDULENT CONCEALMENT.......................................................... 91

28   III.  ESTOPPEL ................................................................................................ 92

**TABLE OF CONTENTS**
**(continued)**

Page

CLAIMS FOR RELIEF ......................................................................................... 92

I.    CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS ........................ 92

NATIONWIDE COUNT I RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT ("RICO") Violation of 18 U.S.C. § 1962(c)-(d)......... 92

A.    Description of the EcoDiesel® RICO Enterprise ................................... 95

1.    The Fiat Chrysler Defendants .................................................. 96

2.    The VM Motori Defendants...................................................... 97

3.    The Bosch Defendants ............................................................. 97

B.    The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits
and Revenues. ...................................................................................... 98

C.    Mail And Wire Fraud .......................................................................... 102

NATIONWIDE COUNT II FRAUD BY CONCEALMENT (Common Law)............. 109

NATIONWIDE COUNT III IMPLIED AND WRITTEN WARRANTY
Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*) ......................... 111

II.   STATE CLASS-SPECIFIC CLAIMS ............................................................. 113

ALABAMA COUNT I VIOLATION OF ALABAMA DECEPTIVE TRADE
PRACTICES ACT (Ala. Code § 8-19-1, *et seq.*) ................................. 113

ALABAMA COUNT II BREACH OF EXPRESS WARRANTY (Ala. Code §§ 7-
2-313 and 7-2A-210)................................................................................ 116

ALABAMA COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ala. Code §§ 7-2-314 and 7-2A-212) ...................... 117

ALASKA COUNT I VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (Alaska Stat. Ann.
§ 45.50.471, *et seq.*) .............................................................................. 118

ALASKA COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (Alaska Stat. Ann. §§ 45.02.314 and 45.12.212)......... 121

ALASKA COUNT III BREACH OF EXPRESS WARRANTY (Alaska Stat. Ann.
§§ 45.02.313 and 45.12.210)...................................................................... 122

ARIZONA COUNT I VIOLATIONS OF THE CONSUMER FRAUD ACT (Ariz.
Rev. Stat. § 44-1521, *et seq.*) .................................................................. 123

ARIZONA COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212) .............. 125

ARIZONA COUNT III BREACH OF EXPRESS WARRANTY (Ariz. Rev. Stat.
§§ 47-2313 and 47-2A210) ....................................................................... 126

ARKANSAS COUNT I VIOLATIONS OF THE DECEPTIVE TRADE
PRACTICE ACT (Ark. Code Ann. § 4-88-101, *et seq.*) .................................. 128

ARKANSAS COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ark. Code Ann. §§ 4-2-314 and 4-2A-212).............. 130

ARKANSAS COUNT III BREACH OF EXPRESS WARRANTY (Ark. Code
Ann. §§ 4-2-313 and 4-2A-210) ............................................................ 131

**TABLE OF CONTENTS**
(continued)

Page

CALIFORNIA COUNT I VIOLATIONS OF THE CONSUMER LEGAL
REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ............................................ 133

CALIFORNIA COUNT II UNLAWFUL, UNFAIR, OR FRAUDULENT
BUSINESS PRACTICES UNDER THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) ................... 135

CALIFORNIA COUNT III FALSE ADVERTISING UNDER THE
CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code
§ 17500, *et seq.*) ................................................................................................ 137

CALIFORNIA COUNT IV BREACH OF EXPRESS WARRANTY (Cal. Com.
Code §§ 2313 and 10210) .................................................................................. 138

CALIFORNIA COUNT V BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Cal. Com. Code §§ 2314 and 10212) ......................... 139

CALIFORNIA COUNT VI VIOLATIONS OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (Cal.
Civ. Code §§ 1791.2 & 1793.2(d)) .................................................................... 140

CALIFORNIA COUNT VII VIOLATIONS OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Cal. Civ. Code §§ 1791.1 and 1792) .......................... 142

CALIFORNIA COUNT VIII BREACH OF EXPRESS CALIFORNIA
EMISSIONS WARRANTIES (Cal. Civ. Code § 1793.2, *et seq.*) ...................... 144

CALIFORNIA COUNT IX FAILURE TO RECALL/RETROFIT UNDER
CALIFORNIA LAW ........................................................................................... 145

COLORADO COUNT I VIOLATIONS OF THE COLORADO CONSUMER
PROTECTION ACT (Colo. Rev. Stat. § 6-1-101, *et seq.*) ................................ 146

COLORADO COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212) .............. 149

COLORADO COUNT III BREACH OF EXPRESS WARRANTY (Colo. Rev.
Stat. §§ 4-2-313 and 4-2.5-210) ........................................................................ 149

CONNECTICUT COUNT I VIOLATION OF CONNECTICUT UNLAWFUL
TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*) ................... 151

CONNECTICUT COUNT II BREACH OF EXPRESS WARRANTY (Conn. Gen.
Stat. Ann. § 42A-2-313) .................................................................................... 154

CONNECTICUT COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Conn. Gen. Stat. Ann. § 42A-2-314) ......................... 155

DELAWARE COUNT I VIOLATIONS OF THE DELAWARE CONSUMER
FRAUD ACT AND DECEPTIVE TRADE PRACTICES ACT (6 Del.
Code § 2513, *et seq.*, and 6 Del. Code § 2531, *et seq.*) ................................... 156

DELAWARE COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-212) ........................... 158

DELAWARE COUNT III BREACH OF EXPRESS WARRANTY (6 Del. Code
§§ 2-313 and 2A-210) ........................................................................................ 159

DISTRICT OF COLUMBIA COUNT I VIOLATION OF THE CONSUMER
PROTECTION PROCEDURES ACT (D.C. Code § 28-3901, *et seq.*) .............. 161

1372875.2

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

DISTRICT OF COLUMBIA COUNT II BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY (D.C. Code §§ 28:2-314 and 28:2A-212) ............. 163

4

DISTRICT OF COLUMBIA COUNT III BREACH OF EXPRESS WARRANTY
(D.C. Code §§ 28:2-313 and 28:2A-210) .......................................... 164

5

FLORIDA COUNT I VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE
TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*).................. 165

6

FLORIDA COUNT II BREACH OF EXPRESS WARRANTY (Fla. Stat.
§§ 672.313 and 680.21)....................................................... 168

7

FLORIDA COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Fla. Stat. §§ 672.314 and 680.212) ........... 169

8

GEORGIA COUNT I VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE
TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, *et seq.*) ..... 170

9

GEORGIA COUNT II VIOLATIONS OF GEORGIA'S FAIR BUSINESS
PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*)................. 172

10

GEORGIA COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)........... 174

11

GEORGIA COUNT IV BREACH OF EXPRESS WARRANTY (Ga. Code. Ann.
§§ 11-2-313 and 11-2A-210) ............................................ 175

12

HAWAII COUNT I UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF
HAWAII LAW (Haw. Rev. Stat. § 480, *et seq.*) ................... 177

13

HAWAII COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212)........ 179

14

HAWAII COUNT III BREACH OF EXPRESS WARRANTY (Haw. Rev. Stat.
§§ 490:2-313 and 490:2A-210)........................................... 180

15

IDAHO COUNT I VIOLATIONS OF THE IDAHO CONSUMER PROTECTION
ACT (Idaho Code § 48-601, *et seq.*).................................. 182

16

IDAHO COUNT II BREACH OF EXPRESS WARRANTY (Idaho Code §§ 28-2-
313 and 28-12-210)....................................................... 184

17

IDAHO COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212).............. 185

18

ILLINOIS COUNT I VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.* and
510/2) .................................................................. 186

19

ILLINOIS COUNT II BREACH OF EXPRESS WARRANTY (810 Ill. Comp.
Stat. §§ 5/2-313 and 5/2A-210)......................................... 189

20

ILLINOIS COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212) ........ 191

21

INDIANA COUNT I VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (Ind. Code § 24-5-0.5-3)........................ 191

22

INDIANA COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212) ............. 194

23

24

25

26

27

28

- iv -

**TABLE OF CONTENTS**
(continued)

Page

INDIANA COUNT III BREACH OF EXPRESS WARRANTY (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210).................................................................... 195

IOWA COUNT I VIOLATIONS OF THE PRIVATE RIGHT OF ACTION  FOR CONSUMER FRAUDS ACT (Iowa Code § 714h.1, *et seq.*) ........................... 197

IOWA COUNT II BREACH OF EXPRESS WARRANTY (Iowa Code §§ 554.2313 and 554.13210)................................................................. 199

IOWA COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Iowa Code §§ 554.2314 and 554.13212) .................. 200

KANSAS COUNT I VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT (Kan. Stat. Ann. § 50-623, *et seq.*)................................. 200

KANSAS COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)........... 202

KANSAS COUNT III BREACH OF EXPRESS WARRANTY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210) ................................................................ 203

KENTUCKY COUNT I VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT (Ky. Rev. Stat. § 367.110, *et seq.*) ................................. 205

KENTUCKY COUNT II BREACH OF EXPRESS WARRANTY (KY. REV. STAT. §§ 335.2-313 and 355.2A-210) ............................................... 208

KENTUCKY COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (KY. REV. STAT. §§ 335.2-314 and 355.2A-212)..... 209

LOUISIANA COUNT I VIOLATIONS OF THE LOUISIANA UNFAIR PRACTICES AND CONSUMER PROTECTION LAW (La. Rev. Stat. § 51:1401, *et seq.*) ................................................................................. 210

LOUISIANA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (La. Civ. Code Art. 2520, 2524)....................................................... 213

MAINE COUNT I VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT (Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*) ................................. 214

MAINE COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)...... 216

MAINE COUNT III BREACH OF EXPRESS WARRANTY (ME. REV. STAT. TIT. 11 §§ 2-313 and 2-1210)................................................................. 217

MARYLAND COUNT I VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (Md. Code Com. Law § 13-101, *et seq.*)........................ 219

MARYLAND COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Md. Code Com. Law §§ 2-314 and 2A-212) ............ 221

MARYLAND COUNT III BREACH OF EXPRESS WARRANTY (Md. Code, Com. Law §§ 2-313 and 2a-210) ................................................................. 222

MASSACHUSETTS COUNT I DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*) ....................................................................................... 223

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

MASSACHUSETTS COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mass. Gen. Laws Ch. 106 §§ 2-314 and 2A-212)...... 226

4

MASSACHUSETTS COUNT III BREACH OF EXPRESS WARRANTY (Mass.
    Gen. Laws Ch. 106 §§ 2-313 and 2A-210) ........................................................ 227

5

MICHIGAN COUNT I VIOLATION OF THE MICHIGAN CONSUMER
    PROTECTION ACT  (Mich. Comp. Laws § 445.903, *et seq.*) ........................ 229

6

MICHIGAN COUNT II BREACH OF EXPRESS WARRANTY (Mich. Comp.
    Laws §§ 440.2313 and 440.2860) ...................................................................... 231

7

MICHIGAN COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mich. Comp. Laws §§ 440.2314 and 440.2860) ........ 233

8

MINNESOTA COUNT I VIOLATIONS OF THE MINNESOTA PREVENTION
    OF CONSUMER FRAUD ACT (Minn. Stat. § 325f.68, *et seq.*)...................... 233

9

MINNESOTA COUNT II VIOLATIONS OF THE MINNESOTA UNIFORM
    DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325d.43, *et seq.*) ...... 235

10

MINNESOTA COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Minn. Stat. §§ 336.2-314 and 336.2A-212) .............. 237

11

MINNESOTA COUNT IV BREACH OF EXPRESS WARRANTY (Minn. Stat.
    §§ 336.2-313 and 336.2A-210) .......................................................................... 238

12

MISSISSIPPI COUNT I VIOLATION OF MISSISSIPPI CONSUMER
    PROTECTION ACT  (Miss. Code. Ann. § 75-24-1, *et seq.*) ........................... 240

13

MISSISSIPPI COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Miss. Code §§ 75-2-314 and 75-2A-212) ................. 241

14

MISSISSIPPI COUNT III BREACH OF EXPRESS WARRANTY (Miss. Code
    §§ 75-2-313 and 75-2A-210) ............................................................................. 242

15

MISSOURI COUNT I VIOLATION OF MISSOURI MERCHANDISING
    PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) .................................... 244

16

MISSOURI COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mo. Stat. §§ 400.2-314 and 400.2A-212) ................. 246

17

MISSOURI COUNT III BREACH OF EXPRESS WARRANTY (Mo. Stat.
    §§ 400.2-313 and 400.2A-210) .......................................................................... 247

18

MONTANA COUNT I VIOLATION OF MONTANA UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (Mont.
    Code Ann. § 30-14-101, *et seq.*) ...................................................................... 248

19

MONTANA COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mont. Code §§ 30-2-314 and 30-2A-212)................ 251

20

MONTANA COUNT III BREACH OF EXPRESS WARRANTY (Mont. Code
    §§ 30-2-313 and 30-2A-210) ............................................................................. 252

21

NEBRASKA COUNT I VIOLATION OF THE NEBRASKA CONSUMER
    PROTECTION ACT (Neb. Rev. Stat. § 59-1601, *et seq.*) ............................... 253

22

NEBRASKA COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212)............. 255

23

24

25

26

27

28

1372875.2

**TABLE OF CONTENTS**
(continued)

Page

NEBRASKA COUNT III BREACH OF EXPRESS WARRANTY (Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210)........................................................................... 256

NEVADA COUNT I VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (Nev. Rev. Stat. § 598.0903, *et seq.*).................................. 258

NEVADA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Nev. Rev. Stat. §§ 104.2314 and 104A.2212)........... 260

NEVADA COUNT III BREACH OF EXPRESS WARRANTY (Nev. Rev. Stat. §§ 104.2313 and 104A.2210)................................................................... 261

NEW HAMPSHIRE COUNT I VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*) ....................... 262

NEW HAMPSHIRE COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.H. Rev. Stat. §§ 382-A:2-314 and 2A-212) .......... 264

NEW HAMPSHIRE COUNT III BREACH OF EXPRESS WARRANTY (N.H. Rev. Stat. §§ 382-A:2-313 and 2A-210)............................................... 265

NEW JERSEY COUNT I VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. Stat. Ann. § 56:8-1, *et seq.*)...................................... 267

NEW JERSEY COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.J. Stat. Ann. § 12A:2-314 and 2A-212)................. 269

NEW JERSEY COUNT III BREACH OF EXPRESS WARRANTY (N.J. Stat. Ann. § 12A:2-313 and 2A-210) ............................................................... 270

NEW MEXICO COUNT I VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1, *et seq.*) ................................. 271

NEW MEXICO COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.M. Stat. §§ 55-2-314 and 55-2A-212).................... 274

NEW MEXICO COUNT III BREACH OF EXPRESS WARRANTY (N.M. Stat. §§ 55-2-313 and 55-2A-210) ................................................................ 274

NEW YORK COUNT I VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. Gen. Bus. Law § 349) ................................................. 276

NEW YORK COUNT II VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. Gen. Bus. Law § 350) ....................................... 278

NEW YORK COUNT III BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. Law §§ 2-313 and 2A-210).................................................................... 280

NEW YORK COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314 and 2A-212) .................. 282

NORTH CAROLINA COUNT I VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)................................................................................ 283

NORTH CAROLINA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen. Stat. §§ 25-2-314 AND 252A-212)........... 285

NORTH CAROLINA COUNT III BREACH OF EXPRESS WARRANTY (N.C. Gen. Stat. §§ 25-2-313 and 252A-210)............................................. 286

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

NORTH DAKOTA COUNT I VIOLATION OF THE NORTH DAKOTA
CONSUMER FRAUD ACT (N.D. Cent. Code § 51-15-02) ............................ 288

4

NORTH DAKOTA COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.D. Cent. Code §§ 41-02-31 and 41-02.1-21) ......... 290

5

NORTH DAKOTA COUNT III BREACH OF EXPRESS WARRANTY (N.D.
Cent. Code §§ 41-02-30 and 41-02.1-19) .......................................... 290

6

OHIO COUNT I VIOLATIONS OF THE OHIO CONSUMER SALES
PRACTICES ACT (Ohio Rev. Code §§ 1345.01, et seq.) ............................... 292

7

OHIO COUNT II VIOLATIONS OF THE OHIO DECEPTIVE TRADE
PRACTICES ACT (Ohio Rev. Code § 4165.01, et seq.) ................................. 294

8

OHIO COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19) ........ 296

9

OHIO COUNT IV BREACH OF EXPRESS WARRANTY (Ohio Rev. Code
§ 1302.26, et seq.) (U.C.C. §2-313)) .................................................. 297

10

OKLAHOMA COUNT I VIOLATION OF OKLAHOMA CONSUMER
PROTECTION ACT (Okla. Stat. Tit. 15 § 751, et seq.) ................................. 298

11

OKLAHOMA COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Okla. Stat. Tit. 12A §§ 2-314 and 2A-212) ............... 300

12

OKLAHOMA COUNT III BREACH OF EXPRESS WARRANTY (Okla. Stat.
Tit. 12A §§ 2-313 and 2A-210) .......................................................... 301

13

OREGON COUNT I VIOLATIONS OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (Or. Rev. Stat. §§ 646.605, et seq.) .................................. 303

14

OREGON COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Or. Rev. Stat. § 72.3140 and 72A.2120) ................... 305

15

OREGON COUNT III BREACH OF EXPRESS WARRANTY (Or. Rev. Stat.
§§ 72.3130 and 72A.2100) ................................................................. 306

16

PENNSYLVANIA COUNT I VIOLATION OF THE PENNSYLVANIA
UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION
LAW (73 Pa. Stat. Ann. § 201-1, et seq.) ........................................... 308

17

PENNSYLVANIA COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (13 Pa. Cons. Stat. §§ 2314 and 2A212) .................... 310

18

PENNSYLVANIA COUNT III BREACH OF EXPRESS WARRANTY (13 PA.
CONS. STAT.  §§ 2313 and 2A210) .................................................... 311

19

RHODE ISLAND COUNT I VIOLATION OF THE RHODE ISLAND
DECEPTIVE TRADE PRACTICES ACT (R.I. Gen. Laws § 6-13.1, et
seq.) .................................................................................................. 313

20

RHODE ISLAND COUNT II BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212) ......... 315

21

RHODE ISLAND COUNT III BREACH OF EXPRESS WARRANTY (R.I. Gen.
Laws §§ 6A-2-313 and 6A-2.1-210) .................................................... 316

22

SOUTH CAROLINA COUNT I VIOLATIONS OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT (S.C. Code Ann. § 39-5-10, et seq.) ...... 317

23

24

25

26

27

28

- viii -

**TABLE OF CONTENTS**
(continued)

Page

SOUTH CAROLINA COUNT II VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. Code Ann. § 56-15-10, *et seq.*) ..................................... 320

SOUTH CAROLINA COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.C. Code §§ 36-2-314 and 36-2A-212) ................... 321

SOUTH CAROLINA COUNT IV BREACH OF EXPRESS WARRANTY (S.C. Code §§ 36-2-313 and 36-2A-210) .................... 322

SOUTH DAKOTA COUNT I VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. Codified Laws § 37-24-6) ................ 324

SOUTH DAKOTA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212) ................ 326

SOUTH DAKOTA COUNT III BREACH OF EXPRESS WARRANTY (S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210) ................ 327

TENNESSEE COUNT I VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977 (Tenn. Code Ann. § 47-18-101, *et seq.*) ........... 328

TENNESSEE COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tenn. Code §§ 47-2-314 and 47-2A-212) ................. 331

TENNESSEE COUNT III BREACH OF EXPRESS WARRANTY (Tenn. Code §§ 47-2-313 and 47-2A-210) ................ 332

TEXAS COUNT I VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT – CONSUMER PROTECTION ACT (Tex. Business & Commercial Code §§ 17.41, *et seq.*) ................ 333

TEXAS COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tex. Bus. & Com. Code §§ 2.314 and 2A.212) ......... 336

TEXAS COUNT III BREACH OF EXPRESS WARRANTY (Tex. Bus. & Com. Code §§ 2.313 and 2A.210) ................ 337

UTAH COUNT I VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT (Utah Code Ann. § 13-11-1, *et seq.*) ................ 339

UTAH COUNT II VIOLATION OF UTAH TRUTH IN ADVERTISING LAW (Utah Code Ann. § 13-11a-1, *et seq.*) ................ 340

UTAH COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Utah Code Ann. §§ 70A-2-314 and 70A-2A-212) ..... 342

UTAH COUNT IV BREACH OF EXPRESS WARRANTY (Utah Code Ann. §§ 70A-2-313 and 70A-2A-210) ................ 343

VERMONT COUNT I VIOLATION OF VERMONT CONSUMER PROTECTION ACT (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*) ................ 344

VERMONT COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2A-212) ........... 347

VERMONT COUNT III BREACH OF EXPRESS WARRANTY (Vt. Stat. Tit. Ann. 9A, §§ 2-313 and 2A-210) ................ 348

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

**TABLE OF CONTENTS**
(continued)

Page

VIRGINIA COUNT I VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (Va. Code Ann. §§ 59.1-196, *et seq.*)................................ 349

VIRGINIA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Va. Code Ann. §§ 8.2-314 and 8.2A-212) ................ 351

VIRGINIA COUNT III BREACH OF EXPRESS WARRANTY (Va. Code Ann. §§ 8.2-313 and 8.2A-210) ................................................................... 352

WASHINGTON COUNT I VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*) ............................................................................. 354

WASHINGTON COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212) ................................................................................. 356

WASHINGTON COUNT III BREACH OF EXPRESS WARRANTY (Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210) ...................................... 357

WEST VIRGINIA COUNT I VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT (W. Va. Code § 46A-1-101, *et seq.*)...................... 359

WEST VIRGINIA COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (W. Va. Code §§ 46-2-314 and 46-2A-212)............... 362

WEST VIRGINIA COUNT III BREACH OF EXPRESS WARRANTY (W. Va. Code §§ 46-2-313 and 46-2A-210)...................................................... 362

WISCONSIN COUNT I VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (Wis. Stat. § 100.18) ............................. 364

WISCONSIN COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wis. Stat. §§ 402.314 and 411.212) ......................... 366

WISCONSIN COUNT III BREACH OF EXPRESS WARRANTY (Wis. Stat. §§ 402.313 and 411.210)................................................................... 367

WYOMING COUNT I VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT (Wyo. Stat. §§ 40-12-101, *et seq.*) ................................... 369

WYOMING COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212)............ 371

WYOMING COUNT III BREACH OF EXPRESS WARRANTY (Wyo. Stat. § 34.1-2-313)................................................................................ 372

III.    PRAYER FOR RELIEF........................................................................ 374

IV.    DEMAND FOR JURY TRIAL.............................................................. 375

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

Plaintiffs bring this action on behalf of themselves and all others similarly situated, against (1) the Defendants collectively referred to as "Fiat Chrysler": FCA US LLC ("FCA"), Fiat Chrysler Automobiles N.V. ("Fiat"), and Sergio Marchionne ("Marchionne"); (2) the Defendants collectively referred to as "VM Motori": VM Motori S.p.A. ("VM Italy") and VM North America, Inc. ("VM America"); and (3) the Defendants collectively referred to as "Bosch": Robert Bosch GmbH ("Bosch GmbH"), Robert Bosch, LLC ("Bosch LLC"), and Volkmar Denner ("Denner"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## INTRODUCTION

1. This nationwide class action arises out of an international race to the bottom. Fiat Chrysler, a rival of automaker Volkswagen struggling to compete on the world stage, sought to grab a piece of the U.S. "clean" diesel market with 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Class Vehicles"). But like Volkswagen, Fiat Chrysler fought dirty. That is, like Volkswagen did with its "clean diesels," Fiat Chrysler concealed from regulators and consumers alike that the EcoDiesel® trucks were far from "Eco."

2. As the Environmental Protection Agency ("EPA") has since discovered, Fiat Chrysler, by and through FCA, concealed emission treatment software features in the Class Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs"). This hidden software, designed and implemented by Bosch GmbH and Bosch LLC, allowed the Class Vehicles to "pass" emission testing and obtain COCs and EOs so that Fiat Chrysler could import and sell the Class Vehicles in the U.S. and California, respectively. Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Class Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by law.

3. On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the

1    2014-2016 FCA Ram 1500s and Jeep Grand Cherokees.[1]  In the NOV, the EPA explained that,

2    despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of

3    one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of

4    design installed to comply with emissions standards under the [Clean Air Act.]"

5         4.     The same day, CARB publicly announced that it, too, had notified Fiat and FCA

6    of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee

7    and Ram 1500 EcoDiesel® vehicles.  CARB also said Fiat and FCA failed to disclose the

8    devices, which can significantly increase NOx emissions when activated.  "Once again," observed

9    CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules

10   and got caught."[2]

11        5.     The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the

12   Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties.[3]

13   As the U.S. has found, "one or more of these undisclosed software features, alone or in

14   combination with one or more of the others, bypass, defeat and/or render inoperative the [Class]

15   Vehicles' emission control system, causing the vehicles to emit substantially higher levels of

16   NOx during certain normal real world driving conditions than during federal emission tests."[4]

17        6.     American consumers were caught in the middle of Fiat Chrysler's scheme.

18   Consumers have been wary of diesel engines as a relic of the past:  noisy and spewing thick, toxic

19   smoke.  This was an understandable concern.  A byproduct of diesel combustion is NOx, a

20   pollutant linked with serious health dangers and climate change.  Seeking to expand the diesel

21   market in the U.S., large automakers in the late 2000's sought to reimagine diesel for regulators

22   and consumers alike.  For its part, Fiat Chrysler touted its "EcoDiesel" technology as the best of

23   both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's

24

---

25   [1] EPA's January 12, 2017 Notice of Violation to Fiat Chrysler Automobiles,
     https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
26   [2] EPA News Release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan. 12, 2017),
     https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.
27   [3] *United States v. Fiat US LLC, et al.*, No. 2:17-cv-11633-JCO-EAS (E.D. Mich. filed May 23,
     2017) (Dkt. No. 1).  The action has since been transferred to this Court for coordination with this
28   MDL.
     [4] *Id.* at ¶ 2.

benefits of greater torque, power, and fuel efficiency.  Fiat Chrysler extracted a premium for these "EcoDiesel" trucks, selling them for thousands of dollars more than the cost of otherwise-comparable gasoline trucks.

7.     Contrary to its public representations, and concealed from consumers and regulators alike, Fiat Chrysler secretly programmed its EcoDiesel® vehicles with hidden software features that significantly reduced the effectiveness of the NOx reduction technology during real-world driving conditions.  As a result, the Class Vehicles emitted harmful pollutants at levels that were illegally high and far in excess of what a reasonable consumer would expect from an "Eco" vehicle.  Plaintiffs' on-road testing has confirmed that the Class Vehicles produced NOx emissions at an average of 222 mg/mile in city driving (four times the Federal Test Procedure ("FTP") standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the U.S. highway standard of 70 mg/mile).  In many instances, NOx values were in excess of 1,600 mg/mile—*more than 20 times governmental standards*.

8.     Compounding this problem is the interplay between performance and emissions in diesel engines.  Fiat Chrysler could not achieve the fuel economy and performance that it promises for the Class Vehicles without cheating on emissions—a fact that it concealed from consumers around the country.

9.     Fiat Chrysler did not act alone.  At the heart of the diesel scandal is Bosch.  Bosch GmbH and Bosch LLC, along with CEO Denner, were active and knowing participants in the scheme.  Bosch designed, created, and tested the electronic diesel control ("EDC") units that allowed Fiat Chrysler to "pass" emission tests for its COC and EO applications.  Bosch went so far as to boast that the "2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[5]  Bosch has since, however, acknowledged its role in the

---

[5] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNewswire (Jan. 24, 2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-dieseltechnology-on-2014-jeep-grand-cherokee-188243051.html;  http://us.bosch-press.com/tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=61223175&CFTOKEN=a16399a1447f6b98-4B6F7D4B-A8E6-F415-F31B16E0E13CB96A&nh=00&Search=0&id=532.

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

creation of defeat devices in certain Fiat Chrysler diesel vehicles sold in the European Union ("EU"). VM Italy and VM America also knowingly participated in the scheme by designing, manufacturing, and calibrating the "EcoDiesel" engines in the Class Vehicles.

10.     On behalf of themselves, the Nationwide Class, and the respective State Classes, Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); common law fraud; and the consumer protection and warranty laws of all 50 states and the District of Columbia.

11.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles as defined herein. Plaintiffs seek a buyback program for the Class Vehicles, monetary damages (including treble damages under RICO), pollution mitigation, business reforms, and injunctive and other equitable relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as alleged in this Complaint. Plaintiffs and Class members are also entitled to a significant award of punitive or exemplary damages, given that Defendants deliberately deceived Plaintiffs and Class members, disregarded their rights to make free and informed consumer choices, damaged them economically, and used them as unwitting puppets in a scheme that impaired the public health.

## PARTIES

## I.     DEFENDANTS

### A.     Fiat Chrysler Defendants

12.     Defendant **FCA US LLC ("FCA")** is a Delaware limited liability company. Defendant **Fiat Chrysler Automobiles N.V. ("Fiat" or, together with FCA, "Fiat Chrysler")** is FCA's corporate parent. Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time Chrysler Group LLC became a wholly-owned indirect subsidiary of Fiat and was renamed FCA US LLC. FCA's principal place of business and headquarters is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

13.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles.  FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors).  FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands.  Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

14.     FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased two models of vehicle for which the EcoDiesel® option is available—the Ram 1500 and the Jeep Grand Cherokee—with the knowledge and intent to market, sell, and lease them in all 50 states, including in California.  Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Class Vehicles in California and throughout the United States.  Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

15.     Fiat, the corporate parent of FCA, is a Dutch corporation headquartered in London, United Kingdom.  Fiat owns numerous European automotive brands in addition to FCA's American brands, including Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth.  As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

16.     Subject to a reasonable opportunity for further investigation or discovery, Plaintiffs allege that Fiat employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Class Vehicles.  Fiat also imported into the United States, sold, offered for sale, introduced into commerce, or delivered the Class Vehicles, with the intent to market or sell them in all fifty states, including in California.

17.     Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Class Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states, including in California.  Fiat Chrysler is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

18.     Defendant **Sergio Marchionne ("Marchionne")** is the CEO and Chairman of FCA, the CEO of Fiat, and the Chairman and/or CEO of several other Fiat subsidiaries, including FCA Italy S.p.A., the Italian subsidiary of Fiat headquartered in Turin, Italy.  Since 2004, Mr. Marchionne has been the CEO of Fiat S.p.A., the predecessor of Fiat, and thus, oversaw Fiat's acquisition of both VM Motori and Chrysler Group LLC, the transformation to the current corporate structure, and the creation of FCA.  Mr. Marchionne has made numerous public statements on behalf of Fiat Chrysler concerning the Class Vehicles, their EcoDiesel® engines, and their emissions and performance characteristics.  In addition to managing and controlling FCA, Mr. Marchionne has a home in the United States, regularly transacts business in the United States, and regularly promotes Fiat Chrysler in the United States.

### B.     VM Motori Defendants

19.     Fiat also owns several auto parts manufacturers, including Defendant **VM Motori S.p.A. ("VM Italy")**, an Italian corporation headquartered in Cento, Italy, which designs and manufactures diesel engines for automobiles, including the Class Vehicles.  Fiat partially acquired VM Italy in early 2011 by purchasing a 50% stake, and took full ownership by acquiring the remaining 50% from General Motors in October 2013.

20.     Defendant **VM North America, Inc. ("VM America" or, together with VM Italy, "VM Motori")** is or was a Delaware corporation and wholly-owned subsidiary of Fiat. VM America existed, at all relevant times, to support VM Italy customers and activities in North America.  VM America's principal place of business is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.  Both VM Italy and VM America conduct business at that address and report to management at both VM Italy and VM America, including while working on the Class Vehicles.

21.     VM Italy transacts business in the United States.  VM Italy employees have been physically present in Auburn Hills, Michigan, while working on engine calibration and air emissions issues related to the Class Vehicles.  Some VM America employees working in Auburn Hills are also employees of VM Italy.  VM Italy employees in Italy communicated regularly

1    about the Class Vehicles with the VM America and VM Italy employees located in Auburn Hills.

2    VM Italy also communicated frequently with FCA about the Class Vehicles.

3          22.     VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel®

4    engine system for inclusion in the Class Vehicles, knowing and intending that the Class Vehicles,

5    along with their engine system, would be marketed, distributed, warranted, sold and leased

6    throughout all 50 states, including in California.

7          **C.     Bosch Defendants**

8          23.     Defendant **Robert Bosch GmbH ("Bosch GmbH")**—a German multinational

9    engineering and electronics company headquartered in Gerlingen, Germany—is the parent

10   company of Defendant **Robert Bosch LLC ("Bosch LLC" or, with Bosch GmbH, "Bosch")**, a

11   Delaware limited liability company with its principal place of business located at 38000 Hills

12   Tech Drive, Farmington Hills, Michigan 48331.

13         24.     Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch

14   Group, which encompasses some 340 subsidiaries and companies.  Defendant **Volkmar Denner**

15   **("Denner")** is the Chairman and CEO of Bosch GmbH and leader of The Bosch Group. Denner

16   has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's

17   Engine ECU Development division, managing the development and sale of automotive engine

18   computers, such as the EDC units that were installed in the Class Vehicles.

19         25.     The Bosch Group is divided into four business sectors: Mobility Solutions

20   (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and

21   Building Technology.  Bosch's sectors and divisions are grouped not by location, but by function.

22   In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and

23   Bosch LLC.  Regardless of whether an individual works for Bosch in Germany or the United

24   States, the employee holds him or herself out as working for Bosch.  This collective identity is

25   captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each

26   entity and person within the Bosch Group.

27

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

26.     Mobility Solutions is the largest Bosch Group business sector.  In 2014, the first full year of Class Vehicle sales, it generated sales of €33.3 billion, amounting to 68% of total group sales.

27.     The Bosch Group is one of the leading automotive suppliers globally.  In 2015, Mobility Solutions generated sales of $9.5 billion in North America alone.

28.     Bosch embeds sales and engineering personnel at customer offices and facilities throughout the world, including automakers like Fiat Chrysler, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

29.     Bosch operates 70 locations in the United States, with over 31,000 employees. One of these locations is the Bosch LLC Research and Technology Center North America in Palo Alto, California.  One of Bosch's research focuses there is application-specific integrated circuit (ASIC) design and MEMS (microelectromechanical-system) technology.  These technologies are used in a variety of automotive applications.  Bosch LLC also operates Research and Technology Centers in Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.

30.     Bosch developed, tested, configured, manufactured, and supplied the EDC Unit 17, which is the EDC system used in the Class Vehicles, knowing and intending that the Class Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California.  As set forth in detail herein, at all relevant times, Bosch, VM Motori, and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Class Vehicles.

31.     From at least 2005 to 2015, Bosch and its employees were knowing and active participants in the creation, development, marketing, and sale of engine and emission control software designed to evade emission requirements in vehicles sold in the United States.  These vehicles include the Ram 1500 EcoDiesel® and Jeep Grand Cherokee EcoDiesel®, as well as diesels made by other automakers such as Volkswagen, Audi, and Porsche.

32.     Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality.  Moreover, Bosch's participation was not limited to engineering these devices.  In fact, Bosch marketed "clean diesel"

-8-

technology in the United States.  Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Fiat Chrysler and VM Motori and others to defraud regulators and consumers in the United States.

## II.    PLAINTIFFS

33.    For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Class Vehicles:

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Alley, Anthony | TX | MS | 2015 | Ram 1500 |
| Bali, Doru | MI | KY | 2014 | Jeep Grand Cherokee |
| Bihorean, Marius | GA | NC | 2015 | Ram 1500 |
| Blake, Harold | VT | VT | 2016 | Ram 1500 |
| Boykin, James | FL | VA | 2015 | Ram 1500 |
| Brinkman, Elmer and Barbara | SD | SD | 2016 | Ram 1500 |
| Broom, Jamie | LA | TX | 2015 | Ram 1500 |
| Burwell, Adam | OR | ID | 2016 | Ram 1500 |
| Calhoun, Karl | WA | ID | 2016 | Ram 1500 |
| Carillo, Giuseppe | NY | CT | 2016 | Ram 1500 |
| Carter, Aaron | IL | IL | 2015 | Jeep Grand Cherokee |
| Chatom Motor Company, Inc. | AL | AL | 2015 | Ram 1500 |
| Chavez, Jose | CA | CA | 2016 | Ram 1500 |
| Claflin, Josh | WI | MN | 2015 | Ram 1500 |
| DeBerry, James | FL | GA | 2016 | Ram 1500 |
| Desroches, Henry | ME | ME | 2016 | Ram 1500 |
| Edwards, Anthony | TN | TN | 2015 | Ram 1500 |
| Elowitz, Steven | AZ | AZ | 2016 | Ram 1500 |
| Falco, Marianna | CA | CA | 2015 | Jeep Grand Cherokee |
| Fasching, Mathue | ID | OR | 2016 | Ram 1500 |
| Feldman, Victor | AL | TX | 2015 | Ram 1500 |
| Fragoso, Miguel | NC | NC | 2016 | Jeep Grand Cherokee |

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Ghrist, Leslie | CA | CA | 2016 | Ram 1500 |
| Giauque, Gregory | CA | AZ | 2015 | Jeep Grand Cherokee |
| Gillespe, Tom | GA | GA | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2015 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2016 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2016 | Ram 1500 |
| Greenberg, Benjamin | MA | MA | 2015 | Jeep Grand Cherokee |
| Griggs, Jeffrey | TN | GA | 2014 | Ram 1500 |
| Gunderson, Jake | NM | NM | 2015 | Ram 1500 |
| Heidlebaugh, Kyle and Jessica | PA | MD | 2014 | Jeep Grand Cherokee |
| Hiner, Brian | VA | VA | 2014 | Jeep Grand Cherokee |
| Hissey, Charles | TX | TX | 2015 | Jeep Grand Cherokee |
| Holland, Lee | OK | OK | 2015 | Ram 1500 |
| Holm, Ronald | MT | MT | 2015 | Ram 1500 |
| Jackson, Richard | DE | DE | 2015 | Ram 1500 |
| Johnson, Michael | GA | SC | 2014 | Ram 1500 |
| Loescher, Andrew | WA | ND | 2015 | Ram 1500 |
| Markin, William | CO | CO | 2014 | Jeep Grand Cherokee |
| Mattingly, Christopher | NV | NV | 2016 | Ram 1500 |
| McGann, Thomas Jr. | NY | NY | 2016 | Ram 1500 |
| Melin, Ernest Jr. | SC | SC | 2016 | Ram 1500 |
| Milner, George | NY | NY | 2014 | Ram 1500 |
| Muckenfuss, Bryan | SC | SC | 2015 | Ram 1500 |
| Norton, Michael | NJ | NJ | 2014 | Jeep Grand Cherokee |
| Petersen, Kirk | IA | IA | 2015 | Ram 1500 |
| Phillips, Melvin | MO | AR | 2015 | Ram 1500 |

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Price, Samuel | LA | NC | 2014 | Ram 1500 |
| Radziewicz, John | LA | LA | 2014 | Jeep Grand Cherokee |
| Reichert, Bobby | FL | FL | 2016 | Ram 1500 |
| Richards, Mark | IN | IN | 2016 | Ram 1500 |
| Roberts, Jon | OH | OH | 2014 | Ram 1500 |
| Ruiz, Kelly | WY | WY | 2014 | Jeep Grand Cherokee |
| Sandifer, Jesse | WA | WA | 2016 | Ram 1500 |
| Silio, Miguel | FL | FL | 2015 | Jeep Grand Cherokee |
| Singh, Satyanam | CA | CA | 2016 | Ram 1500 |
| Stephens, Nelson John | GA | AL | 2014 | Ram 1500 |
| Tonnesen, Wayne | NJ | WI | 2016 | Ram 1500 |
| Turner, William, III | GA | GA | 2014 | Jeep Grand Cherokee |
| Vanderlaan, Steven | UT | UT | 2015 | Ram 1500 |
| WEB Farms, Inc. | NM | TX | 2014 | Ram 1500 |
| Webster, Stonewall, III | NC | NC | 2016 | Ram 1500 |
| Wheelock, Casey | AZ | AZ | 2016 | Ram 1500 |
| Wilson, John | UT | UT | 2016 | Ram 1500 |

34.     Plaintiff **Anthony Alley** (for the purpose of this paragraph, "Plaintiff"), a citizen of Texas, residing in Livingston, Texas, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about December 17, 2015 at Howard Wilson Chrysler Jeep Dodge, an authorized FCA dealer in Flowood, Mississippi.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission

1372875.2

1    tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

2    Vehicle, or would have paid less for it, had he known that it did not comply with emission

3    standards; that its emission treatment system was designed to de-activate during real-world

4    driving conditions; and that it could not achieve the advertised towing power, performance,

5    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

6    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

7    Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

8    control devices.

9        35.    Plaintiff **Doru Bali** (for the purpose of this paragraph, "Plaintiff"), a citizen of

10   Michigan, residing in Canton, Michigan, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for

11   the purpose of this paragraph, the "Class Vehicle") in or about June 2015 at Cross Chrysler Jeep,

12   an authorized FCA dealer in Louisville, Kentucky.  Plaintiff decided to buy the Class Vehicle

13   based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

14   emissions).  These representations, along with the advertised fuel economy and low emissions

15   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

16   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

17   levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

18   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

19   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

20   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

21   comply with emission standards; that its emission treatment system was designed to de-activate

22   during real-world driving conditions; and that it could not achieve the advertised towing power,

23   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

24   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

25   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

26   unauthorized emission control devices.

27       36.    Plaintiff **Marius Bihorean** (for the purpose of this paragraph, "Plaintiff"), a

28   citizen of Georgia, residing in Lawrenceville, Georgia, bought a 2015 Ram 1500 EcoDiesel® (for

-12-

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1  the purpose of this paragraph, the "Class Vehicle") on or about September 12, 2015 at Skyland

2  Automotive Group, an authorized FCA dealer in Asheville, North Carolina.  Plaintiff decided to

3  buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

4  (i.e., reduced emissions).  These representations, along with the advertised fuel economy, towing

5  power, and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At

6  the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

7  only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

8  Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

9  control devices designed to cheat emission tests and to deceive consumers and regulators.

10  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

11  known that it did not comply with emission standards; that its emission treatment system was

12  designed to de-activate during real-world driving conditions; and that it could not achieve the

13  advertised towing power, performance, and/or fuel economy without cheating emission tests.

14  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

15  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

16  Defendants not concealed the unauthorized emission control devices.

17          37.     Plaintiff **Harold Blake** (for the purpose of this paragraph, "Plaintiff"), a citizen of

18  Vermont, residing in Barre, Vermont, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of

19  this paragraph, the "Class Vehicle") on or about November 1, 2016 at Goss Dodge Chrysler, an

20  authorized FCA dealer in South Burlington, Vermont.  Plaintiff decided to buy the Class Vehicle

21  based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

22  emissions).  These representations, along with the advertised fuel economy and performance,

23  were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

24  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

25  levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

26  Class Vehicle was equipped with undisclosed and unauthorized emission control devices

27  designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

28  have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

-13-

1   comply with emission standards; that its emission treatment system was designed to de-activate

2   during real-world driving conditions; and that it could not achieve the advertised towing power,

3   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

4   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

5   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

6   unauthorized emission control devices.

7        38.      Plaintiff **James Boykin** (for the purpose of this paragraph, "Plaintiff"), a citizen of

8   Florida, residing in Oviedo, Florida, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of

9   this paragraph, the "Class Vehicle") on or about August 31, 2015, at Koons Tysons Chrysler

10  Dodge Jeep and Ram, an authorized FCA dealer in Vienna, Virginia.  Plaintiff decided to buy the

11  Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

12  reduced emissions).  These representations, along with the advertised fuel economy, towing

13  power, performance, and resale value were among the primary reasons Plaintiff chose the Class

14  Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

15  advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

16  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

17  emission control devices designed to cheat emission tests and to deceive consumers and

18  regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

19  had he known that it did not comply with emission standards; that its emission treatment system

20  was designed to de-activate during real-world driving conditions; and that it could not achieve the

21  advertised towing power, performance, and/or fuel economy without cheating emission tests.

22  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

23  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

24  Defendants not concealed the unauthorized emission control devices.

25       39.      Plaintiffs **Elmer and Barbara Brinkman** (for the purpose of this paragraph,

26  "Plaintiffs"), citizens of South Dakota, residing in Watertown, South Dakota, bought a 2016 Ram

27  1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September

28  9, 2016 at Watertown Ford Chrysler, an authorized FCA dealer in Watertown, South Dakota.

1    Plaintiffs decided to buy the Class Vehicle based in part on FCA's representations that it was an

2    "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

3    fuel economy and towing power, were among the primary reasons Plaintiffs chose the Class

4    Vehicle.  At the time of purchase, Plaintiffs did not know that the Class Vehicle could perform as

5    advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

6    Nor were Plaintiffs aware that their Class Vehicle was equipped with undisclosed and

7    unauthorized emission control devices designed to cheat emission tests and to deceive consumers

8    and regulators.  Plaintiffs would not have purchased the Class Vehicle, or would have paid less

9    for it, had they known that it did not comply with emission standards; that its emission treatment

10   system was designed to de-activate during real-world driving conditions; and that it could not

11   achieve the advertised towing power, performance, and/or fuel economy without cheating

12   emission tests.  Plaintiffs have suffered a concrete injury as a direct and proximate result of

13   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

14   less for it, had Defendants not concealed the unauthorized emission control devices.

15        40.    Plaintiff **Jamie Broom** (for the purpose of this paragraph, "Plaintiff"), a citizen of

16   Louisiana, residing in Thibodaux, Louisiana, bought a 2015 Ram 1500 EcoDiesel® (for the

17   purpose of this paragraph, the "Class Vehicle") on or about June 1, 2015 at Nyle Maxwell, an

18   authorized FCA dealer in Tyler, Texas.  Plaintiff decided to buy the Class Vehicle based in part

19   on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

20   representations, along with the advertised fuel economy were among the primary reasons Plaintiff

21   chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle

22   could perform as advertised only by emitting NOx at levels that are greater than advertised and

23   above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed

24   and unauthorized emission control devices designed to cheat emission tests and to deceive

25   consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have

26   paid less for it, had he known that it did not comply with emission standards; that its emission

27   treatment system was designed to de-activate during real-world driving conditions; and that it

28   could not achieve the advertised towing power, performance, and/or fuel economy without

-15-

cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

41. Plaintiff **Adam Burwell** (for the purpose of this paragraph, "Plaintiff"), a citizen of Oregon, residing in Klamath Falls, Oregon, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 31, 2016 at Dave Smith Motors, an authorized FCA dealer in Kellogg, Idaho. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions). These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

42. Plaintiff **Karl Calhoun** (for the purpose of this paragraph, "Plaintiff"), a citizen of Washington, residing in Moses Lake, Washington, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about January 16, 2016 at Dave Smith Motors in Kellogg, Idaho. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions). These representations, along with the advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the Class Vehicle. At the time of purchase, Plaintiff did not know

1    that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

2    than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

3    equipped with undisclosed and unauthorized emission control devices designed to cheat emission

4    tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

5    Vehicle, or would have paid less for it, had he known that it did not comply with emission

6    standards; that its emission treatment system was designed to de-activate during real-world

7    driving conditions; and that it could not achieve the advertised towing power, performance,

8    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

9    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

10   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

11   control devices.

12        43.    Plaintiff **Giuseppe Carillo** (for the purpose of this paragraph, "Plaintiff"), a citizen

13   of New York, residing in Amawalk, New York, bought a 2016 Ram 1500 EcoDiesel® (for the

14   purpose of this paragraph, the "Class Vehicle") on or about August 2016 at Danbury Dodge, an

15   authorized FCA dealer in Danbury, Connecticut.  Plaintiff decided to buy the Class Vehicle based

16   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).

17   These representations, along with the advertised fuel economy, towing power, and/or

18   performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

19   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

20   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

21   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

22   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

23   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

24   comply with emission standards; that its emission treatment system was designed to de-activate

25   during real-world driving conditions; and that it could not achieve the advertised towing power,

26   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

27   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

28

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

2    unauthorized emission control devices.

3        44.    Plaintiff **Aaron Carter** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4    Illinois, residing in Swansea, Illinois, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the

5    purpose of this paragraph, the "Class Vehicle") on or about October 17, 2015 at Oliver C. Joseph

6    Chrysler Dodge Jeep, an authorized FCA dealer in Belleville, Illinois.  Plaintiff decided to buy

7    the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

8    reduced emissions).  These representations, along with the advertised fuel economy, towing

9    power, and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

10   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

11   only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

12   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

13   control devices designed to cheat emission tests and to deceive consumers and regulators.

14   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

15   known that it did not comply with emission standards; that its emission treatment system was

16   designed to de-activate during real-world driving conditions; and that it could not achieve the

17   advertised towing power, performance, and/or fuel economy without cheating emission tests.

18   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

19   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

20   Defendants not concealed the unauthorized emission control devices.

21       45.    Plaintiff **Chatom Motor Company, Inc.** (for the purpose of this paragraph,

22   "Plaintiff"), a domestic corporation organized under the laws of Alabama, with its principal place

23   of business in Chatom, Alabama, and a citizen of Alabama, bought a 2015 Ram 1500 EcoDiesel®

24   (for the purpose of this paragraph, the "Class Vehicle") on or about February 1, 2017 for the

25   purpose of reselling the Class Vehicle.  Plaintiff decided to buy and market the Class Vehicle

26   based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

27   emissions).  These representations, along with the advertised fuel economy, towing power, and/or

28   performance were among the primary reasons Plaintiff chose the Class Vehicle to purchase and

1   offer for resale.  At the time of purchase, Plaintiff did not know that the Class Vehicle could not

2   perform as advertised and in fact emitted NOx at levels that are greater than advertised and above

3   legal limits.  Nor was Plaintiff aware that its Class Vehicle was equipped with undisclosed and

4   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

5   and regulators.  Plaintiff would not have purchased and marketed for resale the Class Vehicle, or

6   would have paid less for it, had it known that the Class Vehicle did not comply with emission

7   standards; that its emission treatment system was designed to de-activate during real-world

8   driving conditions; or that it could not achieve the advertised towing power, performance, and/or

9   fuel economy without cheating emission tests.  Plaintiff also would not have invested additional

10   resources to increase the value of the Class Vehicle for resale had it known that the Class Vehicle

11   did not comply with emission standards; that its emission treatment system was designed to de-

12   activate during real-world driving conditions; or that it could not achieve the advertised towing

13   power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered

14   a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

15   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

16   unauthorized emission control devices.

17        46.    Plaintiff **Jose Chavez** (for the purpose of this paragraph, "Plaintiff"), a citizen of

18   California, residing in Antioch, California, purchased a 2016 Ram 1500 EcoDiesel® (for the

19   purpose of this paragraph, the "Class Vehicle") on or about August 26, 2016 at Hilltop Chrysler

20   Jeep Dodge, an authorized FCA dealer in Richmond, California. Plaintiff decided to purchase the

21   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

22   reduced emissions). These representations, along with the advertised fuel economy and

23   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

24   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

25   emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff

26   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

27   devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would

28   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

-19-

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-2777-EMC

1   comply with emission standards; that its emission treatment system was designed to de-activate

2   during real-world driving conditions; and that it could not achieve the advertised towing power,

3   performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

4   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

5   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

6   unauthorized emission control devices.

7        47.    Plaintiff **Josh Claflin** (for the purpose of this paragraph, "Plaintiff"), a citizen of

8   Wisconsin, residing in Ellsworth, Wisconsin, leased a 2015 Ram 1500 EcoDiesel® (for the

9   purpose of this paragraph, the "Class Vehicle") on or about April 15, 2015 at Fury Motors in St.

10   Paul, Minnesota. Plaintiff decided to buy the Class Vehicle based in part on FCA's

11   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

12   representations, along with the advertised fuel economy and low emissions were among the

13   primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

14   that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

15   than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

16   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

17   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

18   Vehicle, or would have paid less for it, had he known that it did not comply with emission

19   standards; that its emission treatment system was designed to de-activate during real-world

20   driving conditions; and that it could not achieve the advertised towing power, performance,

21   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

22   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

23   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

24   control devices.

25        48.    Plaintiff **James DeBerry** (for the purpose of this paragraph, "Plaintiff"), a citizen

26   of Florida, residing in Navarre, Florida, purchased a 2016 Ram 1500 EcoDiesel® (for the purpose

27   of this paragraph, the "Class Vehicle") on or about April 29, 2016 at Five Star Chrysler, Jeep,

28   Dodge, Ram, an authorized FCA dealer in Warner Robins, Georgia.  Plaintiff decided to purchase

1  the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

2  reduced emissions).  These representations, along with the advertised fuel economy and

3  performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

4  purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

5  emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

6  aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

7  devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

8  not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

9  comply with emission standards; that its emission treatment system was designed to de-activate

10 during real-world driving conditions; and that it could not achieve the advertised towing power,

11 performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

12 concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

13 purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

14 unauthorized emission control devices.

15         49.     Plaintiff **Henry Desroches** (for the purpose of this paragraph, "Plaintiff") a citizen

16 of Maine, residing in Norridgewock, Maine, bought a 2016 Ram 1500 EcoDiesel® (for the

17 purpose of this paragraph, the "Class Vehicle") in or about October or November 2016 at Central

18 Maine Chrysler Jeep Dodge Ram, an authorized FCA dealer in Waterville, Maine. Plaintiff

19 decided to buy the Class Vehicle based in part on FCA's representations that it was an

20 "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

21 fuel economy and low emissions were among the primary reasons Plaintiff chose the Class

22 Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

23 advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

24 Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

25 emission control devices designed to cheat emission tests and to deceive consumers and

26 regulators. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

27 had he known that it did not comply with emission standards; that its emission treatment system

28 was designed to de-activate during real-world driving conditions; and that it could not achieve the

1    advertised towing power, performance, and/or fuel economy without cheating emission tests.

2    Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

3    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

4    Defendants not concealed the unauthorized emission control devices.

5          50.    Plaintiff **Anthony Edwards**, (for the purpose of this paragraph, "Plaintiff"), a

6    citizen of Tennessee, residing in Cleveland, Tennessee, bought  a 2015 Ram EcoDiesel® (for the

7    purpose of this paragraph, the "Class Vehicle") in or about November 2016 at Collierville Dodge

8    Ram, an authorized FCA dealer in Collierville, Tennessee.  Plaintiff decided to buy the Class

9    Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

10   emissions).  These representations, along with the advertised fuel economy, towing power, and/or

11   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

12   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

13   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

14   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

15   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

16   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

17   comply with emission standards; that its emission treatment system was designed to de-activate

18   during real-world driving conditions; and that it could not achieve the advertised towing power,

19   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

20   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

21   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

22   unauthorized emission control devices.

23         51.    Plaintiff **Steven Elowitz** (for the purpose of this paragraph, "Plaintiff"), a citizen

24   of Arizona, residing in Mesa, Arizona, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of

25   this paragraph, the "Class Vehicle") on or about December 24, 2015 at Earnhardt Dodge Ram, an

26   authorized FCA dealer in Gilbert, Arizona.  Plaintiff decided to buy the Class Vehicle based in

27   part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

28   representations, along with the advertised fuel economy and low emissions were among the

1   primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

2   that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

3   than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

4   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

5   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

6   Vehicle, or would have paid less for it, had he known that it did not comply with emission

7   standards; that its emission treatment system was designed to de-activate during real-world

8   driving conditions; and that it could not achieve the advertised towing power, performance,

9   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

10  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

11  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

12  control devices.

13          52.     Plaintiff  **Marianna Falco** (for the purpose of this paragraph, "Plaintiff"), a citizen

14  of California, residing in Irvine, California bought a 2015 Jeep Grand Cherokee EcoDiesel® (for

15  the purpose of this paragraph, the "Class Vehicle") on or about June 9, 2015 from Tuttle-Click

16  Inc., an authorized FCA dealer in Irvine, California.  Plaintiff decided to buy the Class Vehicle

17  based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

18  emissions).  These representations, along with the advertised fuel economy, towing power, and/or

19  performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

20  purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

21  emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

22  aware that her Class Vehicle was equipped with undisclosed and unauthorized emission control

23  devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

24  not have purchased the Class Vehicle, or would have paid less for it, had she known that it did not

25  comply with emission standards; that its emission treatment system was designed to de-activate

26  during real-world driving conditions; and that it could not achieve the advertised towing power,

27  performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

28  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

1  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

2  unauthorized emission control devices.

3       53.    Plaintiff **Mathue Fasching** (for the purpose of this paragraph, "Plaintiff"), a

4  citizen of Idaho, residing in Lowman, Idaho, bought a 2016 Ram 1500 EcoDiesel® (for the

5  purpose of this paragraph, the "Class Vehicle") on or about July 10, 2016 at Lithia Chrysler Jeep

6  Dodge of Grants Pass, an authorized FCA dealer in Grants Pass, Oregon. Plaintiff decided to buy

7  the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

8  reduced emissions).  These representations, along with the advertised fuel economy and low

9  emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

10  purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

11  emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

12  aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

13  devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

14  not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

15  comply with emission standards; that its emission treatment system was designed to de-activate

16  during real-world driving conditions; and that it could not achieve the advertised towing power,

17  performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

18  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

19  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

20  unauthorized emission control devices.

21       54.    Plaintiff **Victor Feldman** (for the purpose of this paragraph, "Plaintiff"), a citizen

22  of Alabama, residing in Huntsville, Alabama purchased a 2015 Ram 1500 EcoDiesel® (for the

23  purpose of this paragraph, the "Class Vehicle") on or about November 18, 2016 at Dodge

24  Country, an authorized FCA dealer in Killeen, Texas.  Plaintiff decided to purchase the Class

25  Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

26  emissions).  These representations, along with the advertised fuel economy and performance,

27  were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

28  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

-24-

1    levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

2    Class Vehicle was equipped with undisclosed and unauthorized emission control devices

3    designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

4    have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

5    comply with emission standards; that its emission treatment system was designed to de-activate

6    during real-world driving conditions; and that it could not achieve the advertised towing power,

7    performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

8    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

9    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

10   unauthorized emission control devices.

11          55.     Plaintiff **Miguel Fragoso** (for the purpose of this paragraph, "Plaintiff"), a citizen

12   of North Carolina, residing in Cary, North Carolina, leased a 2016 Jeep Grand Cherokee

13   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 4, 2016

14   at Leith Jeep, an authorized FCA dealer in Cary, North Carolina.  Plaintiff decided to lease the

15   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

16   reduced emissions).  These representations, along with the advertised fuel economy and

17   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

18   lease, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting

19   NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that

20   his Class Vehicle was equipped with undisclosed and unauthorized emission control devices

21   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

22   have leased the Class Vehicle, or would have paid less for it, had he known that it did not comply

23   with emission standards; that its emission treatment system was designed to de-activate during

24   real-world driving conditions; and that it could not achieve the advertised towing power,

25   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

26   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

27   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

28   unauthorized emission control devices.

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

56.     Plaintiff **Leslie Ghrist** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in Simi Valley, California, leased a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about October 6, 2016 at Shaver Chrysler Dodge Jeep Ram & Fiat, an authorized FCA dealer in Thousand Oaks, California.  Plaintiff decided to lease the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that her Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it, had she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have leased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

57.     Plaintiff **Gregory Giauque** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in San Luis Obispo County, California, purchased a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July 29, 2016 at Airpark Dodge, an authorized FCA dealer in Scottsdale, Arizona.  Plaintiff decided to purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

1  emission control devices designed to cheat emission tests and to deceive consumers and

2  regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

3  had he known that it did not comply with emission standards; that its emission treatment system

4  was designed to de-activate during real-world driving conditions; and that it could not achieve the

5  advertised towing power, performance, and/or fuel economy without cheating emission tests.

6  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

7  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

8  Defendants not concealed the unauthorized emission control devices.

9        58.    Plaintiff **Tom Gillespe** (for the purpose of this paragraph, "Plaintiff"), a citizen of

10  Georgia, residing in Ray City, Georgia, purchased a 2014 Ram 1500 EcoDiesel® (for the purpose

11  of this paragraph, the "Class Vehicle") on or about April 27, 2015 at Carl Gregory Chrysler Jeep

12  and Dodge, an authorized FCA dealer in Brunswick, Georgia.  Plaintiff decided to buy the Class

13  Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

14  emissions).  These representations, along with the advertised fuel economy and performance,

15  were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

16  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

17  levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

18  Class Vehicle was equipped with undisclosed and unauthorized emission control devices

19  designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

20  have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

21  comply with emission standards; that its emission treatment system was designed to de-activate

22  during real-world driving conditions; and that it could not achieve the advertised towing power,

23  performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

24  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

25  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

26  unauthorized emission control devices.

27        59.    Plaintiff **GN Systems, Inc.**, a Florida corporation (for the purpose of this

28  paragraph, "Plaintiff"), a citizen of Florida with its principal place of business in Wellington,

-27-

Florida, bought five Dodge Ram 1500 EcoDiesel® vehicles as follows (for the purpose of this paragraph, the "Class Vehicles"): (1) 2016 Ram 1500 EcoDiesel® on or about September 10, 2016 at Rob Lambdin's University Dodge Ram, an authorized FCA dealer in Davie, Florida; (2) 2016 Ram 1500 EcoDiesel® on or about July 24, 2016 at University Dodge, an authorized FCA dealer in Davie, Florida; (3) 2015 Ram 1500 EcoDiesel® on or about February 29, 2016 at University Dodge, an authorized FCA dealer in Davie, Florida; (4) 2014 Ram 1500 EcoDiesel® on or about June 18, 2014 at University Dodge, an authorized FCA dealer in Davie, Florida; and (5) 2014 Ram 1500 EcoDiesel® on or about June 9, 2014 at University Dodge, an authorized FCA dealer in Davie, Florida.  Plaintiff decided to buy the Class Vehicles based in part on FCA's representations that they were "EcoDiesel" vehicles (i.e., reduced emissions).  These representations, along with the advertised fuel economy, towing power, and performance, were among the primary reasons Plaintiff chose the Class Vehicles.  At the time of purchase, Plaintiff did not know that the Class Vehicles could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that its Class Vehicles were equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had it known that they did not comply with emission standards; that their emission treatment systems were designed to de-activate during real-world driving conditions; and that they could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicles, or would have paid less for them, had Defendants not concealed the unauthorized emission control devices.

60.     Plaintiff **Benjamin Greenberg** (for the purpose of this paragraph, "Plaintiff"), a citizen of Massachusetts, residing in Maynard, Massachusetts, leased a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about March 24, 2015 at Kelly Jeep Chrysler, an authorized FCA dealer in Lynnfield, Massachusetts.  Plaintiff decided to lease the Class Vehicle based in part on FCA's representations that it was an

1    "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

2    fuel economy and performance, were among the primary reasons Plaintiff chose the Class

3    Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could perform as

4    advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

5    Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

6    emission control devices designed to cheat emission tests and to deceive consumers and

7    regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it, had

8    he known that it did not comply with emission standards; that its emission treatment system was

9    designed to de-activate during real-world driving conditions; and that it could not achieve the

10   advertised towing power, performance, and/or fuel economy without cheating emission tests.

11   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

12   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

13   Defendants not concealed the unauthorized emission control devices.

14          61.     Plaintiff **Jeffrey Griggs** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15   Tennessee, residing in Georgetown, Tennessee, bought a 2014 Ram 1500 EcoDiesel® (for the

16   purpose of this paragraph, the "Class Vehicle") in or about October 2014 at Mountain View

17   Chrysler Dodge Jeep Ram, an authorized FCA dealer in Ringgold, Georgia.  Plaintiff decided to

18   buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

19   (i.e., reduced emissions).  These representations, along with the advertised fuel economy, towing

20   power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

21   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

22   only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

23   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

24   control devices designed to cheat emission tests and to deceive consumers and regulators.

25   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

26   known that it did not comply with emission standards; that its emission treatment system was

27   designed to de-activate during real-world driving conditions; and that it could not achieve the

28   advertised towing power, performance, and/or fuel economy without cheating emission tests.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

2    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

3    Defendants not concealed the unauthorized emission control devices.

4          62.    Plaintiff **Jake Gunderson** (for the purpose of this paragraph, "Plaintiff"), a citizen

5    of New Mexico residing in Los Alamos, New Mexico, bought a 2015 Ram 1500 EcoDiesel® (for

6    the purpose of this paragraph, the "Class Vehicle") on or about March 7, 2015 at Lithia Chrysler

7    Dodge Jeep Ram Fiat of Santa Fe, an authorized FCA dealer in Santa Fe, New Mexico.  Plaintiff

8    decided to buy the Class Vehicle based in part on FCA's representations that it was an

9    "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

10   fuel economy, towing power, performance, and comfort were among the primary reasons Plaintiff

11   chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle

12   could perform as advertised only by emitting NOx at levels that are greater than advertised and

13   above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed

14   and unauthorized emission control devices designed to cheat emission tests and to deceive

15   consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have

16   paid less for it, had he known that it did not comply with emission standards; that its emission

17   treatment system was designed to de-activate during real-world driving conditions; and that it

18   could not achieve the advertised towing power, performance, and/or fuel economy without

19   cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

20   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

21   less for it, had Defendants not concealed the unauthorized emission control devices.

22         63.    Plaintiffs **Kyle and Jessica Heidlebaugh** (for the purpose of this paragraph,

23   "Plaintiffs"), citizens of Pennsylvania, residing in Spring Grove, Pennsylvania, purchased a 2014

24   Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or

25   about May 4, 2014 at Don White's Chrysler Dodge Jeep Ram, an authorized FCA dealer in

26   Cockeysville, Maryland.  Plaintiffs decided to purchase the Class Vehicle based in part on FCA's

27   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

28   representations, along with the advertised fuel economy and performance, were among the

1   primary reasons Plaintiffs chose the Class Vehicle.  At the time of purchase, Plaintiffs did not

2   know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are

3   greater than advertised and above legal limits.  Nor were Plaintiffs aware that their Class Vehicle

4   was equipped with undisclosed and unauthorized emission control devices designed to cheat

5   emission tests and to deceive consumers and regulators.  Plaintiffs would not have purchased the

6   Class Vehicle, or would have paid less for it, had they known that it did not comply with emission

7   standards; that its emission treatment system was designed to de-activate during real-world

8   driving conditions; and that it could not achieve the advertised towing power, performance,

9   and/or fuel economy without cheating emission tests.  Plaintiffs have suffered a concrete injury as

10  a direct and proximate result of Defendants' misconduct, and would not have purchased the Class

11  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

12  control devices.

13          64.     Plaintiff **Brian Hiner** (for the purpose of this paragraph, "Plaintiff") a citizen of

14  Virginia, residing in Covington, Virginia, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for

15  the purpose of this paragraph, the "Class Vehicle") in or about March 2014 at Alleghany Chrysler

16  Dodge Jeep Ram, an authorized FCA dealer in Covington, Virginia.  Plaintiff decided to buy the

17  Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

18  reduced emissions).  These representations, along with the advertised fuel economy and low

19  emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

20  purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

21  emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff

22  aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

23  devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would

24  not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

25  comply with emission standards; that its emission treatment system was designed to de-activate

26  during real-world driving conditions; and that it could not achieve the advertised towing power,

27  performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

28  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

1   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

2   unauthorized emission control devices.

3       65.    Plaintiff **Charles Patrick Hissey** (for the purpose of this paragraph, "Plaintiff"), a

4   citizen of Texas, residing in Montgomery, Texas, bought a 2015 Jeep Grand Cherokee

5   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about May 13, 2015 at

6   DeMontrond Chrysler Dodge Jeep Ram, an authorized FCA dealer in Conroe, Texas.  Plaintiff

7   decided to buy the Class Vehicle based in part on FCA's representations that it was an

8   "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

9   fuel economy, towing power, and/or performance were among the primary reasons Plaintiff chose

10  the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

11  perform as advertised only by emitting NOx at levels that are greater than advertised and above

12  legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

13  unauthorized emission control devices designed to cheat emission tests and to deceive consumers

14  and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

15  it, had he known that it did not comply with emission standards; that its emission treatment

16  system was designed to de-activate during real-world driving conditions; and that it could not

17  achieve the advertised towing power, performance, and/or fuel economy without cheating

18  emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

19  Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

20  less for it, had Defendants not concealed the unauthorized emission control devices.

21      66.    Plaintiff **Lee Holland** (for the purpose of this paragraph, "Plaintiff"), a citizen of

22  Oklahoma, residing in Lexington, Oklahoma, bought a 2015 Ram 1500 EcoDiesel® (for the

23  purpose of this paragraph, the "Class Vehicle") on or about September 10, 2015 at David Stanley

24  Chrysler Jeep Dodge Ram, an authorized FCA dealer in Midwest City, Oklahoma.  Plaintiff

25  decided to buy the Class Vehicle based in part on FCA's representations that it was an

26  "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

27  fuel economy, towing power, and performance were among the primary reasons Plaintiff chose

28  the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

1   perform as advertised only by emitting NOx at levels that are greater than advertised and above

2   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

3   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

4   and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

5   it, had he known that it did not comply with emission standards; that its emission treatment

6   system was designed to de-activate during real-world driving conditions; and that it could not

7   achieve the advertised towing power, performance, and/or fuel economy without cheating

8   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

9   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

10   less for it, had Defendants not concealed the unauthorized emission control devices.

11       67.     Plaintiff **Ronald Holm** (for the purpose of this paragraph, "Plaintiff"), a citizen of

12   Montana, residing in Butte, Montana, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of

13   this paragraph, the "Class Vehicle") in or about January 2016 at Butte's Mile High Chrysler Jeep

14   Dodge Ram, an authorized FCA dealer in Butte, Montana. Plaintiff decided to buy the Class

15   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

16   emissions).  These representations, along with the advertised fuel economy and low emissions

17   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

18   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

19   levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

20   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

21   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

22   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

23   comply with emission standards; that its emission treatment system was designed to de-activate

24   during real-world driving conditions; and that it could not achieve the advertised towing power,

25   performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

26   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

27   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

28   unauthorized emission control devices.

-33-

68.     Plaintiff **Richard Jackson** (for the purpose of this paragraph, "Plaintiff"), a citizen of Delaware, residing in Dover, Delaware, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about April 1, 2015 at Carman Chrysler Jeep Dodge, an authorized FCA dealer in New Castle, Delaware.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased OR leased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

69.     Plaintiff **Michael R. Johnson** (for the purpose of this paragraph, "Plaintiff"), a citizen of Georgia, residing in Mableton, Georgia, bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 2015 at Big O Dodge, an authorized FCA dealer in Greenville, South Carolina. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

2   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

3   comply with emission standards; that its emission treatment system was designed to de-activate

4   during real-world driving conditions; and that it could not achieve the advertised towing power,

5   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

6   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

7   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

8   unauthorized emission control devices.

9          70.     Plaintiff **Andrew Loescher** (for the purpose of this paragraph, "Plaintiff"), a

10   citizen of Washington, residing in Vancouver, Washington, purchased a 2015 Ram 1500

11   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about December 28,

12   2016 at Marketplace Motors in Devils Lake, North Dakota.  Plaintiff decided to purchase the

13   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

14   reduced emissions).  These representations, along with the advertised fuel economy and

15   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

16   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

17   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

18   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

19   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

20   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

21   comply with emission standards; that its emission treatment system was designed to de-activate

22   during real-world driving conditions; and that it could not achieve the advertised towing power,

23   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

24   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

25   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

26   unauthorized emission control devices.

27          71.     Plaintiff **William Markin** (for the purpose of this paragraph, "Plaintiff"), a citizen

28   of Colorado, residing in Golden, Colorado, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for

1    the purpose of this paragraph, the "Class Vehicle") on or about August 29, 2014 at AutoNation

2    Chrysler Jeep West, an authorized FCA dealer in Golden, Colorado.  Plaintiff decided to buy the

3    Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

4    reduced emissions).  These representations, along with the advertised fuel economy, towing

5    power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

6    the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

7    only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

8    Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

9    control devices designed to cheat emission tests and to deceive consumers and regulators.

10   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

11   known that it did not comply with emission standards; that its emission treatment system was

12   designed to de-activate during real-world driving conditions; and that it could not achieve the

13   advertised towing power, performance, and/or fuel economy without cheating emission tests.

14   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

15   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

16   Defendants not concealed the unauthorized emission control devices.

17        72.    Plaintiff **Christopher Mattingly** (for the purpose of this paragraph, "Plaintiff"), a

18   citizen of Nevada, residing in Las Vegas, Nevada, bought a 2016 Ram 1500 EcoDiesel® (for the

19   purpose of this paragraph, the "Class Vehicle") on or about November 7, 2016 at Chapman Las

20   Vegas Dodge Chrysler Jeep Ram, an authorized FCA dealer in Las Vegas, Nevada.  Plaintiff

21   decided to buy the Class Vehicle based in part on FCA's representations that it was an

22   "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

23   fuel economy, towing power, and performance were among the primary reasons Plaintiff chose

24   the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

25   perform as advertised only by emitting NOx at levels that are greater than advertised and above

26   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

27   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

28   and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

-36-

1   it, had he known that it did not comply with emission standards; that its emission treatment

2   system was designed to de-activate during real-world driving conditions; and that it could not

3   achieve the advertised towing power, performance, and/or fuel economy without cheating

4   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

5   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

6   less for it, had Defendants not concealed the unauthorized emission control devices.

7        73.    Plaintiff **Thomas McGann, Jr.** (for the purpose of this paragraph, "Plaintiff"), a

8   citizen of New York, residing in North Tonawanda, New York, bought a 2016 Ram 1500

9   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September 24,

10  2016 at Lessord Dodge, an authorized FCA dealer in Sodus, New York.  Plaintiff decided to buy

11  the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

12  reduced emissions).  These representations, along with the advertised fuel economy, towing

13  power, and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

14  the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

15  only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

16  Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

17  control devices designed to cheat emission tests and to deceive consumers and regulators.

18  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

19  known that it did not comply with emission standards; that its emission treatment system was

20  designed to de-activate during real-world driving conditions; and that it could not achieve the

21  advertised towing power, performance, and/or fuel economy without cheating emission tests.

22  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

23  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

24  Defendants not concealed the unauthorized emission control devices.

25       74.    Plaintiff **Ernest Melin, Jr.** (for the purpose of this paragraph, "Plaintiff"), a

26  citizen of South Carolina, residing in Mount Pleasant, South Carolina, bought a 2016 Ram 1500

27  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about February 3, 2016

28  at Rick Hendrick Dodge Chrysler Jeep, an authorized FCA dealer in Charleston, South Carolina.

1    Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an

2    "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

3    fuel economy, towing power, and/or performance were among the primary reasons Plaintiff chose

4    the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

5    perform as advertised only by emitting NOx at levels that are greater than advertised and above

6    legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

7    unauthorized emission control devices designed to cheat emission tests and to deceive consumers

8    and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

9    it, had he known that it did not comply with emission standards; that its emission treatment

10   system was designed to de-activate during real-world driving conditions; and that it could not

11   achieve the advertised towing power, performance, and/or fuel economy without cheating

12   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

13   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

14   less for it, had Defendants not concealed the unauthorized emission control devices.

15        75.    Plaintiff **George Milner** (for the purpose of this paragraph, "Plaintiff"), a citizen

16   of New York, residing in Mechanicville, New York, purchased a 2014 Ram 1500 EcoDiesel®

17   (for the purpose of this paragraph, the "Class Vehicle") on or about October 5, 2014 at Zappone

18   Chrysler Dodge, an authorized FCA dealer in Clifton Park, New York.  Plaintiff decided to

19   purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel"

20   vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy

21   and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time

22   of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

23   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

24   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

25   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

26   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

27   comply with emission standards; that its emission treatment system was designed to de-activate

28   during real-world driving conditions; and that it could not achieve the advertised towing power,

performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

unauthorized emission control devices.

76.     Plaintiff **Bryan Thomas Muckenfuss** (for the purpose of this paragraph,

"Plaintiff"), a citizen of South Carolina, residing in Ravenel, South Carolina, bought a 2015 Ram

1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about November

1, 2015 at Rick Hendrick Dodge Chrysler Jeep, an authorized FCA dealer in Charleston, South

Carolina.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it

was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the

advertised fuel economy, towing power, and/or performance were among the primary reasons

Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class

Vehicle could perform as advertised only by emitting NOx at levels that are greater than

advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

with undisclosed and unauthorized emission control devices designed to cheat emission tests and

to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

would have paid less for it, had he known that it did not comply with emission standards; that its

emission treatment system was designed to de-activate during real-world driving conditions; and

that it could not achieve the advertised towing power, performance, and/or fuel economy without

cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

less for it, had Defendants not concealed the unauthorized emission control devices.

77.     Plaintiff **Michael K. Norton** (for the purpose of this paragraph, "Plaintiff"), a

citizen of New Jersey, residing in Riverdale, New Jersey, bought a 2014 Jeep Grand Cherokee

EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July 30, 2014 at

Precision Jeep, an authorized FCA dealer in Butler, New Jersey. Plaintiff decided to buy the Class

Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

emissions).  These representations, along with the advertised fuel economy and low emissions

1    were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

2    Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

3    levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

4    Class Vehicle was equipped with undisclosed and unauthorized emission control devices

5    designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

6    have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

7    comply with emission standards; that its emission treatment system was designed to de-activate

8    during real-world driving conditions; and that it could not achieve the advertised towing power,

9    performance, and/or fuel economy without cheating emission tests.  Plaintiff sold the Class

10   Vehicle in or about May 2017, after the defeat device allegations became public, to Precision

11   Chrysler Jeep Dodge Ram in Butler, New Jersey.  Plaintiff has suffered a concrete injury as a

12   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

13   Vehicle, or would have paid less for it, and/or would have been able to sell it for more, had

14   Defendants not concealed the unauthorized emission control devices.

15        78.    Plaintiff **Kirk Petersen** (for the purpose of this paragraph, "Plaintiff"), a citizen of

16   Iowa, residing in Muscatine, Iowa, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this

17   paragraph, the "Class Vehicle") in or about August 2015 at Deery Brothers Chrysler Dodge Jeep

18   Ram, an authorized FCA dealer in Iowa City, Iowa.  Plaintiff decided to buy the Class Vehicle

19   based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

20   emissions). These representations, advertised fuel economy, towing power, and performance,

21   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

22   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

23   levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

24   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

25   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

26   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

27   comply with emission standards; that its emission treatment system was designed to de-activate

28   during real-world driving conditions; and that it could not achieve the advertised towing power,

1    performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

2    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

3    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

4    unauthorized emission control devices.

5           79.    Plaintiff **Melvin Phillips** (for the purpose of this paragraph, "Plaintiff"), a citizen

6    of Missouri, residing in Aurora, Missouri, bought a 2015 Ram 1500 EcoDiesel® (for the purpose

7    of this paragraph, the "Class Vehicle") on or about October 9, 2015, at Ramsey Motor Company,

8    an authorized FCA dealer in Harrison, Arkansas.  Plaintiff decided to buy the Class Vehicle based

9    in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).

10   These representations, along with the advertised fuel economy, towing power, and performance

11   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

12   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

13   levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

14   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

15   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

16   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

17   comply with emission standards; that its emission treatment system was designed to de-activate

18   during real-world driving conditions; and that it could not achieve the advertised towing power,

19   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

20   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

21   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

22   unauthorized emission control devices.

23          80.    Plaintiff **Samuel Price** (for the purpose of this paragraph, "Plaintiff"), a citizen of

24   Louisiana, residing in Fort Polk City, Louisiana purchased a 2014 Ram 1500 EcoDiesel® (for the

25   purpose of this paragraph, the "Class Vehicle") in or about July 2014 at Crown Dodge, an

26   authorized FCA dealer in Fayetteville, North Carolina.  Plaintiff decided to purchase the Class

27   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

28   emissions).  These representations, along with the advertised fuel economy and performance,

1   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

2   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

3   levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

4   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

5   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

6   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

7   comply with emission standards; that its emission treatment system was designed to de-activate

8   during real-world driving conditions; and that it could not achieve the advertised towing power,

9   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

10  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

11  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

12  unauthorized emission control devices.

13       81.     Plaintiff **John James Radziewicz** (for the purpose of this paragraph, "Plaintiff"), a

14  citizen of Louisiana, residing in New Orleans, Louisiana, bought a 2014 Jeep Grand Cherokee

15  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about June 24, 2015 at

16  Banner Chevrolet, an authorized FCA dealer in New Orleans, Louisiana.  Plaintiff decided to buy

17  the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

18  reduced emissions).  These representations, along with the advertised fuel economy, towing

19  power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

20  the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

21  only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

22  Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

23  control devices designed to cheat emission tests and to deceive consumers and regulators.

24  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

25  known that it did not comply with emission standards; that its emission treatment system was

26  designed to de-activate during real-world driving conditions; and that it could not achieve the

27  advertised towing power, performance, and/or fuel economy without cheating emission tests.

28  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

1    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

2    Defendants not concealed the unauthorized emission control devices.

3           82.    Plaintiff **Bobby Gene Reichert** (for the purpose of this paragraph, "Plaintiff"), a

4    citizen of Florida, residing in Boca Raton, Florida, bought a 2016 Ram 1500 EcoDiesel® (for the

5    purpose of this paragraph, the "Class Vehicle") in or about December 2015 at Arrigo Dodge

6    Chrysler Jeep Sawgrass, an authorized FCA dealer in Tamarac, Florida.  Plaintiff decided to buy

7    the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

8    reduced emissions).  These representations, along with the advertised towing power, were among

9    the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not

10   know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are

11   greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

12   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

13   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

14   Vehicle, or would have paid less for it, had he known that it did not comply with emission

15   standards; that its emission treatment system was designed to de-activate during real-world

16   driving conditions; and that it could not achieve the advertised towing power, performance,

17   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

18   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

19   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

20   control devices.

21          83.    Plaintiff **Mark Richards** (for the purpose of this paragraph, "Plaintiff"), a citizen

22   of Indiana, residing in Franklin, Indiana, bought a 2016 Ram 1500 EcoDiesel® (for the purpose

23   of this paragraph, the "Class Vehicle") on or about March 5, 2016 at Champion Chrysler Jeep

24   Dodge Ram, an authorized FCA dealer in Indianapolis, Indiana.  Plaintiff decided to buy the

25   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

26   reduced emissions).  These representations, along with the advertised fuel economy, were among

27   the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not

28   know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are

-43-

greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

84.     Plaintiff **Jon Roberts** (for the purpose of this paragraph, "Plaintiff") a citizen of Ohio, residing in Amherst, Ohio, bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") in or about June 2014 at Sliman's Sales & Services, an authorized FCA dealer in Amherst, Ohio.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions). These representations, along with the advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

-44-

85.     Plaintiff **Kelly Ruiz** (for the purpose of this paragraph, "Plaintiff"), a citizen of Wyoming residing in Cheyenne, Wyoming, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about April 19, 2014  at Cowboy Dodge in Cheyenne, Wyoming.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

86.     Plaintiff **Jesse Sandifer** (for the purpose of this paragraph, "Plaintiff"), a citizen of Washington, residing in Olalla, Washington, purchased a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September 24, 2016 at West Hills Chrysler Jeep Dodge, an authorized FCA dealer in Bremerton, Washington.  Plaintiff decided to purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

1    devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

2    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

3    comply with emission standards; that its emission treatment system was designed to de-activate

4    during real-world driving conditions; and that it could not achieve the advertised towing power,

5    performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

6    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

7    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

8    unauthorized emission control devices.

9         87.    Plaintiff **Miguel Silio** (for the purpose of this paragraph, "Plaintiff"), a citizen of

10   Florida, residing in Auburndale, Florida, purchased a 2015 Jeep Grand Cherokee EcoDiesel® (for

11   the purpose of this paragraph, the "Class Vehicle") in or about June 2015 at Arrigo Dodge

12   Chrysler, an authorized FCA dealer in West Palm Beach, Florida.  Plaintiff decided to purchase

13   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

14   reduced emissions).  These representations, along with the advertised fuel economy and

15   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

16   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

17   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

18   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

19   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

20   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

21   comply with emission standards; that its emission treatment system was designed to de-activate

22   during real-world driving conditions; and that it could not achieve the advertised towing power,

23   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

24   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

25   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

26   unauthorized emission control devices.

27        88.    Plaintiff **Satyanam Singh** (for the purpose of this paragraph, "Plaintiff"), a citizen

28   of California, residing in Sacramento, California, bought a 2016 Ram 1500 EcoDiesel® (for the

1   purpose of this paragraph, the "Class Vehicle") on or about May 1, 2016 at Roseville Automall in

2   Roseville, California.  Plaintiff decided to buy the Class Vehicle based in part on FCA's

3   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

4   representations, along with the advertised fuel economy, towing power, and performance were

5   among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

6   did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

7   that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

8   Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

9   cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

10  the Class Vehicle, or would have paid less for it, had he known that it did not comply with

11  emission standards; that its emission treatment system was designed to de-activate during real-

12  world driving conditions; and that it could not achieve the advertised towing power, performance,

13  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

14  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

15  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

16  control devices.

17          89.     Plaintiff **Nelson John Stephens** (for the purpose of this paragraph, "Plaintiff"), a

18  citizen of Georgia, residing in Fortson, Georgia bought a 2014 Ram 1500 EcoDiesel® (for the

19  purpose of this paragraph, the "Class Vehicle") on or about June 21, 2014, at Opelika Chrysler,

20  Dodge, Jeep, an authorized FCA dealer in Opelika, Alabama.  Plaintiff decided to buy the Class

21  Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

22  emissions).  These representations, along with the advertised fuel economy and towing power,

23  were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

24  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

25  levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

26  Class Vehicle was equipped with undisclosed and unauthorized emission control devices

27  designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

28  have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

1  comply with emission standards; that its emission treatment system was designed to de-activate

2  during real-world driving conditions; and that it could not achieve the advertised towing power,

3  performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

4  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

5  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

6  unauthorized emission control devices.

7        90.    Plaintiff **Wayne Tonnesen** (for the purpose of this paragraph, "Plaintiff"), a

8  citizen of New Jersey, residing in Tuckerton, New Jersey, purchased a 2016 Ram 1500

9  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about November 24,

10  2016 at Johnson Motors, an authorized FCA dealer in Columbia, Wisconsin.  Plaintiff decided to

11  purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel"

12  vehicle (i.e., reduced emissions).  These representations, along with the advertised fuel economy

13  and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time

14  of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

15  emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

16  aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

17  devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

18  not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

19  comply with emission standards; that its emission treatment system was designed to de-activate

20  during real-world driving conditions; and that it could not achieve the advertised towing power,

21  performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

22  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

23  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

24  unauthorized emission control devices.

25        91.    Plaintiff **William "Bill" Turner, III** (for the purpose of this paragraph,

26  "Plaintiff"), a citizen of Georgia, residing in Columbus, Georgia, leased a 2014 Jeep Grand

27  Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July

28  22, 2014, at Newnan Peachtree Chrysler, an authorized FCA dealer in Newnan, Georgia.  Plaintiff

-48-

1   decided to lease the Class Vehicle based in part on FCA's representations that it was an

2   "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the advertised

3   fuel economy, environmental cleanliness and the longevity of a diesel, were among the primary

4   reasons Plaintiff chose the Class Vehicle.  At the time of lease, Plaintiff did not know that the

5   Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than

6   advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

7   with undisclosed and unauthorized emission control devices designed to cheat emission tests and

8   to deceive consumers and regulators.  Plaintiff would not have leased the Class Vehicle, or would

9   have paid less for it, had he known that it did not comply with emission standards; that its

10   emission treatment system was designed to de-activate during real-world driving conditions; and

11   that it could not achieve the advertised towing power, performance, and/or fuel economy without

12   cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

13   Defendants' misconduct, and would not have leased the Class Vehicle, or would have paid less

14   for it, had Defendants not concealed the unauthorized emission control devices.

15       92.    Plaintiff **Steven Vanderlaan** (for the purpose of this paragraph, "Plaintiff"), a

16   citizen of Utah, residing in South Jordan, Utah, bought a 2015 Ram 1500 EcoDiesel® (for the

17   purpose of this paragraph, the "Class Vehicle") in or about July 2016 at Young Buick GMC, an

18   authorized FCA dealer in Layton, Utah.  Plaintiff decided to buy the Class Vehicle based in part

19   on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).  These

20   representations, along with the advertised fuel economy, towing power, and/or performance were

21   among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

22   did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

23   that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

24   Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

25   cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

26   the Class Vehicle, or would have paid less for it, had he known that it did not comply with

27   emission standards; that its emission treatment system was designed to de-activate during real-

28   world driving conditions; and that it could not achieve the advertised towing power, performance,

1    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

2    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

3    Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

4    control devices.

5          93.    Plaintiff **WEB Farms, Inc.** (for the purpose of this paragraph, "Plaintiff") is a

6    citizen of New Mexico, with its principal place of business in Melrose, New Mexico.  WEB

7    Farms, Inc. is owned by Wendell Bostwick, a citizen of Texas, residing in Lubbock, Texas.

8    Plaintiff bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class

9    Vehicle") on or about October 6, 2014 at Texas Dodge, an authorized FCA dealer in Amarillo,

10   Texas.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it

11   was an "EcoDiesel" vehicle (i.e., reduced emissions).  These representations, along with the

12   advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the

13   Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

14   perform as advertised only by emitting NOx at levels that are greater than advertised and above

15   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

16   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

17   and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

18   it, had he known that it did not comply with emission standards; that its emission treatment

19   system was designed to de-activate during real-world driving conditions; and that it could not

20   achieve the advertised towing power, performance, and/or fuel economy without cheating

21   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

22   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

23   less for it, had Defendants not concealed the unauthorized emission control devices

24         94.    Plaintiff **Stonewall J. Webster III** (for the purpose of this paragraph, "Plaintiff"),

25   a citizen of North Carolina, residing in Mayodan, North Carolina, bought a 2016 Ram 1500

26   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about January 4, 2017

27   at Victory Dodge, an authorized FCA dealer in Shallotte, North Carolina. Plaintiff decided to buy

28   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

1    reduced emissions).  These representations, along with the advertised fuel economy and low

2    emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

3    purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

4    emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

5    aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

6    devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

7    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

8    comply with emission standards; that its emission treatment system was designed to de-activate

9    during real-world driving conditions; and that it could not achieve the advertised towing power,

10   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

11   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

12   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

13   unauthorized emission control devices.

14        95.    Plaintiff **Casey Wheelock** (for the purpose of this paragraph, "Plaintiff"), a citizen

15   of Arizona, residing in Yuma, Arizona, purchased a 2016 Ram 1500 EcoDiesel® (for the purpose

16   of this paragraph, the "Class Vehicle") in or about February 2016 at Fisher Chrysler Dodge, an

17   authorized FCA dealer in Yuma, Arizona.  Plaintiff decided to purchase the Class Vehicle based

18   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions).

19   These representations, along with the advertised fuel economy and performance, were among the

20   primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

21   that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

22   than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

23   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

24   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

25   Vehicle, or would have paid less for it, had he known that it did not comply with emission

26   standards; that its emission treatment system was designed to de-activate during real-world

27   driving conditions; and that it could not achieve the advertised towing power, performance,

28   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

1   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

2   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

3   control devices.

4        96.    Plaintiff **John Casey Wilson** (for the purpose of this paragraph, "Plaintiff"), a

5   citizen of Utah, residing in Sandy, Utah, bought a 2016 Ram 1500 EcoDiesel® (for the purpose

6   of this paragraph, the "Class Vehicle") on or about November 12, 2016 at Ken Garff West Valley

7   Dodge Chrysler Jeep Ram, an authorized FCA dealer in West Valley, Utah.  Plaintiff decided to

8   buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

9   (i.e., reduced emissions).  These representations, along with the advertised fuel economy, towing

10   power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

11   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

12   only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

13   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

14   control devices designed to cheat emission tests and to deceive consumers and regulators.

15   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

16   known that it did not comply with emission standards; that its emission treatment system was

17   designed to de-activate during real-world driving conditions; and that it could not achieve the

18   advertised towing power, performance, and/or fuel economy without cheating emission tests.

19   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

20   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

21   Defendants not concealed the unauthorized emission control devices.

22                    **JURISDICTION AND VENUE**

23        97.    This Complaint is filed as an original action in this District and as the

24   Consolidated Consumer Class Action Complaint in the MDL No. 2777 proceedings, pursuant to

25   Pretrial Order No. 3 therein.

26        98.    This Court has original subject-matter jurisdiction over this action under 28 U.S.C.

27   § 1331 (federal question) and 18 U.S.C. § 1964 (RICO).  The Court also has original subject-

28   matter jurisdiction over this action under 28 U.S.C. § 1332(d), because this is a proposed class

1    action, the amount in controversy exceeds $5,000,000, and there is the required diversity of

2    citizenship pursuant to 28 U.S.C. § 1332(d)(2).  In addition, the Court has supplemental

3    jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

4           99.     This Court has personal jurisdiction over Defendants under California Code of

5    Civil Procedure section 410.10, as well as 18 U.S.C. § 1965(b) and (d).  The Court also possesses

6    pendent personal jurisdiction over Defendants.

7           100.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

8    part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

9    Defendants have marketed, advertised, sold, and leased the Class Vehicles, and otherwise

10   conducted extensive business, within this District.  In addition, or in the alternative, venue is

11   proper under 28 U.S.C. § 1407(a), which authorizes the Judicial Panel on Multidistrict Litigation

12   to transfer consolidated multidistrict litigation "to any district."

13                                   **INTRADISTRICT ASSIGNMENT**

14          101.    This action is properly assigned to the San Francisco Division of this District

15   pursuant to Civ. L.R. 3-2 because a substantial part of the events or omissions giving rise to

16   Plaintiffs' claims arose in the counties served by the San Francisco Division. Several named

17   Plaintiffs and proposed Class representatives, and many more Class members, purchased and

18   maintain their Class Vehicles in the counties served by this Division.  Moreover, FCA conducts

19   substantial business in the counties served by this Division, has marketed, advertised, sold and

20   leased the Class Vehicles in those counties, and has caused harm to Class members residing in

21   those counties.  Furthermore, this Complaint is filed as an original action in this District and as

22   the Consolidated Consumer Class Action Complaint in the MDL No. 2777 proceedings, which

23   have been consolidated before Judge Edward M. Chen, presiding in the San Francisco Division of

24   this District.

25

26

27

28

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.   FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S. "CLEAN" DIESEL MARKET

102.   As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler.  In November of that year, CEO Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a "refresh/facelift."[6]

103.   By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long time supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies.  In May of that year, Marchionne announced another five-year plan at Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to 7 million vehicles by 2018, up from 4.4 million in 2013.[7]  Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."[8]

104.   During this same time frame, emission standards in the United States were ratcheting up.  In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and ***more heavily on light-duty diesels*** and compressed natural gas."[9]  In 2012, Marchionne was quoted as saying, "with 2016 'just around

---

[6] Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan*, MotorTrend (Nov. 6, 2009), http://www.motortrend.com/news/chrysler-five-year-plan/.
[7] Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, Los Angeles Times (May 6, 2014), http://www.latimes.com/business/la-fi-chrysler-revamp-20140507-story.html.
[8] Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, MotorTrend (May 6, 2014), http://www.motortrend.com/news/ram-and-ferraris-place-in-fiat-chryslers-five-year-plan/.
[9] Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, WardsAuto (Aug. 29, 2012), http://wardsauto.com/technology/chrysler-eyes-different-path-meeting-new-cafe-standards.

the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'"[10]  Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in **diesels** and CNG-powered vehicles."[11]  As one commentator put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges."[12]

105.    FCA decided to push into this market beyond its existing heavy-duty diesel trucks (which use engines from a different supplier, Cummins) and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®."  These are the Class Vehicles at issue here.

106.    Fiat Chrysler was not alone.  Seeing an opportunity for growth in the U.S. market, other major automakers rushed to develop and market "clean diesel" engines.  Volkswagen, Mercedes-Benz, General Motors, and other manufacturers also began selling diesel cars and trucks as a more efficient (and thus environmentally-friendly) alternative to gasoline vehicles with no loss of power or performance: the advertised difference was that new emission control technology could make small diesel engines (long regarded by American consumers as fuel efficient but foul-smelling polluters) powerful and clean in addition to fuel-efficient.  The marketing worked, and millions of diesel vehicles were sold and leased in the United States between 2007 and 2016.

107.    The green bubble for diesel vehicles first popped on September 18, 2015, when the EPA issued a Notice of Violation of the CAA to Volkswagen and Audi for installing illegal "defeat devices" in 2009–2015 2.0-liter diesel vehicles.  A defeat device, as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emission control systems under normal driving conditions.  The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emission testing while polluting far in excess of emission standards, revealing the new "clean diesel" technology to be illusory.  CARB also announced that it had

---

[10] *Id.*
[11] *Id.* (emphasis added).
[12] *Id.*

initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the Notice of Violation.  On September 22, 2015, Volkswagen admitted that 11 million diesel cars worldwide were installed with the same defeat device software.[13]  Volkswagen wasn't alone— soon after, government agencies began to reveal that other automakers sold dozens of models exceeding allowable emission levels under applicable standards.  Nevertheless, the Defendants in this action continued with business as usual, concealing from regulators and consumers their Class Vehicles' emissions-related behavior and performance.

## II.      DEFENDANTS' DIRTY "ECODIESEL®" SCHEME

108.     Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans.  Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards).  The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued EO.

109.     There is a very good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

110.     Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions.  Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust.  This causes a more powerful compression of the pistons, which can produce greater engine torque (that is, more power).  Diesel engines are able to do this both because they operate

---

[13] *See* Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

at a higher compression ratio than gasoline engines and because diesel fuel contains more energy than gasoline.

111.    But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions.  Diesel combustion produces NOx, a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.  NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone.  Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects.  Children, the elderly, and people respiratory illnesses are at acute risk of health effects from these pollutants.

112.    Given the risks, minimizing NOx is paramount.  But removing these pollutants from untreated exhaust is difficult, and diesel automakers have reacted by trying to remove NOx from the exhaust using catalysts.  Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted.  Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions.  SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted.  SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

113.    FCA's response to this challenge was the EcoDiesel® engine.  Emission reductions start in the cylinder with advanced fuel injection strategies.  After the byproducts of combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and SCR.

114.    The Class Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions performance for different driving situations.  To manage engine and emission controls, the Class

1    Vehicles use a Bosch EDC system.  Bosch GmBH and Bosch LLC designed, tested, customized,

2    manufactured, and sold these EDC systems, including software code, to Fiat Chrysler (along with

3    other automakers including Volkswagen, Mercedes, and General Motors) for use in the Class

4    Vehicles.

5            115.    The system used in the Class Vehicles is Bosch's EDC Unit 17 (also called

6    "EDC17").  A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine

7    management system" as the "brain of diesel injection" which "controls every parameter that is

8    important for effective, low-emission combustion."  The EDC17 offered "[e]ffective control of

9    combustion" and a "[c]oncept tailored for all vehicle classes and markets."  In the press release,

10   Bosch touted the EDC17 as follows:

11       **EDC17: Ready for future demands**
         Because the computing power and functional scope of the new EDC17 can be
12       adapted to match particular requirements, it can be used very flexibly in any
         vehicle segment on all the world's markets.  In addition to controlling the precise
13       timing and quantity of injection, exhaust gas recirculation, and manifold pressure
         regulation, it also offers a large number of options such as the control of
14       particulate filters or systems for reducing nitrogen oxides.  The Bosch EDC17
         determines the injection parameters for each cylinder, making specific adaptations
15       if necessary.  This improves the precision of injection throughout the vehicle's
         entire service life.  The system therefore makes an important contribution to
16       observing future exhaust gas emission limits.[14]

17

18           116.    Bosch's EDC Unit 17 controls emissions by periodically reading sensor values,

19   evaluating a control function, and controlling actuators based on the control signal.[15]  Sensor

20   readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil

21   temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs

22   such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear.

23   Based on sensor input, EDC17 controls and influences the fuel combustion process including, in

24

25

26   [14] *See* Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-
27   resse.de/presseforum/details.htm?txtID=2603&locale=en.
     [15] Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz, and
28   Stefan Savage, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles* (2017), https://cseweb.ucsd.edu/~klevchen/diesel-sp17.pdf.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[16]

117.    In 2010 or 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans.  This engine had been under development for use in a General Motors automobile for the European market.[17] However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in FCA vehicles to be sold in the United States.

118.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. . . .We combined resources and developed them together."[18]

119.    According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[19]

120.    In fact, VM Motori boasts of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)."[20]  VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[21]

121.    The engine originally was developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in the United States.  Rather than make the engine compliant with U.S. emissions standards, FCA opted to cheat on the emission test.

---

[16] *Id.*
[17] Chad Westfall, *An Inside Look At The Ram 1500 3.0L EcoDiesel*, Engine Labs (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.
[18] *Id.*
[19] *Research and Development*, VM Motori, http://www.vmmotori.com/r-s/vm-motori/r-s-2.htm.
[20] *Id.*
[21] *Id.*

122.    In January 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel®.[22]  As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world.  From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[23]  Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee would be assembled at Bosch's facility in Kentwood, Michigan.

123.    In reality, Fiat Chrysler—working with VM Italy and VM America on the design of the EcoDiesel®'s engines and Bosch GmbH and Bosch LLC on the design of the EDC Unit 17—was either unable or unwilling to devise a solution within the constraints of the law.  And so, like their rivals at Volkswagen, they devised one outside of it.  Instead of cutting their losses on "EcoDiesel," delaying the production of the Class Vehicles, or coming clean, Fiat Chrysler worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit 17 to allow Class Vehicles to simulate "passing" the EPA and CARB testing. Unlike during testing, the software disables or restricts certain of the emission controls during real-world driving conditions.  When the emission controls are de-activated on the road, the Class Vehicles emit up to 20 times the legal limits of NOx.

124.    These software controls designed and implemented by Bosch GmbH and Bosch LLC were concealed from regulators on COC and EO applications for the Class Vehicles, thus deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United States and California.  Of course, consumers, who have no way of discerning that the emission control technology de-activated during real-world driving conditions, were likewise deceived.

125.    Specifically, Bosch GmbH and Bosch LLC worked hand-in-glove with Fiat Chrysler and VM Motori to develop and implement a specific set of software algorithms for

---

[22] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, *supra* note 5.
[23] *Id.*

1    implementation in the Class Vehicles, which enabled FCA to adjust fuel levels, exhaust gas

2    recirculation, air pressure levels, and even urea injection rates.[24]

3         126.    A study recently published by researchers at the University of California, San

4    Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that

5    Bosch code was used in a so-called defeat device for a Fiat vehicle.  The study described the

6    software as setting one mode for when a vehicle is being tested for emissions, but then allowing

7    tailpipe pollution to spike in real-world driving conditions.[25]  The study described Bosch's role in

8    building the electronic control unit ("ECU") hardware and developing the software running on the

9    ECU and found there was "no evidence that automobile manufacturers write any of the code

10   running on the ECU."[26]  To the contrary:  "All code we analyzed in this work was documented in

11   documents copyrighted by Bosch and identified automakers as the intended customers."[27]  The

12   study concluded:  "We find strong evidence that both defeat devices were created by Bosch and

13   then enabled by Volkswagen and Fiat for their respective vehicles."

14        127.    For context, when carmakers test their vehicles against EPA emission standards,

15   they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform

16   a series of specific maneuvers prescribed by federal regulations to simulate driving and test

17   emissions in a controlled environment.  Bosch's EDC Unit 17 gave Fiat Chrysler the ability to

18   detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and

19   even the position of the steering wheel.  For example, given that the steering wheel cannot be

20   turned on a dynamometer, Bosch programmed a sensor which detected whether or not the

21   steering wheel turned.  When the EDC Unit 17's detection algorithm detected an emission test

22   was complete, the EDC Unit 17 could de-activate or reduce the emission control systems'

23

24   _____

[24] *See generally Engine management*, Bosch Auto Parts, http://de.bosch-

25   automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engi
     ne_control_unit_1/  (describing capabilities of Bosch EDC units).
     [25] *See* Ryan Been, *Study of VW's Cheating on Diesels Examines Role of Bosch Code*, Bloomberg

26   Technology (June 9, 2017), https://www.bloomberg.com/news/articles/2017-06-09/study-of-vw-
     s-cheating-on-diesels-examines-role-of-bosch-code.
27   [26] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern

28   Automobiles*, *supra* note 15.
     [27] *Id.*

1372875.2

1    performance, causing the Class Vehicle to spew illegal amounts of NOx emissions when out on

2    the road.

3        128.    This workaround was illegal.  The CAA expressly prohibits defeat devices,

4    defined as any auxiliary emission control device "that reduces the effectiveness of the emission

5    control system under conditions which may reasonably be expected to be encountered in normal

6    vehicle operation and use."  40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-

7    duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle

8    shall be equipped with a defeat device.").  Moreover, the CAA prohibits the sale of components

9    used as defeat devices, "where the person knows or should know that such part or component is

10   being offered for sale or installed for such use or put to such use."  42 U.S.C. § 7522(a)(3).

11   Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary

12   emission control devices installed in the vehicle, a justification for each, and an explanation of

13   why the control device is not a defeat device.

14       129.    As the EPA has now alleged against Fiat, FCA, VM Italy, and VM America,

15   Defendants did not disclose, and affirmatively concealed, the presence of performance-altering

16   software code developed with Bosch GmbH and Bosch LLC from government regulators.  In

17   other words, FCA lied to the government, its customers, its dealers, and the public at large.

18       130.    Because FCA lied on the COC and EO applications, these COCs and EOs were

19   fraudulently obtained.  And because the Class Vehicles did not conform "in all material respects"

20   to the specifications provided in the COC and EO applications, the Class Vehicles were never

21   covered by a valid COC or EO, and thus were *never* legal for sale—nor were they EPA and/or

22   CARB compliant, as represented.  With the complicity of Bosch and VM Motori, Fiat Chrysler

23   hid these facts from the EPA, CARB, and other regulators, from FCA dealers and consumers, and

24   FCA continued to sell and lease the Class Vehicles to the driving public, despite their illegality.

25       131.    Fiat Chrysler's illegal workaround was enabled by a close partnership with Bosch,

26   which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Class

27

28

1    Vehicles and other "clean" diesel vehicles.[28]  Bosch GmbH and Bosch LLC were aware that Fiat

2    Chrysler used its emission control technology as a concealed auxiliary (or defeat) device and, in

3    fact, worked together with Fiat Chrysler and VM Motori to develop and implement software

4    algorithms specifically tailored to allow the Class Vehicles to evade detection.

5            132.    Bosch GmbH and Bosch LLC worked closely with Fiat Chrysler and VM Motori

6    to create specifications and software code for each Class Vehicle model.  Indeed, customizing a

7    road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence

8    at an automaker's facility.  VM Italy and VM America likewise worked closely with Bosch

9    GmbH, Bosch LLC, and Fiat Chrysler in designing, installing, and calibrating the engines for the

10   Class Vehicles.

11           133.    All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine

12   management software over which Bosch exerts near-total control.  In fact, the software is

13   typically locked to prevent customers, like Fiat Chrysler, from making significant changes on

14   their own.  Accordingly, both the design and implementation are interactive processes, requiring

15   Bosch's close collaboration with the automaker from beginning to end.

16           134.    Bosch GmbH and Bosch LLC's security measures further confirm that its

17   customers cannot make significant changes to Bosch software without their involvement.  Bosch

18   boasts that its security modules protect vehicle systems against unauthorized access in every

19   operating phase, meaning that no alteration could have been made without either a breach of that

20   security—and no such claims have been advanced—or Bosch's knowing participation.[29]

21           135.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch

22   maintains absolute control over its software as part of its regular business practices:[30]

23

24   ───────────────────────
     [28] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology
     operations branch of Bosch. *See Bosch probes whether its staff helped VW's emissions rigging*,
25   Automotive News (Jan. 27, 2016),
     http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-
26   helped-vws-emissions-rigging.
     [29] *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016), https://www.escrypt.com/en/news-
27   events/protection-for-ecus.
     [30] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver
28   (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-
     software/.

I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves.  Before each dataset is released it goes back to Bosch for its own validation.

Bosch is involved in all the development we ever do.  They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.

All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….

The car company is *never* entitled by Bosch to do something on their own.

136.    Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them.  As they did with Volkswagen, the units required the work of numerous Bosch coders for a period of more than ten years.[31]  Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[32]

137.    Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating.  As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch warned Volkswagen by letter that using the emission-altering software in production vehicles would constitute an "offense."[33]  Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicles, including the Class Vehicles, from U.S. regulators and consumers.

138.    Bosch LLC worked closely with Bosch GmbH and diesel automakers both in the United States and in Germany, to ensure that the "clean" diesels, like the Class Vehicles, passed emission testing.  Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel vehicles were approved for sale in the United States.  For example, we now know that employees of Bosch LLC and Bosch GmbH provided

---

[31] Again, approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch.  *See Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, *supra* note 28.

[32] *See The brain of diesel injection: New Bosch EDC17 engine management system*, *supra* note 14.

[33] *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept. 27, 2015), http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software-use-in-diesel-cars-report-says; *see also VW Scandal: Company Warned over Test Cheating Years Ago*, BBC (Sept. 27, 2015), http://www.bbc.com/news/business-34373637.

1  specific information to regulators in the United States about how Volkswagen's vehicles

2  functioned and unambiguously stated that the vehicles met emission standards.  Bosch LLC

3  regularly communicated to its colleagues and clients in Germany about ways to deflect and

4  diffuse questions from regulators in the United States about those vehicles.  On information and

5  belief, Bosch LLC also assisted in concealing the true nature of the emission control technology

6  from regulators in the United States with respect to the Class Vehicles at issue here.

7       139.  Bosch not only kept the dirty secret safe, it went a step further and actively lobbied

8  lawmakers to push "clean diesel" in the United States.  As early as 2004, Bosch announced a push

9  to convince U.S. automakers that its diesel technology could meet tougher 2007 emission

10  standards in the United States.[34]  Bosch engaged in a multi-year, multi-million dollar effort

11  involving key players from Bosch in both Germany and the United States.  In its efforts to

12  promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its

13  global group of affiliated companies, including Bosch LLC.

14       140.  Bosch's promotion of diesel technology specifically targeted the United States.

15  For example, Bosch put on "Diesel Days in California"[35] and "SAE World Congress in

16  Detroit."[36]  In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second

17  Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with

18  the aim of providing a venue for "stakeholders to gain insight into the latest technology trends,

19  and to engage in a vital dialogue with industry leaders and policymakers."[37]

20       141.  Bosch LLC hosted multi-day conferences open to regulators and legislators and

21  held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean"

22

23

24  [34] Edmund Chew, *Bosch boosts US diesel lobbying*, Automotive News (Mar. 8, 2004), http://www.autonews.com/article/20040308/SUB/403080876/bosch-boosts-us-diesel-lobbying.

25  [35] *Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/html/734_4066.htm?section=28799C0E86C147799E02226E942307F2.

26  [36] *See, e.g.*, *Bosch Brings Innovation, Green Technology to SAE 2009 World Congress*, Bosch, http://www.bosch.us/content/language1/html/734_7432.htm?section=CDAF31A468D9483198ED8577060384B3.

27  [37] *Bosch: Clean Diesel is Key Part of Future Technology Mix*, Bosch, http://us.bosch-press.com/

28  tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=59743263&CFTOKEN=b0c61c28412924c-BCBB064E-FD22-FC33-50650318A8803D2B&nh=00&Search=0&id=364.

1    diesel technology, including the calibrations necessary for the vehicles to comply with emission

2    regulations.

3          142.   In April 2009, for example, Bosch organized and hosted a two-day "California

4    Diesel Days" event in Sacramento, California.  Bosch invited a roster of lawmakers, journalists,

5    executives, regulators, and non-governmental organizations[38] with the aim of changing

6    perceptions of diesel from "dirty" to "clean."  The event featured "clean diesel" vehicles as

7    ambassadors of "clean diesel" technology.  The stated goals were to "build support for light-duty

8    diesel as a viable solution for achieving California's petroleum and emission reduction

9    objectives."

10         143.   Bosch also joined in events promoting the Class Vehicles.  At one such event

11   hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements

12   regarding the 3.0-liter EcoDiesel V6's performance.  It stated that the "Bosch emissions control

13   system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the

14   tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy

15   that is "30% better than a comparable gasoline engine."[39]

16         144.   In 2009, Bosch also became a founding member of the U.S. Coalition for

17   Advanced Diesel Cars.[40]  One of this advocacy group's purposes included "promoting the energy

18   efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles

19   in the U.S. marketplace."[41]  This group lobbies Congress, U.S. regulators, and CARB in

20   connection with rules affecting "clean diesel" technology.[42]

21

22   _____

23   [38] *Bosch drives clean diesel in California*, *supra* note 35; *see also California Diesel Days*, The U.S. Coalition for Advanced Diesel Cars, http://www.californiadieseldays.com/.
     [39] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, Objects in the Mirror…

24   (blog operated by FCA Digital Media) (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

25   [40] Chrissie Thompson, *New Coalition Aims To Promote Diesel Cars*, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to-

26   promote-diesel-cars.
     [41] *About the Coalition*, The U.S. Coalition for Advanced Diesel Cars (May 22, 2015),

27   http://cleandieseldelivers.com/about/.
     [42] *Id.*; s*ee also, e.g.*, Letter to Mary T. Nichols & the California Air Resources Board concerning a

28   statement made about diesel technology (Jan. 8, 2016), http://cleandieseldelivers.com/ media/Mary-Nichols-Letter-01082016.pdf.

1     **III.**     **FCA'S MISLEADING ADVERTISING CAMPAIGN**

2          145.     To counter consumer perception that diesel engines produce "dirty" emissions and

3 to capitalize on consumers' desire to protect the environment and to save fuel costs, FCA

4 aggressively markets the EcoDiesel® engine as being environmentally friendly, using a leaf and

5 green coloring in its logo:



6

7

8

9          146.     In fact, the central theme in FCA's diesel engine marketing is the promise of

10 "clean" diesel:[43]



20          147.     In its EcoDiesel® advertising, FCA specifically targets consumers "who want to

21 drive an efficient, environmentally friendly truck without sacrificing capability or

22 performance."[44] Indeed, it claims that the Ram 1500 was "the NAFTA market's first and only

23 light-duty pickup powered by clean diesel technology."[45]

24

---

25 [43] *EcoDiesel: An Essential Tool for Every Outdoorsman*, *supra* note 39.
[44] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone

26 (Ram trucks blog operated by FCA US LLC) (July 16, 2013),
https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-

27 a-dealer-near-you/.
[45] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's*

28 *10 Best Engines for 2014*, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorth
america.com/News/ChryslerDocuments/ChryslerGroupLLC_Sustain2013Dec12.pdf.

1      148.    To convince these consumers, FCA markets the Class Vehicles as EcoDiesel®

2    vehicles, with EPA certifications throughout the United States, claiming throughout its

3    advertising, specifications, and public-facing statements:

4        • "Thanks to advanced emissions-control technology … [EcoDiesel's]
             exhaust is ultra-clean, making this engine available in all 50 states."[46]
5
6        • "Equipped with a diesel oxidation catalyst, diesel particulate filter and
             selective catalyst reduction, the EcoDiesel® V6 engine will be emissions-
             compliant in all 50 states."[47]
7
8        • "Chrysler Group engineers adapted the engine—manufactured by Fiat-
             owned V.M. Motori—to meet the NAFTA region's stringent emissions and
             on-board diagnostic regulations.  The new EcoDiesel® V-6 is Tier 2/Bin 5
9            compliant."[48]

10       • The emissions on the EcoDiesel® engine data sheet meet Tier2 Bin5
             requirements.[49]
11

12     149.    FCA further claims that "the Bosch emissions control system helps ensure that

13   virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[50]

14     150.    FCA goes so far as to hold itself out as a protector of the environment: "We are in

15   a race against time.  Climate change and the increasing scarcity of traditional sources of energy

16   require new approaches to mobility.  Fiat Group is addressing this challenge head-on by ensuring

17   individual freedom of movement with maximum consideration for the environment and local

18   communities."[51]  Step one, according to FCA, is to "minimize environmental impacts related to

19   the use of our products."

20     151.    FCA also claims that the EcoDiesel® engines equip the Ram 1500 with the "best

21   fuel economy of any full-size pick-up"[52] and the Jeep Grand Cherokee "with an incredible 730-

22   [46] *Id.*
23   [47] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, *supra* note 44.
24   [48] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, *supra* note 45.
     [49] L630 Specification Sheet, VM Motori S.p.A., available at
25   http://www.vmmotori.com/images/data_sheet/L630_DOHC-NEW.pdf (last accessed July 19, 2017).
26   [50] *EcoDiesel: An Essential Tool for Every Outdoorsman*, *supra* note 39.
     [51] Fiat Chrysler's 2014 Sustainability Report at 4, available at
27   http://www.fcanorthamerica.com/company/sustainability/Documents/Fiat%20Chrysler%20Sustainability%20Brochure%202014.pdf (last accessed July 19, 2017).
28   [52] *EcoDiesel – Ram 1500 HFE*, Ram Trucks (FCA), available at
     https://www.ramtrucks.com/en/ecodiesel/ (last accessed July 19, 2017).

mile highway driving range, you can find hundreds of miles of discovered roads and be confident you'll find your way back."[53]  The claim concerning Ram 1500's "fuel economy" was featured on FCA's website and thus sent across the interstate wires:[54]



152.    FCA goes even further, offering prospective Ram 1500 buyers a calculator to determine how much money they can save with "fewer fill-ups day-by-day":[55]



153.    FCA's Jeep Grand Cherokee advertising claims that diesel technology reduces the number of fill-ups for consumers:[56]

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *See EcoDiesel*, Jeep (FCA), available at http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/ (last accessed July 19, 2017).

1

2

3

4

5

6

7

8

9



10     154.    Another theme of FCA's misleading advertising campaign is the Class Vehicles'

11  power, including torque and towing capacity.  FCA claims that the 2015 Jeep Grand Cherokee

12  equipped with a 3.0-liter EcoDiesel V6 engine has best-in-class towing capability of up to 7,400

13  pounds.[57]  Similarly, FCA claims that the EcoDiesel® engine has best-in-class torque: "The

14  EcoDiesel® engine delivers best-in-class 420 lb-ft of torque.  Paired with an impressive 240

15  horsepower, this engine has serious muscle."[58]

16     155.    FCA could not achieve the promised fuel economy and/or towing power for the

17  Class Vehicles at issue without de-activating or reducing the emission control system during real-

18  world driving conditions.  If and when FCA recalls the Class Vehicles and/or provides a "fix" that

19  results in decreasing the EcoDiesel® engine performance to bring them into compliance,

20  Plaintiffs and Class members will be required to spend additional sums on fuel and will not retain

21  the promised towing power.  And Class Vehicles will necessarily be worth less in the marketplace

22  because of their decrease in performance and efficiency and increased wear on their engines.

23     A.    **"Dieselgate" Scandalizes The Global Auto Industry.**

24     156.    The world was shocked to learn that Volkswagen had manufactured over

25  11 million diesel cars that were on the roads in violation of European emission standards, and

26

27  _____
[57] *Id.*

28  [58] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, *supra* note 44.

1    over 565,000 vehicles operating in the United States in violation of EPA and state emission

2    standards.  But Volkswagen was not the only one.

3            157.    In the wake of the Volkswagen "defeat device" scandal,[59] scientific literature and

4    reports and testing indicate that many other so-called "clean diesel" vehicles emit far more

5    pollution on the road than in lab tests.  The EPA has since widened its probe of diesel emissions

6    to include the Class Vehicles at issue here.

7            158.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure

8    and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers,

9    when tested, emitted significantly more NOx on real-world trips but nevertheless passed

10   laboratory tests.  The report concluded that "[i]n most circumstances arising in normal situations

11   on the road, the system scarcely succeeded in any effective reduction of NOx emissions."[60]

12          159.    The report further remarked:[61]

13          It is remarkable that the NOx emission under real-world conditions exceeds the
            type approval value by [so much].  It demonstrates that the settings of the engine,
14          the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are
            such that they do not result in low NOx emissions in practice.  In other words:  *In*
15          *most circumstances arising in normal situations on the road, the systems*
            *scarcely succeed in any effective reduction of NOx emissions*.
16

17   The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel"

18   advertising, including that for the Class Vehicles at issue here.

19          160.    Other organizations are beginning to take notice of the emission deception.  The

20   Transportation and Environment ("T&E") organization, a European group aimed at promoting

21   sustainable transportation, compiled data from "respected testing authorities around Europe."

22

23   [59] The EPA's Sept. 18, 2015 Notice of Violation to Volkswagen Group of America, Inc.,
     available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-
24   15.pdf.  As detailed therein, software detects when the vehicle is undergoing official emission
     testing and turns full emission controls on only during the test.  But otherwise, while the vehicle
25   is running, the emission controls are suppressed.  This results in cars that meet emission standards
     in the laboratory or at the state testing station, but during normal operation they emit NOx at up to
26   40 times the standard allowed under U.S. laws and regulations.  Volkswagen has admitted to
     installing a defeat device in its diesel vehicles.
27   [60] *Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*,
     TNO (May 18, 2015), http://publications.tno.nl/publication/34616868/a1Ug1a/TNO-2015-
28   R10702.pdf.
     [61] *Id.* at 6 (emphasis added).

                                                         AMENDED CONSOLIDATED CONSUMER CLASS
                                                                   ACTION COMPLAINT
                                                              CASE NO. 3:17-MD-02777-EMC

1    T&E stated in September 2015 that real-world emission testing showed drastic differences from

2    laboratory tests, such that models tested emitted more pollutants on the road than in the lab.  "For

3    virtually every new model that comes onto the market the gap between test and real-world

4    performance leaps," the report asserts.[62]

5           161.    In a summary report, T&E graphically depicted the widespread failure of most

6    manufacturers to meet emission standards:[63]



25

[62] *VW's cheating is just the tip of the iceberg*, Transport & Environment (Sept. 21, 2015),
http://www.transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.
[63] *Five facts about diesel the car industry would rather not tell you*, Transport & Environment
(Sept. 2015),
http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_
about_diesel_FINAL.pdf.

162.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results,"[64] because manufacturers like Fiat Chrysler can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions.

163.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles."  With regard to its recent on-road emission testing, the company explains:[65]

> [I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory.  Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures.  For car buyers, this means that fuel economy on average is one quarter worse than advertised.  This matters, even if no illegal activity is found.

**B.    Defendants Are Caught Cheating.**

**1.    Plaintiffs' Testing Reveals Cheating.**

164.    In late 2016, counsel for Plaintiffs tested the 2015 Ram 1500 pickup using a Portable Emissions Measurement System ("PEMS").  Testing revealed that Fiat Chrysler also cheated in that it had concealed the fact that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

165.    The applicable standard both at the federal and state level is 50 mg/mile of NOx for "FTP Style" driving: *i.e.*, city driving.  Testing was conducted with a PEMS unit to simulate driving conditions under both the FTP certification cycle and the highway certification cycle. The Ram 1500 emits an average of 159 mg/mile of NOx and a maximum of 1,283 mg/mile on flat roads, and 222 mg/mile of NOx with a maximum of 1,859 mg/mile on hills.  For highway driving, the average was 232 mg/mile and a maximum of 1,615 mg/mile, compared to the 70 mg/mile standard.  On hills, the numbers are 353 mg/mile and 3,240 mg/mile.  Testing also revealed a device triggered by ambient temperature that significantly derates the performance of the NOx emission reduction system, with ambient threshold temperatures above approximately

---

[64] *Id.*

[65] Emissions Analytics Press Release, (Sept. 28, 2015), available at http://www.abvwc.com/home/emissions-analytics.(last accessed July 19, 2017).

95ºF and below 40-50ºF.  The resulting NOx emissions increase by a factor of 10 when above or below these threshold temperatures.  Testing also revealed the presence of a device that is triggered when ascending hills, as the emission control system appears to be significantly derated after a short period of steady driving on hills.  As a result, NOx emissions increase after about 500-1000 seconds on hills with grades as low as 1%, where emissions are often 10 times the highway standard.  For grades as little as 0.4%, emissions were found to be as high as 6 times the highway standard.

166.    The Ram 1500's emission software is a "Bosch EDC17," as is the Jeep Grand Cherokee's emission software.  The same basic emission system is in the Grand Cherokee EcoDiesel® and the engines are identical.

167.    In separate testing by counsel for Plaintiffs, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road.  In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS from Horiba®.

168.    The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (*i.e.*, in the laboratory).  On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times.  When tested on a highway, the average NOx emissions measured *35 times* the EPA Tier 2 Bin 5 standard.

### 2.    The EPA Issues A Notice Of Violation to Fiat and FCA.

169.    On January 12, 2017, the EPA issued a NOV to Fiat and FCA for failing to justify or disclose defeat devices in model year 2014–2016 Ram 1500 EcoDiesel® and 2014–2016 Jeep Grand Cherokee EcoDiesel® vehicles (the Class Vehicles at issue here).  CARB also issued a Notice of Violation to Fiat and FCA.  Since then, the EPA, by and through the Department of Justice, has sued Fiat, FCA, VM Italy, and VM America for violations of the CAA.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

170.     The EPA's NOV and lawsuit arose in part from emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory.  The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device."

171.     The EPA identified at least eight AECDs in the Class Vehicles that were concealed on COC applications:

- AECD 1 (Full EGR Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

172.     The EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use."  For example:

a.     AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system.  Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system.  The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b.     AECD 5 & 6 together reduce the effectiveness of the NOx emission control system, using a timer to discontinue warming of the SCR after-treatment system, which reduces its effectiveness.

c.     AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use.  The operation of AECD 1, AECD 2, and/or AECD 5 increase the frequency of occurrence of AECD 4.

d.     AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

173.    The EPA further found that Fiat and FCA did not disclose or justify these control devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce, or imported one of the approximately 103,828 Class Vehicles.  The EPA is now seeking injunctive relief and penalties.

### 3.    Bosch Software Documentation Further Verifies the Violations

174.    Researchers have obtained Bosch software documentation describing the functions, modules, structure, variables and calibration parameters believed to be installed in Class Vehicles. The documentation is over 10,000 pages long and contains hundreds of functions and thousands of variables developed by Bosch that describe the operation of the engine.  These parameters and functions correlate with many of the violations alleged by the EPA and CARB. Critically, these functions, designed and implemented by Bosch, have elements that have no legitimate purpose in normal use.  At the same time, these same elements, when enabled, allow the functions to reduce the effectiveness of emission controls in real world driving conditions, but not during an emission test cycle.

### a.    AECDs 1 and 2:  Reducing or Disabling EGR at Highway Speeds

175.    The function named *"AirCtl_RatDesValCalc"* described in the Bosch documentation as *"Exhaust gas recirculation control - EGR ratio setpoint calculation"* is used to calculate the desired EGR rate. The software documentation contains figures with flow diagrams describing the inputs, outputs, and calculation performed by this software function. Bosch has included vehicle speed as an input used by the EGR control function to modify the EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate reason for the EGR rate to depend directly on vehicle speed.

176.    By allowing EGR rate to depend directly on vehicle speed, Bosch provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle

1    operation and use.  This function may be, and is likely to have been, used to implement the

2    undisclosed AECDs 1 and 2 identified in the EPA NOV to Fiat and FCA.

3                   **b.     AECD 3: EGR Shut-Off for Exhaust Valve Cleaning**

4            177.    AECD 3 identified in the EPA NOV has also been identified in Bosch's software

5    documentation in the function named  "*AirCtl_Mon*" described in the Bosch documentation as

6    "*Exhaust gas recirculation control – Monitoring and shut-off.*"  Bosch described this AECD as

7    ostensibly providing a cleaning mechanism for the engine exhaust valves when the Class Vehicle

8    is in overrun (*i.e.*, the engine is turning without combustion, such as when the vehicle is going

9    downhill).  To accomplish this cleaning, the function created by Bosch closes the EGR valve

10   (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch also

11   programmed a software switch (named "*AirCtl_swtOvrRunOff_C*") that allowed Fiat and FCA to

12   enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

13           178.    Together with an activation delay added by Bosch—controlled by

14   *AirCtl_tiEngRunDrvCycMin_C*, which is described as *"Calibration time after which exhaust*

15   *valve cleaning routine can start"*—the *AirCrl_Mon* function can be readily used as a defeat

16   device.  To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun

17   (*AirCtl_swtOvrRunOff_C* = TRUE), but only after the duration of a typical emission test cycle

18   (*AirCtl_tiEngRunDrvCycMin_C* = 1800 seconds).  This would disable EGR after an emission test

19   cycle, resulting in increased NOx emission.  This function may be, and is likely to have been,

20   used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

21                   **c.     AECD 7: Alternative SCR Dosing Modes**

22           179.    Bosch included a timer in another function, without a legitimate purpose.  The

23   Bosch function named "*SCRFFC_Main*," described in documentation as "*Calculation of the NH3*

24   *precontrol quantity*" has an input variable timer entitled "*CoEng_tiNormal*," which holds the

25   time duration since the engine was started.  This variable can be used to reduce SCR efficiency,

26   and, therefore, increase NOx emission, after a certain time has elapsed.  In particular, this timer

27   may be set to the duration of a typical emission test cycle.  There is no legitimate reason for SCR

28   control to depend directly on the time duration since engine start.  By making SCR control

depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world driving conditions.  This function may be, and is likely to have been, used to implement undisclosed AECD 7 identified in the EPA and CARB NOVs.

### 4.   West Virginia University Testing of the Class Vehicles

180.    Beginning in 2015, researchers at the West Virginia University Center for Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering Volkswagen's fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA.  The test vehicles comprised the Class Vehicles at issue here: Jeep Grand Cherokees and Ram 1500 diesel vehicles, all equipped with the 3.0L EcoDiesel® engine, and featuring SCR NOx after-treatment technology.[66]

181.    All test vehicles were evaluated on a vehicle chassis dynamometer representing the test conditions for regulatory compliance.  Each vehicle was also tested over-the-road using a PEMS device during a variety of driving conditions including urban/suburban and highway driving.

182.    One of the Jeep Grand Cherokees and one of the Ram 1500 vehicles was tested prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which included a software "reflash" by FCA that concerned the vehicles' emission control systems.

183.    Results indicated that both Jeep Grand Cherokee and Ram 1500 in MY 2014 exhibited significantly increased NOx emissions during on-road operation as compared to the results observed through testing on the chassis dynamometer.  For MY 2015, Jeep vehicles produced from 4 to 8 times more NOx emissions during urban/rural on-road operation than the certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx permitted by EPA Tier2-Bin5 standard for highway driving conditions.

---

[66] Marc C. Besch, Sri Hari Chalagalla, and Dan Carder, *On-Road & Chassis Dynamometer Testing of Light-Duty Diesel Passenger Cars*, Center for Alternative Fuels, Engines, and Emissions, West Virginia University, available at http://www.cafee.wvu.edu/files/d/c586c1dd-b361-410d-a88d-d34e8834eda6/testing-of-light-duty-diesel-passenger-cars.pdf (last accessed July 19, 2017). . .

1    184.    The researchers noted that for the vehicles tested post-recall using the

2    dynamometer, $NO_x$ emissions were similar or slightly lower than that observed for vehicles tested

3    pre-recall.  But on-road emissions were still very different from emissions observed through

4    chassis dynamometer testing, even though they were slightly improved from the levels observed

5    during pre-recall testing.

6                          **5.    European Investigation and Testing**

7    185.    Fiat Chrysler and Bosch have both found themselves in trouble with German

8    regulators in the wake of the Volkswagen scandal.

9    186.    German prosecutors have launched an investigation into Bosch, reportedly raiding

10    Bosch's offices in Stuttgart.[67]  In April 2016, Bosch GmbH representatives met with Germany's

11    Federal Motor Transport Authority ("KBA") on at least two occasions.  In an April 14, 2016

12    meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control

13    units provided to Fiat Chrysler for diesel vehicles sold in Europe.  Bosch confirmed that it had

14    delivered the control units for the vehicles as well as the associated software and that Bosch

15    employees had integrated the emission-related applications into the software.  Bosch admitted

16    that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after

17    an elapsed period of driving time or number of cycles.  Specifically, 22 minutes after the start of

18    the engine (the estimated duration of emission testing), the software reduced the EGR rate to

19    nearly zero and de-activated NSC regeneration.  Another trigger for de-activation of the NSC

20    regeneration occurred after the vehicle had been driven a distance of 100 kilometers.  Bosch

21    confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5.

22    The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles

23    and Bosch shared responsibility for the defeat device with Fiat Chrysler.  Media reports have

24    confirmed the same.[68]

25    _____

26    [67]    *See* Edward Taylor, *Stuttgart prosecutor targets Bosch in Daimler diesel investigation*,
Reuters (May 26, 2017), http://www.reuters.com/article/us-daimler-emissions-bosch-idUSKBN18M172.

27    [68]    Media reports similarly said that Bosch had confirmed to German regulators that certain Fiat
vehicles were cheating on emission testing.  *See, e.g., Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat

28    Is Next to be Accused"; *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*,
Reuters (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-

1372875.2

187.    After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time, causing the vehicles to emit more than 10 times the legal limit of NOx.  The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes.[69] As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models."[70]  In August 2016, the German government formally concluded that Fiat vehicles sold in the EU had used defeat devices.

### 6.    Joint  University of California, San Diego and German Study of the Fiat 500X

188.    The testing of European regulators has been confirmed by independent testing conducted here in the United States.  A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage catalyst regeneration.[71]  Unlike the Volkswagen defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started.  (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

189.    According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle.  The researchers obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of conditions using the terms "during homologation cycle" and "during real driving."  The term "homologation" is commonly used in Europe to describe the process of testing an automobile for regulatory conformance.  Bosch's authorship of the document and use of the terms

---

idUSKCN0XL0MT; David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests: Report,* Jalopnik (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on-emissions-test-1772948181.
[69] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag, supra* note 68.
[70] *Here's How Fiat Might also be Cheating on Emissions Tests: Report, supra* note 68.
[71] Moritz Contag, *et al., How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles, supra* note 15.

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

"homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate that it not only created the mechanism for Fiat Chrysler but was also aware of the mechanism's intended purpose of circumventing emission testing.

190.    Together, these facts reveal that Defendants have fraudulently concealed the functions of its emission control technology from regulators and consumers alike.  Further, they demonstrate that Fiat Chrysler's claims about its EcoDiesel® Class Vehicles as "clean diesel" with "ultralow emissions" and "no NOx" emitted through the tailpipe is false or misleading.

### C.    The Damage Caused By Defendants' Dirty Diesel Scheme

191.    Class members paid a significant premium for the EcoDiesel features that FCA falsely advertised.  Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles.[72]  In return, FCA promised power, performance, fuel economy, and environmental friendliness (and vehicles that were legal to drive).  FCA could not deliver on that promise.  Plaintiffs and Class members suffered significant harm as a result.

192.    FCA may not be able to bring the Class Vehicles into compliance with emissions standards.  If that is the case, those vehicles will have to be removed from the road.

193.    But even if FCA can bring the Class Vehicles into compliance with emission standards, it will not be able to do so without substantially degrading their performance characteristics, including their horsepower and/or fuel efficiency and/or maintenance requirements.  Consequently, Class members will not possess the vehicles they thought they purchased and will not have received the benefit of the bargain.  This will also result in a diminution in value of every Class Vehicle, and it will cause owners and lessees of Class Vehicles to pay more for the use of their Class Vehicles.

194.    Assuming, for the sake of argument, that the Class Vehicles could be brought into compliance with emission standards without any material degradation to performance or maintenance characteristics—and if that were the case, it begs the question as to why FCA

---

[72] John Lamm, *2014 Jeep Grand Cherokee EcoDiesel® V-6, First Drive* Review, Car and Driver (February 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-first-drive-review; Andrew Wendler, *2015 Ram 1500 EcoDiesel® 4x4, Instrumented Test*, Car and Driver (August 2015), http://www.caranddriver.com/reviews/2015-ram-1500-4x4-ecodiesel-4x4-test-review.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    cheated in the first place—Class members would still have been deprived of the benefit of the

2    bargain for all the years they owned and/or leased the Class Vehicles that could not and did not

3    deliver all of the characteristics for which Class members paid a premium, and were not

4    compliant with U.S. law.

5        195.    In sum, had regulators or the public known the true facts, Plaintiffs and the Class

6    would not have purchased or leased the Class Vehicles (in fact, they could not have legally been

7    sold), or would have paid substantially less for them.

8                            **CLASS ACTION ALLEGATIONS**

9    **I.    CLASS DEFINITIONS**

10       196.    Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of

11   Civil Procedure, Plaintiffs bring this action on behalf of themselves and Nationwide Class and

12   Statewide Classes (collectively, "the Class"), defined as:

13       **Nationwide Class:**

14       All persons or entities in the United States (including its territories and the District
         of Columbia) that purchased or leased a Class Vehicle.  Class Vehicles include all
15       FCA EcoDiesel® vehicles equipped with SCR to control NOx emissions,
         including but not limited to the Model Year 2014-2016 Ram 1500 and the Model
16       Year 2014-2016 Jeep Grand Cherokee.

17       197.    The phrase, "persons or entities," as used in this Complaint and the Nationwide

18   and State Class definitions, includes, but is not limited to, independent (non-FCA franchise)

19   automobile dealers in the United States (including its territories and the District of Columbia)

20   with one or more previously-owned Class Vehicles in their inventory on or after January 12,

21   2017.

22       198.    In addition to the Nationwide Class, and pursuant to Federal Rules of Civil

23   Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes or subclasses as

24   well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate

25   at the time of class certification:

26       **Alabama State Class:**

27       All persons or entities that purchased or leased a Class Vehicle within Alabama or
         that purchased or leased a Class Vehicle and reside in Alabama.
28

**Alaska State Class:**

All persons or entities that purchased or leased a Class Vehicle within Alaska or that purchased or leased a Class Vehicle and reside in Alaska.

**Arizona State Class:**

All persons or entities that purchased or leased a Class Vehicle within Arizona or that purchased or leased a Class Vehicle and reside in Arizona.

**Arkansas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Arkansas or that purchased or leased a Class Vehicle and reside in Arkansas.

**California State Class:**

All persons or entities that purchased or leased a Class Vehicle within California or that purchased or leased a Class Vehicle and reside in California.

**Colorado State Class:**

All persons or entities that purchased or leased a Class Vehicle within Colorado or that purchased or leased a Class Vehicle and reside in Colorado.

**Connecticut State Class:**

All persons or entities that purchased or leased a Class Vehicle within Connecticut or that purchased or leased a Class Vehicle and reside in Connecticut.

**Delaware State Class:**

All persons or entities that purchased or leased a Class Vehicle within Delaware or that purchased or leased a Class Vehicle and reside in Delaware.

**District of Columbia Class:**

All persons or entities that purchased or leased a Class Vehicle within the District of Columbia or that purchased or leased a Class Vehicle and reside in the District of Columbia.

**Florida State Class:**

All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

**Georgia State Class:**

All persons or entities that purchased or leased a Class Vehicle within Georgia or that purchased or leased a Class Vehicle and reside in Georgia.

**Hawaii State Class:**

All persons or entities that purchased or leased a Class Vehicle within Hawaii or that purchased or leased a Class Vehicle and reside in Hawaii.

**Idaho State Class:**

All persons or entities that purchased or leased a Class Vehicle within Idaho or that purchased or leased a Class Vehicle and reside in Idaho.

**Illinois State Class:**

All persons or entities that purchased or leased a Class Vehicle within Illinois or that purchased or leased a Class Vehicle and reside in Illinois.

**Indiana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Indiana or that purchased or leased a Class Vehicle and reside in Indiana.

**Iowa State Class:**

All persons or entities that purchased or leased a Class Vehicle within Iowa or that purchased or leased a Class Vehicle and reside in Iowa.

**Kansas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Kansas or that purchased or leased a Class Vehicle and reside in Kansas.

**Kentucky State Class:**

All persons or entities that purchased or leased a Class Vehicle within Kentucky or that purchased or leased a Class Vehicle and reside in Kentucky.

**Louisiana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Louisiana or that purchased or leased a Class Vehicle and reside in Louisiana.

**Maine State Class:**

All persons or entities that purchased or leased a Class Vehicle within Maine or that purchased or leased a Class Vehicle and reside in Maine.

**Maryland State Class:**

All persons or entities that purchased or leased a Class Vehicle within Maryland or that purchased or leased a Class Vehicle and reside in Maryland.

**Massachusetts State Class:**

All persons or entities that purchased or leased a Class Vehicle within Massachusetts or that purchased or leased a Class Vehicle and reside in Massachusetts.

**Michigan State Class:**

All persons or entities that purchased or leased a Class Vehicle within Michigan or that purchased or leased a Class Vehicle and reside in Michigan.

**Minnesota State Class:**

All persons or entities that purchased or leased a Class Vehicle within Minnesota or that purchased or leased a Class Vehicle and reside in Minnesota.

**Mississippi State Class:**

All persons or entities that purchased or leased a Class Vehicle within Mississippi or that purchased or leased a Class Vehicle and reside in Mississippi.

**Missouri State Class:**

All persons or entities that purchased or leased a Class Vehicle within Missouri or that purchased or leased a Class Vehicle and reside in Missouri.

**Montana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Montana or that purchased or leased a Class Vehicle and reside in Montana.

**Nebraska State Class:**

All persons or entities that purchased or leased a Class Vehicle within Nebraska or that purchased or leased a Class Vehicle and reside in Nebraska.

**Nevada State Class:**

All persons or entities that purchased or leased a Class Vehicle within Nevada or that purchased or leased a Class Vehicle and reside in Nevada.

**New Hampshire State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Hampshire or that purchased or leased a Class Vehicle and reside in within New Hampshire.

**New Jersey State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Jersey or that purchased or leased a Class Vehicle and reside in New Jersey.

**New Mexico State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Mexico or that purchased or leased a Class Vehicle and reside in New Mexico.

**New York State Class:**

All persons or entities that purchased or leased a Class Vehicle within New York or that purchased or leased a Class Vehicle and reside in New York.

**North Carolina State Class:**

All persons or entities that purchased or leased a Class Vehicle within North Carolina or that purchased or leased a Class Vehicle and reside in North Carolina.

**North Dakota State Class:**

All persons or entities that purchased or leased a Class Vehicle within North Dakota or that purchased or leased a Class Vehicle and reside in North Dakota.

**Ohio State Class:**

All persons or entities that purchased or leased a Class Vehicle within Ohio or that purchased or leased a Class Vehicle and reside in Ohio.

**Oklahoma State Class:**

All persons or entities that purchased or leased a Class Vehicle within Oklahoma or that purchased or leased a Class Vehicle and reside in Oklahoma.

**Oregon State Class:**

All persons or entities that purchased or leased a Class Vehicle within Oregon or that purchased or leased a Class Vehicle and reside in Oregon.

**Pennsylvania State Class:**

All persons or entities that purchased or leased a Class Vehicle within Pennsylvania or that purchased or leased a Class Vehicle and reside in Pennsylvania.

**Rhode Island State Class:**

All persons or entities that purchased or leased a Class Vehicle within Rhode Island or that purchased or leased a Class Vehicle and reside in Rhode Island.

**South Carolina State Class:**

All persons or entities that purchased or leased a Class Vehicle within South Carolina or that purchased or leased a Class Vehicle and reside in South Carolina.

**South Dakota State Class:**

All persons or entities that purchased or leased a Class Vehicle within South Dakota or that purchased or leased a Class Vehicle and reside in South Dakota.

**Tennessee State Class:**

All persons or entities that purchased or leased a Class Vehicle within Tennessee or that purchased or leased a Class Vehicle and reside in Tennessee.

**Texas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Texas or that purchased or leased a Class Vehicle and reside in Texas.

**U.S. Territory Class:**

All persons or entities that purchased or leased a Class Vehicle within a U.S. Territory or that purchased or leased a Class Vehicle and reside in U.S. Territory.

**Utah State Class:**

All persons or entities that purchased or leased a Class Vehicle within Utah or that purchased or leased a Class Vehicle and reside in Utah.

**Vermont State Class:**

All persons or entities that purchased or leased a Class Vehicle within Vermont or that purchased or leased a Class Vehicle and reside in Vermont.

**Virginia State Class:**

All persons or entities that purchased or leased a Class Vehicle within Virginia or that purchased or leased a Class Vehicle and reside in Virginia.

**Washington State Class:**

All persons or entities that purchased or leased a Class Vehicle within Washington or that purchased or leased a Class Vehicle and reside in Washington.

**West Virginia State Class:**

All persons or entities that purchased or leased a Class Vehicle within West Virginia or that purchased or leased a Class Vehicle and reside in West Virginia.

**Wisconsin State Class:**

All persons or entities that purchased or leased a Class Vehicle within Wisconsin or that purchased or leased a Class Vehicle and reside in Wisconsin.

**Wyoming State Class:**

All persons or entities that purchased or leased a Class Vehicle within Wyoming or that purchased or leased a Class Vehicle and reside in Wyoming.

199.    Excluded from the Class are individuals who have personal injury claims resulting from the conduct alleged herein.  Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

200.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

201. This action has been brought and may be properly maintained on behalf of the Nationwide Class and/or State Class proposed herein under Federal Rule of Civil Procedure 23.

202. Plaintiffs reserve the right to modify the definition of the Nationwide and/or any State Class prior to class certification.

## II.   CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF CIVIL PROCEDURE 23

203. ***Numerosity: Rule 23(a)(1).***  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe, based on available information on the volume of sales and registrations of Class Vehicles, that there are no fewer than 100,000 members of the Class. The precise number of Class members may be ascertained from Defendants' records and vehicle registration records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

204. ***Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).***  This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c.    Whether Defendants knew or should have known that the Class Vehicles emitted NOx at levels above those reasonably assumed by consumers and, if so, how long Defendants have known or should have known;

    d.    Whether the true nature of the Class Vehicles' performance, emissions levels, fuel economy, and emissions software constitute material facts that reasonable consumers would have considered in deciding whether to purchase and/or lease a Class Vehicle;

    e.    Whether Defendants' EcoDiesel® engine system in the Class Vehicles can be made to comply with emission standards without substantially degrading the performance and/or efficiency of the Class Vehicles;

    f.    Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of Defendants' deception;

g.      Whether Defendants made material misrepresentations regarding the Class Vehicles;

h.      Whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

i.      Whether Defendants omitted, concealed, and/or failed to disclose material facts about the Class Vehicles;

j.      Whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

k.      Whether Bosch designed and manufactured the emissions software present in the Class Vehicles;

l.      Whether Bosch supplied the emissions software to FCA with the knowledge that FCA would use it in production of the Class Vehicles;

m.      Whether Bosch acted in concert with FCA and aided and abetted FCA's fraud;

n.      Whether VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Class Vehicles, knowing, they would be used to evade emission laws and deceive the consuming public;

o.      Whether Defendant FCA designed, manufactured, marketed, and distributed Class Vehicles with the alleged emissions software;

p.      Whether Defendants' conduct violates RICO, consumer protection statutes, false advertising laws, warranty laws, and other laws as asserted herein;

q.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

r.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

s.      Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

205.    ***Typicality: Rule 23(a)(3).***  Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and each Class member purchased a Class Vehicle and were similarly injured through Defendants' wrongful conduct as described above.  Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims

1    of the other Class members.  Plaintiffs' claims are based upon the same legal theories as the

2    claims of the other Class members.

3         206.    ***Adequacy: Rule 23(a)(4).***  Plaintiffs will fairly and adequately represent and

4    protect the interests of the Class members as required by Federal Rule of Civil Procedure

5    23(a)(4).  Plaintiffs have retained counsel competent and experienced in complex class action

6    litigation, including vehicle defect litigation and other consumer protection litigation.  Plaintiffs

7    intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have interests that

8    conflict with the interests of the other Class members.  Therefore, the interests of the Class

9    members will be fairly and adequately protected.

10        207.    ***Declaratory and Injunctive Relief: Rule 23(b)(2).***  Defendants have acted or

11   refused to act on grounds generally applicable to Plaintiffs and the other members of the Class,

12   thereby making appropriate final injunctive relief and declaratory relief, as described below, with

13   respect to the Class as a whole.

14        208.    ***Superiority: Rule 23(b)(3).***  A class action is superior to any other available means

15   for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to

16   be encountered in the management of this class action.  The damages or other financial detriment

17   suffered by Plaintiffs and the other Class members are relatively small compared to the burden

18   and expense that would be required to individually litigate their claims against Defendants, so it

19   would be impracticable for members of the Class to individually seek redress for Defendants'

20   wrongful conduct.

21        209.    Even if Class members could afford individual litigation, the court system could

22   not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and

23   increases the delay and expense to all parties and the court system.  By contrast, the class action

24   device presents far fewer management difficulties and provides the benefits of single

25   adjudication, economies of scale, and comprehensive supervision by a single court.

26

27

28

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### I.   DISCOVERY RULE

210.   The tolling doctrine was made for cases of concealment like this one.  Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants had conspired to install software that would evade emission regulations, and that Defendants were concealing and misrepresenting the true emission levels of the Class Vehicles to regulators and the driving public.

211.   Defendants' fraud was elaborate and well concealed.  Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

212.   Plaintiffs and Class members had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through their respective Notices of Violation.

213.   Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

### II.   FRAUDULENT CONCEALMENT

214.   All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

215.   Defendants have known of the emission control software installed in the Class Vehicles since at least 2014, when Defendants began installing them.  Since then Defendants have intentionally concealed from, or failed to notify, regulators, Plaintiffs, Class members, and the driving public of the  undisclosed auxiliary (or defeat) devices and the true level of emissions and performance of the Class Vehicles.

216.   Despite knowing about the emission control software and unlawful emissions during real-world driving conditions, Defendants did not acknowledge the problem, and in fact actively concealed it, until after the EPA and CARB issued their Notices of Violation.  Even to present day, Defendants have denied any wrongdoing.

217.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

### III.    ESTOPPEL

218.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their emission systems and their compliance with applicable federal and state law, particularly given their misleading advertising statements.  Instead, Defendants actively concealed the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Class Vehicles.

219.    Plaintiffs and Class members reasonably relied upon Defendants' active concealment of these facts that rendered their statements misleading.

220.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**CLAIMS FOR RELIEF**

### I.    CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS

**NATIONWIDE COUNT I**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**Violation of 18 U.S.C. § 1962(c)-(d)**

221.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

222.    Plaintiffs bring this action on behalf of the Nationwide Class against Defendants Fiat, FCA, Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Denner (inclusively, for purpose of this Count, Defendants are referred to as "RICO Defendants").

223.    Fiat conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, like FCA, VM Italy, and VM America, each of which is a separate legal entity. The Bosch Group also conducts its business, both legitimate and illegitimate, through hundreds of companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC.[73]  At all relevant

---

[73] *See generally* https://www.bosch.com/bosch-group/ (last accessed on July 19, 2017).

1     times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each

2     was capable of holding "a legal or beneficial interest in property."

3         224.    Section 1962(c) makes it "unlawful for any person employed by or associated with

4     any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

5     conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

6     pattern of racketeering activity."  18 U.S.C. § 1962(c).

7         225.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section

8     1962(c), among other provisions.  *See* 18 U.S.C. § 1962(d).

9         226.    As part of a strategy to expand its North American presence, in 2009, Fiat began

10    its acquisition of one of the "Big 3" U.S. automakers, Chrysler.  In November of that year, CEO

11    Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel

12    variants" of Jeep and to give Ram "Light duty (1500)" a "refresh/facelift."[74]

13        227.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA,

14    and VM Motori, a longtime supplier, was now part of the Fiat Chrysler sprawling family of

15    affiliated companies.  In May of that year, Marchionne announced another five-year plan at

16    Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global

17    auto behemoths, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to

18    7 million vehicles by 2018, up from 4.4 million in 2013.[75]  Integral to the strategy was the

19    expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including

20    "diesel engines."[76]

21        228.    During this same time frame, emission standards in the United States were

22    ratcheting up.  In contrast to other global automakers, like Toyota and Ford, which were focusing

23    on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took

24    another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet

25    another route that focuses less on electrification and ***more heavily on light-duty diesels*** and

---

[74] *See* Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan*, *supra* note 6.
[75] *See* Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, *supra* note 7.
[76] *See* Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, *supra* note 8.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    compressed natural gas."[77]  In 2012, Marchionne observed, "with 2016 'just around the corner'

2    and 2025 not far away given the auto industry's long product-development lead times, 'there are

3    big choices to be made[.]'"[78]  Marchionne explained that "Chrysler, which is starting to share

4    platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in

5    *diesels* and CNG-powered vehicles."[79]  As one commenter put it at the time, "[f]uel-efficient

6    towing remains a strong point of diesels, and Marchionne says he still is optimistic about the

7    potential of light-duty diesels in the U.S. despite significant emissions challenges."[80]

8            229.    As it turned out, however, Fiat Chrysler was either unable or unwilling to devise a

9    solution within the constraints of the law.  And so, like Volkswagen, they devised one outside of

10   it.  Instead of cutting their losses, holding up the Class Vehicle roll outs, or coming clean, they

11   conspired with VM Italy and VM America and Bosch GmbH and Bosch LLC to install

12   customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel controls so

13   that the Class Vehicles could "pass" the EPA and CARB testing.  The software disabled or

14   restricted certain of the emission controls during real-world driving conditions, however, causing

15   the Class Vehicles to spew up to 25 times the legal limits of NOx.  These software controls were

16   concealed from regulators on COC and EO applications for the Class Vehicles by FCA, thus

17   deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United

18   States and California.

19           230.    To accomplish their scheme or common course of conduct, Fiat, FCA,

20   Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Denner, along with others,

21   had to work together to conceal the truth.  Each Defendant was employed by or associated with,

22   and conducted or participated in the affairs of, one or several RICO enterprises (defined below

23   and referred to collectively as the "EcoDiesel® RICO Enterprise").  The purpose of the

24   EcoDiesel® RICO Enterprise was to deceive regulators into believing that the Class Vehicles

25   were eligible for coverage by a COC and/or EO and compliant with emission standards.  The

26   ――――――――――――――――
[77] *See* Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, *supra* note

27   9.
[78] *Id.*
[79] *Id.*
28   [80] *Id.*

1372875.2

1   motivation was simple:  to increase Defendants' revenues and profits and minimize their losses

2   from the design, manufacture, distribution and sale of the Class Vehicles and their component

3   parts.  As a direct and proximate result of their fraudulent scheme and common course of

4   conduct, the RICO Defendants were able to extract over a billion dollars from consumers.  As

5   explained below, their years-long misconduct violated Sections 1962(c) and (d).

6           **A.      Description of the EcoDiesel® RICO Enterprise**

7           231.    In an effort to expand its market share in the United States and beyond, Fiat, a

8   publicly-traded Italian-controlled, Dutch-registered company headquartered in London, bought

9   then-Chrysler (now FCA), a separate Delaware company, headquartered in Michigan.  Fiat uses

10  FCA to design, market, manufacture and sell the Class Vehicles and other vehicles under the

11  Chrysler, Dodge, Jeep, Ram, and Fiat brands throughout the United States.  FCA also submitted

12  the COC and EO applications for the Class Vehicles.  Fiat used VM Italy and VM America to

13  design and manufacture the EcoDiesel® engines for the Class Vehicles, which were calibrated in

14  Michigan with Bosch's hidden software.  Fiat, FCA, VM Italy, and VM America maintained tight

15  control over the design, manufacture, calibration, and testing of the Class Vehicles.  Bosch also

16  participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing,

17  writing the software code customized for the Class Vehicles, and concealing the hidden software

18  installed in the Class Vehicles in order to allow them to "pass" testing but then disable or restrict

19  certain emission controls during real-world driving conditions.

20          232.    At all relevant times, the RICO Defendants, along with other individuals and

21  entities, including unknown third parties involved in the design, calibration, manufacture, testing,

22  marketing, and sale of the Class Vehicles or the emission controls therein, operated an

23  association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs

24  from the EPA (and EOs from CARB) in order to sell the Class Vehicles throughout the United

25  States (and California), and through which enterprise they conducted a pattern of racketeering

26  activity under 18 U.S.C. § 1961(4).  The enterprise is called the "EcoDiesel® RICO Enterprise."

27          233.    At all relevant times, the EcoDiesel® RICO Enterprise constituted a single

28  "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities,

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1   as well as individuals and legal entities associated-in-fact for the common purpose of engaging in

2   RICO Defendants' unlawful profit-making scheme.

3       234.   The association-in-fact EcoDiesel® RICO Enterprise consisted of at least the

4   following entities and individuals, and likely others:

5               **1.   The Fiat Chrysler Defendants**

6       235.   Fiat Chrysler is the seventh-largest automaker in the world based on total annual

7   vehicle sales and is an international automotive group.  Fiat is listed on the New York Stock

8   Exchange under the symbol "FCAU" and on the Mercato Telematico Azionario under the symbol

9   "FCA."[81]  FCA is not publicly traded and thus has no SEC reporting obligations, but it does have

10  reporting obligations, protections and responsibilities unique to the State of Delaware.  FCA is a

11  distinct legal entity, controlled and owned (indirectly) by Defendant Fiat.  Marchionne is the CEO

12  and Chairman of Fiat Chrysler and oversees the board of directors for FCA.  Along with other

13  members of Fiat Chrysler's leadership, Marchionne played a pivotal role in the scheme, common

14  course of conduct, and conspiracy.  Marchionne set an aggressive plan for Fiat Chrysler to

15  increase the sales and market share of FCA, relying, in part, on incorporating its diesel experience

16  from the European to the U.S. market.  FCA's day-to-day operations are managed by employees

17  of both Fiat and FCA.  Fiat's Group Executive Committee are based in FCA's Michigan

18  headquarters.  Fiat and FCA worked closely with VM Italy and VM America to develop and

19  calibrate the EcoDiesel® engines for the Class Vehicles and to gather information for submission

20  to regulators in the COC and EO applications by FCA.  Each of these Defendants knew or

21  recklessly disregarded that the Class Vehicles were unable to (and did not) comply with U.S.

22  emission standards and yet concealed this information from regulators.

23      236.   Working with other members of the EcoDiesel® RICO Enterprise, Fiat and FCA,

24  with Marchionne at the helm, conspired to install and conceal emission control software in the

25  EcoDiesel® engines to illegally circumvent stringent U.S. emission standards.  Employing this

26  technology, Fiat Chrysler fraudulently obtained COCs and EOs for the Class Vehicles even

27  ───────────────

[81] *See About Us – FCA US LLC*, available at

28  http://www.fcanorthamerica.com/company/AboutUs/Pages/AboutUs.aspx (last accessed on July 17, 2017).

1372875.2

1    though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating

2    conditions.  Further, they concealed this information from regulators once questions were raised.

3                        **2.**        **The VM Motori Defendants**

4          237.    As explained above, Fiat bought 50% of VM Italy in 2011 and the remaining 50%

5    stake from General Motors in 2013.  Fiat Chrysler used VM Italy and VM America to design,

6    calibrate, and manufacture the EcoDiesel® engine to be used in the Class Vehicles.  Fiat and

7    FCA worked with, and oversaw, VM Italy and VM America in the development and calibration

8    of the engines at Michigan headquarters.  Employees from VM Italy and VM America worked

9    jointly on the manufacturing and/or assembling the engines for the Class Vehicles in the United

10   States.  And VM Italy and VM America performed engine calibrations, including calibrations

11   involving the concealed emission control technology for the Class Vehicles.  For example, VM

12   Motori's Calibration Leader for the Class Vehicles was based in Michigan and reported to

13   management at both VM Italy and VM America.  Finally, VM Italy and VM America provided

14   information to FCA for inclusion in the COC and EO applications.  VM Italy and VM America

15   knew or recklessly disregarded that the EcoDiesel® engines in the Class Vehicles were unable to

16   comply with U.S. emission standards and yet concealed this information from regulators.

17                       **3.**        **The Bosch Defendants**

18         238.    As explained above, the Bosch Defendants supplied the emission control

19   technology at issue—EDC Unit 17s—which were installed in the Class Vehicles.  Bosch GmbH

20   is a multinational engineering and electronics company headquartered in Germany, which has

21   hundreds of subsidiaries and companies, including in the United States.  It wholly owns Bosch

22   LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.

23   Bosch's sectors and divisions are grouped by subject matter, not location.  Mobility Solutions is

24   the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees

25   of both Bosch GmbH and Bosch LLC.  These individuals were responsible for the design,

26   manufacture, development, customization, and supply of the EDC units for the Class Vehicles.

27         239.    Defendant Denner has been Chairman and CEO of Bosch since July 2012, after

28   decades of working in Bosch's Engine ECU Development division, managing the development

and sale of automotive engine computers, such as the EDC units that were installed in the Class Vehicles.  Denner fostered Bosch's relationship with key corporate partners, such as Fiat, which brought in millions of dollars in annual revenue for Bosch.

240.    Bosch worked with Fiat and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions.  Bosch was well aware that the EDC Unit 17 would be used for this purpose.  Bosch was also critical to the concealment of these software functions in communications with regulators.

**B.    The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues.**

241.    The EcoDiesel® RICO Enterprise began as early as 2009, when Fiat began to acquire FCA and later VM Motori.  On information and belief, Fiat Chrysler and Bosch entered into an agreement to develop and install EDC Unit 17's into over a hundred thousand Class Vehicles sold in the United States.  It was not until September 2015 that the scheme began to unravel, when U.S. regulators uncovered Volkswagen's defeat devices provided by Bosch and questions were raised as to whether other diesel automakers were cheating, too.

242.    At all relevant times, the EcoDiesel® RICO Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Fiat and FCA, their network of dealerships, Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Class Vehicles to consumers in the Nationwide Class through fraudulent COCs and EOs, false emissions tests, false or misleading sales tactics and materials, and deriving profits and revenues from those activities.  Each member of the EcoDiesel® RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the

-98-

benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.[82]

243.    The EcoDiesel® RICO Enterprise functioned by selling vehicles and component parts to the consuming public.  Many of these products are legitimate, including vehicles that do not contain concealed AECDs.  However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

244.    The EcoDiesel® RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

245.    Within the EcoDiesel® RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

246.    Each participant in the EcoDiesel® RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the EcoDiesel® RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

247.    The RICO Defendants participated in the operation and management of the EcoDiesel® Enterprise by directing its affairs, as described herein.  While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the

---

[82] Fiat and FCA sold more Class Vehicles, and was able to charge consumers a premium price, by advertising the Class Vehicles as "clean," "environmentally friendly," and "fuel efficient."  As a result, VM Motori sold more "EcoDiesel®" engines and Bosch sold more EDC Units to equip the Class Vehicles.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

248.    Fiat, FCA, and Marchionne exerted substantial control over the EcoDiesel® RICO Enterprise, and participated in the affairs of the Enterprise, by:

A.    installing emission control software that deactivates or restricts one or more of the controls during real-world driving conditions;

B.    concealing these software functions from regulators;

C.    failing to correct or disable the hidden software when warned;

D.    manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

E.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

F.    introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

G.    concealing the existence of the emission controls and the unlawfully high emissions from regulators and the public;

H.    persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emission testing and discrepancies concerning the same;

I.    misleading government regulators as to the nature of the emission control technology and the defects in the Class Vehicles;

J.    misleading the driving public as to the nature of the emission control technology and the defects in the Class Vehicles;

K.    designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

L.    otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

M.    illegally selling and/or distributing the Class Vehicles;

1      N.      collecting revenues and profits from the sale of such products; and/or

2      O.      ensuring that the other RICO Defendants and unnamed co-conspirators

3              complied with the scheme or common course of conduct.

4          249.    VM Italy and VM America also participated in, operated and/or directed the

5  EcoDiesel RICO Enterprise by developing an engine that emits high levels of toxic pollutants,

6  calibrating the emission controls to deactivate or diminish during real-world driving conditions,

7  and providing false or misleading information for purposes of supplying it to regulators on COC

8  and/or EO applications.

9          250.    Bosch GmbH, Bosch LLC, and Denner also participated in, operated and/or

10  directed the EcoDiesel® RICO Enterprise.  On information and belief, Denner formed a

11  partnership with Fiat to provide engine management and emission control technology for the

12  Class Vehicles.  Bosch GmbH and Bosch LLC participated in the fraudulent scheme by

13  manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 for the Class

14  Vehicles.  Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects

15  of the software and closely collaborated with Fiat, FCA, VM Italy, and VM America to develop,

16  customize, and calibrate the software for the Class Vehicles.  Additionally, Bosch GmbH and

17  Bosch LLC continuously cooperated with the other RICO Defendants to ensure that the EDC

18  Unit 17 was fully integrated into the Class Vehicles.  Bosch GmbH and Bosch LLC also

19  participated in the affairs of the Enterprise by concealing the software functions from U.S.

20  regulators and actively lobbying regulators on behalf of "clean diesel."  Bosch collected millions

21  of dollars in revenues and profits from the hidden software installed in the Class Vehicles.

22          251.    Without the RICO Defendants' willing participation, including Bosch GmbH and

23  Bosch LLC's active involvement in developing and supplying the critical emission control

24  software for the Class Vehicles, the Enterprise's scheme and common course of conduct would

25  have been unsuccessful.

26          252.    The RICO Defendants directed and controlled the ongoing organization necessary

27  to implement the scheme at meetings and through communications of which Plaintiffs cannot

28  fully know at present, because such information lies in the Defendants' and others' hands.

1   Similarly, because the defendants often refer to themselves as a group (*i.e.*, "Bosch" rather than

2   "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the full extent of each individual

3   corporate entity's involvement in the wrongdoing prior to having access to discovery.

4   **C.      Mail And Wire Fraud**

5   253.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants,

6   each of whom is a person associated-in-fact with the EcoDiesel® RICO Enterprise, did

7   knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the

8   Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1),

9   1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of

10  18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

11  254.    Specifically, as alleged herein, the RICO Defendants have committed, conspired to

12  commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering

13  activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.  The multiple

14  acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the

15  commission of, were related to each other, posed a threat of continued racketeering activity, and

16  therefore constitute a "pattern of racketeering activity."  The racketeering activity was made

17  possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and

18  employees of the EcoDiesel® RICO Enterprise.  The RICO Defendants participated in the

19  scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in

20  interstate or foreign commerce.

21  255.    The RICO Defendants used, directed the use of, and/or caused to be used,

22  thousands of interstate mail and wire communications in service of their scheme through virtually

23  uniform misrepresentations, concealments and material omissions.

24  256.    In devising and executing the illegal scheme, the RICO Defendants devised and

25  knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide

26  Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or

27  fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of

28  executing the illegal scheme, the RICO Defendants committed these racketeering acts, which

1372875.2

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    number in the thousands, intentionally and knowingly with the specific intent to advance the

2    illegal scheme.

3            257.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

4    include, but are not limited to:

5                    A.      Mail Fraud:  The RICO Defendants violated 18 U.S.C. § 1341 by sending

6                            or receiving, or by causing to be sent and/or received, materials via U.S.

7                            mail or commercial interstate carriers for the purpose of executing the

8                            unlawful scheme to design, manufacture, market, and sell the Class

9                            Vehicles by means of false pretenses, misrepresentations, promises, and

10                           omissions.

11                   B.      Wire Fraud:  The RICO Defendants violated 18 U.S.C. § 1343 by

12                           transmitting and/or receiving, or by causing to be transmitted and/or

13                           received, materials by wire for the purpose of executing the unlawful

14                           scheme to defraud and obtain money on false pretenses,

15                           misrepresentations, promises, and omissions.

16           258.    The RICO Defendants' uses of the mails and wires include, but are not limited to,

17   the transmission, delivery, or shipment of the following by the RICO Defendants or third parties

18   that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

19                   A.      the Class Vehicles themselves;

20                   B.      component parts for the EcoDiesel® engines;

21                   C.      component parts for the Bosch emission control hardware and software;

22                   D.      false or misleading emission test results;

23                   E.      applications for EPA COCs and CARB EOs that concealed AECDs;

24                   F.      fraudulently-obtained EPA COCs and CARB EOs;

25                   G.      vehicle registrations and plates as a result of the fraudulently-obtained EPA

26                           COCs and CARB EOs;

27                   H.      documents and communications that facilitated "passing" emission tests;

28

I.  false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emission controls and/or AECDs;

J.  sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Class Vehicles;

K.  documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.  documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

M.  payments to VM Italy and VM America;

N.  payments to Bosch GmbH and Bosch LLC;

O.  millions of dollars in compensation to Marchionne and Denner;

P.  deposits of proceeds; and/or

Q.  other documents and things, including electronic communications.

259.  The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| FCA | Bosch LLC | January 2013 | Documents related to agreement to purchase Bosch EDC Unit 17 for 2014 Jeep Grand Cherokee. |
| VM Motori | FCA | January 2013 | Documents related to EcoDiesel® engine for 2014 Jeep Grand Cherokee. |
| FCA, Michigan | FCA Dealerships | July 2013 | Marketing Documents for 2014 Ram 1500 Class Vehicles. |
| EPA | FCA | September 2013 | COC and related documents for 2014 Jeep Grand Cherokee. |

| From | To | Date | Description |
|------|------|------|-------------|
| EPA | FCA | September 2014 | COC and related documents for 2015 Jeep Grand Cherokee. |
| FCA Warren Truck Assembly | Arrigo Dodge dealership, Sunrise, Florida | November 2015 | Shipment of 2016 Ram 1500 Class Vehicles. |

260.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|------|------|-------------|
| Bosch LLC | PR Newswire, New York (and media network around United States) | January 2013 | Press release that Bosch's "clean diesel" technology will be featured in 2014 Jeep Grand Cherokee. |
| FCA, Michigan | Driving Public Throughout All 50 States | July 2013 | Ram Zone Blog: *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You.* |
| Bosch LLC | FCA | October 2013 | Software and calibration documentation for emission control technology. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2014 | Certification Summery Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram 1500. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2015 | Certification Summery Information Report with emission test results for 2015 Jeep Grand Cherokee and 2015 Ram 1500. |
| FCA, Michigan | EPA, Washington, DC | February 2, 2016 | Email correspondence re: FCA lulling press release concerning compliance of diesel vehicles with applicable emission regulations. |

| From | To | Date | Description |
|------|-----|------|-------------|
| EPA, Washington DC | FCA, Michigan | November 30, 2016 | Email correspondence re: conference call between EPA officials and Defendant Marchionne. |

261.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.  Specifically, FCA, under the direction and control of Fiat and Marchionne, made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics.

262.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

263.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

264.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

265.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as

1372875.2

1  defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in

2  these offenses and have performed acts in furtherance of the conspiracy to increase or maintain

3  revenues, increase market share, and/or minimize losses for the Defendants and their unnamed

4  co-conspirators throughout the illegal scheme and common course of conduct.

5          266.    The RICO Defendants aided and abetted others in the violations of the above laws,

6  thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

7          267.    To achieve their common goals, the RICO Defendants hid from the general public

8  the excessive and unlawful emissions of the Class Vehicles and obfuscated the true nature and

9  level of the emissions even after regulators raised concerns.  The RICO Defendants suppressed

10  and/or ignored warnings from third parties, whistleblowers, and governmental entities about the

11  discrepancies in emissions testing and the concealed auxiliary (or defeat) devices present in the

12  Class Vehicles.

13          268.    With knowledge and intent, the RICO Defendants and each member of the

14  conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy,

15  and have participated in the common course of conduct, to commit acts of fraud and indecency in

16  designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and

17  the emission control technology contained therein).

18          269.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-

19  conspirators had to agree to implement and use the similar devices and fraudulent tactics.

20  Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Class

21  Vehicles.

22          270.    The RICO Defendants knew and intended that government regulators would rely

23  on their material omissions made about the Class Vehicles to approve them for importation,

24  marketing, and sale in the United States and each state.  The RICO Defendants knew and

25  intended that consumers would purchase the Class Vehicles and incur costs as a result.  Plaintiffs'

26  reliance on this ongoing concealment is demonstrated by the fact that they purchased illegal and

27  defective vehicles that never should have been introduced into the U.S. stream of commerce.  In

28  addition, the EPA, CARB, and other regulators relied on the misrepresentations and material

1   concealment and omissions made or caused to be made by the RICO Defendants; otherwise, FCA

2   could not have obtained valid COCs and EOs to sell the Class Vehicles.

3       271.    As described herein, the RICO Defendants engaged in a pattern of related and

4   continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities,

5   each conducted with the common purpose of obtaining significant monies and revenues from

6   Plaintiffs and Class members based on their misrepresentations and omissions, while providing

7   Class Vehicles that were worth significantly less than the purchase price paid.  The predicate acts

8   also had the same or similar results, participants, victims, and methods of commission.  The

9   predicate acts were related and not isolated events.

10      272.    The predicate acts had the purpose of generating significant revenue and profits for

11  the RICO Defendants at the expense of Plaintiffs and Class members.  The predicate acts were

12  committed or caused to be committed by the RICO Defendants through their participation in the

13  EcoDiesel® RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in

14  that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses

15  associated with remediating the Class Vehicles.

16      273.    During the design, manufacture, testing, marketing and sale of the Class Vehicles,

17  the RICO Defendants shared among themselves technical, marketing, and financial information

18  that revealed the existence of the AECDs contained therein.  Nevertheless, the RICO Defendants

19  chose and agreed to disseminate information that deliberately misrepresented the Class Vehicles

20  as legal, "clean," "environmentally friendly," and "fuel efficient" in their concerted efforts to

21  market and sell them to consumers.

22      274.    By reason of, and as a result of the conduct of the RICO Defendants, and in

23  particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in

24  their business and/or property in multiple ways, including but not limited to:

25          A.    Purchase or lease of illegal, defective Class Vehicles;

26          B.    Overpayment at the time of purchase or lease for Class Vehicles

27              purportedly having "EcoDiesel" properties and benefits, and meeting

28

1372875.2

1    applicable federal and state emissions standards, that did not have these

2    properties or meet these standards;

3    C.    The value of the Class Vehicles has diminished;

4    D.    Other, ongoing out-of-pocket and loss-of-use expenses;

5    E.    Payment for alternative transportation; and

6    F.    Loss of employment due to lack of transportation.

7    275.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and

8 proximately caused economic damage to Plaintiffs' and Class members' business and property,

9 and Plaintiffs and Class members are entitled to bring this action for three times their actual

10 damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to

11 18 U.S.C. § 1964(c).

12
13
**NATIONWIDE COUNT II**
**FRAUD BY CONCEALMENT**
**(Common Law)**

14    276.    Plaintiffs incorporate by reference all preceding allegations as though fully set

15 forth herein.

16    277.    Plaintiffs bring this action on behalf of themselves and the Nationwide Class or, in

17 the alternative, on behalf of the State Classes, against Fiat, FCA, Marchionne, VM Italy, VM

18 America, Bosch GmbH, Bosch LLC, and Denner.

19    278.    Each Defendant committed fraud by installing and calibrating emission control

20 devices in the Class Vehicles, which were unlawfully concealed from regulators and consumers

21 alike.  In uniform advertising and materials provided with each Class Vehicle, the Fiat Chrysler

22 Defendants concealed from Plaintiffs and the Nationwide Class that the emission treatment

23 technology de-activated under real-world driving conditions.

24    279.    The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to

25 disclose the facts that the Class Vehicles had defective emission controls and/or emitted

26 unlawfully high levels of pollutants such as NOx.  These Defendants, along with VM Motori and

27 the Bosch Defendants, knew or should have known the true facts, due to their involvement in the

28 design, installment, and calibration of the emission treatment technology in the Class Vehicles.

1    And yet, at no time did any of these Defendants reveal the truth to Plaintiffs or the Class.  To the

2    contrary, each Defendant concealed the truth, intending for Plaintiffs and the Class to rely—

3    which they did.

4         280.    A reasonable consumer would not have expected that the emission treatment

5    technology in the Class Vehicles de-activated under real-world driving conditions or that the

6    Class Vehicle would spew unmitigated NOx during city or highway driving.  Plaintiffs and the

7    members of the Class did not know of the facts which were concealed from them by Defendants.

8    Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel

9    the deception on their own.

10        281.    Defendants had a duty to disclose that the emission treatment technology is de-

11   activated under real-world driving conditions and that the Class Vehicles spewed unmitigated

12   NOx during real-world conditions.  Defendants had such a duty because the true facts were

13   known and/or accessible only to them and because they knew these facts were not known to or

14   reasonably discoverable by Plaintiffs or the members of the Class.

15        282.    Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the

16   emission controls in light of their statements about the qualities of the EcoDiesel® engines and

17   the Class Vehicles' emissions levels, which were misleading, deceptive, and incomplete without

18   the disclosure of the fact that the emission treatment technology is de-activated under real-world

19   driving conditions and that the Class Vehicles spewed unmitigated NOx during real-world

20   conditions.  Fiat Chrysler held out the Class Vehicles as ***reduced emission*** diesel vehicles, when

21   in fact, they were ***unlawfully high*** emission vehicles.  Having volunteered to provide information

22   to Plaintiffs and the members of the Class, Fiat Chrysler and VM Motori had the duty to disclose

23   the whole truth.  On information and belief, Fiat Chrysler has still not made full and adequate

24   disclosures and continues to defraud Plaintiffs and the members of the Class by concealing

25   material information regarding the emissions qualities of the Class Vehicles.

26        283.    Had the truth been revealed, Plaintiffs and the Class would not have purchased the

27   Class Vehicles, or would have paid less for them.  Plaintiffs and the members of the Class have

28   sustained damage because they own Class Vehicles that should never have been placed in the

1   stream of commerce and are diminished in value as a result of Defendants' fraud.  Accordingly,

2   Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be

3   proven at trial.

4        284.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with

5   intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich

6   themselves.  Their misconduct warrants an assessment of punitive damages in an amount

7   sufficient to deter such conduct in the future, which amount shall be determined according to

8   proof at trial.

9                           **NATIONWIDE COUNT III**
                    **IMPLIED AND WRITTEN WARRANTY**
10          **Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

11        285.    Plaintiffs incorporate by reference all preceding allegations as though fully set

12   forth herein.

13        286.    Plaintiffs bring this action on behalf of themselves and the Nationwide Class

14   against FCA US LLC.

15        287.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by

16   virtue of 28 U.S.C. § 1332 (a)-(d).

17        288.    Plaintiffs and members of the Class are "consumers" within the meaning of

18   15 U.S.C. § 2301(3).

19        289.    FCA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)

20   and (5), respectively.

21        290.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C.

22   § 2301(1).

23        291.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

24   damaged by the failure of a warrantor to comply with a written or implied warranty.

25        292.    The amount in controversy of Plaintiffs' individual claims meets or exceeds

26   $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value

27   (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

28

293.     FCA provided Plaintiffs and each member of the Class with "written warranties" and "implied warranties," as identified above, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

294.     The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased their Class Vehicles.

295.     FCA breached these written and implied warranties as described in detail above. Without limitation, the Class Vehicles share a common design defect in that they emit more pollutants than: (a) is allowable under the applicable regulations, and (b) was revealed to regulators, consumers, and the driving public.

296.     Plaintiffs and each member of the Class have had sufficient direct dealings with either FCA or its agents (including dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiffs and each member of the Class, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

297.     Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle, FCA knew, or should have known, of its misrepresentations and/or material omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

298.     In addition, given the conduct described herein, any attempts by FCA, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage

1    of the defect is unconscionable and any such effort to disclaim, or otherwise limit, liability for the

2    defect is null and void.

3        299.    As a direct and proximate result of FCA's breach of the written and implied

4    warranties, Plaintiffs and each member of the Class have suffered damages.

5        300.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by

6    law, including compensation for the monetary difference between the Class Vehicles as warranted

7    and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or

8    renting replacement vehicles, along with all other incidental and consequential damages, statutory

9    attorney fees, and all other relief allowed by law.

10   **II.     STATE CLASS-SPECIFIC CLAIMS**

11                          **ALABAMA COUNT I**
12       **VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT**
                          **(Ala. Code § 8-19-1, *et seq.*)**

13       301.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

14   forth herein.

15       302.    Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John

16   Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves

17   and the Alabama State Class against all Defendants.

18       303.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

19   Marchionne, Plaintiffs, and the Alabama State Class members are "persons" within the meaning

20   of Ala. Code § 8-19-3(5).  Plaintiffs and the Alabama State Class members are "consumers"

21   within the meaning of Ala. Code § 8-19-3(2).

22       304.    The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

23       305.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

24   and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Ala. Code

25   § 8-19-3(8).

26       306.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") makes unlawful

27   several specific acts, including:"(5) Representing that goods or services have sponsorship,

28   approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7)

1    Representing that goods or services are of a particular standard, quality, or grade, or that goods

2    are of a particular style or model, if they are of another," and "(27) Engaging in any other

3    unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or

4    commerce."  Ala. Code § 8-19-5.

5        307.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

6    Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alabama

7    DTPA as detailed above.  Specifically, in developing and installing emission control devices in

8    the Class Vehicles that were concealed from regulators and consumers alike, and in marketing,

9    offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of

10   the following unfair or deceptive acts or practices as defined in Ala. Code § 8-19-5:

11           A.    Causing likelihood of confusion or of misunderstanding as to the approval

12                 or certification of the Class Vehicles;

13           B.    Representing that the Class Vehicles have approval, characteristics, uses,

14                 benefits, or qualities that they do not have;

15           C.    Representing that the Class Vehicles are of a particular standard, quality

16                 and grade when they are not; and/or

17           D.    Advertising the Class Vehicles with the intent not to sell or lease them as

18                 advertised.

19       308.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

20   emission control system were material to Plaintiffs and the Alabama State Class, as Defendants

21   intended.  Had they known the truth, Plaintiffs and the Alabama State Class would not have

22   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

23   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

24   them.

25       309.    Plaintiffs and Alabama State Class members had no way of discerning that

26   Defendants' representations were false and misleading, or otherwise learning the facts that

27   Defendants had concealed or failed to disclose, because Defendants' emission control software

28

1   was extremely sophisticated technology.  Plaintiffs and Alabama State Class members did not,

2   and could not, unravel Defendants' deception on their own.

3           310.    Defendants had an ongoing duty to Plaintiffs and the Alabama State Class to

4   refrain from unfair and deceptive practices under the Alabama DTPA in the course of their

5   business.  Specifically, Defendants owed Plaintiffs and Alabama State Class members a duty to

6   disclose all the material facts concerning the EcoDiesel® emission control system because they

7   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Alabama

8   State Class, and/or they made misrepresentations that were rendered misleading because they

9   were contradicted by withheld facts.

10          311.    Plaintiffs and Alabama State Class members suffered ascertainable loss and actual

11  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

12  failure to disclose material information.

13          312.    Defendants' violations present a continuing risk to Plaintiffs and the Alabama

14  State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

15  of herein affect the public interest.

16          313.    Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama State Class seek an

17  order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages,

18  treble damages, and any other just and proper relief available under the Alabama DTPA.

19          314.    On June 12, 2017, Plaintiff Stephens sent a notice letter to FCA US LLC

20  complying with Ala. Code § 8-19-10(e).  Additionally, all Defendants were provided notice of the

21  issues raised in this count and this Complaint by the governmental investigations, the numerous

22  complaints filed against them, and the many individual notice letters sent by Plaintiffs within a

23  reasonable amount of time after the allegations of Class Vehicle defects became public.

24  Moreover, Plaintiffs sent a second notice letter pursuant to Ala. Code § 8-19-10(e) to all

25  Defendants on July 19, 2017.  Because Defendants failed to remedy their unlawful conduct within

26  the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the

27  Alabama State Class are entitled.

28

**ALABAMA COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Ala. Code §§ 7-2-313 and 7-2A-210)**

315.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

316.    Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alabama State Class against Fiat and FCA.

317.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

318.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

319.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

320.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

321.   Fiat and FCA provided these warranties to Plaintiffs and the Alabama State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Alabama State Class purchased or leased their Class Vehicles.

322.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Alabama State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

323.   Plaintiffs and the Alabama State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Alabama State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Alabama State Class.

324.   Any opportunity to cure the express breach is unnecessary and futile.

325.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Alabama State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**ALABAMA COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ala. Code §§ 7-2-314 and 7-2A-212)**

326.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

327.   Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alabama State Class against Fiat and FCA.

1372875.2

328.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

329.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

330.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

331.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

332.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

333.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs and the Alabama State Class.  The amount of damages due will be proven at trial.

**ALASKA COUNT I**
**VIOLATION OF THE ALASKA UNFAIR TRADE**
**PRACTICES AND CONSUMER PROTECTION ACT**
**(Alaska Stat. Ann. § 45.50.471, *et seq.*)**

334.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

335.    This count is brought on behalf of the Alaska State Class against all Defendants.

336.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

1372875.2

person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."  Alaska Stat. Ann. § 45.50.471.

337.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alaska CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Alaska Stat. Ann. § 45.50.471:

A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment,

1    suppression or omission, in connection with the advertisement and

2    sale/lease of the Class Vehicles, whether or not any person has in fact been

3    misled, deceived or damaged thereby.

4        338.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

5    emission control system were material to the Alaska State Class, as Defendants intended.  Had

6    they known the truth, the Alaska State Class would not have purchased or leased the Class

7    Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

8    Vehicles rendered legal to sell—would have paid significantly less for them.

9        339.    Alaska State Class members had no way of discerning that Defendants'

10   representations were false and misleading, or otherwise learning the facts that Defendants had

11   concealed or failed to disclose, because Defendants' emission control software was extremely

12   sophisticated technology.  Alaska State Class members did not, and could not, unravel

13   Defendants' deception on their own.

14       340.    Defendants had an ongoing duty to the Alaska State Class to refrain from unfair

15   and deceptive practices under the Alaska CPA in the course of their business.  Specifically,

16   Defendants owed Alaska State Class members a duty to disclose all the material facts concerning

17   the EcoDiesel® emission control system because they possessed exclusive knowledge, they

18   intentionally concealed it from the Alaska State Class, and/or they made misrepresentations that

19   were rendered misleading because they were contradicted by withheld facts.

20       341.    Alaska State Class members suffered ascertainable loss and actual damages as a

21   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

22   disclose material information.

23       342.    Defendants' violations present a continuing risk to the Alaska State Class, as well

24   as to the general public.  Defendants' unlawful acts and practices complained of herein affect the

25   public interest.

26       343.    Pursuant to Alaska Stat. Ann. §§ 45.50.531 and 45.50.535, the Alaska State Class

27   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1372875.2

1    damages, punitive damages, treble damages, and any other just and proper relief available under

2    the Alaska CPA.

3         344.    On November 28, 2016, a notice letter was sent to FCA US LLC complying with

4    Alaska Stat. § 45.50.535(b)(1).  Additionally, all Defendants were provided notice of the issues

5    raised in this count and this Complaint by the governmental investigations, the numerous

6    complaints filed against them, and the many individual notice letters sent by Plaintiffs within a

7    reasonable amount of time after the allegations of Class Vehicle defects became public.  Plaintiffs

8    sent a second notice letter pursuant to Alaska Stat. § 45.50.535(b)(1) to all Defendants on July 19,

9    2017.  Because Defendants failed to remedy their unlawful conduct within the requisite time

10   period, the Alaska State Class members seek all damages and relief to which they are entitled.

## ALASKA COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Alaska Stat. Ann. §§ 45.02.314 and 45.12.212)

13        345.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

14   paragraphs as though fully set forth herein.

15        346.    This count is brought on behalf of the Alaska State Class against Fiat and FCA.

16        347.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

17   under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles

18   under § 45.02.103(a)(4).

19        348.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

20   motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

21        349.    The Class Vehicles are and were at all relevant times "goods" within the meaning

22   of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8).

23        350.    A warranty that the Class Vehicles were in merchantable condition and fit for the

24   ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat.

25   §§ 45.02.314 and 45.12.212.

26        351.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

27   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

28   Vehicles were not in merchantable condition because their design violated state and federal laws.

The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

352.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Alaska State Class.  The amount of damages due will be proven at trial.

**ALASKA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Alaska Stat. Ann. §§ 45.02.313 and 45.12.210)**

353.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

354.    This count is brought on behalf of the Alaska State Class against Fiat and FCA.

355.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles under § 45.02.103(a)(4).

356.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

357.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8)).

358.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

359.     Fiat and FCA provided these warranties to the Alaska State Class. These warranties formed the basis of the bargain that was reached when the Alaska State Class members purchased or leased their Class Vehicles.

360.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Alaska State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

361.     The Alaska State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Alaska State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Alaska State Class.

362.     Any opportunity to cure the express breach is unnecessary and futile.

363.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Alaska State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**ARIZONA COUNT I**
**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. § 44-1521, *et seq.*)**

364.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

365.     Plaintiffs Steven Elowitz, Gregory Giauque, and Casey Wheelock (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Arizona State Class against all Defendants.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

366.    FCA, Fiat, VM Italy, VM America, Bosch GmBH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Arizona State Class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

367.    The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

368.    The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

369.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Arizona CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in deceptive acts or practices, as outlined in Ariz. Rev. Stat. § 44-1522(A), including using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

370.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Arizona State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Arizona State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

371.     Plaintiff and Arizona State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Arizona State Class members did not, and could not, unravel Defendants' deception on their own.

372.     Defendants had an ongoing duty to Plaintiffs and the Arizona State Class to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business. Specifically, Defendants owed Plaintiff and Arizona State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Arizona State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

373.     Plaintiff and Arizona State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

374.     Defendants' violations present a continuing risk to Plaintiffs and the Arizona State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

375.     Plaintiffs and the Arizona State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arizona CFA.

## ARIZONA COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212)

376.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

377.     Plaintiffs Steven Elowitz, Gregory Giauque, and Casey Wheelock (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Arizona State Class against Fiat and FCA.

378.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under § 47-2103(A)(4).

379.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

380.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

381.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

382.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

383.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Arizona State Class.  The amount of damages due will be proven at trial.

**ARIZONA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Ariz. Rev. Stat. §§ 47-2313 and 47-2A210)**

384.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

385.    Plaintiffs Steven Elowitz, Gregory Giauque, and Casey Wheelock (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Arizona State Class against Fiat and FCA.

386.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under § 47-2103(A)(4).

387.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

388.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

389.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

390.    Fiat and FCA provided these warranties to Plaintiffs and the Arizona State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Arizona State Class purchased or leased their Class Vehicles.

391.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Arizona State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

392.    Plaintiffs and the Arizona State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the Arizona State Class, the Class Vehicles were designed to pollute at higher than legal limits during

normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Arizona State Class.

393.    Any opportunity to cure the express breach is unnecessary and futile.

394.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Arizona State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**ARKANSAS COUNT I**
**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT**
**(Ark. Code Ann. § 4-88-101, *et seq*.)**

395.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

396.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Arkansas State Class against all Defendants.

397.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Volkmar Denner, Plaintiff, and the Arkansas State Class are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

398.    The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

399.    The Arkansas Deceptive Trade Practice Act ("Arkansas DTPA") makes unlawful "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]"  Ark. Code Ann. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  Ark. Code Ann. § 4-88-108.

400.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Arkansas DTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ark. Code Ann. §§ 4-88-107 - 108:

> A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> C.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or
>
> D.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

401.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Arkansas State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Arkansas State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

402.     Plaintiff and Arkansas State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software

1  was extremely sophisticated technology.  Plaintiff and Arkansas State Class members did not, and

2  could not, unravel Defendants' deception on their own.

3      403.    Defendants had an ongoing duty to Plaintiff and the Arkansas State Class to refrain

4  from unfair and deceptive practices under the Arkansas DTPA in the course of their business.

5  Specifically, Defendants owed Plaintiff and the Arkansas State Class members a duty to disclose

6  all the material facts concerning the EcoDiesel® emission control system because they possessed

7  exclusive knowledge, they intentionally concealed it from the Arkansas State Class, and/or they

8  made misrepresentations that were rendered misleading because they were contradicted by

9  withheld facts.

10     404.    Plaintiff and Arkansas State Class members suffered ascertainable loss and actual

11 damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

12 failure to disclose material information.

13     405.    Defendants' violations present a continuing risk to the Arkansas State Class, as

14 well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

15 the public interest.

16     406.    Plaintiff and the Arkansas State Class seek an order enjoining Defendants' unfair

17 and/or deceptive acts or practices, and awarding damages pursuant to Ark. Code Ann. § 4-88-

18 13(f), and any other just and proper relief available under the Arkansas DTPA.

19                    **ARKANSAS COUNT II**
                **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
20                **(Ark. Code Ann. §§ 4-2-314 and 4-2A-212)**

21     407.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

22 paragraphs as though fully set forth herein.

23     408.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this

24 action on behalf of himself and the Arkansas State Class against Fiat and FCA.

25     409.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

26 under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under

27 § 4-2-103(1)(d).

28

410.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

411.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

412.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code Ann. §§ 4-2-314 and 4-2A-212.

413.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

414.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Arkansas State Class.  The amount of damages due will be proven at trial.

**ARKANSAS COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-210)**

415.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

416.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Arkansas State Class against Fiat and FCA.

417.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

418.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

419.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

420.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

421.     Fiat and FCA provided these warranties to the Arkansas State Class. These warranties formed the basis of the bargain that was reached when the Arkansas State Class purchased or leased their Class Vehicles.

422.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Arkansas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

423.     Plaintiff and the Arkansas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Arkansas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Arkansas State Class.

1    424.    Any opportunity to cure the express breach is unnecessary and futile.

2    425.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

3    Plaintiff and the Arkansas State Class suffered significant damages, and seek damages in an

4    amount to be determined at trial.

**CALIFORNIA COUNT I**
**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750, *et seq.*)**

7    426.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

8    forth herein.

9    427.    Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and

10   Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of

11   themselves and the California State Class against all Defendants.

12   428.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

13   Marchionne, Volkmar Denner, Plaintiffs, and the California State Class members are "persons"

14   within the meaning of Cal. Civ. Code § 1761(c).  Plaintiffs and the California State Class

15   members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

16   429.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts

17   or practices undertaken by any person in a transaction intended to result or which results in the

18   sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

19   430.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

20   Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the

21   CLRA as detailed above.  Specifically, in developing and installing emission control devices in

22   the Class Vehicles that were concealed from regulators and consumers alike, and in marketing,

23   offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of

24   the following unfair or deceptive acts or practices as defined in Cal. Civ. Code § 1770(a):

A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

C.      Advertising the Class Vehicles with the intent not to sell or lease them as

advertised.

431.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to Plaintiffs and the California State Class, as Defendants

intended.  Had they known the truth, Plaintiffs and the California State Class would not have

purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

them.

432.    Plaintiffs and California State Class members had no way of discerning that

Defendants' representations were false and misleading, or otherwise learning the facts that

Defendants had concealed or failed to disclose, because Defendants' emission control software

was extremely sophisticated technology.  Plaintiffs and California State Class members did not,

and could not, unravel Defendants' deception on their own.

433.    Defendants had an ongoing duty to Plaintiffs and the California State Class to

refrain from unfair and deceptive practices under the California CLRA in the course of their

business.  Specifically, Defendants owed Plaintiffs and California State Class members a duty to

disclose all the material facts concerning the EcoDiesel® emission control system because they

possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the California

State Class, and/or they made misrepresentations that were rendered misleading because they

were contradicted by withheld facts.

434.    Plaintiffs and California State Class members suffered ascertainable loss and

actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

and/or failure to disclose material information.

435.    Defendants' violations present a continuing risk to Plaintiffs and the California

State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

of herein affect the public interest.

436.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs and the California State Class seek

an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

1    punitive damages, and any other just and proper relief available under the CLRA.  Under Cal.

2    Civ. Code § 1780(b), Plaintiff seeks an additional award against Defendants of up to $5,000 for

3    each California State Class member who qualifies as a "senior citizen" or "disabled person" under

4    the CLRA.  Defendants knew or should have known that their conduct was directed to one or

5    more California State Class members who are senior citizens or disabled persons.  Defendants'

6    conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss

7    of property set aside for retirement or for personal or family care and maintenance, or assets

8    essential to the health or welfare of the senior citizen or disabled person.  One or more California

9    State Class members who are senior citizens or disabled persons are substantially more vulnerable

10   to Defendants' conduct because of age, poor health or infirmity, impaired understanding,

11   restricted mobility, or disability, and each of them suffered substantial physical, emotional, or

12   economic damage resulting from Defendants' conduct.

13            437.    On November 28, 2016, Plaintiff Chavez sent a notice letter to FCA US LLC

14   complying with Cal. Civ. Code § 1780(b).  On January 17, a second notice letter was sent to FCA

15   US LLC and Fiat Chrysler. Plaintiffs sent yet another notice letter pursuant to Cal. Civ. Code

16   § 1780(b) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice

17   of the issues raised in this count and this Complaint by the governmental investigations, the

18   numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs

19   within a reasonable amount of time after the allegations of Class Vehicle defects became public.

20   Because Defendants failed to remedy their unlawful conduct within the requisite time period,

21   Plaintiff seek all damages and relief to which Plaintiffs and the California State Class are entitled.

22                              **CALIFORNIA COUNT II**
     **UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE**
23                   **CALIFORNIA UNFAIR COMPETITION LAW**
                     **(Cal. Bus. & Prof. Code § 17200, *et seq.*)**
24

25            438.    Plaintiff incorporates by reference each preceding paragraph as though fully set

26   forth herein.

27

28

439.    Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against all Defendants.

440.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."  Fiat, FCA, VM Motori, Bosch GmbH, Bosch LLC, Marchionne, and Denner have engaged in at least the following unlawful, fraudulent, and unfair business acts and practices in violation of the UCL:

        A.    by knowingly and intentionally concealing from Plaintiffs and the other California State Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs and Class members;

        B.    by marketing Class Vehicles as possessing functional and defect-free, "clean" diesel engine systems; and

        C.    by violating both federal and California laws, including the federal RICO statute and California laws governing vehicle emissions and emission testing requirements.

441.    Defendants' cheating scheme and concealment of the true characteristics of the EcoDiesel emission control system were material to Plaintiffs and the California State Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the California State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

442.    Plaintiffs and California State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.  Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs and the California State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to

1    Plaintiffs and California State Class members any money acquired by unfair competition,

2    including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code

3    §§ 17203 and 3345, and any other just and proper relief available under the California UCL.

4                              **CALIFORNIA COUNT III**

     **FALSE ADVERTISING UNDER THE CALIFORNIA UNFAIR COMPETITION LAW**
5                        **(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

6            443.    Plaintiff incorporates by reference all preceding allegations as though fully set

7    forth herein.

8            444.    Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and

9    Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of

10   themselves and the California State Class against FCA, Fiat, Marchionne, Bosch LLC, Bosch

11   GmbH, Denner, and VM Motori.

12           445.    California Bus. & Prof. Code § 17500 states:  "It is unlawful for any person, …

13   corporation …or any employee thereof with intent directly or indirectly to dispose of real or

14   personal property… or to induce the public to enter into any obligation relating thereto, to make

15   or disseminate or cause to be made or disseminated … before the public in this state or from this

16   state before the public in any state, in any newspaper or other publication, or any advertising

17   device, … or in any other manner or means whatever, including over the Internet, any statement

18   … which is untrue or misleading, and which is known, or which by the exercise of reasonable

19   care should be known, to be untrue or misleading."

20           446.    FCA, Fiat, and Marchionne; Bosch LLC, Bosch GmbH, and Denner; and VM

21   Motori, each made or caused to be made and disseminated throughout California and the United

22   States, through advertising, marketing, and other publications, numerous statements that were

23   untrue or misleading, and which were known, or which by the exercise of reasonable care should

24   have been known to each Defendant, to be untrue and misleading to consumers, including

25   Plaintiff and the other California State Class members. Numerous examples of these statements

26   and advertisements appear throughout this Complaint.

27           447.    Pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiffs and the California State

28   Class seek an order enjoining Defendants' false advertising, any such orders or judgments as may

1    be necessary to restore to Plaintiffs and the California State Class members any money acquired

2    by unfair competition, including restitution and/or restitutionary disgorgement, and any other just

3    and proper relief available under the false advertising provisions of the UCL.

### CALIFORNIA COUNT IV
### BREACH OF EXPRESS WARRANTY
### (Cal. Com. Code §§ 2313 and 10210)

6        448.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

7    fully set forth herein.

8        449.    Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and

9    Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of

10   themselves and the California State Class against Fiat and FCA.

11       450.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

12   vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under

13   § 2103(1)(d).

14       451.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

15   motor vehicles under Cal. Com. Code § 10103(a)(16).

16       452.    The Class Vehicles are and were at all relevant times "goods" within the meaning

17   of Cal. Com. Code §§ 2105(1) and 10103(a)(8)).

18       453.    Federal law requires manufacturers of light-duty vehicles to provide two federal

19   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

20   The Performance Warranty applies to repairs that are required during the first two years or 24,000

21   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

22   major emission control components are covered for the first eight years or 80,000 miles,

23   whichever comes first.  These major emission control components subject to the longer warranty

24   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

25   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

26   emission control or emission related parts which fail to function or function improperly due to a

27   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

28

miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

454. Fiat and FCA provided these warranties to Plaintiffs and the California State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the California State Class purchased or leased their Class Vehicles.

455. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the California State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

456. Plaintiffs and the California State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the California State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the California State Class.

457. Any opportunity to cure the express breach is unnecessary and futile.

458. As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the California State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**CALIFORNIA COUNT V**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Cal. Com. Code §§ 2314 and 10212)**

459. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

460.    Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

461.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

462.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

463.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

464.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

465.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

466.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the California State Class.  The amount of damages due will be proven at trial.

**CALIFORNIA COUNT VI**
**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR**
**BREACH OF EXPRESS WARRANTIES**
**(Cal. Civ. Code §§ 1791.2 & 1793.2(d))**

467.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

468.   Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

469.   Plaintiffs and the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

470.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

471.   Fiat Chrysler is a "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

472.   Plaintiffs and the California State Class bought/leased new motor vehicles manufactured by Fiat Chrysler.

473.   Fiat Chrysler made express warranties to Plaintiffs and the California State Class within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

474.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

475.   Fiat and FCA provided these warranties to Plaintiffs and the California State Class.  These warranties formed the basis of the bargain that was reached when Plaintiffs and the California State Class purchased or leased their Class Vehicles.

476.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the California State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

477.    Plaintiffs and the California State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the California State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the California State Class.

478.    Any opportunity to cure the express breach is unnecessary and futile.

479.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the California State Class suffered significant damages, and seek damages in an amount to be determined at trial.

480.    Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, CA Plaintiffs and the other California State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**CALIFORNIA COUNT VII**
**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Cal. Civ. Code §§ 1791.1 and 1792)**

481.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

482.     Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

483.     Plaintiffs and the other California State Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

484.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

485.     Fiat Chrysler is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

486.     Fiat Chrysler impliedly warranted to CA Plaintiffs and the other California State Class members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

487.     Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.     Pass without objection in the trade under the contract description.

B.     Are fit for the ordinary purposes for which such goods are used.

C.     Are adequately contained, packaged, and labeled.

D.     Conform to the promises or affirmations of fact made on the container or label.

488.     The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' "clean" diesel engine system.  Because of the defects in the Class Vehicles' EcoDiesel® engine systems, they are not in merchantable condition and thus not fit for ordinary purposes.

489.     The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' diesel engine system.  The Class Vehicles do not conform to the promises and affirmations made by Fiat Chrysler.

490. Fiat Chrysler's breach of the implied warranty of merchantability caused damage to Plaintiffs and the California State Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

491. Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the California State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**CALIFORNIA COUNT VIII**
**BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES**
**(Cal. Civ. Code § 1793.2, *et seq.*)**

492. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

493. Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

494. Each class vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

495. The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." This provision applies without any time or mileage limitation.

496. The California Emissions Warranties also specifically warrant Class members against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.

497. California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

498.     Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option.  *See* Cal. Civ. Code § 1793.2(d)(2).

499.     Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Fiat Chrysler is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished."  Cal. Civ. Code § 1793.2(c).

500.     This complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods."  *Id.*

501.     In addition to all other damages and remedies, Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation.  *See* Cal. Civ. Code § 1794(e)(1).  Any "third-party dispute resolution process" offered by Defendants does not relieve Defendants from the civil penalty imposed because Defendants are not offering the process to Class members for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant.  *See* Cal. Civ. Code § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

**CALIFORNIA COUNT IX**
**FAILURE TO RECALL/RETROFIT UNDER CALIFORNIA LAW**

502.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

503.     Plaintiffs Jose Chavez, Marianna Falco, Leslie Ghrist, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

504.     Fiat Chrysler manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Vehicles, as set forth above.

505.    Defendants knew or reasonably should have known that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable risk.

506.    Fiat Chrysler became aware that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

507.    Fiat Chrysler failed to recall the Class Vehicles in a timely manner or warn of the dangers posed by Class Vehicles.

508.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Vehicles.

509.    Plaintiffs and the California State Class were harmed by Fiat Chrysler's failure to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience, and caused by Fiat Chrysler's ongoing failure to properly recall, retrofit, and fully repair the Class Vehicles.

510.    Even in the event of a recall, Plaintiffs and the California State Class have suffered and continue to damages for each day that a recall is delayed.

511.    Fiat Chrysler's failure to timely recall the Class Vehicles was a substantial factor in causing the harm to Plaintiffs and the California State Class as alleged herein.

## COLORADO COUNT I
## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (Colo. Rev. Stat. § 6-1-101, *et seq.*)

512.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

513.    Plaintiff William Markin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Colorado State Class against all Defendants.

514.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Colorado State Class members are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101, *et seq.*  Plaintiff and the Colorado State Class members are "consumers" within the meaning of Col. Rev. Stat § 6-1-113(1)(a).

515.    The Colorado CPA makes unlawful deceptive trade practices in the course of a person's business.  Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though FCA knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to FCA at the time of advertisement or sale with the intent to induce Colorado State Class members to purchase, lease or retain the Class Vehicles.

516.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Colorado CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Colo. Rev. Stat. § 6-1-105:

A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

D.    Failing to disclose material information concerning the Class Vehicles known to Defendants at the time of advertisement or sale, with the intention of inducing Plaintiff and Class members to purchase or lease the vehicles.

517.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Colorado State Class, as Defendants

-147-

1   intended.  Had they known the truth, Plaintiff and the Colorado State Class would not have

2   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

3   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

4   them.

5          518.   Plaintiff and Colorado State Class members had no way of discerning that

6   Defendants' representations were false and misleading, or otherwise learning the facts that

7   Defendants had concealed or failed to disclose, because Defendants' emission control software

8   was extremely sophisticated technology.  Plaintiff and Colorado State Class members did not, and

9   could not, unravel Defendants' deception on their own.

10         519.   Defendants had an ongoing duty to Plaintiff and the Colorado State Class to refrain

11  from unfair and deceptive practices under the Colorado CPA in the course of their business.

12  Specifically, Defendants owed Plaintiff and Colorado State Class members a duty to disclose all

13  the material facts concerning the EcoDiesel® emission control system because they possessed

14  exclusive knowledge, they intentionally concealed it from Plaintiff and the Colorado State Class,

15  and/or they made misrepresentations that were rendered misleading because they were

16  contradicted by withheld facts.

17         520.   Plaintiff and Colorado State Class members suffered ascertainable loss and actual

18  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

19  failure to disclose material information.

20         521.   Defendants' violations present a continuing risk to Plaintiff and the Colorado State

21  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

22  herein affect the public interest.

23         522.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff and the Colorado State Class seek

24  an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

25  treble or punitive damages, and any other just and proper relief available under the Colorado CPA

26

27

28

**COLORADO COUNT II**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212)**

523.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

524.    Plaintiff William Markin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Colorado State Class against Fiat and FCA.

525.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

526.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

527.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

528.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

529.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

530.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Colorado State Class.  The amount of damages due will be proven at trial.

**COLORADO COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)**

531.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

532.    Plaintiff William Markin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Colorado State Class against Fiat and FCA.

533.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

534.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

535.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

536.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

537.    Fiat and FCA provided these warranties to Plaintiff and the Colorado State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Colorado State Class purchased or leased their Class Vehicles.

538.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Colorado State Class were designed to deactivate under real-

1    world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2    emissions testing, and therefore, knew that the emission systems contained defects.

3        539.    Plaintiff and the Colorado State Class reasonably relied on Fiat's and FCA's

4    express warranties concerning emissions when purchasing or leasing the Class Vehicles.

5    However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

6    Colorado State Class, the Class Vehicles were designed to pollute at higher than legal limits

7    during normal driving, and could not achieve advertised performance and efficiency metrics

8    without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

9    FCA therefore breached their express warranty by providing a product containing defects that

10   were never disclosed to Plaintiff and the Colorado State Class.

11       540.    Any opportunity to cure the express breach is unnecessary and futile.

12       541.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13   Plaintiff and the Colorado State Class suffered significant damages, and seek damages in an

14   amount to be determined at trial.

15                              **CONNECTICUT COUNT I**
                **VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
16                          **(Conn. Gen. Stat. § 42-110a, *et seq.*)**

17       542.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

18   forth herein.

19       543.    Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this

20   action on behalf of himself and the Connecticut State Class against all Defendants.

21       544.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

22   Sergio Marchionne, Plaintiff, and the Connecticut State Class members are "persons" within the

23   meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act

24   ("Connecticut UTPA").  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner,

25   and Marchionne are engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat.

26   § 42-110a(4).

27

28

545.   The Connecticut provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

546.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Connecticut UTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

547.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Connecticut State Class, as Defendants

1    intended.  Had they known the truth, Plaintiff and the Connecticut State Class would not have

2    purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

3    and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

4    them.

5         548.    Plaintiff and Connecticut State Class members had no way of discerning that

6    Defendants' representations were false and misleading, or otherwise learning the facts that

7    Defendants had concealed or failed to disclose, because Defendants' emission control software

8    was extremely sophisticated technology.  Plaintiff and Connecticut State Class members did not,

9    and could not, unravel Defendants' deception on their own.

10        549.    Defendants had an ongoing duty to Plaintiff and the Connecticut State Class to

11   refrain from unfair and deceptive practices under the Connecticut UTPA in the course of their

12   business.  Specifically, Defendants owed Plaintiff and Connecticut State Class members a duty to

13   disclose all the material facts concerning the EcoDiesel® emission control system because they

14   possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Connecticut

15   State Class, and/or they made misrepresentations that were rendered misleading because they

16   were contradicted by withheld facts.

17        550.    Plaintiff and Connecticut State Class members suffered ascertainable loss and

18   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

19   and/or failure to disclose material information.

20        551.    Defendants' violations present a continuing risk to Plaintiff and the Connecticut

21   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

22   of herein affect the public interest.

23        552.    Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff and the Connecticut State Class

24   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

25   damages, punitive damages, and any other just and proper relief available under the Connecticut

26   UTPA.

27

28

**CONNECTICUT COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Conn. Gen. Stat. Ann. § 42A-2-313)**

553.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

554.   Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Connecticut State Class against Fiat and FCA.

555.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

556.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

557.   Fiat and FCA provided these warranties to Plaintiff and the Connecticut State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Connecticut State Class purchased or leased their Class Vehicles.

558.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Connecticut State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

559.    Plaintiff and the Connecticut State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Connecticut State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the California State Class.

560.    Any opportunity to cure the express breach is unnecessary and futile.

561.    Due to Fiat and FCA's breach of warranty as set forth herein, Plaintiff and the Connecticut State Class assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods and for a return to Plaintiff and the Connecticut State Class of the purchase price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

562.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Connecticut State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## CONNECTICUT COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Conn. Gen. Stat. Ann. § 42A-2-314)

563.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

564.    Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Connecticut State Class against Fiat and FCA.

565.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

566.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

567.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

568.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Connecticut State Class.  The amount of damages due will be proven at trial.

### DELAWARE COUNT I
### VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT AND DECEPTIVE TRADE PRACTICES ACT
### (6 Del. Code § 2513, *et seq*., and 6 Del. Code § 2531, *et seq*.)

569.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

570.   Plaintiff Richard Jackson (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Delaware State Class against all Defendants.

571.   Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Volkmar Denner, and the Delaware State Class members are "persons" within the meaning of 6 Del. Code § 2511(7) and § 2531(5).

572.   The Delaware Consumer Fraud Act ("Delaware CFA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 Del. Code § 2513(a).

573.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Delaware CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unlawful acts or practices prohibited by 6 Del. Code § 2513(a): using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

574.     Defendants also engaged in one or more of the following deceptive trade practices enumerated by the Delaware Deceptive Trade Practices Act at 6 Del. Code § 2532:

a.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

d.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

e.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

575.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Delaware State Class, as Defendants intended.  Had they known the truth, the Delaware State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

576.     Delaware State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely

1    sophisticated technology.  Delaware State Class members did not, and could not, unravel

2    Defendants' deception on their own.

3         577.    Defendants had an ongoing duty to the Delaware State Class to refrain from unfair

4    and deceptive practices under the Delaware CFA in the course of their business.  Specifically,

5    Defendants owed Delaware State Class members a duty to disclose all the material facts

6    concerning the EcoDiesel® emission control system because they possessed exclusive

7    knowledge, they intentionally concealed it from the Delaware State Class, and/or they made

8    misrepresentations that were rendered misleading because they were contradicted by withheld

9    facts.

10        578.    Delaware State Class members suffered ascertainable loss and actual damages as a

11   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

12   disclose material information.

13        579.    Defendants' violations present a continuing risk to the Delaware State Class, as

14   well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

15   the public interest.

16        580.    The Delaware State Class seeks an order enjoining Defendants' unfair and/or

17   deceptive acts or practices, and awarding damages, punitive or treble damages, and any other just

18   and proper relief available under the Delaware CFA and DTPA (6 Del. Code §§ 2525 and 2533).

19   *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).

20   **DELAWARE COUNT II**
     **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
21   **(6 Del. Code §§ 2-314 and 2A-212)**

22        581.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

23   paragraphs as though fully set forth herein.

24        582.    Plaintiff Richard Jackson (for the purpose of this section, "Plaintiff") brings this

25   action on behalf of himself and the Delaware State Class against Fiat and FCA.

26        583.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

27   under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

28

584.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

585.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

586.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

587.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

588.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Delaware State Class.  The amount of damages due will be proven at trial.

**DELAWARE COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(6 Del. Code §§ 2-313 and 2A-210)**

589.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

590.   Plaintiff Richard Jackson (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Delaware State Class against Fiat and FCA.

591.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

592.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

593.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

594.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

595.     Fiat and FCA provided these warranties to the Delaware State Class. These warranties formed the basis of the bargain that was reached when the Delaware State Class purchased or leased their Class Vehicles.

596.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Delaware State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

597.     The Delaware State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Delaware State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Delaware State Class.

598.     Any opportunity to cure the express breach is unnecessary and futile.

599.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Delaware State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**DISTRICT OF COLUMBIA COUNT I**
**VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT**
**(D.C. Code § 28-3901, *et seq.*)**

600.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

601.     This count is brought on behalf of the District of Columbia Class against all Defendants.

602.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the District of Columbia Class members are "persons" within the meaning of D.C. Code § 28-3901(a)(1).  The District of Columbia Class members are "consumers" within the meaning of D.C. Code § 28-3901(1)(2).

603.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade practices" within the meaning of D.C. Code § 28-3901.

604.     The District of Columbia Consumer Protection Procedures Act ("District of Columbia CPPA") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  D.C. Code § 28-3901, *et seq.*

605.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the District of Columbia CPPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in D.C. Code § 28-3901, *et seq.*:

> A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

C.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

606.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the District of Columbia Class, as Defendants intended. Had they known the truth, the District of Columbia Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

607.    District of Columbia Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  District of Columbia Class members did not, and could not, unravel Defendants' deception on their own.

608.    Defendants had an ongoing duty to the District of Columbia Class to refrain from unfair and deceptive practices under the District of Columbia CPPA in the course of their business.  Specifically, Defendants owed District of Columbia Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the District of Columbia Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

609.    District of Columbia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

610.    Defendants' violations present a continuing risk to the District of Columbia Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

611.    Pursuant to D.C. Code § 28-3901, the District of Columbia Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble and/or punitive damages, and any other just and proper relief available under the District of Columbia CPPA.

**DISTRICT OF COLUMBIA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(D.C. Code §§ 28:2-314 and 28:2A-212)**

612.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

613.    This count is brought on behalf of the District of Columbia Class against Fiat and FCA.

614.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

615.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

616.    The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

617.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-314 and 28:2A-212.

618.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

619.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the District of Columbia Class.  The amount of damages due will be proven at trial.

1372875.2

## DISTRICT OF COLUMBIA COUNT III
## BREACH OF EXPRESS WARRANTY
### (D.C. Code §§ 28:2-313 and 28:2A-210)

620.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

621.    This count is brought on behalf of the District of Columbia Class against Fiat and FCA.

622.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

623.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

624.    The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

625.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

626.    Fiat and FCA provided these warranties to the District of Columbia Class. These warranties formed the basis of the bargain that was reached when the District of Columbia Class purchased or leased their Class Vehicles.

627. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the District of Columbia Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

628. The District of Columbia Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to the District of Columbia Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the District of Columbia Class.

629. Any opportunity to cure the express breach is unnecessary and futile.

630. As a direct and proximate result of Fiat's and FCA's breach of express warranties, the District of Columbia Class suffered significant damages, and seek damages in an amount to be determined at trial.

## FLORIDA COUNT I
## VIOLATION OF FLORIDA'S UNFAIR &
## DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq.*)

631. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

632. Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida State Class against all Defendants.

633. Plaintiffs and the Florida State Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

634.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8).

635.    The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).

636.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the FUDTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by Fla. Stat. § 501.204(1):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

637.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Florida State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Florida State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

638.   Plaintiffs and Florida State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Florida State Class members did not, and could not, unravel Defendants' deception on their own.

639.   Defendants had an ongoing duty to Plaintiffs and the Florida State Class to refrain from unfair and deceptive practices under the FUDTPA in the course of their business. Specifically, Defendants owed Plaintiffs and Florida State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Florida State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

640.   Plaintiffs and Florida State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

641.   Defendants' violations present a continuing risk to Plaintiffs and the Florida State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

642.   Pursuant to Fla. Stat. §§ 501.2105(1)-(2), Plaintiffs and the Florida State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the FUDTPA.

-167-

**FLORIDA COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Fla. Stat. §§ 672.313 and 680.21)**

643.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

644.    Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida State Class against Fiat and FCA.

645.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

646.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

647.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

648.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1372875.2

649.     Fiat and FCA provided these warranties to Plaintiffs and the Florida State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Florida State Class purchased or leased their Class Vehicles.

650.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Florida State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

651.     Plaintiffs and the Florida State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Florida State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Florida State Class.

652.     Any opportunity to cure the express breach is unnecessary and futile.

653.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Florida State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**FLORIDA COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Fla. Stat. §§ 672.314 and 680.212)**

654.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

655.     Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida State Class against Fiat and FCA.

656.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

657.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

658.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

659.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

660.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

661.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Florida State Class.  The amount of damages due will be proven at trial.

### GEORGIA COUNT I
### VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Ga. Code Ann. § 10-1-370, *et seq.*)

662.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

663.    Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespe, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against all Defendants.

664.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Georgia State Class members are "persons" within the

1  meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code.

2  Ann. § 10-1-371(5).

3      665.    The Georgia UDTPA prohibits any "deceptive trade practices," which include

4  misrepresenting the "standard, quality, or grade" of goods or services, and engaging "in any other

5  conduct which similarly creates a likelihood of confusion or of misunderstanding."  Ga. Code.

6  Ann. § 10-1-372(a).

7      666.    Defendants' deceptive conduct violates the Georgia UDPTA in at least the

8  following ways:

9          A.    Causing likelihood of confusion or of misunderstanding as to the approval

10             or certification of the Class Vehicles;

11         B.    Representing that the Class Vehicles have characteristics, uses, or benefits

12             that they do not have;

13         C.    Representing that the Class Vehicles are of a particular standard, quality

14             and grade when they are not;

15         D.    Advertising the Class Vehicles with the intent not to sell or lease them as

16             advertised; and

17         E.    Engaging in other conduct which created a likelihood of confusion or of

18             misunderstanding.

19     667.    Defendants' cheating scheme and concealment of the true characteristics of the

20  EcoDiesel emission control system were material to Plaintiffs and the Georgia State Class, and

21  Defendants misrepresented, concealed, or failed to disclose the truth with the intention that

22  consumers would rely on the misrepresentations, concealments, and omissions.  Had they known

23  the truth, Plaintiffs and the Georgia State Class members who purchased or leased the Class

24  Vehicles would not have purchased or leased them at all or—if the Vehicles' true nature had been

25  disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly

26  less for them.

27

28

668.    Plaintiffs and Georgia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

669.    Pursuant to Ga. Code. Ann § 10-1-373, Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to Plaintiffs and Georgia State Class members any money acquired by deceptive trade practices, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the Georgia UDTPA.

### GEORGIA COUNT II
### VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
#### (Ga. Code Ann. § 10-1-390, *et seq.*)

670.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

671.    Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespe, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against all Defendants.

672.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.  Ga. Code. Ann. § 10-1-393(a).

673.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Georgia FBPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ga. Code. Ann. § 10-1-393(b):

A.    Causing confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.  Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

D.  Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

674.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Georgia State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Georgia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

675.  Plaintiffs and Georgia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Georgia State Class members did not, and could not, unravel Defendants' deception on their own.

676.  Defendants had an ongoing duty to Plaintiffs and the Georgia State Class to refrain from unfair and deceptive practices under the Georgia FBPA in the course of their business. Specifically, Defendants owed Plaintiffs and Georgia State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Georgia State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

677.  Plaintiffs and Georgia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

678.     Defendants' violations present a continuing risk to Plaintiffs and the Georgia State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

679.     Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble damages, and any other just and proper relief available under the Georgia FBPA.

680.     On June 12, 2017, Plaintiff Turner sent a notice letter to FCA US LLC complying with Ga. Code. Ann. § 10-1-399(b).  Plaintiffs sent a second notice letter pursuant to Ga. Code. Ann. § 10-1-399(b) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Georgia State are entitled.

**GEORGIA COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)**

681.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

682.     Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespe, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against Fiat and FCA.

683.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

684.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

685.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

686.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

687.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

688.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Georgia State Class.  The amount of damages due will be proven at trial.

## GEORGIA COUNT IV
## BREACH OF EXPRESS WARRANTY
### (Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)

689.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

690.    Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespe, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against Fiat and FCA.

691.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

692.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

693.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

694.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

695.     Fiat and FCA provided these warranties to Plaintiffs and the Georgia State Class.  These warranties formed the basis of the bargain that was reached when Plaintiffs and the Georgia State Class purchased or leased their Class Vehicles.

696.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Georgia State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

697.     Plaintiffs and the Georgia State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Georgia State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Georgia State Class.

1    698.    Any opportunity to cure the express breach is unnecessary and futile.

2    699.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

3  Plaintiffs and the Georgia State Class suffered significant damages, and seek damages in an

4  amount to be determined at trial.

5                          **HAWAII COUNT I**
                **UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW**
6                          **(Haw. Rev. Stat. § 480, *et seq.*)**

7    700.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

8  forth herein.

9    701.    This count is brought on behalf of the Hawaii State Class against all Defendants.

10    702.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

11  Sergio Marchionne, and the Hawaii State Class members are "persons" within the meaning of

12  Haw. Rev. Stat. § 480-1.  The Hawaii State Class members are "consumers" within the meaning

13  of Haw. Rev. Stat. § 480-1.

14    703.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and

15  Marchionne are engaged in trade or commerce.

16    704.    The Hawaii Act prohibits "unfair methods of competition and unfair or deceptive

17  acts or practices in the conduct of any trade or commerce...."  Haw. Rev. Stat. § 480-2(a).

18    705.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

19  Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Hawaii Act

20  as detailed above.  Specifically, in developing and installing emission control devices in the Class

21  Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for

22  sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the

23  following unfair or deceptive acts or practices in violation of § 480-2(a):

24            A.    Causing likelihood of confusion or of misunderstanding as to the approval

25                  or certification of the Class Vehicles;

26            B.    Representing that the Class Vehicles have approval, characteristics, uses,

27                  or benefits that they do not have;

28

C.  Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

706.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Hawaii State Class, as Defendants intended.  Had they known the truth, the Hawaii State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

707.   Hawaii State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Hawaii State Class members did not, and could not, unravel Defendants' deception on their own.

708.   Defendants had an ongoing duty to the Hawaii State Class to refrain from unfair and deceptive practices under the Hawaii Act in the course of their business.  Specifically, Defendants owed Hawaii State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Hawaii State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

709.   Hawaii State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

710.   Defendants' violations present a continuing risk to the Hawaii State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

711.   Pursuant to Haw. Rev. Stat. § 480-13, the Hawaii State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Hawaii Act.

712.   Under Haw. Rev. Stat. § 480-13.5, Plaintiff seeks an additional award against Defendants of up to $10,000 for each Hawaii State Class member who qualifies as a Hawaiian elder under the Hawaii Act.  Defendants knew or should have known that their conduct was directed to one or more Hawaii State Class members who are elders.  Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. One or more Hawaii State Class members who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

## HAWAII COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212)

713.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

714.   This count is brought on behalf of the Hawaii State Class against Fiat and FCA.

715.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

1    716.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

2    motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

3    717.    The Class Vehicles are and were at all relevant times "goods" within the meaning

4    of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

5    718.    A warranty that the Class Vehicles were in merchantable condition and fit for the

6    ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat.

7    §§ 490:2-314 and 490:2A-212.

8    719.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

9    condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

10   Vehicles were not in merchantable condition because their design violated state and federal laws.

11   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

12   federal emission standards.

13   720.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

14   damage to the Hawaii State Class.  The amount of damages due will be proven at trial.

15                          **HAWAII COUNT III**
                   **BREACH OF EXPRESS WARRANTY**
16              **(Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210)**

17   721.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

18   fully set forth herein.

19   722.    This count is brought on behalf of the Hawaii State Class against Fiat and FCA.

20   723.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

21   vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor

22   vehicles under § 490:2-103(1)(d).

23   724.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

24   motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

25   725.    The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

27   726.    Federal law requires manufacturers of light-duty vehicles to provide two federal

28   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1  The Performance Warranty applies to repairs that are required during the first two years or 24,000

2  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

3  major emission control components are covered for the first eight years or 80,000 miles,

4  whichever comes first.  These major emission control components subject to the longer warranty

5  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

6  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

7  emission control or emission related parts which fail to function or function improperly due to a

8  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

9  miles, whichever comes first, or, for the major emission control components, for eight years or

10  80,000 miles, whichever comes first.

11  727.  Fiat and FCA provided these warranties to the Hawaii State Class. These

12  warranties formed the basis of the bargain that was reached when the Hawaii State Class

13  purchased or leased their Class Vehicles.

14  728.  However, Fiat and FCA knew or should have known that the warranties were false

15  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

16  sold and leased to the Hawaii State Class were designed to deactivate under real-world driving

17  conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

18  testing, and therefore, knew that the emission systems contained defects.

19  729.  The Hawaii State Class reasonably relied on Fiat's and FCA's express warranties

20  concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class

21  Vehicles did not perform as warranted.  Unbeknownst to the Hawaii State Class, the Class

22  Vehicles were designed to pollute at higher than legal limits during normal driving, and could not

23  achieve advertised performance and efficiency metrics without this cheating design.  This design

24  and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express

25  warranty by providing a product containing defects that were never disclosed to the Hawaii State

26  Class.

27  730.  Any opportunity to cure the express breach is unnecessary and futile.

28

731.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Hawaii State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**IDAHO COUNT I**
**VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT**
**(Idaho Code § 48-601, *et seq.*)**

732.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

733.    Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class against all Defendants.

734.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Idaho State Class members are "persons" within the meaning Idaho Code § 48-602(1).

735.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Idaho Code § 48-602(2).

736.    The Idaho Consumer Credit and Protection Act ("Idaho CPA") makes unlawful misleading, false, or deceptive acts.

737.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Idaho CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices proscribed by Idaho Code § 48-603:

A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

738.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Idaho State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Idaho State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

739.    Plaintiffs and Idaho State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Idaho State Class members did not, and could not, unravel Defendants' deception on their own.

740.    Defendants had an ongoing duty to Plaintiffs and the Idaho State Class to refrain from unfair and deceptive practices under the Idaho CPA in the course of their business. Specifically, Defendants owed Plaintiffs and Idaho State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Idaho State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

741.    Plaintiffs and Idaho State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

742. Defendants' violations present a continuing risk to Plaintiffs and the Idaho State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

743. Pursuant Idaho Code § 48-608, Plaintiffs and the Idaho State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Idaho CPA.

## IDAHO COUNT II
## BREACH OF EXPRESS WARRANTY
### (Idaho Code §§ 28-2-313 and 28-12-210)

744. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

745. Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class against Fiat and FCA.

746. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

747. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

748. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h)).

749. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of

1   emission control or emission related parts which fail to function or function improperly due to a

2   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

3   miles, whichever comes first, or, for the major emission control components, for eight years or

4   80,000 miles, whichever comes first.

5          750.    Fiat and FCA provided these warranties to Plaintiffs and the Idaho State Class.

6   These warranties formed the basis of the bargain that was reached when Plaintiffs and the Idaho

7   State Class purchased or leased their Class Vehicles.

8          751.    However, Fiat and FCA knew or should have known that the warranties were false

9   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

10  sold and leased to Plaintiffs and the Idaho State Class were designed to deactivate under real-

11  world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

12  emissions testing, and therefore, knew that the emission systems contained defects.

13         752.    Plaintiffs and the Idaho State Class reasonably relied on Fiat's and FCA's express

14  warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

15  Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Idaho State

16  Class, the Class Vehicles were designed to pollute at higher than legal limits during normal

17  driving, and could not achieve advertised performance and efficiency metrics without this

18  cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

19  therefore breached their express warranty by providing a product containing defects that were

20  never disclosed to Plaintiffs and the Idaho State Class.

21         753.    Any opportunity to cure the express breach is unnecessary and futile.

22         754.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

23  Plaintiffs and the Idaho State Class suffered significant damages, and seek damages in an amount

24  to be determined at trial.

25                             **IDAHO COUNT III**
                   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
26                      **(Idaho Code §§ 28-2-314 and 28-12-212)**

27         755.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

28  paragraphs as though fully set forth herein.

-185-

756.     Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class against Fiat and FCA.

757.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

758.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

759.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

760.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant Idaho Code §§ 28-2-314 and 28-12-212.

761.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

762.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Idaho State Class.  The amount of damages due will be proven at trial.

**ILLINOIS COUNT I**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, *et seq.* and 510/2)**

763.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

764.     Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Illinois State Class against all Defendants.

765.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Illinois State Class members are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5).  Plaintiff and the Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

766.    The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

767.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Illinois CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

-187-

E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

768.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Illinois State Class, as Defendants intended. Had they known the truth, Plaintiff and the Illinois State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

769.    Plaintiff and Illinois State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiff and Illinois State Class members did not, and could not, unravel Defendants' deception on their own.

770.    Defendants had an ongoing duty to Plaintiff and the Illinois State Class to refrain from unfair and deceptive practices under the Illinois CFA in the course of their business. Specifically, Defendants owed Plaintiff and Illinois State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Illinois State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

771.    Plaintiff and Illinois State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

772.    Defendants' violations present a continuing risk to Plaintiff and the Illinois State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

773.    Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff and the Illinois State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

**ILLINOIS COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**

774.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

775.    Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Illinois State Class against Fiat and FCA.

776.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

777.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

778.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

779.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

780.    Fiat and FCA provided these warranties to Plaintiff and the Illinois State Class.  These warranties formed the basis of the bargain that was reached when Plaintiff and the Illinois State Class purchased or leased their Class Vehicles.

781.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Illinois State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

782.    Plaintiff and the Illinois State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Illinois State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Illinois State Class.

783.    Any opportunity to cure the express breach is unnecessary and futile.

784.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Illinois State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**ILLINOIS COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)**

785.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

786.    Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Illinois State Class against Fiat and FCA.

787.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

788.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

789.    The Class Vehicles are and were at all relevant times "goods" within the meaning 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h)).

790.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

791.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

792.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Illinois State Class.  The amount of damages due will be proven at trial.

**INDIANA COUNT I**
**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(Ind. Code § 24-5-0.5-3)**

793.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

794.   Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Indiana State Class against all Defendants.

795.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Indiana State Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

796.   Plaintiff's and Indiana State Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

797.   The Indiana Deceptive Consumer Sales Act ("Indiana DCSA prohibits a person from engaging in a "deceptive act," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."  Ind. Code § 24-5-0.5-3.

798.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one

or more of the following unfair or deceptive acts or practices as defined in Ind. Code § 24-5-0.5-3:

        A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

        C.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

799.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Indiana State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Indiana State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

800.     Plaintiff and Indiana State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Indiana State Class members did not, and could not, unravel Defendants' deception on their own.

801.     Defendants had an ongoing duty to Plaintiff and the Indiana State Class to refrain from unfair and deceptive practices under the Indiana DCSA in the course of their business.  Specifically, Defendants owed Plaintiff and Indiana State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Indiana State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-193-

802.    Plaintiff and Indiana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

803.    Defendants' violations present a continuing risk to Plaintiff and the Indiana State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

804.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Indiana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Indiana DCSA.

805.    On November 8, 2016, a notice letter was sent to FCA US LLC complying with Ind. Code § 24-5-0.5-5(a).  Plaintiffs sent a second notice letter pursuant to Ind. Code § 24-5-0.5-5(a) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Indiana State Class are entitled.

## INDIANA COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)

806.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

807.    Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Indiana State Class against Fiat and FCA.

808.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

809.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

810.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

811.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

812.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

813.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Indiana State Class.  The amount of damages due will be proven at trial.

**INDIANA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)**

814.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

815.    Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Indiana State Class against Fiat and FCA.

816.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

817.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

818.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

819.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1372875.2

The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

820.  Fiat and FCA provided these warranties to Plaintiff and the Indiana State Class.  These warranties formed the basis of the bargain that was reached when Plaintiff and the Indiana State Class purchased or leased their Class Vehicles.

821.  However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Indiana State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

822.  Plaintiff and the Indiana State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Indiana State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Indiana State Class.

823.  Any opportunity to cure the express breach is unnecessary and futile.

824.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Indiana State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**IOWA COUNT I**
**VIOLATIONS OF THE PRIVATE RIGHT OF ACTION**
**FOR CONSUMER FRAUDS ACT**
**(Iowa Code § 714h.1, *et seq.*)**

825.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

826.     Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Iowa State Class against all Defendants.

827.     Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and Iowa State Class members are "persons" within the meaning Iowa Code § 714H.2(7).

828.     Plaintiff and the Iowa State Class members are "consumers" within the meaning of Iowa Code § 714H.2(3).

829.     The Iowa Deceptive Consumer Sales Act ("Iowa DCSA") prohibits a person from engaging in a "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

830.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Iowa DCSA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants violated Iowa Code § 714H.3 by using or employing deception, fraud, false pretense, false promise or

1372875.2

misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

831.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Iowa State Class, as Defendants intended.  Had they known the truth, the Iowa State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

832.     Iowa State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Iowa State Class members did not, and could not, unravel Defendants' deception on their own.

833.     Defendants had an ongoing duty to the Iowa State Class to refrain from unfair and deceptive practices under the Iowa DCSA in the course of their business.  Specifically, Defendants owed Iowa State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Iowa State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

834.     Iowa State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

835.     Defendants' violations present a continuing risk to the Iowa State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

836.    Pursuant to Iowa Code § 714H.5, the Iowa State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Iowa DCSA.

**IOWA COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Iowa Code §§ 554.2313 and 554.13210)**

837.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

838.    Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Iowa State Class against Fiat and FCA.

839.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

840.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

841.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

842.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

## IOWA COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Iowa Code §§ 554.2314 and 554.13212)

843.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

844.     Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Iowa State Class against Fiat and FCA.

845.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

846.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

847.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

848.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code §§ 554.2314 and 554.13212.

849.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

850.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Iowa State Class.  The amount of damages due will be proven at trial.

### KANSAS COUNT I
#### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
##### (Kan. Stat. Ann. § 50-623, *et seq.*)

851.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

852.     This count is brought on behalf of the Kansas State Class against all Defendants.

853.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are "suppliers" within the meaning of Kan. Stat. Ann. § 50-624(l).  The Kansas State Class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

854.     The sale of the Class Vehicles to the Kansas State Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

855.     The Kansas Consumer Credit and Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).

856.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Kansas CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Kan. Stat. Ann. § 50-627(a):

A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C.     Exaggerating and providing falsehoods regarding the material facts concerning the Class Vehicles; and/or

D.     Failing to state, willfully concealing, suppressing, and/or omitting material facts relating to the Class Vehicles.

857.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Kansas State Class, as Defendants intended.  Had they known the truth, the Kansas State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

858.     Kansas State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Kansas State Class members did not, and could not, unravel Defendants' deception on their own.

859.     Defendants had an ongoing duty to the Kansas State Class to refrain from unfair and deceptive practices under the Kansas CPA in the course of their business.  Specifically, Defendants owed Kansas State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Kansas State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

860.     Kansas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

861.     Defendants' violations present a continuing risk to the Kansas State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

862.     Pursuant to Kan. Stat. Ann §§ 50-634 and 50-636, the Kansas State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Kansas CPA.

### KANSAS COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)

863.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

864.     This count is brought on behalf of the Kansas State Class against Fiat and FCA.

865.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

866.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

867.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

868.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212.

869.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

870.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Kansas State Class.  The amount of damages due will be proven at trial.

**KANSAS COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210)**

871.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

872.    This count is brought on behalf of the Kansas State Class against Fiat and FCA.

873.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

874.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

875.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

876.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1    The Performance Warranty applies to repairs that are required during the first two years or 24,000

2    miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

3    major emission control components are covered for the first eight years or 80,000 miles,

4    whichever comes first.  These major emission control components subject to the longer warranty

5    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

6    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

7    emission control or emission related parts which fail to function or function improperly due to a

8    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

9    miles, whichever comes first, or, for the major emission control components, for eight years or

10   80,000 miles, whichever comes first.

11        877.    Fiat and FCA provided these warranties to the Kansas State Class. These

12   warranties formed the basis of the bargain that was reached when the Kansas State Class

13   purchased or leased their Class Vehicles.

14        878.    However, Fiat and FCA knew or should have known that the warranties were false

15   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

16   sold and leased to the Kansas State Class were designed to deactivate under real-world driving

17   conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

18   testing, and therefore, knew that the emission systems contained defects.

19        879.    The Kansas State Class reasonably relied on Fiat's and FCA's express warranties

20   concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class

21   Vehicles did not perform as warranted.  Unbeknownst to the Kansas State Class, the Class

22   Vehicles were designed to pollute at higher than legal limits during normal driving, and could not

23   achieve advertised performance and efficiency metrics without this cheating design.  This design

24   and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express

25   warranty by providing a product containing defects that were never disclosed to the Kansas State

26   Class.

27        880.    Any opportunity to cure the express breach is unnecessary and futile.

28

1372875.2

881.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Kansas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

882.    Fiat and FCA provided these warranties to the Kansas State Class. These warranties formed the basis of the bargain that was reached when the Kansas State Class purchased or leased their Class Vehicles.

883.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Kansas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

884.    The Kansas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Kansas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Kansas State Class.

885.    Any opportunity to cure the express breach is unnecessary and futile.

886.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Kansas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### KENTUCKY COUNT I
### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
#### (Ky. Rev. Stat. § 367.110, *et seq.*)

887.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

888.    Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Kentucky State Class against all Defendants.

889.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Kentucky State Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

890.    FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

891.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." Ky. Rev. Stat. § 367.170(1).

892.    In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Kentucky CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.170(1):

A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or

misrepresentation, or the concealment, suppression or omission of a

material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the advertisement and

sale/lease of the Class Vehicles, whether or not any person has in fact been

misled, deceived or damaged thereby.

893.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®
emission control system were material to Plaintiff and the Kentucky State Class, as Defendants
intended.  Had they known the truth, Plaintiff and the Kentucky State Class would not have
purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed
and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for
them.

894.    Plaintiff and Kentucky State Class members had no way of discerning that
Defendants' representations were false and misleading, or otherwise learning the facts that
Defendants had concealed or failed to disclose, because Defendants' emission control software
was extremely sophisticated technology.  Plaintiff and Kentucky State Class members did not,
and could not, unravel Defendants' deception on their own.

895.    Defendants had an ongoing duty to Plaintiff and the Kentucky State Class to
refrain from unfair and deceptive practices under the Kentucky CPA in the course of their
business.  Specifically, Defendants owed Plaintiff and Kentucky State Class members a duty to
disclose all the material facts concerning the EcoDiesel® emission control system because they
possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Kentucky
State Class, and/or they made misrepresentations that were rendered misleading because they
were contradicted by withheld facts.

896.    Plaintiff and Kentucky State Class members suffered ascertainable loss and actual
damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or
failure to disclose material information.

897.    Defendants' violations present a continuing risk to Plaintiff and the Kentucky State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

898.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiff and the Kentucky State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Kentucky CPA.

**KENTUCKY COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(KY. REV. STAT. §§ 335.2-313 and 355.2A-210)**

899.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

900.    Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Kentucky State Class against Fiat and FCA.

901.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

902.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

903.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

904.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

1    emission control or emission related parts which fail to function or function improperly due to a

2    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

3    miles, whichever comes first, or, for the major emission control components, for eight years or

4    80,000 miles, whichever comes first.

5        905.    Fiat and FCA provided these warranties to Plaintiff and the Kentucky State Class.

6    These warranties formed the basis of the bargain that was reached when Plaintiff and the

7    Kentucky State Class purchased or leased their Class Vehicles.

8        906.    However, Fiat and FCA knew or should have known that the warranties were false

9    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

10   sold and leased to Plaintiff and the Kentucky State Class were designed to deactivate under real-

11   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

12   emissions testing, and therefore, knew that the emission systems contained defects.

13       907.    Plaintiff and the Kentucky State Class reasonably relied on Fiat's and FCA's

14   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

15   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

16   Kentucky State Class, the Class Vehicles were designed to pollute at higher than legal limits

17   during normal driving, and could not achieve advertised performance and efficiency metrics

18   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

19   FCA therefore breached their express warranty by providing a product containing defects that

20   were never disclosed to Plaintiff and the Kentucky State Class.

21       908.    Any opportunity to cure the express breach is unnecessary and futile.

22       909.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

23   Plaintiff and the Kentucky State Class suffered significant damages, and seek damages in an

24   amount to be determined at trial.

25                          **KENTUCKY COUNT III**
                  **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
26                   **(KY. REV. STAT. §§ 335.2-314 and 355.2A-212)**

27       910.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

28   paragraphs as though fully set forth herein.

911.     Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Kentucky State Class against Fiat and FCA.

912.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

913.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

914.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

915.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

916.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

917.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Kentucky State Class.  The amount of damages due will be proven at trial.

### LOUISIANA COUNT I
### VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW
### (La. Rev. Stat. § 51:1401, *et seq*.)

918.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

919.     Plaintiffs Jamie Broom, Samuel Price, and John Radziewicz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Louisiana State Class against all Defendants.

920.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Louisiana State Class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).  Plaintiffs and the Louisiana State Class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

921.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

922.     The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).

923.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Louisiana CPL as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in La. Rev. Stat. § 51:1405(A):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

-211-

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

924.     Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Louisiana State Class, as Defendants intended. Had they known the truth, Plaintiffs and the Louisiana State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

925.     Plaintiffs and Louisiana State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs and Louisiana State Class members did not, and could not, unravel Defendants' deception on their own.

926.     Defendants had an ongoing duty to Plaintiffs and the Louisiana State Class to refrain from unfair and deceptive practices under the Louisiana CPL in the course of their business. Specifically, Defendants owed Plaintiffs and Louisiana State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Louisiana State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

927.     Plaintiffs and Louisiana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

928.     Defendants' violations present a continuing risk to Plaintiffs and the Louisiana State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

929.     Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Louisiana CPL.

**LOUISIANA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
**WARRANTY AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**

930.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

931.     Plaintiffs Jamie Broom, Samuel Price, and John Radziewicz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Louisiana State Class against Fiat and FCA.

932.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles.

933.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law in the instant transactions.

934.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

935.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Louisiana State Class.  The amount of damages due will be proven at trial.

-213-

**MAINE COUNT I**
**VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT**
**(Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*)**

936.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

937.   Plaintiff Henry Desroches (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against all Defendants.

938.   Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Maine State Class members are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(2).

939.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(3.

940.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  Me. Rev. Stat. Ann. Tit. 5 § 207.

941.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Maine UTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Me. Rev. Stat. Ann. Tit. 5 § 207:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

-214-

D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

942.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Maine State Class, as Defendants intended.  Had they known the truth, the Maine State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

943.   Maine State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Maine State Class members did not, and could not, unravel Defendants' deception on their own.

944.   Defendants had an ongoing duty to the Maine State Class to refrain from unfair and deceptive practices under the Maine UTPA in the course of their business.  Specifically, Defendants owed Maine State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Maine State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

945.    Maine State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

946.    Defendants' violations present a continuing risk to the Maine State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

947.    Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, the Maine State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Maine UTPA.

948.    On November 28, 2016, a notice letter was sent to FCA US LLC complying with Me. Rev. Stat. Ann. Tit. 5 § 213(1-A).  Plaintiffs sent a second notice letter pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213(1-A) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, the Maine State Class members seek all damages and relief to which they are entitled.

**MAINE COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)**

949.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

950.    Plaintiff Henry Desroches (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against Fiat and FCA.

951.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

952.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

953.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

954.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

955.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

956.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Maine State Class.  The amount of damages due will be proven at trial.

**MAINE COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(ME. REV. STAT. TIT. 11 §§ 2-313 and 2-1210)**

957.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

958.    Plaintiff Henry Desroches (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against Fiat and FCA.

959.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

960.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

961.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

962. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

963. Fiat and FCA provided these warranties to the Maine State Class. These warranties formed the basis of the bargain that was reached when the Maine State Class purchased or leased their Class Vehicles.

964. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Maine State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

965. The Maine State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to the Maine State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Maine State Class.

-218-

966.     Any opportunity to cure the express breach is unnecessary and futile.

967.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Maine State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### MARYLAND COUNT I
### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### (Md. Code Com. Law § 13-101, *et seq.*)

968.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

969.     Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against all Defendants.

970.     FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Maryland State Class members are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

971.     The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md. Code Com. Law § 13-303.

972.     In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Maryland CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Md. Code Com. Law § 13-303:

    A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

1        C.      Advertising the Class Vehicles with the intent not to sell or lease them as

2                advertised; and/or

3        D.      Using or employing deception, fraud, false pretense, false promise or

4                misrepresentation, or the concealment, suppression or omission of a

5                material fact with intent that others rely upon such concealment,

6                suppression or omission, in connection with the advertisement and

7                sale/lease of the Class Vehicles, whether or not any person has in fact been

8                misled, deceived or damaged thereby.

9        973.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

10  emission control system were material to Plaintiffs and the Maryland State Class, as Defendants

11  intended.  Had they known the truth, Plaintiffs and the Maryland State Class would not have

12  purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

13  and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

14  them.

15       974.    Plaintiffs and Maryland State Class members had no way of discerning that

16  Defendants' representations were false and misleading, or otherwise learning the facts that

17  Defendants had concealed or failed to disclose, because Defendants' emission control software

18  was extremely sophisticated technology.  Plaintiffs and Maryland State Class members did not,

19  and could not, unravel Defendants' deception on their own.

20       975.    Defendants had an ongoing duty to Plaintiffs and the Maryland State Class to

21  refrain from unfair and deceptive practices under the Maryland CPA in the course of their

22  business.  Specifically, Defendants owed Plaintiffs and Maryland State Class members a duty to

23  disclose all the material facts concerning the EcoDiesel® emission control system because they

24  possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Maryland

25  State Class, and/or they made misrepresentations that were rendered misleading because they

26  were contradicted by withheld facts.

27

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

976.     Plaintiffs and Maryland State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

977.     Defendants' violations present a continuing risk to Plaintiffs and the Maryland State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

978.     Pursuant to Md. Code Com. Law § 13-408, Plaintiffs and the Maryland State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Maryland CPA.

### MARYLAND COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Md. Code Com. Law §§ 2-314 and 2A-212)

979.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

980.     Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against Fiat and FCA.

981.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1)  and "sellers" of motor vehicles under § 2-103(1)(d).

982.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

983.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

984.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314 and 2a-212.

985.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

1    Vehicles were not in merchantable condition because their design violated state and federal laws.

2    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

3    federal emission standards.

4         986.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

5    damage to the Plaintiffs and the Maryland State Class.  The amount of damages due will be

6    proven at trial.

**MARYLAND COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Md. Code, Com. Law §§ 2-313 and 2a-210)**

9         987.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

10    fully set forth herein.

11         988.    Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section,

12    "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against Fiat

13    and FCA.

14         989.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

15    vehicles under Md. Code Com. Law § 2-104(1)  and "sellers" of motor vehicles under § 2-

16    103(1)(d).

17         990.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

18    motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

19         991.    The Class Vehicles are and were at all relevant times "goods" within the meaning

20    of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

21         992.    Federal law requires manufacturers of light-duty vehicles to provide two federal

22    emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

23    The Performance Warranty applies to repairs that are required during the first two years or 24,000

24    miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

25    major emission control components are covered for the first eight years or 80,000 miles,

26    whichever comes first.  These major emission control components subject to the longer warranty

27    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

28    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

993.    Fiat and FCA provided these warranties to Plaintiffs and the Maryland State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Maryland State Class purchased or leased their Class Vehicles.

994.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Maryland State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

995.    Plaintiffs and the Maryland State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Maryland State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Maryland State Class.

996.    Any opportunity to cure the express breach is unnecessary and futile.

997.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Maryland State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### MASSACHUSETTS COUNT I
### DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
**(Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)**

998.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

999.    Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against all Defendants.

1000.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Massachusetts State Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1001.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1002.   The Massachusetts consumer protection law ("Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

1003.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws ch. 93A, § 2:

        A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

        B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

        D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

        E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1004.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Massachusetts State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Massachusetts State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1005.  Plaintiff and Massachusetts State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Massachusetts State Class members did not, and could not, unravel Defendants' deception on their own.

1006.  Defendants had an ongoing duty to Plaintiff and the Massachusetts State Class to refrain from unfair and deceptive practices under the Massachusetts Act in the course of their business.  Specifically, Defendants owed Plaintiff and Massachusetts State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Massachusetts State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1007.  Plaintiff and Massachusetts State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1008.   Defendants' violations present a continuing risk to Plaintiff and the Massachusetts State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1009.   Plaintiff and the Massachusetts State Class seek an order pursuant to Mass. Gen. Laws ch. 93A § 9 enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Massachusetts Act.

1010.   On November 28, 2017, a notice letter was sent to FCA US LLC pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  Plaintiffs sent a second notice letter pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Massachusetts State Class are entitled.

## MASSACHUSETTS COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Mass. Gen. Laws Ch. 106 §§ 2-314 and 2A-212)

1011.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1012.   Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against Fiat and FCA.

1013.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

1014.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

-226-

1015.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

1016.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

1017.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1018.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Massachusetts State Class.  The amount of damages due will be proven at trial.

## MASSACHUSETTS COUNT III
## BREACH OF EXPRESS WARRANTY
### (Mass. Gen. Laws Ch. 106 §§ 2-313 and 2A-210)

1019.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1020.   Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against Fiat and FCA.

1021.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

1022.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

1023.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

1024.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1025.   Fiat and FCA provided these warranties to Plaintiff and the Massachusetts State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Massachusetts State Class purchased or leased their Class Vehicles.

1026.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Massachusetts State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1027.   Plaintiff and the Massachusetts State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Massachusetts State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Massachusetts State Class.

1028.   Any opportunity to cure the express breach is unnecessary and futile.

1029.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Massachusetts State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## MICHIGAN COUNT I
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
**(Mich. Comp. Laws § 445.903, *et seq.*)**

1030.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1031.   Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Michigan State Class against all Defendants.

1032.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the Michigan State Class members are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

1033.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

1034.   The Michigan Consumer Protection Act ("Michigan CPA") makes unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903(1).

1035.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Michigan CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Mich. Comp. Laws § 445.903(1):

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

  B.  Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

  C.  Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

  D.  Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

  E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1036. Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Michigan State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Michigan State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1037. Plaintiff and Michigan State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Michigan State Class members did not, and could not, unravel Defendants' deception on their own.

1038. Defendants had an ongoing duty to Plaintiff and the Michigan State Class to refrain from unfair and deceptive practices under the Michigan CPA in the course of their business.  Specifically, Defendants owed Plaintiff and Michigan State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Michigan State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1039.  Plaintiff and Michigan State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1040.  Defendants' violations present a continuing risk to Plaintiff and the Michigan State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1041.  Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the Michigan State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Michigan CPA.

**MICHIGAN COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Mich. Comp. Laws §§ 440.2313 and 440.2860)**

1042.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1043.  Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Michigan State Class against Fiat and FCA.

1044.  Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

1045.  With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1046.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1047.  Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

1    whichever comes first.  These major emission control components subject to the longer warranty

2    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

3    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

4    emission control or emission related parts which fail to function or function improperly due to a

5    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

6    miles, whichever comes first, or, for the major emission control components, for eight years or

7    80,000 miles, whichever comes first.

8         1048.   Fiat and FCA provided these warranties to Plaintiff and the Michigan State Class.

9    These warranties formed the basis of the bargain that was reached when Plaintiff and the

10   Michigan State Class purchased or leased their Class Vehicles.

11        1049.   However, Fiat and FCA knew or should have known that the warranties were false

12   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

13   sold and leased to Plaintiff and the Michigan State Class were designed to deactivate under real-

14   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

15   emissions testing, and therefore, knew that the emission systems contained defects.

16        1050.   Plaintiff and the Michigan State Class reasonably relied on Fiat's and FCA's

17   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

18   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

19   Michigan State Class, the Class Vehicles were designed to pollute at higher than legal limits

20   during normal driving, and could not achieve advertised performance and efficiency metrics

21   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

22   FCA therefore breached their express warranty by providing a product containing defects that

23   were never disclosed to Plaintiff and the Michigan State Class.

24        1051.   Any opportunity to cure the express breach is unnecessary and futile.

25        1052.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

26   Plaintiff and the Michigan State Class suffered significant damages, and seek damages in an

27   amount to be determined at trial.

28

**MICHIGAN COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mich. Comp. Laws §§ 440.2314 and 440.2860)**

1053.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1054.   Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Michigan State Class against Fiat and FCA.

1055.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

1056.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1057.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1058.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

1059.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1060.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Michigan State Class.  The amount of damages due will be proven at trial.

**MINNESOTA COUNT I**
**VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(Minn. Stat. § 325f.68, *et seq.*)**

1061.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1062.   Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against all Defendants.

1063.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1064.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1).

1065.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Minn. Stat. § 325F.69(1): using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1066.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Minnesota State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Minnesota State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1067.   Plaintiff and Minnesota State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that

1   Defendants had concealed or failed to disclose, because Defendants' emission control software

2   was extremely sophisticated technology.  Plaintiff and Minnesota State Class members did not,

3   and could not, unravel Defendants' deception on their own.

4        1068.   Defendants had an ongoing duty to Plaintiff and the Minnesota State Class to

5   refrain from unfair and deceptive practices under the Minnesota CFA in the course of their

6   business.  Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to

7   disclose all the material facts concerning the EcoDiesel® emission control system because they

8   possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Minnesota

9   State Class, and/or they made misrepresentations that were rendered misleading because they

10  were contradicted by withheld facts.

11       1069.   Plaintiff and Minnesota State Class members suffered ascertainable loss and actual

12  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

13  failure to disclose material information.

14       1070.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota

15  State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

16  of herein affect the public interest.

17       1071.   Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), Plaintiff and the Minnesota

18  State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and

19  awarding damages, and any other just and proper relief available under the Minnesota CFA.

20                          **MINNESOTA COUNT II**
    **VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES**
21                                  **ACT**
                          **(Minn. Stat. § 325d.43, *et seq.*)**
22
23       1072.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

    forth herein.
24
         1073.   Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action
25
    on behalf of himself and the Minnesota State Class against all Defendants.
26
         1074.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits
27
    deceptive trade practices.  Minn. Stat. § 325D.44.
28

1075.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Minn. Stat. § 325D.44:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1076.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Minnesota State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Minnesota State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1077.   Plaintiff and Minnesota State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Minnesota State Class members did not, and could not, unravel Defendants' deception on their own.

1078.   Defendants had an ongoing duty to Plaintiff and the Minnesota State Class to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of their business.  Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Minnesota State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1079.   Plaintiff and Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1080.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1081.   Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Plaintiff and the Minnesota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota DTPA.

### MINNESOTA COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)

1082.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1083.   Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against Fiat and FCA.

1084.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1085.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1086.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1087.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1088.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1089.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Minnesota State Class.  The amount of damages due will be proven at trial.

## MINNESOTA COUNT IV
## BREACH OF EXPRESS WARRANTY
### (Minn. Stat. §§ 336.2-313 and 336.2A-210)

1090.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1091.   Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against Fiat and FCA.

1092.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1093.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1094.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

1095.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1096.  Fiat and FCA provided these warranties to Plaintiff and the Minnesota State Class.  These warranties formed the basis of the bargain that was reached when Plaintiff and the Minnesota State Class purchased or leased their Class Vehicles.

1097.  However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Minnesota State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1098.  Plaintiff and the Minnesota State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Minnesota State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Minnesota State Class.

1099.  Any opportunity to cure the express breach is unnecessary and futile.

1       1100.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

2   Plaintiff and the Minnesota State Class suffered significant damages, and seek damages in an

3   amount to be determined at trial.

4                           **MISSISSIPPI COUNT I**
                   **VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT**
5                         **(Miss. Code. Ann. § 75-24-1, *et seq.*)**

6       1101.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

7   forth herein.

8       1102.   Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this

9   action on behalf of himself and the Mississippi State Class against all Defendants.

10      1103.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair

11  or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1).

12      1104.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

13  Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries,

14  violated the Mississippi CPA as detailed above.  Specifically, in developing and installing

15  emission control devices in the Class Vehicles that were concealed from regulators and

16  consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles,

17  Defendants engaged in one or more of the following unfair or deceptive acts or practices as

18  defined in Miss. Code. Ann. § 75-24-5(1):

19          A.      Representing that the Class Vehicles have approval, characteristics, uses,

20                  or benefits that they do not have;

21          B.      Representing that the Class Vehicles are of a particular standard, quality

22                  and grade when they are not; and/or

23          C.      Advertising the Class Vehicles with the intent not to sell or lease them as

24                  advertised.

25      1105.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

26  emission control system were material to the Mississippi State Class, as Defendants intended.

27  Had they known the truth, the Mississippi State Class would not have purchased or leased the

28

1    Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

2    Vehicles rendered legal to sell—would have paid significantly less for them.

3         1106.   Mississippi State Class members had no way of discerning that Defendants'

4    representations were false and misleading, or otherwise learning the facts that Defendants had

5    concealed or failed to disclose, because Defendants' emission control software was extremely

6    sophisticated technology.  Mississippi State Class members did not, and could not, unravel

7    Defendants' deception on their own.

8         1107.   Defendants had an ongoing duty to the Mississippi State Class to refrain from

9    unfair and deceptive practices under the Mississippi CPA in the course of their business.

10   Specifically, Defendants owed Mississippi State Class members a duty to disclose all the material

11   facts concerning the EcoDiesel® emission control system because they possessed exclusive

12   knowledge, they intentionally concealed it from the Mississippi State Class, and/or they made

13   misrepresentations that were rendered misleading because they were contradicted by withheld

14   facts.

15        1108.   Mississippi State Class members suffered ascertainable loss and actual damages as

16   a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

17   disclose material information.

18        1109.   Defendants' violations present a continuing risk to the Mississippi State Class, as

19   well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

20   the public interest.

21        1110.   The Mississippi State Class seek an under Miss. Code Ann. § 75-25-9 enjoining

22   Defendants' unfair and/or deceptive acts or practices and awarding damages, including restitution

23   under § 75-24-11, and any other just and proper relief available under the Mississippi CPA.

24                          **MISSISSIPPI COUNT II**
                   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
25                      **(Miss. Code §§ 75-2-314 and 75-2A-212)**

26        1111.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

27   paragraphs as though fully set forth herein.

28

1372875.2

1112.  Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Mississippi State Class against Fiat and FCA.

1113.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1114.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1115.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1116.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

1117.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1118.  Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Mississippi State Class.  The amount of damages due will be proven at trial.

**MISSISSIPPI COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Miss. Code §§ 75-2-313 and 75-2A-210)**

1119.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1120.  Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Mississippi State Class against Fiat and FCA.

1121.  Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1122.  With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1       1123.  The Class Vehicles are and were at all relevant times "goods" within the meaning

2    of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

3       1124.  Federal law requires manufacturers of light-duty vehicles to provide two federal

4    emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

5    The Performance Warranty applies to repairs that are required during the first two years or 24,000

6    miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

7    major emission control components are covered for the first eight years or 80,000 miles,

8    whichever comes first.  These major emission control components subject to the longer warranty

9    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

10   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

11   emission control or emission related parts which fail to function or function improperly due to a

12   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

13   miles, whichever comes first, or, for the major emission control components, for eight years or

14   80,000 miles, whichever comes first.

15      1125.  Fiat and FCA provided these warranties to the Mississippi State Class. These

16   warranties formed the basis of the bargain that was reached when the Mississippi State Class

17   purchased or leased their Class Vehicles.

18      1126.  However, Fiat and FCA knew or should have known that the warranties were false

19   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

20   sold and leased to the Mississippi State Class were designed to deactivate under real-world

21   driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

22   emissions testing, and therefore, knew that the emission systems contained defects.

23      1127.  The Mississippi State Class reasonably relied on Fiat's and FCA's express

24   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

25   Class Vehicles did not perform as warranted.  Unbeknownst to the Mississippi State Class, the

26   Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

27   could not achieve advertised performance and efficiency metrics without this cheating design.

28   This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

express warranty by providing a product containing defects that were never disclosed to the Mississippi State Class.

1128.   Any opportunity to cure the express breach is unnecessary and futile.

1129.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Mississippi State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**MISSOURI COUNT I**
**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. § 407.010, et seq.)**

1130.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1131.   Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Missouri State Class against all Defendants.

1132.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Missouri State Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1133.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1134.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise. Mo. Rev. Stat. § 407.020.

1135.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Missouri MPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in the following unfair or deceptive acts or practices prohibited by Mo. Rev. Stat. § 407.020: using or

1   employing deception, fraud, false pretense, false promise or misrepresentation, or the

2   concealment, suppression or omission of a material fact with intent that others rely upon such

3   concealment, suppression or omission, in connection with the advertisement and sale/lease of the

4   Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

5        1136.   By failing to disclose these defects or facts about the defects described herein

6   known to it or that were available to Defendants upon reasonable inquiry, Defendants deprived

7   consumers of all material facts about the safety and functionality of their vehicles.  By failing to

8   release material facts about the defect, Defendants curtailed or reduced the ability of consumers to

9   take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep

10  those facts from consumers.  15 Mo. Code of State Reg. § 60-9.110.

11       1137.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

12  emission control system were material to the Missouri State Class, as Defendants intended.  Had

13  they known the truth, the Missouri State Class would not have purchased or leased the Class

14  Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

15  Vehicles rendered legal to sell—would have paid significantly less for them.

16       1138.   Missouri State Class members had no way of discerning that Defendants'

17  representations were false and misleading, or otherwise learning the facts that Defendants had

18  concealed or failed to disclose, because Defendants' emission control software was extremely

19  sophisticated technology.  Missouri State Class members did not, and could not, unravel

20  Defendants' deception on their own.

21       1139.   Defendants had an ongoing duty to the Missouri State Class to refrain from unfair

22  and deceptive practices under the Missouri MPA in the course of their business.  Specifically,

23  Defendants owed Missouri State Class members a duty to disclose all the material facts

24  concerning the EcoDiesel® emission control system because they possessed exclusive

25  knowledge, they intentionally concealed it from the Missouri State Class, and/or they made

26  misrepresentations that were rendered misleading because they were contradicted by withheld

27  facts.

28

1        1140.   Missouri State Class members suffered ascertainable loss and actual damages as a

2   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

3   disclose material information.

4        1141.   Defendants' violations present a continuing risk to the Missouri State Class, as

5   well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

6   the public interest.

7        1142.   Pursuant to Mo. Rev. Stat. § 407.025, the Missouri State Class seek an order

8   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive

9   damages, and any other just and proper relief available under the Missouri MPA.

10                          **MISSOURI COUNT II**
                 **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
11                    **(Mo. Stat. §§ 400.2-314 and 400.2A-212)**

12       1143.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

13  paragraphs as though fully set forth herein.

14       1144.   Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this

15  action on behalf of himself and the Missouri State Class against Fiat and FCA.

16       1145.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

17  under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

18       1146.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

19  motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

20       1147.   The Class Vehicles are and were at all relevant times "goods" within the meaning

21  of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

22       1148.   A warranty that the Class Vehicles were in merchantable condition and fit for the

23  ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314

24  and Mo. Stat. § 400.2A-212.

25       1149.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

26  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

27  Vehicles were not in merchantable condition because their design violated state and federal laws.

28

1   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2   federal emission standards.

3       1150.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

4   damage to the Missouri State Class.  The amount of damages due will be proven at trial.

### MISSOURI COUNT III
### BREACH OF EXPRESS WARRANTY
### (Mo. Stat. §§ 400.2-313 and 400.2A-210)

7       1151.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

8   fully set forth herein.

9       1152.   Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this

10  action on behalf of himself and the Missouri State Class against Fiat and FCA.

11      1153.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

12  vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

13      1154.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

14  motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

15      1155.   The Class Vehicles are and were at all relevant times "goods" within the meaning

16  of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

17      1156.   Federal law requires manufacturers of light-duty vehicles to provide two federal

18  emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

19  The Performance Warranty applies to repairs that are required during the first two years or 24,000

20  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

21  major emission control components are covered for the first eight years or 80,000 miles,

22  whichever comes first.  These major emission control components subject to the longer warranty

23  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

24  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

25  emission control or emission related parts which fail to function or function improperly due to a

26  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

27  miles, whichever comes first, or, for the major emission control components, for eight years or

28  80,000 miles, whichever comes first.

1157.   Fiat and FCA provided these warranties to the Missouri State Class. These warranties formed the basis of the bargain that was reached when the Missouri State Class purchased or leased their Class Vehicles.

1158.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Missouri State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1159.   The Missouri State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Missouri State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Missouri State Class.

1160.   Any opportunity to cure the express breach is unnecessary and futile.

1161.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Missouri State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**MONTANA COUNT I**
**VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER**
**PROTECTION ACT OF 1973**
**(Mont. Code Ann. § 30-14-101, *et seq.*)**

1162.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1163.   Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Montana State against all Defendants.

1164.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Montana State Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).  The Montana State Class members are "consumers" within the meaning of Mont. Code Ann. § 30-14-102(1).

1165.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Mont. Code Ann. § 30-14-102(8).

1166.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mont. Code Ann. § 30-14-103.

A.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Montana CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mont. Code Ann. § 30-14-103:

B.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

C.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

D.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

E.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

F.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

G.      Using or employing deception, fraud, false pretense, false promise or
        misrepresentation, or the concealment, suppression or omission of a
        material fact with intent that others rely upon such concealment,
        suppression or omission, in connection with the advertisement and
        sale/lease of the Class Vehicles, whether or not any person has in fact been
        misled, deceived or damaged thereby.

1167.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®
emission control system were material to the Montana State Class, as Defendants intended.  Had
they known the truth, the Montana State Class would not have purchased or leased the Class
Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the
Vehicles rendered legal to sell—would have paid significantly less for them.

1168.   Montana State Class members had no way of discerning that Defendants'
representations were false and misleading, or otherwise learning the facts that Defendants had
concealed or failed to disclose, because Defendants' emission control software was extremely
sophisticated technology.  Montana State Class members did not, and could not, unravel
Defendants' deception on their own.

1169.   Defendants had an ongoing duty to the Montana State Class to refrain from unfair
and deceptive practices under the Montana CPA in the course of their business.  Specifically,
Defendants owed Montana State Class members a duty to disclose all the material facts
concerning the EcoDiesel® emission control system because they possessed exclusive
knowledge, they intentionally concealed it from the Montana State Class, and/or they made
misrepresentations that were rendered misleading because they were contradicted by withheld
facts.

1170.   Montana State Class members suffered ascertainable loss and actual damages as a
direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to
disclose material information.

1171. Defendants' violations present a continuing risk to the Montana State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1172. Pursuant to Mont. Code Ann. § 30-14-133, the Montana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Montana CPA.

**MONTANA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mont. Code §§ 30-2-314 and 30-2A-212)**

1173. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1174. Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Montana State against Fiat and FCA.

1175. Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

1176. With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

1177. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

1178. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

1179. Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1180. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Montana State Class. The amount of damages due will be proven at trial.

**MONTANA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Mont. Code §§ 30-2-313 and 30-2A-210)**

1181.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1182.   Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Montana State against Fiat and FCA.

1183.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

1184.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

1185.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

1186.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1187.   Fiat and FCA provided these warranties to the Montana State Class. These warranties formed the basis of the bargain that was reached when the Montana State Class purchased or leased their Class Vehicles.

1372875.2

1188.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Montana State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1189.   The Montana State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Montana State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Montana State Class.

1190.   Any opportunity to cure the express breach is unnecessary and futile.

1191.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Montana State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**NEBRASKA COUNT I**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT**
**(Neb. Rev. Stat. § 59-1601, *et seq.*)**

1192.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1193.   This count is brought on behalf of the Nebraska State Class against all Defendants.

1194.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Nebraska State Class members are "persons" within the meaning of Neb. Rev. Stat. § 59-1601(1).

1195.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Neb. Rev. Stat. § 59-1601(2).

1196.   The Nebraska Consumer Protection Act ("Nebraska CPA") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602.

1197.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Nebraska CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Neb. Rev. Stat. § 59-1602:

> A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;
>
> E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or
>
> F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1198.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Nebraska State Class, as Defendants intended.  Had

1    they known the truth, the Nebraska State Class would not have purchased or leased the Class

2    Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

3    Vehicles rendered legal to sell—would have paid significantly less for them.

4         1199.   Nebraska State Class members had no way of discerning that Defendants'

5    representations were false and misleading, or otherwise learning the facts that Defendants had

6    concealed or failed to disclose, because Defendants' emission control software was extremely

7    sophisticated technology.  Nebraska State Class members did not, and could not, unravel

8    Defendants' deception on their own.

9         1200.   Defendants had an ongoing duty to the Nebraska State Class to refrain from unfair

10   and deceptive practices under the Nebraska CPA in the course of their business.  Specifically,

11   Defendants owed Nebraska State Class members a duty to disclose all the material facts

12   concerning the EcoDiesel® emission control system because they possessed exclusive

13   knowledge, they intentionally concealed it from the Nebraska State Class, and/or they made

14   misrepresentations that were rendered misleading because they were contradicted by withheld

15   facts.

16        1201.   Nebraska State Class members suffered ascertainable loss and actual damages as a

17   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

18   disclose material information.

19        1202.   Defendants' violations present a continuing risk to the Nebraska State Class, as

20   well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

21   the public interest.

22        1203.   Pursuant to Neb. Rev. Stat. § 59-1609, the Nebraska State Class seek an order

23   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive

24   damages, and any other just and proper relief available under the Nebraska CPA.

25                          **NEBRASKA COUNT II**
                **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
26                    **(Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212)**

27        1204.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

28   paragraphs as though fully set forth herein.

1205.   This count is brought on behalf of the Nebraska State Class against Fiat and FCA.

1206.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1207.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1208.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1209.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

1210.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1211.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Nebraska State Class.  The amount of damages due will be proven at trial.

**NEBRASKA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210)**

1212.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1213.   This count is brought on behalf of the Nebraska State Class against Fiat and FCA.

1214.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1215.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1216.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1217.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1218.   Fiat and FCA provided these warranties to the Nebraska State Class.  These warranties formed the basis of the bargain that was reached when the Nebraska State Class purchased or leased their Class Vehicles.

1219.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Nebraska State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1220.   The Nebraska State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Nebraska State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

1   express warranty by providing a product containing defects that were never disclosed to the

2   Nebraska State Class.

3         1221.   Any opportunity to cure the express breach is unnecessary and futile.

4         1222.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

5   the Nebraska State Class suffered significant damages, and seek damages in an amount to be

6   determined at trial.

7

**NEVADA COUNT I**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
8                        **(Nev. Rev. Stat. § 598.0903, *et seq*.)**

9         1223.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

10   forth herein.

11         1224.   Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings

12   this action on behalf of himself and the Nevada State Class against all Defendants.

13         1225.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat.

14   § 598.0903, *et seq*. prohibits deceptive trade practices.

15         1226.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

16   Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries,

17   violated the Nevada DTPA as detailed above.  Specifically, in developing and installing emission

18   control devices in the Class Vehicles that were concealed from regulators and consumers alike,

19   and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged

20   in one or more of the following unfair or deceptive acts or practices as defined in Nev. Rev. Stat.

21   §§ 598.0915, 598.0923, and 598.0925:

22            A.     Representing that the Class Vehicles have approval, characteristics, uses,

23                  or benefits that they do not have;

24            B.     Representing that the Class Vehicles are of a particular standard, quality

25                  and grade when they are not;

26            C.     Advertising the Class Vehicles with the intent not to sell or lease them as

27                  advertised;

28

D.      Violating state and federal statutes and regulations relating to the sale of
        the Class Vehicles; and/or

E.      Intending to injure competitors and destroy or substantially lessen
        competition.

1227.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®
emission control system were material to Plaintiff and the Nevada State Class, as Defendants
intended.  Had they known the truth, Plaintiff and the Nevada State Class would not have
purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed
and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for
them.

1228.   Plaintiff and Nevada State Class members had no way of discerning that
Defendants' representations were false and misleading, or otherwise learning the facts that
Defendants had concealed or failed to disclose, because Defendants' emission control software
was extremely sophisticated technology.  Plaintiff and Nevada State Class members did not, and
could not, unravel Defendants' deception on their own.

1229.   Defendants had an ongoing duty to Plaintiff and the Nevada State Class to refrain
from unfair and deceptive practices under the Nevada DTPA in the course of their business.
Specifically, Defendants owed Plaintiff and Nevada State Class members a duty to disclose all the
material facts concerning the EcoDiesel® emission control system because they possessed
exclusive knowledge, they intentionally concealed it from Plaintiff and the Nevada State Class,
and/or they made misrepresentations that were rendered misleading because they were
contradicted by withheld facts.

1230.   Plaintiff and Nevada State Class members suffered ascertainable loss and actual
damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or
failure to disclose material information.

1231.   Defendants' violations present a continuing risk to Plaintiff and the Nevada State
Class, as well as to the general public.  Defendants' unlawful acts and practices complained of
herein affect the public interest.

1232.   Pursuant to Nev. Rev. Stat. §§ 41.600 and 598.0977, Plaintiff and the Nevada State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Nevada DTPA.

**NEVADA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**

1233.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1234.   Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Nevada State Class against Fiat and FCA.

1235.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1236.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

1237.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

1238.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

1239.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1240.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Nevada State Class.  The amount of damages due will be proven at trial.

**NEVADA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)**

1241.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1242.   Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Nevada State Class against Fiat and FCA.

1243.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1244.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

1245.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

1246.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1247.   Fiat and FCA provided these warranties to Plaintiff and the Nevada State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Nevada State Class purchased or leased their Class Vehicles.

1372875.2

1248.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Nevada State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1249.   Plaintiff and the Nevada State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Nevada State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Nevada State Class.

1250.   Any opportunity to cure the express breach is unnecessary and futile.

1251.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Nevada State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**NEW HAMPSHIRE COUNT I**
**VIOLATION OF N.H. CONSUMER PROTECTION ACT**
**(N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)**

1252.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1253.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1254.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the New Hampshire State Class members are "persons" within the meaning of N.H. Rev. Stat. § 358-A:1.

1255.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of N.H. Rev. Stat. § 358-A:1.

1256.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes unfair or deceptive trade practices unlawful. N.H. Rev. Stat. Ann. § 358-A:2.

1257.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Hampshire CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in N.H. Rev. Stat. § 358-A:2:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or
>
> D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1258.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the New Hampshire State Class, as Defendants intended.  Had they known the truth, the New Hampshire State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1259.   New Hampshire State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely

1   sophisticated technology.  New Hampshire State Class members did not, and could not, unravel

2   Defendants' deception on their own.

3       1260.   Defendants had an ongoing duty to the New Hampshire State Class to refrain from

4   unfair and deceptive practices under the New Hampshire CPA in the course of their business.

5   Specifically, Defendants owed New Hampshire State Class members a duty to disclose all the

6   material facts concerning the EcoDiesel® emission control system because they possessed

7   exclusive knowledge, they intentionally concealed it from the New Hampshire State Class, and/or

8   they made misrepresentations that were rendered misleading because they were contradicted by

9   withheld facts.

10      1261.   New Hampshire State Class members suffered ascertainable loss and actual

11  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

12  failure to disclose material information.

13      1262.   Defendants' violations present a continuing risk to the New Hampshire State

14  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

15  herein affect the public interest.

16      1263.   Pursuant to N.H. Rev. Stat. § 358-A:10, the New Hampshire State Class seek an

17  order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

18  punitive damages, and any other just and proper relief available under the New Hampshire CPA.

19                      **NEW HAMPSHIRE COUNT II**
                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
20                      **(N.H. Rev. Stat. §§ 382-A:2-314 and 2A-212)**

21      1264.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

22  paragraphs as though fully set forth herein.

23      1265.   This count is brought on behalf of the New Hampshire State Class against Fiat and

24  FCA.

25      1266.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

26  under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-

27  103(1)(d).

28

-264-

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1267.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

1268.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and  382-A:2A-103(1)(h).

1269.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

1270.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1271.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the New Hampshire State Class.  The amount of damages due will be proven at trial.

**NEW HAMPSHIRE COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(N.H. Rev. Stat. §§ 382-A:2-313 and 2A-210)**

1272.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1273.   This count is brought on behalf of the New Hampshire State Class against Fiat and FCA.

1274.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

1275.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

1276.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

1277.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1278.   Fiat and FCA provided these warranties to the New Hampshire State Class. These warranties formed the basis of the bargain that was reached when the New Hampshire State Class purchased or leased their Class Vehicles.

1279.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the New Hampshire State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1280.   The New Hampshire State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the New Hampshire State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the New Hampshire State Class.

1281.   Any opportunity to cure the express breach is unnecessary and futile.

1282.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the New Hampshire State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## NEW JERSEY COUNT I
## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. § 56:8-1, *et seq.*)

1283.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1284.   Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against all Defendants.

1285.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the New Jersey State Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1286.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (e).

1287.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

1288.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing,

-267-

offering for sale, and selling the defective Class Vehicles, Defendants engaged in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1289.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the New Jersey State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the New Jersey State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1290.   Plaintiff and New Jersey State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and New Jersey State Class members did not, and could not, unravel Defendants' deception on their own.

1291.   Defendants had an ongoing duty to Plaintiffs and the New Jersey State Class to refrain from unfair and deceptive practices under the New Jersey CFA in the course of their business.  Specifically, Defendants owed Plaintiff and New Jersey State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the New Jersey State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1292.   Plaintiff and New Jersey State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1293.   Defendants' violations present a continuing risk to Plaintiffs and the New Jersey State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1294.   Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Jersey CFA.

**NEW JERSEY COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J. Stat. Ann. § 12A:2-314 and 2A-212)**

1295.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1296.   Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against Fiat and FCA.

1297.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1298.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1299.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1300.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1301.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1302. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the New Jersey State Class. The amount of damages due will be proven at trial.

**NEW JERSEY COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. § 12A:2-313 and 2A-210)**

1303. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1304. Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against Fiat and FCA.

1305. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1306. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1307. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h),

1308. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1309.   Fiat and FCA provided these warranties to Plaintiffs and the New Jersey State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the New Jersey State Class purchased or leased their Class Vehicles.

1310.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the New Jersey State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1311.   Plaintiffs and the New Jersey State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the New Jersey State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the New Jersey State Class.

1312.   Any opportunity to cure the express breach is unnecessary and futile.

1313.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the New Jersey State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**NEW MEXICO COUNT I**
**VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**

1314.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1315.   Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against all Defendants.

1372875.2

1316.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the New Mexico State Class members are "persons" within the meaning of N.M. Stat. Ann. § 57-12-2.

1317.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in trade or commerce within the meaning of N.M. Stat. Ann. § 57-12-2.

1318.   The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D).

1319.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Mexico UTPA as detailed above. Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.M. Stat. Ann. § 57-12-2(D) and § 57-12-2(E):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Using exaggeration as to a material fact and/or failing to state the material facts concerning the Class Vehicles in a way that tended to deceive; and/or

    E.    Acting in a manner that resulted in a gross disparity between the true value of the Class Vehicles and the price paid.

1320.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the New Mexico State Class, as Defendants intended. Had they known the truth, the New Mexico State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1321.   New Mexico State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  New Mexico State Class members did not, and could not, unravel Defendants' deception on their own.

1322.   Defendants had an ongoing duty to the New Mexico State Class to refrain from unfair and deceptive practices under the New Mexico UTPA in the course of their business. Specifically, Defendants owed New Mexico State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the New Mexico State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1323.   New Mexico State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1324.   Defendants' violations present a continuing risk to the New Mexico State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1325.   Pursuant to N.M. Stat. Ann. § 57-12-10, the New Mexico State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Mexico UTPA.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

**NEW MEXICO COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.M. Stat. §§ 55-2-314 and 55-2A-212)**

1326.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1327.   Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against Fiat and FCA.

1328.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1329.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1330.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1331.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314 and 55-2A-212.

1332.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1333.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the New Mexico State Class.  The amount of damages due will be proven at trial.

**NEW MEXICO COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(N.M. Stat. §§ 55-2-313 and 55-2A-210)**

1334.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1335.   Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against Fiat and FCA.

1336.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1337.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1338.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1339.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1340.   Fiat and FCA provided these warranties to the New Mexico State Class. These warranties formed the basis of the bargain that was reached when the New Mexico State Class purchased or leased their Class Vehicles.

1341.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the New Mexico State Class were designed to deactivate under real-world

1   driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2   emissions testing, and therefore, knew that the emission systems contained defects.

3       1342.   The New Mexico State Class reasonably relied on Fiat's and FCA's express

4   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

5   Class Vehicles did not perform as warranted.  Unbeknownst to the New Mexico State Class, the

6   Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

7   could not achieve advertised performance and efficiency metrics without this cheating design.

8   This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

9   express warranty by providing a product containing defects that were never disclosed to the New

10  Mexico State Class.

11      1343.   Any opportunity to cure the express breach is unnecessary and futile.

12      1344.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13  the New Mexico State Class suffered significant damages, and seek damages in an amount to be

14  determined at trial.

**NEW YORK COUNT I**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349)**

17      1345.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

18  forth herein.

19      1346.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the

20  purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York

21  State Class against all Defendants.

22      1347.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

23  Sergio Marchionne, Plaintiffs, and the New York State Class members are "persons" within the

24  meaning of N.Y. Gen. Bus. Law § 349(h).

25      1348.   The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful

26  "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus.

27  Law § 349.

28

1349.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the New York DAPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1350.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the New York State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the New York State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1351.   Plaintiffs and New York State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and New York State Class members did not, and could not, unravel Defendants' deception on their own.

1352.   Defendants had an ongoing duty to Plaintiffs and the New York State Class to refrain from unfair and deceptive practices under the New York DAPA in the course of their business.  Specifically, Defendants owed Plaintiffs and New York State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the New York State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1353.   Plaintiffs and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1354.   Defendants' violations present a continuing risk to Plaintiffs and the New York State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1355.   Plaintiffs and the New York State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New York DAPA.

**NEW YORK COUNT II**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**

1356.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1357.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York State Class against all Defendants.

1358.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

1359.   The New York False Advertising Act ("NY FAA") makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

1360.   Defendants caused to be made or disseminated through New York and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and the other New York State Class members.

1361.   At a minimum, Defendants violated the NY FAA by: representing that the Class Vehicles had characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; engaging in other conduct creating a likelihood of confusion or of misunderstanding; and employing concealment, suppression, or omission of material facts in connection with the advertisement and sale of the Class Vehicles.  Defendants knew or should have known that their conduct violated the NY FAA.

1362.   Plaintiffs and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations, deceptions, and their concealment of and failure to disclose material information.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1363.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of New York and nationwide.

1364.   Pursuant to the NY FAA, Plaintiffs and the New York State Class seek injunctive relief, as well as monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class member. Because Defendants' conduct was committed willingly and knowingly, Plaintiffs and the New York State Class are entitled to recover three times actual damages, up to $10,000.

**NEW YORK COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**

1365.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1366.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York State Class against Fiat and FCA.

1367.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law §  2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1368.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1369.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1370.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1371.   Fiat and FCA provided these warranties to Plaintiffs and the New York State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the New York State Class purchased or leased their Class Vehicles.

1372.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the New York State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1373.   Plaintiffs and the New York State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the New York State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the New York State Class.

1374.   Any opportunity to cure the express breach is unnecessary and futile.

1375.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the New York State Class suffered significant damages, and seek damages in an amount to be determined at trial.

1
2

# NEW YORK COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)

3      1376.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

4   paragraphs as though fully set forth herein.

5      1377.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the

6   purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York

7   State Class against Fiat and FCA.

8      1378.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

9   under N.Y. UCC Law §  2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

10      1379.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

11   motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

12      1380.   The Class Vehicles are and were at all relevant times "goods" within the meaning

13   of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

14      1381.   A warranty that the Class Vehicles were in merchantable condition and fit for the

15   ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-

16   314 and 2A-212.

17      1382.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

18   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

19   Vehicles were not in merchantable condition because their design violated state and federal laws.

20   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

21   federal emission standards.

22      1383.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

23   damage to the Plaintiffs and the New York State Class.  The amount of damages due will be

24   proven at trial.

25
26
27
28

**NORTH CAROLINA COUNT I**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**

1384.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1385.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against all Defendants.

1386.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the North Carolina State Class members are "persons" within the meaning of N.C. Gen. Stat. § 75-1.1, *et seq.*

1387.   FCA's, Fiat's, VM Italy's, VM America's, Bosch GmbH's, Bosch LLC's, Volkmar Denner's, and Sergio Marchionne's acts and practices complained of herein were performed in the course of their trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

1388.   The North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[,]" and the North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the law.  N.C. Gen. Stat. § 75-16.

1389.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the North Carolina UDTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by the North Carolina UDTPA:

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1390.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the North Carolina State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the North Carolina State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1391.   Plaintiffs and North Carolina State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and North Carolina State Class members did not, and could not, unravel Defendants' deception on their own.

1392.   Defendants had an ongoing duty to Plaintiffs and the North Carolina State Class to refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and North Carolina State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the North Carolina State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1393.   Plaintiffs and North Carolina State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1394.   Defendants' violations present a continuing risk to Plaintiffs and the North Carolina State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1395.   Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs and the North Carolina State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the North Carolina UDTPA.

### NORTH CAROLINA COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. §§ 25-2-314 AND 252A-212)

1396.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1397.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against Fiat and FCA.

1398.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1399.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1400.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).5.

1401.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. § 25-2-314 and § 25-2A-212.

1402.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1403.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the North Carolina State Class.  The amount of damages due will be proven at trial.

## NORTH CAROLINA COUNT III
### BREACH OF EXPRESS WARRANTY
#### (N.C. Gen. Stat. §§ 25-2-313 and 252A-210)

1404.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1405.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against Fiat and FCA.

1406.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1407.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1408.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).5.

1409.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1410.   Fiat and FCA provided these warranties to Plaintiffs and the North Carolina State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the North Carolina State Class purchased or leased their Class Vehicles.

1411.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the North Carolina State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1412.   Plaintiffs and the North Carolina State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the North Carolina State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the North Carolina State Class.

1413.   Any opportunity to cure the express breach is unnecessary and futile.

1414.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the North Carolina State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**NORTH DAKOTA COUNT I**
**VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT**
**(N.D. Cent. Code § 51-15-02)**

1415.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1416.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the North Dakota State Class against all Defendants.

1417.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the North Dakota State Class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

1418.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in the "sale" of "merchandise" within the meaning of N.D. Cent Code §§ 51-15-02(3), (5).

1419.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…."  N.D. Cent. Code § 51-15-02.

1420.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the North Dakota CFA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by N.D. Cent. Code § 51-15-02: using or employing deception, fraud, false pretense, false promise or misrepresentation,

1   with intent that others rely thereon, in connection with the advertisement and sale/lease of the

2   Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

3       1421.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4   emission control system were material to the North Dakota State Class, as Defendants intended.

5   Had they known the truth, the North Dakota State Class would not have purchased or leased the

6   Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

7   Vehicles rendered legal to sell—would have paid significantly less for them.

8       1422.   North Dakota State Class members had no way of discerning that Defendants'

9   representations were false and misleading, or otherwise learning the facts that Defendants had

10  concealed or failed to disclose, because Defendants' emission control software was extremely

11  sophisticated technology.  North Dakota State Class members did not, and could not, unravel

12  Defendants' deception on their own.

13      1423.   Defendants had an ongoing duty to the North Dakota State Class to refrain from

14  unfair and deceptive practices under the North Dakota CFA in the course of their business.

15  Specifically, Defendants owed North Dakota State Class members a duty to disclose all the

16  material facts concerning the EcoDiesel® emission control system because they possessed

17  exclusive knowledge, they intentionally concealed it from the North Dakota State Class, and/or

18  they made misrepresentations that were rendered misleading because they were contradicted by

19  withheld facts.

20      1424.   North Dakota State Class members suffered ascertainable loss and actual damages

21  as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

22  disclose material information.

23      1425.   Defendants' violations present a continuing risk to the North Dakota State Class,

24  as well as to the general public.  Defendants' unlawful acts and practices complained of herein

25  affect the public interest.

26      1426.   Pursuant to N.D. Cent. Code Ann. §§ 51-15-07 and 51-15-09, the North Dakota

27  State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and

28

1    awarding damages, treble damages, and any other just and proper relief available under the North

2    Dakota CFA.

### NORTH DAKOTA COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.D. Cent. Code §§ 41-02-31 and 41-02.1-21)

5        1427.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

6    paragraphs as though fully set forth herein.

7        1428.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this

8    action on behalf of himself and the North Dakota State Class against Fiat and FCA.

9        1429.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

10   under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

11       1430.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

12   motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

13       1431.   The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).5.

15       1432.   A warranty that the Class Vehicles were in merchantable condition and fit for the

16   ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code

17   §§ 41-02-31 and 41-02.1-21.

18       1433.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

19   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

20   Vehicles were not in merchantable condition because their design violated state and federal laws.

21   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

22   federal emission standards.

23       1434.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

24   damage to the North Dakota State Class.  The amount of damages due will be proven at trial.

### NORTH DAKOTA COUNT III
### BREACH OF EXPRESS WARRANTY
### (N.D. Cent. Code §§ 41-02-30 and 41-02.1-19)

27       1435.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

28   fully set forth herein.

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1436.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the North Dakota State Class against Fiat and FCA.

1437.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1438.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1439.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).5.

1440.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1441.   Fiat and FCA provided these warranties to the North Dakota State Class. These warranties formed the basis of the bargain that was reached when the North Dakota State Class purchased or leased their Class Vehicles.

1442.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the North Dakota State Class were designed to deactivate under real-world

1   driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2   emissions testing, and therefore, knew that the emission systems contained defects.

3       1443.   The North Dakota State Class reasonably relied on Fiat's and FCA's express

4   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

5   Class Vehicles did not perform as warranted.  Unbeknownst to the North Dakota State Class, the

6   Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

7   could not achieve advertised performance and efficiency metrics without this cheating design.

8   This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

9   express warranty by providing a product containing defects that were never disclosed to the North

10  Dakota State Class.

11      1444.   Any opportunity to cure the express breach is unnecessary and futile.

12      1445.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13  the North Dakota State Class suffered significant damages, and seek damages in an amount to be

14  determined at trial.

## OHIO COUNT I
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
#### (Ohio Rev. Code §§ 1345.01, *et seq.*)

17      1446.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

18  forth herein.

19      1447.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

20  on behalf of himself and the Ohio State Class against all Defendants.

21      1448.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

22  Sergio Marchionne, and the Ohio State Class members are "persons" within the meaning of Ohio

23  Rev. Code § 1345.01(B).  Defendants are so "supplier[s]" as defined by Ohio Rev. Code

24  § 1345.01(C).

25      1449.   The Ohio State Class members are "consumers" within the meaning of Ohio Rev.

26  Code § 1345.01(D), and their purchase and leases of the Class Vehicles are "consumer

27  transactions" within the meaning of Ohio Rev. Code § 1345.01(A)

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1450.   The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Ohio Rev. Code § 1345.02.

1451.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio CSPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Ohio Rev. Code § 1345.02:

      A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; and/or

      B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not.

1452.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Ohio State Class, as Defendants intended.  Had they known the truth, the Ohio State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1453.   Ohio State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Ohio State Class members did not, and could not, unravel Defendants' deception on their own.

1454.   Defendants had an ongoing duty to the Ohio State Class to refrain from unfair and deceptive practices under the Ohio CSPA in the course of their business.  Specifically, Defendants owed Ohio State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they

1    intentionally concealed it from the Ohio State Class, and/or they made misrepresentations that

2    were rendered misleading because they were contradicted by withheld facts.

3        1455.   Ohio State Class members suffered ascertainable loss and actual damages as a

4    direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

5    disclose material information.

6        1456.   Defendants' violations present a continuing risk to the Ohio State Class, as well as

7    to the general public.  Defendants' unlawful acts and practices complained of herein affect the

8    public interest.

9        1457.   Pursuant to Ohio Rev. Code § 1345.09, the Ohio State Class seek an order

10   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive

11   damages, and any other just and proper relief available under the Ohio CSPA.

12                              **OHIO COUNT II**
     **VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**
13                    **(Ohio Rev. Code § 4165.01,** *et seq.***)**

14       1458.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

15   forth herein.

16       1459.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

17   on behalf of himself and the Ohio State Class against all Defendants.

18       1460.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

19   Sergio Marchionne, and the Ohio State Class members are "persons" within the meaning of Ohio

20   Rev. Code § 4165.01(D).

21       1461.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

22   Marchionne are engaged in "the course of [their] business" within the meaning of Ohio Rev.

23   Code § 4165.02(A).

24       1462.   The Ohio Deceptive Trade Practices Act ("Ohio DTPA") makes unlawful

25   deceptive trade practices.  Ohio Rev. Code § 4165.02(A).

26       1463.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

27   Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio

28   DTPA as detailed above.  Specifically, in developing and installing emission control devices in

the Class Vehicles that were concealed from regulators and consumers alike, and in marketing,

offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of

the following unfair or deceptive acts or practices as defined in Ohio Rev. Code § 4165.02(A):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1464.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Ohio State Class, as Defendants intended.  Had they known the truth, the Ohio State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1465.   Ohio State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Ohio State Class members did not, and could not, unravel Defendants' deception on their own.

1466.   Defendants had an ongoing duty to the Ohio State Class to refrain from unfair and deceptive practices under the Ohio DTPA in the course of their business.  Specifically, Defendants owed Ohio State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Ohio State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1       1467.   Ohio State Class members suffered ascertainable loss and actual damages as a

2   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

3   disclose material information.

4       1468.   Defendants' violations present a continuing risk to the Ohio State Class, as well as

5   to the general public.  Defendants' unlawful acts and practices complained of herein affect the

6   public interest.

7       1469.   Pursuant to Ohio Rev. Code §§ 2727.02 and 4165.03, the Ohio State Class seek an

8   order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

9   punitive damages, and any other just and proper relief available under the Ohio DTPA.

10                          **OHIO COUNT III**
    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
11               **(Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)**

12      1470.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

13  paragraphs as though fully set forth herein.

14      1471.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

15  on behalf of himself and the Ohio State Class against Fiat and FCA.

16      1472.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

17  under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under

18  § 1302.01(4).

19      1473.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

20  motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

21      1474.   The Class Vehicles are and were at all relevant times "goods" within the meaning

22  of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

23      1475.   A warranty that the Class Vehicles were in merchantable condition and fit for the

24  ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code

25  §§ 1302.27 and 1310.19.

26      1476.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

27  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

28  Vehicles were not in merchantable condition because their design violated state and federal laws.

1    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2    federal emission standards.

3        1477.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

4    damage to the Ohio State Class.  The amount of damages due will be proven at trial.

5                                    **OHIO COUNT IV**
                           **BREACH OF EXPRESS WARRANTY**
6                   **(Ohio Rev. Code § 1302.26, *et seq*.) (U.C.C. §2-313))**

7        1478.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

8    fully set forth herein.

9        1479.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

10   on behalf of himself and the Ohio State Class against Fiat and FCA.

11       1480.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

12   vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor

13   vehicles under § 1302.01(4).

14       1481.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

15   motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

16       1482.   The Class Vehicles are and were at all relevant times "goods" within the meaning

17   of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

18       1483.   Federal law requires manufacturers of light-duty vehicles to provide two federal

19   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

20   The Performance Warranty applies to repairs that are required during the first two years or 24,000

21   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

22   major emission control components are covered for the first eight years or 80,000 miles,

23   whichever comes first.  These major emission control components subject to the longer warranty

24   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

25   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

26   emission control or emission related parts which fail to function or function improperly due to a

27   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

28

1372875.2

1   miles, whichever comes first, or, for the major emission control components, for eight years or

2   80,000 miles, whichever comes first.

3       1484.   Fiat and FCA provided these warranties to the Ohio State Class. These warranties

4   formed the basis of the bargain that was reached when the Ohio State Class purchased or leased

5   their Class Vehicles.

6       1485.   However, Fiat and FCA knew or should have known that the warranties were false

7   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

8   sold and leased to the Ohio State Class were designed to deactivate under real-world driving

9   conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

10  testing, and therefore, knew that the emission systems contained defects.

11      1486.   The Ohio State Class reasonably relied on Fiat's and FCA's express warranties

12  concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class

13  Vehicles did not perform as warranted.  Unbeknownst to the Ohio State Class, the Class Vehicles

14  were designed to pollute at higher than legal limits during normal driving, and could not achieve

15  advertised performance and efficiency metrics without this cheating design.  This design and the

16  devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by

17  providing a product containing defects that were never disclosed to the Ohio State Class.

18      1487.   Any opportunity to cure the express breach is unnecessary and futile.

19      1488.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

20  the Ohio State Class suffered significant damages, and seek damages in an amount to be

21  determined at trial.

22                          **OKLAHOMA COUNT I**
                **VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT**
23                      **(Okla. Stat. Tit. 15 § 751, *et seq.*)**

24      1489.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

25  forth herein.

26      1490.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action

27  on behalf of himself and the Oklahoma State Class against all Defendants.

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1491.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Oklahoma State Class members are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

1492.   At all relevant times, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are and were engaged in "the course of business" within the meaning of Okla. Stat. Tit. 15 § 753.

1493.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits numerous unlawful acts, including misleading representations, false advertisements, and false statements. Okla. Stat. Tit. 15 § 753.

1494.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Oklahoma CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Okla. Stat. Tit. 15 § 753:

> A.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

> C.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1495.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Oklahoma State Class, as Defendants intended.  Had they known the truth, the Oklahoma State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1496.   Oklahoma State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Oklahoma State Class members did not, and could not, unravel Defendants' deception on their own.

1497.   Defendants had an ongoing duty to the Oklahoma State Class to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business. Specifically, Defendants owed Oklahoma State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Oklahoma State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1498.   Oklahoma State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1499.   Defendants' violations present a continuing risk to the Oklahoma State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1500.   Pursuant to Okla. Stat. Tit. 15 § 761.1, the Oklahoma State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oklahoma CPA.

**OKLAHOMA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)**

1501.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1502.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Oklahoma State Class against Fiat and FCA.

1503.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1504.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1505.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1506.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

1507.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1508.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Oklahoma State Class.  The amount of damages due will be proven at trial.

### OKLAHOMA COUNT III
### BREACH OF EXPRESS WARRANTY
### (Okla. Stat. Tit. 12A §§ 2-313 and 2A-210)

1509.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1510.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Oklahoma State Class against Fiat and FCA.

1511.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1512.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1513.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1514.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1515.   Fiat and FCA provided these warranties to the Oklahoma State Class. These warranties formed the basis of the bargain that was reached when the Oklahoma State Class purchased or leased their Class Vehicles.

1516.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Oklahoma State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1517.   the Oklahoma State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Oklahoma State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

1   express warranty by providing a product containing defects that were never disclosed to the

2   Oklahoma State Class.

3      1518.   Any opportunity to cure the express breach is unnecessary and futile.

4      1519.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

5   the Oklahoma State Class suffered significant damages, and seek damages in an amount to be

6   determined at trial.

7                              **OREGON COUNT I**
       **VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
8                      **(Or. Rev. Stat. §§ 646.605, *et seq.*)**

9      1520.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

10  forth herein.

11     1521.   Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section,

12  "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against all

13  Defendants.

14     1522.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

15  Sergio Marchionne, Plaintiffs, and the Oregon State Class members are "persons" within the

16  meaning of Or. Rev. Stat. § 646.605(4).

17     1523.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

18  and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Or. Rev.

19  Stat. § 646.605(8).

20     1524.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful

21  practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).

22     1525.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

23  Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the

24  Oregon UTPA. Specifically, in developing and installing emission control devices in the Class

25  Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for

26  sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the

27  following unlawful practices as defined in Or. Rev. Stat. § 646.608(1):

28

A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1526.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Oregon State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Oregon State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1527.   Plaintiffs and the Oregon State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and the Oregon State Class members did not, and could not, unravel Defendants' deception on their own.

1528.   Defendants had an ongoing duty to Plaintiffs and the Oregon State Class to refrain from unfair and deceptive practices under the Oregon UTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and the Oregon State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Oregon State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1   1529.   Plaintiffs and the Oregon State Class members suffered ascertainable loss and

2   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

3   and/or failure to disclose material information.

4   1530.   Defendants' violations present a continuing risk to Plaintiffs and the Oregon State

5   Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

6   herein affect the public interest.

7   1531.   Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs and the Oregon State Class seek an

8   order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

9   punitive damages, and any other just and proper relief available under the Oregon UTPA.

**OREGON COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Or. Rev. Stat. § 72.3140 and 72A.2120)**

12   1532.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

13   paragraphs as though fully set forth herein.

14   1533.   Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section,

15   "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against Fiat and

16   FCA.

17   1534.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

18   under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under

19   § 72.1030(1)(d).

20   1535.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

21   motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

22   1536.   The Class Vehicles are and were at all relevant times "goods" within the meaning

23   of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

24   1537.   A warranty that the Class Vehicles were in merchantable condition and fit for the

25   ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat.

26   §§ 72.3140 and 72A-2120.

27   1538.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

28   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

1  Vehicles were not in merchantable condition because their design violated state and federal laws.

2  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

3  federal emission standards.

4      1539.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

5  damage to the Plaintiffs and the Oregon State Class.  The amount of damages due will be proven

6  at trial.

7                              **OREGON COUNT III**
                          **BREACH OF EXPRESS WARRANTY**
8                       **(Or. Rev. Stat. §§ 72.3130 and 72A.2100)**

9      1540.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

10  fully set forth herein.

11      1541.   Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section,

12  "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against Fiat and

13  FCA.

14      1542.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

15  vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles

16  under § 72.1030(1)(d).

17      1543.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

18  motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

19      1544.   The Class Vehicles are and were at all relevant times "goods" within the meaning

20  of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

21      1545.   Federal law requires manufacturers of light-duty vehicles to provide two federal

22  emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

23  The Performance Warranty applies to repairs that are required during the first two years or 24,000

24  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

25  major emission control components are covered for the first eight years or 80,000 miles,

26  whichever comes first.  These major emission control components subject to the longer warranty

27  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

28  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

1   emission control or emission related parts which fail to function or function improperly due to a

2   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

3   miles, whichever comes first, or, for the major emission control components, for eight years or

4   80,000 miles, whichever comes first.

5        1546.   Fiat and FCA provided these warranties to Plaintiffs and the Oregon State Class.

6   These warranties formed the basis of the bargain that was reached when Plaintiffs and the Oregon

7   State Class purchased or leased their Class Vehicles.

8        1547.   However, Fiat and FCA knew or should have known that the warranties were false

9   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

10  sold and leased to Plaintiffs and the Oregon State Class were designed to deactivate under real-

11  world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

12  emissions testing, and therefore, knew that the emission systems contained defects.

13       1548.   Plaintiffs and the Oregon State Class reasonably relied on Fiat's and FCA's

14  express warranties concerning emissions when purchasing or leasing the Class Vehicles.

15  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

16  Oregon State Class, the Class Vehicles were designed to pollute at higher than legal limits during

17  normal driving, and could not achieve advertised performance and efficiency metrics without this

18  cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

19  therefore breached their express warranty by providing a product containing defects that were

20  never disclosed to Plaintiffs and the Oregon State Class.

21       1549.   Any opportunity to cure the express breach is unnecessary and futile.

22       1550.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

23  Plaintiffs and the Oregon State Class suffered significant damages, and seek damages in an

24  amount to be determined at trial

25

26

27

28

**PENNSYLVANIA COUNT I**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(73 Pa. Stat. Ann. § 201-1, *et seq.*)**

1551.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1552.   Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against all Defendants.

1553.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Pennsylvania State Class members are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2.(2).

1554.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

1555.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 Pa. Stat. Ann. § 201 3.

1556.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Pennsylvania UTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1557.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Pennsylvania State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Pennsylvania State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1558.   Plaintiffs and Pennsylvania State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Pennsylvania State Class members did not, and could not, unravel Defendants' deception on their own.

1559.   Defendants had an ongoing duty to Plaintiffs and the Pennsylvania State Class to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Pennsylvania State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the

1    Pennsylvania State Class, and/or they made misrepresentations that were rendered misleading

2    because they were contradicted by withheld facts.

3        1560.   Plaintiffs and Pennsylvania State Class members suffered ascertainable loss and

4    actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

5    and/or failure to disclose material information.

6        1561.   Defendants' violations present a continuing risk to Plaintiffs and the Pennsylvania

7    State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

8    of herein affect the public interest.

9        1562.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), Plaintiffs and the Pennsylvania State

10   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

11   damages, punitive and/or treble damages, and any other just and proper relief available under the

12   Pennsylvania UTPA.

**PENNSYLVANIA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(13 Pa. Cons. Stat. §§ 2314 and 2A212)**

15       1563.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

16   paragraphs as though fully set forth herein.

17       1564.   Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section,

18   "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against

19   Fiat and FCA.

20       1565.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

21   under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

22       1566.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

23   motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

24       1567.   The Class Vehicles are and were at all relevant times "goods" within the meaning

25   of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

26       1568.   A warranty that the Class Vehicles were in merchantable condition and fit for the

27   ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat.

28   §§ 2314 and 2A212.

1569.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1570.  Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Pennsylvania State Class.  The amount of damages due will be proven at trial.

### PENNSYLVANIA COUNT III
### BREACH OF EXPRESS WARRANTY
### (13 PA. CONS. STAT.  §§ 2313 and 2A210)

1571.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1572.  Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against Fiat and FCA.

1573.  Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

1574.  With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1575.  The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1576.  Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

1   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

2   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

3   emission control or emission related parts which fail to function or function improperly due to a

4   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

5   miles, whichever comes first, or, for the major emission control components, for eight years or

6   80,000 miles, whichever comes first.

7        1577.   Fiat and FCA provided these warranties to Plaintiffs and the Pennsylvania State

8   Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

9   Pennsylvania State Class purchased or leased their Class Vehicles.

10       1578.   However, Fiat and FCA knew or should have known that the warranties were false

11  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

12  sold and leased to Plaintiffs and the Pennsylvania State Class were designed to deactivate under

13  real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

14  undergoing emissions testing, and therefore, knew that the emission systems contained defects.

15       1579.   Plaintiffs and the Pennsylvania State Class reasonably relied on Fiat's and FCA's

16  express warranties concerning emissions when purchasing or leasing the Class Vehicles.

17  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

18  Pennsylvania State Class, the Class Vehicles were designed to pollute at higher than legal limits

19  during normal driving, and could not achieve advertised performance and efficiency metrics

20  without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

21  FCA therefore breached their express warranty by providing a product containing defects that

22  were never disclosed to Plaintiffs and the Pennsylvania State Class.

23       1580.   Any opportunity to cure the express breach is unnecessary and futile.

24       1581.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

25  Plaintiffs and the Pennsylvania State Class suffered significant damages, and seek damages in an

26  amount to be determined at trial.

27

28

**RHODE ISLAND COUNT I**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT**
**(R.I. Gen. Laws § 6-13.1, *et seq*.)**

1582.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1583.   This count is brought on behalf of the Rhode Island State Class against all Defendants.

1584.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Rhode Island State Class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

1585.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

1586.   The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  R.I. Gen. Laws § 6-13.1-2.

1587.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Rhode Island DTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in R.I. Gen. Laws § 6-13.1-1(6):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

-313-

1       D.      Advertising the Class Vehicles with the intent not to sell or lease them as

2            advertised; and/or

3       E.      Engaging in other conduct which created a likelihood of confusion or of

4            misunderstanding.

5       1588.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

6   emission control system were material to the Rhode Island State Class, as Defendants intended.

7   Had they known the truth, the Rhode Island State Class would not have purchased or leased the

8   Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the

9   Vehicles rendered legal to sell—would have paid significantly less for them.

10      1589.  Rhode Island State Class members had no way of discerning that Defendants'

11  representations were false and misleading, or otherwise learning the facts that Defendants had

12  concealed or failed to disclose, because Defendants' emission control software was extremely

13  sophisticated technology.  Rhode Island State Class members did not, and could not, unravel

14  Defendants' deception on their own.

15      1590.  Defendants had an ongoing duty to the Rhode Island State Class to refrain from

16  unfair and deceptive practices under the Rhode Island DTPA in the course of their business.

17  Specifically, Defendants owed Rhode Island State Class members a duty to disclose all the

18  material facts concerning the EcoDiesel® emission control system because they possessed

19  exclusive knowledge, they intentionally concealed it from the Rhode Island State Class, and/or

20  they made misrepresentations that were rendered misleading because they were contradicted by

21  withheld facts.

22      1591.  Rhode Island State Class members suffered ascertainable loss and actual damages

23  as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

24  disclose material information.

25      1592.  Defendants' violations present a continuing risk to the Rhode Island State Class, as

26  well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

27  the public interest.

28

-314-

1593.   Pursuant to R.I. Gen. Laws § 6-13.1-5.2(a), the Rhode Island State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Rhode Island DTPA.

**RHODE ISLAND COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212)**

1594.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1595.   This count is brought on behalf of the Rhode Island State Class against Fiat and FCA.

1596.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1597.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1598.   The Class Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1599.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

1600.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1601.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Rhode Island State Class.  The amount of damages due will be proven at trial.

**RHODE ISLAND COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210)**

1602.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1603.   This count is brought on behalf of the Rhode Island State Class against Fiat and FCA.

1604.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1605.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1606.   The Class Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1607.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1608.   Fiat and FCA provided these warranties to the Rhode Island State Class. These warranties formed the basis of the bargain that was reached when the Rhode Island State Class purchased or leased their Class Vehicles.

-316-

1609.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Rhode Island State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1610.   The Rhode Island State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Rhode Island State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Rhode Island State Class.

1611.   Any opportunity to cure the express breach is unnecessary and futile.

1612.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Rhode Island State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**SOUTH CAROLINA COUNT I**
**VIOLATIONS OF THE SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**(S.C. Code Ann. § 39-5-10, *et seq.*)**

1613.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1614.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State Class against all Defendants.

1615.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the South Carolina State Class members are "persons" within the meaning of S.C. Code § 39-5-10(a).

1616.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

1617.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

1618.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Carolina UTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of S.C. Code § 39-5-20(a):

A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and

1  sale/lease of the Class Vehicles, whether or not any person has in fact been

2  misled, deceived or damaged thereby.

3  1619.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4  emission control system were material to Plaintiffs and the South Carolina State Class, as

5  Defendants intended.  Had they known the truth, Plaintiffs and the South Carolina State Class

6  would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

7  been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

8  significantly less for them.

9  1620.  Plaintiffs and South Carolina State Class members had no way of discerning that

10  Defendants' representations were false and misleading, or otherwise learning the facts that

11  Defendants had concealed or failed to disclose, because Defendants' emission control software

12  was extremely sophisticated technology.  Plaintiffs and South Carolina State Class members did

13  not, and could not, unravel Defendants' deception on their own.

14  1621.  Defendants had an ongoing duty to Plaintiffs and the South Carolina State Class to

15  refrain from unfair and deceptive practices under the South Carolina UTPA in the course of their

16  business.  Specifically, Defendants owed Plaintiffs and South Carolina State Class members a

17  duty to disclose all the material facts concerning the EcoDiesel® emission control system because

18  they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the South

19  Carolina State Class, and/or they made misrepresentations that were rendered misleading because

20  they were contradicted by withheld facts.

21  1622.  Plaintiffs and South Carolina State Class members suffered ascertainable loss and

22  actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

23  and/or failure to disclose material information.

24  1623.  Defendants' violations present a continuing risk to Plaintiffs and the South

25  Carolina State Class, as well as to the general public.  Defendants' unlawful acts and practices

26  complained of herein affect the public interest.

27  1624.  Pursuant to S.C. Code § 39-5-140(a), Plaintiffs and the South Carolina State Class

28  seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

1   damages, treble and/or punitive damages, and any other just and proper relief available under the

2   South Carolina UTPA.

3                          **SOUTH CAROLINA COUNT II**
     **VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS,**
4                   **DISTRIBUTORS, AND DEALERS ACT**
                        **(S.C. Code Ann. § 56-15-10,** *et seq.***)**
5
6   1625.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

7   forth herein.

8   1626.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose

9   of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State

10  Class against FCA, Fiat, VM Italy, and VM America.

11  1627.   FCA, Fiat, VM Italy, and VM America are "manufacturer[s]" as set forth in S.C.

12  Code Ann. § 56-15-10(b), as they were engaged in the business of manufacturing or assembling

13  new and unused motor vehicles.  FCA and Fiat are also "distributors" and/or "wholesalers" as set

14  forth in S.C. Code Ann. § 56-15-10(g), (p).

15  1628.   The South Carolina Regulation of Manufacturers, Distributors, and Dealers Act

16  ("Manufacturers Act") prohibits "unfair or deceptive acts or practices" as defined in S.C. Code

17  Ann. § 56-15-40. S.C. Code Ann. § 56-15-30(a). Accordingly, the Manufacturers Act prohibits

18  any manufacturer from engaging in bad faith and unconscionable actions that cause damage to the

19  parties or the public; it also prohibits manufacturers from using false or misleading advertising in

20  connection with their business. S.C. Code Ann. § 56-15-40(1), (3)(d).

21  1629.   FCA, Fiat, VM Italy, and VM America committed unfair or deceptive acts or

22  practices that violated the Manufacturers Act. These bad faith and unconscionable actions

23  include, but are not limited to: misrepresenting, concealing, and/or failing to disclose the true

24  emissions and performance characteristics of the Class Vehicles, and failing to disclose the Class

25  Vehicles' defective emissions control systems.

26  1630.   Defendants also violated the Manufacturers' Act by using false and misleading

27  advertisements in connection with the sale and lease of Class Vehicles.  As alleged above,

28  Defendants made numerous material statements about the safety, cleanliness, efficiency and

reliability of the Class Vehicles that were either false or misleading.  Each of these statements—and the failure to disclose the truth—contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.  Had they known the truth, Plaintiffs and the South Carolina State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1631.  Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiff brings this action on behalf of [himself/herself] and the South Carolina State Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1632.  Plaintiffs and South Carolina State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1633.  Plaintiffs and the South Carolina State Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110.  Plaintiff also seeks injunctive relief under S.C. Code Ann. § 56-15-110.  Plaintiff also seeks treble damages because the Defendants acted maliciously.

### SOUTH CAROLINA COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. Code §§ 36-2-314 and 36-2A-212)

1634.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1635.  Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State Class against Fiat and FCA.

1636.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

1637.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

1638. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1639. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

1640. Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1641. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the South Carolina State Class. The amount of damages due will be proven at trial.

**SOUTH CAROLINA COUNT IV**
**BREACH OF EXPRESS WARRANTY**
**(S.C. Code §§ 36-2-313 and 36-2A-210)**

1642. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1643. Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State Class against Fiat and FCA.

1644. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

1645. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

1646. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1647.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1648.   Fiat and FCA provided these warranties to Plaintiffs and the South Carolina State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the South Carolina State Class purchased or leased their Class Vehicles.

1649.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the South Carolina State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1650.   Plaintiffs and the South Carolina State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the South Carolina State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the South Carolina State Class.

1651.   Any opportunity to cure the express breach is unnecessary and futile.

1652.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the South Carolina State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**SOUTH DAKOTA COUNT I**
**VIOLATION OF THE SOUTH DAKOTA**
**DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(S.D. Codified Laws § 37-24-6)**

1653.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1654.   Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves and the South Dakota State Class against all Defendants.

1655.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiff, and the South Dakota State Class members are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

1656.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

1657.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."  S.D. Codified Laws § 37-24-6(1).

1658.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Dakota CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in

1    marketing, offering for sale, and selling the defective Class Vehicles, Defendants used or

2    employed deception, fraud, false pretense, false promise or misrepresentation, or the

3    concealment, suppression or omission of a material fact with intent that others rely upon such

4    concealment, suppression or omission, in connection with the advertisement and sale/lease of the

5    Class Vehicles.

6         1659.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

7    emission control system were material to Plaintiffs and the South Dakota State Class, as

8    Defendants intended.  Had they known the truth, Plaintiffs and the South Dakota State Class

9    would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

10   been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

11   significantly less for them.

12        1660.   Plaintiff and South Dakota State Class members had no way of discerning that

13   Defendants' representations were false and misleading, or otherwise learning the facts that

14   Defendants had concealed or failed to disclose, because Defendants' emission control software

15   was extremely sophisticated technology.  Plaintiff and South Dakota State Class members did not,

16   and could not, unravel Defendants' deception on their own.

17        1661.   Defendants had an ongoing duty to Plaintiffs and the South Dakota State Class to

18   refrain from unfair and deceptive practices under the South Dakota CPA in the course of their

19   business.  Specifically, Defendants owed Plaintiff and South Dakota State Class members a duty

20   to disclose all the material facts concerning the EcoDiesel® emission control system because they

21   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the South

22   Dakota State Class, and/or they made misrepresentations that were rendered misleading because

23   they were contradicted by withheld facts.

24        1662.   Plaintiff and South Dakota State Class members suffered ascertainable loss and

25   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

26   and/or failure to disclose material information.

27

28

1663.   Defendants' violations present a continuing risk to Plaintiffs and the South Dakota State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1664.   Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the South Dakota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the South Dakota CPA.

**SOUTH DAKOTA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212)**

1665.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1666.   Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves and the South Dakota State Class against Fiat and FCA.

1667.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

1668.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

1669.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1670.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

1671.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.

The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1672.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the South Dakota State Class.  The amount of damages due will be proven at trial.

**SOUTH DAKOTA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210)**

1673.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1674.   Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves and the South Dakota State Class against Fiat and FCA.

1675.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

1676.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

1677.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1678.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a

1    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

2    miles, whichever comes first, or, for the major emission control components, for eight years or

3    80,000 miles, whichever comes first.

4         1679.  Fiat and FCA provided these warranties to Plaintiffs and the South Dakota State

5    Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

6    South Dakota State Class purchased or leased their Class Vehicles.

7         1680.  However, Fiat and FCA knew or should have known that the warranties were false

8    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

9    sold and leased to Plaintiffs and the South Dakota State Class were designed to deactivate under

10   real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

11   undergoing emissions testing, and therefore, knew that the emission systems contained defects.

12        1681.  Plaintiffs and the South Dakota State Class reasonably relied on Fiat's and FCA's

13   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

14   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

15   South Dakota State Class, the Class Vehicles were designed to pollute at higher than legal limits

16   during normal driving, and could not achieve advertised performance and efficiency metrics

17   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

18   FCA therefore breached their express warranty by providing a product containing defects that

19   were never disclosed to Plaintiffs and the South Dakota State Class.

20        1682.  Any opportunity to cure the express breach is unnecessary and futile.

21        1683.  As a direct and proximate result of Fiat's and FCA's breach of express warranties,

22   Plaintiffs and the South Dakota State Class suffered significant damages, and seek damages in an

23   amount to be determined at trial.

24                          **TENNESSEE COUNT I**
                 **VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977**
25                    **(Tenn. Code Ann. § 47-18-101, *et seq*.)**

26        1684.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

27   forth herein.

28

1685.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against all Defendants.

1686.   Plaintiffs and the Tennessee State Class members are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2).

1687.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

1688.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Tenn. Code § 47-18-104.

1689.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Tennessee CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Tenn. Code § 47-18-104:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1690.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Tennessee State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Tennessee State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1691.  Plaintiffs and Tennessee State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Tennessee State Class members did not, and could not, unravel Defendants' deception on their own.

1692.  Defendants had an ongoing duty to Plaintiffs and the Tennessee State Class to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Tennessee State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Tennessee State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1693.  Plaintiffs and Tennessee State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1694.  Defendants' violations present a continuing risk to Plaintiffs and the Tennessee State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1695.  Pursuant to Tenn. Code §§ 47-18-109, 47-18-109, and 47-18-109(a)(3), Plaintiffs and the Tennessee State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Tennessee CPA.

**TENNESSEE COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tenn. Code §§ 47-2-314 and 47-2A-212)**

1696.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1697.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against Fiat and FCA.

1698.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

1699.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1700.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1701.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

1702.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1703.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Tennessee State Class.  The amount of damages due will be proven at trial.

**TENNESSEE COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Tenn. Code §§ 47-2-313 and 47-2A-210)**

1704.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1705.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against Fiat and FCA.

1706.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

1707.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1708.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1709.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1710.   Fiat and FCA provided these warranties to Plaintiffs and the Tennessee State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Tennessee State Class purchased or leased their Class Vehicles.

1711.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Tennessee State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1712.   Plaintiffs and the Tennessee State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Tennessee State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Tennessee State Class.

1713.   Any opportunity to cure the express breach is unnecessary and futile.

1714.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Tennessee State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### TEXAS COUNT I
### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT – CONSUMER PROTECTION ACT
**(Tex. Business & Commercial Code §§ 17.41, *et seq.*)**

1715.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1716.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against all Defendants.

1372875.2

1717.   Plaintiffs and the Texas State Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

1718.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

1719.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

1720.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

1721.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Texas DTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Tex. Bus. & Com. Code § 17.46(a):

        A.      Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

        B.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1722.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Texas State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Texas State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1723.   Plaintiffs and Texas State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Texas State Class members did not, and could not, unravel Defendants' deception on their own.

1724.   Defendants had an ongoing duty to Plaintiffs and the Texas State Class to refrain from unfair and deceptive practices under the Texas DTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Texas State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Texas State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1725.   Plaintiffs and Texas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1726.   Defendants' violations present a continuing risk to Plaintiffs and the Texas State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1727.   Pursuant to Tex. Bus. & Com. Code §§ 17.50 and 17.50(b)(1), Plaintiffs and the Texas State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Texas DTPA.

1728.   On November 28, 2017, a notice letter was sent to FCA US LLC complying with Tex. Bus. & Com. Code § 17.505(a).  A second notice letter complying with Tex. Bus. & Com. Code § 17.505(a) was sent on July 17, 2017 to Bosch LLC, Bosch GmbH.  Plaintiffs sent another notice letter pursuant to Tex. Bus. & Com. Code § 17.505(a) to all Defendants on July 19, 2017. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas State Class are entitled.

## TEXAS COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)

1729.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1730.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against Fiat and FCA.

1731.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1732.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1733.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1734.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

1735.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1736.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Texas State Class.  The amount of damages due will be proven at trial.

## TEXAS COUNT III
## BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Com. Code §§ 2.313 and 2A.210)

1737.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1738.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against Fiat and FCA.

1739.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1740.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1741.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1742.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000

1  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

2  major emission control components are covered for the first eight years or 80,000 miles,

3  whichever comes first.  These major emission control components subject to the longer warranty

4  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

5  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

6  emission control or emission related parts which fail to function or function improperly due to a

7  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

8  miles, whichever comes first, or, for the major emission control components, for eight years or

9  80,000 miles, whichever comes first.

10      1743.  Fiat and FCA provided these warranties to Plaintiffs and the Texas State Class.

11  These warranties formed the basis of the bargain that was reached when Plaintiffs and the Texas

12  State Class purchased or leased their Class Vehicles.

13      1744.  However, Fiat and FCA knew or should have known that the warranties were false

14  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

15  sold and leased to Plaintiffs and the Texas State Class were designed to deactivate under real-

16  world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

17  emissions testing, and therefore, knew that the emission systems contained defects.

18      1745.  Plaintiffs and the Texas State Class reasonably relied on Fiat's and FCA's express

19  warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

20  Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Texas State

21  Class, the Class Vehicles were designed to pollute at higher than legal limits during normal

22  driving, and could not achieve advertised performance and efficiency metrics without this

23  cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

24  therefore breached their express warranty by providing a product containing defects that were

25  never disclosed to Plaintiffs and the Texas State Class.

26      1746.  Any opportunity to cure the express breach is unnecessary and futile.

27

28

1747.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Texas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**UTAH COUNT I**
**VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT**
**(Utah Code Ann. § 13-11-1, *et seq.*)**

1748.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1749.   Plaintiffs Steven Vanderlaan and John Wilson (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah State Class against Fiat and FCA.

1750.   FCA and Fiat are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

1751.   The Utah State Class members are "persons" under Utah Code § 13-11-3(5).

1752.   The sales and leases of the Class Vehicles to the Plaintiffs and Utah State Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

1753.   The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction."  Utah Code § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  Utah Code § 13-11-5.

1754.   In connection with a consumer transaction, Fiat and FCA, through their agents, employees, and/or subsidiaries, violated the Utah CSPA as detailed above.  Specifically, Fiat and FCA engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11-4:

        A.   Indicating that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        B.   Indicating that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

        C.   Indicating that the Class Vehicles were supplied in accordance with Defendants' prior representations, although they were not as represented.

1    1755.   Utah State Class members suffered ascertainable loss and actual damages as a

2    direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

3    disclose material information.

4    1756.   Defendants' violations present a continuing risk to the Utah State Class, as well as

5    to the general public.  Defendants' unlawful acts and practices complained of herein affect the

6    public interest.

7    1757.   The Utah State Class seek an order enjoining Defendants' unfair and/or deceptive

8    acts or practices, and awarding damages and any other just and proper relief available under the

9    Utah CSPA.

10                                    **UTAH COUNT II**
                       **VIOLATION OF UTAH TRUTH IN ADVERTISING LAW**
11                             **(Utah Code Ann. § 13-11a-1, *et seq.*)**

12   1758.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

13   forth herein.

14   1759.   Plaintiffs Steven Vanderlaan and John Wilson (for the purpose of this section,

15   "Plaintiffs") bring this action on behalf of themselves and the Utah State Class against all

16   Defendants.

17   1760.   Plaintiffs, the Utah State Class, FCA, Fiat, VM Italy, VM America, Bosch GmbH,

18   Bosch LLC, Volkmar Denner, and Sergio Marchionne are "person[s]" within the meaning of

19   Utah Code § 13-11a-1(7).

20   1761.   Utah's Truth In Advertising law makes unlawful any deceptive practice

21   undertaken in the course of a person's business.  Utah Code § 13-11a-3.

22   1762.   In the course of their business, FCA, Fiat, VM Italy, VM America, Bosch GmbH,

23   Bosch LLC, Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or

24   subsidiaries, violated Utah Truth In Advertising Law as detailed above.  Specifically, in

25   developing and installing emission control devices in the Class Vehicles that were concealed from

26   regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class

27   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

28   practices as defined in Utah Code § 13-11a-3:

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding about the true characteristics of the Class Vehicles.

1763.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Utah State Class, as Defendants intended. Had they known the truth, the Utah State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1764.   Utah State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Utah State Class members did not, and could not, unravel Defendants' deception on their own.

1765.   Defendants had an ongoing duty to the Utah State Class to refrain from unfair and deceptive practices in the course of their business. Specifically, Defendants owed Utah State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Utah State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-341-

1766.   Utah State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1767.   Defendants' violations present a continuing risk to the Utah State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1768.   the Utah State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices pursuant to Utah Code Ann. § 13-11a-4, and awarding damages, punitive damages, and any other just and proper relief available under the Utah Truth In Advertising law.

**UTAH COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Utah Code Ann. §§ 70A-2-314 and 70A-2A-212)**

1769.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1770.   Plaintiffs Steven Vanderlaan and John Wilson (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah State Class against Fiat and FCA.

1771.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1772.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1773.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1774.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

1775.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

1    Vehicles were not in merchantable condition because their design violated state and federal laws.

2    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

3    federal emission standards.

4        1776.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

5    damage to the Utah State Class.  The amount of damages due will be proven at trial.

6                                 **UTAH COUNT IV**
                         **BREACH OF EXPRESS WARRANTY**
7                 **(Utah Code Ann. §§ 70A-2-313 and 70A-2A-210)**

8        1777.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

9    fully set forth herein.

10       1778.   Plaintiffs Steven Vanderlaan and John Wilson (for the purpose of this section,

11   "Plaintiffs") bring this action on behalf of themselves and the Utah State Class against Fiat and

12   FCA.

13       1779.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

14   vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles

15   under § 70A-2-103(1)(d).

16       1780.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

17   motor vehicles under Utah Code § 70A-2a-103(1)(p).

18       1781.   The Class Vehicles are and were at all relevant times "goods" within the meaning

19   of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

20       1782.   Federal law requires manufacturers of light-duty vehicles to provide two federal

21   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

22   The Performance Warranty applies to repairs that are required during the first two years or 24,000

23   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

24   major emission control components are covered for the first eight years or 80,000 miles,

25   whichever comes first.  These major emission control components subject to the longer warranty

26   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

27   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

28   emission control or emission related parts which fail to function or function improperly due to a

1   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

2   miles, whichever comes first, or, for the major emission control components, for eight years or

3   80,000 miles, whichever comes first.

4       1783.   Fiat and FCA provided these warranties to the Utah State Class. These warranties

5   formed the basis of the bargain that was reached when the Utah State Class purchased or leased

6   their Class Vehicles.

7       1784.   However, Fiat and FCA knew or should have known that the warranties were false

8   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

9   sold and leased to the Utah State Class were designed to deactivate under real-world driving

10  conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

11  testing, and therefore, knew that the emission systems contained defects.

12      1785.   The Utah State Class reasonably relied on Fiat's and FCA's express warranties

13  concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class

14  Vehicles did not perform as warranted.  Unbeknownst to the Utah State Class, the Class Vehicles

15  were designed to pollute at higher than legal limits during normal driving, and could not achieve

16  advertised performance and efficiency metrics without this cheating design.  This design and the

17  devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by

18  providing a product containing defects that were never disclosed to the Utah State Class.

19      1786.   Any opportunity to cure the express breach is unnecessary and futile.

20      1787.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

21  the Utah State Class suffered significant damages, and seek damages in an amount to be

22  determined at trial.

23  **VERMONT COUNT I**<br>**VIOLATION OF VERMONT CONSUMER PROTECTION ACT**<br>**(Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*)**

24

25      1788.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

26  forth herein.

27      1789.   Plaintiff Harold Blake (for the purpose of this section, "Plaintiff") brings this

28  action on behalf of himself and the Vermont State Class against all Defendants.

1790.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are "persons" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).  Plaintiff and the Vermont State Class members are "consumers" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).

1791.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and Sergio Marchionne are engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

1792.   The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce…." Vt. Stat. Tit. 9, § 2453(a).

1793.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Vermont CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Vt. Stat. Tit. 9, § 2453(a):

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1794.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Vermont State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Vermont State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1795.   Plaintiff and Vermont State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Vermont State Class members did not, and could not, unravel Defendants' deception on their own.

1796.   Defendants had an ongoing duty to Plaintiff and the Vermont State Class to refrain from unfair and deceptive practices under the Vermont CPA in the course of their business. Specifically, Defendants owed Plaintiff and Vermont State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Vermont State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1797.   Plaintiff and Vermont State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1798.   Defendants' violations present a continuing risk to Plaintiff and the Vermont State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1799.   Pursuant to Vt. Stat. Tit. 9, § 2461(b), Plaintiff and the Vermont State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, exemplary damages, and any other just and proper relief available under the Vermont CPA.

**VERMONT COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2A-212)**

1800.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1801.   Plaintiff Harold Blake (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Vermont State Class against Fiat and FCA.

1802.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

1803.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1804.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1805.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-314 and 2A-212.

1806.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1807.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Vermont State Class.  The amount of damages due will be proven at trial.

**VERMONT COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Vt. Stat. Tit. Ann. 9A, §§ 2-313 and 2A-210)**

1808.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1809.   Plaintiff Harold Blake (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Vermont State Class against Fiat and FCA.

1810.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

1811.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1812.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1813.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1814. Fiat and FCA provided these warranties to Plaintiff and the Vermont State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Vermont State Class purchased or leased their Class Vehicles.

1815. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Vermont State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1816. Plaintiff and the Vermont State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiff and the Vermont State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Vermont State Class.

1817. Any opportunity to cure the express breach is unnecessary and futile.

1818. As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Vermont State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**VIRGINIA COUNT I**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. §§ 59.1-196, *et seq.*)**

1819. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1820. Plaintiffs James Boykin and Brian Hiner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Virginia State Class against all Defendants.

1821.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Virginia State Class members are "persons" within the meaning of Va. Code § 59.1-198.

1822.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are "supplier[s]" within the meaning of Va. Code § 59.1-198.

1823.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices."  Va. Code § 59.1-200(A).

1824.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Virginia CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Va. Code § 59.1-200(A):

A.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

C.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1825.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Virginia State Class, as Defendants intended.  Had they known the truth, the Virginia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1826.   Virginia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely

1    sophisticated technology.  Virginia State Class members did not, and could not, unravel

2    Defendants' deception on their own.

3        1827.  Defendants had an ongoing duty to the Virginia State Class to refrain from unfair

4    and deceptive practices under the Virginia CPA in the course of their business.  Specifically,

5    Defendants owed Virginia State Class members a duty to disclose all the material facts

6    concerning the EcoDiesel® emission control system because they possessed exclusive

7    knowledge, they intentionally concealed it from the Virginia State Class, and/or they made

8    misrepresentations that were rendered misleading because they were contradicted by withheld

9    facts.

10        1828.  Virginia State Class members suffered ascertainable loss and actual damages as a

11   direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

12   disclose material information.

13        1829.  Defendants' violations present a continuing risk to the Virginia State Class, as well

14   as to the general public.  Defendants' unlawful acts and practices complained of herein affect the

15   public interest.

16        1830.  Pursuant to Va. Code § 59.1-204(A)–(B), the Virginia State Class seek an order

17   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive

18   damages, and any other just and proper relief available under the Virginia CPA.

19                            **VIRGINIA COUNT II**
                   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
20                       **(Va. Code Ann. §§ 8.2-314 and 8.2A-212)**

21        1831.  Plaintiffs reallege and incorporate by reference all allegations of the preceding

22   paragraphs as though fully set forth herein.

23        1832.  Plaintiffs James Boykin and Brian Hiner (for the purpose of this section,

24   "Plaintiffs") bring this action on behalf of themselves and the  Virginia State Class against Fiat

25   and FCA.

26        1833.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

27   under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-

28   103(1)(d).

1834.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1835.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1836.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

1837.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1838.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Virginia State Class.  The amount of damages due will be proven at trial.

**VIRGINIA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Va. Code Ann. §§ 8.2-313 and 8.2A-210)**

1839.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1840.   Plaintiffs James Boykin and Brian Hiner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the  Virginia State Class against Fiat and FCA.

1841.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

1842.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1843.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1844.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1845.   Fiat and FCA provided these warranties to the Virginia State Class. These warranties formed the basis of the bargain that was reached when the Virginia State Class purchased or leased their Class Vehicles.

1846.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Virginia State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1847.   The Virginia State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Virginia State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Virginia State Class.

1848.   Any opportunity to cure the express breach is unnecessary and futile.

1849.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Virginia State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**WASHINGTON COUNT I**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*)**

1850.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1851.   Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State Class against all Defendants.

1852.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, Plaintiffs, and the Washington State Class members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1853.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and Marchionne are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(1).

1854.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code § 19.86.020.

1855.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Washington CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.020:

A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1856.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Washington State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Washington State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1857.   Plaintiffs and Washington State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Washington State Class members did not, and could not, unravel Defendants' deception on their own.

1858.   Defendants had an ongoing duty to Plaintiffs and the Washington State Class to refrain from unfair and deceptive practices under the Washington CPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Washington State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Washington State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1859.   Plaintiffs and Washington State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1860.   Defendants' violations present a continuing risk to Plaintiffs and the Washington State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1861.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble damages, and any other just and proper relief available under the Washington CPA.

## WASHINGTON COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212)

1862.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1863.   Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State Class against Fiat and FCA.

1864.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1865. With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1866. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1867. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

1868. Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1869. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Washington State Class. The amount of damages due will be proven at trial.

**WASHINGTON COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210)**

1870. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1871. Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State Class against Fiat and FCA.

1872. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1873. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1   1874. The Class Vehicles are and were at all relevant times "goods" within the meaning

2 of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

3   1875. Federal law requires manufacturers of light-duty vehicles to provide two federal

4 emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

5 The Performance Warranty applies to repairs that are required during the first two years or 24,000

6 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

7 major emission control components are covered for the first eight years or 80,000 miles,

8 whichever comes first.  These major emission control components subject to the longer warranty

9 include the catalytic converters, the electronic engine control unit (ECU), and the onboard

10 emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

11 emission control or emission related parts which fail to function or function improperly due to a

12 defect in materials or workmanship.  This warranty provides protection for two years or 24,000

13 miles, whichever comes first, or, for the major emission control components, for eight years or

14 80,000 miles, whichever comes first.

15   1876. Fiat and FCA provided these warranties to Plaintiffs and the Washington State

16 Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

17 Washington State Class purchased or leased their Class Vehicles.

18   1877. However, Fiat and FCA knew or should have known that the warranties were false

19 and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

20 sold and leased to Plaintiffs and the Washington State Class were designed to deactivate under

21 real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

22 undergoing emissions testing, and therefore, knew that the emission systems contained defects.

23   1878. Plaintiffs and the Washington State Class reasonably relied on Fiat's and FCA's

24 express warranties concerning emissions when purchasing or leasing the Class Vehicles.

25 However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

26 Washington State Class, the Class Vehicles were designed to pollute at higher than legal limits

27 during normal driving, and could not achieve advertised performance and efficiency metrics

28 without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1   FCA therefore breached their express warranty by providing a product containing defects that

2   were never disclosed to Plaintiffs and the Washington State Class.

3       1879.   Any opportunity to cure the express breach is unnecessary and futile.

4       1880.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

5   Plaintiffs and the Washington State Class suffered significant damages, and seek damages in an

6   amount to be determined at trial.

7                           **WEST VIRGINIA COUNT I**
                   **VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**
8                           **(W. Va. Code § 46A-1-101, *et seq.*)**

9       1881.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

10   forth herein.

11       1882.   This count is brought on behalf of the West Virginia State Class against all

12   Defendants.

13       1883.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

14   Sergio Marchionne, and the West Virginia State Class members are "persons" within the meaning

15   of W. Va. Code § 46A-1-102(31).  The West Virginia State Class members are "consumers"

16   within the meaning of W. Va. Code §§ 46A-6-102(2) and 46A-1-102(12).

17       1884.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner,

18   and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of W. Va.

19   Code § 46A-6-102(6).

20       1885.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA")

21   makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the

22   conduct of any trade or commerce."  W. Va. Code § 46A-6-104.

23       1886.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch,

24   Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries,

25   violated the West Virginia CCPA as detailed above.  Specifically, in developing and installing

26   emission control devices in the Class Vehicles that were concealed from regulators and

27   consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles,

28

AMENDED CONSOLIDATED CONSUMER CLASS
ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in W. Va. Code § 46A-6-102(7):

A. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C. Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D. Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1887.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the West Virginia State Class, as Defendants intended. Had they known the truth, the West Virginia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1888.  West Virginia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  West Virginia State Class members did not, and could not, unravel Defendants' deception on their own.

1889.   Defendants had an ongoing duty to the West Virginia State Class to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of their business. Specifically, Defendants owed West Virginia State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the West Virginia State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1890.   West Virginia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1891.   Defendants' violations present a continuing risk to the West Virginia State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1892.   Pursuant to W. Va. Code § 46A-6-106(a), the West Virginia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

1893.   On November 28, 2017, a notice letter was sent to FCA US LLC complying with W. Va. Code § 46A-6-106(c).  A second notice letter was sent to FCA US LLC and Fiat Chrysler complying with W. Va. Code § 46A-6-106(c) on January 17, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which the West Virginia State Class are entitled.

**WEST VIRGINIA COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(W. Va. Code §§ 46-2-314 and 46-2A-212)**

1894.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1895.  This count is brought on behalf of the West Virginia State Class against Fiat and FCA.

1896.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1897.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1898.  The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1899.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

1900.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1901.  Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the West Virginia State Class.  The amount of damages due will be proven at trial.

**WEST VIRGINIA COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(W. Va. Code §§ 46-2-313 and 46-2A-210)**

1902.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1903.   This count is brought on behalf of the West Virginia State Class against Fiat and FCA.

1904.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1905.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1906.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1907.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1908.   Fiat and FCA provided these warranties to the West Virginia State Class. These warranties formed the basis of the bargain that was reached when the West Virginia State Class purchased or leased their Class Vehicles.

1909.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the West Virginia State Class were designed to deactivate under real-world

1    driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2    emissions testing, and therefore, knew that the emission systems contained defects.

3        1910.   The West Virginia State Class reasonably relied on Fiat's and FCA's express

4    warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

5    Class Vehicles did not perform as warranted.  Unbeknownst to the West Virginia State Class, the

6    Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

7    could not achieve advertised performance and efficiency metrics without this cheating design.

8    This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

9    express warranty by providing a product containing defects that were never disclosed to the West

10   Virginia State Class.

11       1911.   Any opportunity to cure the express breach is unnecessary and futile.

12       1912.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13   the West Virginia State Class suffered significant damages, and seek damages in an amount to be

14   determined at trial.

15                         **WISCONSIN COUNT I**
16   **VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
                          **(Wis. Stat. § 100.18)**

17       1913.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

18   forth herein.

19       1914.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section,

20   "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against all

21   Defendants.

22       1915.   Plaintiffs and the Wisconsin State Class are members of "the public" and are

23   "persons" within the meaning of Wis. Stat. § 100.18(1).

24       1916.   FCA, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, and

25   Sergio Marchionne are a "person, firm, corporation or association" within the meaning of Wis.

26   Stat. § 100.18(1).

27

28

1917.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. § 100.18(1).

1918.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Volkmar Denner, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Wisconsin DTPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Wis. Stat. § 100.18(1):

      A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

      C.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1919.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Wisconsin State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Wisconsin State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1920.   Plaintiffs and Wisconsin State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Wisconsin State Class members did not, and could not, unravel Defendants' deception on their own.

-365-

1921.   Defendants had an ongoing duty to Plaintiffs and the Wisconsin State Class to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Wisconsin State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Wisconsin State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1922.   Plaintiffs and Wisconsin State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1923.   Defendants' violations present a continuing risk to Plaintiffs and the Wisconsin State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1924.   Pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs and the Wisconsin State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wisconsin DTPA.

**WISCONSIN COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wis. Stat. §§ 402.314 and 411.212)**

1925.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1926.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against Fiat and FCA.

1927.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1928.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1929.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1930.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

1931.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1932.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Wisconsin State Class.  The amount of damages due will be proven at trial.

## WISCONSIN COUNT III
## BREACH OF EXPRESS WARRANTY
### (Wis. Stat. §§ 402.313 and 411.210)

1933.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1934.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against Fiat and FCA.

1935.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1936.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1937.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1938.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1939.   Fiat and FCA provided these warranties to Plaintiffs and the Wisconsin State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Wisconsin State Class purchased or leased their Class Vehicles.

1940.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Wisconsin State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1941.   Plaintiffs and the Wisconsin State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Wisconsin State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Wisconsin State Class.

1942.   Any opportunity to cure the express breach is unnecessary and futile.

1943.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Wisconsin State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**WYOMING COUNT I**
**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT**
**(Wyo. Stat. §§ 40-12-101, *et seq.*)**

1944.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1945.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Wyoming State Class against all Defendants.

1946.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Volkmar Denner, Sergio Marchionne, and the Wyoming State Class members are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1947.   The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

1948.   Each sale or lease of a Class Vehicle to a Wyoming State Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii).  These consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-12-105(a).

1949.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits deceptive trade practices.  Wyo. Stat. § 40-12-105(a).

1950.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, Denner, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Wyoming CPA as detailed above.  Specifically, in developing and installing emission control devices in the Class Vehicles that were concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Wyo. Stat. §§ 40-12-105(a):

A.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

D.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1951.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Wyoming State Class, as Defendants intended.  Had they known the truth, the Wyoming State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1952.   Wyoming State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Wyoming State Class members did not, and could not, unravel Defendants' deception on their own.

1953.   Defendants had an ongoing duty to the Wyoming State Class to refrain from unfair and deceptive practices under the Wyoming CPA in the course of their business.  Specifically, Defendants owed Wyoming State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Wyoming State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1954.   Wyoming State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

-370-

1955.   Defendants' violations present a continuing risk to the Wyoming State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1956.   Pursuant to Wyo. Stat. §§ 40-12-108(a) and 40-12-108(b), the Wyoming State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wyoming CPA.

1957.   On November 28, 2016, a notice letter was sent to FCA US LLC complying with Wyo. Stat. § 40-12-109. Plaintiffs sent a second notice letter pursuant to Wyo. Stat. § 40-12-109 to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which the Wyoming State Class are entitled.

## WYOMING COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212)

1958.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1959.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Wyoming State Class against Fiat and FCA.

1960.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1961.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1962.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

-371-

1963.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

1964.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1965.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Wyoming State Class.  The amount of damages due will be proven at trial.

**WYOMING COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Wyo. Stat. § 34.1-2-313)**

1966.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1967.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Wyoming State Class against Fiat and FCA.

1968.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1969.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1970.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1971.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

1    whichever comes first.  These major emission control components subject to the longer warranty

2    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

3    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

4    emission control or emission related parts which fail to function or function improperly due to a

5    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

6    miles, whichever comes first, or, for the major emission control components, for eight years or

7    80,000 miles, whichever comes first.

8        1972.  Fiat and FCA provided these warranties to the Wyoming State Class.  These

9    warranties formed the basis of the bargain that was reached when the Wyoming State Class

10   purchased or leased their Class Vehicles.

11       1973.  However, Fiat and FCA knew or should have known that the warranties were false

12   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

13   sold and leased to the Wyoming State Class were designed to deactivate under real-world driving

14   conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

15   testing, and therefore, knew that the emission systems contained defects.

16       1974.  The Wyoming State Class reasonably relied on Fiat's and FCA's express

17   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

18   Class Vehicles did not perform as warranted.  Unbeknownst to the Wyoming State Class, the

19   Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

20   could not achieve advertised performance and efficiency metrics without this cheating design.

21   This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

22   express warranty by providing a product containing defects that were never disclosed to the

23   Wyoming State Class.

24       1975.  Any opportunity to cure the express breach is unnecessary and futile.

25       1976.  As a direct and proximate result of Fiat's and FCA's breach of express warranties,

26   the Wyoming State Class suffered significant damages, and seek damages in an amount to be

27   determined at trial.

28

1

### III.    PRAYER FOR RELIEF

2        WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class

3  and State Classes, respectfully request that the Court grant certification of the proposed

4  Nationwide Class and State Classes, including the designation of Plaintiffs as the named

5  representatives of the Nationwide Class and respective State Classes, the appointment of the

6  undersigned as Class Counsel, and the designation of any appropriate issue classes and/or

7  subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter

8  judgment in their favor and against Defendants, as follows:

9        A.    A declaration that any applicable statutes of limitation are tolled due to the

10  fraudulent concealment alleged in this complaint, and that Defendants are estopped from relying

11  on any statutes of limitations in defense;

12        B.    An order enjoining Defendants from continuing the unlawful, deceptive,

13  fraudulent, and unfair business practices alleged in this Complaint;

14        C.    Injunctive and equitable relief in the form of a comprehensive program to repair,

15  modify, and/or buy back all Class Vehicles, and to fully reimburse and make whole all Class

16  members for all costs and economic losses, and degradation of mileage performance, durability,

17  and reliability that the Class Vehicles could incur by being brought into compliance with federal

18  and state law;

19        D.    Environmental reparations, mitigation, and remediation to offset the harm caused

20  by the Class Vehicles, based on the mileage driven by all Class Vehicles and/or other appropriate

21  measures of environmental harm;

22        E.    Costs, restitution, compensatory damages for economic loss and out-of-pocket

23  costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive

24  and exemplary damages under applicable law;

25        F.    Rescission of all Class Vehicle purchases or leases, including reimbursement

26  and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and

27  other fees;

28

G.      A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

H.      Any and all applicable statutory and civil penalties;

I.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

J.      An award of costs and attorneys' fees;

K.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

L.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## IV.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.


DATED this 29th day of September, 2017.          Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP


By /s/ _____
       Elizabeth Cabraser (SBN 083151)
       275 Battery Street, 29th Floor
       San Francisco, CA 94111-3339
       Telephone: 415.956.1000
       Facsimile: 415.956.1008
       Email:  ecabraser@lchb.com

       *Plaintiffs' Lead Counsel*

Roland K. Tellis                              W. Daniel ("Dee") Miles, III
BARON & BUDD, P.C.                            BEASLEY, ALLEN, CROW, METHVIN,
15910 Ventura Boulevard, Suite 1600           PORTIS & MILES P.C.
Encino, CA 91436                              218 Commerce Street
Telephone: 818.839.2320                       Montgomery, AL 36104
Facsimile: 818.986.9698                       Telephone: 800.898.2034
Email: trellis@baronbudd.com                  Facsimile: 334.954.7555
                                              Email: dee.miles@beasleyallen.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD, LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
Telephone: 415.445.4003
Facsimile: 415.445.4020
Email:  lweaver@bfalaw.com

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: 206.623.7292
Facsimile: 206.623.0594
Email: steve@hbsslaw.com

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
Email:  jrice@motleyrice.com

David S. Casey, Jr.
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP
110 Laurel Street
San Diego, CA 92101-1486
Telephone: 619.238.1811
Facsimile: 619.544.9232
Email: dcasey@cglaw.com

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206.623.1900
Facsimile: 206.623.3384
Email:  lsarko@kellerrohrback.com

Rachel L. Jensen
ROBBINS GELLER RUDMAN &
DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 98101
Telephone: 619.231.1058
Facsimile: 619.231.7423
Email:  rachelj@rgrdlaw.com

Stacey P. Slaughter
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612.349.8500
Facsimile: 612.339.4181
Email: sslaughter@robinskaplan.com

*Plaintiffs' Steering Committee*