UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CHRYSLER-DODGE-JEEP ECODIESEL MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION. | Case No.  17-md-02777-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>Docket Nos. 231-232 |

United States District Court
Northern District of California

United States District Court
Northern District of California

# TABLE OF CONTENTS

I.    FACTUAL & PROCEDURAL BACKGROUND ........................................................ 1

    A.   Parties ............................................................................................................ 1

    B.   Main Allegations in the FAC ........................................................................ 2

    C.   Claims ........................................................................................................... 5

II.   STANDING ............................................................................................................... 6

    A.   Injury-in-Fact ................................................................................................ 7

       1.   Promised Performance of Class Vehicles .......................................... 8

       2.   More Than Regulatory Violation ....................................................... 9

       3.   Sufficiency of Allegations of Overpayment .................................... 10

          a.   Identification of Specific Advertisements ............................ 10

          b.   Decline in Vehicle Value ..................................................... 12

       4.   Theoretical Future Injuries .............................................................. 15

    B.   Traceability ................................................................................................. 16

    C.   Standing To Bring Certain State-Law Claims ............................................ 19

       1.   *In re Carrier IQ* ............................................................................. 20

       2.   *Melendres* ...................................................................................... 21

       3.   Analysis ........................................................................................... 22

    D.   Dealer Plaintiff Chatom's Standing ........................................................... 23

III.  RICO CLAIMS ........................................................................................................ 24

    A.   Statutory Standing ...................................................................................... 25

       1.   RICO's Injury Requirement ............................................................. 25

          a.   Theories of Injury ................................................................ 25

i

b.     Injury to "Business or Property" ................................................ 27

c.     Concrete Financial Loss ............................................................ 31

    i.    *Mendoza* and *Diaz* .......................................................... 31

    ii.    Application ...................................................................... 32

    iii.    Out-of-Circuit Decisions ................................................ 33

d.     RICO Injury Summary ............................................................. 35

2.    Proximate Cause ............................................................................... 35

a.     Fraud-on-the-Regulators Theory .............................................. 36

    i.    *Bridge*, *Anza*, and *Rezner* ............................................. 36

    ii.    Application ...................................................................... 38

b.     Direct Relationship Requirement .............................................. 39

c.     Difficulty Apportioning Damages ............................................ 41

d.     Fraud on the Market ................................................................. 42

B.    Merits of the Section 1962(c) RICO Claim ............................................ 46

1.    Racketeering Activity ....................................................................... 46

a.     Knowing Participants in Scheme to Defraud ........................... 47

    i.    Bosch GmbH and Bosch LLC ....................................... 47

    ii.    VW Italy and VM America ............................................ 49

    iii.    FCA N.V. and FCA US .................................................. 50

    iv.    Mr. Marchionne ............................................................. 51

    v.    Rule 9(b) ......................................................................... 52

b.     Specific Intent to Defraud ........................................................ 53

c.     Use of the Mails and Wires ...................................................... 55

2.   Pattern of Racketeering Activity ................................................................. 57

3.   Enterprise Requirement ............................................................................... 57

4.   Conducting the Affairs of the Enterprise ................................................... 61

C.   RICO Conspiracy Claim ......................................................................................... 63

D.   RICO Aider and Abettor Liability ......................................................................... 63

IV.   CLAIMS FOR COMMON LAW FRAUDULENT CONCEALMENT and

VIOLATION OF CONSUMER PROTECTION STATUTES ...................................................... 66

A.   Fraud on Consumers ................................................................................................ 66

1.   Factual Predicate for Fraud-on-Consumer Claims .................................... 66

2.   Mr. Marchionne .......................................................................................... 69

3.   Bosch Defendants ....................................................................................... 70

B.   Preemption .............................................................................................................. 71

1.   Express Preemption ..................................................................................... 72

a.   Affirmative Misrepresentation Theory............................................ 75

b.   Fraudulent Concealment Theory ..................................................... 83

c.   Summary .......................................................................................... 86

2.   Field Preemption ......................................................................................... 86

3.   Conflict Preemption .................................................................................... 89

C.   Common Law Fraud Claims ................................................................................... 90

1.   Damages ...................................................................................................... 90

2.   Intent to Deceive ......................................................................................... 91

3.   Affirmative Misrepresentation Theory: Puffery.......................................... 91

4.   Fraudulent Concealment Theory: Cognizability of Fraudulent Concealment Claims .... 95

5.   Fraudulent Concealment Theory: Duty to Disclose ........................................ 96

a.   Fiduciary Relationship ................................................................ 96

b.   Arm's Length Transaction ........................................................... 100

c.   Exclusive Knowledge ................................................................. 102

6.   Fraudulent Concealment Theory: Reliance ................................................ 103

D.   Consumer Protection Claims ............................................................................ 106

1.   Joint Appendix ............................................................................ 106

2.   Prohibitions on Class Actions ........................................................ 108

3.   Prohibitions on Actions for Damages and Standing for Injunctive Relief .................. 109

4.   Heightened Pleading Requirements re Injury and Scienter ........................... 109

5.   Economic Loss Doctrine ................................................................ 114

6.   Privity ........................................................................................ 115

7.   Punitive Damages ........................................................................ 117

8.   Identification of False Advertisements ............................................ 118

9.   Attorney General Approval ............................................................ 118

V.   Warranty Claims .......................................................................................... 118

A.   State Law Warranty Claims: Preemption ........................................................ 118

B.   Federal MMWA Warranty Claim .................................................................... 121

VI.   PERSONAL JURISDICTION ......................................................................... 122

VII.   CONCLUSION ............................................................................................ 127

The above-referenced case is a multidistrict litigation ("MDL").  Private Plaintiffs (hereinafter, "Plaintiffs") are individuals or companies who purchased certain trucks marketed under the Jeep and Ram 1500 model names.  More specifically, these trucks (2014-2016 models) had diesel engines that were branded "EcoDiesel."  Plaintiffs have brought class action claims against (1) the manufacturers of the cars and their chief executive (the FCA Defendants); (2) the companies who manufactured the EcoDiesel engines (the VM Motori Defendants); and (3) the companies who supplied the electronic diesel control ("EDC") units that were used to control the emissions from the engines (the Bosch Defendants).  The gist of Plaintiffs' complaint is that Defendants concealed the fact that they had installed "defeat devices" in Plaintiffs' cars – *i.e.*, devices that reduced the effectiveness of the emissions control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.  In other words, Plaintiffs contend that the vehicles emit excessive emissions under normal driving conditions and that the vehicles are in fact not eco-friendly.  Based on that allegation, Plaintiffs have brought (1) fraud-based claims and (2) warranty-based claims.[1]

Currently pending before the Court are two motions to dismiss: one brought by the FCA and VM Defendants and the other brought by the Bosch Defendants.  Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part both motions.

## I.      FACTUAL & PROCEDURAL BACKGROUND

A.      Parties

The operative complaint is the first amended consolidated consumer class action complaint ("FAC").  *See* Docket No. 225 (FAC).  The named plaintiffs in the FAC are primarily individual consumers but also include a dealer/reseller of motor vehicles (Chatom Motor Co., Inc.).

As for Defendants, as indicated above, there are three groups: (1) the FCA Defendants, (2) the VM Motori Defendants, and (3) the Bosch Defendants.

---

[1] The federal government has also brought an action against the FCA entities and the VM Defendants, which is a part of this MDL.  However, the pending motions challenge the lawsuits filed by Plaintiffs, and not that filed by the federal government.

United States District Court
Northern District of California

The **FCA Defendants** are:

(1) FCA US LLC ("FCA US");

(2) Fiat Chrysler Automobiles N.V. ("FCA N.V."), the corporate parent of FCA; and

(3) Sergio Marchionne, the CEO of both FCA US and FCA N.V.

As alleged in the complaint, FCA US is a motor vehicle manufacturer.  It distributes and sells motor vehicles under various brands, including Jeep and Ram.  *See* FAC ¶ 13.  The motor vehicles at issue in the instant case are the 2014-2016 EcoDiesel trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Class Vehicles").  *See* FAC ¶¶ 1, 14, 105.

The **VM Motori Defendants** are:

(1) VM Motori S.p.A. ("VM Italy"); and

(2) VM North America, Inc. ("VM America").

As alleged in the complaint, FCA N.V. owns both VM Italy and VM America.  VM Italy is an auto parts manufacturer.  It designed and manufactured the diesel engines at issue in the instant case (*i.e.*, the EcoDiesel).  *See* FAC ¶ 19.  VM America supports VM Italy customers and activities in North America.  *See* FAC ¶ 20.

The **Bosch Defendants** are:

(1) Robert Bosch LLC ("Bosch LLC"); and

(2) Robert Bosch GmbH ("Bosch GmbH"), the parent of Bosch LLC.[2]

As alleged in the complaint, the Bosch Defendants developed and manufactured the EDC unit (known as EDC Unit 17) which they supplied to the FCA Defendants and/or VM Defendants for use in the Class Vehicles to control emissions.  *See* FAC ¶ 30.

B.    Main Allegations in the FAC

The main allegations in Plaintiffs' operative complaint are as follows.

Emission standards for motor vehicles are set by the Environmental Protection Agency

---

[2] Plaintiffs have voluntarily dismissed Volkmar Denner, the CEO of Bosch GmbH, without prejudice.  *See* Docket No. 234 (notice).

1   ("EPA") or the California Air Resources Board ("CARB").[3]  Motor vehicle manufacturers must

2   certify to the EPA or CARB that their motor vehicles comply with the applicable emission

3   standards.  *See* FAC ¶¶ 2, 108.

4        Every motor vehicle sold in the United States must be covered by an EPA-issued

5   Certificate of Conformity ("COC") and every vehicle sold in California must be covered by a

6   CARB-issued Executive Order ("EO").  *See* FAC ¶¶ 2, 108.  To obtain a COC or EO, an

7   automaker "must submit an application, which lists all auxiliary emission control devices installed

8   in the vehicle, a justification for each, and an explanation of why the control device is not a defeat

9   device."  FAC ¶ 128.  A defeat device is generally "defined as any auxiliary emission control

10  device 'that reduces the effectiveness of the emission control system under conditions which may

11  reasonably be expected to be encountered in normal vehicle operation and use.'"  FAC ¶ 128

12  (quoting 40 C.F.R. § 86.1803-01).

13       "Diesel engines pose a unique challenge" with respect to emissions because "the greater

14  the power and fuel efficiency [*i.e.*, the benefits of a diesel engine], the dirtier and more harmful the

15  emissions."  FAC ¶ 110.  Notably, "[d]iesel combustion produces NOx"; "NOx pollution

16  contributes to nitrogen dioxide [and] particulate matter in the air, and reacts with sunlight in the

17  atmosphere to form ozone.  Exposure to these pollutants has been linked with serious health

18  dangers."  FAC ¶ 111.

19       "Given the [health] risks, minimizing NOx is paramount."  FAC ¶ 112.  For the Class

20  Vehicles, FCA US sought to minimize NOx through the EcoDiesel engine (supplied by the FCA

21  N.V.-owned VM Motori Defendants).  *See* FAC ¶ 113 (alleging that "[e]mission reductions start

22  in the cylinder with advanced fuel injection strategies" and, "[a]fter the byproducts of combustion

23  leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation

24

25  _____

    [3] The Clean Air Act ("CAA") allows California to adopt and enforce its own emission standards

26  as long as those standards are approved by the EPA.  Other states and the District of Columbia
    may choose to require that vehicles sold therein meet California's emissions requirements instead

27  of the EPA's.  *See In re Volkswagen "Clean Diesel" Mktg.*, MDL No. 2672 CRB (JSC), 264 F.
    Supp. 3d 1040, 1043 (N.D. Cal. 2017) [hereinafter *VW Wyo.*] (noting that "Congress has permitted

28  California to adopt its own vehicle emissions standards, which other States may follow"); *see also*
    42 U.S.C. § 7543(b).

United States District Court
Northern District of California

1   catalyst, diesel particulate filter, and SCR [selective catalytic reduction]").  To control emissions

2   from the EcoDiesel engine, the FCA entities used Bosch Defendants' EDC Unit 17.  *See* FAC ¶¶

3   114-15.

4   > Bosch's EDC Unit 17 controls emissions by periodically reading
5   > sensor values, evaluating a control function, and controlling
    > actuators based on the control signal.  Sensor readings include
6   > crankshaft position, air pressure, air temperature, air mass, fuel
    > temperature, oil temperature, coolant temperature, vehicle speed,
7   > exhaust oxygen content, as well as driver inputs such as accelerator
    > pedal position, brake pedal position, cruise control setting, and
8   > selected gear.  Based on sensor input, EDC [Unit] 17 controls and
    > influences the fuel combustion process including, in particular, fuel
9   > injection timing, which affects engine power, fuel consumption, and
    > the composition of the exhaust gas.

10  FAC ¶ 116.

11          According to Plaintiffs, the FCA Defendants worked with the VM Motori Defendants and

12  the Bosch Defendants

13  > to customize the EDC Unit 17 to allow Class Vehicles to simulate
    > "passing" the EPA and CARB [emission] testing.  Unlike during
14  > testing, the software [in the EDC Unit 17] disables or restricts
    > certain of the emission controls during real-world driving
15  > conditions.  When the emission controls are de-activated on the
    > road, the Class Vehicles emit up to 20 times the legal limits of NOx.
16

17  FAC ¶ 123; *see also* FAC ¶ 125 (alleging that all Defendants worked together "to develop and

18  implement a specific set of software algorithms for implementation in the Class Vehicles, which

19  enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea

20  injection rates").  Plaintiffs maintain that the software controls used for the EcoDiesel engines

21  "were concealed from regulators on COC and EO applications for the Class Vehicles, thus

22  deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United

23  States and California."  FAC ¶ 124.

24          On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against the FCA

25  entities for failing to disclose eight auxiliary emission control devices – which potentially were

26  defeat devices (as defined in federal regulations) – in the 2014-2016 Ram 1500s and Jeep Grand

27  Cherokees.  *See* FAC ¶¶ 3, 169.  On the same day, CARB also issued a NOV.  *See* FAC ¶¶ 4, 169.

28          According to Plaintiffs, not only were government regulators deceived by Defendants but

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    also consumers – *i.e.*, Defendants concealed from consumers the fact that defeat devices were

2    installed in the Class Vehicles.

3           Notably, the lawsuits comprising this MDL followed in the wake of the Volkswagen

4    "clean diesel" scandal.  In the fall of 2015, the public learned that Volkswagen had installed a

5    defeat device in 11 million diesel cars sold worldwide, including over 565,000 vehicles sold in the

6    United States.  *See* FAC ¶¶ 156-57.  News of the scandal gave rise to considerable civil and

7    criminal litigation against the company.  The civil cases filed in federal courts were transferred to

8    the Hon. Charles R. Breyer in this District as part of an MDL.  Classes of consumers who had

9    purchased or leased affected Volkswagen vehicles ultimately settled their claims with the

10   company and other defendants.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and*

11   *Prods. Liab. Litig.* ("*VW 3.0-Liter Settlement Approval Order*"), MDL No. 2672 CRB (JSC), 2017

12   WL 2212783 (N.D. Cal. May 17, 2017); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*

13   *and Prods. Liab. Litig.* ("*VW 2.0-Liter Settlement Approval Order*"), MDL No. 2672 CRB (JSC),

14   2016 WL 6248426 (N.D. Cal. Oct. 25, 2016).  Other litigation in *Volkswagen* is ongoing.  Among

15   the ongoing matters is a case by Volkswagen-branded franchise dealers against the Bosch

16   Defendants.  The franchise dealers allege that the Bosch Defendants participated in a RICO

17   enterprise to deceive regulators and consumers about the defeat device used in Volkswagen's

18   "clean diesel" vehicles.  In October 2017, Judge Breyer entered an order denying the Bosch

19   Defendants' motion to dismiss the franchise dealers' RICO claim.  *See In re Volkswagen "Clean*

20   *Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.* ("*VW Franchise Dealers*"), MDL No. 2672

21   CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)

22   C.    Claims

23          Based on, *inter alia*, the above allegations, Plaintiffs in the case at bar have asserted the

24   following nationwide class claims:

25   •    violation of RICO predicated on mail and wire fraud, *see* 18 U.S.C. § 1962(c)-(d);

26   •    common law fraudulent concealment; and

27   •    violation of the Magnuson-Moss Warranty Act ("MMWA") (breach of both written

28         and implied warranties).  *See* 15 U.S.C. § 2301 *et seq.*

Plaintiffs have also asserted state-specific class claims:

- violation of consumer protection statutes;

- breach of express warranty; and

- breach of implied warranty.

Although Plaintiffs have raised the various claims noted above, the claims may loosely be categorized as (1) fraud claims and (2) warranty claims.  Plaintiffs' fraud claims, in turn, may be subcategorized as (a) claims asserting fraud on government regulators (the RICO claim) and (b) claims asserting fraud on consumers (the common law fraudulent concealment claim and the claims for violation of consumer protection statutes).

In their motions to dismiss, Defendants have challenged all claims.  Defendants' motions raise issues of standing, failure to state a claim for relief, preemption, and personal jurisdiction.

## II.     STANDING

Standing is a threshold jurisdictional requirement derived from Article III's case-or-controversy condition.  *See* U.S. Const. art. III, § 2, cl. 1.  To satisfy this requirement, the plaintiff bears the burden of establishing three elements:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

Because standing relates to a federal court's subject matter jurisdiction, an assertion that the requirements of standing are not satisfied is properly raised in a motion brought pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A party moving to dismiss under Rule 12(b)(1) may make a facial challenge, as Defendants do here, by asserting that "the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In ruling on a facial challenge, the court "must accept as true all material allegations of the

United States District Court
Northern District of California

6

1    complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*,

2    422 U.S. 490, 501 (1975).  "At the pleading stage, general factual allegations of injury resulting

3    from the defendant's conduct may suffice . . . ."  *Lujan*, 504 U.S. at 561.

4                                      * * *

5            Defendants contend that Plaintiffs have not satisfied the first element of standing – an

6    injury-in-fact.  The Bosch Defendants also challenge the second element – asserting that, to the

7    extent Plaintiffs were injured, their injury is not fairly traceable to the Bosch Defendants' conduct.

8    Defendants further raise two narrower standing arguments, asserting that Plaintiffs lack standing

9    to assert claims under the laws of states in which no named Plaintiff resides or purchased or leased

10   a Class Vehicle, and that named Plaintiff Chatom Motor Company, Inc. cannot plausibly allege an

11   injury that is traceable to Defendants' conduct because of the timing of its Class Vehicle purchase.

12   A.    Injury-in-Fact

13           The Ninth Circuit has held that when a consumer alleges that he or she would not have

14   purchased property, or would have paid less for it, had the seller not misrepresented the property

15   or failed to disclose its limitations, the consumer has plausibly alleged an injury-in-fact.  *See, e.g.*,

16   *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013); *Mazza v. Am. Honda Motor Co.*, 666 F.3d

17   581 (9th Cir. 2012); *Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011).

18           In *Hinojos*, consumers alleged that they would not have purchased "on sale" merchandise,

19   or would have paid less for it, had they known that the retailer routinely sold the merchandise at

20   the advertised sale price, and that the "original" price did not reflect prevailing market prices.  *See*

21   *Hinojos*, 718 F.3d at 1101-02.  The Ninth Circuit held that, "when, as here, Plaintiffs contend that

22   class members paid more for a product than they otherwise would have paid, or bought it when

23   they otherwise would not have done so they have suffered an Article III injury in fact."  *Id.* at

24   1104 n.3 (internal quotation marks omitted).

25           In *Mazza*, consumers asserted that they would not have purchased Honda's collision

26   mitigation braking system, or would have paid less for it, had Honda disclosed the system's

27   limitations, including that the system might not warn drivers in time to avoid an accident.  *See*

28   *Mazza*, 666 F.3d at 586-87.  The Ninth Circuit held that "[t]o the extent that class members were

United States District Court
Northern District of California

7

1    relieved of their money by Honda's deceptive conduct – as Plaintiffs allege – they have suffered

2    an injury in fact."  *Id.* at 595 (internal quotation marks omitted).

3          Finally, in *Maya*, plaintiffs alleged that they would not have purchased homes in a new

4    housing development, or would have paid less for them, had the homebuilders disclosed that they

5    were marketing the homes to "unqualified buyers" who were likely to default on their home loans

6    and abandon the properties.  *See Maya*, 658 F.3d at 1065-66.  The Ninth Circuit held that the

7    plaintiffs' economic loss constituted an injury in fact: "Allegedly, plaintiffs spent money that,

8    absent defendants' actions, they would not have spent.  This is a quintessential injury-in-fact."  *Id.*

9    at 1069.

10         In the instant case, Plaintiffs allege the same type of economic loss as the plaintiffs in

11   *Hinojos*, *Mazza*, and *Maya*.  They contend that they decided to buy and lease the Class Vehicles

12   based in part on FCA US's representations that the vehicles were "'EcoDiesel' vehicle[s] (i.e.,

13   reduced emissions)."  FAC ¶¶ 34-96.  Had Defendants disclosed that the Class Vehicles actually

14   emitted NOx at levels up to 20 times legal limits; could not achieve advertised towing power,

15   performance, or fuel economy without cheating emissions tests; and were each equipped with an

16   emission treatment system that was designed to de-activate during real-world driving conditions,

17   *i.e.*, a "defeat device," Plaintiffs contend that they would not have bought and leased the Class

18   Vehicles, or would have paid less to do so.  *See* FAC ¶¶ 34-96 (named Plaintiffs' individual

19   allegations); FAC ¶ 123 (allegations regarding on-road NOx emission levels).

20         *Hinojos*, *Mazza*, and *Maya* are on point.  Nonetheless, Defendants contend that Plaintiffs'

21   injury allegations are insufficient because (1) the Class Vehicles work as promised; (2) Plaintiffs

22   cannot base their overpayment theory on a mere regulatory violation; and (3) the allegations of

23   overpayment are not particular enough.

24         1.    Promised Performance of Class Vehicles

25         In support of their overpayment theory, Plaintiffs allege that consumers "paid a significant

26   premium for the EcoDiesel features that [FCA US] falsely advertised."  FAC ¶ 191.  Specifically:

27   "[C]onsumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the

28   comparable gasoline vehicles.  In return, FCA promised power, performance, fuel economy, and

8

United States District Court
Northern District of California

environmental friendliness (and vehicles that were legal to drive)." FAC ¶ 191. Focusing on these allegations, Defendants contend that Plaintiffs' overpayment injury is not plausible because Plaintiffs do not allege that the "power, performance, or fuel economy of the Vehicles is anything other than what was advertised," or that "any named Plaintiff paid a single penny for *just* 'environmental friendliness.'" FCA/VM Mot. at 21, 23.

Defendants reading of the FAC picks apart and separates the four characteristics of the EcoDiesel that *together* are alleged to have supported the premium. Plaintiffs allege that the EcoDiesel premium was for a car that offered "a 'green' alternative to gasoline with reduced emissions *coupled with* diesel's benefits of greater torque, power, and fuel efficiency." FAC ¶ 6 (emphasis added). Plaintiffs contend that they did not receive this collection of benefits because the Class Vehicles "could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests." FAC ¶¶ 34-96. By focusing only on towing power, performance, and fuel economy, Defendants segment the allegations in a way that misses the point of Plaintiffs' overpayment theory. Defendants' argument is meritless.

      2.   <u>More Than Regulatory Violation</u>

Defendants next argue that the only injury alleged is a mere regulatory violation; specifically, that the Class Vehicles emit NOx at levels that exceed emission limits and contain unauthorized defeat devices. Defendants assert that these regulatory violations cannot support standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).

The Supreme Court held in *Spokeo* that "Article III standing requires a concrete injury even in the context of a statutory violation," and that "a bare procedural violation, divorced from any concrete harm, [cannot] satisfy the injury-in-fact requirement of Article III." *Id.* at 1549. After articulating this standard, the Court in *Spokeo* remanded the case to the lower court to apply the standard in the context of the plaintiff's action against a consumer reporting agency for violation of his rights under the Fair Credit Reporting Act. Before doing so, the Court provided an example of a FCRA violation that could be divorced from any concrete harm, noting that a consumer reporting agency may disseminate an incorrect zip code for an individual, but that "[i]t is difficult to imagine how [that] dissemination . . . , without more, could work any concrete

United States District Court
Northern District of California

harm."  *Id.* at 1550.

In the instant case, Plaintiffs allege more than "a bare procedural violation, divorced from any concrete harm," unlike the zip code example in *Spokeo*.  *Id.* at 1549.  Even if Plaintiffs' claims were tied to EPA and CARB emission standards – and as discussed in the preemption analysis further below, they are not, *see* Part IV.B, *infra* – Plaintiffs allege that they paid money for the Class Vehicles that they would not have otherwise spent but for Defendants' misrepresentations and concealment of material facts.  There was no similar expenditure of money in *Spokeo*; this expenditure "is a quintessential injury-in-fact."  *Maya*, 658 F.3d at 1069; *see also Mazza*, 666 F.3d at 595 ("To the extent that class members were relieved of their money by Honda's deceptive conduct – as Plaintiffs allege – they have suffered an injury in fact.") (internal quotation marks omitted).  Because Plaintiffs allege a financial injury, *Spokeo* does not support dismissal of their case.

### 3.   Sufficiency of Allegations of Overpayment

Defendants assert that Plaintiffs' allegations of overpayment are not particular enough because the allegations do not support that (a) Plaintiffs relied on specific advertisements about the Class Vehicles' emission levels in making their purchasing decisions; or (b) that the Class Vehicles have declined in value.

#### a.   Identification of Specific Advertisements

Defendants have not cited any authority that requires Plaintiffs to identify specific advertisements upon which they relied in order to sufficiently plead an injury-in-fact for purposes of establishing standing under Article III.  Defendants cite to *Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103 (9th Cir. 2017), a false advertising case involving "flushable" wipes that were not in fact flushable.  But the only Article III issue addressed there was whether a previously deceived consumer had standing to seek injunctive relief.  *See id.* at 1112-16.  Here, in contrast, the question is whether Plaintiffs have standing to seek damages for a financial injury.  Further, even in the context addressed in *Davidson*, the court did not require the plaintiff to satisfy a particularity requirement in order to support Article III standing.  Defendants also cite to *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004), and *Elias v. Hewlett-Packard Co.*, 903 F.

1    Supp. 2d 843 (N.D. Cal. 2012), but those decisions addressed the specificity needed to plausibly

2    allege certain substantive statutory violations, not to satisfy Article III. *See In re Ford*, 381 F.3d at

3    570-71 (vague "puffing statements" insufficient to support a Rule 10b-5 securities fraud claim);

4    *Elias*, 903 F. Supp. 2d at 854-55 (generalized misrepresentations insufficient to plead California

5    UCL, FAL, and CLRA claims).  Whether allegations are sufficient to state a substantive claim,

6    *e.g.*, fraud or fraudulent concealment or breach of contract, is a separate inquiry from whether the

7    Court has Article III jurisdiction over the dispute.

8            Not only do Defendants fail to cite authority for their particularity requirement, but such a

9    requirement is at odds with the principle that Article III requires only "general factual allegations

10   of injury resulting from the defendant's conduct" at the pleading stage. *Lujan*, 504 U.S. at 561

11   ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that

12   are necessary to support the claim.") (internal quotation marks omitted).  The Ninth Circuit's

13   decision in *Mazza* is instructive.  The court noted there that it was "likely that many class

14   members were never exposed to the allegedly misleading advertisements, insofar as advertising of

15   the challenged [collision mitigation braking] system was very limited." *Mazza*, 666 F.3d at 595.

16   Yet the court concluded that the plaintiffs had adequately pled an injury-in-fact because they

17   alleged that they "paid more for the [system] than they otherwise would have paid, or bought it

18   when they otherwise would not have done so, because Honda made deceptive claims and failed to

19   disclose the system's limitations." *Id.*  Consistent with *Lujan*, *Mazza* demonstrates that only

20   generalized allegations of injury are needed to plead an injury-in-fact under Article III.

21           Also instructive is *Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich.

22   2017).  Similar to this case, the plaintiffs in *Counts* alleged that they overpaid for cars with "clean

23   diesel" features. *See id.* at 577-80.  On a motion to dismiss, General Motors argued that the

24   plaintiffs lacked standing "because they did not plausibly allege that [they] saw and relied upon

25   specific advertisements or other false statements in deciding to buy [GM's Diesel Cruze]." *Id.* at

26   584.  The *Counts* court rejected this argument, noting that "GM has not established that Plaintiffs

27   must actually plead reliance in order to establish standing." *Id.*

28           Plaintiffs do not need to identify specific advertisements on which they relied in order to

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    support an Article III injury-in-fact.  But even if they did need to identify specific advertising, they

2    have done so.  Plaintiffs allege that they relied on FCA US's representation that the Class Vehicles

3    had an EcoDiesel engine.  *See* FAC ¶¶ 34-96.  One does not need to look far to find this

4    representation: as alleged, it appeared on the Class Vehicles themselves, which each had an

5    "EcoDiesel" logo that used a leaf and green coloring.  *See* FAC ¶ 145.  Regardless of whether this

6    is sufficient to state a plausible claim of, *e.g.*, fraud, this would be sufficient to establish Article III

7    standing.

8         Additionally, Plaintiffs not only allege that they were misled by FCA US's EcoDiesel

9    advertising, but that Defendants concealed that the Class Vehicles were equipped with one or

10   more defeat devices and emitted NOx at levels well in excess of legal limits.  *See* FAC ¶¶ 34-96,

11   123.  This is a fraudulent concealment theory.  And as discussed in more detail in the Court's

12   analysis of the merits of this theory, *see* Part IV.C, *infra*, a party's failure to disclose a fact during

13   a commercial transaction may be actionable if, *e.g.*, there is a duty to disclose and the fact

14   withheld could have justifiably induced the other party to the transaction to have acted differently.

15   *See* Restatement (Second) of Torts § 551 (1977) (outlining circumstances in which such a duty to

16   disclose arises).  Because this concealment theory is not tied to any particular affirmative

17   misrepresentations, there is no need as a matter of substantive law – certainly none under Article

18   III – to identify specific advertisements to support injury (and Article III jurisdiction) on this basis.

19   Allegations of overpayment based on a defendant's failure to disclose a product's limitations are

20   clearly sufficient to satisfy Article III's injury-in-fact requirement.  *See Maya*, 658 F.3d at 1069

21   (injury-in-fact requirement satisfied where plaintiffs alleged that "they would not have purchased

22   their homes had defendants made the disclosures").

23              b.    Decline in Vehicle Value

24        Defendants also contend that the FAC lacks allegations supporting that Plaintiffs' Class

25   Vehicles have declined in value.  For example, Defendants note that the FAC does not identify

26   reduced trade-in values for the Class Vehicles.

27        This argument misconstrues the alleged injury.  Whether the value of the Class Vehicles

28   has dropped is not Plaintiffs' focus.  Instead, like the home buyers in *Maya*, Plaintiffs contend that

they overpaid for the Class Vehicles "*at the time of sale*." *Maya*, 658 F.3d at 1069; *see also* FAC ¶ 191 ("Class members paid a significant premium for the EcoDiesel features that FCA falsely advertised."); FAC ¶ 195 ("[H]ad regulators or the public known the true facts, Plaintiffs . . . would not have purchased or leased the Class Vehicles . . . or would have paid substantially less for them.").

Defendants rely on cases in which courts have held that alleged overpayment injuries were speculative, or needed to be pled with more detail, because they were based on product defects that had not yet manifested. *See, e.g.*, *Barakezyan v. BMW of N. Am., LLC*, No. 16-cv-00173 SJO (GJSx), 2016 WL 2840803, at *4 (C.D. Cal. Apr. 7, 2016) ("Plaintiff has not alleged an economic injury because he has not alleged the Subject Vehicle failed to perform as advertised . . . ."); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972 (C.D. Cal. 2014) ("Plaintiffs have not alleged an actual economic injury because they have not had any negative experience with the [vehicles] . . . ."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.* ("*In re Toyota I*"), 790 F. Supp. 2d 1152, 1165 n.11 (C.D. Cal. 2011) ("When the economic loss is predicated solely on how a product functions, and the product has *not malfunctioned*, the Court agrees that something more is required than simply alleging an overpayment for a 'defective' product.") (emphasis added); *Contreras v. Toyota Motor Sales USA, Inc.*, No. C 09-06024 JSW, 2010 WL 2528844, at *2 (N.D. Cal. June 18, 2010) (overpayment allegations insufficient to support standing where "Plaintiffs do not allege that their Vehicles have manifested this defect"), *aff'd in part, rev'd in part on other grounds*, 484 F. App'x 116 (9th Cir. 2012).

For the reasons stated above, these cases are not persuasive. In any event, Plaintiffs here, in contrast, have alleged that the Class Vehicles are currently defective. Indeed, they were allegedly defective when first sold. The Class Vehicles emit NOx at levels up to 20 times legal limits, and each contains an "emission treatment system [that] was designed to de-activate during real-world driving conditions," *i.e.*, a defeat device. FAC ¶¶ 7, 34-96. Because the Class Vehicles are alleged to have been defective from the outset, Plaintiffs' overpayment allegations are plausible and distinguish the instant case from the authorities relied upon by Defendants. *See*

13

*Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *2, 4 (N.D. Cal. Aug. 1, 2017) (holding that plaintiffs had sufficiently alleged an injury-in-fact where they alleged that they overpaid for vehicles with engines that were "inherently defective"); *In re Toyota I*, 790 F. Supp. 2d at 1166 ("As long as Plaintiffs do not simply allege that their Toyota vehicles are 'defective,' but rather offer detailed, non-conclusory factual allegations of the product defect, the economic loss injury flows from the plausibly alleged defect at the pleadings stage.").

The Ninth Circuit's unpublished decision in *Cahen v. Toyota Motor Corp.*, -- F. App'x --, 2017 WL 6525501 (9th Cir. Dec. 21, 2017), which the FCA and VM Motori Defendants submitted as a supplemental authority after oral argument, *see* Docket No. 278, is not inconsistent with the above analysis.  The plaintiffs in *Cahen* alleged that they overpaid for vehicles that lacked certain software security features, which rendered the vehicles susceptible to hacking.  But the plaintiffs did not allege "that any of their vehicles ha[d] actually been hacked, or that they [were] aware of any vehicles that ha[d] been hacked outside of controlled environments."  *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 959 (N.D. Cal. 2015).  Reasoning that the plaintiffs' alleged economic injury "rest[ed] solely upon the existence of a speculative risk of future harm," the district court dismissed the complaint for lack of Article III standing.  *Id.* at 971.

The Ninth Circuit affirmed.  In doing so, it noted that the plaintiffs "[did] not allege that any of their vehicles ha[d] actually been hacked," and that "nearly 100% of cars on the market include wireless technologies that could pose vulnerabilities to hacking or privacy intrusions."  *Cahen*, 2017 WL 6525501, at *2.  Against this backdrop, the Ninth Circuit concluded that the plaintiffs' overpayment allegations were "conclusory and unsupported by any facts."  *Id.*  The Ninth Circuit also cited favorably to certain observations that the district court had made, which included that the plaintiffs had failed to allege that the software defect had "a demonstrable effect on the market for their specific vehicles based on documented recalls or declining Kelley Bluebook values."  *Id.*  The absence of such allegations lent further support to the Ninth Circuit's conclusion that the plaintiffs' "economic loss theory [was] not credible."  *Id.*

*Cahen* is consistent with the decisions cited in the preceding paragraphs.  Because the plaintiffs in *Cahen* only alleged that their vehicles *could* be hacked in the future, "something

14

more" was required than general allegations of overpayment.  *See In re Toyota I*, 790 F. Supp. 2d at 1165 n.11 ("[S]omething more is required than simply alleging an overpayment for a 'defective' product" when "the product has *not malfunctioned*") (emphasis added).  In contrast, when a complaint includes concrete allegations of a *current universal* vehicle defect, as the FAC does here, those allegations plausibly and specifically support an overpayment theory of injury.  This is because "[a] vehicle with a defect is worth less than one without a defect."  *Id.* at 1163.  Because Plaintiffs have offered concrete allegations of current defects in the Class Vehicles, this case is distinguishable from *Cahen*.

Nor does the *Volkswagen "Clean Diesel"* MDL support a different conclusion. Defendants assert that the injury allegations there were more detailed than those here, as the consumer plaintiffs in *Volkswagen* alleged, for example, that they had seen reduced trade-in values for the affected Volkswagen vehicles.  *See* FAC/VM Mot. at 25-26 (citing *Volkswagen* amended consolidated consumer class action complaint).  The consumer plaintiffs and defendants in *Volkswagen* settled their claims before the court considered a motion to dismiss.  *See VW 3.0-Liter Settlement Approval Order*, 2017 WL 2212783; *VW 2.0-Liter Settlement Approval Order*, 2016 WL 6248426.  The *Volkswagen* court accordingly did not consider the sufficiency of the injury allegations, let alone rule that the level of detail pled there was required to support an injury-in-fact under Article III.

4.    Theoretical Future Injuries

Plaintiffs also allege potential future injuries arising from efforts to bring the Class Vehicles into compliance.  If the FCA Defendants are not able to devise an emissions fix, Plaintiffs contend that the vehicles "will have to be removed from the road."  FAC ¶ 192. Plaintiffs also allege that, "even if FCA can bring the Class Vehicles into compliance with emission standards, it will not be able to do so without substantially degrading their performance characteristics, including their horsepower and/or fuel efficiency and/or maintenance requirements."  FAC ¶ 193.

Defendants argue that these injuries are too speculative to support standing.  If these were the only injuries alleged, the Court would have to undertake a closer analysis of such a singular

15

1    basis for standing.  While it is possible that the Class Vehicles may need to be removed from the

2    road, or that an emissions fix will materially reduce performance, the likelihood of these outcomes

3    is not clear.  *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("[W]e have

4    repeatedly reiterated that 'threatened injury must be *certainly* impending to constitute injury in

5    fact,' and that '[a]llegations of *possible* future injury' are not sufficient.") (second alteration in

6    original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  As the analysis above

7    demonstrates, however, Plaintiffs do not, in any event, rely on solely these future injuries to

8    support standing.  Instead, they contend that they suffered economic injury at the time of sale of

9    the Class Vehicles.  Uncertainty as to the sufficiency of their allegations of future injury, standing

10   alone, does not negate the Article III standing with respect to the claims asserted in the FAC.

11          Under the Ninth Circuit's decisions in *Hinojos*, *Mazza*, and *Maya*, Plaintiffs' allegations of

12   overpayment satisfy Article III's injury-in-fact requirement.

B.      Traceability

14          The Bosch Defendants separately argue that Plaintiffs' alleged economic injury is not

15   fairly traceable to them because (1) Plaintiffs have not identified any statement that the Bosch

16   Defendants made to Plaintiffs that could support a purportedly inflated price for the Class

17   Vehicles; and (2) the Bosch Defendants were not a party to a contract with Plaintiffs and therefore

18   have not deprived Plaintiffs of the benefit of their bargain with respect to the Class Vehicles.  The

19   Court does not find either of these arguments persuasive.

20          The thrust of Plaintiffs' allegations against the Bosch Defendants is not that these entities

21   made misrepresentations directly to Plaintiffs, or that the Bosch Defendants entered into, and then

22   breached, contracts with Plaintiffs.  Rather, Plaintiffs allege that the Bosch Defendants

23   participated in a scheme and conspiracy with the FCA and VM Motori Defendants to develop,

24   implement, and conceal software used in the Class Vehicles to cheat emissions tests.  *See* FAC

25   ¶¶ 215, 231, 238-40.  Plaintiffs' alleged economic injuries are traceable to this conduct in at least

26   two ways.

27          First, the hidden software is part of what has rendered the Class Vehicles defective and,

28   consequently, worth less.  *See In re Toyota I*, 790 F. Supp. 2d at 1163 ("A vehicle with a defect is

16

United States District Court
Northern District of California

United States District Court
Northern District of California

worth less than one without a defect.").  Because the Bosch Defendants allegedly had a hand in developing and implementing this software, their conduct plausibly caused Plaintiffs' economic loss.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.* ("*In re Toyota II*"), 826 F. Supp. 2d 1180, 1191 (C.D. Cal. 2011) (concluding that Article III's traceability requirement was satisfied where the plaintiffs alleged that Toyota's "defective designs resulted in devaluation of their vehicles purchased under the guise of defect-free vehicles").

Second, to the extent the Bosch Defendants knowingly concealed the software installed in the Class Vehicles from regulators and consumers, Plaintiffs' economic injuries are also fairly traceable to that conduct.  This is because Plaintiffs contend that they would not have bought or leased the Class Vehicles, or would have paid less to do so, if Defendants had disclosed that the Class Vehicles were equipped with software used to cheat emissions tests.  *See* FAC ¶¶ 34-96; *see also Juarez v. Quintero*, 530 F. Supp. 267, 273 (N.D. Cal. 1981) (holding that plaintiffs' allegations of economic loss were "fairly traceable to the defendants' failure to disclose").  Plaintiffs' economic injuries are accordingly traceable to the Bosch Defendants' failure to disclose.

As the above demonstrates, Plaintiffs do not need to identify a statement on which they relied that was made by the Bosch Defendants to plausibly trace their economic injuries to these entities.  Nor do Plaintiffs need to allege that they had a contract with the Bosch Defendants.  The Bosch Defendants played a role in designing the accused device that caused vehicles to perform in a way that deceived consumers and regulators, and allegedly did so knowingly and purposefully as part of a conspiracy with the other Defendants.  The injuries suffered by Plaintiffs are sufficiently traceable to the Bosch Defendants.

Faced with nearly identical allegations, the district court in *In re Duramax Diesel Litigation*, No. 17-cv-11661, 2018 U.S. Dist. LEXIS 26543 (E.D. Mich. Feb. 20, 2018), recently reached the same conclusion.  The plaintiffs there alleged that they overpaid for General Motors diesel vehicles, which GM marketed as having low emissions, but which utilized defeat devices and actually emitted NOx at levels that exceeded EPA limits.  *See id.* at *4-5.  The plaintiffs also

alleged that the affected vehicles utilized Bosch's EDC Unit 17, and that Bosch collaborated with GM to develop, manufacture, and test the defeat devices. *See id.* at *7-9. Although the Bosch Defendants argued that the plaintiffs' injuries were not traceable to their conduct – because Bosch did not advertise the vehicles to consumers, establish the vehicles' price, or enter into vehicle-purchase contracts with the plaintiffs – the district court rejected the argument. *See id.* at *18-25. In denying Bosch's motion to dismiss, the district court reasoned that the plaintiffs allegedly "overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the Duramax vehicles." *Id.* at *23. The plaintiffs' injuries were therefore traceable to the Bosch Defendants' conduct. For the reasons stated above, the same is true here.

The Bosch Defendants rely on *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257 (3d Cir. 2010), and *Young v. Johnson & Johnson*, No. 11-4580 (JAP), 2012 WL 1372286 (D.N.J. Apr. 19, 2012), in arguing that Plaintiffs' economic injuries are not traceable to them. These cases are factually distinguishable, and the Bosch Defendants' reliance on them is misplaced.

In both *L'Oreal* and *Johnson & Johnson*, consumers alleged that they were misled by product packaging into purchasing goods that they believed were unhealthy (lipstick with trace amounts of lead in *L'Oreal* and a butter/margarine substitute that contained trans fats in *Johnson & Johnson*). The consumers asserted that, had they known that the products had these "health" defects, they would not have purchased them. *See L'Oreal*, 374 F. App'x at 258-59; *Johnson & Johnson*, 2012 WL 1372286, at *1, 3.

In each case, the court held that the plaintiffs lacked standing to assert their claims. Specifically, each court held that the alleged health defects were speculative, in part because the FDA had approved the product labeling. *See L'Oreal*, 374 F. App'x at 259; *Johnson & Johnson*, 2012 WL 1372286, at *3. Separately, both courts concluded that the plaintiffs had mistakenly relied in part on a benefit-of-the-bargain theory of injury. Both courts held that this was an erroneous theory because the plaintiffs did not allege that they had purchased the products pursuant to a contract. *See L'Oreal*, 374 F. App'x at 259; *Johnson & Johnson*, 2012 WL 1372286, at *1, 4.

The Bosch Defendants seize on this last component of the *L'Oreal* and *Johnson & Johnson*

18

1   decisions – regarding the benefit-of-the-bargain theory – and argue that Plaintiffs must allege that

2   they purchased the Class Vehicles pursuant to a contract with them in order to support traceability.

3   But the courts in *L'Oreal* and *Johnson & Johnson* never held that a plaintiff must have a

4   contractual relationship with a defendant in order to assert a cognizable overpayment injury.

5   Instead, those courts simply noted that the plaintiffs there had invoked a benefit-of-the-bargain

6   theory of injury, but could not maintain such a theory because they had not entered into contracts

7   with the defendants.  Here, Plaintiffs do not allege that they entered into contracts with the Bosch

8   Defendants, which were then breached.  Rather, Plaintiffs assert that the Bosch Defendants played

9   a role in designing, implementing, and concealing software that was used in the Class Vehicles to

10  cheat emissions tests.  This is not a benefit-of-the-bargain theory.  It is a theory that sounds in tort

11  and "exists independent of any contract."  *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d

12  936, 966 (N.D. Cal. 2014).  The benefit-of-the-bargain contract analysis in *L'Oreal* and *Johnson*

13  *& Johnson* is therefore inapplicable.

14          Further, as is evident from the above summary of *L'Oreal* and *Johnson & Johnson*, those

15  decisions were not based on traceability, but on the absence of a concrete injury.  Because the

16  FDA had approved the product labeling at issue, the courts held that the plaintiffs' claims of

17  overpayment were speculative.  That is not the case here, as Plaintiffs allege that each of the Class

18  Vehicles contained software that qualified as a defeat device, which is clearly prohibited by

19  federal regulations.  *See* 40 C.F.R. § 86.1803-01.  Regulatory approval of the Class Vehicles does

20  not, under these circumstances, break the chain of traceability.

21          For the reasons stated above, the Court rejects the Bosch Defendants' traceability

22  arguments.

23  C.      Standing To Bring Certain State-Law Claims

24          Plaintiffs bring claims on behalf of a putative nationwide class and allege injury under the

25  laws of the 50 states and the District of Columbia.  No named Plaintiff, however, is alleged to

26  reside or have purchased or leased a Class Vehicle in seven states or the District of Columbia.

27  Defendants assert that claims under the laws of those states and the District of Columbia should

28  therefore be dismissed for lack of standing.  Plaintiffs respond that the determination of standing

United States District Court
Northern District of California

19

1   with respect to these claims is better addressed after class certification.

2       This Court previously addressed a similar issue in *In re Carrier IQ, Inc., Consumer*

3   *Privacy Litigation*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015), which is a decision on which Plaintiffs

4   and Defendants both rely.  The Ninth Circuit's intervening decision in *Melendres v. Arpaio*, 784

5   F.3d 1254 (9th Cir. 2015), may govern instead of *In re Carrier IQ*.  Under either case, however,

6   dismissal of the state-law claims at this time is not warranted.

7           1.      *In re Carrier IQ*

8       In *In re Carrier IQ*, individuals from 13 different states filed claims against Carrier IQ,

9   Inc. under a number of states' privacy and consumer protection statutes.  *See In re Carrier IQ*, 78

10  F. Supp. 3d at 1059.  On a motion to dismiss, defendants argued that the plaintiffs lacked standing

11  to assert claims under state laws from states in which they did not reside.  *See id.* at 1065.

12      The Court noted that this dispute turned on an issue for which there was no clear

13  precedent; that issue being "whether the Court should adjudicate the standing question now at the

14  pre-certification pleading stage as measured by the named plaintiffs only or . . . after deciding

15  class certification." *Id.* at 1068.  The Court noted that at that time "the Ninth Circuit recognized

16  this question was an open one, expressly declining to reach the 'difficult chicken-and-egg question

17  of whether class certification should be decided before standing.'" *Id.* at 1069 (quoting *Perez v.*

18  *Nidek Co.*, 711 F.3d 1109 (9th Cir. 2013)).  After reviewing relevant Supreme Court and Ninth

19  Circuit precedent, as well as decisions from various district courts and analysis by legal

20  commentators, *see id.* at 1069-73, the Court concluded "that it ha[d] the discretion to defer

21  questions of standing until after class certification," which it could decide to exercise on a case-by-

22  case basis. *Id.* at 1074.

23      On the facts of *In re Carrier IQ*, the Court declined to exercise this discretion, and instead

24  decided, "as a matter of case management, to require the Plaintiffs to present a named class

25  member who possesses individual standing to assert each state law's claims against Defendants."

26  *Id.*  The Court did so for several reasons.  First, the Court noted that the "number of consumers

27  from 35 other states in which state law claims are asserted is vast relative to the claims to which

28  the named Plaintiffs have standing."  *Id.*  Because of this, the Court expressed "reservations of

United States District Court
Northern District of California

subjecting the [Defendants] to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs who clearly have standing and are willing and able to assert claims under these state laws." *Id.* Second, the Court reasoned that "given the breadth of the proposed class and the number of state law claims asserted on behalf of the class, there is a meaningful risk that the requirements of class certification under Rule 23 may not be met or, if they are, subclasses may have to be created which would engender delay (adding that any new named plaintiffs would likely be subject to another round of discovery and further class certification motion practice)." *Id.* at 1074-75. As a result, the Court concluded that "[i]t makes sense to address standing to bring some 35 state law claims before class certification," and in doing so the Court concluded that "the named Plaintiffs do not have standing to assert claims from states in which they do not reside or did not purchase their mobile device." *Id.* at 1075.

   2. *Melendres*

   Three months after *In re Carrier IQ*, the Ninth Circuit decided *Melendres*, 784 F.3d 1254. That case was an appeal from a district court judgment against Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office, which enjoined them from, among other things, using race as a factor in deciding whether to stop any vehicle with a Latino occupant. *See id.* at 1258. The injunction applied to stops during both "saturation patrol" – when the defendant officers would saturate a particular area for the purpose of enforcing immigration laws – and nonsaturation patrols. *See id.* at 1258-59. On appeal, the defendants argued that the plaintiffs lacked standing to bring constitutional claims on behalf of class members stopped during nonsaturation patrols, because the named plaintiffs had been stopped only during saturation patrols. *See id.* at 1259. The Ninth Circuit disagreed. It observed that, "when courts have found a disjuncture between the claims of named plaintiffs and those of absent class members, they have not always classified the disjuncture consistently, some referring to it as an issue of standing, and others as an issue of class certification." *Id.* at 1261.

   The "standing approach" treats dissimilarities between the claims of named and unnamed plaintiffs as affecting the "standing" of the named plaintiff to represent the class. In other words, if there is a disjuncture between the injuries suffered by named and unnamed plaintiffs, courts applying the standing approach would say the

United States District Court
Northern District of California

1

2

3

4

> disjuncture deprived the named plaintiff of standing to obtain relief
> for the unnamed class members. *See, e.g., Blum v. Yaretsky*, 457
> U.S. 991, 999-1002 (1982). The "class certification approach," on
> the other hand, "holds that once the named plaintiff demonstrates
> her individual standing to bring a claim, the standing inquiry is
> concluded, and the court proceeds to consider whether the Rule
> 23(a) prerequisites for class certification have been met."
> NEWBERG ON CLASS ACTIONS § 2:6.

5   *Melendres*, 784 F.3d at 1261-62.

6         After summarizing these two approaches, the court in *Melendres* adopted the "class

7   certification approach." *Id.* at 1262. Accordingly, the court noted that "any issues regarding the

8   relationship between the class representative and the passive class members – such as dissimilarity

9   in injuries suffered – are relevant only to class certification, not to standing." *Id.* at 1262 (quoting

10  NEWBERG § 2:6).

11        3.   Analysis

12        The disjuncture between the claims of named plaintiffs and those of absent putative class

13  members in this case is the same type of disjuncture that was at issue in *In re Carrier IQ*. In both

14  instances, the named plaintiffs seek to bring claims under the laws of states where they reside or

15  transacted with defendants, as well as under the laws of states where they do not reside and where

16  they did not transact with defendants, but where other putative class members do or did. *See In re*

17  *Carrier IQ*, 78 F. Supp. 3d at 1072 (referring to this as the "sister state" law scenario). The

18  disjuncture in *Melendres* was different. The claims there were federal and constitutional claims,

19  so standing to assert state-law claims was not at issue. Rather, the disjuncture was factual, with

20  plaintiffs who were stopped during saturation patrol seeking to being claims on behalf of others

21  who were stopped during nonsaturation patrol. Ultimately, however, this distinction appears

22  immaterial. As in *Melendres*, there is a "disjuncture between the claims of the named plaintiffs

23  and absent class members." *Melendres*, 784 F.3d at 1261. And when such a disjuncture exists,

24  *Melendres* requires courts in the Ninth Circuit to apply the "class certification approach." That is,

25  once the named plaintiffs demonstrate their individual standing to sue, as Plaintiffs have done

26  here, *see* Part II.A-B, *supra*, the standing inquiry may be concluded; the disjuncture may better be

27  addressed in the context of class certification. *See id.* at 1262.

28        Even if *Melendres* does not sweep so broadly as to impose a per se rule, however, and

United States District Court
Northern District of California

22

1    district courts retain discretion to address standing before or after class certification in the "sister

2    state" law scenario, it is appropriate to defer the standing analysis here.  In *In re Carrier IQ*, the

3    Court chose to address standing before class certification in part because the named plaintiffs had

4    ties to less than a third of the states for which state-law claims were asserted.  (The named

5    plaintiffs came from 13 states, and there were no named plaintiffs from 35 other states.)  *See In re*

6    *Carrier IQ*, 78 F. Supp. 3d at 1074.  Here, the ratio of states with named Plaintiffs to states

7    without is almost the opposite: the named Plaintiffs reside in or purchased or leased Class

8    Vehicles in 43 states, and there are no named Plaintiffs for only seven states and the District of

9    Columbia.  As a result, Defendants would need to engage in near-nationwide discovery even if the

10   Court dismissed the state-law claims for states that do not have a named Plaintiff.  There is

11   therefore less concern here, as compared to in *In re Carrier IQ*, about "subjecting the [Defendants]

12   to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs

13   who clearly have standing and are willing and able to assert claims under these state laws."  *Id.*

14        The other factor considered in *In re Carrier IQ* was whether deferral of the standing issue

15   could lead to delay at the class certification stage.  *See id.* at 1074-75.  Deferring consideration of

16   the standing issue in this case, as in *In re Carrier IQ*, poses a risk of delay at the class certification

17   stage.  But because the number of states without a named Plaintiff is substantially smaller than in

18   *In re Carrier IQ*, such delay, if any, is likely to be short.  Thus, even under a discretionary

19   standard, the Court chooses to defer consideration of the standing issue for the "sister state" law

20   claims.

21   D.    <u>Dealer Plaintiff Chatom's Standing</u>

22        Plaintiff Chatom Motor Company, Inc., a vehicle dealer/reseller, alleges that it bought a

23   Class Vehicle "on or about February 1, 2017."  FAC ¶ 45.  Chatom's purchase was approximately

24   20 days after the EPA and CARB issued their NOVs to the FCA Defendants on January 12, 2017.

25   *See* FAC ¶¶ 4, 169.

26        Defendants argue that Chatom cannot plausibly allege that its purchase was "fairly

27   traceable" to their conduct so as to support standing.  Instead, Defendants argue that Chatom's

28   purchase is traceable to its "own decision to purchase the Vehicle despite the EPA's well-

23

1    publicized allegations."  FCA/VM Mot. at 26 n.8; *see also* Bosch Mot. at 13.

2         Although Chatom purchased a Class Vehicle after the EPA and CARB issued their NOVs,

3    Chatom alleges that, "[a]t the time of purchase, [it] *did not know* that the Class Vehicle . . . emitted

4    NOx at levels that are greater than advertised and above legal limits."  FAC ¶ 45 (emphasis

5    added).  Chatom also alleges that it did not know that the Class Vehicle it purchased "was

6    equipped with undisclosed and unauthorized emission control devices designed to cheat emission

7    tests," and that the vehicle "could not achieve the advertised towing power, performance, and/or

8    fuel economy without cheating emission tests."  FAC ¶ 45.

9         In considering Defendants' facial challenge to subject matter jurisdiction under Rule

10   12(b)(1), Chatom's allegations must be taken as true.  *See Seldin*, 422 U.S. at 501.  Defendants'

11   argument is a factual one that turns on, among things, whether news of the EPA and CARB NOVs

12   was widespread, and whether Chatom was put on notice of the NOVs.  The allegations in the FAC

13   do not answer these questions, which are best addressed at a later stage in the proceedings.

14                                          * * *

15        For all of the reasons discussed above, the Court denies Defendants' Rule 12(b)(1) motion

16   to dismiss for lack of Article III standing.

17              **III.       RICO CLAIMS**

18        Plaintiffs' RICO claims are predicated on a fraud-on-the-regulators theory.  They allege

19   that Defendants formed an enterprise to fraudulently obtain COCs from the EPA and EOs from

20   CARB in order to sell the Class Vehicles throughout the United States and California, even though

21   the Class Vehicles emitted unlawful levels of NOx and contained illegal defeat devices.  Plaintiffs

22   contend that they were injured by this enterprise when they purchased the Class Vehicles in the

23   stream of commerce.

24        To successfully plead a RICO claim under 18 U.S.C. § 1962(c), Plaintiffs must plausibly

25   allege that Defendants participated, directly or indirectly, in (1) the conduct (2) of an enterprise

26   that affects interstate commerce, (3) through a pattern (4) of racketeering activity.  *See Eclectic*

27   *Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  Plaintiffs must

28   also satisfy RICO's statutory standing requirements, which require Plaintiffs to plausibly allege

United States District Court
Northern District of California

24

1  (1) an injury to "business or property," that is (2) "by reason of a violation of section 1962."

2  18 U.S.C. § 1964(c).

3          In addition to their RICO claim under § 1962(c), Plaintiffs also seek to pursue a RICO

4  conspiracy claim under 18 U.S.C. § 1962(d), which provides that "[i]t shall be unlawful for any

5  person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  In

6  the alternative to their § 1962(c) claim, and in addition to their § 1962(d) conspiracy claim,

7  Plaintiffs also seek to pursue a RICO claim against the Bosch Defendants on an aiding and

8  abetting theory.

9          In considering Plaintiffs' RICO claims, the Court is mindful of the principle that "RICO is

10  to be read broadly" and should "be liberally construed to effectuate its remedial purposes."  *Odom*

11  *v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (quoting *Sedima, S.P.R.L. v. Imrex*

12  *Co.*, 473 U.S. 479, 497-98 (1985)).

13  A.    <u>Statutory Standing</u>

14         1.    <u>RICO's Injury Requirement</u>

15          To successfully plead a RICO injury, Plaintiffs must satisfy two requirements.  First, they

16  must plausibly allege "a harm to a specific business or property interest."  *Diaz v. Gates*, 420 F.3d

17  897, 900 (9th Cir. 2005) (en banc).  This is "a categorical inquiry typically determined by

18  reference to state law."  *Id.*  Second, they must plausibly allege that their injury has resulted in

19  "concrete financial loss."  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008)

20  (quoting *Oscar v. Univ. Students Co-op Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)),

21  *abrogated on other grounds by Diaz*, 420 F.3d 897.  Further below the Court considers whether

22  Plaintiffs' FAC satisfies these requirements; but first, the Court addresses the theories of injury.

23              a.    <u>Theories of Injury</u>

24          Plaintiffs list six injuries in the FAC that were allegedly caused by Defendants' RICO

25  enterprise.  *See* FAC ¶ 274(A)-(F).  First, they allege that, but for Defendants' scheme to defraud

26  the EPA and CARB, they could not have purchased or leased the Class Vehicles.  *See* FAC

27  ¶ 274(A).  In opposition to the motions to dismiss, Plaintiffs characterize this injury as "damage in

28  the amount of *all* the money" they spent on the Class Vehicles.  Opp'n at 23 ("No consumer could

United States District Court
Northern District of California

25

have spent a single dime on the Class Vehicles but for Defendants' scheme.").  Second, Plaintiffs allege that as a result of Defendants' scheme they overpaid "at the time of purchase or lease for Class Vehicles purportedly having 'EcoDiesel' properties and benefits, and meeting applicable federal and state emissions standards, that did not have these properties or meet these standards." FAC ¶ 274(B).  Specifically, Plaintiffs allege that they "paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles."  FAC ¶ 191.  The other four injuries are (1) the diminished value of the Class Vehicles; (2) ongoing out-of-pocket and loss-of-use expenses; (3) payment for alternative transportation; and (4) loss of employment due to lack of transportation.  *See* FAC ¶ 274(C)-(F).

There are no factual allegations in the FAC that support these last four theories of injury. In their opposition to the motions to dismiss, Plaintiffs do not assert otherwise; they focus only on the first two theories of injury.  The Court accordingly does not address whether the last four theories of injury would be cognizable under RICO if supported by sufficient factual allegations. Plaintiffs have leave to amend to add allegations to support these injuries if they can do so in good faith.

As to the first theory of injury – that Plaintiffs have been injured in the amount of *all* the money they spent to purchase or lease the Class Vehicles – the Court does not find this theory to be plausible.  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Drawing on those sources here, it is not plausible that Plaintiffs have been injured in an amount equal to the entire purchase price of the Class Vehicles because they have presumably been using the vehicles and obtaining value from them.  (There are no allegations to the contrary.)  Even if Plaintiffs theoretically could not have purchased and leased the Class Vehicles "but for" the fraud on the regulators, Plaintiffs did purchase and lease the Class Vehicles, and their use of the vehicles must be considered.  *See VW 2.0-Liter Settlement Approval Order*, 2016 WL 6248426, at *17 ("Class Members could only be entitled to a full refund of the purchase price if they returned their vehicles in the same condition they received it.  Such a scenario is virtually inconceivable as it is highly unlikely Class Members

1   never used their vehicles after purchasing them."); *Kruse v. Chevrolet Motor Div.*, No. Civ. A. 96-

2   1474, 1997 WL 408039, at *2 (E.D. Pa. July 17, 1997) ("[P]laintiff accepted and used the car for

3   approximately one and one-half years, thereby diminishing the value of the car.  Awarding

4   damages equal to the full purchase price does not take into account the natural depreciation of the

5   vehicle from normal usage.").  Because Plaintiffs' first theory of injury is not plausible, it does not

6   support a RICO injury.  In the analysis that follows, the Court accordingly focuses on only

7   Plaintiffs' second theory of injury: overpayment at the time of purchase.  *See* FAC ¶ 274(B).

8                    b.      Injury to "Business or Property"

9       In considering a RICO claim, the Ninth Circuit in *Canyon County* stated that,"[i]n the

10  ordinary context of a commercial transaction, a consumer who has been overcharged can claim an

11  injury to her property, based on a wrongful deprivation of her money."  *Canyon County*, 519 F.3d

12  at 976.  *Canyon County* relied on *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), for this point, an

13  antitrust case where the Supreme Court interpreted the Clayton Act's injury to "business or

14  property" requirement.  The Ninth Circuit has noted elsewhere that, because of similarities

15  between the Clayton Act's injury requirement and RICO's, these provisions "have been

16  interpreted in tandem."  *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002).

17      In *Reiter*, the Supreme Court concluded that the plaintiff had alleged an injury in her

18  "property" when "the price of the hearing aid she bought was artificially inflated" due to

19  anticompetitive conduct.  *Reiter*, 442 U.S. at 342.  In reaching this conclusion, the Court reasoned

20  that "[i]n its dictionary definitions and in common usage 'property' comprehends anything of

21  material value owned or possessed[,]" and "[m]oney, of course, is a form of property."  *Id.* at 338.

22  Thus, when "a consumer . . . acquir[es] goods or services for personal use, [she] is injured in

23  'property' when the price of those goods or services is artificially inflated by reason of the

24  anticompetitive conduct complained of."  *Id.* at 339.

25      Under *Canyon County* and *Reiter*, Plaintiffs have plausibly alleged "a harm to a specific

26  business or property interest."  *Diaz*, 420 F.3d at 900.  That is, "[o]verpayment at the time of

27  purchase or lease for Class Vehicles purportedly having 'EcoDiesel' properties and benefits, and

28  meeting applicable federal and state emissions standards, that did not have these properties or

United States District Court
Northern District of California

meet these standards." FAC ¶ 274(B).  Because "[m]oney . . . is a form of property," *Reiter*, 442

U.S. at 338, Plaintiffs' alleged overpayment constitutes "a harm to a specific . . . property

interest."  *Diaz*, 420 F.3d at 900; *see also Canyon Cty.*, 519 F.3d at 976 (in the "ordinary context

of a commercial transaction, a consumer who has been overcharged can claim an injury to her

*property*, based on a wrongful deprivation of her money") (emphasis added).

   Defendants contend that Plaintiffs' alleged injury is not an injury to "property," but instead

is an injury to an "expectation" interest, which is not an injury that is cognizable under RICO.  In

support of this argument, Defendants rely on *McLaughlin v. American Tobacco Co.*, 522 F.3d 215

(2d Cir. 2008), and *In re General Motors LLC Ignition Switch Litigation*, No. 14-md-2543 JMF,

2016 WL 3920353 (S.D.N.Y. July 15, 2016).  In *McLaughlin*, a group of smokers alleged that an

implicit misrepresentation by tobacco companies that "Light" cigarettes were healthier than

regular cigarettes "led them to buy Lights in greater quantity than they otherwise would have and

at an artificially high price, resulting in plaintiffs' overpayment for cigarettes."  *McLaughlin*, 522

F.3d at 220.  To show that their claims were amenable to common proof, the plaintiffs' expert

submitted a "loss of value" model in support of class certification, which estimated a loss in value

of 77.7 percent if the Lights were as harmful as regular cigarettes.  *See id.* at 228.  In a decision

reversing the district court's class certification order, the Second Circuit concluded that the

smokers could not rely on this model because it was "designed to award plaintiffs damages based

on the benefit of their bargain," and "[s]uch damages are generally unavailable in RICO suits."  *Id.*

at 228.  The court reasoned that this restriction followed from the text of § 1964(c), which

compensates only for injury to "business or property," not for an injury to a party's "expectation."

*Id.*

   In *General Motors*, a district court in the Second Circuit relied on *McLaughlin* in

dismissing a RICO claim brought by owners and lessees of GM vehicles.  *See General Motors*,

2016 WL 3920353, at *16-17.  The plaintiffs in *General Motors* had each alleged that they were

injured "when they purchased for *x* dollars a New GM car that contained a latent defect

. . . [because] had they known about the defect, they would have paid fewer than *x* dollars for the

car (or not bought the car at all), because a car with a safety defect is worth less than a car without

a safety defect." *Id.* at *7. "[I]n the face of *McLaughlin*," the *General Motors* court concluded that this "benefit-of-the-bargain" theory of injury could not support a RICO claim. *Id.* at *17.

Defendants contend that, like *McLaughlin* and *General Motors*, here, Plaintiffs' alleged overpayment for EcoDiesel features and for vehicles that complied with emission standards is an injury to their expectation interest. The Court disagrees.

First, when a plaintiff alleges that he or she overpaid for a good or service because of anticompetitive or deceptive conduct, the Supreme Court's decision in *Reiter* and the Ninth Circuit's decision in *Canyon County* support that such an injury is one to "property," not merely "expectation interests." *See Reiter*, 442 U.S. at 339, 342; *Canyon Cty.*, 519 F.3d at 976. Those decisions bind this Court; *McLaughlin* and *General Motors* do not.

Second, the injury to expectation interests addressed in *McLaughlin* is distinguishable from the overpayment injury alleged in this case. The *McLaughlin* court noted that the Light cigarettes at issue there "ha[d] always been priced the same as full-flavored cigarettes." *McLaughlin*, 522 F.3d at 228. So smokers did not pay an artificially inflated price for Lights. Indeed, the court noted that "Defendants' misrepresentation[s] could in no way have reduced the value of the cigarettes that plaintiffs actually purchased; they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id.* at 229. The smokers, however, alleged an injury to their "expectation of a safer cigarette," which the court concluded was an expectation-based injury that was too speculative to value. *See id.* ("We are asked to conceptualize the impossible – a healthy cigarette – and then imagine what a consumer might have paid for such a thing.").

This difference between overpayment and expectation-based injury is also evident in the principal case upon which the *McLaughlin* court relied to support its holding. The *McLaughlin* court relied on *Heinhold v. Perlstein*, 651 F. Supp. 1410 (E.D. Pa. 1987), where the plaintiff alleged that he suffered a RICO injury when the defendant induced him to purchase a diamond ring by misrepresenting how much the ring was worth. *See id.* at 1411. Critically, the plaintiff did not allege that the diamond was worth less than the amount he paid for it, only that the diamond was worth less than the defendant had represented, and that the plaintiff therefore lost a "bargain opportunity" to sell the ring for a profit. *Id.* The court held that this lost bargain was not a

29

1    recoverable RICO injury.  The court reasoned that the parties' contract "did not cause plaintiff to

2    lose money, because he concedes that he did not pay more than the fair market value of the ring."

3    *Id.*  Instead, the only claimed injury was that the plaintiff "lost the benefit of his bargain, *i.e.*, his

4    expectation interest in the contract."  *Id.* at 1412.  Such an injury, the court reasoned, was injury to

5    an expectation interest, not an injury to business or property as required by RICO.  *See id.*

6            In *McLaughlin* and *Heinhold*, then, there was no actual overpayment because the plaintiffs

7    in those cases did not pay more than the fair market value of the items they purchased.  The same

8    cannot be said here.  Plaintiffs allege that they paid a premium for the Class Vehicles; specifically,

9    they allege that they "paid between $3,120 and $5,000 more for the EcoDiesel option than for the

10   comparable gasoline vehicles."  FAC ¶ 191.  Plaintiffs also allege that they did not receive cars

11   that actually perform as EcoDiesels, *see* FAC ¶¶ 34-96, which, when considered along with the

12   alleged premium, plausibly supports that they paid more than fair market value for the Class

13   Vehicles.  This is clearly an overpayment injury, and it is distinguishable from the expectation-

14   based injury in *McLaughlin*.

15           *General Motors*, 2016 WL 3920353, is not distinguishable on the same grounds.  The

16   plaintiffs there alleged that they purchased vehicles with latent defects, *see id.* at *7, and it is

17   possible that they paid more than fair market value for those vehicles because a car with a defect is

18   worth less than one without a defect.  *See In re Toyota I*, 790 F. Supp. 2d at 1163.  But this

19   possible overpayment also distinguishes *General Motors* from *McLaughlin*, making the *General*

20   *Motors* court's reliance on *McLaughlin* less persuasive.  In any event, *General Motors* is

21   distinguishable from this case in its own way.  As discussed below, *see* Part III.A.1.c, *infra*, courts

22   have held that latent defects are too speculative to satisfy RICO's concrete injury requirement.

23   The defects alleged here, in contrast, are not latent – they allegedly exist presently in each Class

24   Vehicle, and have existed since the vehicles were manufactured.

25           When a plaintiff alleges that he or she overpaid for a good or service because of

26   anticompetitive or deceptive conduct, under *Reiter* and *Canyon County*, such an injury is one to

27   "property," not merely "expectation interests."  The Court concludes that Plaintiffs have

28   adequately alleged "a harm to a specific . . . property interest."  *Diaz*, 420 F.3d at 900.

United States District Court
Northern District of California

30

c.     Concrete Financial Loss

A civil RICO injury also "requires proof of concrete financial loss, and not mere 'injury to a valuable intangible property interest.'" *Oscar*, 965 F.2d at 785 (quoting *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990)).  For example, "out-of-pocket expenditures," such as costs incurred to repair damaged property, constitute concrete financial loss.  *Id.* at 786.  In contrast, the loss of "use and enjoyment of [a] leasehold interest," *id.* at 787, and the loss of "peace of mind," *Berg*, 915 F.2d at 463-64, are intangible injuries that do not support a RICO claim.

Money has physical form; and the overpayment of money, as Plaintiffs allege, is a tangible injury.  But Defendants contend that overpayment, as compared to out-of-pocket costs to repair damaged property, is speculative and thus insufficiently concrete to support a RICO injury.  Two Ninth Circuit decisions support the opposite conclusion.

i.     *Mendoza* and *Diaz*

In *Mendoza*, 301 F.3d at 1166, a group of agricultural laborers alleged that certain fruit orchards and packing houses engaged in a RICO enterprise to depress their wages by hiring undocumented workers.  The district court dismissed the RICO claim, holding that the laborers' losses were insufficiently concrete because a "wide range of factors determines the wage for orchard laborers in the Yakima Valley."  *Mendoza v. Zirkle Fruit Co.*, No. CS-00-3024-FVS, 2000 WL 33225470, at *10 (E.D. Wash. Sept. 27, 2000).  The Ninth Circuit reversed, noting that:

> [I]t is important to distinguish between uncertainty in the fact of damage and in the amount of damage.  That wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers, is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be.

*Mendoza*, 301 F.3d at 1171.  The Ninth Circuit also reasoned that:

> [T]he workers must be allowed to make their case through presentation of evidence, including experts who will testify about the labor market, the geographic market, and the effects of the illegal scheme.  Questions regarding the relevant labor market and the growers' power within that market are exceedingly complex and best addressed by economic experts and other evidence at a later stage in the proceedings.

*Id.*

United States District Court
Northern District of California

31

Subsequently, in *Diaz*, an en banc panel held that "false imprisonment that caused the victim to lose employment and employment opportunities is an injury to 'business or property' within the meaning of RICO." *Diaz*, 420 F.3d at 898. In reaching this holding, the court noted that the "three-judge panel [had] tried to distinguish *Mendoza* on the theory that Diaz did not allege 'that he lost actual employment, only that he was rendered unable to pursue gainful employment.'" *Id.* at 900 (quoting *Diaz v. Gates*, 380 F.3d 480, 484 (9th Cir. 2004)). The en banc court concluded that this distinction was immaterial, reasoning that:

> There may be a practical difference between current and future employment for purposes of RICO – for instance, it may be easier to prove causation or determine damages for a plaintiff who has lost current employment – but this difference is not relevant to whether there was an injury to "business or property."

*Id.* at 900-01.

### ii.   Application

*Mendoza* and *Diaz* establish a relatively low threshold for plaintiffs to adequately plead a "concrete" RICO injury. In neither case did the plaintiffs identify a particular dollar amount of lost wages. Yet the *Mendoza* court concluded that the plaintiffs' allegations that "wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers, is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be." *Mendoza*, 301 F.3d at 1171. And in *Diaz*, the court held that even the loss of a future employment opportunity could constitute an injury to "property" for purposes of RICO. *See Diaz*, 420 F.3d at 900-01.

Plaintiffs' allegations of overpayment easily clear the threshold established by these cases. Unlike in *Mendoza* and *Diaz*, Plaintiffs have identified a particular, reasonably narrow range by which they allegedly overpaid for the Class Vehicles – "between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles." FAC ¶ 191. This is a "concrete financial loss, and not mere 'injury to a valuable intangible property interest.'" *Oscar*, 965 F.2d at 785 (quoting *Berg*, 915 F.2d at 464). It is also a plausible injury, given that Plaintiffs allegedly paid for what turned out to be defective vehicles. *See In re Toyota I*, 790 F. Supp. 2d at 1163 ("A vehicle with a defect is worth less than one without a defect.").

1        The district court in *Duramax* recently reached the same conclusion.  *See In re Duramax*

2   *Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *69.  The plaintiffs there alleged that they each

3   paid a premium "of nearly $9,000, as GM charged more for its Duramax engine than a comparable

4   gas car." *Id.*  The district court concluded that this was a cognizable out-of-pocket injury, because

5   the plaintiffs "identif[ied] a specific payment attributable directly to the vehicle component at

6   issue which they opted to purchase on the basis of fraudulent conduct." *Id.* at *69.

7                  iii.    Out-of-Circuit Decisions

8        In arguing that Plaintiffs' alleged overpayment is insufficiently concrete, Defendants rely

9   on certain out-of-circuit decisions where courts have rejected overpayment injury theories under

10  RICO.  *See Maio v. Aetna, Inc.*, 221 F.3d 472, 488 (3d Cir. 2000) (alleged overpayment for health

11  plan that lacked certain qualities and features was not a "tangible economic harm compensable

12  under RICO"); *General Motors*, 2016 WL 3920353, at *1, 7, 16 (alleged overpayment for vehicles

13  with defective ignition switch was a speculative, expectation-based injury that was not cognizable

14  under RICO); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069,

15  1077 (S.D. Ind. 2001) (alleged overpayment for vehicles with "dangerous propensity to suffer

16  complete or substantial tread separation" was not sufficiently concrete to satisfy RICO); *Tri-State*

17  *Express, Inc. v. Cummins Engine Co.*, No. 99-cv-00220 (HHK), 2000 U.S. Dist. LEXIS 23564, at

18  *19-20 (D.D.C. Sept. 11, 2000) (alleged overpayment for diesel trucks with undisclosed "defeat

19  devices" was insufficiently concrete to satisfy RICO).

20       *Maio*, *General Motors*, and *Bridgestone* are distinguishable from this case.  The plaintiffs

21  in those cases asserted that they overpaid for goods or services that had unmanifested defects.  As

22  a result, the courts concluded that the plaintiffs had alleged only a *risk* of loss.  Specifically, the

23  plaintiffs in *Maio* alleged that the quality and features of an HMO plan they purchased were

24  falsely advertised by Aetna; but the plaintiffs did not actually allege "that they suffered personal

25  injuries, were denied necessary benefits, or received inferior care." *Maio*, 221 F.3d at 485.  The

26  Third Circuit reasoned that, "[a]bsent such assertions of diminished benefits or care . . . ,

27  [plaintiffs] simply cannot establish as a factual matter that they received anything less than what

28  they bargained for . . . and consequently cannot claim that they paid too much for the health

United States District Court
Northern District of California

insurance they received." *Id.* at 494.  The fact of concrete injury was too uncertain.  Similarly, in *General Motors*, the plaintiffs purchased vehicles with a *latent* ignition switch defect and asserted that they had overpaid for these vehicles.  *See General Motors*, 2016 WL 3920353, at *1, 7.  In holding that the plaintiffs' injuries were not cognizable under RICO, the district court referred to them as "speculative, expectation-based" damages.  *Id.* at *16.  Finally, the plaintiffs in *Bridgestone* alleged that their tires "*may* suffer tread separation" which "*may* cause them to suffer . . . loss." *Bridgestone*, 155 F. Supp. 2d at 1091 (emphasis added).  In concluding that these allegations were insufficient to support an overpayment theory of injury, the court stated that "RICO affords a monetary remedy only to plaintiffs who have actually realized the diminished value *or experienced product failure*, and not to those who allege a risk (or even a probability) of such loss." *Id.* (emphasis added).

Unlike the plaintiffs in *Maio*, *General Motors*, and *Bridgestone*, Plaintiffs allege that their Class Vehicles *are currently defective*: that the Class Vehicles currently emit NOx at levels up to 20 times legal limits and are currently equipped with an "emission treatment system [that] was designed to de-activate during real-world driving conditions."  FAC ¶¶ 7, 34-96.  The alleged defects also affect *all* Class Vehicles.  This is therefore not a case where there is a risk that a particular vehicle might suffer a defect which might manifest itself at some point in the future.  Because Plaintiffs allege current and existing defects affecting all Class Vehicles, Plaintiffs' allegations of financial loss "are not grounded in the possibility of future events." *Bridgestone*, 155 F. Supp. 2d at 1091; *see also In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *58-60 (distinguishing *Bridgestone* on the same basis, and holding that consumers who alleged that they overpaid for GM vehicles that were equipped with defeat devices had alleged a cognizable RICO injury).

To be sure, *Tri-State* is not so distinguishable.  Similar to here, the plaintiffs in *Tri-State* alleged that they overpaid for trucks that, unknown to them, contained defeat devices that allowed the trucks to remain within the EPA's NOx limits during emissions testing, but to substantially exceed those limits during normal driving conditions.  *See Tri-State*, 2000 U.S. Dist. LEXIS 23564 at *6-7.  In rejecting the plaintiffs' overpayment theory of RICO injury, the *Tri-State* court

34

1  reasoned that, because the plaintiffs had not sold their trucks for a loss, they had only asserted an

2  "unrealized injur[y] they anticipate will take place at some indeterminate future time." *Id.* at *20.

3        Despite the factual similarities, the Court does not adopt the reasoning in *Tri-State*. The

4  Court does not agree that overpayment is an unrealized, contingent injury based on events that will

5  take place in the future for the reasons discussed above; it is instead an injury that has already

6  taken place. *See* FAC ¶ 274(B) (alleging "[o]verpayment at the time of purchase or lease"); *see*

7  *also In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *69 ("The amount by which

8  Plaintiffs overpaid is not contingent on a future occurrence or on the vagaries of the free market.

9  It occurred and became determinable at the moment the Plaintiffs paid a premium for a vehicle

10  component which did not work as had been represented."). Further, to the extent that the *amount*

11  of overpayment is susceptible to future factual disputes, that uncertainty does not warrant

12  dismissal of a RICO claim under the law of this Circuit. *See Mendoza*, 301 F.3d at 1171

13  (distinguishing between "uncertainty in the fact of damage and in the amount of damage" and

14  holding that complex questions regarding the latter are "best addressed by economic experts and

15  other evidence at a later stage in the proceedings"). This is especially so given that Plaintiffs have

16  identified a particular range of overpayment in their complaint – between $3,210 and $5,000 per

17  Class Vehicle.   In sum, the out-of-circuit authority cited by Defendants is either distinguishable or

18  inconsistent with in-circuit authority.

19              d.   RICO Injury Summary

20        Plaintiffs' alleged overpayment for the defective Class Vehicles is an injury to a "property

21  interest" because Plaintiffs allege that they have been deprived of their money, which is a form of

22  property. *See Reiter*, 442 U.S. at 342; *Canyon Cty.*, 519 F.3d at 976. The alleged overpayment is

23  also a concrete, "out-of-pocket" loss, not a "mere injury to a valuable intangible property interest."

24  *Oscar*, 965 F.2d at 785-86 (internal quotation marks omitted). The Court therefore concludes that

25  Plaintiffs have sufficiently pled an injury to "business or property" that is cognizable under RICO.

26              2.   Proximate Cause

27        The Supreme Court has held that the "by reason of" language in 18 U.S.C. § 1964(c)

28  requires a civil RICO plaintiff "to show that a RICO predicate offense not only was a but for cause

United States District Court
Northern District of California

35

of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (internal quotation marks omitted). In analyzing proximate cause under RICO, the "central question" is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

### a.    Fraud-on-the-Regulators Theory

Plaintiffs allege that Defendants' scheme to defraud the EPA and CARB led directly to their overpayment injury, and that their theory of causation is analogous to the one upheld in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652 (2008). Defendants contend that Plaintiffs' theory of causation is instead more analogous to the ones rejected in *Anza*, 547 U.S. 451, and *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010). The Court considers *Bridge*, *Anza*, and *Rezner* below.

### i.    *Bridge, Anza, and Rezner*

In *Bridge*, 553 U.S. 639, the plaintiffs and defendants were regular participants in county tax-lien auctions. Multiple bidders in these auctions often made the same bid, which led the county to award the liens on a rotational basis. *See id.* at 642-643. To keep bidders from manipulating the rotation system, the county had a Single, Simultaneous Bidder Rule, which prohibited bidders from using agents or related entities to submit simultaneous bids for the same property. *See id.* The plaintiffs alleged that the defendants violated the Rule by arranging for related firms to bid on their behalf and by filing false attestations with the county that they complied with the Rule. *See id.* at 643-44. As a result of the defendants' fraud on the county, the plaintiffs alleged that the defendants were able to obtain additional liens at the auctions, while the plaintiffs in turn obtained fewer. *See id.* The defendants argued that the plaintiffs could not demonstrate that their injuries were "by reason of a violation of section 1962" because the defendants made misrepresentations to the county, not to the plaintiffs. *Id.* at 644-45, 647 (quoting 18 U.S.C. § 1964(c)). A unanimous Supreme Court disagreed, holding that first-person reliance is not an element of a RICO claim, as "a person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649. "[T]his is a case in point," the Court observed. *Id.* at 658. "It was a foreseeable and natural consequences of

36

petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens." *Id.*

The Supreme Court reached the opposite conclusion in *Anza*, 547 U.S. 451. The plaintiff there sued its main commercial competitor, alleging that the competitor had engaged in an unlawful racketeering scheme to gain market share at plaintiff's expense. *See id.* at 453. The competitor allegedly did so by "failing to charge the requisite New York sales tax to cash-paying customers." *Id.* at 454. This practice allegedly allowed the competitor to reduce its prices without affecting its profit margin, which in turn caused the plaintiff to lose business. *See id.* The Court held that the plaintiff's theory of injury did not satisfy RICO's proximate cause requirement. *See id.* at 455-56, 460-61. Noting that "[i]t was the State that was being defrauded and the State that lost tax revenue as a result," the Court reasoned that the State was the direct victim of the challenged conduct and could be "expected to pursue appropriate remedies." *Id.* at 458. The Court also observed that there were two discontinuities between the RICO violation and the plaintiff's injury: first, "[t]he cause of [plaintiff's] asserted harms . . . [was] a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)"; second, the plaintiff's lost sales "could have resulted from factors other than [the competitor's] alleged acts of fraud," as "[b]usinesses lose and gain customers for many reasons." *Id.* at 458-59. Finally, the Court noted that RICO's proximate cause requirement "has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws." *Id.* at 460.

The Ninth Circuit also rejected a RICO claim on proximate cause grounds in *Rezner*, 630 F.3d 866. The plaintiff there purchased a tax shelter from the defendant, which the IRS subsequently concluded was unlawful, and which led to an order for plaintiff to pay back taxes. Bringing a RICO claim against the tax-shelter provider, the plaintiff alleged that the defendant "engaged in a scheme to defraud the United States of tax revenue through fraudulent tax shelters that caused injury to purchasers of such shelters." *Id.* at 868. Reversing the district court's grant of summary judgment for the plaintiff, the Ninth Circuit held that the directly injured party was the United States, not plaintiff, as "[i]t was the United States that lost tax revenue as a direct result

of [defendant's] fraud." *Id.* at 873.  The Ninth Circuit also distinguished *Bridge*, reasoning that the plaintiffs there – the losing auction bidders – "'were the *only* parties injured by [the defendant's] misrepresentations,'" because the county "received the same revenue regardless of which bidder prevailed."  *Id.* (quoting *Bridge*, 553 U.S. at 658).

ii.     Application

This case shares similarities with all three of these cases.  Of the three, however, it is most analogous to *Bridge*.  Although Defendants are alleged to have deceived the EPA and CARB by concealing defeat devices in COC and EO applications for the Class Vehicles, the EPA and CARB are not alleged to have suffered any harm as a result of that deceit.  They did not lose tax money like the State of New York in *Anza* or the United States in *Rezner*.  Instead, Plaintiffs are the ones who bought and leased the Class Vehicles and who are alleged to have overpaid for them as a result of Defendants' fraud.  Like the losing bidders in *Bridge*, Plaintiffs are in the best position to sue to recover those economic losses.[4]

There are also other distinctions between this case and *Anza*.  First, unlike *Anza*, this case does not involve "economic competitors," and so is not in a context in which RICO's proximate cause requirement "has particular resonance."  *Anza*, 547 U.S. at 460.  Because the case does not involve economic competitors, RICO's proximate cause standard need not be applied with the same rigor as in *Anza*.  Second, in *Anza* there were two "discontinuit[ies] between the RICO violation and the asserted injury."  *Id.* at 549.  The defendant competitor could have lowered its prices for reasons other than its tax fraud, and the plaintiff could have lost sales based on factors other than the defendant's lower prices.  *See id.* ("Businesses lose and gain customers for many reasons . . . .").  Here, there is no analogous layering of intervening independent factors that could have caused Plaintiffs' alleged injury.  To be sure, factors other than the EcoDiesel features likely impacted the price of the Class Vehicles.  But the damage claimed here is the *difference* in price

---

[4] This is so even though the EPA has filed a civil action against the FCA Defendants and the VM Motori Defendants.  That action is not for damages, but instead is for injunctive relief and civil penalties authorized by the Clean Air Act and regulations promulgated thereunder.  *See United States v. Fiat Chrysler Auto. N.V. et al.*, No. C-17-3446 EMC (Docket No. 1) (May 23, 2017); 42 U.S.C. §§ 7523-24; 40 C.F.R. § 86 *et seq.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  attributable to the defect, so the alleged overpayment by Plaintiff is tied directly to the loss of

2  value caused by Defendants.

3       The alleged "fraud on the regulators" plausibly led directly to Plaintiffs' economic injury.

4  By deceiving regulators, Defendants were able to sell Class Vehicles that emitted NOx at levels up

5  to 20 times legal limits and that contained one or more defeat devices.  This deceit plausibly

6  caused Plaintiffs to overpay for the defective Class Vehicles by an amount directly attributable to

7  the alleged wrongful conduct of the Defendants.

8              b.       Direct Relationship Requirement

9       The Bosch Defendants separately argue that they did not proximately cause Plaintiffs'

10  injury because they lack a direct relationship with Plaintiffs.  What matters, however, "is not

11  whether there is a direct relationship between the plaintiff and defendant, but whether there is a

12  'sufficiently direct relationship between the defendant's wrongful *conduct* and the plaintiff's

13  injury.'"  *VW Franchise Dealers*, at *9-10 (quoting *Bridge*, 553 U.S. at 657).  Here, there is such a

14  connection.  As discussed more below in the Court's analysis of the merits of the § 1962(c) RICO

15  claim, *see* Part III.B, *infra*, Plaintiffs allege that the Bosch Defendants were involved in

16  implementing the defeat devices in the Class Vehicles.  And those devices are part of what has

17  rendered the Class Vehicles defective.  The Bosch Defendants' alleged conduct therefore led

18  directly to each Plaintiff purchasing or leasing "[a] vehicle with a defect."  Such a vehicle is

19  "worth less than one without a defect."  *In re Toyota I*, 790 F. Supp. 2d at 1163.[5]

20       The Ninth Circuit's decision in *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,

21  298 F.3d 768 (9th Cir. 2002), does not support a different conclusion.  The court there held that a

22  robbery victim could not maintain a RICO claim against a co-schemer of the robbers, where the

23  _____

24  [5] That the Bosch Defendants are not alleged to have played a role in setting the price for the Class
Vehicles does not support a different conclusion.  *See* Bosch Mot. at 21.  Whatever price was set,
25  that price was for a defect-free car.  That is not what Plaintiffs allege they received.  And because
the Bosch Defendants directly contributed to the Class Vehicles' defects, they directly contributed
26  to Plaintiffs' economic injury.  Further, as in *Duramax*, "Bosch has provided no authority for the
proposition that a RICO defendant may avoid liability simply by identifying a separate action by
27  its codefendant [here, the setting of the price for the Class Vehicles] which partially contributed to
the plaintiff's injury (especially, when, as here, the Plaintiffs allege that the RICO Defendants
28  worked together to cause the injury)."  *In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543,
at *76-77.

co-schemer's role was to launder the proceeds of the robbery.  *See id.* at 774.  Because the co-schemer's actions took place only after the robbers stole plaintiff's property, the Ninth Circuit concluded that the co-schemer's conduct "lack[ed] any 'direct relationship' to the armed robbery." *Id.*  The sequence of events in *Oki Semiconductor*, in other words, ruled out the possibility that the co-schemer's wrongful conduct caused the plaintiff's injury.  The same is not true here, where Plaintiffs allege that the Bosch Defendants were involved in the scheme *from the beginning*.  *See, e.g.*, FAC ¶ 250 ("Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects of the software . . . . [They] also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators . . . .");  *see also VW Franchise Dealers*, 2017 WL 4890594, at *9 n.2 (distinguishing *Oki* and reasoning that, unlike *Oki*, "the alleged conduct by Bosch took place before the Franchise Dealers were injured and plausibly led directly to those injuries").  Unlike *Oki Semiconductor*, there is a close link between Defendants' alleged conduct and Plaintiffs' injury.

Nor does the Ninth Circuit's decision in *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924 (9th Cir. 1994), or the Supreme Court's decision in *Hemi Group*, 559 U.S.1, require Plaintiffs to have a direct relationship with the Bosch Defendants.  Both of those decisions rejected RICO claims that relied on passed-on injury, which is injury derived from a third party's direct injury.  *See Hemi Group*, 559 U.S. at 990 ("The City's theory . . . requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City).");  *Pillsbury*, 31 F.3d at 930 (holding that sublessor could not bring a RICO claim against the owners of the building, who allegedly engaged in a scheme to fraudulently increase rents, because "[t]he directly injured party, [the master tenant], can sue for the *whole* injury").  As these cases illustrate, passed-on injury requires an examination of the *relationship between different injured parties, not* the relationship between a RICO plaintiff and *different members of the RICO scheme*.  Neither case held that each participant in a RICO enterprise must have a direct relationship with the plaintiff directly injured by that enterprise's conduct.

United States District Court
Northern District of California

40

c.      Difficulty Apportioning Damages

The Bosch Defendants also argue that difficulty in apportioning damages between the FCA Defendants and them creates the risk of double recovery, which they assert further undercuts the conclusion that they were the "proximate cause" of any alleged RICO injury.

The potential for difficulty apportioning damages is a factor that courts consider as part of the RICO proximate cause analysis. *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992). But the focus in that analysis is on the difficulty of apportioning damages among different *injured parties*, not defendants. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008) (the apportionment question centers on whether "the existence of other *injured parties* creates difficulties of apportionment or risks of multiple recovery") (emphasis added).

In *Holmes*, for example, a stock manipulation scheme bankrupt two broker-dealers, which in turn prevented the broker-dealers from meeting obligations to their customers. *See Holmes*, 503 U.S. at 270-74. The Court held that an entity representing the customers of the broker-dealers could not pursue a RICO claim against the stock manipulator because the "directly injured . . . broker-dealers . . . could be counted on to bring suit." *Id.* at 273. By limiting the suit to the directly injured, the Court reasoned that the district court could avoid "hav[ing] to find some way to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages." *Id.*

Similarly, in *Pillsbury* the Ninth Circuit held that an entity that subleased office space could not pursue a RICO claim against owners of the building who engaged in a scheme to fraudulently increase rents. The court reasoned that "the apportionment task need not be taken," because "[t]he directly injured party, [the master tenant], can sue for the whole injury." *Pillsbury*, 31 F.3d at 930.

This is a different problem than apportioning damages among multiple co-conspirators. Under Bosch's reasoning, co-conspirators would automatically escape damages liability simply from the multiplicity of defendants and the problem of apportioning damages among them. Defendants cite no case for this profound proposition save one.

The Bosch Defendants cite a district court decision extending the apportionment inquiry

41

1    analysis to defendants.  *See Koch v. Royal Wine Merchs., Ltd.*, 907 F. Supp. 2d 1332, 1343 (S.D.

2    Fla. 2012) ("[The] possibility of multiple recoveries encompasses not only the possibility that

3    Defendants would be subjected to multiple claims but also that Plaintiff could recover against

4    multiple parties.").  *Koch* is not persuasive.  The *Koch* court did not cite support for this position,

5    and its analysis is not consistent with the authority cited above.  With respect to the apportionment

6    inquiry, "[t]he focus on plaintiffs and not members of the RICO scheme is sensible: those injured

7    by a RICO enterprise should not be prevented from seeking relief simply because of the

8    complexity of the enterprise." *VW Franchise Dealers*, 2017 WL 4890594, at *9.

9               d.    Fraud on the Market

10          Finally, the Bosch Defendants contend that Plaintiffs impermissibly rely on a "fraud on the

11   market" theory, *i.e.*, that if Defendants had disclosed the Class Vehicles' emissions problems, then

12   FCA US and its dealers would have lowered the price of the vehicles.  The Bosch Defendants cite

13   out-of-circuit decisions which hold that the fraud on the market theory is inapplicable in RICO

14   cases.  *See, e.g.*, *Lawrie v. Ginn Dev. Co.*, No. 3:09-CV-446-J-32JBT, 2014 WL 4788067, at *14

15   (M.D. Fla. Sept. 19, 2014) (dismissing RICO claim where plaintiffs' alleged injury "rel[ied] on a

16   fraud-on-the-market theory"); *In re Schering-Plough Corp.*, No. 2:06-cv-5774 (SRC), 2009 WL

17   2043604, at *20-21 (D.N.J. July 10, 2009) (noting that the fraud on the market theory of injury

18   "has been resoundingly rejected outside the context of federal securities fraud litigation" and "is

19   not cognizable under RICO").

20          Defendants' attempt to invoke the fraud on the market theory sets up a strawman.

21   Plaintiffs do not rely on a fraud on the market theory.   Fraud on the market is a theory that allows

22   plaintiffs in a securities fraud case, in certain circumstances, to invoke a rebuttable presumption of

23   reliance rather than prove direct reliance on a company's misrepresentations.  *See Halliburton Co.*

24   *v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014).  It arose because of difficult causation

25   questions inherent in that context.  As the Supreme Court explained in *Halliburton*, the theory is

26   based on the idea that

27               the market price of shares traded on well-developed markets reflects
             all publicly available information, and, hence, any material
28               misrepresentations. . . . [Thus], rather than scrutinize every piece of

42

> public information about a company for himself, the typical investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price – the belief that it reflects all public, material information.  As a result, whenever the investor buys or sells stock at the market price, his reliance on any public material misrepresentations may be presumed . . . .

*Id.* (citations omitted).  The theory allows plaintiffs to prove and recover damages, based not on each shareholder's specific reliance upon the securities fraud committed by defendants, but derivatively through the discernible effect of the fraud upon the market price of securities.

Such a theory is not necessary nor is it invoked by Plaintiffs in the instant case for several reasons.   First, reliance is not a necessary element of a RICO claim.  *See Bridge*, 553 U.S. at 661 ("[A] plaintiff asserting a RICO claim predicated on mail fraud need not show . . . that it relied on the defendant's alleged misrepresentations.").   Second, to the extent Plaintiffs have asserted damages based on reliance, they pin their damages claim not indirectly or derivatively on the fraud's general effect on market prices, but on the fact that they "paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles,"  FAC ¶ 191, a premium they would not have paid had Defendants disclosed the emissions problems.  Their claim for damages is not predicated on what would have happened generally to the market price of the class vehicles, but more directly on the fact that they would not have paid for something they did not get.

To be sure, Defendants cite cases which have used the phrase "fraud on the market" to mean something else outside the context of securities fraud – as shorthand for a theory of overpayment that occurs when a seller's misrepresentations cause its goods or services to sell for an inflated price.  Courts using this shorthand have held that such a theory of overpayment is too speculative to support a concrete RICO injury.

In *Schering-Plough*, for example, insurance companies alleged that a prescription drug manufacturer illegally marketed certain of its drugs for off-label uses.  *See Schering-Plough*, 2009 WL 2043604, at *1.  The off-label marketing allegedly caused demand for the drugs to increase, which in turn inflated the drugs' prices.  *See id.* at *1, 4.  The court referred to this as a "fraud-on-the-market theory" of injury and held that the theory was too speculative to support a RICO claim. *Id.* at *21.  Specifically, the court reasoned that "[a]ny perceived price impact attributed to

43

Schering's off-label marketing is merely speculative and discounts the impact of important external variables such as the medical judgment of physicians and the preference of patients." *Id.* The court also noted that, "[i]n reality, the price[s] of prescription drugs are fixed by pharmaceutical manufacturers, not the market." *Id.* Similarly, the court in *Lawrie* reasoned that the plaintiffs there had impermissibly relied on a "fraud on the market" theory of injury when they alleged that they overpaid for residential properties due to misrepresentations by the properties' developers. *See Lawrie*, 2014 WL 4788067, at *10-11. Citing to *Schering-Plough*, the court held that this "fraud on the market" theory of injury was not cognizable under RICO. *See id.* at *10-11 & n.14.

For two reasons, these "fraud on the market" decisions are not persuasive here. First, Plaintiffs' allegations are materially distinguishable from those in *Schering-Plough* and *Lawrie*. In those cases, the plaintiffs alleged that they overpaid for defendants' goods as a result of defendants' fraudulent misrepresentations about the goods, but the plaintiffs were not able to identify their overpayment with specificity. As a result, the plaintiffs in those cases, like securities fraud plaintiffs, had to rely on a kind of proxy theory to prove their economic injuries – basing their damages indirectly on the effects the frauds had on market prices for the goods they purchased. The courts in those cases, however, deemed the market effects of these alleged frauds to be speculative.

Here, in contrast, Plaintiffs have identified a specific range by which they allegedly overpaid for the Class Vehicles – "between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles." FAC ¶ 191. As noted above, these allegations of overpayment are not based on speculation as to the indirect effect of the fraud on the market but on the premiums that FCA US directly charged Plaintiffs for the Class Vehicles. The Court must take these allegations as true in considering the motions to dismiss. *See Iqbal*, 556 U.S. at 678. And because of these specific, concrete premiums based on a direct chain of causation, the speculation about market effect that drove the decisions in *Schering-Plough* and *Lawrie* is not

present here.[6]

Second, *Schering-Plough* and *Lawrie* are at odds with the Ninth Circuit's decision in *Mendoza*, 301 F.3d 1163. *Mendoza* involved fraud on the market for labor – with the plaintiffs alleging that their wages were depressed when the defendants hired undocumented workers. *See id.* at 1166. Similar to the market for prescription drugs in *Schering-Plough*, the Ninth Circuit acknowledged that "[q]uestions regarding the relevant labor market and the [defendants'] power within that market are exceedingly complex," and that it may be difficult to establish "how much lower the wages would be" as a result of the defendants' use of undocumented workers. *Id.* at 1171. But the Ninth Circuit, rather than concluding that this complexity warranted dismissal of the plaintiffs' RICO claims, reasoned that these questions would be "best addressed by economic experts and other evidence at a later stage in the proceedings." *Id.* "That wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers," is a claim that the Ninth Circuit reasoned was "at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be." *Id.* Under the law of this Circuit, then, economic injury based on "fraud on the market," as that phrase is used in *Schering-Plough*, may be cognizable under RICO if the economic injury alleged is plausible and not speculative. Thus, even where damages are based on indirect market effects, such a claim may lie in this Circuit. Given the specific claim of damages and the direct causation theory alleged by Plaintiffs, Plaintiffs' RICO claim is not barred by the fraud on the market theory.

Plaintiffs have satisfied RICO's statutory standing requirements. Their alleged overpayment injury is an injury to a "property interest," and the injury is sufficiently concrete to

---

[6] As part of their "fraud on the market" argument, the Bosch Defendants also rely again on *McLaughlin*, 522 F.3d 215, where the Second Circuit rejected "a damages theory [that was] based on an estimate of the 'price impact' that a disclosure that Lights were not safer than full-flavored cigarettes would have had on the market" for Lights. *Id.* at 229. As noted above, the factual allegations in *McLaughlin* distinguish that case from this one. *See* Part III.A.1.b, *supra*. Further, the Second Circuit in *McLaughlin* rejected the plaintiffs' price impact theory on a motion for class certification, and the court's reasoning turned on a lack of evidence supporting the theory. *See id.* at 230. The *McLaughlin* court's fact intensive analysis is not instructive here given that the Court is addressing Defendants' motions to dismiss and must take the Plaintiffs' overpayment allegations as true.

United States District Court
Northern District of California

support a RICO claim.  Their injury is also directly traceable to Defendants' (including Bosch's) alleged scheme to conceal from regulators the fact that the Class Vehicles contained illegal defeat devices, which resulted in Plaintiffs buying and leasing defective Class Vehicles.

B.     Merits of the Section 1962(c) RICO Claim

A RICO claim under § 1962(c) requires the plaintiff to allege that the defendant participated, directly or indirectly, in (1) the conduct (2) of an enterprise that affects interstate commerce, (3) through a pattern (4) of racketeering activity.  *See Eclectic Props.*, 751 F.3d at 997 (citing 18 U.S.C. § 1962(c)).  For the reasons that follow, the Court concludes that Plaintiffs have satisfied each of these elements as to each Defendant.

1.     Racketeering Activity

Mail and wire fraud are predicate acts that may constitute "racketeering activity."  *See* 18 U.S.C. § 1961.  Plaintiffs allege that Defendants engaged in two or more acts of mail and wire fraud by, among other things, submitting applications to the EPA and CARB for COCs and EOs that concealed defeat devices in the Class Vehicles.  *See* FAC ¶¶ 253-54, 258(E).

The elements of mail and wire fraud are "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props.*, 751 F.3d at 997.  The "scheme to defraud" element is "treated like conspiracy in several respects."  *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)).  "Like co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers' use of the mails or wires."  *Id.* (quoting *Lothian*, 976 F.2d at 1262-63).  As a result,

> a defendant may be held liable for mail or wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme.

*VW Franchise Dealers*, 2017 WL 4890594, at *12 (citing *Stapleton*, 293 F.3d at 1117).

Federal Rule of Civil Procedure 9(b) requires fraud to be pled with particularity.  The allegations of fraud must be "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

46

1   1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  This requires the plaintiff to

2   identify "the who, what, when, where, and how" of the alleged misconduct.  *Id.*

3       "The only aspects of wire fraud that require particularized allegations are the factual

4   circumstances of the fraud itself."  *Odom*, 486 F.3d at 554.  To the extent that the first element – a

5   scheme to defraud – requires a showing of the defendants' state of mind, "general rather than

6   particularized allegations are sufficient."  *Id.*  However, "[i]n the context of a fraud suit involving

7   multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the

8   alleged fraudulent scheme."  *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (internal

9   quotation marks omitted).

a.     <u>Knowing Participants in Scheme to Defraud</u>

11       Plaintiffs allege that Defendants engaged in a scheme to deceive regulators into believing

12   that the Class Vehicles complied with emission standards when the vehicles in fact did not.

13   Defendants did so, Plaintiffs contend, by installing eight auxiliary emission control devices

14   ("AECDs") in the Class Vehicles.  These AECDs are alleged to have activated vehicle emission

15   controls under test conditions but to have reduced the effectiveness of the emission controls under

16   normal driving conditions, which renders the AECDs defeat devices.  *See* FAC ¶¶ 127-28; 40

17   C.F.R. § 86.1803-01.

18       The allegations in the FAC support that each Defendant knowingly participated in this

19   scheme to defraud.

i.     <u>Bosch GmbH and Bosch LLC</u>

21       Plaintiffs allege that the Bosch Defendants worked with the FCA Defendants to develop

22   and implement the hidden AECDs in the Class Vehicles.  *See* FAC ¶ 240.  This is plausible given

23   that the AECDs are comprised of software that was part of the Bosch Defendants' EDC Unit 17,

24   which is the engine management system that controls the Class Vehicles' emissions.  *See* FAC

25   ¶¶ 114-16, 133.  Further, Plaintiffs allege that the Bosch Defendants exercised near-total control

26   over the EDC Unit 17: They locked the software "to prevent customers, like Fiat Chrysler, from

27   making significant changes on their own."  FAC ¶ 133.  They also used other security measures to

28   "protect vehicle systems against unauthorized access in every operating phase."  FAC ¶ 134.

47

United States District Court
Northern District of California

1    Given this level of control, it is highly plausible that the Bosch Defendants played a role in

2    developing and implementing the AECDs.

3        Additional support for this conclusion comes from allegations that researchers – at the

4    University of California, San Diego and Ruhr-Universität Bochum in Germany – have analyzed

5    technical documents showing that code written by the Bosch Defendants was used in a defeat

6    device found in the Fiat 500X.  *See* FAC ¶ 126.  Although the Fiat 500X is not a Class Vehicle,

7    these allegations show that the Bosch Defendants knew how to develop a defeat device, and were

8    willing to do so.  Plaintiffs also allege that researchers have obtained "Bosch software

9    documentation" which describes parameters and functions that correlate with many of the hidden

10   AECDs in the Class Vehicles.  FAC ¶ 174.

11       Despite the Bosch Defendants' plausible involvement with the hidden AECDs, Plaintiffs

12   allege that the Bosch Defendants did not disclose the AECDs to regulators and the U.S. public.

13   To the contrary, Plaintiffs allege that the Bosch Defendants deceptively promoted "clean diesel"

14   technology.  *See* FAC ¶¶ 122, 138-44.  For example, in January 2013 Bosch LLC marketed the

15   2014 Jeep Grand Cherokee in a PRNewswire press release as "compliant with the most stringent

16   emission regulations in the world."  FAC ¶¶ 9 & n.5, 122.  And Bosch GmbH actively lobbied

17   lawmakers to push "clean diesel" in the United States.  FAC ¶ 139.[7]

18       Together, these allegations plausibly support that the Bosch Defendants were actively

19   involved in developing the hidden AECDs used in the Class Vehicles, and not only concealed

20   their use but also falsely touted to the market and lawmakers that "clean diesel" vehicles,

21   including the Class Vehicles, were compliant with emission standards.  Plaintiffs have accordingly

22

---

23   [7] The Bosch Defendants assert that their lobbying activities cannot be considered because of the
     *Noerr-Pennington* doctrine.  Under *Noerr-Pennington*, "those who petition any department of the

24   government for redress are generally immune from statutory liability for their petitioning
     conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  Plaintiffs are not asserting

25   that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying
     activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch

26   Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*.  *See United Mine
     Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within

27   the province of the trial judge to admit this evidence, if he deemed it probative and not unduly
     prejudicial . . . if it tends reasonably to show the purpose and character of the particular

28   transactions under scrutiny."); *VW Franchise Dealers*, 2017 WL 4890594, at *15 n.4 (rejecting the
     same argument by the Bosch Defendants).

United States District Court
Northern District of California

1 pled with sufficient detail that the Bosch Defendants knowingly participated in the scheme to

2 defraud for purposes of RICO.

3              ii.    VW Italy and VM America

4              FCA N.V. owns both VM Italy and VM America.  VM Italy is an auto parts manufacturer,

5 and VM America supports VM Italy customers and activities in North America.  *See* FAC ¶¶ 19-

6 20.  Plaintiffs allege that the VM Motori Defendants designed, calibrated, and manufactured the

7 EcoDiesel engine used in the Class Vehicles, *see* FAC ¶ 237, and that the VM Motori Defendants'

8 comprehensive involvement with the EcoDiesel engine ultimately led them to work closely with

9 the Bosch Defendants and the FCA Defendants "to customize the EDC17 to allow Class Vehicles

10 to simulate 'passing' the EPA and CARB testing."  FAC ¶ 132.  The VM Motori Defendants'

11 involvement with these customization efforts is plausible given that, to run effectively, the

12 EcoDiesel engines required a careful balancing between engine performance and emission levels.

13 *See* FAC ¶¶ 110-13.  It is therefore plausible that the VM Defendants were responsible not only

14 for the nuts and bolts of the EcoDiesel engine (managing elements such as power and

15 performance), but also for how the EcoDiesel engine generated and treated emissions.  This

16 conclusion is supported further by allegations that the VM Motori Defendants participated in

17 "[e]xhaust after-treatment system development, and [e]nvironmental trips (hot/cold climate, high

18 altitude, etc.)."  FAC ¶ 120.  And the VM Motori Defendants' facilities included a "Rolling dyno

19 for vehicle emission measurement and 17 engine test benches for emission/performance

20 development."  FAC ¶ 237.  Further, Plaintiffs allege that the VM Motori Defendants "provided

21 information to FCA [US] for inclusion in the COC and EO applications," FAC ¶ 237, which also

22 supports that the VM Motori Defendants were involved with the Class Vehicles' emissions.

23              Together, these allegations plausibly support that the VM Motori Defendants were

24 knowing participants in the scheme to deceive regulators into certifying that the Class Vehicles.

25 They participated in the scheme by developing and customizing the EcoDiesel engine, and by

26 working with the other Defendants to knowingly customize the EDC Unit 17 to simulate passing

27 emissions tests.

28

United States District Court
Northern District of California

### iii.   FCA N.V. and FCA US

Plaintiffs contend that the FCA Defendants were the ringleaders of the emissions scheme. They offer the following allegations in support of this position.  Plaintiffs allege that the seeds of the emissions scheme were sown in 2009 when FCA N.V. acquired U.S. automaker Chrysler – which became FCA US – as part of FCA N.V.'s strategy to increase its North American presence. *See* FAC ¶ 102.  To further that strategy, CEO Sergio Marchionne unveiled ambitious five-year plans in 2009 and 2014 to sell Jeep and Ram 1500 models with diesel engines.  *See* FAC ¶¶ 102-03.  Diesel-powered engines were a strength of FCA N.V.'s in the European market, and Mr. Marchionne sought to capitalize on this strength in the United States.  FAC ¶ 104.

Around the same time that Mr. Marchionne announced plans to sell more diesel-engine vehicles in the United States, emission standards in the United States "were ratcheting up."  FAC ¶ 104.  Certain automakers, including Toyota and Ford, responded by focusing on hybrid and electric vehicles.  The FCA Defendants, along with Volkswagen, Mercedes-Benz, and General Motors, instead sought to enter the "clean diesel" market, advertising light-duty diesel-engine vehicles powered by new emission-control technology.  *See* FAC ¶¶ 104-06.  Specifically, FCA N.V. used FCA US to "design, market, manufacture and sell the Class Vehicles" under the Jeep and Dodge brands.  FAC ¶ 231.  FCA US then advertised the Class Vehicles as a more efficient alternative to gasoline vehicles, with no loss of power or performance.  *See* FAC ¶¶ 106, 145-54.

While promoting the new EcoDiesel technology, Plaintiffs allege that behind the scenes the FCA Defendants were "either unable or unwilling" to develop the emission control technology needed to bring the EcoDiesel vehicles into compliance with U.S. emission standards.  FAC ¶ 123.  "Instead of cutting their losses on 'EcoDiesel,' delaying the production of the Class Vehicles, or coming clean," Plaintiffs allege that employees at both FCA entities  "worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit 17 to allow Class Vehicles to simulate 'passing' the EPA and CARB testing."  FAC ¶ 123.

These allegations are sufficient to plausibly support the FCA Defendants' participation in the emissions scheme.  Given Mr. Marchionne's focus on expanding FCA's footprint in the United States through the sale of diesel-engine vehicles, and the importance of meeting

50

United States District Court
Northern District of California

1    increasingly strict U.S. emission requirements to do so, it is plausible that the FCA Defendants

2    would have been involved with customizing the emission software in the Class Vehicles,

3    including the hidden AECDs.  And although the Bosch Defendants are alleged to have maintained

4    tight control over the EDC Unit 17, *see* FAC ¶ 133, it is plausible that the FCA Defendants would

5    have had some oversight over their work given that the EDC Unit 17 affected vehicle

6    performance.  *See* FAC ¶¶ 110, 116.

7         Two other allegations also support the plausibility of the FCA Defendants' involvement

8    with the hidden AECDs.  First, in the study referenced above by researchers at the University of

9    California, San Diego and Ruhr-Universität Bochum in Germany, the researchers studied various

10   technical documents and concluded that the defeat devices in a Fiat vehicle were "created" by

11   Bosch and then "enabled" by Fiat.  FAC ¶ 126.  In other words, the researchers' study suggests

12   that even if the Bosch Defendants developed the defeat devices, the FCA Defendants ultimately

13   put them into use.  Second, Plaintiffs allege – and Exhibit 6 to the Cafasso Declaration confirms –

14   that in the EPA's January 12, 2017 NOV to the FCA Defendants for failure to disclose the eight

15   hidden AECDs in the Class Vehicles, the EPA noted that "*despite having the opportunity to do so*,

16   Fiat and FCA failed to refute that the 'principle effect of one or more of these AECDs was to

17   bypass, defeat, or render inoperative one or more elements of design installed to comply with

18   emissions standards under the [Clean Air Act]."  FAC ¶ 3 (emphasis added) (alteration in

19   original).  If the FCA Defendants had not knowingly concealed the AECDs at issue, it is

20   reasonable to infer that they would have disclosed the AECDs in discussions with the EPA.  Their

21   failure to do so further supports the plausibility of Plaintiffs' allegations that they knowingly

22   participated in the scheme to defraud.

23                              iv.    Mr. Marchionne

24        Mr. Marchionne, as the CEO of FCA N.V. and FCA US, is alleged to have been a

25   champion of leveraging FCA N.V.'s strength in diesel engines to promote the sale of light-duty

26   diesel engine vehicles in the United States.  *See* FAC ¶¶ 103-04, 227-28, 235.  He made the sale of

27   light-duty diesel-engine vehicles in the United States a part of his 2009 and 2014 five-year plans

28   to increase the FCA Defendants' sales and market share.  *See* FAC ¶¶ 102-03.  He also "made

                                          51

numerous public statements on behalf of Fiat Chrysler concerning the Class Vehicles, their

EcoDiesel® engines, and their emissions and performance characteristics."  FAC ¶ 18.  With

respect to emissions, he specifically noted in 2012 that he was still "optimistic about the potential

of light-duty diesels in the U.S. despite significant emissions challenges."  FAC ¶ 104.

Given Mr. Marchionne's focus on expanding the sale of diesel-engine vehicles in the

United States, and his awareness of the regulatory challenges that the FCA Defendants faced to

bring the EcoDiesel vehicles to market, it is plausible that Mr. Marchionne would have known

about, and maintained oversight over, the modifications to the EcoDiesel engine that implemented

the hidden AECDs.  The allegations are therefore sufficient to support that Mr. Marchionne was

also a knowing participant in the scheme.

v.     Rule 9(b)

The allegations above not only plausibly support each Defendant's knowing participation

in the alleged scheme, but they also answer the "who," "what," and "how" questions regarding the

fraud as required to satisfy Rule 9(b)'s particularity requirement.  *See Vess*, 317 F.3d at 1106.

That is, Mr. Marchionne championed the EcoDiesel project; FCA N.V. used FCA US to design,

market, manufacture, and sell the Class Vehicles; both FCA entities oversaw and worked closely

with the VM Motori Defendants and the Bosch Defendants to customize the emissions software

for the Class Vehicles; and FCA US submitted the COC and EO applications to regulators that

concealed the eight AECDs that are alleged to constitute defeat devices.

As to "where" the fraud took place, Plaintiffs allege that the EcoDiesel engines were

developed and calibrated in Michigan, *see* FAC ¶¶ 231, 237, which is where FCA US, Bosch

LLC, and VM America are headquartered, and where Fiat's Group Executive Committee is based.

*See* FAC ¶¶ 12, 20, 23, 231, 235.  As to "when" the fraud took place, the FAC can reasonably be

read to support that customization of the EDC Unit 17 took place sometime between 2011 and

2014.  This is based on allegations that the VM Motori Defendants began developing the

EcoDiesel engine in 2011, FAC ¶ 117, and that "[i]n January 2013, Bosch LLC announced that its

'clean diesel' technology, including the EDC Unit 17, would be featured in the new 2014 Jeep

Grand Cherokee 3.0-Liter EcoDiesel®."  FAC ¶ 122.  Plaintiffs also allege that customization of

the EDC17 was an intensive three- to five-year process.  *See* FAC ¶ 132.

The Bosch Defendants protest that Plaintiffs have improperly "lumped" the Bosch entities together, failing to specify what each company's wrongdoing was.  *See* Bosch Mot. at 14.  This "lumping" argument is not persuasive.  As Plaintiffs point out, in their FAC, they have alleged that the Bosch Group – the "umbrella" that covers the Bosch Defendants (among others) – is divided into four business sectors," and the business sectors are "grouped not by location, but by function. [Thus, for example,] [the business sector] Mobility Solutions [formerly Automotive Technology] includes knowledgeable individuals at both Bosch GmbH and Bosch LLC."  FAC ¶ 25. Accordingly, if there has been lumping together of the Bosch Defendants in the FAC, that is a direct result of how the Bosch Group and/or the Bosch Defendants have chosen to operate.  Judge Breyer recently made this very point in the *Volkswagen "Clean Diesel"* MDL.  *See VW Franchise Dealers*, 2017 WL 4890594, at *10 (noting that "it is still difficult to determine which [Bosch] entity did what" based on the allegations in the franchise dealers' pleading but the pleading makes clear that "the blur between Bosch GmbH and Bosch LLC is caused by the way in which employees at both entities work together on certain projects, including the EDC17 project"); *see also In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *30 (stating that, "[g]iven Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific").  The Court thus denies Bosch's argument here as well.

b.    Specific Intent to Defraud

Intent to defraud may be inferred "by examining the scheme itself."  *Eclectic Props.*, 751 F.3d at 997 (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984)).  Here, given the plausibility of the allegations that each Defendant knowingly participated in the emissions scheme, intent to defraud easily follows.  This is because the scheme itself involved the development and use of hidden AECDs in the Class Vehicles; FCA US has failed to refute at this stage that these AECDs are defeat devices.  *See* FAC ¶ 3.  Because the AECDs themselves plausibly have a deceitful purpose, allegations supporting that each Defendant knew about yet concealed the AECDs also support a plausible claim that each Defendant intended to defraud.  *See*

United States District Court
Northern District of California

53

*VW Franchise Dealers*, 2017 WL 4890594, at *15 (holding that the Bosch Defendants' intent to defraud could be "inferred from the scheme itself" where "[n]o one to date in this multidistrict litigation has sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emissions systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions"); *In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *97 (reaching the same holding based on nearly identical allegations: "The way in which EDC17 interacted with the Duramax engine is inherently deceptive").

That the hidden AECDs plausibly have a deceitful purpose distinguishes this case from *Eclectic Properties*, on which Defendants rely.  There, the purchasers of commercial properties alleged that the sellers of the properties had engaged in a RICO scheme to inflate the property values through sale-leaseback transactions and the payment of inflated rent payments.  *See Eclectic Props.*, 751 F.3d at 994-95.  In affirming the district court's dismissal of the RICO claim, the Ninth Circuit held that plaintiffs had failed to sufficiently plead specific intent to defraud for purposes of the predicate acts of mail and wire fraud.  *See id.* at 997-1000.  In reaching this conclusion, the Ninth Circuit noted:

> When companies engage in sale-leaseback transactions that are facially legitimate, pay rent and operate legitimate businesses for years thereafter, and otherwise act as routine participants in American commerce, a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme.

*Id.* at 997-98.

Unlike the facially legitimate sale-leaseback transactions in *Eclectic Properties*, here, Defendants have not explained a legitimate use for the hidden AECDs.  The alleged fraud here, then, is centered around the use of devices that plausibly had only a deceitful and unlawful purpose.  That Defendants are alleged to have known about and concealed these devices supports the contention that they had specific intent to defraud.

Defendants also argue that *Pirnik v. Fiat Chrysler Automobiles*, No. 15-cv-7199 JMF, 2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017), supports a holding that Plaintiffs have not sufficiently pled intent to defraud.  *Pirnik* is a securities-fraud suit that is predicated on the

54

1    EcoDiesel emissions issue.  The district court there dismissed the plaintiffs' complaint, without

2    prejudice, concluding that the plaintiffs had failed to plead a strong inference of scienter.

3               On the whole, their allegations boil down to general claims about
                the importance of certain diesel-engine vehicles to the company, the
4               unremarkable fact that Marchionne received regular reports
                regarding emissions tests and that the company had audited its
5               vehicles for emissions compliance, FCA's awareness that other
                automobile manufacturers were facing regulatory scrutiny for using
6               illegal "defeat devices," and vague statements by confidential
                witnesses that emissions reports were "forwarded up" through
7               "senior" management to reach Marchionne.  Conspicuously absent,
                however, are any allegations that FCA officials or Marchionne ever
8               received test results, reports, or other communications indicating
                that FCA vehicles were not in compliance with relevant emissions
9               regulations prior to the EPA's and CARB's notices on January 12,
                2017.  That dooms Plaintiffs' case for scienter here.
10

11   *Id.* at *2 (citations omitted).

12          While *Pirnik* is notable given that the securities-fraud claims there are predicated on the

13   same factual events at issue here, the decision is not particularly persuasive on the issue of intent.

14   As a securities-fraud case, *Pirnik* is governed by the Private Securities Litigation Reform Act,

15   which requires scienter to be pled with "particularity."  *Tellabs, Inc. v. Makor Issues & Rights,*

16   *Ltd.*, 551 U.S. 308, 313 (2007).  This heightened pleading standard does not apply in the context

17   of RICO, where only "general allegations" of a defendant's state of mind are required.  *Odom*, 486

18   F.3d at 554.  Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a

19   person's mind may be alleged generally."  A general allegation of scienter does not require the

20   level of specificity (*e.g.*, specific allegations that the defendant received actual test results)

21   required in *Tellabs*.

22                           c.    Use of the Mails and Wires

23          The final element of the mail and wire fraud predicate offenses is the use of the mails and

24   wires in furtherance of a scheme to defraud.  *See Eclectic Props.*, 751 F.3d at 997.  "[A]ny

25   'mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the

26   mailing itself contain[s] no false information.'"  *Bridge*, 553 U.S. at 647 (second alteration in

27   original) (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)).  The use of the mails or

28   wires instead only needs to be "a step in the plot."  *United States v. Garlick*, 240 F.3d 789, 792

United States District Court
Northern District of California

55

1    (9th Cir. 2004) (internal quotation marks omitted).

2         As alleged, Plaintiffs primarily effectuated the emissions scheme by concealing the eight

3    AECDs at issue from regulators in COC and EO applications.  *See* FAC ¶¶ 124, 130-31, 270.

4    These applications were sent through the mail and interstate wires.  *See* FAC ¶ 258(E).  The FAC

5    also includes charts that identify other mailings and wire communications, the dates of the

6    communications, and their contents.  *See, e.g.*, FAC ¶ 259 (alleging that, in September 2013, the

7    EPA mailed to FCA US "COC and related documents for 2014 Jeep Grand Cherokee"); FAC

8    ¶ 260 (alleging that, in January 2014, FCA US wired the EPA and CARB "Certification Summary

9    Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram

10   1500").  These alleged communications were all plausibly "step[s] in the plot" to deceive

11   regulators into certifying the Class Vehicles.  *Garlick*, 240 F.3d at 792.

12        Defendants contend that Plaintiffs must identify instances in which *each* Defendant used

13   the mails and wires in furtherance of the scheme, and that Plaintiffs have not done so.  In support

14   of this position, Defendants cite to cases that have generally stated that "[t]he requirements of

15   § 1962(c) must be established as to each individual defendant," *Craig Outdoor Advert., Inc. v.*

16   *Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008), and that, "[w]here RICO claims under

17   § 1962(c) are asserted against multiple defendants, a plaintiff must allege at least two predicate

18   acts by each defendant."  *Committee to Protect Our Agric. Water v. Occidental Oil and Gas*

19   *Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017); *accord In re WellPoint, Inc. Out-of-Network*

20   *UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011); *Kerrigan v. ViSalus, Inc.*, 112 F.

21   Supp. 3d 580 (E.D. Mich. 2015).  When the predicate acts are acts of mail or wire fraud, however,

22   the Ninth Circuit has held that "knowing participants in the scheme are legally liable for their *co-*

23   *schemers* use of the mails or wires."  *Stapleton*, 293 F.3d at 1117 (emphasis added) (internal

24   quotation marks omitted).  The Bosch Defendants acknowledge as much, arguing that,

25        while "knowing participants" in a fraudulent scheme can be held
          liable for their co-schemers' use of the mails or wires, *see, e.g.*,
26        *United States v. Stapleton*, 293 F.3d 1111, 1116-18 (9th Cir. 2002),
          such vicarious liability extends only if the Plaintiffs adequately
27        plead that each Defendant knowingly participated in the scheme to
          defraud with specific intent to deceive.  Plaintiffs have made no
28        such showing here.

56

United States District Court
Northern District of California

Bosch Mot. at 29 n.9.

As noted above, the allegations in the FAC plausibly support that each Defendant was a knowing participant in the scheme to defraud the EPA and CARB.  Because "knowing participants in the scheme are legally liable for their co-schemers use of the mails or wires," *Stapleton*, 293 F.3d at 1117 (internal quotation marks omitted), the Bosch Defendants, the VM Motori Defendants, FCA N.V., and Mr. Marchionne can all be held liable for FCA US's use of the mails and wires in furtherance of the scheme, which includes FCA US's submissions of COC and EO applications, respectively to the EPA and CARB, for the Class Vehicles.  *See* FAC ¶ 258(E); *see also In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *99 (applying the same co-schemer standard and holding that the Bosch Defendants could be held liable for mail and wire fraud based on GM's use of the mails and wires).[8]

   2.   Pattern of Racketeering Activity

A "pattern of racketeering activity" requires the commission of at least two predicate acts within a ten-year period.  *See* 18 U.S.C. § 1961(5).  The FAC easily satisfies this requirement, as it identifies multiple mailings and communications in furtherance of the scheme between January 2013 and November 2016.  *See* FAC ¶¶ 258-60.  These include the applications for EPA COCs and CARB EOs that concealed the AECDs for the 2014–2016 EcoDiesel trucks.  *See* FAC ¶ 258(E).

   3.   Enterprise Requirement

A RICO "enterprise" consists of "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not as a legal entity."  18 U.S.C. § 1961(4).  The Ninth Circuit has referred to this definition as "expansive" and "'not very demanding.'"  *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom*, 486 F.3d at 548).

Plaintiffs allege that Defendants engaged in an associated-in-fact enterprise, *see* FAC

---

[8] Plaintiffs alternatively argue that the FAC *does* identify uses of the mails and wires by Bosch GmbH, Bosch LLC, and Mr. Marchionne.  Because the Court concludes that the allegations plausibly tie each Defendant to FCA US's use of the mails and wires, the Court does not consider the sufficiency of these separate allegations.

¶¶ 232-34, which is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Christensen*, 828 F.3d at 780 (quoting *Odom*, 486 F.3d at 548). Such an enterprise has three elements: "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props.*, 751 F.3d at 997 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

With respect to the "common purpose" element, "[e]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Boyle*, 556 U.S. at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). This is such a case. The allegations that plausibly support that Defendants committed multiple acts of mail and wire fraud also support that they shared a common purpose to "deceive regulators into believing that the Class Vehicles were eligible for coverage by a COC and/or EO and compliant with emission standards," FAC ¶ 230, "in order to sell the Class Vehicles throughout the United States (and California)." FAC ¶ 232.

Of course, Defendants also organized themselves for the more general purpose of manufacturing and selling vehicles. But that does not shield them from RICO liability. This is clear from the Ninth Circuit's en banc decision in *Odom*, 486 F.3d 541. The plaintiff there brought a RICO claim against Microsoft and Best Buy. *See id.* at 543. Microsoft had invested $200 million in Best Buy and the companies had agreed to promote each other's products and services. *See id.* While this promotional arrangement was a routine, lawful business dealing, the plaintiff alleged that the companies also participated in a scheme in which Best Buy would give its customers Trial CDs of Microsoft's MSN subscription and, without the customers' knowledge or permission, would provide Microsoft with the customers' debit and credit card information. *See id.* at 543-44. Microsoft would then activate MSN accounts in the customers' names without their consent. *See id.* The en banc court concluded that these allegations were "more than adequate to establish, if true, that Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's [MSN] service through fraudulent means." *Id.* at 552. In other words, Microsoft and Best Buy could not hide behind lawful commercial dealings to avoid RICO liability. Nor can the Defendants do so here.

United States District Court
Northern District of California

1    Defendants rely on two decisions in which district courts have rejected attempts to

2 characterize routine commercial dealings as a RICO enterprise.  *See Shaw v. Nissan North*

3 *America, Inc.*, 220 F. Supp. 3d 1046 (C.D. Cal. 2016); *Gomez v. Guthy-Renker, LLC*, No. 14-cv-

4 01425 JGB, 2015 WL 4270042 (C.D. Cal. July 13, 2015).  In *Shaw*, the plaintiffs asserted that

5 certain Nissan entities and a parts supplier engaged in a RICO enterprise to sell Nissan cars with

6 defective timing chains.  *See Shaw*, 220 F. Supp. 3d at 1050.  In holding that the plaintiffs failed to

7 plead a common fraudulent purpose, the district court reasoned:

8      At bottom, both sides seem to agree that the Subject Nissan Vehicles
       were produced with a part that could have been improved in certain
9      ways.  From this starting premise, Plaintiffs conclude that
       Defendants participated in an enterprise bound by the common
10     purpose of fraudulently selling defective vehicles at inflated prices. .
       . . [H]owever, Plaintiffs have not given us any specific facts that
11     move their allegations from the realm of the possible to the
       plausible.
12

13 *Id.* at 1057.

14    Likewise in *Gomez*, plaintiffs allege that a consumer-products company engaged in a

15 scheme to charge customers unexpected fees for a "continuity program," even after customers

16 tried to cancel their memberships.  *Gomez*, 2015 WL 4270042, at *1-2.  The plaintiffs alleged that

17 the company did not act alone, but instead formed a RICO enterprise with third-party payment

18 processors and customer-service operators.  *See id.* at *2.  Yet the plaintiffs failed to plead specific

19 facts supporting that these third parties had taken part in the fraudulent scheme.  In dismissing the

20 RICO claim, the district court reasoned that "RICO liability must be predicated on a relationship

21 more substantial than a routine contract between a service provider and its client."  *Id.* at *11.

22    The key difference between this case and *Shaw* and *Gomez* is that the specific factual

23 allegations that were lacking in those cases are present in this one.  This starts with the hidden

24 AECDs themselves, which were installed in the Class Vehicles and plausibly had only a deceitful

25 purpose – to cheat emissions tests.  There were no similar fraudulent devices in *Shaw* or *Gomez*.

26 In fact, the timing-chain defect in *Shaw* may have very well been the result of an unintentional,

27 negligent design flaw.  The same cannot be said of the AECDs as alleged, which turn the Class

28 Vehicles' emission controls on or off depending on whether the vehicles are undergoing emissions

59

testing.  Such devices are not developed by accident or as part of routine business dealings.

Further, as detailed above, Plaintiffs' allegations plausibly support that each Defendant participated in developing or implementing the AECDs.  Plaintiffs allege that the Bosch Defendants' software documentation describes parameters and functions that correlate with many of the hidden AECDs, *see* FAC ¶ 174; that the VM Motori Defendants were responsible for how the EcoDiesel engine generated and treated emissions, and therefore plausibly would have been involved with implementing the AECDs, *see* FAC ¶¶ 110-13, 120, 237; and that the FCA Defendants initiated and oversaw development of the EcoDiesel engine and activated the AECDs in the Class Vehicles.  *See* FAC ¶¶ 102-06, 126.  These allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings.  Rather, like the allegations regarding Microsoft and Best Buy in *Odom*, Plaintiffs' allegations support that Defendants shared a common purpose to deceive.  *See also In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *90 (reasoning that alleged collaboration by Bosch and GM to equip diesel vehicles with defeat devices was "far from 'routine'" business dealing and plausibly supported a common purpose to deceive).

Plaintiffs have also sufficiently pled that the enterprise had a "structure or organization." RICO's structural requirement requires only a "relationship among those associated with the enterprise." *Boyle*, 556 U.S. at 946.  Neither a "hierarchy, role differentiation . . . [or] a chain of command" is required.  *Id.*  In *Boyle*, for example, the defendant and others participated in a series of bank thefts.  The group was "loosely and informally organized," did "not appear to have a leader or hierarchy," and did not appear to "ever formulate[] any long-term master plan or agreement."  *Id.* at 941.  The defendant was nevertheless convicted of violating § 1962(c), and the Supreme Court affirmed the conviction.  *See id.* at 941-42.

Defendants' enterprise had much greater organization than the enterprise in *Boyle*. Plaintiffs identify specific roles for each Defendant within the scheme, alleging that the FCA Defendants oversaw the scheme under the guidance of Mr. Marchionne, *see* FAC ¶¶ 102-06, 123, 227-28, 235; that the VM Motori Defendants developed and calibrated the EcoDiesel engine used in the Class Vehicles, *see* FAC ¶¶ 120, 132, 237; and that the FCA Defendants "worked closely

United States District Court
Northern District of California

60

with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit
17." FAC ¶ 123.  These allegations provide more than enough detail to support RICO's structural
requirement.  Moreover, the Defendants had an organized plan of design and manufacture in their
joint efforts to sell vehicles.

As for the longevity requirement, RICO requires only "longevity sufficient to permit [the]
associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.  Plaintiffs have satisfied
this requirement.  They allege that Defendants participated in the emissions scheme over the
course of three Class Vehicle model years. *See* FAC ¶¶ 1, 230.  This was a sufficient amount of
time to pursue the enterprise's purpose of deceiving the EPA and CARB into certifying the Class
Vehicles so that the vehicles could be sold in the United States.

### 4.    Conducting the Affairs of the Enterprise

The final element Plaintiffs must prove to support their § 1962(c) RICO claim is that each
Defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's
affairs." 18 U.S.C. § 1962(c).  In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme
Court reasoned that the word "participate" in § 1962(c) "makes clear that RICO liability is not
limited to those with primary responsibility for the enterprise's affairs." *Id.* at 179.  The use of the
phrase "directly or indirectly" also "makes clear that RICO liability is not limited to those with a
formal position in the enterprise." *Id.*  Yet "*some* part in directing the enterprise's affairs is
required." *Id.*  "'[S]imply performing services for the enterprise' or failing to stop illegal activity,
is not sufficient." *VW Franchise Dealers*, 2017 WL 4890594, at *16 (quoting *Walter v. Drayson*,
538 F.3d 1244, 1248-49 (9th Cir. 2008)).

The allegations in the FAC plausibly support that each Defendant took some part in
directing the enterprise's affairs.  First, with respect to Mr. Marchionne, Plaintiffs allege that it
was his focus on diesel that led the FCA Defendants to develop light-duty diesel-engine vehicles
for sale in the United States. *See* FAC ¶¶ 226-28.  Plaintiffs also allege that Mr. Marchionne was
"at the helm" of the enterprise to illegally circumvent stringent U.S. emission standards.  FAC
¶ 236.  Mr. Marchionne, then, did not simply perform services for the enterprise; he plausibly
played a role in directing the enterprise's affairs.

61

The same is true for the FCA Defendants.  Led by Mr. Marchionne, Plaintiffs allege that the FCA Defendants "conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards."  FAC ¶ 236.  To further their efforts, both FCA entities are alleged to have "worked with, and oversaw, VM Italy and VM America in the development and calibration of the engines at Michigan headquarters," FAC ¶ 237, and to have "worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customized the EDC Unit 17 to allow Class Vehicles to simulate 'passing' the EPA and CARB testing."  FAC ¶ 123.  Together, the allegations support that the FCA Defendants were not simply taking orders, but instead were responsible for orchestrating the scheme.

As for the VM Motori Defendants, Plaintiffs allege that they "designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Class Vehicles."  FAC ¶ 22.  Although some of this work may have been performed at the behest of the FCA Defendants, *see* FAC ¶ 237 (alleging that the FCA Defendants "oversaw" the VM Motori Defendants' development and calibration of the engines), Plaintiffs allege that the VM Defendants were "deeply involved in the development and testing of all aspects of the engine."  FAC ¶ 119.  Given their technical expertise and the importance of the EcoDiesel engine to the enterprise, it is plausible that the VM Motori Defendants participated in conducting the enterprise's affairs.

Finally, the Bosch Defendants argue that they were simply performing services for the enterprise.  But given the level of control they are alleged to have maintained over the emissions software in the Class Vehicles, that conclusion is not sustainable at the pleading stage.  Plaintiffs allege that the Bosch Defendants locked the EDC Unit 17 "to prevent customers, like Fiat Chrysler, from making significant changes on their own."  FAC ¶ 133.  As a result, the Bosch Defendants would have needed to consent to any customization of the EDC Unit 17, including the addition of the hidden AECDs.  That power of consent and control over the configuration of the EDC Unit 17 plausibly shifts the Bosch Defendants from "[s]imply performing services for the enterprise," *Walter*, 538 F.3d at 1248-49, to taking "some part in directing the enterprise's affairs," *Reves*, 507 U.S. at 179 (emphasis omitted).  The district court in *Duramax* reached the same conclusion.  *See In re Duramax Diesel Litig.*, 2018 U.S. Dist. LEXIS 26543, at *107-08 ("[T]he

United States District Court
Northern District of California

1    operation of EDC17 is the apparent heart of the fraudulent enterprise and, because Bosch bears

2    primary responsibility for programming EDC17, it knowingly carried out core aspects of the

3    alleged enterprise.") (internal quotation marks omitted).

4        Plaintiffs' allegations plausibly support each of the four elements of their § 1962(c) RICO

5    claim as to each Defendant.  The Court accordingly denies Defendants' motions to dismiss this

6    cause of action.

7    C.    RICO Conspiracy Claim

8        Plaintiffs also bring a RICO conspiracy claim against each Defendant.  To establish a

9    RICO conspiracy, Plaintiffs must allege either (1) "an agreement that is a substantive violation of

10   RICO," or (2) "that the defendants agreed to commit, or participated in, a violation of two

11   predicate offenses."  *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (citing 18

12   U.S.C. § 1962(d)).  Plaintiffs' allegations satisfy the second of these options.  For the reasons

13   addressed above, it is plausible that Defendants all agreed to commit, or participate in, a violation

14   of two or more predicate acts of mail or wire fraud in furtherance of the enterprise.

15       Defendants only arguments for dismissal of the RICO conspiracy claim rely on the same

16   arguments they made in the context of § 1962(c).  *See* FCA/VM Mot. at 27 n.9; Bosch Mot. at 34-

17   35.  Because the Court found those arguments unpersuasive in the § 1962(c) context, it reaches the

18   same conclusion here.  The Court accordingly denies Defendants' motions to dismiss Plaintiffs'

19   RICO conspiracy claim.

20   D.    RICO Aider and Abettor Liability

21       Plaintiffs' allegations are sufficient to support a claim against the Bosch Defendants for

22   direct liability under § 1962(c).  In the alternative, however, Plaintiffs also seek to hold the Bosch

23   Defendants liable for violating RICO under an aiding and abetting theory.  *See* FAC ¶¶ 254, 266.

24   Such a theory of liability is not available under RICO.

25       While Congress has enacted a general aiding and abetting statute applicable to all federal

26   criminal offenses, *see* 18 U.S.C. § 2, it has not done the same for civil offenses.  As a result,

27   "when Congress enacts a statute under which a person may sue and recover damages from a

28   private defendant for the defendant's violation of some statutory norm, there is no general

United States District Court
Northern District of California

63

presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). Instead, Congress has "taken a statute-by-statute approach to civil aiding and abetting liability." *Id.* (noting, for example, that the Internal Revenue Code contains "a full section governing aiding and abetting liability;" that the Commodity Exchange Act "contains an explicit aiding and abetting provision;" and that "various provisions of the securities laws prohibit aiding and abetting").

Given that Congress "has been quite explicit in imposing civil aiding and abetting liability," *id.* at 183, the Supreme Court in *Central Bank* held that a private plaintiff cannot maintain an aiding and abetting suit under Section 10(b) of the Securities Exchange Act of 1934, because "the language of Section 10(b) does not in terms mention aiding and abetting." *Id.* at 175. "Congress [knows] how to impose aiding and abetting liability when it [chooses] to do so," the Court reasoned, and if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Id.* at 176-77. In light of the text, and without any persuasive evidence of legislative intent to the contrary, or policy considerations that would render the textual reading "'so bizarre' that Congress could not have intended it," *id.* at 188 (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 191 (1991)), the Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)," *id.* at 192.

After *Central Bank*, the Third Circuit considered whether a private cause of action for aiding and abetting a RICO violation could be maintained. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998), *abrogated on other grounds as recognized in Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2001). Like Section 10(b) of the Exchange Act, the Third Circuit noted that "the text of § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO." *Id.* at 657. The Third Circuit then noted that it "must interpret and apply the law as Congress has written it," because *Central Bank*'s analysis "began and ended with a review of the language of the statute." *Id.* at 656-57. "Because the text of the RICO statute does not encompass a private cause of action for aiding and abetting a RICO violation," the Third Circuit reasoned, "we have no authority to imply one." *Id.* at 657.

64

In support of their aiding and abetting claim, Plaintiffs cite to *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993), where the Ninth Circuit noted in dicta "that there is some support among the Circuits for the imposition of aider or abettor liability in the civil RICO context." *Id.* at 1347 (collecting cases).[9]  *Baumer* and the cases it cited predate *Central Bank*, however.  And given *Central Bank*'s holding that "there is no general [statutory] presumption that [a civil] plaintiff may also sue aiders and abettors," and the fact that the RICO statute does not use the terms "aiding and abetting," the dicta in *Baumer* is not binding.

The district court decisions that Plaintiffs have cited are also not persuasive.  In *Minnesota Life Insurance Co. v. Philpot*, No. 11-CV-00812 BTM (POR), 2012 WL 4486311 (S.D. Cal. Sept. 27, 2012), the court concluded that the plaintiffs' allegations, which included the phrase "conspired with and aided and abetted," met the standard for knowing participation in a fraudulent scheme and stated a *primary* RICO violation under 1962(c).  *Minn. Life*, 2012 WL 4486311, at *10.  The court therefore did not consider whether an aiding and abetting theory was cognizable.  And in *Regence Group v. TIG Specialty Insurance Co.*, 903 F. Supp. 2d 1152 (D. Or. 2012), the court held that aiding and abetting liability is available under RICO; but the court only cited a pre-*Central Bank* out-of-circuit decision for its holding.  *See id.* at 1162 (citing *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994)).  In contrast, district courts in the Ninth Circuit that have relied on *Central Bank* have held that "[t]he civil RICO statute does not provide for aiding and abetting liability," and that "the statute's silence precludes such a claim."  *Ferrari v. Mercedes-Benz USA, LLC*, No. 15-cv-4379 YGR, 2016 WL 658966, at *2 (N.D. Cal. Feb. 18, 2016) (citing *Salas v. Int'l Union of Operating Engineers*, No. 12-cv-10506 DDP VBKx, 2015 WL 728365, at *7 (C.D. Cal. Feb. 18, 2015)).

It is clear from *Central Bank* that statutory text is paramount in determining whether a

---

[9] After noting this support among some circuits, the Court concluded,

> This being said, the instant case does not require that we address whether appellants have stated a claim on the basis of aider or abettor liability.  As noted above, the § 1962(c) claim against Pachl fails under the Court's interpretation of the recent *Reves* decision.

*Baumer*, 8 F.3d at 1347 (footnotes omitted).

65

private cause of action for aiding and abetting is available.  Congress has used the terms "aid" and "abet" on multiple occasions, which led the Court in *Central Bank* to conclude that Congress knows how to impose aiding and abetting liability when it wants to.  *See also Digital Realty Trust, Inc. v. Somers*, --- S. Ct. ----, 2018 WL 987345, at *9 (Feb. 21, 2018) ("When Congress includes particular language in one section of a statute but omits it in another, this Court presumes that Congress intended a difference in meaning.") (quoting *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014)).  With respect to the civil RICO statute, Congress did not use those terms.  And Plaintiffs have not cited to any evidence of legislative intent that would support deviation from the text.  The Court therefore concludes that a private cause of action for aiding and abetting a RICO violation is unavailable and grants the Bosch Defendants' motion to dismiss Plaintiffs' RICO claim for aiding and abetting liability.

## IV.     CLAIMS FOR COMMON LAW FRAUDULENT CONCEALMENT AND VIOLATION OF CONSUMER PROTECTION STATUTES

A.     Fraud on Consumers

While Plaintiffs' RICO claim focuses on fraud on government regulators, Plaintiffs have also brought independent claims targeting fraud on consumers.  These claims – specifically, for common law fraudulent concealment and violation of consumer protection statutes – are all predicated on state law.

1.     Factual Predicate for Fraud-on-Consumer Claims

As an initial matter, the Court must pinpoint what the factual predicate is for the fraud-on-consumer claims.  There are three basic factual allegations in the FAC:

(1) Each named plaintiff decided to buy a Class Vehicle "based in part on FCA [U.S.'s] representations that [the truck] was an 'EcoDiesel' vehicle (i.e., reduced emissions)." FAC ¶ 34 *et seq.*  Although the complaint is not the model of clarity, it appears that the "EcoDiesel" logo – using a leaf and green coloring – was displayed on each Class Vehicle.  *See* FAC ¶ 145.  Defendants do not dispute the display of the "EcoDiesel" logo on the Class Vehicles.

(2) Each named plaintiff decided to buy a Class Vehicle based in part on the vehicle's

advertised fuel economy.  *See* FAC ¶ 34 *et seq.*

(3) Each named plaintiff was not aware that the Class Vehicle was equipped with a "defeat device."  *See* FAC ¶ 34 *et seq.*

With respect to (1), this is an allegation of an affirmative misrepresentation, and not a fraudulent omission or concealment.  Accordingly, to the extent Plaintiffs have characterized their fraud-on-consumer claims solely as fraudulent concealment claims, *see, e.g.*, FAC ¶ 276 *et seq.*, that appears to be mistaken.  This mistake, however, is inconsequential with respect to the Court's ability to adjudicate this claim.  Defendants recognize that Plaintiffs have an affirmative misrepresentation theory based on the EcoDiesel logo displayed on the Class Vehicles and attacked that theory in the pending motions.[10]

As for (2), this allegation does present a fraudulent concealment theory – *i.e.*, Defendants failed to disclose that the advertised fuel economy could be achieved only because "the emission treatment technology de-activated under real-world driving conditions."  FAC ¶ 278; *see also* FAC ¶ 34 *et seq.* (alleging that each named plaintiff "did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits").  The problem for Plaintiffs is that they have failed to identify what advertising they saw that promised certain fuel economy or performance, a predicate to Plaintiffs' specific concealment theory in this case.  *See* Fed. R. Civ. P. 9(b) (providing that "a party must state with

---

[10] The Court notes that, in *Duramax*, the plaintiffs (who are represented by some of the same counsel who represent Plaintiffs here) "den[ied] that they were advancing any fraud claims premised on affirmative representations."  *Duramax*, 2018 U.S. Dist. LEXIS 26543, at *31-32.

> Plaintiffs acknowledge that the consolidated amended complaint includes an extended discussion of various advertisements and press release which GM issued regarding vehicles equipped with the Duramax engine.  Those allegations, Plaintiffs explain, are not meant to buttress affirmative misrepresentation claims.  They are meant "to show that Defendants' omissions were material for purposes of claims under consumer protection statutes and RICO."  To repeat: "The relevance of those promises is GM's acknowledgment that low emissions are material . . . to a reasonable consumer."

*Id.* at *32-33.  In the instant case, Plaintiffs have not – at least not expressly or otherwise clearly – made a disavowal of an affirmative misrepresentation theory.  Of course, they are free to do so.

particularity the circumstances constituting fraud or mistake"); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (noting that "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong"; adding that "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged") (internal quotation marks omitted).  While the FAC does refer to FCA U.S.'s website and some blogs operated by a FCA entity, *see, e.g.*, FAC ¶¶ 148-49, 151-55, there is no allegation that any named plaintiff actually saw the website or blogs, or any promises contained therein, regarding fuel economy or performance.  Nor is there any allegation about fuel economy being displayed on the Class Vehicles.  *See, e.g.*, *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 984 (N.D. Cal. 2015) (Tigar, J.) (noting that, under California law, a claim for fraud is viable where the defendant makes a partial representation that is misleading because some other material fact has not been disclosed; but "[a] partial-representation claim requires [a plaintiff] to plead reliance on at least some misleading partial representations" – *i.e.*, the plaintiff "saw or heard these partial representations and [was] misled by them in such a way that [the defendant] should have fully disclosed related information").  Accordingly, for purposes of this opinion, the Court cannot consider the factual allegation in (2) as a basis for Plaintiffs' fraud claims; it is not sufficiently specific in identifying the advertisements which contained the misleading partial representations.  Plaintiffs, however, have leave to amend to correct this specific deficiency if they can do so in good faith.[11]  *See* Fed. R. Civ. P. 11.

Finally, with respect to (3), this is another fraudulent concealment theory – *i.e.*, Defendants failed to disclose that the Class Vehicles contained defeat devices.  Furthermore, this is a concealment theory that the Court may consider for purposes of this opinion because this theory – unlike the fraudulent concealment theory in (2) above – is not dependent on any advertising by

---

[11] Starting with ¶ 145 of the FAC, Plaintiffs make various allegations regarding a misleading advertising campaign conducted by FCA U.S.  However, there are no allegations that any named plaintiff actually viewed any of the identified advertising, with the exception of the EcoDiesel logo that physically appears on the Class Vehicles.  Plaintiffs have leave to amend here as well if they can allege in good faith that any such advertising was viewed by a named plaintiff.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants.  In other words, this is a straight omission/concealment theory.  *See, e.g.*, *Daniel v.*

2    *Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (in a case where plaintiffs claimed

3    fraudulent omission under California law based on car manufacturer's failure to disclose a rear

4    suspension defect, rejecting manufacturer's contention that plaintiffs could not establish reliance

5    because the evidence showed that they did not view any advertising materials prior to purchase;

6    noting that plaintiffs offered evidence that they would have been aware of the defect, if disclosed,

7    by other means, *i.e.*, through the manufacturer's authorized dealerships).

8            2.    Mr. Marchionne

9            Having identified the factual predicate for the fraud-on-consumer claims, the Court may

10   now turn to Mr. Marchionne's argument that the claims asserted against him should be dismissed

11   because Plaintiffs have failed to allege that he engaged in any fraud himself.  Mr. Marchionne

12   argues, for example, that "Plaintiffs cite to only two statements by [him], both of which express

13   intentions to expand FCA operations[;] [t]hose statements are not alleged to have been false or

14   misleading in any way."  FCA/VM Mot. at 54.

15          While Mr. Marchionne's position is not without some merit, *see* FAC ¶ 18 (alleging in

16   conclusory terms that "Mr. Marchionne has made numerous public statements on behalf of [the

17   FCA entities] concerning the Class Vehicles, their EcoDiesel® engines, and their emissions and

18   performance characteristics"), there is enough in the FAC to withstand the 12(b)(6) challenge.

19   Plaintiffs' theory is not that Mr. Marchionne himself made misrepresentations about EcoDiesel but

20   rather that he "signed off" on the FCA companies' statements about EcoDiesel.  *Cf., e.g.*, FAC ¶

21   261 (in RICO claim, alleging that "FCA [US], *under the direction and control of [FCA N.V.] and*

22   *[Mr.] Marchionne*, made misrepresentations about the Class Vehicles on their websites, YouTube,

23   and through ads online, all of which were intended to mislead regulators and the public about the

24   emission standards and other performance metrics").  In other words, Mr. Marchionne approved

25   of, or ratified, the use of the "EcoDiesel" logo on the Class Vehicles, and with knowledge of the

26   emissions problem.  *See, e.g.*, *Gassis v. Corkery*, No. 8868-VCG, 2014 WL 3565418, at *4 (Del.

27   Ch. Ct. July 21, 2014) (Delaware) (noting that, under the personal participation doctrine, "a

28   corporate officer may be held liable in tort only where she is 'actively involved [in the commission

1    of the tort] in that [she] directed, ordered, ratified, approved or consented to the tort'");

2    *Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (1999) (Massachusetts) (stating that "[a]

3    corporate officer is personally liable for a tort committed by the corporation that employs him, if

4    he personally participated in the tort by, for example, directing, controlling, approving, or ratifying

5    the act that injured the aggrieved party"); *Huffman v. Poore*, 6 Neb. App. 43, 53 (1997)

6    (Nebraska) (stating that, "'[o]rdinarily, corporate directors are personally liable, independently of

7    statute, for fraud or for false and fraudulent representations which they or their agents made within

8    the scope of their employment, or for those which were approved or ratified'"; adding that "'[a]n

9    officer of a corporation who takes part in the commission of a tort by the corporation is personally

10   liable for resulting injuries'").

11         To the extent Mr. Marchionne argues that there are insufficient allegations of approval or

12   ratification on his part, the Court does not agree.  It is a reasonable inference that Mr. Marchionne

13   approved or ratified use of the logo because there are allegations in the FAC that he heavily

14   promoted diesel within the FCA entities, particularly with respect to the Jeep and Ram brands.

15   *See* FAC ¶ 102 *et seq.*; *see also* Part III.B.1.a.iv, *supra* (discussing knowing participation in

16   scheme to defraud).  Mr. Marchionne plausibly would have maintained oversight as to what was

17   happening with the diesel engines, including but not limited to the "EcoDiesel" brand and the use

18   of defeat devices which were instrumental in passing emissions tests.

19         Finally, even if Mr. Marchionne did not approve or ratify any misrepresentation by the

20   FCA companies, Plaintiffs also have, as discussed above, a fraudulent concealment theory.

21   Similar to above, given the role that Mr. Marchionne played vis-à-vis diesel engines, it is a

22   reasonable inference that he was directly involved with, and therefore knowledgeable about, what

23   was happening with the EcoDiesel engines and FCA's concealment of the defeat devices. The

24   Court therefore rejects this challenge raised by Mr. Marchionne.

25         3.    Bosch Defendants

26         The Bosch Defendants make an argument similar to that made by Mr. Marchionne; that is,

27   the Bosch Defendants argue for dismissal on the ground that Plaintiffs have failed to allege that

28   the Bosch Defendants made any misrepresentations to the public.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Bosch Defendants have a legitimate argument to the extent Plaintiffs are making a

2 claim for an affirmative misrepresentation.  Notably, the FAC does not contain any allegation that

3 the Bosch Defendants had a hand in branding the Class Vehicles "EcoDiesel."  In addition, while

4 there are allegations in the FAC about, *e.g.*, Bosch press releases and promotional events, *see, e.g.*,

5 FAC ¶¶ 9, 115, 122, 142-43, there is no allegation that any of the named plaintiffs saw the press

6 releases or participated in the promotional events.

7    That being said, as discussed above, Plaintiffs are not simply relying on an affirmative

8 misrepresentation theory; rather, they also have a fraudulent concealment theory.  The fraudulent

9 concealment theory is not dependent on any advertising by any defendant, including but not

10 limited to the Bosch Defendants.  As noted in the above discussion regarding RICO liability, *see*

11 Part III.B.1.a.i, *supra* (discussing knowing participation in scheme to defraud), the FAC alleges

12 that the Bosch Defendants played a substantial and knowing role in devising and installing the

13 defeat devices, and concealed that fact from the government and consumers.  The Court therefore

14 rejects the Bosch Defendants' argument that no claim of concealment is possible absent any

15 particular advertisement being seen by Plaintiffs.

16    To the extent the Bosch Defendants contend that Plaintiffs have failed to distinguish

17 between the two Bosch companies – *i.e.*, pinpoint what *each* company's alleged misconduct was

18 vis-à-vis the alleged concealment – as discussed above, *see* Part III.B.1.a, *supra*, the Court is not

19 persuaded.  While, in general, "lumping" of defendants is not permissible, Plaintiffs have made

20 allegations explaining why it is appropriate in the instant case, at least at this stage of the

21 proceedings.  That is, at this early stage in the proceedings, Plaintiffs have essentially been forced

22 to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific

23 way, grouping business sectors by function (instead of location), such that plausibly both Bosch

24 companies played a role with respect to the EDC Unit 17 that was used in Class Vehicles.

25 B.   Preemption

26    Defendants contend that Plaintiffs' fraud-on-consumer claims, whether based on an

27 affirmative representation theory (*i.e.*, misleadingly branding the Class Vehicles "EcoDiesel") or a

28 fraudulent concealment theory (*i.e.*, failing to disclose the defeat devices in the Class Vehicles),

71

are preempted.  Defendants invoke all three species of preemption, namely, express, field, and conflict preemption.  For each kind of preemption, "'[t]he purpose of Congress is the ultimate touchstone.'"  *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 724 (9th Cir. 2016).

### 1.    Express Preemption

"[E]xpress preemption[] arises when the text of a federal statute explicitly manifests Congress's intent to displace state law.'"  *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013).

When confronted with a preemption statute, a court must "'identify the domain expressly pre-empted by that language.'  [A court] use[s] the text of the provision, the surrounding statutory framework, and Congress's stated purposes in enacting the statute to determine the proper scope of an express preemption provision."  *Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010). Where a statute's language is plain, that is largely where the inquiry both begins and ends.  As the Supreme Court instructed in *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016), evaluation of a "pre-emption provision begins with the language of the statute itself, and that is also where the inquiry should end [where] 'the statute's language is plain'"; "because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Id.* at 1946 (internal quotation marks omitted).   However, "'when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors preemption."'  *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015); *see also Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 449 (2005) (stating that, "[e]ven if Dow had offered us a plausible alternative reading of § 136v(b) – indeed, even if its alternative were just as plausible as our reading of that text – we would nevertheless have a duty to accept the reading that disfavors pre-emption[;] '[b]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action'").

In the instant case, Defendants argue express preemption of the fraud-on-consumer claims based on § 209(a) of the CAA.  That section provides in relevant part as follows: "No State or any

72

political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part [42 USCS § 7521 *et seq.*].'' 42 U.S.C. § 7543(a). Defendants focus on the phrase ''attempt to enforce.'' According to Defendants, Plaintiffs are trying, through their fraud-on-consumer claims, to enforce emission control standards. Defendants underscore that ''[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'' *In re Detroit Diesel Corp. v. AG of New York*, 269 A.D.2d 1 (N.Y. Supreme Ct., App. Div. 2000) (internal quotation marks and emphasis omitted). In short, Defendants argue that an action for damages for violation of federal emissions standards is effectively an attempt to enforce such standards, and therefore is preempted.

In assessing this argument, the Court acknowledges first that § 209(a) does preempt ''attempt[s] to enforce.'' 42 U.S.C. § 7543(a). The Court further notes that the ''attempt to enforce'' language seems to have been included because of legislative concern that that ''the problems faced by the automobile manufacturing industry arising out of identical Federal and State standards, separately administered, would be difficult for the industry to meet since different administration could easily lead to different answers to identical questions.'' H. R. Rep. No. 728, 90th Cong., 1st Sess., 22 (1967); *cf. Motor & Equip. Mfrs. Ass'n. v. Envtl. Prot. Agency*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (noting that ''[t]he debate [over including an express preemption provision] sharpened the differences between the states, which wanted to preserve their traditional role in regulating motor vehicles, and the manufacturers, which wanted to avoid the economic disruption latent in having to meet fifty-one separate sets of emissions control requirements''). While the effect of divergent results dependent upon variation in state law would be more pronounced where states enact varying substantive pollution standards, it appears that Congress believed variations in enforcement among states, even of a uniform pollution standard, could impose intolerable burdens on manufacturers.

Second, the Court takes into consideration that, while § 209(a) uses the broad phrase ''relating to,'' the Supreme Court has given guidance as to what is meant by a standard relating to

emission control standards.  More specifically, in *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246 (2004) [hereinafter, *EMA*], the Supreme Court noted as follows:

> Today, as in 1967 when § 209(a) became law, "standard" is defined as that which "is established by authority, custom, or general consent, as a model or example; criterion; test."  The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine.  To meet them the vehicle must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions.  This interpretation is consistent with the use of "standard" throughout Title II of the CAA (which governs emissions from moving sources) to denote requirements such as numerical emission levels with which vehicles or engines must comply or emission-control technology with which they must be equipped.

*Id.* at 252-53.

Furthermore, in *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control District*, 644 F.3d 934 (9th Cir. 2011), the Ninth Circuit relied on *EMA* to caution against an overly broad understanding of the phrase "relating to," albeit as used in § 209(e)(2) instead of § 209(a).  Section 209(e)(2) essentially bars states and political subdivisions thereof from adopting and enforcing "'standards and other requirements relating to the control of emissions from'" nonroad engines.  *See id.* at 939 (emphasis omitted).  The plaintiff in *Jensen* was a for-profit agricultural corporation that owned and operated diesel engines, in particular, to provide power to irrigation pumps on its farms.  It filed suit against the Monterey Bay Unified Air Pollution Control District after the District adopted and began to enforce rules regulating diesel-powered engines.  The rules included ones that required owners and operators to register and pay fees for certain diesel engines used in agricultural operations.  The plaintiff asserted that these rules were preempted by the CAA because, even though they did not directly control emissions, they were still *related to* emissions control.  The Ninth Circuit disagreed, stating as follows:

> We find this argument unconvincing.  Jensen specifically argues that because the legislative mission of the District is to "control . . . air pollution from all sources [other than motor vehicles]," Rules 220 and 310 necessarily relate to emissions standards.  Under Jensen's logic, *every* rule promulgated by the District relating to nonroad engines and vehicles would be preempted by § 209(e).  Such a broad reading of the "relating to" clause would render inconsequential the

74

> analysis contained in [*EMA*], which clarified the breadth of the word "standard."  Moreover, the Court did not suggest in [*EMA*] that the statutory mission of the governmental authority has a bearing on whether its air pollution regulations are federally preempted. We therefore decline to embrace Jensen's expansive interpretation of the term "relating to."

*Id.* at 941 (emphasis in original).  Given the Ninth Circuit's holding in *Jensen*, this Court likewise does not apply an overly broad reading of the phrase "relating to" as used in § 209(a).

Bearing in mind the above, the Court holds that the fraud-on-consumer claims herein are not expressly preempted by the CAA.

### a.    Affirmative Misrepresentation Theory

The Court addresses first Plaintiffs' fraud claims based on an affirmative misrepresentation theory.  As discussed above, the affirmative misrepresentation theory is based on the branding of the Class Vehicles as "EcoDiesel," a logo displayed on the Class Vehicles themselves.  According to Plaintiffs, "EcoDiesel" conveys that the Class Vehicles are environmentally friendly (*e.g.*, reduced emissions) when in fact they are not.

The Court holds that the affirmative misrepresentation claims are not an attempt to enforce an emissions control standard, and thus not subject to CAA preemption.  In reaching this conclusion, the Court finds the reasoning of the state court in *In re Volkswagen "Clean Diesel" Litigation*, 94 Va. Cir. 189 (2016) [hereinafter *VW Va.*], highly persuasive.

In *VW Va.*, Volkswagen was sued based on factual allegations similar to those in the instant case, *i.e.*, a failure to disclose a defeat device.  The state court noted that the CAA preemption provision would be a bar to a claim only "if the legal duty that is the predicate of the [claim] 'relates to' enforcement of new motor vehicle emission standards."  *Id.* at 195.  The court then held that, with respect to the plaintiffs' fraud and consumer protection claims, there was no CAA preemption.

> On their face, Plaintiffs' fraud and [consumer protection] claims do not rely on emissions violations or enforcement to make out their claims.  Instead Plaintiffs' claims rely upon allegedly false promises of compliance, efficiency, and new technology; or concealment of the fact that compliance testing was being circumvented.  Although Plaintiffs *reference* the EPA violation notice in support of their allegations of falsehood and concealment, their claims ultimately rest on and seek remediation of injuries arising from *misrepresentations and concealment* of material facts made to (or

75

hidden from) the Plaintiffs about the compliance, efficiency, and technology of their vehicles. . . .

Plaintiffs' lack of reliance on emissions standards is further revealed when one considers whether Plaintiffs even need to assert lack of compliance in raising their fraud and [consumer protection] claims. Plaintiffs point to advertising materials and news releases promising not only compliance with regulations, but also describing new technologies developed by [VW] and offering improved fuel economy.  Plaintiffs also point to [VW's] public statement that it had been "dishonest" to consumers in such advertising.  As such, and although emissions compliance or lack thereof *may be further proof of deceit*, it is *the deceit about compliance*, rather than the need to enforce compliance, that is the gravamen of Plaintiffs' claims.

*Id.* at 196-97 (emphasis added).  *VW Va.* thus rested on two points.  First, the gravamen of the complaint was misrepresentation and concealment, not the violation itself of federal regulations.  Second, as a factual matter, the state claims could be established independent of any federal regulatory standard, even if, as a matter of proof, evidence of regulatory violations would strengthen the case.  *See also Counts v. GM, LLC*, 237 F. Supp. 3d 572, 591 & n.8 (E.D. Mich. 2017) (stating that "the gravamen of Plaintiffs' claims, like in [*VW Va.*], focus on 'the deceit about compliance, rather than the need to enforce compliance'"; adding that, even though "[p]roof of noncompliance strengthens Plaintiffs' claims, . . . it is not required for success," *i.e.*, "Plaintiffs can prove that GM misrepresented the level of emissions produced by the Cruze without proving regulatory noncompliance"); *cf. VW Wyo.*, 264 F. Supp. 3d at 1056 (noting that "Wyoming is not attempting to hold Volkswagen liable for *deceptive statements made* to the State's residents; the State is instead attempting to hold Volkswagen liable for *using* a defeat device in its vehicles" and thus there was preemption in the case under consideration) (emphasis added).

The reasoning in *VW Va.* is equally applicable in the case at bar.  Here, as in *VW Va.*, the wrongful conduct being targeted by Plaintiffs is not Defendants' failure to comply with federal law (the CAA), but rather Defendants' *deceit* about the vehicles' emissions.  In other words, the legal duty underlying Plaintiffs' affirmative misrepresentation claims is not a federal law requirement but rather a state tort law prohibiting deception.  Furthermore, Plaintiffs may establish their affirmative misrepresentation claims without proving a violation of the CAA.  For example, Plaintiffs could prove that the Class Vehicles are not environmentally friendly (contrary to the

76

"EcoDiesel" label) by offering evidence as to how much NOx is spewed into the air when the vehicles are in regular use and then offering expert testimony as to how that amount of NOx poses risks to health and safety.  While Plaintiffs *could* make reference to emission control standards under the CAA to strengthen their case (*e.g.*, "[w]hen the emission controls are de-activated on the road, the Class Vehicles emit up to 20 times the legal limits of NOx," FAC ¶ 123), Plaintiffs might nonetheless prove their affirmative misrepresentation claims *without* proof of regulatory noncompliance.  *Cf. Duramax*, 2018 U.S. Dist. LEXIS 26543, at *43 (noting that "it is conceivably possible that Defendants could simultaneously comply with EPA regulations while still concealing material information from consumers"; adding that there is a "significant market for environmentally friendly vehicles – which are designed to emit pollution from below the regulatory maximums").

The Ninth Circuit's *McClellan* decision, though a conflict preemption case, is in accord with *VW Va.*  In *McClellan*, the plaintiff sued a medical device manufacturer.  Medical devices such as the one at issue in *McClellan* were regulated under the Medical Device Amendments of 1976 (MDA) to the Food, Drug & Cosmetics Act (FDCA).  "The MDA requires that manufacturers provide the U.S. Food and Drug Administration with 'reasonable assurance of the safety and effectiveness' of a device prior to marketing and sale."  *McClellan*, 776 F.3d at 1037-38.  The plaintiff in *McClellan*, however, did not sue the medical device manufacturer for any violation of the MDA but rather for violations of state law only – namely, negligence and strict products liability.

At trial, the plaintiff asked the court to give certain instructions, including instructions telling the jury to consider statutes and regulations in determining reasonable care and instructions related to federal law.  The district court refused to give the instructions based on obstacle preemption.  *See id.* at 1039  (noting that obstacle preemption (a kind of conflict preemption) arises "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (internal quotation marks omitted).  On appeal, the Ninth Circuit disagreed.

The Ninth Circuit noted first that a presumption against preemption applied because "[t]he

regulation of medical devices prior to the MDA 'was left largely to the States to supervise as they

saw fit.'"  *Id.* at 1040.  The Ninth Circuit then acknowledged a Supreme Court case, *Buckman Co.*

*v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), which also involved a medical device and where

conflict preemption was found, but explained that *Buckman* was distinguishable.  While *Buckman*

reflected that "Congress intended that the MDA be enforced exclusively by the Federal

Government,'" *McClellan*, 776 F.3d at 1040, the *Buckman* Court found conflict preemption only

because the fraud claims at issue – asserting fraud on the FDA – "'exist[ed] *solely* by virtue of the

FDCA disclosure requirements.'"  *Id.* (emphasis in original).  "'[W]ere [the *Buckman*] plaintiffs to

maintain their fraud-on-the-agency claims . . . , they would *not* be relying on traditional state tort

law which had predated the federal enactments in question.  On the contrary, the existence of these

federal enactments is a critical element in their case.'"  *Id.* (emphasis added).

     In contrast, in *McClellan*, the plaintiff's claim for a negligent failure to warn "did not arise

solely by virtue of the MDA."  In addition, there was "no suggestion that Congress intended to

displace traditional tort law by making all policing of medical labels and warnings the exclusive

province of the FDA."  *Id.* at 1040-41.  Finally, the Ninth Circuit underscored that the plaintiff's

> requested instructions would not usurp the exclusive federal
> enforcement power over the MDA.  The allegations at issue occur
> outside the context of the regulatory process, unlike in *Buckman*.
> Where the plaintiff in Buckman alleged that the defendant made
> fraudulent representations during the market approval process, to the
> FDA, McClellan's requested instructions here have little to do with
> direct regulatory interaction with the FDA.  *The appellees would
> have us conclude that any use of federal law to establish a standard
> of care is an attempt to enforce the underlying federal provisions,
> but we do not accept that proposition.*

*Id.* at 1041 (emphasis omitted and added).

     As noted above, in the case at bar, Plaintiffs do not assert that violation of federal emission

standards establishes *per se* their affirmative misrepresentation claims; rather, the gravamen of the

affirmative misrepresentation claims is that Defendants deceived consumers.  Thus, the fraud

claims here do not arise "solely by virtue of" noncompliance with FAA emissions rules; they arise

out of the alleged deceit practiced on consumers by Defendants.  Moreover, the affirmative

misrepresentation claims, as in *VW Va.*, may be established even if there is no violation of federal

United States District Court
Northern District of California

78

1    regulations.

2           Defendants' reliance on *Detroit Diesel*, 269 A.D.2d at 1, and *Jackson v. GMC*, 770 F.

3    Supp. 2d 570 (S.D.N.Y. 2011), is unavailing.  *Detroit Diesel* is materially distinguishable.  There,

4    the attorney general ("AG") of New York issued subpoenas to car and car parts manufacturers.

5    The subpoenas were issued on the same day that the federal government filed a complaint against

6    the manufacturers, as well as consent decrees resolving the case.  The federal government had

7    taken the position that the manufacturers used defeat devices in the cars at issue, which used

8    heavy-duty diesel engines.  The New York AG's subpoena sought, *inter alia*,

9                 all testing data generated by each manufacturer in connection with
                  its compliance with Federal emissions standards; all documents
10                provided to the EPA with respect to that agency's recently
                  concluded investigation of electronic engine controls for [heavy-
11                duty diesel engines]; all correspondence between petitioners and
                  either the EPA or the Department of Justice relating to the Federal
12                investigation and the negotiations which led to the execution of the
                  consent decrees; and all submissions by petitioners in response to
13                EPA's order to show cause concerning their compliance with the
                  Federal emissions standards.
14

15    *Detroit Diesel*, 269 A.D.2d at 4.  The AG indicated that documents obtained through the subpoena

16    would be used to support New York's public comments regarding the federal consent decrees or to

17    support a motion to intervene in federal court.  *See id.*

18           The manufacturers moved to quash the subpoenas, invoking the CAA's preemption

19    provision (*i.e.*, § 209(a)).  The state court agreed with the manufacturers that the AG was barred

20    from issuing and enforcing the subpoenas because the CAA preemption provision stated that

21    "'[n]o state . . . shall adopt *or attempt to enforce* any standard relating to the control of emissions

22    from new motor vehicles.'"  *Id.* at 10 (emphasis in original).  Given the AG's indication that it

23    would use subpoenaed documents to comment on the federal consent decrees or intervene in

24    federal court, this ruling was understandable.  This can easily be characterized as a direct attempt

25    to enforce the federal emissions standard.  As the Court in *VW Va.* noted in distinguishing *Detroit

26    Diesel*, the claims there "sought to recover for injuries from the alleged noncompliance itself, or

27    alleged fraud based on statements or representations made to federal regulators," not deceptive

28    representations made to consumers.  *VW Va.*, 94 Va. Cir. at 196; *see also Counts*, 237 F. Supp. 3d

United States District Court
Northern District of California

79

at 591.

To be sure, the state court in *Detroit Diesel* went on to find that there was also preemption of common law claims (not just the subpoenas).  Apparently, the AG invoked the prospect of common law claims in support of his actions.  According to the AG, such common law actions for damages (including fraud and breach of warranty) would not be preempted by the CAA.  *See id.* at 5, 10-11.  The state court disagreed, rejecting the AG's position that "Congress, in enacting the CAA, simply sought to preempt the State enforcement of numerical emission standards and/therefore, the States remain free to enforce statutory and/or common-law requirements other than emission standards."  *Id.* at 10-11.  In support of this ruling, the state court pointed to Supreme Court authority noting that "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief.  The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."  *Id.* at 11 (internal quotation marks and emphasis omitted).  The court continued:

> In pursuing the common-law claims, the Attorney General is not, as he suggests, attempting to enforce an existing State standard or pursue a simple common-law claim but, rather, is seeking to use this State's common law to penalize the manufacturers for producing engines *which failed to comply with the Federal standards promulgated pursuant to the CAA*.  In doing so, the Attorney General is attempting to enforce those standards[,]

*id.* (emphasis added), and so CAA preemption applied.

The state court's holding on the common law claims, however, should be taken in context.  The state court's ruling on the common law claims appears to have been informed by the AG's issuance of subpoenas.  That is, the state court essentially indicated that it would not allow form to be elevated over substance; even though the AG was invoking common law claims, the reality – at bottom – was that the AG was trying to enforce federal emissions standards, *i.e.*, to penalize the defendants for not complying with such standards.  Again, this appeared to be an attempt to directly enforce federal standards.

To the extent *Detroit Diesel* went further than this – *e.g.*, holding that there was preemption simply because "the predicate acts underlying the claim[s] [for, *e.g.*, fraud] involve alleged violations of Federal emissions standards," *id.* at 12 (stating that "liability would

1    necessarily be based on the scope of [federal emissions] standards") – the Court does not find the

2    case persuasive authority for two reasons.

3         First, as noted above, Plaintiffs in the instant case need not prove noncompliance with the

4    CAA to prove their affirmative misrepresentation claims.

5         Second, even if noncompliance with the CAA due to the emissions defect were essential to

6    Plaintiffs' fraud claim, as noted above, the gravamen of their complaint is not failure to comply

7    with the CAA but rather deceit about compliance.  Noncompliance alone would not establish a

8    common law fraud claim; deceit must be shown.  In this regard, the Court finds *VW Va.* more

9    persuasive than *Detroit Diesel*.

10        The Court also finds the *Jackson* case cited by Defendants unpersuasive.  There, the

11   plaintiffs were employees of the New York Transit Authority (*e.g.*, employed as bus drivers,

12   mechanics, etc.).  They sued manufacturers of urban transit buses and diesel engines, claiming

13   injury as a result of their ingestion of harmful diesel exhaust fumes.  The plaintiffs' claims

14   included claims for negligence and strict product liability.  According to the plaintiffs, the

15   defendants were negligent because, *e.g.*, the vehicles did not meet emissions standards of the

16   CAA; also, with respect to strict product liability, the design of the buses violated CAA emissions

17   standards.

18        The *Jackson* court held that the plaintiffs' claims were preempted by the CAA.  Like the

19   *Detroit Diesel* court, the *Jackson* court focused on the "attempt to enforce" language in the CAA

20   preemption provision (§ 209(a)): "As 'it is the essence of the common law to *enforce* duties . . . ,'

21   it is clear that a state common law action that questions whether a defendant complied with

22   standards promulgated under the CAA is an example of a state attempting to enforce the CAA,

23   and is therefore subject to preemption."  *Jackson*, 770 F. Supp. 2d at 575 (emphasis in original).

24        The court added that the CAA preemption provision had language similar to that in the

25   Airline Deregulation Act of 1978.

26             Under the ADA's preemption provision, states are expressly
               preempted from "enact[ing] or enforc[ing] a law, regulation, or other
27             provision having the force and effect of law related to a price, route,
               or service of an air carrier . . . ."  In *Morales v. Trans World*
28             *Airlines*, 504 U.S. 374, 383-84 (1992), the Supreme Court held that,

United States District Court
Northern District of California

81

> as a result of such language, "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted," and the Second Circuit has held that state common law tort actions come within the meaning of this rule. As a result, by analogy to the ADA's preemption provision, § 209(a)'s language unambiguously and expressly preempts state common law tort actions, provided that they "relate to" the control of emissions.

*Id.* at 576. Finally, the *Jackson* court took note of the *Detroit Diesel* court's ruling on preemption of common law claims. *See id.*

Similar to above, *Jackson* is distinguishable from the instant case. In *Jackson*, the common law claim was based on injury resulting from noncompliance with federal emissions standard. In contrast, in the instant case, the injury from the misrepresentation claims is based on the deceptive act of Defendants, not the noncompliance with federal emissions standards *per se* – the alleged injury flows not directly from the violation of the CAA, but from Defendants' deceit. Again, *VW Va.*'s analysis in this regard distinguishing *Jackson* is persuasive. *See VW Va.*, 94 Va. Cir. at 196 (noting that the plaintiffs in *Jackson*, as well as *Detroit Diesel*, "sought to recover for injuries from the alleged noncompliance itself, or alleged fraud based on statements or representations made to federal regulators").

Furthermore, the only new point added by the *Jackson* court was that the CAA could be analogized to the ADA, as both statutes' preemption provisions referred to no state enforcement. But the CAA is not the ADA; a court must look not only to the text of a provision but also its "surrounding statutory framework[] and Congress's stated purposes in enacting the statute to determine the proper scope of an express preemption provision." *Chae*, 593 F.3d at 942; *see also Medtronic*, 518 U.S. at 485 (stating that interpretation of statutory "language does not occur in a contextual vacuum"). Congress's findings and declaration of purpose for the CAA highlighted the importance of state action in controlling air pollution. For example:

- "The Congress finds . . . that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

- "The purposes of this title are [*inter alia*] to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the

1  productive capacity of its population." *Id.* § 7401(b)(1).

2  • "A primary goal of this Act is to encourage or otherwise promote reasonable Federal,

3  State, and local governmental actions, consistent with the provisions of this Act, for

4  pollution prevention." *Id.* § 7401(c).

5  Notably, nothing in § 7401 of the CAA suggests that there was an intent on the part of Congress to

6  displace traditional tort law simply because it might implicate air pollution control. *Cf.*

7  *McClellan*, 776 F.3d at 104 (stating that "there is no suggestion that Congress intended to displace

8  traditional tort law by making all policing of medical labels and warnings the exclusive province

9  of the FDA"). Indeed, the text of the CAA preemption provision is reasonably susceptible to a

10  narrow reading – *i.e.*, that only direct state enforcement of federal emissions standards (wherein

11  violation of federal standards is the *sine qua non* of the state claim) is barred, not state

12  enforcement of other laws focused on other wrongful conduct which merely refer to federal

13  emissions standards. *See McClellan*, 776 F.3d at 1039 (stating that, "'when the text of a pre-

14  emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the

15  reading that disfavors preemption"'). *Jackson* as well as *Detroit Diesel* did not appear to take this

16  consideration into account in reaching their holdings.

17  Accordingly, the affirmative misrepresentation claims are not expressly preempted.

18        b.    <u>Fraudulent Concealment Theory</u>

19  Likewise, the Court concludes that Defendants' fraudulent concealment claims are not

20  subject to express preemption. The fraud at issue here is Defendants' concealment of the fact that

21  the Class Vehicles had devices that permitted excessive pollution. Similar to above, there is no

22  preemption here because the gravamen of Plaintiffs' complaint still is Defendants' deceit, not the

23  violation *per se* of federal emissions standards, and thus this is not an attempt to enforce an

24  emissions control standard.

25  In addition, there is no preemption here because Plaintiffs need not prove a violation of the

26  CAA. For example, Plaintiffs need not prove that the devices that permit excessive pollution meet

27  the formal definition of "defeat device" under the federal regulations. The regulations define

28  "defeat device" as

United States District Court
Northern District of California

an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1) Such conditions are substantially included in the Federal emission test procedure;

(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident;

(3) The AECD does not go beyond the requirements of engine starting; or

(4) The AECD applies only for emergency vehicles and the need is justified in terms of preventing the vehicle from losing speed, torque, or power due to abnormal conditions of the emission control system, or in terms of preventing such abnormal conditions from occurring, during operation related to emergency response. . . .

40 C.F.R. § 86.1803-01.

To prove their fraudulent concealment claims, it is not necessary that Plaintiffs establish that the "defeat devices" in the Class Vehicles meet the above definition – including but not limited to proof that these devices did not fall within the scope of the exceptions identified in the regulation.  *See Duramax*, 2018 U.S. Dist. LEXIS 26543, at *40, 43 n.14 (noting that "Plaintiffs can prevail on their [fraud] claims without proving the existence of a 'defeat device' as that term is defined by the EPA"; adding that "defeat device" is a "term that has entered the common parlance" such that not "every use of the term . . . necessarily involves a reference to [the EPA] regulatory definition").  Rather, Plaintiffs may simply prove that there was an EDC unit installed in their Class Vehicles such that the emissions controls for the EcoDiesel engines did not operate as one would expect during normal driving use and would result in more pollution than a reasonable consumer might expect from an eco-friendly vehicle.  In short, Plaintiffs could have claims for relief independent and irrespective of the more granular regulation of defeat devices.[12]

_____

[12] To be sure, the issue of preemption for the fraudulent concealment theory presents a closer call than the affirmative misrepresentation theory.  If the fraudulent concealment rested solely on concealment of Defendants' violation of federal regulations (*e.g.*, use of a defeat device within the meaning of 40 C.F.R. § 86.1803-01),  hence making a federal regulatory violation the *sine qua non* of the state tort claim, then a finding of no preemption would rest on just one of *VW Va.*'s two pillars – the fact that the gravamen of the complaint still focused on deceit of consumers, not the

84

*United States District Court*
*Northern District of California*

In reaching its holding, the Court acknowledges that, in *VW Wyo.*, Judge Breyer held that Wyoming's claims for violation of state-promulgated anti-tampering and concealment rules were preempted by the CAA.[13]  The anti-tampering rule provided that no person shall intentionally remove, alter, or otherwise render ineffective or inoperative any air pollution control device or system which has been installed as a requirement of federal law.  *See VW Wyo.*, 264 F. Supp. 3d at 1045.  The anti-concealment rule provided that no person shall cause or permit the installation or use of any device, etc. which, without resulting in reduction of the total amount of air contaminant released to the atmosphere, shall dilute or conceal an emission from a source.  *See id.*  Judge Breyer held that the state-promulgated rules were attempts to enforce a standard relating to emissions control (for purposes of § 209(a)) because (1) the Supreme Court has stated that a standard relating to emissions control includes requirements that a vehicle or engine must be equipped with a certain type of pollution control device or must have some other design feature related to the control of emissions, *see id.* at 1050, 1052, and (2) "[a]lthough the relevant SIP [state implementation plan] provisions do not use the term 'defeat device,' their application here is ultimately predicated on Volkswagen installing such a device in its 'clean diesel' vehicles during manufacturing."  *Id.* at 1055.

*VW Wyo.*, however, is distinguishable from the instant case.  In *VW Wyo.*, the conduct prohibited by the state-promulgated rules involved attempts to circumvent directly federal emissions standards.  This could readily be characterized as the state's direct enforcement of federal emissions standards.  As stated above, here, the fraud-on-consumers claims do not represent such direct enforcement; the element of Defendants' deceit of consumers still must be proven.  Judge Breyer's opinion cannot be read more broadly as preempting fraud claims simply because the fraud references misrepresentation about compliance with federal law; as Judge Breyer noted, "Wyoming is not attempting to hold Volkswagen liable for deceptive statements

federal regulatory violation itself.

[13] In *State of Alabama v. Volkswagen AG*, No. 01-CV-2016-903390.00 (available at Docket No. 267-1), an Alabama state court reached a similar conclusion.

85

United States District Court
Northern District of California

1   made to the State's residents." *Id.* at 1056.[14]

2          c.      Summary

3          For the foregoing reasons, the Court concludes that Plaintiffs' fraud-on-consumer claims –

4   whether based on an affirmative misrepresentation theory or a fraudulent concealment theory – are

5   not expressly preempted by § 209(a) of the CAA.

6          2.      Field Preemption

7          Even if the Court does not find express preemption, it must still consider whether there is

8   any implied preemption of Plaintiffs' state claims.  For both kinds of implied preemption – field

9   and conflict – there is a presumption against preemption in the instant case because the Court is

10  dealing with areas in which the states have traditionally acted – *i.e.*, air pollution, health and

11  safety, and consumer protection.  The Ninth Circuit has emphasized that, when a court "deal[s]

12  with an area in which states have traditionally acted, [it must] start with the assumption that a

13  state's historic police powers will not be superseded absent a '*clear and manifest* purpose of

14  Congress.'"  *Chae.*, 593 F.3d at 944 (emphasis added); *see also Atay v. Cty. of Maui*, 842 F.3d

15  688, 699 (9th Cir. 2016) (noting that, "[p]articularly where a statute regulates a field traditionally

16  occupied by states, . . . a 'presumption against preemption' adheres").  *See, e.g.*, *id.* (stating that

17  "health, safety, and land use are fields "traditionally occupied by states"); *Chae*, 593 F.3d at 944

18  (stating that "[c]ontract and consumer protection laws have traditionally been in state law

19  enforcement hands"); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir.

20  2011) (stating that "[s]tates have long sought protect their own residents from the undisputedly

21  harmful effects of air pollution and other forms of environmental harms"; adding that, "[g]iven the

22  'historic presence of state law' in the area of air pollution, we apply the well-established

23  presumption or assumption against preemption").

24         In applying the presumption against preemption in the instant case, the Court

25

26  [14] Defendants have not argued that Plaintiffs' fraudulent concealment theory is preempted because
    it runs up against § 209(a)'s provision that "'[n]o State . . . shall *adopt* . . . any standard relating to
27  the control of emissions from new motor vehicles.'"  42 U.S.C. § 7543(a) (emphasis added).  But
    even if Defendants had made such an argument, it would not be persuasive because, under the
28  fraud claim herein, the states are not adopting a particular emissions standard but instead
    sanctioning misrepresentations and deceit by Defendants.

86

United States District Court
Northern District of California

1    acknowledges Judge Breyer's statements in *VW Wyo.* – *e.g.*, that, "although environmental

2    regulation 'traditionally has been a matter of state authority,' the Clean Air Act and amendments

3    have made 'the States and the Federal Government partners in the struggle against air pollution,'"

4    *VW Wyo.*, 264 F. Supp. 3d at 1049 (quoting *Jensen*, 644 F.3d at 938), and that, "[w]ith respect to

5    emissions from stationary sources, States still have substantial discretion to set and enforce

6    pollution standards[,] [b]ut the regulation of motor-vehicle emissions has become 'a principally

7    federal project.'" *Id.* (quoting D.C. Circuit case, *EMA*, 88 F.3d at 1079).

8         However, these points do not alter the fact that air pollution is still an area in which the

9    states have traditionally acted, a point that Judge Breyer acknowledged as he still applied the

10    presumption against preemption in *VW Wyo. See id.* at 1048 ("applying the above interpretive

11    framework (including the presumption against preemption) in determining whether the Clean Air

12    Act bars Wyoming's claims").  Moreover, the presumption against preemption in the instant case

13    applies not only because air pollution and health and safety are at issue, but also because the case

14    concerns consumer protection, another area falling within the traditional powers of the state.

15    Unlike the instant case, *VW Wyo.* did not involve an "attempt[] to hold [the car manufacturer]

16    liable for deceptive statements made to the State's residents." *Id.* at 1056.

17         Taking into consideration the above, the Court now turns to the issue of field preemption.

18         Under . . . field preemption, "the States are precluded from
regulating conduct in a field that Congress, acting within its proper
19         authority, has determined must be regulated by its exclusive
governance."  Field preemption can be "inferred from a framework
20         of regulation 'so pervasive . . . that Congress left no room for the
States to supplement it' or where there is a 'federal interest . . . so
21         dominant that the federal system will be assumed to preclude
enforcement of state laws on the same subject.'"

22

23    *Valle Del Sol*, 732 F.33d at 1022-23.

24         "The regulation of immigration is the quintessential example of field preemption."  *United

25    States v. S. Carolina*, 840 F. Supp. 2d 898, 913 (D.S.C. 2011); *see also Pharm. Research & Mfrs.*

26    *of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 64-65 (D.D.C. 2005) (noting that, "[i]n *Hines*

27    the Supreme Court found that the immigration system that Congress had enacted in regard to the

28    registration of aliens was enacted in order to create 'one uniform national registration system,' and

87

that the federal regulation was such that a state law could not be enforced when it interfered with the congressional regulation").  Other examples of field preemption relate to the regulation of air safety, labor disputes, and pension disputes.  *See Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2010) (addressing air safety); *Schoeffler-Miller v. Nw. Airlines, Inc.*, No. 08-cv-4012, 2008 U.S. Dist. LEXIS 93851, at *6 n.1 (C.D. Ill. Nov. 17, 2008) (referring to the Labor Management Relations Act and the Employee Retirement Income Security Act).  Outside of these areas, field preemption is rare.

Here, it is clear that Congress did not intend to occupy the field to the extent the field is defined (broadly) as motor vehicle emissions:  "The CAA's express preemption provision [§ 209(a)] is followed by a savings clause which explicitly states that 'Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles [§ 209(d)].'"  *In re Caterpillar, Inc.*, MDL No. 2540, 2015 U.S. Dist. 98784, at *47-48 (D.N.J. July 29, 2015) (quoting § 209(d) of the CAA, *i.e.*, 42 U.S.C. § 7543(d)).  In *Caterpillar*, the court emphasized that, even with "the breadth of federal regulation in the area, the savings clause suggests that Congress did not intend to occupy the entire field of motor vehicle regulation. Instead, the text of the Act explicitly contemplates continued state involvement in the regulation of motor vehicles."  *Id.* at *48.

Left with this predicament, Defendants suggest a narrower field for field preemption – *i.e.*, that there is field preemption with respect to *new* motor vehicle emissions (as opposed to *registered* or *licensed* which fall under the rubric of § 209(d)).  *See* FCA/VM Mot. at 46. Defendants take note that, in *Washington v. GM Corp.*, 406 U.S. 109 (1972), the Supreme Court stated: "Congress has largely preempted the field with regard to 'emissions from new motor vehicles' and motor vehicle fuels and fuel additives."  *Id.* at 114.  But this statement was *dicta*.  In *Washington*, multiple states asked for leave to file a bill of complaint with the Supreme Court based on allegations that the country's four major car manufacturers and their trade association had conspired to restrain the development of motor vehicle air pollution control equipment.  The Supreme Court agreed that it had jurisdiction over the controversy but nevertheless denied leave to

file the bill of complaint because of "the availability of the federal district court as an alternative

forum and the nature of the relief requested," *i.e.*, "corrective remedies . . . must be considered in

the context of localized situations." *Id.* at 114.  The Supreme Court was never called upon to

make and never made a preemption ruling but rather only made reference (in passing) to Congress

"largely" preempting the field in, *e.g.*, new motor vehicle emissions, seemingly as part of its

broader point that both the federal and the state governments played roles in addressing air

pollution.  *See also Exxon Corp. v. New York*, 548 F.2d 1088, 1095 n.12 (2d Cir. 1977) (noting

that the above statement from *Washington* was *dicta*).  In any event, that Congress "largely"

preempted the field does not equate to field preemption which necessarily means the *entire* field.

Because Defendants have failed to cite any other authority in support of its position that the field

of new motor vehicle emissions has been preempted, the presumption against preemption obtains

here.  There is no clear and manifest intent by Congress to apply implied field preemption.  *See

Chae*, 593 F.3d at 944 (stating that, when a court "deal[s] with an area in which states have

traditionally acted, [it must] start with the assumption that a state's historic police powers will not

be superseded absent a '*clear and manifest* purpose of Congress'") (emphasis added).  And, as

discussed above, the gravamen of Plaintiffs' pleading is Defendants' deceit, not their failure to

comply with new motor vehicle emissions standards.  Nothing suggests Congress intended to

broadly preempt the field of deception, even deception which pertains to emissions.  Thus, the

Court finds no field preemption under the CAA.

### 3.    Conflict Preemption

Like field preemption, conflict preemption is a kind of implied (as opposed to express)

preemption.  There are two kinds of conflict preemption: (1) impossibility preemption and (2)

obstacle preemption.  "Courts find impossibility preemption 'where it is impossible for a private

party to comply with both state and federal law.'  Courts will find obstacle preemption where the

challenged state law 'stands "as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress."'" *Valle Del Sol*, 732 F.3d at 1023.  Regarding

impossibility preemption, there is no such preemption where a state requirement falls within (*i.e.*,

does not exceed) a federal requirement.  *See Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1231 (9th

United States District Court
Northern District of California

1   Cir. 2012).  Regarding obstacle preemption, a court "discern[s] congressional objectives by

2   'examining the federal statute as a whole and identifying its purpose and intended effects.'"  *Chae*,

3   593 F.3d at 943.

4            Defendants do not argue impossibility preemption but rather only obstacle preemption.

5   Defendants contend that the CAA has an "'integrated scheme of regulation'" – one that even

6   contemplates a suit by a private citizen "to enforce its provisions [albeit] only if the EPA has *not*

7   brought suit 'to require compliance with the standard, limitation, or order' at issue, or is not

8   diligently prosecuting such action."  FCA/VM Mot. at 46-47 (emphasis in original).  Defendants

9   maintain that, given this prescribed scheme of enforcement, Plaintiffs' claims – which seek to

10  impose remedies beyond those contemplated by federal law – present an obstacle to the

11  enforcement of the CAA.  The problem with Defendants' position is that it is predicated on the

12  assumption that Plaintiffs are seeking remedies "for the same conduct that the EPA is charged

13  with addressing."  FCA/VM Mot. at 46.  As discussed above, for the fraud-on-consumer claims,

14  Plaintiffs need not prove any CAA violation in order to prove up their claims.  More important,

15  the gravamen of the complaint is Defendants' deceit; they are not attempting directly to enforce

16  the CAA.  Instead, they seek to recover tort law for wrongful conduct that at most references in

17  part the CAA.  *See also Duramax*, 2018 U.S. Dist. LEXIS 26543, at *48-49 (noting that "[t]he

18  EPA is asked with *environmental* protection, not *consumer* protection" and "Defendants have not

19  provided 'any basis to conclude[] that a significant federal regulatory goal of the CAA is

20  consumer protection from false advertising claims regarding emissions compliance, vehicle

21  efficiency, or implementation of new emissions technology'") (emphasis in original).

22  C.       Common Law Fraud Claims

23           Having concluded that the fraud-on-consumer claims (whether based on common law

24  fraud or violation of consumer protection statutes) are not preempted, the Court now turns to

25  Defendants' specific challenges to the claims for common law fraud.  Many, but not all, arguments

26  are directed at the fraudulent concealment theory specifically.

27           1.       Damages

28           To the extent Defendants argue that Plaintiffs have failed to adequately plead damages for

90

common law fraud (whether an affirmative misrepresentation or fraudulent concealment), the

Court does not agree.  Plaintiffs' allegations of damages are not speculative.  *See* Part II.A, *supra*

(addressing injury-in-fact); Part III.A.1, *supra* (addressing RICO injury).

### 2. Intent to Deceive

The Court also rejects Defendants' contention that Plaintiffs have failed to adequately

plead an intent to deceive (whether the theory is an affirmative misrepresentation or fraudulent

concealment).  Plaintiffs have sufficiently pled factual allegations from which a trier of fact could

reasonably infer an intent to deceive by each of the named defendants.  *See* Part III.B.1.a-b, *supra*.

### 3. Affirmative Misrepresentation Theory: Puffery

Defendants argue still that, to the extent Plaintiffs have identified any misleading

advertising, that advertising amounts to puffery which is not actionable.  This argument, of course,

applies to Plaintiffs' affirmative misrepresentation theory only, and not any theory of fraudulent

concealment (which is not predicated on any advertising).  And, as currently pled in the operative

complaint, the only affirmative misrepresentation at issue is the use of the logo "EcoDiesel" on the

Class Vehicles.

As a preliminary mater, the Court notes that puffery is generally characterized as a

statement of opinion, as opposed to a statement of fact, on which no reasonable consumer would

rely.  *See, e.g.*, *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 311 (2014) (California) (noting

that "'[a] a statement is considered puffery if the claim is extremely unlikely to induce consumer

reliance'").[15]  In addition, whether a statement is deemed puffery is generally considered a

---

[15] Neither party contends there is a substantial variation in the state's laws on this issue.  *See also*:

- *Park Rise Homeowners Ass'n v. Resource Constr. Co.*, 155 P.3d 427, 435 (Colo. Ct. App. 2006) (Colorado) (indicating that puffing is the "'expression of an exaggerated opinion – as opposed to factual representations – with the intent to sell a good or service'") (quoting Black's Law Dictionary);
- *Totz v. Continental Du Page Acura*, 602 N.E.2d 1374, 1383 (Ill. Ct. App. 1992) (Illinois) (noting that "[a] contention that statements about a product or service constitute puffing is, in effect, an argument that they were nonactionable statements of opinion as opposed to representations of fact"; adding that "[w]hether a representation will be considered a statement of opinion or a factual representation may depend upon the circumstances of the case" – *e.g.*, "[i]f an individual makes a statement that might otherwise be considered an opinion, but does not specifically express it as his or her opinion, the statement will be considered a factual representation if it would be reasonable for the other party to treat it as

United States District Court
Northern District of California

question of fact, not law, although there are instances in which the answer is so clear that the issue

may be decided as a matter of law (*i.e.*, a reasonable trier of fact could reach only one conclusion

based on the facts alleged and all reasonable inferences in favor of the plaintiff).  *See, e.g.*, *Peviani*

*v. Natural Balance, Inc.*, 774 F. Supp. 2d 1066, 1072 (S.D. Cal. 2011) (California) (denying

motion to dismiss with respect to defendant's argument that representations at issue constituted

nonactionable puffery).[16]

---

such");
- *Lingar v. Live-In Companions, Inc.*, 692 A.2d 61, 64 (N.J. Super. Ct. 1997) (New Jersey) (indicating that puffery is an "'exaggerated claim[] of quality'" or an "'unactionable [declaration] of opinion'" as opposed to a statement "'susceptible of personal knowledge'" and "represented in such a way 'that the consumer could reasonably treat [it] as [a declaration] of fact'");
- *Davis v. Byers Volvo*, No. 11CA817, 2012 Ohio App. LEXIS 752, at *25 (Ohio Ct. App. Feb. 24, 2012) (Ohio) (stating that "[p]uffery is generally defined as exaggerated blustering or subjective boasting upon which no reasonable consumer would rely") (internal quotation marks omitted);
- *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 97 (Tenn. Ct. App. 1996) (Tennessee) (indicating that puffing is a "mere statement[] of opinion" or "loose general sales talk" as opposed to "a misrepresentation of a material fact . . . upon which the consumer is expected to justifiably rely");
- *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462-63 (Tex. Ct. App. 1990) (Texas) (taking note of considerations as to whether a statement is puffing or opinion – *e.g.*, the specificity of the statement (with "[i]mprecise or vague representations [being] mere opinions") and the knowledge of the buyer and seller (evaluating "whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment")).

*Cf. Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (in Lanham Act case, noting that "puffing" is "'exaggerated advertising, blustering and boasting upon which no reasonable buyer would rely'").

[16] *See also*:

- *Uop v. Consulting*, CV 950145753, 1997 Conn. Super. LEXIS 1090, at *4 (Conn. Super. Ct. Apr. 24, 1997) (Connecticut) (stating that "[t]he determination as to whether a statement is puffery is generally a question of fact").
- *Giles v. Inflatable Store, Inc.*, No. 07-cv-00401-PAB-KLM, 2009 U.S. Dist. LEXIS 28382, at *9 n.4 (D. Colo. Apr. 6, 2009) (Colorado) ("find[ing] that, if a statement allegedly constituting a deceptive trade practice can reasonably be construed as both fact and opinion, whether it is non-actionable puffery is properly a question of fact for the jury").
- *Bitters v. Golden Lakes Vill. Condo. Ass'n*, No. 50 2011 CA 019486 MB, 2013 Fla. Cir. LEXIS 1153, at *2 (Fla. Cir. Ct. Feb. 14, 2013) (Florida) (stating that the "argument that any statements concerning the safety and security of the community was mere puffery" simply "raises a material question of fact for the jury").
- *Evolution, Inc. v. Suntrust Bank*, 342 F. Supp. 2d 964, 972-73 (D. Kan. 2004) (Kansas) (denying "plaintiff's motion for summary judgment on the basis that plaintiff's statements were mere puffery").

Given the above parameters, the Court rejects Defendants' puffery and related arguments. First, contrary to what Defendants argue, it is plausible that a reasonable consumer would understand "EcoDiesel" to mean environmentally friendly or reduced emissions.  While it is also plausible that a reasonable consumer would simply understand "EcoDiesel" to mean good fuel economy (as Defendants maintain), the fact that there is an equally plausible interpretation in Plaintiffs' favor means that Plaintiffs survive a 12(b)(6) challenge.  *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (noting that, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)[;] [p]laintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible") (emphasis in original).

Second, to the extent that Defendants contend that a claim of "environmentally friendly" should still be deemed puffery, this argument cannot be adjudicated as a matter of law at this

---

- *Keel v. Toledo Harley-Davidson/Buell*, 920 N.E.2d 1041, 1046 & n.2 (Ohio Ct. App. 2009) (Ohio) (stating that there was still a genuine issue of material fact as to whether defendant made representations beyond mere puffing; adding that "[w]hether a representation is deceptive or just puffing depends on the comment and the context in which it was made").
- *Yuzwak v. Dygert*, 144 A.D.2d 938, 939 (N.Y. Supreme Ct. 1988) (New York) (noting that whether a representation by a seller is puffery "is almost always a question of fact for a jury's resolution").
- *Peterson v. N. Am. Plant Breeders*, 354 N.W.2d 625, 629-30 (Neb. 1984) (Nebraska) (finding that whether statements made by defendant constituted puffery was a fact question).
- *Union Ink Co. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002) (New Jersey) (stating that "[w]hether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact").
- *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 836 N.W.2d 807, 819-20 (Wis. 2013) (Wisconsin) (stating that "[a] number of courts have refrained from drawing a bright line around puffery in terms of whether it presents a question of fact or of law, recognizing, as we do, that while it is usually a question of fact it can at times be a question of law, and that courts should apply the usual summary judgment standard to figure out which label fits more closely in a given case").

*Cf. Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (in Lanham Act case, stating that "the determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion[;] [a] statement is considered puffery if the claim is extremely unlikely to induce consumer reliance"); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Coll. Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (in Lanham Act case, noting that the court could "determine as a matter of law whether this alleged misrepresentation is a statement of fact, actionable under the Lanham Act, or mere puffery").

United States District Court
Northern District of California

stage.  At this point in the proceedings, Plaintiffs need only prove that it is plausible that the "EcoDiesel" representation is not a representation that is "'extremely unlikely to induce consumer reliance.'"  *Demetriades*, 228 Cal. App. 4th at 311; *see also* note 13, *supra*.  This is especially so where, as alleged, the Class Vehicles can at times omit NOx at 20 times the federal standard. Plaintiffs' allegations suffice.  "[A]dvertising statements placed in an ad knowing or intending that they are of the type that will affect the consumer's judgment, are not puffery, but rather constitute actionable representations."  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1253 (D. Ariz. 1981) (addressing the analogous federal Lanham Act) (internal quotation marks omitted).  Here, it is a reasonable inference that Defendants marketed the Class Vehicles as "EcoDiesel" intending and expecting to cash in on the consumer interest in "green" products.  Notably, the representation that the Class Vehicles were environmentally friendly is different in nature from the representations that are generally deemed puffery – classic examples being a vague advertising claim that one's product is better than a competitor's or a boastful, exaggerated description of a product.  *See, e.g.*, *Davis*, 2012 Ohio App. LEXIS 752, at *26-27 (noting that, "[i]n general, '[m]ost statements of puffery consist of vague advertising claims that one's product is better than comparable products offered by competitors'" and "[e]xamples of puffery include 'boastful assertions and exaggerated descriptions,' such as 'luxuriously soft,' 'the real McCoy,' and 'classic detail'"); *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 333 (Ind. 2013) (taking note of a prior case in which court held that "'top quality seeds' was 'a classic example of puffery' because it 'contains no definitive statement as to how the product is warranted or any assertion of fact concerning the product, but is merely the opinion of' the seller[;] [b]ut 'high vitality, vigor[,] and germination' could constitute a warranty, because it was 'a promise that the seeds will perform in a certain manner,' not merely the seller's opinion").

The Court acknowledges that a district court reached a different result in a similar case.  In *Counts*, the court held at the 12(b)(6) phase that "[s]tatements of cleanliness convey 'inherently subjective' concepts and thus 'constitute[] nonactionable opinion[s].'"  *Counts*, 237 F. Supp. 3d at 597; *see also id.* at 598 (noting that nothing about "clean diesel" is quantifiable).  The court also held that that a "claim regarding 90% less emissions, although it includes a statistic, is not

1   quantifiable by itself" and therefore could not be the basis of a fraud claim.  *Id.* (stating that

2   "assertions that a product has '90% less emissions' raises the question: 90% less than what?").

3   But *Counts* is not binding authority on this Court, and the Court does not find *Counts* persuasive

4   on this point.  The touchstone of the puffery analysis is not whether a particular representation is

5   quantifiable, but the likelihood that reasonable consumers would rely on that representation.

6   Quantifiability is one factor, but there are others which may affect consumers' reaction and

7   reliance.  In this regard, the record is sparse, and puffery cannot at this juncture be decided as a

8   matter of law.

9         Accordingly, the Court denies Defendants' motion to dismiss the affirmative

10   misrepresentation claims on the basis that the representations at issue were simply puffery.

11   Whether the "EcoDiesel" representation is puffery cannot be resolved in the current context of the

12   instant 12(b)(6) motion.

13         4.      Fraudulent Concealment Theory: Cognizability of Fraudulent Concealment Claims

14         With respect to Plaintiffs' fraudulent concealment theory, Defendants have asserted

15   multiple arguments, the first being that some states– specifically, Connecticut, Minnesota,

16   Tennessee, and Texas – do not recognize a substantive claim for fraudulent concealment.

17   According to Defendants, "fraudulent concealment is not a substantive cause of action, but instead

18   operates only to toll the statute of limitations."  FCA/MV Mot. at 52 n.18.

19         Defendants are incorrect.  In essence, Defendants are playing a kind of "name game."

20   While there is some state case law indicating that fraudulent *concealment* is not a cause of action

21   but rather simply a tool to toll the statute of limitations, Defendants ignore the fact that there is

22   also case law still recognizing a claim for fraud based on *omission* or *nondisclosure*.  Below are

23   cases from each relevant jurisdiction.  (Plaintiffs have cited additional authority in footnote 23 of

24   their opposition brief.)

25         • Connecticut.  *See Omega Eng'g, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1094-

26            95 (D. Conn. 1995) (stating that, "[a]lthough fraudulent misrepresentation involves . . .

27            proof [that the defendant made false statements knowingly or recklessly], fraudulent

28            nondisclosure involves not a statement, but silence").

- Minnesota. *See Powell v. Trans Global Tours, Inc.*, 594 N.W.2d 252, 256 (Minn. Ct. App. 1999) (stating that "[t]here are four elements of fraudulent nondisclosure: a party conceals a fact material to a transaction, the fact is peculiarly within the concealing party's knowledge, the concealing party knows the other party will act on the presumption that no such fact exists, and the concealing party has a legal or equitable duty to communicate the fact").

- Tennessee. *See McPherson v. Shea Ear Clinic*, No. W2006-01936-COA-R3-CV, 2007 Tenn. App. LEXIS 265, at *29-30 (Tenn. Ct. App. Apr. 27, 2007) (stating that "[n]ondisclosure of a material fact may also give rise to a claim for fraudulent misrepresentation when the defendant has a duty to disclose and the matters not disclosed are material").

- Texas. *See Jurek v. Kivell*, No. 01-10-00040-CV, 2011 Tex. App. LEXIS 3032, at *9 (Tex. Ct. App. Apr. 21, 2011) (stating that "[t]he elements of fraud by nondisclosure, or fraud by omission, are (1) the defendant failed to disclose facts to the plaintiff when the defendant had a duty to disclose such facts; (2) the facts were material; (3) the defendant knew of the facts; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the intent to induce the plaintiff to take some action; and (6) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts").

5.   Fraudulent Concealment Theory: Duty to Disclose

With respect to Plaintiffs' fraudulent concealment theory, Defendants argue next that there can be liability for fraudulent concealment only where there is a duty to disclose, and Plaintiffs have failed to establish such a duty. The argument is without merit.

a.   Fiduciary Relationship

Defendants contend that a number of states – namely, Massachusetts, Maryland, Maine, New Jersey, Nevada, Oregon, Pennsylvania, South Carolina, and Tennessee – recognize a fraudulent concealment claim only where there is a fiduciary relationship between the plaintiff and

defendant.  *See* FCA/VM Mot. at 54.  Defendants are incorrect.  Although Defendants do cite some authority to support their position, there is substantial authority to the contrary – *e.g.*, a fiduciary relationship is not the only time a duty to disclose arises; also, an affirmative act of concealment by the defendant effectively negates the duty-to-disclose requirement (*i.e.*, there is a difference between silence, where a duty to disclose is required, and active concealment, where there is no such requirement).  In this regard, Plaintiffs do not claim that Defendants were simply silent but rather that they took affirmative steps to conceal the defeat devices – including not identifying them for the EPA and CARB.  (Plaintiffs cite additional authority in footnote 26 of their opposition brief.)  A duty to disclose thus may obtain in a variety of circumstances or indeed, may not even be required in some situations:

- Massachusetts.  *See Nota Constr. Corp. v. Keyes Assocs.*, 694 N.E.2d 401, 404-05 (Mass. Ct. App. 1998) ("agree[ing] that an action for deceit may not be predicated on a mere failure to disclose where there is no duty to disclose" but "recogniz[ing] that a duty to disclose may arise in a number of circumstances" – *e.g.*, as reflected in the Restatement (Second) of Torts, a defendant has a duty to disclose "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of such facts") (internal quotation marks omitted).

- Maryland.  *See Lubore v. RPM Assocs.*, 674 A.2d 547, 556 (Md. Ct. App. 1996) (stating that "[j]ust because the relationship between the parties is not such that a duty to disclose is owed does not mean that appellant is legally foreclosed from maintaining a deceit action against appellees" because "[o]ne who conceals facts that materially qualify affirmative representations may be liable for fraud" and "concealment may amount to fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a

97

United States District Court
Northern District of California

withdrawal or distraction of a party's attention from the real facts").

- Maine. *See Martin v. Ort*, No. BANSC-CV-2015-195, 2016 Me. Super. LEXIS 15, at *9 (Me. Super. Ct. Feb. 3, 2016) (stating that "a failure to disclose or an omission by silence may be an equivalent to an affirmative false representation if the plaintiff proves: (1) active concealment of the truth; *or* (2) a special relationship that imposes a duty to disclose; *or* . . . (3) [a] statutory duty to disclose"; adding that "[e]ven if none of these elements are present, fraud based on a party's silence may still be actionable depending on the facts of the case") (emphasis added).[17]

- New Jersey. *See United Jersey Bank v. Kensey*, 704 A.2d 38, 45 (N.J. Super. Ct. 1997) (indicating agreement with Restatement (Second) of Torts that there is a duty "to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts'").

- Nevada. *See Villalon v. Bowen*, 273 P.2d 409, 414-15 (Nev. 1954) (stating that, "even in the absence of a fiduciary or confidential relationship and where the parties are dealing at arm's length, an obligation to speak can arise from the existence of material facts peculiarly within the knowledge of the party sought to be charged and not within the fair and reasonable reach of the other party").

- Oregon. *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, 160 F. Supp. 3d 1214, 1223-24 (D. Or. 2016) (noting that, "[i]n addition to fraud by affirmative

---

[17] In their papers, Defendants refer to New Hampshire and not Maine; however, the case cited by Defendants (*Rared Manchester NH, LLC v. Rite Aid of N.H., Inc.*, 693 F.3d 48 (1st Cir. 2012)) discusses Maine law, not New Hampshire law.

In their reply brief, Defendants admit the error but then introduce the new argument that "*[b]oth* Maine and New Hampshire" require allegations of a fiduciary relationship. FCA/VM Reply at 23 n.27. Although it is not proper for Defendants to inject New Hampshire for the first time in reply, they appear to be, in any event, wrong on the merits. *See Benoit v. Perkins*, 104 A. 254, 256 (N.H. 1918) (stating that "[t]he duty to speak must arise from the circumstances, *or* there must be some relation of trust and confidence between the parties upon which to build the duty to disclose") (emphasis added).

United States District Court
Northern District of California

misrepresentation or omission, there is a third category of fraud recognized under Oregon law, actual concealment" and, "where 'fraud is based on actual concealment, as opposed to simple nondisclosure, a duty to speak is not required'").

- Pennsylvania.  *See Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp. 3d 849, 859 n.6 (E.D. Pa. 2015) (noting that "[t]he Third Circuit has observed that in cases of 'active concealment' a 'duty to disclose is not always a required element of common-law fraud when there has been a material nondisclosure'"); *Jeter v. Brown & Williamson Tobacco Corp.*, 294 F. Supp. 2d 681, 688 (W.D. Pa. 2003) (stating that, "'[w]hile a concealment may constitute fraud, mere silence is not sufficient in the absence of a duty to speak'"); *Gnagey Gas & Oil Co. v. Pa. Underground Storage Tank Indemn. Fund*, 82 A.3d 485, 500 (Pa. Commw. Ct. 2013) (stating that "Pennsylvania law recognizes a difference between active concealment and mere silence in the context of common law fraud"); *see also City of Rome v. Glanton*, 958 F. Supp. 1026, 1039 (E.D. Pa. 1997) (recognizing a duty to speak "where the undisclosed fact is basic to the transaction").

- South Carolina.  *See Cohen v. Blessing*, 192 S.E.2d 294, 205-06 (S.C. 1972) (finding that "the complaint states a cause of action for fraud and deceit" because there "a duty on the seller to disclose termite or insect infestation 'in the property known to him, but unknown to, and not readily observable upon reasonable inspection by the purchaser'"); *Holly Hill Lumber Co. v. McCoy*, 23 S.E.2d 372, 378 (S.C. 1942) (stating that "[n]on-disclosure become fraudulent only when it is the duty of the party having knowledge of the facts to uncover them to the other" and the duty to disclose arises if there is a fiduciary or special relationship; but adding that "an informed vendee must limit himself to silence in order to escape the imputation of fraud" and, "[i]f in addition to the party's silence there is any statement, even in word or act on his part, which tends affirmatively to a suppression of truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, the line is overstepped, and the concealment becomes fraudulent").

- Tennessee.  *See Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 752-53 (M.D. Tenn. 2010) (noting that "defendants ignore the line of Tennessee precedent . . . which held that 'each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it'"); *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992) (stating that, "[g]enerally, a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action" and that "the affirmative action on the part of the defendant must be something more than mere silence or a mere failure to disclose known facts[;] [t]here must be some trick or contrivance intended to exclude suspicion and prevent injury, or else there must be a duty resting on the party knowing such facts to disclose them") (emphasis omitted).

    b.    Arm's Length Transaction

Defendants further argue that, in certain states – namely, Alabama, Delaware, Illinois, Indiana, Kansas, Vermont, and Virginia – a fraudulent concealment claim is not viable if the parties were engaged in an arm's-length transaction.  *See* FCA/VM Mot. at 54.  This argument is essentially a variant of that above – *i.e.*, that only where there is a fiduciary or special relationship that gives rise to a duty to disclose is there a viable fraudulent concealment claim.  Defendants are incorrect.  As indicated by the authority below (Plaintiffs cite additional authority in footnote 27 of their opposition brief), fraudulent concealment claims can be viable even when there is arm's-length transaction between the parties:

- Alabama.  *See Hines v. Riverside Chevrolet-Olds*, 655 So. 2d 909, 918 (Ala. 1994) (stating that "[a] duty to disclose may arise form a confidential relationship, from a request for information, or from the particular circumstances of the case"; adding that "whether a duty to disclose arises in the particular circumstances of the case depends on the relation of the parties, the value of a particular fact, the relative knowledge of the parties, and other circumstances" – *e.g.*, "[w]hen the defendant had superior knowledge of the fact not disclosed and the plaintiff was induced to take action that the plaintiff might not have otherwise taken . . . , a reasonable person is more likely to find

100

a duty to disclose"), *overruled on other grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998).

- Delaware.  *See Air Prod. & Chem., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 214-15 (D. Del. 2017) (stating that "[t]he first element of fraud can be established one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; *or* (3) active concealment of material facts") (emphasis added).

- Illinois.  *See Heider v. Leewards Creative Crafts*, 613 N.E.2d 805, 814 (Ill. Ct. App. 1993) (stating that "[m]ere silence in a business transaction does not amount to fraud[,] [y]et, silence accompanied by deceptive conduct or suppression of material facts gives rise to active concealment; it is then the duty of the party which has concealed information to speak").

- Indiana.  *See Northrop Corp. v. Gen. Motors Corp.*, 807 N.E.2d 70, 87 (Ind. Ct. App. 2004) (stating that "[a] duty to speak may arise when (1) the material fact is known or accessible only to the defendant and (2) the defendant knows that the plaintiff is unaware of the fact or cannot reasonably discover the undisclosed fact").

- Kansas.  *See Bank of Am., N.A. v. Narula*, 261 P.3d 898, 911 (Kan. Ct. App. 2011) (indicating that "a duty to disclose would arise in cases under three situations: (1) when a disparity exists between two contracting parties in either bargaining power or expertise; (2) when a known defect is not known to or is not reasonably discoverable by the buyer; or (3) when a party knows the other party is entering the contract under a mistake about important facts and, because of custom in the trade or other objective circumstances, the other party would reasonably expect disclosure of those facts").

- Vermont.  *See White v. Pepin*, 561 A.2d 94, 96 (Vt. 1989) (stating that "[t]his Court has not hesitated to find a duty to disclose material facts where some legal or equitable duty exists between the parties" – *e.g.*, "where plaintiff had superior knowledge or means of knowledge, he had duty to disclose to defendant that certain items were not accurately reflected in corporate records upon which defendant relied in purchasing shares of the corporation"); *cf. Lay v. Pettengill*, 38 A.3d 1139, 1144 (Vt. 2011)

(stating that, "'[i]n arm's-length transactions,' . . . 'where facts are equally within the means of knowledge of both parties, neither party is required to speak, in the absence of inquiry respecting such matters'").

- Virginia.  *See White v. Potocska*, 589 F. Supp. 2d 631, 642 (E.D. Va. 2008) (stating that "[a] duty to disclose does not normally arise when parties are engaged in an arm's length transaction" but adding that "[a] duty may arise . . . if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist").

### c.  Exclusive Knowledge

Defendants argue that, to the extent Plaintiffs allege a duty to disclose based on Defendants' "exclusive knowledge of material facts not known to [Plaintiffs]," *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), that allegation is insufficient because "it is not enough to allege . . . that [Defendants] 'knew or should have known' [of the problem based simply on] 'their involvement in the design, installment, and calibration of the emission treatment technology.'" FCA/VM Mot. at 53.  In support of this argument, Defendants cite *Kampuries v. American Honda Motor Co., Inc.*, 204 F. Supp. 3d 484 (E.D.N.Y. 2016); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) (Fogel, J.); and *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008).  *See* FCA/VM Mot. at 53-54.  In *Sanders*, for example, Judge Fogel indicated that knowledge of a design defect could not be inferred just because the defendant manufactured the product because allegations about "exclusive knowledge as the manufacturer . . . could be made about any alleged design defect in any manufactured product."  *Sanders*, 672 F. Supp. 2d at 986.  *See also Oestreicher*, 544 F. Supp. 2d at 972 (noting that there are policy reasons militating against a broad duty to disclose – *e.g.*, "'[m]anufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time,'" and "'[a] rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage'").

*Kampuries*, *Sanders*, and *Oestreicher* are all distinguishable from the instant case.  In *Kampuries*, there was an allegedly defective air bag; in *Sanders*, there was an allegedly defective

United States District Court
Northern District of California

computer display component; and in *Oestreicher*, there was an allegedly defective heat management system in a notebook computer.  For this kind of defect claim, there is reason to be concerned along the lines raised by Judge Fogel in *Sanders*.  But the instant case is different because the gist of Plaintiffs' complaint is not that the emissions control system in the Class Vehicles was broken or flawed which may or may not have been within the actual (as opposed to imputed) knowledge of the manufacturer.  Rather, the thrust of the complaint is that there was purposeful manipulation of the system by the various defendants involved in the design and manufacturing process to achieve the deceptive result (*i.e.*, ability to pass the emissions tests but no proper emissions control under normal driving conditions).  Given the allegation of specific manipulation, it is reasonable to infer knowledge on the part of Defendants, which would then give rise to a duty to disclose.

### 6.   Fraudulent Concealment Theory: Reliance

According to Defendants, even if duty to disclose is not an issue, Plaintiffs have failed to adequately plead reliance for their common law fraud claims.  This argument is ultimately directed to Plaintiffs' fraudulent concealment theory, and not their affirmative misrepresentation theory.[18] The problem for Defendants is that – as Plaintiffs note – reliance may be presumed (or at least inferred) when a defendant's omission is material.[19]

For example, the Ninth Circuit has noted that, under California law, "[t]o prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of

---

[18] Plaintiffs' affirmative misrepresentation theory is based on the use of the "EcoDiesel" logo on Class Vehicles.  Because the "EcoDiesel" logo is on the face of each Class Vehicle, there is a plausible assertion of pervasive advertising from which an inference of reliance could be made. *See Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) (in a tobacco case, stating that, "where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements").

[19] In *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2018 U.S. Dist. LEXIS 34873 (N.D. Cal. Mar. 2, 2018), Judge Breyer stated, with respect to a securities claim, that a presumption of reliance "does not apply when the only omission alleged is of the truth that an affirmative misstatement misrepresents." *Id.* at *344. However, here, Plaintiffs are not alleging an omission of the truth that an affirmative misstatement misrepresents; Plaintiffs do not claim, *e.g.*, that Defendants made an affirmative misrepresentation that the Class Vehicles did not have defeat devices.

United States District Court
Northern District of California

the plaintiff's injury-producing conduct," and the plaintiff may prove causation "by simply

proving 'that had the omitted information been disclosed, one would have been aware of it and

behaved differently.'"  *Daniel*, 806 F.3d at 1225.  The California Supreme Court has confirmed

the same, stating that "a presumption, or at least an inference, of reliance arises wherever there is a

showing that a misrepresentation was material" and adding that "[a] misrepresentation is judged to

be material if a reasonable man would attach importance to its existence or nonexistence in

determining his choice of action in the transaction in question, and as such materiality is generally

a question of fact unless the fact misrepresented is so obviously unimportant that the jury could

not reasonably find that a reasonable man would have been influenced by it."[20]  *Tobacco II Cases*,

207 P.3d at 39 (internal quotation marks omitted).

      To the extent Defendants assert that Plaintiffs have not sufficiently alleged materiality, *see*

---

[20] In their reply brief, the FCA/VM Defendants argue that "California state court decisions [regarding reliance] do not apply to claims arising under other states' laws," FCA/VM Reply at 21 n.25; however, these defendants fail to cite to any contrary authority outside of California where an omissions theory was at issue.

      Furthermore, several jurisdictions that have addressed the question appear to be in accord with California. *See, e.g., Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 206-07 (4th Cir. 1988) (in discussing South Carolina law, noting that "[t]he dissent would reverse the award of punitive damages on the basis that North Strand failed to prove detrimental reliance on Goodyear's misrepresentation" but stating that " the actionable independent fraudulent act here was not Goodyear's misrepresentation of its reason for cancellation, but rather its affirmative concealment of the extension of the completion date[,] [a]nd, direct proof of reliance on the concealment was not required for it was practically impossible to prove, by direct evidence, reliance on that which had been intentionally concealed"); *Bp Am. Prod. Co. v. Patterson*, 263 P.3d 103, 110 (Colo. 2011) (noting that "[o]ut-of-state courts have recognized that a jury may presume reliance on a class-wide basis where there is sufficient, common evidence that the defendant concealed a material fact from class members"); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 74 (D.N.J. 2009) (stating that, "[e]ven if Plaintiffs were required at trial to show evidence of reliance similar to that required in common law fraud claims, that requirement would not render class certification inappropriate" because "plaintiffs asserting fraud claims 'involving primarily failure to disclose' material information need not demonstrate 'positive proof of reliance' in order to recover[;] '[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision'"); *Cope v. Metro. Life Ins. Co.*, 696 N.E.2d 1001, 1008 (Ohio 1998) (stating that, "[w]hen there is nondisclosure of a material fact, courts permit inferences or presumptions of inducement and reliance[;] [t]hus, cases involving common omissions across the entire class are generally certified as class actions, notwithstanding the need for each class member to prove these elements"); *Weinberg v. Hertz Corp.*, 116 A.D.2d 1, 7 (N.Y. Supreme Ct. 1986) (holding that, "once it has been determined that the representations alleged are material and actionable, thus warranting certification, the issue of reliance may be presumed subject to such proof as is required on the trial").

United States District Court
Northern District of California

1    FCA/VM Reply at 21 n.25, the Court rejects that argument.  There is, at the very least, a question

2    of fact regarding materiality in light of the fact that the Class Vehicles were promoted as

3    environmentally friendly in the first place.  In other words, if Defendants promoted the Class

4    Vehicles as such, they believed that such information was material to the consuming public.  *See*

5    *MyFord Touch*, 46 F. Supp. 3d at 957 (stating that "it is odd for Ford to quibble with materiality

6    here when it promoted the MFT system as a desirable component of a vehicle in the first place[;]

7    [i]n other words, if the MFT system was so desirable, then it would not be surprising for Plaintiffs

8    to consider a problem with the system – particularly a systemic one – a material fact").

9          To the extent Defendants are making a slightly different argument – *i.e.*, that Plaintiffs

10   have not sufficiently alleged that, had the information about the defeat devices been disclosed,

11   Plaintiffs would have been aware of it – Defendants still fare no better.  Defendants' reliance on

12   *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010), is unavailing.  In *Ehrlich*,

13   the court recognized that actual reliance is presumed or at least inferred when an omission is

14   material.  The court also noted that the plaintiff had sufficiently alleged that the windshield

15   cracking defect would have been material to a reasonable consumer looking to purchase the MINI

16   car.  The defendant argued, however, that the plaintiff had failed to allege that he would have been

17   aware of the omitted information if it had been disclosed – *e.g.*, there was no allegation that,

18   before he bought the MINI, the plaintiff reviewed a brochure, website, or promotional material

19   that might have contained a disclosure of the windshield cracking defect.  The court agreed:

20             Given the alleged importance of the cracking defect, had BMW
               chosen to disclose it to prospective buyers, presumably Plaintiff, as
21             a member of the buying public, would have been become aware of
               the defect in the course of making his purchasing decision.
22             Nevertheless, the Court agrees with BMW that the FAC is devoid of
               allegations that Plaintiff would have plausibly been aware of the
23             cracking defect before he purchased his MINI had BMW publicized
               this information.
24

25   *Ehrlich*, 801 F. Supp. 2d at 920.

26          The Court is not persuaded by *Ehrlich*.  Notably, in *Daniel* – a post-*Ehrlich* case – the

27   Ninth Circuit rejected the car manufacturer's argument that the plaintiffs would not have been

28   aware of the defect if disclosure had been made because they did not view any advertising

materials prior to purchase.  The Ninth Circuit pointed out that the plaintiffs had presented

evidence that they interacted with and received information from sales representatives at

authorized Ford dealerships before purchasing the vehicles at issue.  *See Daniel*, 806 F.3d at 1226.

Like *Daniels*, here, it is plausible that, had Defendants made a disclosure about the defeat device

to the authorized FCA dealerships, they would have passed on that information to consumers at

the time of the contemplated purchases.  *See* FAC ¶ 34 *et seq.* (largely alleging purchases from

authorized FCA dealerships).  Moreover, it is worth noting that Plaintiffs' theory here is that

Defendants *knowingly* installed emissions control defeat devices in approximately 100,000

vehicles, with those vehicles *specifically being marketed* as environmentally friendly.  Had

Defendants made the disclosure of a defeat device, it is plausible that the media would pick up that

story, and it would have made national news, particularly in the wake of the Volkswagen scandal

regarding defeat devices.

D.    Consumer Protection Claims

        For the reasons stated above, Plaintiffs' claims for common law fraud cannot be dismissed

at this juncture.  The Court now turns to Defendants' specific challenges to the claims for violation

of consumer protection statutes.

        1.    Joint Appendix

        As a preliminary matter, the Court takes note that Defendants have provided a joint

appendix (approximately fifteen pages long) in which they suggest that all of the state consumer

protection claims are flawed because (1) Plaintiffs fail to adequately allege reliance (*i.e.*, no causal

connection); (2) Plaintiffs fail to allege a deceptive act, omission, or practice; and (3) Plaintiffs fail

to allege a concrete, nonspeculative loss.  *See* FCA/VM Mot. at 55.

        The Court rejects Defendants' attempt to make argument via the joint appendix.  This

Court, like the court in *Counts*, deems those arguments waived.  *See Counts*, 237 F. Supp. 3d at

594 (noting that both parties "attempt[] to 'raise' certain state-specific arguments by referencing

appendices attached to their briefing"; adding that the "scattershot effort to raise arguments and

defenses by simply citing to dozens, if not hundreds, of state court cases will not be addressed,"

particularly as the court permitted expanded briefing and a court is not "responsible for combing

through appendices in an attempt to *sua sponte* raise and resolve legal arguments which the parties have not briefed").

That being said, the Court finds that each of these three issues has  largely been addressed above – (1) and (2) in the context of the common law fraud claims and (3) in the context of Article III standing.  Also, with respect to (1), it is not clear that reliance is required for all consumer protection statutes.  *See* Opp'n at 65-66 & n.34.[21]

---

[21] Below are some examples of case law or other authority indicating that reliance is not required. The examples are not exhaustive.

- Florida.  *See Turner Greenberg Assocs. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. Dist. Ct. App. 2004) (stating that "a demonstration of reliance by an individual consumer is not necessary in the context of [the Florida Deceptive and Unfair Trade Practices Act]").

- Illinois.  *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) (stating that, under the Illinois Consumer Fraud Act, "[p]laintiff's reliance is not an element of statutory consumer fraud, but a valid claim must show that the consumer fraud proximately caused plaintiff's injury").

- Kentucky.  *See Corder v. Ford Motor Co.*, 869 F. Supp. 2d 835, 837-39 (W.D. Ky. 2012) (holding that reliance is not an element of a claim for violation of the Kentucky Consumer Protection Act; noting that loss causation is different from reliance and indicating that the former may be proved through, *e.g.*, a benefit-of-the-bargain theory that the product or service received was not worth what the customer paid for it).

- Missouri.  *See Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) (noting that "a fraud claim requires both proof of reliance and intent to induce reliance; the [Missouri Merchandising Practices Act] claim expressly does not" – 15 C.S.R. 60-9.110(4), which addresses concealment or omission or a material fact, provides that "'[r]eliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1'").

- New Jersey.  *See Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007) (stating that "[o]ur statute [the New Jersey Consumer Fraud Act] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss").

- New York.  *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995) (stating that, "while the statute [N.Y. Gen. Bus. Law § 349(a)] does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm").

- North Dakota.  *See* N.D. Cent. Code § 51-15-02 (providing that "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice").

107

The Court now turns to the specific challenges to the consumer protection claims, as raised in Defendants' motions.

### 2. Prohibitions on Class Actions

Defendants' first substantive argument with respect to the consumer protection claims is that some states do not allow class actions for violation of their consumer protection statutes. More specifically, Defendants advance three arguments: (1) that multiple states (Alabama, Georgia, Louisiana, Mississippi, Montana, and South Carolina) do not allow class actions for violations of their consumer protection statutes; (2) that two states (Colorado and Tennessee) do not allow for class actions for damages for violations of their consumer protection statutes; and (3) that one state (Iowa) requires approval of the attorney general before a consumer protection class action may be brought.

In response to (1) and (2), Plaintiffs argue that a decision is premature; that is, the issues are better addressed when Plaintiffs move for class certification. Plaintiffs add that, in any event, Defendants' two arguments do not dispose of Plaintiffs' *individual* claims for relief. Both of Plaintiffs' responsive arguments have merit.

As for (3) – *i.e.*, in Iowa, approval of the attorney general is needed first for a class action), here, Defendants are in better stead. Iowa Code § 714H.7 provides as follows: "A class action lawsuit alleging a violation of this chapter *shall not be filed* with a court unless it has been approved by the attorney general." Iowa Code § 714H.7 (emphasis added). However, that deficiency is potentially capable of being cured, and therefore, the Court gives Plaintiffs leave to amend their Iowa consumer protection claim.[22]

---

- Ohio. *See Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827, 835-36 (S.D. Ohio 2003) (with respect to the Ohio Consumer Sales Practices Act, holding that "the allegation that the Defendants engaged in unfair, deceptive, or unconscionable practices or acts in connection with the sale of Xenadrine RFA-1 indicates that the members of the proposed class who purchased the product as a result of those practices or acts suffered a cognizable injury"; also noting that, "[u]nlike a fraud claim, where a plaintiff must allege harm above and beyond the misrepresentation and reliance thereon, a cause of action accrues under the Consumer Sales Practices Act as soon as the allegedly unfair or deceptive transaction occurs").

[22] Plaintiffs contend that a failure to notify the attorney general is not a proper basis for dismissal

United States District Court
Northern District of California

### 3.   Prohibitions on Actions for Damages and Standing for Injunctive Relief

Defendants argue next that some states (Delaware, Georgia, and Minnesota) do not allow

any actions (private or class) for damages and, to the extent Plaintiffs want injunctive relief with

respect to these state consumer protection statutes, they lack standing such that the consumer

protection claims for these states should be dismissed in their entirety.

As an initial matter, the Court notes that Defendants are wrong on Delaware in that

Delaware does provide for damages.  Under Delaware law, "[i]f damages are awarded to the

aggrieved party under the common law or other statutes of this State, such damages shall be treble

the amount of the actual damages proved."  Del. Code Ann. tit. 6, § 2533.

As for Georgia and Minnesota, Plaintiffs do not dispute that damages are unavailable

under those states' consumer protection statutes.  *See also* Ga. Code Ann. § 10-1-373; Minn. Stat.

§ 325d.45.  Nevertheless, contrary to what Defendants argue, Plaintiffs do have standing to pursue

injunctive relief under Georgia and Minnesota (or even Delaware) law.  A plaintiff has standing to

seek injunctive relief to address an "ongoing injury," *Mayfield v. United States*, 599 F.3d 964, 969

(9th Cir. 2010), and, here, Plaintiffs have alleged that they are still suffering ongoing harm based

on Defendants' past conduct – at the very least, the Class Vehicles need to be fixed.  *See* Opp'n at

55.

### 4.   Heightened Pleading Requirements re Injury and Scienter

Defendants argue that the consumer protection claims should also be dismissed for those

states that have heightened pleading requirements for injury.  See FCA/VM Mot. at 57-58

---

misses the point.  In support of this argument, Plaintiffs cite § 714H.6.  Under § 714H.6,

> All copies of pleadings, orders, judgments, and notices required by
> this section to be sent to the attorney general shall be sent by
> certified mail unless the attorney general has previously been
> provided such copies of pleadings, orders, judgments, or notices in
> the same action by certified mail, in which case subsequent mailings
> may be made by regular mail.  *Failure to provide the required
> mailings to the attorney general shall not be grounds for dismissal
> of an action under this chapter*, but shall be grounds for a
> subsequent action by the attorney general to vacate or modify the
> judgment.

Iowa Code § 714H.6(5) (emphasis added).  But a failure to notify the attorney general is not the
same thing as a failure to get approval of the attorney general.  Defendants are arguing the latter.

United States District Court
Northern District of California

1    (asserting that there are twenty-five such states).  Defendants also argue that there is a heightened

2    pleading requirement for scienter in certain states.  *See* FCA/VM Mot. at 58-59 (arguing that there

3    are fourteen such states).  Neither argument is persuasive.  Defendants' injury argument is

4    effectively a rehash of its argument above regarding damages, *see* Part II.A, *supra* (addressing

5    injury-in-fact); Part III.A.1, *supra* (addressing RICO injury), *supra*, and Defendants' scienter

6    argument is not supported by their citations.

7         To the extent Defendants are trying to make a different argument on scienter – *i.e.*, that a

8    defendant in a consumer protection case must have acted with the intent to *deceive* – Plaintiffs

9    have, in fact, made allegations regarding such an intent, as discussed above.  *See* Part III.B.1.a to

10   .b, *supra*.  Moreover, Plaintiffs properly assert that not all consumer protection claims actually

11   require, as an essential element, an intent to deceive.  For example:

12       • Arkansas.  Defendants rely on the fact that the Arkansas Deceptive Trade Practice Act

13          includes the following provision: "Deceptive and unconscionable trade practices made

14          unlawful . . . include . . . [k]knowingly making a false representation."  Ark. Code Ann.

15          § 4-88-107(a)(1).  The problem for Defendants is that the Act goes on to provide that

16          deceptive and unconscionable trade practices also include "[e]ngaging in any other

17          unconscionable, false, or deceptive act or practice in business, commerce, or trade," *id.*

18          § 4-88-107(a)(10), and, as the Eighth Circuit has held, § 4-88-107(a)(10) does "not

19          require knowing or intentional deception."  *Curtis Lumber Co. v. La. Pac. Corp.*, 618

20          F.3d 762, 776 (8th Cir. 2010).  Moreover, as the Eighth Circuit noted in *Curtis Lumber*,

21          yet another provision in the Act – namely, § 4-88-108(2) – makes unlawful "[t]he

22          concealment, suppression, or omission or any material fact *with the intent that others*

23          *rely upon the concealment, suppression, or omission*."  Ark. Code Ann. § 4-88-108(2)

24          (emphasis added).  The Eighth Circuit held that § 4-88-108(2) also does not require

25          knowing or intentional deception, underscoring that "states with laws virtually identical

26          to Arkansas Code § 4-88-108(2) have overwhelmingly concluded that intent to deceive

27          is not required."  *Curtis Lumber*, 618 F.3d at 777.  "'[T]he statute requires only that a

28          violator intend for a purchaser to *rely* on his acts or omissions.'"  *Id.* at 778.

- Illinois. The Illinois Consumer Fraud Act contains some language similar to that contained in the Arkansas statute. More specifically, the Illinois statute provides that the following is unlawful: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, . . . misrepresentation or the concealment, suppression or omission of any material fact, *with the intent that others rely upon the concealment, suppression, or omission or such material fact*." 815 ILCS 505/2 (emphasis added). Furthermore, even though, to show a violation of the Act, a plaintiff must establish, *inter alia*, a deceptive act or practice *and* intent on the defendant's part that the plaintiff rely on the deception, an Illinois federal court has emphasized that those requirements "are not as strict as they sound . . . The deceptive act and intent requirements can be satisfied by innocent misrepresentations of a defendant." *Chow v. Aegis Mortg. Corp.*, 286 F. Supp. 2d 956, 963 (N.D. Ill. 2003) (stating that, under the Act, "[t]o satisfy the intent requirement, plaintiff need not show that defendant intended to deceive the plaintiff, but only that the defendant intended the plaintiff to rely on the (intentionally *or* unintentionally) deceptive information given") (emphasis added).

- Iowa. The Iowa Consumer Frauds Act contains some language similar to the Arkansas and Illinois statutes above. *See* Iowa Code § 714H.3(1) (providing that "[a] person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentations, concealment, suppression, or omission of a material fact, *with the intent that others rely upon the unfair practice, deception,* [etc.]") (emphasis added). "[I]t is not necessary for the State to prove that the violator acted with an intent to deceive, as is required for common law"; the only intent required by the statute is that the defendant act 'with the intent *that others rely*' upon his omissions[;] [i]n addition, there is no requirement under the statute that a violator have knowledge of the falsity of his or her representations." *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 771 (Iowa 2004).

111

- Kentucky.  Even Defendants' cited authority indicates that a defendant need not have the intent to deceive; gross negligence is enough.  *See Scanlan v. Sunbeam Prods., Inc.*, 690 Fed. Appx. 319, 333 (6th Cir. 2017) (stating that, "[i]n order to establish a violation of the [Kentucky Consumer Protection Act], plaintiffs must show that the defendant's actions were (1) intentional *or* (2) grossly negligent") (emphasis added).

- Louisiana.  The Louisiana statute covers not only fraud but also unfair conduct, which does not necessarily require an intent to deceive.  *See, e.g.*, La. Rev. Stat. § 51:1405(A) (providing that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful"); *Mabile v. BP, P.L.C.*, No. 11-1783, 2016 U.S. Dist. LEXIS 129540, at *76-78 (E.D. La. Sep. 22, 2016) (stating that "it is clear that [the Louisiana Unfair Trade Practices Act] claims are not limited solely to allegations of fraud, but may be independently premised on a range of non-fraudulent conduct").  Moreover, even if Plaintiffs' consumer protection claims were predicated on a fraud/deceit theory, it still is not clear that an intent to deceive, as opposed to a capacity or tendency to deceive, is required.  *See Industrias Magromer Cueros Y Pieles S.A. v. La. Bayou Furs*, 293 F.3d 912, 922 (5th Cir. 2002) (holding that the LUTPA "does not require an intent to obtain an advantage or to cause a loss"; "[t]he statute merely requires a showing of 'some element of fraud, misrepresentation, deception or other unethical conduct on [a] defendant's part'").  Defendants have cited to a case in which a court stated that "[a] defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition." *Elliott Co. v. Montgomery*, No. 6:15-02404, 2016 U.S. Dist. LEXIS 148523, at *14 (W.D. La. Sep. 28, 2016).  However, that statement regarding motivation or purpose seems to be driving at the point that the "'LUPTA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions.'" *Id.* at *15.  In any event, case law generally emphasizes that what is an unfair or deceptive act must be evaluated on a case-by-case basis. *See, e.g.*, *id.* at *14; *Nursing Enters. v. Marr*, No,

112

United States District Court
Northern District of California

30,776-CA, 719 So. 2d 524, 528 (La. Ct. App. 1998).

- Minnesota. *See Church of the Nativity of Our Lord v. WatPro, Inc.*, 474 N.W.2d 605, 612 (Minn. Ct. App. 1991) (noting that "Minnesota courts have held that a finding of negligent or unintentional misrepresentation violates" the Minnesota Consumer Fraud Act). Even Defendants' authority is not really to the contrary, indicating that it is the intent that others rely, not the intent to deceive, that is important. *See Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 344 (D. Minn. 1999) (noting that the Minnesota Consumer Fraud Act "prohibits 'the act, use, or employment by any person of any fraud, . . . misrepresentation, misleading statement or deceptive practice, *with the intent that others rely thereon*'") (emphasis added).

- New Mexico. Even Defendants' authority shows that, in effect, negligence is enough to support a violation. *See U.S. ex rel. Custom Grading, Inc. v. Great Am. Ins. Co.*, 952 F. Supp. 2d 1259, 1267-68 (D.N.M. 2013) (stating that the false or misleading representation must have been knowingly made and that "requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading") (internal quotation marks omitted). New Mexico courts have held that there is no requirement of an intent to deceive. *See Ashlock v. Sunwest Bank of Rosewell, N.A.*, 107 N.M. 100, 102 (1988) (rejecting the argument that the knowingly made requirement means that the statement must have been made with the intent to mislead; adding that applying the statute to all misleading or deceptive statements, "whether intentionally or unintentionally made," ensures that the statute "lends the protection of its broad application to innocent consumers"), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133 (1995).

- North Dakota. This is another example of a statute that uses language regarding an intent that others rely, not an intent to deceive. *See* N.D. Cent. Code § 51-15-02 (providing that "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, *with the intent that*

113

1    *others rely thereon* in connection with the sale or advertisement of any merchandise,

2    whether or not any person has in fact been misled, deceived, or damaged thereby, is

3    declared to be an unlawful practice") (emphasis added).

4        5.    Economic Loss Doctrine

5        According to Defendants, the consumer protection claim under North Carolina law must be

6    dismissed because it is barred by the economic loss doctrine.  The doctrine "'prohibits recovery

7    for economic loss in tort. . . . [S]uch claims are governed by contract law'" instead.  *Buffa v.*

8    *Cygnature Constr. & Dev., Inc.*, No. COA16-237, 2016 N.C. App. LEXIS 1334, at *9 (N.C. Ct.

9    App. Dec. 30, 2016); *see also Artistic Southern Inc. v. Lund*, 2015 NCBC 109, at *34-35 (N.C.

10   Super. Ct. Dec. 9, 2015) (noting that, under the doctrine, purely economic losses are not

11   recoverable under tort law; rather, there must be injury to person or property before imposing tort

12   liability).

13           The rationale for the economic loss rule is that the sale of goods is
             accomplished by contract . . . . To give a party a remedy in tort,
14           where the defect in the product damages the actual product, would
             permit the party to ignore and avoid the rights and remedies granted
15           or imposed by the parties' contract.  [However,] [w]here a defective
             product causes damage to property other than the product itself,
16           losses attributable to the defective product are recoverable in tort
             rather than contract.

17

18   *Buffa*, 2016 N.C. App. LEXIS 1334, at *9-10.

19       However, in *MyFord Touch*, this Court previously held that the economic loss doctrine is

20   not a bar to a statutory consumer protection claim.  *See In re MyFord Touch Consumer Litig.*, 46

21   F. Supp. 3d 936, 967 (N.D. Cal. 2014) (holding that North Carolina's consumer protection statute

22   "gives rise to a duty independent of the contract and therefore should not be barred by the

23   economic loss rule"); *see also Coker v. DaimlerChrysler Corp.*, 617 S.E.2d 306, 319 (N.C. Ct.

24   App. 2005) (Hudson, J., dissenting) (supporting the view that claims under consumer protection

25   statute "'are exempt from the economic loss rule because the rule is judicial, not legislative, and

26   must give way to specific legislative policy pronouncement allowing damages for economic

27   loss[;] [i]n other words, by enacting a remedy for economic losses suffered by reason of an act

28   deemed wrongful by the statute, the legislature has effectively preempted the economic loss rule

United States District Court
Northern District of California

114

United States District Court
Northern District of California

1    for those cases covered by the act'").[23]

2          6.      Privity

3          Defendants maintain that privity of contract is required to state a claim under the Idaho and

4    Kentucky consumer protection statutes.

5          With respect to Idaho, the Court is not persuaded.  Admittedly, there is an Idaho Supreme

6    Court case stating that, "[i]n order to have standing under the Idaho Consumer Protection Act, the

7    aggrieved party must have been in a contractual relationship with the party alleged to have acted

8    unfairly or deceptively."  *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010).  But it is not clear

9    from *Taylor* what kind of contractual relationship the court was contemplating; in other words, it

10   is not clear that the court was necessarily requiring a direct contract between the plaintiff and

11   defendant (immediate privity).  For example, *Taylor* cited the following in support of the above

12   statement: (1) Idaho Code § 48-608(1) which provides that "'[a]ny person who purchases or leases

13   goods or services and thereby suffers . . . ,'" *id.*, and (2) *Haskin v. Glass*, 640 P.2d 1186, 1189

14   (Idaho Ct. App. 1982), which states that "'a claim under the ICPA must be based upon a

15   contract.'"  *Taylor*, 243 P.2d at 662.  Arguably, § 48-608(1) and *Haskin* simply reflect that a

16   plaintiff's claim must ultimately be founded on a contract; they do not necessarily require that the

17   contract must be one entered into by the plaintiff and defendant directly.  Here, Plaintiffs appear to

18   have contracts with, *e.g.*, dealers that resulted in the Class Vehicles being purchased.  *See, e.g.*,

19   FAC ¶ 34 ("Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and

20   disseminating vehicle information provided by Fiat Chrysler to customers.").  The case cited by

21

22   [23] Defendants rely on *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614 (M.D.N.C. 2006),
     but that court specifically recognized that "the North Carolina appellate courts have not yet
23   decided whether to extend the economic loss rule to claims based on frauds or unfair trade
     practices."  *Id.* at 627 (adding that the court's decision was limited "to cases such as the instant
24   case involving allegations of a defective product where the only damage alleged is damage to the
     product itself and the allegations of unfair trade practices are intertwined with the breach of
25   contract or warranty claims"); *see also Artistic Southern*, 2015 NCBC 109, at *58 n.13 stating that
     "it is unclear whether the economic loss doctrine applies broadly to bar unfair and deceptive trade
26   practices claims as a matter of law [as] North Carolina appellate courts have not expressly
     extended the doctrine to bar all such claims[;] [m]oreover, in *Coker* . . . , although the majority
27   opinion did not reach the issue, now-Supreme Court Justice Hudson, in a dissenting opinion,
     rejected application of the economic loss rule to Chapter 75 claims because the economic loss rule
28   is judicial, not legislative, and must give way to specific legislative policy pronouncement
     allowing damages for economic loss").

1   Defendants is not to the contrary, focusing on the fact that a "contemplated transaction with no

2   contract" is insufficient for a consumer protection claim.  *Moto Tech, Ltd. Liab. Co. v. KTM N.*

3   *Am., Inc.*, No. 1:13-cv-00165-BLW, 2013 U.S. Dist. LEXIS 175581, at *10 (D. Idaho Dec. 9,

4   2013).  These cases do not address the situation where a contract is with a defendant's dealer.

5       As for Kentucky, however, Plaintiffs have the weaker position.  The case cited by

6   Defendants states that "[c]laims may only be brought under the [Kentucky Consumer Protection

7   Act] by individuals who personally purchase goods or services from a merchant."  *Keaton v. G.C.*

8   *Williams Funeral Home, Inc.*, 436 S.W.3d 538, 546 (Ky. Ct. App. 2013).  As noted above, here,

9   Plaintiffs have purchased Class Vehicles from dealers.  But the *Keaton* court went further and

10  required that the plaintiffs have a direct contractual relationship with the defendant.  According to

11  the court, the plaintiffs did not have standing to bring a consumer protection claim against a

12  subcontractor because there was no immediate contract between the plaintiffs and the

13  subcontractor.  The plaintiffs had a contract with the contractor only, not the subcontractor.  *See*

14  *id.*  The fact that the subcontractor seemed to have a close relationship with the contractor – the

15  two companies had "common owners" – did not impact the court's decision.  *Id.*  Specifically, in

16  *Keaton*, the plaintiffs' mother was buried in a plot different from the one she had purchased next

17  to her husband.  The mother was eventually reinterred in the correct plot.  The plaintiffs filed suit

18  against both the funeral home and the cemetery.  One of the claims asserted was violation of the

19  Kentucky Consumer Protection Act.  The court held that the plaintiffs did not have a claim against

20  the cemetery because they did not have a contract with the cemetery; rather, the only contract the

21  plaintiffs had was with the funeral home who then subcontracted with the cemetery to perform the

22  interment.  The court stated that because there was no privity of contract between the plaintiffs and

23  the cemetery, they lacked standing to pursue a claim against the cemetery.  Arguably, the situation

24  here is distinguishable because the dealers who sold the Class Vehicles acted as agents for FCA.

25  However, Plaintiffs do not cite any cases employing agency theory for the Kentucky Consumers

26  Protection Act.

27      The Kentucky case cited by Plaintiffs, *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897 (Ky.

28  2008), appears consistent with *Keaton*.  There, the defendant, a used car dealer, argued that the

United States District Court
Northern District of California

116

plaintiffs did not have consumer protection claim because there was an incomplete sales transaction. The Kentucky Supreme Court rejected the defendant's argument but only because the statute simply required that a person "purchase" a good or service, and purchase was defined broadly as "'taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property.'" *Id.* at 902. The court continued:

> Under the facts of this case, [the plaintiffs] took the Camaro, at least for a time, following a period of negotiations and after giving value by signing over title to the Nissan. At the very least, [the plaintiffs] had an equitable interest in the Camaro equal to the value of the Nissan. So we conclude that a purchase was made at least for purposes of the KCPA, which is designed to provide broad protection to consumers victimized by unlawful and deceptive trade practices.

*Id.* at 902-03. It added: "[T]he absence of a finding of a valid contract is not fatal to a claim for unfair trade practices under the [Kentucky Consumer Protection Act] as it would be to a breach of contract claim" because "[n]othing in the KCPA . . . explicitly requires that a binding contract be reached." *Id.* at 903. *Craig & Bishop* does not provide much guidance for the instant case because it does not address liability via agency. Indeed, in *Craig & Bishop*, there was a direct relationship between the plaintiff and defendant, even if not a formal contractual one. In contrast, in the case at bar, there is no direct relationship between Plaintiffs and Defendants, only a relationship between Plaintiffs and the dealers.

In sum, the Court finds in Plaintiffs' favor on the Idaho claim and Defendants' favor on the Kentucky claim. Accordingly, the Court dismisses the Kentucky consumer protection claim.

### 7.  Punitive Damages

According to Defendants multiple states bar punitive damages as relief – namely, Maryland, Maine, Minnesota, Nebraska, South Dakota, and West Virginia. Defendants also argue that Oklahoma requires malice or evil intent for punitives, and Plaintiffs have failed to allege such.

Plaintiffs have agreed to dismiss their claims for punitives under Nebraska and West Virginia law (without prejudice). *See* Opp'n at 69. They have also conceded that Maryland, Maine, Minnesota, and South Dakota do not allow for punitives. *See* Opp'n at 69-79. This

United States District Court
Northern District of California

1    resolves all of the states identified by Defendants, except for Oklahoma.

2        As to Oklahoma, Plaintiffs have adequate alleged malice.  As noted above, Plaintiffs'

3    theory is that there was specific manipulation of the emission control system which resulted in

4    NOx emissions up to twenty times the legal limit.  Hence, the motion to dismiss the Oklahoma

5    claim for punitive damages is denied.

6        8.    Identification of False Advertisements

7        Defendants also argue for dismissal of the New York consumer protection claim on the

8    ground that New York law requires all allegedly false advertisements to be identified.  As

9    discussed above, Plaintiffs have identified one specific affirmative misrepresentation – *i.e.*, the use

10   of the "EcoDiesel" logo on the Class Vehicles.  Accordingly, the motion to dismiss the New York

11   consumer protection claim is denied.

12       9.    Attorney General Approval

13       Finally, Defendants argue that at least one state (Mississippi) requires the approval of the

14   state attorney general before a private suit may be filed for violation of the consumer protection

15   statute.  Plaintiffs concede but ask the Court for leave to amend.  *See* Opp'n at 70.  Leave is

16   granted.

17                      **V.    WARRANTY CLAIMS**

18       In addition to the fraud-on-consumer claims, Plaintiffs have brought claims for breach of

19   warranty.  Plaintiffs' warranty claims are as follows: (1) breach of express warranty under state

20   law; (2) breach of implied warranty under state law; and (3) breach of written and implied

21   warranties under federal law (*i.e.*, a violation of the MMWA).

22   A.   State Law Warranty Claims: Preemption

23       Defendants argue that the state law warranty claims (both express and implied) should be

24   dismissed because of preemption.  In addressing this argument, the Court begins by identifying the

25   factual predicate for the warranty claims.

26       For breach of express warranty, the warranties at issue are two emission control warranties,

27   which, as expressly alleged in the FAC, federal law *requires* manufacturers to provide: (1) a

28   "Performance Warranty" and (2) a "Defect Warranty."  *See, e.g.*, FAC ¶ 453 (allegations

United States District Court
Northern District of California

regarding claim for breach of express warranty under California law).  For breach of implied

warranty, the Class Vehicles are allegedly not in merchantable condition because their design

violated state and federal laws; furthermore, the Class Vehicles are allegedly not fit for their

ordinary purpose because they were built to evade state and federal emission standards.  *See* FAC

¶ 465 (allegations regarding claim for breach of implied warranty under California law).

Based on the factual predicate of the warranty claims, the Court agrees with Defendants

that there is preemption – more specifically, that the warranty claims are expressly preempted by

the CAA.  In so holding, the Court finds *Caterpillar*, 2015 U.S. Dist. 98784, and *VW Va.*, 94 Va.

Cir. at 189, persuasive authority.

In *Caterpillar*, the plaintiffs sued a diesel engine manufacturer, asserting that the emissions

control system used in the engine was "defective and render[ed] [their] vehicles inoperative on

account of repeated and endemic engine failure, deratings [*i.e.*, decrease of engine horsepower and

speed], and shutdowns."  *Caterpillar*, 2015 U.S. Dist. LEXIS 98784, at *2-3.  According to the

plaintiffs, the emission control system – known as "CRS" – was "unable to maintain reliable

thermal management of exhaust temperatures as required to achieve regeneration under all

operating conditions and applications.  As a result, the CRS's protective measures frequently and

repeatedly render[ed] the vehicles inoperable and require[d] remediation by authorized Caterpillar

technicians using proprietary Caterpillar equipment and methods."  *Id.* at *10.  The plaintiffs'

claims included claims for breach of warranty.

The defendant argued, *inter alia*, that the warranty claims were preempted by the CAA (§

209(a)).  The court found that most warranty claims were not preempted because the defendant

had "*voluntarily* assumed the warranty obligations."  *Id.* at *43 (emphasis added).  Thus, the

requirements imposed by the warranty had nothing to do with the requirements of the CAA, *see

id.* at *42-43, and there could be no enforcement of federal emissions standards via the warranty.

There was one warranty claim, however, that the court did find to be preempted, more

specifically the claim for breach of the *statutorily mandated* Federal Emissions Control Warranty

("FECW").  Preemption was warranted here, the court explained, because

the FECW was *not* voluntarily undertaken.  [Rather,] [i]t is

119

1    mandated by federal law [42 U.S.C. § 7541(a)(1)] as part of the
     statutory and regulatory scheme to ensure compliance with motor
2    vehicle emissions standards.  The CAA authorizes the federal
     government to pursue violations of warranty provisions in federal
3    court or administratively.  Accordingly, the FECW is part of the
     enforcement scheme under the CAA.  As discussed *infra*, to trigger
4    the manufacturer's obligations under the FECW, *the emissions-
     related parts or components must cause the vehicle or engine to not
     conform to EPA regulations*.  It is therefore untenable for Plaintiffs
5    to argue that there can be no preemption because their claims do not
     relate to the ability of the Engines to comply with EPA standards or
6    depend upon a showing of non-conformity.  In light of the Supreme
     Court's interpretation of the term "standard" in *EMA*, permitting
7    Plaintiffs' claim for a breach of the FECW would be "an attempt to
     enforce [a] standard relating to the control of emissions from new
8    motor vehicles or . . . engines."

9    *Id.* at *44-45 (emphasis added).  In other words, given the mandatory nature of the express

10   warranties and the enforcement scheme of the CAA in respect thereto, state claims for breach of

11   those express warranties completely overlapped with the CAA.

12        In *VW Va.*, the court also determined that warranty claims asserted by the plaintiffs were

13   preempted by the CAA.  The court explained as follows: "Here, the relief sought in each of the

14   injunctive counts, Lemon law claims, warranty claims, and public nuisance claims directly relates

15   to enforcement of emissions standards because the basis for the breach or nuisance is violation of

16   the federal emissions standards."  *VW Va.*, 94 Va. Cir. at 197.  In other words, the legal duty that

17   was the predicate of these claims was compliance with CAA emissions standards.  Indeed, unlike

18   the claims of fraud and deception discussed above, noncompliance with the CAA emissions

19   standards constitutes the breach-of-warranty claim.  *See id.* (noting, *e.g.*, that "the Virginia Lemon

20   Law and breach of warranty claims cite Plaintiffs having to drive an 'illegal' vehicle or one that

21   fails to comply with emissions regulations as the source of their injury").

22        Plaintiffs argue that, in the instant case, the warranties were voluntarily adopted and

23   therefore their warranty claims are really based on contract.  But that argument has no force for the

24   express warranty claim because that claim is based on a "Performance Warranty" and a "Defect

25   Warranty," both of which – as alleged in the FAC – are required by federal law.  Plaintiffs'

26   reliance on *Cipollone v. Liggett Group*, 505 U.S. 504 (1992), is unavailing.  There, the Supreme

27   Court did note that "[a] manufacturer's liability for breach of an express warranty derives from,

28   and is measured by, the terms of that warranty.  Accordingly, the 'requirements' imposed by an

United States District Court
Northern District of California

120

1   express warranty claim are not 'imposed under State law [the language used in the preemption

2   provision at issue],' but rather imposed *by the warrantor*." *Id.* at 525 (emphasis in original).  But

3   in the instant case, the warranties at issue *are* required by federal law.  And a finding of violation

4   of a CAA emissions standard necessarily results in a breach of warranty without any intervening

5   independent and volitional conduct (*e.g.*, deceit and misrepresentation) by the Defendants.

6        As for the implied warranty claims, Plaintiffs' voluntariness argument is irrelevant because

7   the voluntariness question applies to express warranties only.  In other words, a defendant can

8   voluntarily adopt only an express warranty.  Implied warranties obtain irrespective of a

9   defendant's volition.  The problem for Plaintiffs is that their implied warranty claims are entirely

10   predicated on compliance with federal emissions standards (EPA or CARB).  Breach of the

11   implied warranty is synonymous with violation of federal emissions standards, and thus, this

12   amounts to direct enforcement of federal emissions standards preempted by the CAA.

13        Accordingly, the Court dismisses Plaintiffs' state law warranty claims (both express and

14   implied) based on express preemption.

15   B.    <u>Federal MMWA Warranty Claim</u>

16        Defendants take the position that, if the state warranty claims are preempted, then the

17   federal warranty claim must be dismissed as well, not because of preemption per se but because

18   the federal warranty claim is ultimately based on state law.  *See* FCA/VM Mot. at 49 (arguing that,

19   "[b]ecause Plaintiffs do not adequately plead state warranty claims, their MMWA claim fails

20   along with all of their state warranty claims").

21        Defendants' position is problematic.  The MMWA provides in relevant part that "[a]

22   consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply

23   with any obligation . . . under a written warranty [or] implied warranty . . . may bring suit for

24   damages and other legal and equitable relief."  15 U.S.C. § 2310(d) (emphasis added).

25   Admittedly, if a plaintiff cannot state a claim for breach of warranty under state law, then it makes

26   sense that the plaintiff cannot state a MMWA claim either.  *See also id.* § 2301(7) (defining

27   "implied warranty" as "an implied warranty arising under State law").  However, in the instant

28   case, there is no contention that Plaintiffs have failed to state a substantive claim for breach of

United States District Court
Northern District of California

1   warranty under state law; rather, the only challenge that Defendants have made to the state

2   warranty claims is that such claims are preempted.  Preemption is a question entirely independent

3   of the merits of breach of warranty claims.  Defendants have cited no case holding that MMWA's

4   effective incorporation by reference to state warranty claims is meant to refer to anything other

5   than the merits of such claims.  Absent case authority so holding, the Court is not persuaded that a

6   finding of CAA preemption should vitiate a MMWA claim.  After all, the MMWA is a federal law

7   and its incorporation of state law to create a *federal* cause of action would, if anything, counsel

8   against preemption, at least in the absence of a clear congressional directive.

9       The cases that Defendants cite in their brief, *see* FCA/VM Mot. at 49, are distinguishable

10  precisely because they do not address the issue of whether preemption of a state warranty claim *by*

11  *itself* is a reason to dismiss a MMWA claim.  For example, the court in *Meaunrit v. Pinnacle*

12  *Foods Grp., LLC*, No. C 09-04555 CW, 2010 U.S. Dist. LEXIS 43858 (N.D. Cal. May 5, 2010),

13  concluded that the state warranty claims were preempted by a federal law, but it also held that the

14  plaintiffs had failed to state a claim for relief, under state law, for breach of warranty.  *See id.* at

15  *32-33.  Therefore, dismissal of the MMWA claim could have rested on failure to state a claim for

16  relief alone (and not preemption).

17      Accordingly, although the Court finds preemption of the state claims for breach of

18  warranty (express and implied), there is no reason why the MMWA warranty claim cannot

19  continue at this juncture.

20                          **VI.      PERSONAL JURISDICTION**

21      The final issue for the Court is whether it has personal jurisdiction over the foreign entities

22  that have been sued – *i.e.*, FCA N.V., VM Italy, and Bosch GmbH.  Plaintiffs do not claim general

23  jurisdiction over any of these foreign entities.  Therefore, the only question for the Court is

24  whether there is specific jurisdiction – at least a prima facie case of such.[24]  *See Data Disc, Inc. v.*

25  *Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (stating that, "[i]f [a] court

26

27  [24] Plaintiffs may not rely on RICO, 18 U.S.C. § 1965(b), to supply a basis for personal
    jurisdiction.  *See Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 343 (S.D.N.Y. 2015) (explaining
28  that "a district court relying on § 1965[(b)] may only exert this jurisdictional pull over defendants
    'residing in any other district,' not foreign defendants").

United States District Court
Northern District of California

1 | determines that it will receive only affidavits or affidavits plus discovery materials, . . . a plaintiff

2 | must make only a prima facie showing of jurisdictional facts through the submitted materials in

3 | order to avoid a defendant's motion to dismiss").

4 | Specific jurisdiction must be evaluated on a claim-by-claim basis.  The relevant claims that

5 | have survived dismissal, as discussed above, are (1) violation of RICO and (2) (for the most part)

6 | the fraud-on-consumer claims.[25]

7 | Under Ninth Circuit law, there is a three-prong test for analyzing a claim of specific

8 | jurisdiction:

9 | (1) The non-resident defendant must purposefully direct his
activities or consummate some transaction with the forum or

10 | resident thereof; or perform some act by which he purposefully
avails himself of the privilege of conducting activities in the

11 | forum, thereby invoking the benefits and protections of its laws;

12 | (2) the claim must be one which arises out of or relates to the
defendant's forum-related activities; and

13 |

14 | (3) the exercise of jurisdiction must comport with fair play and
substantial justice, i.e. it must be reasonable.

15 | *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  Because the RICO

16 | and fraud-on-consumer claims are all predicated on torts, a purposeful direction analysis applies

17 | instead of a purposeful availment analysis.  *See id.*  "A showing that a defendant purposefully

18 | directed his conduct toward a forum state . . . usually consists of evidence of the defendant's

19 | actions outside the forum state that are directed at the forum, such as the distribution in the forum

20 | state of goods originating elsewhere."  *Id.* at 803.

21 | In the instant case, the dispute between the parties centers on the purposeful direction

22 | factor.  The foreign entities argue that Plaintiffs must show purposeful direction with respect to

23 | each of the states where the lawsuits comprising the MDL were initially filed.  *See* FCA/VM Mot.

24 | at 50 n.15 (citing *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 (9th Cir. 2011) (stating that

25 | "[a] district judge exercising authority over [MDL] cases transferred for pretrial proceedings

26 |

27 | ───────────────
[25] While the MMWA claim has survived dismissal, it has been asserted against FCA US only and

28 | not any foreign entity.  *See* FAC ¶ 286 ("Plaintiffs bring this action on behalf of themselves and
the Nationwide Class against FCA US LLC.").

United States District Court
Northern District of California

'inherits the entire pretrial jurisdiction that the transferor district judge would have exercised if the transfer had not occurred'")); *see also In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*, MDL No. 2753, 2017 U.S. Dist. LEXIS 192108, at *23 (D.N.H. Nov. 14, 2017) (stating that, "[i]n multi-district litigation based on diversity jurisdiction, ordinarily personal jurisdiction in the transferee court is based on the jurisdiction of the transferor court"); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2016 U.S. Dist. LEXIS 142235, at *430 (N.D. Ill. Oct. 10, 2016) (stating that, "[t]o establish that this Court has personal jurisdiction over Besins in this MDL proceeding, plaintiffs bear the burden of showing that the transferor courts where their cases originated would have personal jurisdiction over Besins"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02-1486 PJH 2005 U.S. Dist. LEXIS 30299, at *7 (N.D. Cal. Nov. 7, 2005) (stating that, "[i]n MDL actions such as this one, the court is entitled to exercise personal jurisdiction over each defendant only to the same degree that the original transferor court could have"); *In re Ski Train Fire in Kaprun, Aus.*, 257 F. Supp. 2d 717, 723 (S.D.N.Y. 2003) (noting that, "'[i]n a multi-district litigation, the transferee court must apply the law of the transferor forum in determining issues of personal jurisdiction'").

In response, Plaintiffs counter that this approach is not necessary because this Court may evaluate the foreign entities' contacts with the United States, and not each transferor court, under Federal Rule of Civil Procedure 4(k)(2).  *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158-59 (9th Cir. 2006) (explaining that Rule 4(k)(2) "is commonly referred to as the federal long-arm statute" because it allows a plaintiff "to look to the aggregate contacts of a defendant with the United States as a whole instead of a particular state forum").

> The exercise of Rule 4(k)(2) as a federal long-arm statute requires the plaintiff to prove three factors.  First, the claim against the defendant must arise under federal law.  Second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction.  Third, the federal court's exercise of personal jurisdiction must comport with due process. . . .
>
> . . . . The due process analysis is identical to [the typical minimum contacts analysis], except here the relevant forum is the entire United States.

United States District Court
Northern District of California

1    *Id.* at 1159.

2          Plaintiffs argue that (1) they have asserted a federal claim (the RICO claim[26]), (2) the

3    foreign entities have disavowed that they are subject to the personal jurisdiction of any state court

4    of general jurisdiction, and (3) they have adequately alleged minimum contacts once the United

5    States as a whole is considered.  Plaintiffs add that, under the doctrine of pendent jurisdiction, the

6    Court may exercise pendent personal jurisdiction over the state law claims because they share a

7    factual predicate with the RICO claim (*i.e.*, the claims arise out of a common nucleus of operative

8    facts).  *See* Opp'n at 71 n.40 (citing *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066,

9    1076 (9th Cir. 2011) (stating that, "[u]nder the doctrine of pendent personal jurisdiction, the court

10   may also exercise jurisdiction over the balance of CollegeSource's claims, which 'arise[] out of a

11   common nucleus of operative facts' with the misappropriation claim [over which there was

12   specific jurisdiction]"); *see also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174,

13   1181 (9th Cir. 2004) ("adopt[ing] the doctrine of pendent personal jurisdiction").

14         In reply, the foreign entities do not challenge any of Plaintiffs' arguments except for (3)

15   above; that is, they maintain that there are insufficient minimum contacts with the United States

16   because Plaintiffs have simply alleged in conclusory terms that the foreign entities purposefully

17   directed conduct toward the United States as a whole.

18         The Court finds that Plaintiffs have adequately established a prima facie case of specific

19   jurisdiction.  As to Bosch GmbH's contacts with the United States, there are sufficient contacts in

20   light of the appropriate "lumping" together of Bosch GmbH and Bosch LLC discussed above.  *See*

21   Part III.B.1.a.i, *infra*.

22         As for FCA N.V. and VM Italy, their argument that the FAC does not spell out precisely

23   what each company's contacts with the United States were (with reference to the RICO enterprise

24   "to install customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel

25   controls so that the Class Vehicles could 'pass' the EPA and CARB testing," FAC ¶ 229) is not

26   without some basis.  Nevertheless, Plaintiffs have made out a sufficient showing because the

27

28   _____
     [26] Plaintiffs also make reference to the MMWA claim but, as noted above, that claim has not been
     asserted against any foreign entity.  Rather, the only defendant for that claim is FCA US.

whole point of the enterprise was to get Class Vehicles into the U.S. market and sell, through deception, defective vehicles to U.S. customers.  There are multiple allegations in the operative complaint regarding the direct participation of the foreign entities in this enterprise.  *See, e.g.*, FAC ¶ 16 (alleging that FCA N.V. approved elements of design and/or strategies related to emission compliance for the Class Vehicles and imported Class Vehicles into the United States); FAC ¶ 17 (alleging that the FCA entities developed and disseminated owners' manuals, warranty booklets, and promotional materials relating to the Class Vehicles for distribution in the United States); FAC ¶ 96 (alleging that the FCA entities worked closely with the VM Defendants "to develop and calibrate the EcoDiesel® engines for the Class Vehicles and to gather information for submission to regulators in the COC and EO applications by FCA [US]"); FAC ¶ 237 (alleging that the VM Defendants "worked jointly on the manufacturing and/or assembling the engines for the Class Vehicles in the United States" and "provided information to FCA [US] for inclusion in the COC and EO applications").  These allegations of engaging in a jointly conceived and implemented plan to manufacture and sell defective vehicles, while purposefully concealing such defects, into the United States in violation of federal and state law constitutes conduct sufficient to be deemed purposefully directed at the United States so as to constitute minimum contacts.  *See In re Volkswagen "Clean Diesel" Mktg.*, MDL No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 179652, at *771-72 (N.D. Cal. Oct. 30, 2017) (holding that there was personal jurisdiction over Bosch GmbH because it intentionally designed and/or approved a defeat device to evade U.S. emission requirements and its employees lobbied U.S. regulators and lawmakers about the benefits of "clean diesel" technology); *cf. L.A. Gem & Jewelry Design, Inc. v. An & Assocs. Co.*, No. CV17-2417-CAS(JEMx), 2017 U.S. Dist. LEXIS 201918, at *19 (C.D. Cal. Dec. 6, 2017) (in copyright infringement case, stating that, "[h]ere, the Canadian defendants target the United States with their advertising, employ fully interactive websites selling the infringing products that cater to customers in the United States, and ship the infringing products to the United States[;] [o]n this record the Court easily finds that defendants targeted the United States").

The Court therefore denies the foreign entities' motions to dismiss on the basis of lack of personal jurisdiction.

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss.  The main rulings of the Court are below:

**Standing**

- Plaintiffs have satisfied Article III's standing requirements.

**RICO claim**

- Plaintiffs' RICO claim and RICO conspiracy claim are well pled.

- Plaintiffs' claim for aiding and abetting a RICO violation is dismissed because a private cause of action for aiding and abetting a RICO violation is unavailable.

**Common law fraud claims**

- Plaintiffs have leave to amend the common law fraud claims (as well as the consumer protection claims) to clarify that the claims are not purely fraudulent concealment claims but also affirmative misrepresentation claims.

- Plaintiffs have leave to amend the common law fraud claims (as well as the consumer protection claims) to include additional factual predicates for their fraud-on-consumer claims (*e.g.*, misleading advertisements regarding fuel economy or performance).

- The affirmative misrepresentation theory, as pled, applies only with respect to the FCA/VM Defendants, not to the Bosch Defendants.  The fraudulent concealment theory, as pled, applies to all Defendants.

- Neither the asserted affirmative misrepresentation claims nor the asserted fraudulent concealment claims are preempted.

- Plaintiffs have adequately pled an affirmative misrepresentation theory – *e.g.*, they have sufficiently pled an intent to deceive on the part of all Defendants, and whether the "EcoDiesel" logo amounted to puffery is for purposes of this motion a question of fact that cannot be decided at this juncture of the proceedings.

- Plaintiffs have adequately pled a fraudulent concealment theory – *e.g.*, fraudulent concealment is a cognizable claim, and Plaintiffs have sufficiently alleged, *inter*

1      *alia*, a duty to disclose (or an active concealment rendering such a duty moot) and

2      reliance.

3      **Consumer protection claims**

4      - The consumer protection claims, as pled, are not preempted.

5      - Plaintiffs' Iowa claim is dismissed but with leave to amend (*i.e.*, so that Plaintiffs

6        may allege that the filing of the class action claim has been approved by the Iowa

7        attorney general).

8      - Plaintiffs do not dispute that damages are unavailable under Georgia and

9        Minnesota's consumer protection statutes.

10     - Plaintiffs have adequately alleged an intent to deceive or an intent to deceive is not

11       an essential element of a claim for violation of certain state consumer protection

12       statutes.  *See* Part IV.D.4, *supra*.

13     - Plaintiffs' North Carolina claim is not barred by the economic loss doctrine.

14     - Plaintiffs' Kentucky claim is dismissed because Kentucky law has a privity

15       requirement that not been met.

16     - Plaintiffs have agreed to dismiss their claims for punitives under Nebraska and

17       West Virginia law.  They have also conceded that Maryland, Maine, Minnesota,

18       and South Dakota do not allow for punitives.  Plaintiffs have adequately alleged

19       malice as required under Oklahoma law to obtain punitive damages.

20     - Plaintiffs' Mississippi claim is dismissed but with leave to amend (*i.e.*, so that

21       Plaintiffs may allege the approval of the state attorney general).

22     **Warranty claims**

23     - The state law warranty claims are preempted; however, there is no basis to dismiss

24       the federal warranty (*i.e.*, MMWA) claim.

25     ///

26     ///

27     ///

28     ///

**Personal jurisdiction**

- Plaintiffs have established a prima facie case of personal jurisdiction over the foreign entities.

This order disposes of Docket Nos. 231 and 232.

**IT IS SO ORDERED.**

Dated: March 15, 2018

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California