Elizabeth J. Cabraser (State Bar No. 83151)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
Email: ecabraser@lchb.com

*Plaintiffs' Lead Counsel*

*(Plaintiffs' Steering Committee Members Listed on Signature Page)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CHRYSLER-DODGE-JEEP ECODIESEL® MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS<br><br><br>DORU BALI, *et al.*, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., FCA US LLC, SERGIO MARCHIONNE, VM MOTORI S.p.A., VM NORTH AMERICA, INC., ROBERT BOSCH GmbH, and ROBERT BOSCH LLC,<br><br>        Defendants. | MDL 2777 EMC<br><br>**SECOND AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>The Honorable Edward M. Chen |

1528982.7

1

**TABLE OF CONTENTS**

2

**Page**

3   INTRODUCTION ................................................................................................ 1

4   PARTIES ........................................................................................................... 4

    I.       DEFENDANTS ...................................................................................... 4

5            A.      Fiat Chrysler Defendants................................................................ 4

6            B.      VM Motori Defendants .................................................................. 6

7            C.      Bosch Defendants .......................................................................... 7

    II.      PLAINTIFFS ......................................................................................... 9

8   JURISDICTION AND VENUE ......................................................................... 65

9   INTRADISTRICT ASSIGNMENT.................................................................... 65

10  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.............................. 66

    I.       FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S.
11           "CLEAN" DIESEL MARKET ............................................................... 66

12  II.      DEFENDANTS' DIRTY "ECODIESEL®" SCHEME ............................ 69

    III.     FCA'S MISLEADING MARKETING .................................................... 79

13           A.      Fiat Chrysler Identifies and Combats the "Dirty Diesel" Stigma. ....... 79

14           B.      The EcoDiesel Name and Badge Communicate Environmental Friendliness
                     and Fuel Efficiency. ..................................................................... 81

15           C.      FCA Misrepresents the Class Vehicles to Consumers in a Consistent and
                     Pervasive Marketing Campaign. .................................................... 85

16                   1.      Press Releases and Media Communications............................. 86

17                   2.      Dealer Training Materials ..................................................... 87

18                   3.      Vehicle Brochures................................................................ 90

19                   4.      FCA Websites ..................................................................... 94

                     5.      Print Media and Television ................................................. 100

20           D.      The Defendants Knew These Representations Were False and Misleading........ 105

21                   1.      EGR AECD Strategy: EGR Rate Reduction.......................... 106

22                   2.      SCR AECD Strategy: Dosing Disablement ........................... 108

    IV.      "DIESELGATE" SCANDALIZES THE GLOBAL AUTO INDUSTRY. .... 110

23  V.       DEFENDANTS ARE CAUGHT CHEATING. ...................................... 113

24           A.      Plaintiffs' Testing Reveals Cheating.................................................. 113

25           B.      The EPA Issues A Notice of Violation to Fiat and FCA. ................... 114

             C.      Bosch Software Documentation Further Verifies the Violations .......... 116

26                   1.      AECDs 1 and 2:  Reducing or Disabling EGR at Highway Speeds ....... 116

27                   2.      AECD 3: EGR Shut-Off for Exhaust Valve Cleaning............. 117

                     3.      AECD 7: Alternative SCR Dosing Modes.............................. 117

28           D.      West Virginia University Testing of the Class Vehicles .................... 118

- i -

**TABLE OF CONTENTS**
(continued)

Page

    E.    European Investigation and Testing....................................................................... 119

    F.    Joint University of California, San Diego and German Study of the Fiat 500X........................................................................................................................ 120

VI.   THE DAMAGE CAUSED BY DEFENDANTS' DIRTY DIESEL SCHEME ............ 121

CLASS ACTION ALLEGATIONS ........................................................................................ 122

I.     CLASS DEFINITIONS ............................................................................................. 122

II.    CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF CIVIL PROCEDURE 23 ...................................................................................................... 128

ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED................................... 131

I.     DISCOVERY RULE .................................................................................................. 131

II.    FRAUDULENT CONCEALMENT ......................................................................... 131

III.   ESTOPPEL ................................................................................................................. 132

CLAIMS FOR RELIEF .......................................................................................................... 132

I.     CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS ..................... 132

    NATIONWIDE COUNT I RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") Violation of 18 U.S.C. § 1962(c)-(d)....... 132

    A.    Description of the EcoDiesel® RICO Enterprise ................................................ 135

         1.    The Fiat Chrysler Defendants ............................................................... 136

         2.    The VM Motori Defendants................................................................... 137

         3.    The Bosch Defendants .......................................................................... 137

    B.    The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues. ...................................................................................................... 138

    C.    Mail And Wire Fraud ......................................................................................... 142

    NATIONWIDE COUNT II FRAUD (Common Law) ................................................. 149

    A.    Affirmative Misrepresentation ........................................................................... 149

    B.    Fraudulent Concealment: Fuel Economy and Performance Representations ..... 150

    C.    Fraudulent Concealment: Installing and Concealing the Defeat Devices........... 151

    NATIONWIDE COUNT III IMPLIED AND WRITTEN WARRANTY Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*) ........................... 153

         1.    Alabama ................................................................................................ 155

    BREACH OF EXPRESS WARRANTY (Ala. Code §§ 7-2-313 and 7-2A-210) .......... 155

    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ala. Code §§ 7-2-314 and 7-2A-212) ................................................................................. 156

         2.    Alaska.................................................................................................... 157

    BREACH OF EXPRESS WARRANTY (Alaska Stat. Ann. §§ 45.02.313 and 45.12.210) .......................................................................................................... 157

1528982.7

**TABLE OF CONTENTS**
(continued)

Page

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Alaska Stat. Ann. §§ 45.02.314 and 45.12.212) ............................................................ 159

    3.       Arizona ................................................................... 160

BREACH OF EXPRESS WARRANTY (Ariz. Rev. Stat. §§ 47-2313 and 47-2A210) ................................................................................................................ 160

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212) ................................................................. 162

    4.       Arkansas .................................................................. 163

BREACH OF EXPRESS WARRANTY (Ark. Code Ann. §§ 4-2-313 and 4-2A-210) ................................................................................................................ 163

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ark. Code Ann. §§ 4-2-314 and 4-2A-212) ................................................................. 164

    5.       California ................................................................. 165

BREACH OF EXPRESS WARRANTY (Cal. Com. Code §§ 2313 and 10210) ........... 165

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Com. Code §§ 2314 and 10212) ..................................................................... 167

VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (Cal. Civ. Code §§ 1791.2 & 1793.2(d)) ...................................................................................................... 168

VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Civ. Code §§ 1791.1 and 1792) ............................................................... 170

BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES (Cal. Civ. Code § 1793.2, *et seq.*) ......................................................................... 171

    6.       Colorado .................................................................. 173

BREACH OF EXPRESS WARRANTY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210) ................................................................................................................ 173

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212) ..................................................... 174

    7.       Connecticut ............................................................. 175

BREACH OF EXPRESS WARRANTY (Conn. Gen. Stat. Ann. § 42A-2-313) ........... 175

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Conn. Gen. Stat. Ann. § 42A-2-314) ............................................................................. 177

    8.       Delaware .................................................................. 178

BREACH OF EXPRESS WARRANTY (6 Del. Code §§ 2-313 and 2A-210) ............. 178

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-212) ..................................................................... 179

    9.       District of Columbia ................................................ 180

BREACH OF EXPRESS WARRANTY (D.C. Code §§ 28:2-313 and 28:2A-210) ...... 180

1528982.7

**TABLE OF CONTENTS**
(continued)

Page

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (D.C. Code §§ 28:2-314 and 28:2A-212)................................................................... 182

    10.      Florida ................................................................................ 183

BREACH OF EXPRESS WARRANTY (Fla. Stat. §§ 672.313 and 680.21) ............... 183

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Fla. Stat. §§ 672.314 and 680.212)................................................................... 184

    11.      Georgia .............................................................................. 185

BREACH OF EXPRESS WARRANTY (Ga. Code. Ann. §§ 11-2-313 and 11-2A-210) ................................................................................................. 185

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)....................................................... 187

    12.      Hawaii ............................................................................... 188

BREACH OF EXPRESS WARRANTY (Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210)......................................................................................... 188

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212) ........................................... 190

    13.      Idaho................................................................................. 191

BREACH OF EXPRESS WARRANTY (Idaho Code §§ 28-2-313 and 28-12-210)..... 191

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212) ............................................................. 192

    14.      Illinois .............................................................................. 193

BREACH OF EXPRESS WARRANTY (810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)......................................................................................... 193

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)................................................ 195

    15.      Indiana .............................................................................. 196

BREACH OF EXPRESS WARRANTY (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210) ................................................................................................. 196

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)....................................................... 197

    16.      Iowa.................................................................................. 198

BREACH OF EXPRESS WARRANTY (Iowa Code §§ 554.2313 and 554.13210) ..... 198

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Iowa Code §§ 554.2314 and 554.13212)................................................................ 199

    17.      Kansas .............................................................................. 200

BREACH OF EXPRESS WARRANTY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210) ................................................................................................. 200

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)....................................................... 202

1

2

**TABLE OF CONTENTS**
(continued)

Page

3      18.      Kentucky ..................................................................... 203

BREACH OF EXPRESS WARRANTY (KY. REV. STAT. §§ 335.2-313 and
355.2A-210) ...................................................................................... 203

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (KY. REV.
STAT. §§ 335.2-314 and 355.2A-212) ............................................. 205

19.      Louisiana ................................................................... 206

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
WARRANTY AGAINST REDHIBITORY DEFECTS (La. Civ. Code Art.
2520, 2524) ....................................................................................... 206

20.      Maine ........................................................................ 207

BREACH OF EXPRESS WARRANTY (ME. REV. STAT. TIT. 11 §§ 2-313 and
2-1210) .............................................................................................. 207

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ME. REV.
STAT. TIT. 11 §§ 2-314 and 2-1212)................................................ 208

21.      Maryland .................................................................. 209

BREACH OF EXPRESS WARRANTY (Md. Code, Com. Law §§ 2-313 and 2a-
210) ................................................................................................... 209

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Md. Code
Com. Law §§ 2-314 and 2A-212) ..................................................... 211

22.      Massachusetts........................................................... 212

BREACH OF EXPRESS WARRANTY (Mass. Gen. Laws Ch. 106 §§ 2-313 and
2A-210) ............................................................................................. 212

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Mass. Gen.
Laws Ch. 106 §§ 2-314 and 2A-212)................................................ 214

23.      Michigan ................................................................... 215

BREACH OF EXPRESS WARRANTY (Mich. Comp. Laws §§ 440.2313 and
440.2860) .......................................................................................... 215

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Mich. Comp.
Laws §§ 440.2314 and 440.2860) ..................................................... 216

24.      Minnesota ................................................................. 217

BREACH OF EXPRESS WARRANTY (Minn. Stat. §§ 336.2-313 and 336.2A-
210) ................................................................................................... 217

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Minn. Stat.
§§ 336.2-314 and 336.2A-212) ......................................................... 219

25.      Mississippi ................................................................ 220

BREACH OF EXPRESS WARRANTY (Miss. Code §§ 75-2-313 and 75-2A-210) .... 220

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Miss. Code
§§ 75-2-314 and 75-2A-212) ............................................................ 221

26.      Missouri .................................................................... 222

BREACH OF EXPRESS WARRANTY (Mo. Stat. §§ 400.2-313 and 400.2A-210) .... 222

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- v -

**TABLE OF CONTENTS**
**(continued)**

**Page**

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Mo. Stat.
§§ 400.2-314 and 400.2A-212) ............................................................ 224

27.     Montana ................................................ 225

BREACH OF EXPRESS WARRANTY (Mont. Code §§ 30-2-313 and 30-2A-
210) .................................................................................... 225

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Mont. Code
§§ 30-2-314 and 30-2A-212) ........................................... 226

28.     Nebraska.............................................. 227

BREACH OF EXPRESS WARRANTY (Neb. Rev. St. U.C.C. §§ 2-313 and 2A-
210) .................................................................................... 227

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Neb. Rev. St.
U.C.C. §§ 2-314 and 2A-212).......................................... 229

29.     Nevada ................................................. 230

BREACH OF EXPRESS WARRANTY (Nev. Rev. Stat. §§ 104.2313 and
104A.2210) ........................................................................ 230

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Nev. Rev.
Stat. §§ 104.2314 and 104A.2212) .................................. 231

30.     New Hampshire....................................... 232

BREACH OF EXPRESS WARRANTY (N.H. Rev. Stat. §§ 382-A:2-313 and 2A-
210) .................................................................................... 232

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.H. Rev.
Stat. §§ 382-A:2-314 and 2A-212) .................................. 234

31.     New Jersey ............................................ 235

BREACH OF EXPRESS WARRANTY (N.J. Stat. Ann. § 12A:2-313 and 2A-210).... 235

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.J. Stat.
Ann. § 12A:2-314 and 2A-212) ....................................... 236

32.     New Mexico........................................... 237

BREACH OF EXPRESS WARRANTY (N.M. Stat. §§ 55-2-313 and 55-2A-210)...... 237

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.M. Stat.
§§ 55-2-314 and 55-2A-212) ........................................... 239

33.     New York .............................................. 240

BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. Law §§ 2-313 and 2A-210) ..... 240

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C.
Law §§ 2-314 and 2A-212).............................................. 241

34.     North Carolina........................................ 242

BREACH OF EXPRESS WARRANTY (N.C. Gen. Stat. §§ 25-2-313 and 252A-
210) .................................................................................... 242

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen.
Stat. §§ 25-2-314 AND 252A-212).................................. 244

- vi -

# TABLE OF CONTENTS
## (continued)

Page

35.    North Dakota ................................................................. 245

BREACH OF EXPRESS WARRANTY (N.D. Cent. Code §§ 41-02-30 and 41-02.1-19) ................................................................. 245

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.D. Cent. Code §§ 41-02-31 and 41-02.1-21) ................................................................. 247

36.    Ohio ................................................................. 247

BREACH OF EXPRESS WARRANTY (Ohio Rev. Code § 1302.26, *et seq.*) (U.C.C. §2-313)) ................................................................. 247

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19) ................................................................. 249

37.    Oklahoma ................................................................. 250

BREACH OF EXPRESS WARRANTY (Okla. Stat. Tit. 12A §§ 2-313 and 2A-210) ................................................................. 250

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Okla. Stat. Tit. 12A §§ 2-314 and 2A-212) ................................................................. 252

38.    Oregon ................................................................. 253

BREACH OF EXPRESS WARRANTY (Or. Rev. Stat. §§ 72.3130 and 72A.2100) .... 253

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Or. Rev. Stat. § 72.3140 and 72A.2120) ................................................................. 254

39.    Pennsylvania ................................................................. 255

BREACH OF EXPRESS WARRANTY (13 PA. CONS. STAT.  §§ 2313 and 2A210) ................................................................. 255

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (13 Pa. Cons. Stat. §§ 2314 and 2A212) ................................................................. 257

40.    Rhode Island ................................................................. 258

BREACH OF EXPRESS WARRANTY (R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210) ................................................................. 258

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212) ................................................................. 260

41.    South Carolina ................................................................. 260

BREACH OF EXPRESS WARRANTY (S.C. Code §§ 36-2-313 and 36-2A-210) ...... 260

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.C. Code §§ 36-2-314 and 36-2A-212) ................................................................. 262

42.    South Dakota ................................................................. 263

BREACH OF EXPRESS WARRANTY (S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210) ................................................................. 263

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212) ................................................................. 265

43.    Tennessee ................................................................. 266

1528982.7

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3   BREACH OF EXPRESS WARRANTY (Tenn. Code §§ 47-2-313 and 47-2A-210).... 266

4   BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tenn. Code §§ 47-2-314 and 47-2A-212) ............................................................ 267

5        44.     Texas ...................................................................................... 268

6   BREACH OF EXPRESS WARRANTY (Tex. Bus. & Com. Code §§ 2.313 and 2A.210) ...................................................................................................... 268

7   BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tex. Bus. & Com. Code §§ 2.314 and 2A.212) ...................................................... 270

8        45.     Utah ........................................................................................ 271

9   BREACH OF EXPRESS WARRANTY (Utah Code Ann. §§ 70A-2-313 and 70A-2A-210) ............................................................................................... 271

10

11  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Utah Code Ann. §§ 70A-2-314 and 70A-2A-212)............................................. 273

        46.     Vermont .................................................................................. 274

12  BREACH OF EXPRESS WARRANTY (Vt. Stat. Tit. Ann. 9A, §§ 2-313 and 2A-210) ...................................................................................................... 274

13

14  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2A-212)................................................. 275

15       47.     Virginia .................................................................................. 276

16  BREACH OF EXPRESS WARRANTY (Va. Code Ann. §§ 8.2-313 and 8.2A-210) ...................................................................................................... 276

17  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Va. Code Ann. §§ 8.2-314 and 8.2A-212) ............................................... 278

18       48.     Washington ............................................................................ 279

19  BREACH OF EXPRESS WARRANTY (Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210) ....................................................................................... 279

20  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212) ........................................... 280

21       49.     West Virginia ......................................................................... 281

22  BREACH OF EXPRESS WARRANTY (W. Va. Code §§ 46-2-313 and 46-2A-210) ...................................................................................................... 281

23

24  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (W. Va. Code §§ 46-2-314 and 46-2A-212) ................................................. 283

        50.     Wisconsin ............................................................................... 284

25  BREACH OF EXPRESS WARRANTY (Wis. Stat. §§ 402.313 and 411.210)............. 284

26  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wis. Stat. §§ 402.314 and 411.212).................................................................. 286

27       51.     Wyoming ................................................................................ 287

28  BREACH OF EXPRESS WARRANTY (Wyo. Stat. § 34.1-2-313).............................. 287

- viii -

**TABLE OF CONTENTS**
**(continued)**

Page

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212) ....................................... 288

II.     STATE CLASS CONSUMER PROTECTION CLAIMS.............................................. 289

VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT (Ala. Code § 8-19-1, *et seq.*).......................................... 289

VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (Alaska Stat. Ann. § 45.50.471, *et seq.*) ...................................................................... 292

VIOLATIONS OF THE CONSUMER FRAUD ACT (Ariz. Rev. Stat. § 44-1521, *et seq.*) ...................................................................... 296

ARKANSAS COUNT I VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT (Ark. Code Ann. § 4-88-101, *et seq.*) .................................... 298

VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ....................................................... 301

UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*)............................................ 304

FALSE ADVERTISING UNDER THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) ................................. 305

FAILURE TO RECALL/RETROFIT UNDER CALIFORNIA LAW.......................... 307

VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (Colo. Rev. Stat. § 6-1-101, *et seq.*)........................................... 308

VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*) .................................... 310

VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT AND DECEPTIVE TRADE PRACTICES ACT (6 Del. Code § 2513, *et seq.*, and 6 Del. Code § 2531, *et seq.*) ....................................... 313

VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT (D.C. Code § 28-3901, *et seq.*) ...................................................... 316

VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) .................................... 318

VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, *et seq.*) .......................... 321

VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*)............................................. 323

UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW (Haw. Rev. Stat. § 480, *et seq.*) ................................................. 325

VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (Idaho Code § 48-601, *et seq.*)................................................... 328

VIOLATION OF ILLINOIS CONSUMER FRAUD AND  DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.* and 510/2)............... 331

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1

**TABLE OF CONTENTS**
(continued)

2

Page

3   VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (Ind.
4       Code § 24-5-0.5-3) ............................................................................... 333

   VIOLATIONS OF THE PRIVATE RIGHT OF ACTION  FOR CONSUMER
5       FRAUDS ACT (Iowa Code § 714h.1, *et seq.*)..................................... 336

6   VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT (Kan. Stat.
        Ann. § 50-623, *et seq.*).......................................................................... 339

7   VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND
        CONSUMER PROTECTION LAW (La. Rev. Stat. § 51:1401, *et seq.*)............ 341

8   VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT (Me. Rev. Stat.
9       Ann. Tit. 5 § 205-a, *et seq.*) ................................................................ 344

   VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (Md.
10      Code Com. Law § 13-101*, et seq.*) ...................................................... 347

11  DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS
        LAW (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)..................................... 349

12  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
        (Mich. Comp. Laws § 445.903, *et seq.*)............................................... 352

13  VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER
        FRAUD ACT (Minn. Stat. § 325f.68, *et seq.*) ...................................... 355

14  VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE
15      PRACTICES ACT (Minn. Stat. § 325d.43, *et seq.*) ............................. 357

16  VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT  (Miss. Code.
        Ann. § 75-24-1, *et seq.*)........................................................................ 359

17  VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (Mo. Rev.
        Stat. § 407.010, *et seq.*)........................................................................ 362

18  VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND
        CONSUMER PROTECTION ACT OF 1973 (Mont. Code Ann. § 30-14-
19      101, *et seq.*) ......................................................................................... 364

20  VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (Neb.
        Rev. Stat. § 59-1601, *et seq.*) .............................................................. 367

21  VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
        (Nev. Rev. Stat. § 598.0903, *et seq.*) .................................................. 370

22  VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H. Rev. Stat. Ann.
23      § 358-a:1, *et seq.*)................................................................................. 372

   VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. Stat.
24      Ann. § 56:8-1, *et seq.*).......................................................................... 374

25  VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT (N.M. Stat.
        Ann. §§ 57-12-1, *et seq.*)...................................................................... 377

26  VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. Gen.
        Bus. Law § 349) ..................................................................................... 379

27  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. Gen.
28      Bus. Law § 350) ..................................................................................... 382

1

2

**TABLE OF CONTENTS**
(continued)

Page

3

VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE
  TRADE PRACTICES ACT (N.C. Gen. Stat. §§ 75-1.1, *et seq.*) ...................... 384

4

VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D.
  Cent. Code § 51-15-02)................................................................... 387

5

VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (Ohio
  Rev. Code §§ 1345.01, *et seq.*) ............................................................ 389

6

VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (Ohio
  Rev. Code § 4165.01, *et seq.*) ............................................................. 392

7

VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (Okla. Stat.
  Tit. 15 § 751, *et seq.*) ..................................................................... 394

8

VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
  (Or. Rev. Stat. §§ 646.605, *et seq.*) ...................................................... 396

9

10

VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES  AND
  CONSUMER PROTECTION LAW (73 Pa. Stat. Ann. § 201-1, *et seq.*) ......... 399

11

VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES
  ACT (R.I. Gen. Laws § 6-13.1, *et seq.*) ............................................... 401

12

VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES
  ACT (S.C. Code Ann. § 39-5-10, *et seq.*) ............................................. 404

13

VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF
  MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C.
  Code Ann. § 56-15-10, *et seq.*) ........................................................ 407

14

15

VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE TRADE PRACTICES
  AND CONSUMER PROTECTION LAW (S.D. Codified Laws § 37-24-6)..... 409

16

VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977
  (Tenn. Code Ann. § 47-18-101, *et seq.*)............................................... 411

17

18

VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES  ACT –
  CONSUMER PROTECTION ACT (Tex. Business & Commercial Code
  §§ 17.41, *et seq.*) ...................................................................... 413

19

VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT (Utah Code
  Ann. § 13-11-1, *et seq.*)................................................................. 416

20

21

VIOLATION OF UTAH TRUTH IN ADVERTISING LAW (Utah Code Ann.
  § 13-11a-1, *et seq.*)...................................................................... 418

22

VIOLATION OF VERMONT CONSUMER PROTECTION ACT (Vt. Stat. Ann.
  Tit. 9, § 2451 *et seq.*) .................................................................... 420

23

VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (Va.
  Code Ann. §§ 59.1-196, *et seq.*) ........................................................ 423

24

25

VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
  (Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*)................................... 425

26

VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT (W.
  Va. Code § 46A-1-101, *et seq.*) ....................................................... 428

27

VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
  (Wis. Stat. § 100.18) ..................................................................... 431

28

**TABLE OF CONTENTS**
**(continued)**

Page

VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT (Wyo. Stat. §§ 40-12-101, *et seq.*) ................................................................................. 434

III.     PRAYER FOR RELIEF............................................................................................ 436

IV.     DEMAND FOR JURY TRIAL.................................................................................. 438

1528982.7

Plaintiffs bring this action on behalf of themselves and all others similarly situated, against (1) the Defendants collectively referred to as "Fiat Chrysler": FCA US LLC ("FCA"), Fiat Chrysler Automobiles N.V. ("Fiat"), and Sergio Marchionne ("Marchionne"); (2) the Defendants collectively referred to as "VM Motori": VM Motori S.p.A. ("VM Italy") and VM North America, Inc. ("VM America"); and (3) the Defendants collectively referred to as "Bosch": Robert Bosch GmbH ("Bosch GmbH"), and Robert Bosch, LLC ("Bosch LLC").  Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## **INTRODUCTION**

1.     This nationwide class action arises out of an international race to the bottom.  Fiat Chrysler, a rival of automaker Volkswagen struggling to compete on the world stage, sought to grab a piece of the U.S. "clean" diesel market with 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Class Vehicles").  But like Volkswagen, Fiat Chrysler fought dirty.  That is, like Volkswagen did with its "clean diesels," Fiat Chrysler concealed from regulators and consumers alike that the EcoDiesel® trucks were far from "Eco."

2.     As the Environmental Protection Agency ("EPA") has since discovered, Fiat Chrysler, by and through FCA, concealed emission treatment software features in the Class Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs").  This hidden software, designed and implemented by Bosch GmbH and Bosch LLC, allowed the Class Vehicles to "pass" emission testing and obtain COCs and EOs so that Fiat Chrysler could import and sell the Class Vehicles in the U.S. and California, respectively.  Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Class Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by law.

3.     On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the

2014-2016 FCA Ram 1500s and Jeep Grand Cherokees.[1]  In the NOV, the EPA explained that, despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"

4.      The same day, CARB publicly announced that it, too, had notified Fiat and FCA of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles.  CARB also said Fiat and FCA failed to disclose the devices, which can significantly increase NOx emissions when activated.  "Once again," observed CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules and got caught."[2]

5.      The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties.[3] As the U.S. has found, "one or more of these undisclosed software features, alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the [Class] Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests."[4]

6.      American consumers were caught in the middle of Fiat Chrysler's scheme. Consumers have been wary of diesel engines as a relic of the past:  noisy and spewing thick, toxic smoke.  This was an understandable concern.  A byproduct of diesel combustion is NOx, a pollutant linked with serious health dangers and climate change.  Seeking to expand the diesel market in the U.S., large automakers in the late 2000's sought to reimagine diesel for regulators and consumers alike.  For its part, Fiat Chrysler touted its "EcoDiesel" technology as the best of both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's

---

[1] EPA's January 12, 2017 Notice of Violation to Fiat Chrysler Automobiles, https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
[2] EPA News Release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan. 12, 2017), https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.
[3] *United States v. Fiat US LLC, et al.*, No. 2:17-cv-11633-JCO-EAS (E.D. Mich. filed May 23, 2017) (Dkt. No. 1).  The action has since been transferred to this Court for coordination with this MDL.
[4] *Id.* at ¶ 2.

1    benefits of greater torque, power, and fuel efficiency.  Fiat Chrysler extracted a premium for these

2    "EcoDiesel" trucks, selling them for thousands of dollars more than the cost of otherwise-

3    comparable gasoline trucks.

4           7.      Contrary to its public representations, and concealed from consumers and

5    regulators alike, Fiat Chrysler secretly programmed its EcoDiesel® vehicles with hidden software

6    features that significantly reduced the effectiveness of the NOx reduction technology during real-

7    world driving conditions.  As a result, the Class Vehicles emitted harmful pollutants at levels that

8    were illegally high and far in excess of what a reasonable consumer would expect from an "Eco"

9    vehicle.  Plaintiffs' on-road testing has confirmed that the Class Vehicles produced NOx

10   emissions at an average of 222 mg/mile in city driving (four times the Federal Test Procedure

11   ("FTP") standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the

12   U.S. highway standard of 70 mg/mile).  In many instances, NOx values were in excess of 1,600

13   mg/mile—*more than 20 times governmental standards*.

14          8.      Compounding this problem is the interplay between performance and emissions in

15   diesel engines.  Fiat Chrysler could not achieve the fuel economy and performance that it

16   promises for the Class Vehicles without cheating on emissions—a fact that it concealed from

17   consumers around the country.

18          9.      Fiat Chrysler did not act alone.  At the heart of the diesel scandal is Bosch.  Bosch

19   GmbH and Bosch LLC, along with CEO Volkmar Denner ("Denner"), were active and knowing

20   participants in the scheme.  Bosch designed, created, and tested the electronic diesel control

21   ("EDC") units that allowed Fiat Chrysler to "pass" emission tests for its COC and EO

22   applications.  Bosch went so far as to boast that the "2014 Jeep Grand Cherokee features a Bosch

23   emission system compliant with the most stringent emission regulations in the world. From fuel

24   tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a

25   great driving experience requiring fewer stops at the pump."[5]  Bosch has since, however,

26   _____

27   [5] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNewswire (Jan.
     24, 2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-dieseltechnology-
     on-2014-jeep-grand-cherokee-188243051.html;  http://us.bosch-press.com/tbwebdb/bosch-
28   usa/en-US/PressText.cfm?CFID=61223175&CFTOKEN=a16399a1447f6b98-4B6F7D4B-A8E6-
     F415-F31B16E0E13CB96A&nh=00&Search=0&id=532.

1  acknowledged its role in the creation of defeat devices in certain Fiat Chrysler diesel vehicles sold

2  in the European Union ("EU").  VM Italy and VM America also knowingly participated in the

3  scheme by designing, manufacturing, and calibrating the "EcoDiesel" engines in the Class

4  Vehicles.

5          10.    On behalf of themselves, the Nationwide Class, and the respective State Classes,

6  Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt

7  Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the federal Magnuson-Moss Warranty

8  Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); common law fraud; and the consumer laws of all 50

9  states and the District of Columbia.

10          11.    Plaintiffs bring this action individually and on behalf of all other current and

11  former owners or lessees of the Class Vehicles as defined herein.  Plaintiffs seek a buyback

12  program for the Class Vehicles, monetary damages (including treble damages under RICO),

13  pollution mitigation, business reforms, and injunctive and other equitable relief for Defendants'

14  misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as

15  alleged in this Complaint.  Plaintiffs and Class members are also entitled to a significant award of

16  punitive or exemplary damages, given that Defendants deliberately deceived Plaintiffs and Class

17  members, disregarded their rights to make free and informed consumer choices, damaged them

18  economically, and used them as unwitting puppets in a scheme that impaired the public health.

19                                    **PARTIES**

20  **I.**     **DEFENDANTS**

21          **A.**      **Fiat Chrysler Defendants**

22          12.    Defendant **FCA US LLC ("FCA")** is a Delaware limited liability company.

23  Defendant **Fiat Chrysler Automobiles N.V. ("Fiat" or, together with FCA, "Fiat Chrysler")**

24  is FCA's corporate parent.  Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's

25  predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time

26  Chrysler Group LLC became a wholly-owned indirect subsidiary of Fiat and was renamed FCA

27  US LLC.  FCA's principal place of business and headquarters is located at 1000 Chrysler Drive,

28  Auburn Hills, Michigan 48326.

     -4-     

13.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles.  FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors).  FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands.  Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

14.     FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased two models of vehicle for which the EcoDiesel® option is available—the Ram 1500 and the Jeep Grand Cherokee—with the knowledge and intent to market, sell, and lease them in all 50 states, including in California.  Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Class Vehicles in California and throughout the United States.  Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

15.     Fiat, the corporate parent of FCA, is a Dutch corporation headquartered in London, United Kingdom.  Fiat owns numerous European automotive brands in addition to FCA's American brands, including Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth.  As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

16.     Subject to a reasonable opportunity for further investigation or discovery, Plaintiffs allege that Fiat employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Class Vehicles.  Fiat also imported into the United States, sold, offered for sale, introduced into commerce, or delivered the Class Vehicles, with the intent to market or sell them in all fifty states, including in California.

17.     Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Class Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states, including in California.  Fiat Chrysler is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

18.     Defendant **Sergio Marchionne ("Marchionne")** is the CEO and Chairman of FCA, the CEO of Fiat, and the Chairman and/or CEO of several other Fiat subsidiaries, including FCA Italy S.p.A., the Italian subsidiary of Fiat headquartered in Turin, Italy.  Since 2004, Mr. Marchionne has been the CEO of Fiat S.p.A., the predecessor of Fiat, and thus, oversaw Fiat's acquisition of both VM Motori and Chrysler Group LLC, the transformation to the current corporate structure, and the creation of FCA.  Mr. Marchionne has made numerous public statements on behalf of Fiat Chrysler concerning the Class Vehicles, their EcoDiesel® engines, and their emissions and performance characteristics.  In addition to managing and controlling FCA, Mr. Marchionne has a home in the United States, regularly transacts business in the United States, and regularly promotes Fiat Chrysler in the United States.

**B.     VM Motori Defendants**

19.     Fiat also owns several auto parts manufacturers, including Defendant **VM Motori S.p.A. ("VM Italy")**, an Italian corporation headquartered in Cento, Italy, which designs and manufactures diesel engines for automobiles, including the Class Vehicles.  Fiat partially acquired VM Italy in early 2011 by purchasing a 50% stake, and took full ownership by acquiring the remaining 50% from General Motors in October 2013.

20.     Defendant **VM North America, Inc. ("VM America" or, together with VM Italy, "VM Motori")** is or was a Delaware corporation and wholly-owned subsidiary of Fiat. VM America existed, at all relevant times, to support VM Italy customers and activities in North America.  VM America's principal place of business is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.  Both VM Italy and VM America conduct business at that address and report to management at both VM Italy and VM America, including while working on the Class Vehicles.

21.     VM Italy transacts business in the United States.  VM Italy employees have been physically present in Auburn Hills, Michigan, while working on engine calibration and air emissions issues related to the Class Vehicles.  Some VM America employees working in Auburn Hills are also employees of VM Italy.  VM Italy employees in Italy communicated regularly

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    about the Class Vehicles with the VM America and VM Italy employees located in Auburn Hills.

2    VM Italy also communicated frequently with FCA about the Class Vehicles.

3        22.    VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel®

4    engine system for inclusion in the Class Vehicles, knowing and intending that the Class Vehicles,

5    along with their engine system, would be marketed, distributed, warranted, sold and leased

6    throughout all 50 states, including in California.

7        **C.    Bosch Defendants**

8        23.    Defendant **Robert Bosch GmbH ("Bosch GmbH")**—a German multinational

9    engineering and electronics company headquartered in Gerlingen, Germany—is the parent

10   company of Defendant **Robert Bosch LLC ("Bosch LLC" or, with Bosch GmbH, "Bosch")**, a

11   Delaware limited liability company with its principal place of business located at 38000 Hills

12   Tech Drive, Farmington Hills, Michigan 48331.

13       24.    Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch

14   Group, which encompasses some 340 subsidiaries and companies.  Volkmar Denner ("Denner")

15   is the Chairman and CEO of Bosch GmbH and leader of The Bosch Group. Denner has been

16   Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU

17   Development division, managing the development and sale of automotive engine computers, such

18   as the EDC units that were installed in the Class Vehicles.

19       25.    The Bosch Group is divided into four business sectors: Mobility Solutions

20   (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and

21   Building Technology.  Bosch's sectors and divisions are grouped not by location, but by function.

22   In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and

23   Bosch LLC.  Regardless of whether an individual works for Bosch in Germany or the United

24   States, the employee holds him or herself out as working for Bosch.  This collective identity is

25   captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each

26   entity and person within the Bosch Group.

27

28

26.     Mobility Solutions is the largest Bosch Group business sector.  In 2014, the first full year of Class Vehicle sales, it generated sales of €33.3 billion, amounting to 68% of total group sales.

27.     The Bosch Group is one of the leading automotive suppliers globally.  In 2015, Mobility Solutions generated sales of $9.5 billion in North America alone.

28.     Bosch embeds sales and engineering personnel at customer offices and facilities throughout the world, including automakers like Fiat Chrysler, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

29.     Bosch operates 70 locations in the United States, with over 31,000 employees. One of these locations is the Bosch LLC Research and Technology Center North America in Palo Alto, California.  One of Bosch's research focuses there is application-specific integrated circuit (ASIC) design and MEMS (microelectromechanical-system) technology.  These technologies are used in a variety of automotive applications.  Bosch LLC also operates Research and Technology Centers in Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.

30.     Bosch developed, tested, configured, manufactured, and supplied the EDC Unit 17, which is the EDC system used in the Class Vehicles, knowing and intending that the Class Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California.  As set forth in detail herein, at all relevant times, Bosch, VM Motori, and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Class Vehicles.

31.     From at least 2005 to 2015, Bosch and its employees were knowing and active participants in the creation, development, marketing, and sale of engine and emission control software designed to evade emission requirements in vehicles sold in the United States.  These vehicles include the Ram 1500 EcoDiesel® and Jeep Grand Cherokee EcoDiesel®, as well as diesels made by other automakers such as Volkswagen, Audi, and Porsche.

32.     Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality.  Moreover, Bosch's participation was not limited to engineering these devices.  In fact, Bosch marketed "clean diesel"

-8-

technology in the United States.  Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Fiat Chrysler and VM Motori and others to defraud regulators and consumers in the United States.

## II.   PLAINTIFFS

33.   For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Class Vehicles:

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Alley, Anthony | TX | MS | 2015 | Ram 1500 |
| Bali, Doru | MI | KY | 2014 | Jeep Grand Cherokee |
| Bernstein, Leslie | CA | CA | 2016 | Ram 1500 |
| Bihorean, Marius | GA | NC | 2015 | Ram 1500 |
| Boykin, James | FL | VA | 2015 | Ram 1500 |
| Brinkman, Elmer and Barbara | SD | SD | 2016 | Ram 1500 |
| Broom, Jamie | LA | TX | 2015 | Ram 1500 |
| Burwell, Adam | OR | ID | 2016 | Ram 1500 |
| Calhoun, Karl | WA | ID | 2016 | Ram 1500 |
| Carillo, Giuseppe | NY | CT | 2016 | Ram 1500 |
| Carter, Aaron | IL | IL | 2015 | Jeep Grand Cherokee |
| Chatom Motor Company, Inc. | AL | AL | 2015 | Ram 1500 |
| Chavez, Jose | CA | CA | 2016 | Ram 1500 |
| Claflin, Josh | WI | MN | 2015 | Ram 1500 |
| DeBerry, James | FL | GA | 2016 | Ram 1500 |
| Devault, Edward | ME | ME | 2014 | Jeep Grand Cherokee |
| Edwards, Anthony | TN | TN | 2015 | Ram 1500 |
| Fasching, Mathue | ID | OR | 2016 | Ram 1500 |
| Feist, Tommy | CO | CO | 2016 | Ram 1500 |
| Feldman, Victor | AL | TX | 2015 | Ram 1500 |
| Fragoso, Miguel | NC | NC | 2016 | Jeep Grand Cherokee |
| Giauque, Gregory | CA | AZ | 2015 | Jeep Grand Cherokee |

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Gillespie, Tom | GA | GA | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2014 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2015 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2016 | Ram 1500 |
| GN Systems, Inc. | FL | FL | 2016 | Ram 1500 |
| Greenberg, Benjamin | MA | MA | 2015 | Jeep Grand Cherokee |
| Griggs, Jeffrey | TN | GA | 2014 | Ram 1500 |
| Gunderson, Jake | NM | NM | 2015 | Ram 1500 |
| Heidlebaugh, Kyle and Jessica | PA | MD | 2014 | Jeep Grand Cherokee |
| Hiner, Brian | VA | VA | 2014 | Jeep Grand Cherokee |
| Hissey, Charles | TX | TX | 2015 | Jeep Grand Cherokee |
| Holland, Lee | OK | OK | 2015 | Ram 1500 |
| Holm, Ronald | MT | MT | 2015 | Ram 1500 |
| Hood, Connie | NE | NE | 2014 | Jeep Grand Cherokee |
| Johnson, Matthew and Amanda Kobussen | AK/WA | AK | 2015 | Jeep Grand Cherokee |
| Johnson, Michael | GA | SC | 2014 | Ram 1500 |
| Korrell, Donald II | MD | PA | 2014 | Jeep Grand Cherokee |
| Lindholm, Richard | NE | NE | 2015 | Ram 1500 |
| Loescher, Andrew | WA | ND | 2015 | Ram 1500 |
| Mattingly, Christopher | NV | NV | 2016 | Ram 1500 |
| McGann, Thomas Jr. | NY | NY | 2016 | Ram 1500 |
| Melin, Ernest Jr. | SC | SC | 2016 | Ram 1500 |
| Milner, George | NY | NY | 2014 | Ram 1500 |
| Montgomery, Ryan | CO | CO | 2014 | Ram 1500 |
| Muckenfuss, Bryan | SC | SC | 2015 | Ram 1500 |
| Norton, Michael | NJ | NJ | 2014 | Jeep Grand Cherokee |
| Petersen, Kirk | IA | IA | 2015 | Ram 1500 |

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Phillips, Melvin | MO | AR | 2015 | Ram 1500 |
| Price, Samuel | LA | NC | 2014 | Ram 1500 |
| Radziewicz, John | LA | LA | 2014 | Jeep Grand Cherokee |
| Reichert, Bobby | FL | FL | 2016 | Ram 1500 |
| Richards, Mark | IN | IN | 2016 | Ram 1500 |
| Roberts, Jon | OH | OH | 2014 | Ram 1500 |
| Ruiz, Kelly | WY | WY | 2014 | Jeep Grand Cherokee |
| Sandifer, Jesse | WA | WA | 2016 | Ram 1500 |
| Silio, Miguel | FL | FL | 2015 | Jeep Grand Cherokee |
| Singh, Satyanam | CA | CA | 2016 | Ram 1500 |
| Stephens, Nelson John | GA | AL | 2014 | Ram 1500 |
| Tonnesen, Wayne | NJ | WI | 2016 | Ram 1500 |
| Turner, William, III | GA | GA | 2014 | Jeep Grand Cherokee |
| WEB Farms, Inc. | NM | TX | 2014 | Ram 1500 |
| Webb, John | CO | CO | 2016 | Ram 1500 |
| Webster, Stonewall, III | NC | NC | 2016 | Ram 1500 |
| Wilson, John | UT | UT | 2016 | Ram 1500 |

34.     Plaintiff **Anthony Alley** (for the purpose of this paragraph, "Plaintiff"), a citizen of Texas, residing in Livingston, Texas, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about December 17, 2015 at Howard Wilson Chrysler Jeep Dodge, an authorized FCA dealer in Flowood, Mississippi.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff recalls visiting the Ram website, on which the Class Vehicles were represented as environmentally friendly, having low emissions and good fuel economy.  Plaintiff also recalls seeing television commercials about the Class Vehicles.  When Plaintiff went to Howard Wilson Chrysler Jeep Dodge to purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy and

1    performance.  These representations, along with the advertised fuel economy, were among the

2    primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

3    that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

4    than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

5    equipped with undisclosed and unauthorized emission control devices designed to cheat emission

6    tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

7    Vehicle, or would have paid less for it, had he known that it did not comply with emission

8    standards; that its emission treatment system was designed to de-activate during real-world

9    driving conditions; and that it could not achieve the advertised towing power, performance,

10   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

11   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

12   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

13   control devices.

14          35.     Plaintiff **Doru Bali** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15   Michigan, residing in Canton, Michigan, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for

16   the purpose of this paragraph, the "Class Vehicle") on or about June 20, 2015 at Cross Chrysler

17   Jeep FIAT, an authorized FCA dealer in Louisville, Kentucky.  Plaintiff decided to buy the Class

18   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

19   emissions and fuel efficient).  When Plaintiff went to Cross Chrysler Jeep FIAT to purchase the

20   Class Vehicle, the sales associate there touted the Class Vehicle's EcoDiesel® attributes and

21   informed Plaintiff that the Diesel Exhaust Fluid ("DEF") additive changed exhaust fumes into

22   "steamed water." These representations, along with the advertised fuel economy and low

23   emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

24   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

25   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

26   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

27   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

28   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

-12-

1   comply with emission standards; that its emission treatment system was designed to de-activate

2   during real-world driving conditions; and that it could not achieve the advertised towing power,

3   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

4   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

5   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

6   unauthorized emission control devices.

7        36.     Plaintiff **Leslie Bernstein** (formerly Leslie Ghrist) (for the purpose of this

8   paragraph, "Plaintiff"), a citizen of California, residing in Simi Valley, California, leased a 2016

9   Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") in or about

10  October 2015 at Shaver Chrysler Dodge Jeep Ram & Fiat, an authorized FCA dealer in Thousand

11  Oaks, California.  Plaintiff decided to lease the Class Vehicle based in part on FCA's

12  representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

13  When Plaintiff went to Shaver Chrysler Dodge Jeep Ram & Fiat to lease the Class Vehicle, the

14  sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy,

15  power, low emissions, and environmental friendliness. After leasing the vehicle, Plaintiff

16  conducted online research to confirm the representations made to her by the sales associate at

17  Shaver Chrysler Dodge Jeep Ram & Fiat were in fact accurate. Plaintiff intended on returning her

18  Class Vehicle within the three-day grace period offered by Shaver Chrysler Dodge Jeep Ram &

19  Fiat if the representations made by the sales associate did not match the representations on the

20  Ram website. Plaintiff saw representations on Ram's website in which the Class Vehicles were

21  represented to have good fuel economy while having low emissions. These representations, along

22  with the advertised fuel economy, were among the primary reasons Plaintiff chose the Class

23  Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could perform as

24  advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

25  Nor was Plaintiff aware that her Class Vehicle was equipped with undisclosed and unauthorized

26  emission control devices designed to cheat emission tests and to deceive consumers and

27  regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it, had

28  she known that it did not comply with emission standards; that its emission treatment system was

-13-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1   designed to de-activate during real-world driving conditions; and that it could not achieve the

2   advertised towing power, performance, and/or fuel economy without cheating emission tests.

3   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

4   misconduct, and would not have leased the Class Vehicle, or would have paid less for it, had

5   Defendants not concealed the unauthorized emission control devices.

6          37.     Plaintiff **Marius Bihorean** (for the purpose of this paragraph, "Plaintiff"), a

7   citizen of Georgia, residing in Lawrenceville, Georgia, bought a 2015 Ram 1500 EcoDiesel® (for

8   the purpose of this paragraph, the "Class Vehicle") on or about September 12, 2015 at Skyland

9   Automotive Group, an authorized FCA dealer in Asheville, North Carolina.  Plaintiff decided to

10  buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

11  (i.e., reduced emissions and fuel efficient).  When Plaintiff went to Skyland Automotive Group to

12  purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes,

13  including its fuel economy, clean operation, towing power, and performance.  These

14  representations, along with the advertised fuel economy, towing power, and performance, were

15  among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

16  did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

17  that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

18  Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

19  cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

20  the Class Vehicle, or would have paid less for it, had he known that it did not comply with

21  emission standards; that its emission treatment system was designed to de-activate during real-

22  world driving conditions; and that it could not achieve the advertised towing power, performance,

23  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

24  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

25  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

26  control devices.

27          38.     Plaintiff **James Boykin** (for the purpose of this paragraph, "Plaintiff"), a citizen of

28  Florida, residing in Oviedo, Florida, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of

1   this paragraph, the "Class Vehicle") on or about August 9, 2015, at Koons Tysons Chrysler

2   Dodge Jeep and Ram, an authorized FCA dealer in Vienna, Virginia.  Plaintiff decided to buy the

3   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

4   reduced emissions and fuel efficient).  Plaintiff saw television commercials that focused primarily

5   on the Class Vehicles' design. When Plaintiff went to Koons Tysons Chrysler Dodge Jeep and

6   Ram to purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel®

7   attributes, including its fuel economy and low emissions.  These representations, along with the

8   advertised fuel economy, towing power, performance, and resale value were among the primary

9   reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the

10  Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than

11  advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

12  with undisclosed and unauthorized emission control devices designed to cheat emission tests and

13  to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

14  would have paid less for it, had he known that it did not comply with emission standards; that its

15  emission treatment system was designed to de-activate during real-world driving conditions; and

16  that it could not achieve the advertised towing power, performance, and/or fuel economy without

17  cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

18  Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

19  less for it, had Defendants not concealed the unauthorized emission control devices.

20          39.     Plaintiffs **Elmer and Barbara Brinkman** (for the purpose of this paragraph,

21  "Plaintiffs"), citizens of South Dakota, residing in Watertown, South Dakota, bought a 2016 Ram

22  1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September

23  9, 2016 at Watertown Ford Chrysler, an authorized FCA dealer in Watertown, South Dakota.

24  Plaintiffs decided to buy the Class Vehicle based in part on FCA's representations that it was an

25  "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff Elmer Brinkman saw

26  representations on Ram's website in which the Class Vehicles were represented to be

27  environmentally friendly, low emissions, have good fuel economy, and towing power. When

28  Plaintiffs went to Watertown Ford Chrysler to purchase the Class Vehicle, Plaintiffs recall being

given a brochure for the Class Vehicle that touted the EcoDiesel®'s low emissions, fuel

economy, and towing capabilities. Plaintiff Elmer Brinkman also recalls being told by the

salesperson, Mr. Mark Brooks, that the Class Vehicle did not have the same emission compliance

issues as the Volkswagen diesel vehicles. These representations, along with the advertised fuel

economy and towing power, were among the primary reasons Plaintiffs chose the Class Vehicle.

At the time of purchase, Plaintiffs did not know that the Class Vehicle could perform as

advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

Nor were Plaintiffs aware that their Class Vehicle was equipped with undisclosed and

unauthorized emission control devices designed to cheat emission tests and to deceive consumers

and regulators.  Plaintiffs would not have purchased the Class Vehicle, or would have paid less

for it, had they known that it did not comply with emission standards; that its emission treatment

system was designed to de-activate during real-world driving conditions; and that it could not

achieve the advertised towing power, performance, and/or fuel economy without cheating

emission tests.  Plaintiffs have suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

less for it, had Defendants not concealed the unauthorized emission control devices.

40.     Plaintiff **Jamie Broom** (for the purpose of this paragraph, "Plaintiff"), a citizen of

Louisiana, residing in Thibodaux, Louisiana, bought a 2015 Ram 1500 EcoDiesel® (for the

purpose of this paragraph, the "Class Vehicle") on or about June 1, 2015 at Nyle Maxwell

Chrysler Dodge Jeep, an authorized FCA dealer in Taylor, Texas.  Plaintiff decided to buy the

Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

reduced emissions and fuel efficient).  Plaintiff saw representations on Ram's website, in a Ram

promotional brochure, and in television commercials in which the Class Vehicles were

represented as having good fuel economy, towing capacity, and power all while being

environmentally friendly with low emissions. When Plaintiff went to Southland Dodge Chrysler

Jeep in Houma, Louisiana to find out more information about the Class Vehicle, and Nyle

Maxwell Chrysler Dodge Jeep to purchase the Class Vehicle, the sales associates at both

authorized FCA dealers touted the Class Vehicle's EcoDiesel® attributes, including its low

1   emissions, fuel economy, towing power, and performance. These representations, along with the

2   advertised fuel economy were among the primary reasons Plaintiff chose the Class Vehicle.  At

3   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

4   only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

5   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

6   control devices designed to cheat emission tests and to deceive consumers and regulators.

7   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

8   known that it did not comply with emission standards; that its emission treatment system was

9   designed to de-activate during real-world driving conditions; and that it could not achieve the

10  advertised towing power, performance, and/or fuel economy without cheating emission tests.

11  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

12  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

13  Defendants not concealed the unauthorized emission control devices.

14      41.    Plaintiff **Adam Burwell** (for the purpose of this paragraph, "Plaintiff"), a citizen

15  of Oregon, residing in Klamath Falls, Oregon, bought a 2016 Ram 1500 EcoDiesel® (for the

16  purpose of this paragraph, the "Class Vehicle") on or about August 31, 2016 at Dave Smith

17  Motors, an authorized FCA dealer in Kellogg, Idaho.  Plaintiff decided to buy the Class Vehicle

18  based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions

19  and fuel efficient).  Plaintiff saw representations on Ram's website in which the Class Vehicles

20  were represented to be environmentally friendly, have low emissions, have good fuel economy,

21  and high performance.  When Plaintiff went to Dave Smith Motors to purchase the Class Vehicle,

22  the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel efficiency,

23  low emissions, and performance. These representations, along with the advertised fuel economy,

24  were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

25  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

26  levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

27  Class Vehicle was equipped with undisclosed and unauthorized emission control devices

28  designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

-17-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

2    comply with emission standards; that its emission treatment system was designed to de-activate

3    during real-world driving conditions; and that it could not achieve the advertised towing power,

4    performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

5    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

6    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

7    unauthorized emission control devices.

8          42.    Plaintiff **Karl Calhoun** (for the purpose of this paragraph, "Plaintiff"), a citizen of

9    Washington, residing in Moses Lake, Washington, bought a 2016 Ram 1500 EcoDiesel® (for the

10    purpose of this paragraph, the "Class Vehicle") on or about January 16, 2016 at Dave Smith

11    Motors, an authorized FCA dealer in Kellogg, Idaho.  Plaintiff decided to buy the Class Vehicle

12    based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions

13    and fuel efficient).  Plaintiff saw a representation on the Ram website stating that the Class

14    Vehicles were highly fuel efficient with good torque, and had excellent towing capability.

15    Plaintiff also reviewed information that discussed the reduced emissions of the EcoDiesel®

16    engines. Additionally, Plaintiff saw television advertisements stating the trucks would achieve 29

17    MPG highway, with high torque and great towing capacity. When Plaintiff went to Dave Smith

18    Motors to purchase the Class Vehicle, he discussed towing capacity, torque, horsepower, and

19    mileage figures with a sales associate before making the purchase.  These representations, along

20    with the advertised fuel economy and low emissions were among the primary reasons Plaintiff

21    chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle

22    could perform as advertised only by emitting NOx at levels that are greater than advertised and

23    above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed

24    and unauthorized emission control devices designed to cheat emission tests and to deceive

25    consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have

26    paid less for it, had he known that it did not comply with emission standards; that its emission

27    treatment system was designed to de-activate during real-world driving conditions; and that it

28    could not achieve the advertised towing power, performance, and/or fuel economy without

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

43. Plaintiff **Giuseppe Carillo** (for the purpose of this paragraph, "Plaintiff"), a citizen of New York, residing in Amawalk, New York, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 23, 2016 at Danbury Chrysler Dodge Jeep Ram, an authorized FCA dealer in Danbury, Connecticut. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff spoke with the sales representative at Danbury Chrysler Dodge Jeep Ram about mileage, EcoDiesel, and towing capacity. These representations, along with the advertised fuel economy, towing power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

44. Plaintiff **Aaron Carter** (for the purpose of this paragraph, "Plaintiff"), a citizen of Illinois, residing in Swansea, Illinois, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about October 17, 2015 at Oliver C. Joseph Chrysler Dodge Jeep, an authorized FCA dealer in Belleville, Illinois. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

reduced emissions and fuel efficient).  Plaintiff saw representations on Jeep's website in which

the Class Vehicles were represented as having good fuel efficiency and towing power.  Plaintiff

also saw representations in a Jeep brochure that touted the Class Vehicle's EcoDiesel® attributes,

including its fuel efficiency, performance, environmental friendliness, and low emissions.

Plaintiff also recalls the Jeep brochure representing the Class Vehicle to have clean-diesel

technology that satisfied the emissions requirements in all 50 states. These representations, along

with the advertised fuel economy, towing power, and performance were among the primary

reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the

Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than

advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

with undisclosed and unauthorized emission control devices designed to cheat emission tests and

to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

would have paid less for it, had he known that it did not comply with emission standards; that its

emission treatment system was designed to de-activate during real-world driving conditions; and

that it could not achieve the advertised towing power, performance, and/or fuel economy without

cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

less for it, had Defendants not concealed the unauthorized emission control devices.

45.     Plaintiff **Chatom Motor Company, Inc.** (for the purpose of this paragraph,

"Plaintiff"), a domestic corporation organized under the laws of Alabama, with its principal place

of business in Chatom, Alabama, and a citizen of Alabama, bought a 2015 Ram 1500 EcoDiesel®

(for the purpose of this paragraph, the "Class Vehicle") on or about February 1, 2017 for the

purpose of reselling the Class Vehicle.  Plaintiff decided to buy and market the Class Vehicle

based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions

and fuel efficient).  Plaintiff had previously seen representations on Ram's website, and on third-

party sites linked on the Ram website, in which the Class Vehicles were represented to be

"clean," to have "the best fuel economy of any full-size pickup," and to produce "reduce[d] CO2

emissions." Plaintiff purchased the Class Vehicles on an auction website commonly used in its

1   industry based on the value added by the EcoDiesel label. These representations, along with the

2   advertised fuel economy, towing power, and/or performance were among the primary reasons

3   Plaintiff chose the Class Vehicle to purchase and offer for resale.  At the time of purchase,

4   Plaintiff did not know that the Class Vehicle could not perform as advertised and in fact emitted

5   NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that

6   its Class Vehicle was equipped with undisclosed and unauthorized emission control devices

7   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

8   have purchased and marketed for resale the Class Vehicle, or would have paid less for it, had it

9   known that the Class Vehicle did not comply with emission standards; that its emission treatment

10  system was designed to de-activate during real-world driving conditions; or that it could not

11  achieve the advertised towing power, performance, and/or fuel economy without cheating

12  emission tests.  Plaintiff also would not have invested additional resources to increase the value of

13  the Class Vehicle for resale had it known that the Class Vehicle did not comply with emission

14  standards; that its emission treatment system was designed to de-activate during real-world

15  driving conditions; or that it could not achieve the advertised towing power, performance, and/or

16  fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct

17  and proximate result of Defendants' misconduct, and would not have purchased the Class

18  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

19  control devices.

20        46.      Plaintiff **Jose Chavez** (for the purpose of this paragraph, "Plaintiff"), a citizen of

21  California, residing in Antioch, California, purchased a 2016 Ram 1500 EcoDiesel® (for the

22  purpose of this paragraph, the "Class Vehicle") on or about August 26, 2016 at Hilltop Chrysler

23  Jeep Dodge, an authorized FCA dealer in Richmond, California. Plaintiff decided to purchase the

24  Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

25  reduced emissions and fuel efficient). These representations, along with the advertised fuel

26  economy and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At

27  the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

28  only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was

1   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

2   control devices designed to cheat emission tests and to deceive consumers and regulators.

3   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

4   known that it did not comply with emission standards; that its emission treatment system was

5   designed to de-activate during real-world driving conditions; and that it could not achieve the

6   advertised towing power, performance, and/or fuel economy without cheating emission tests.

7   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

8   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

9   Defendants not concealed the unauthorized emission control devices.

10       47.     Plaintiff **Josh Claflin** (for the purpose of this paragraph, "Plaintiff"), a citizen of

11   Wisconsin, residing in Ellsworth, Wisconsin, leased a 2015 Ram 1500 EcoDiesel® (for the

12   purpose of this paragraph, the "Class Vehicle") on or about April 17, 2015 at Fury Motors in St.

13   Paul, Minnesota. Plaintiff decided to lease the Class Vehicle based in part on FCA's

14   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

15   Plaintiff learned about the EcoDiesel® engine at a recreational vehicle ("RV") show, where he

16   discussed the relative fuel efficiency of diesel engines compared to gas engines with a

17   salesperson. The salesperson also explained that the new EcoDiesel would comply with new laws

18   imposing stricter requirements for diesel emissions. Plaintiff then used the Ram website to

19   virtually "build" and price a truck with the options he wanted, including the EcoDiesel® engine.

20   He recalls the website touting a fuel economy figure of 24-28 MPG. When Plaintiff went to Fury

21   Motors to lease the Class Vehicle, the sales associate there represented that the Class Vehicle was

22   environmentally friendly while still getting torque and horsepower figures comparable to those of

23   a gas-powered V8 engine. The sales associate told Plaintiff that he had learned these facts from

24   Fiat Chrysler training. Plaintiff was given brochures for the Class Vehicle that discussed the

25   engine's longevity and reliability, and also reviewed the Monroney sticker prior to leasing the

26   truck.  These representations, along with the advertised fuel economy and low emissions were

27   among the primary reasons Plaintiff chose the Class Vehicle.  At the time of lease, Plaintiff did

28   not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle

2    was equipped with undisclosed and unauthorized emission control devices designed to cheat

3    emission tests and to deceive consumers and regulators.  Plaintiff would not have leased the Class

4    Vehicle, or would have paid less for it, had he known that it did not comply with emission

5    standards; that its emission treatment system was designed to de-activate during real-world

6    driving conditions; and that it could not achieve the advertised towing power, performance,

7    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

8    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

9    Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

10   control devices.

11       48.     Plaintiff **James DeBerry** (for the purpose of this paragraph, "Plaintiff"), a citizen

12   of Florida, residing in Navarre, Florida, purchased a 2016 Ram 1500 EcoDiesel® (for the purpose

13   of this paragraph, the "Class Vehicle") on or about April 30, 2016 at Five Star Chrysler, Jeep,

14   Dodge, Ram, Warner Robins, an authorized FCA dealer in Warner Robins, Georgia.  Plaintiff

15   decided to purchase the Class Vehicle based in part on FCA's representations that it was an

16   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw several TV

17   commercials for the EcoDiesel® Ram and online information from the Ram website where the

18   Class Vehicles were represented to be environmentally friendly with good fuel economy.  When

19   Plaintiff went to Five Star Chrysler, Jeep, Dodge, Ram, Warner Robins to test drive and purchase

20   the Class Vehicle, the sales associate showed Plaintiff the window sticker and discussed the

21   specifications of the Class Vehicle, including its fuel mileage, range, horsepower and towing

22   figures.  These representations, along with the advertised fuel economy and performance, were

23   among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

24   did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

25   that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

26   Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

27   cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

28   the Class Vehicle, or would have paid less for it, had he known that it did not comply with

-23-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1  emission standards; that its emission treatment system was designed to de-activate during real-

2  world driving conditions; and that it could not achieve the advertised towing power, performance,

3  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

4  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

5  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

6  control devices.

7      49.    Plaintiff **Edward Devault** (for the purpose of this paragraph, "Plaintiff"), a citizen

8  of Maine, residing in Concord Township, Maine, purchased a 2014 Jeep Grand Cherokee

9  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July 18, 2014  at

10  Central Maine Chrysler Dodge Jeep Ram Fiat, an authorized FCA dealer in Waterville, Maine.

11  Plaintiff decided to purchase the Class Vehicle based in part on FCA's representations that it was

12  an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  When Plaintiff went to

13  Central Maine Chrysler Dodge Jeep Ram Fiat to purchase the Class Vehicle, Plaintiff saw the

14  window sticker in which the Class Vehicles were represented to have good fuel economy.

15  Plaintiff also spoke to a salesperson at Central Maine Chrysler Dodge Jeep Ram Fiat, who made

16  representations about the Class Vehicle's good fuel economy.  These representations, along with

17  the advertised fuel economy and performance, were among the primary reasons Plaintiff chose

18  the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

19  perform as advertised only by emitting NOx at levels that are greater than advertised and above

20  legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

21  unauthorized emission control devices designed to cheat emission tests and to deceive consumers

22  and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

23  it, had he known that it did not comply with emission standards; that its emission treatment

24  system was designed to de-activate during real-world driving conditions; and that it could not

25  achieve the advertised towing power, performance, and/or fuel economy without cheating

26  emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

27  Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

28  less for it, had Defendants not concealed the unauthorized emission control devices.

50.     Plaintiff **Anthony Edwards**, (for the purpose of this paragraph, "Plaintiff"), a citizen of Tennessee, residing in Cleveland, Tennessee, bought a 2015 Ram EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") in or about November 10, 2016 at Collierville Chrysler Dodge Jeep Ram, an authorized FCA dealer in Collierville, Tennessee.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on the Collierville Chrysler Dodge Jeep Ram website in which the Class Vehicles were represented to be environmentally friendly with low emissions and good fuel economy, and was so impressed with the descriptions of the Class Vehicle and its attributes on the Collierville Chrysler Dodge Jeep Ram website that he purchased it online without physically inspecting or test driving the Class Vehicle.  When Plaintiff went to the Collierville Chrysler Dodge Jeep Ram dealership to collect the Class Vehicle, no salesperson made any statement to counter Plaintiff's expectations regarding the Class Vehicle's fuel economy and clean operation based on the descriptions and reviews found on Collierville Chrysler Dodge Jeep Ram website.  These representations, along with the advertised fuel economy, towing power, and/or performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

51.     Plaintiff **Mathue Fasching** (for the purpose of this paragraph, "Plaintiff"), a citizen of Idaho, residing in Lowman, Idaho, bought a 2016 Ram 1500 EcoDiesel® (for the

1    purpose of this paragraph, the "Class Vehicle") on or about July 12, 2016 at Lithia Chrysler Jeep

2    Dodge of Grants Pass, an authorized FCA dealer in Grants Pass, Oregon. Plaintiff decided to buy

3    the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

4    reduced emissions and fuel efficient).  These representations, along with the advertised fuel

5    economy and low emissions were among the primary reasons Plaintiff chose the Class Vehicle.

6    At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

7    only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

8    Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

9    control devices designed to cheat emission tests and to deceive consumers and regulators.

10   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

11   known that it did not comply with emission standards; that its emission treatment system was

12   designed to de-activate during real-world driving conditions; and that it could not achieve the

13   advertised towing power, performance, and/or fuel economy without cheating emission tests.

14   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

15   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

16   Defendants not concealed the unauthorized emission control devices.

17          52.     Plaintiff **Tommy Feist** (for the purpose of this paragraph, "Plaintiff"), a citizen of

18   Colorado, residing in Woodland Park, Colorado leased a 2016 Ram 1500 EcoDiesel® (for the

19   purpose of this paragraph, the "Class Vehicle") on or about July 16, 2016 at Colorado Springs

20   Dodge, an authorized FCA dealer in Colorado Springs, Colorado. Plaintiff decided to lease the

21   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

22   reduced emissions and fuel efficient).  Plaintiff saw television commercials and representations

23   on the Ram website in which the Class Vehicles were represented to be fuel efficient and safe for

24   the environment.  When Plaintiff went to Colorado Springs Dodge to lease the Class Vehicle, the

25   sales associate discussed the information on the window sticker with Plaintiff and Plaintiff was

26   also provided a brochure for the Class Vehicle that touted the EcoDiesel's fuel economy and

27   clean operation.  These representations, along with the advertised fuel economy and performance,

28   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of lease, Plaintiff

1    did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

2    that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

3    Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

4    cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have leased the

5    Class Vehicle, or would have paid less for it, had he known that it did not comply with emission

6    standards; that its emission treatment system was designed to de-activate during real-world

7    driving conditions; and that it could not achieve the advertised towing power, performance,

8    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

9    direct and proximate result of Defendants' misconduct, and would not have leased the Class

10   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

11   control devices.

12        53.    Plaintiff **Victor Feldman** (for the purpose of this paragraph, "Plaintiff"), a citizen

13   of Alabama, residing in Huntsville, Alabama purchased a 2015 Ram 1500 EcoDiesel® (for the

14   purpose of this paragraph, the "Class Vehicle") on or about November 18, 2016 at Dodge

15   Country, an authorized FCA dealer in Killeen, Texas.  Plaintiff decided to purchase the Class

16   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

17   emissions and fuel efficient).  These representations, along with the advertised fuel economy and

18   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

19   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

20   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

21   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

22   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

23   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

24   comply with emission standards; that its emission treatment system was designed to de-activate

25   during real-world driving conditions; and that it could not achieve the advertised towing power,

26   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

27   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

28

-27-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

2    unauthorized emission control devices.

3            54.     Plaintiff **Miguel Fragoso** (for the purpose of this paragraph, "Plaintiff"), a citizen

4    of North Carolina, residing in Cary, North Carolina, leased a 2016 Jeep Grand Cherokee

5    EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 9, 2016

6    at Leith Jeep, an authorized FCA dealer in Cary, North Carolina.  Plaintiff decided to lease the

7    Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

8    reduced emissions and fuel efficient).  Plaintiff saw representations on Jeep's website, television

9    commercials, and posters in the dealership in which the Class Vehicles were represented to be

10   fuel efficient with low emissions.  Plaintiff also read reviews of the Class Vehicle in Car and

11   Driver magazine, Autoweek magazine, cars.com, and Edmunds.com, in which the Class Vehicles

12   were represented to be fuel efficient with low emissions.  When Plaintiff went to Leith Jeep to

13   lease the Class Vehicle, the sales representative told him the Class Vehicle provided very high

14   efficiency and great mileage. The sales representative also told Plaintiff that the Class Vehicle

15   would have a positive impact on the environment while maintaining powerful towing capacity.

16   The finance manager at Leith Jeep told Plaintiff the Class Vehicle was a "clean vehicle" that was

17   good for the environment without any performance degradation.  These representations, along

18   with the advertised fuel economy and performance, were among the primary reasons Plaintiff

19   chose the Class Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could

20   perform as advertised only by emitting NOx at levels that are greater than advertised and above

21   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

22   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

23   and regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it,

24   had he known that it did not comply with emission standards; that its emission treatment system

25   was designed to de-activate during real-world driving conditions; and that it could not achieve the

26   advertised towing power, performance, and/or fuel economy without cheating emission tests.

27   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

28

1    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

2    Defendants not concealed the unauthorized emission control devices.

3         55.    Plaintiff **Gregory Giauque** (for the purpose of this paragraph, "Plaintiff"), a

4    citizen of California, residing in San Luis Obispo County, California, purchased a 2015 Jeep

5    Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about

6    July 29, 2016 at Airpark Dodge, an authorized FCA dealer in Scottsdale, Arizona.  Plaintiff

7    decided to purchase the Class Vehicle based in part on FCA's representations that it was an

8    "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on

9    Jeep's website, print advertisements, third-party websites (Cars.com, autotrader.com, US News &

10   World Report, MotorTrend, Greencarreports.com, and Edmunds) and various billboards in which

11   the Class Vehicles were represented to be clean, environmentally friendly, have low emissions,

12   and/or have good fuel economy. When Plaintiff went to Airpark Dodge to purchase the Class

13   Vehicle, the sales associate commented on the Class Vehicle's EcoDiesel® attributes, including

14   its fuel economy, towing power, and performance.  These representations, along with the

15   advertised fuel economy and performance, were among the primary reasons Plaintiff chose the

16   Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

17   perform as advertised only by emitting NOx at levels that are greater than advertised and above

18   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

19   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

20   and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

21   it, had he known that it did not comply with emission standards; that its emission treatment

22   system was designed to de-activate during real-world driving conditions; and that it could not

23   achieve the advertised towing power, performance, and/or fuel economy without cheating

24   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

25   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

26   less for it, had Defendants not concealed the unauthorized emission control devices.

27        56.    Plaintiff **Tom Gillespie** (for the purpose of this paragraph, "Plaintiff"), a citizen of

28   Georgia, residing in Ray City, Georgia, purchased a 2014 Ram 1500 EcoDiesel® (for the purpose

of this paragraph, the "Class Vehicle") on March 28, 2014 at Carl Gregory Chrysler Jeep and

Dodge, an authorized FCA dealer in Brunswick, Georgia.  Plaintiff decided to buy the Class

Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

emissions and fuel efficient).  Plaintiff saw representations on Ram's website and in television

commercials in which the Class Vehicles were represented to be environmentally friendly, with

low emissions, phenomenal torque, and great gas mileage. When Plaintiff went to Carl Gregory

Chrysler Jeep and Dodge to purchase the Class Vehicle, the sales associate touted the Class

Vehicle's EcoDiesel® attributes, including its fuel economy, towing power, and performance.

Carl Gregory Chrysler Jeep and Dodge also provided Plaintiff with a brochure for the Class

Vehicle that touted the EcoDiesel®'s fuel economy and clean operation.  These representations,

along with the advertised fuel economy and performance, were among the primary reasons

Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class

Vehicle could perform as advertised only by emitting NOx at levels that are greater than

advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

with undisclosed and unauthorized emission control devices designed to cheat emission tests and

to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

would have paid less for it, had he known that it did not comply with emission standards; that its

emission treatment system was designed to de-activate during real-world driving conditions; and

that it could not achieve the advertised towing power, performance, and/or fuel economy without

cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

less for it, had Defendants not concealed the unauthorized emission control devices.

57.     Plaintiff **GN Systems, Inc.**, a Florida corporation (for the purpose of this

paragraph, "Plaintiff"), a citizen of Florida with its principal place of business in Wellington,

Florida, bought five Ram 1500 EcoDiesel® vehicles as follows (for the purpose of this paragraph,

the "Class Vehicles"): (1) 2016 Ram 1500 EcoDiesel® on or about September 10, 2016 at Rob

Lambdin's University Dodge Ram, an authorized FCA dealer in Davie, Florida; (2) 2016 Ram

1500 EcoDiesel® on or about July 24, 2016 at University Dodge, an authorized FCA dealer in

1   Davie, Florida; (3) 2015 Ram 1500 EcoDiesel® on or about February 29, 2016 at University

2   Dodge, an authorized FCA dealer in Davie, Florida; (4) 2014 Ram 1500 EcoDiesel® on or about

3   May 1, 2014 at University Dodge, an authorized FCA dealer in Davie, Florida; and (5) 2014 Ram

4   1500 EcoDiesel® on or about June 9, 2014 at University Dodge, an authorized FCA dealer in

5   Davie, Florida.  Plaintiff decided to buy the Class Vehicles based in part on FCA's

6   representations that they were "EcoDiesel" vehicles (i.e., reduced emissions and fuel efficient).

7   Plaintiff GN Systems Inc. saw representations on Ram's website and on television in which the

8   Class Vehicles were represented to be environmentally friendly, to have low emissions, and to

9   have good fuel economy.  When Plaintiff went to the University Dodge dealership to purchase the

10  Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its

11  fuel economy, towing power, and clean operation performance.  These representations, along

12  with the advertised fuel economy, towing power, and performance, were among the primary

13  reasons Plaintiff chose the Class Vehicles.  At the time of purchase, Plaintiff did not know that

14  the Class Vehicles could perform as advertised only by emitting NOx at levels that are greater

15  than advertised and above legal limits.  Nor was Plaintiff aware that its Class Vehicles were

16  equipped with undisclosed and unauthorized emission control devices designed to cheat emission

17  tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

18  Vehicles, or would have paid less for them, had it known that they did not comply with emission

19  standards; that their emission treatment systems were designed to de-activate during real-world

20  driving conditions; and that they could not achieve the advertised towing power, performance,

21  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

22  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

23  Vehicles, or would have paid less for them, had Defendants not concealed the unauthorized

24  emission control devices.

25          58.     Plaintiff **Benjamin Greenberg** (for the purpose of this paragraph, "Plaintiff"), a

26  citizen of Massachusetts, residing in Maynard, Massachusetts, leased a 2015 Jeep Grand

27  Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about March

28  22, 2015 at Kelly Jeep Chrysler, an authorized FCA dealer in Lynnfield, Massachusetts.  Plaintiff

1    decided to lease the Class Vehicle based in part on FCA's representations that it was an

2    "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw online information

3    from the Jeep website, the car dealership website, the sticker of the car, print advertising at the

4    dealership, and media advertising on television in which the Class Vehicles were represented to

5    be powerful, reliable, rugged, environmentally friendly (low emissions) and have great gas

6    mileage.  When Plaintiff went to Kelly Jeep Chrysler to test drive and lease the Class Vehicle, the

7    sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy,

8    towing power, and performance.  Plaintiff was also provided a brochure for the Class Vehicle that

9    touted the EcoDiesel®'s fuel economy and clean operation.  These representations, along with the

10   advertised fuel economy and performance, were among the primary reasons Plaintiff chose the

11   Class Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could perform

12   as advertised only by emitting NOx at levels that are greater than advertised and above legal

13   limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

14   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

15   and regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it,

16   had he known that it did not comply with emission standards; that its emission treatment system

17   was designed to de-activate during real-world driving conditions; and that it could not achieve the

18   advertised towing power, performance, and/or fuel economy without cheating emission tests.

19   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

20   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

21   Defendants not concealed the unauthorized emission control devices.

22        59.    Plaintiff **Jeffrey Griggs** (for the purpose of this paragraph, "Plaintiff"), a citizen of

23   Tennessee, residing in Georgetown, Tennessee, bought a 2014 Ram 1500 EcoDiesel® (for the

24   purpose of this paragraph, the "Class Vehicle") on or about September 13, 2014 at Mountain

25   View Chrysler Dodge Jeep Ram, an authorized FCA dealer in Ringgold, Georgia.  Plaintiff

26   decided to buy the Class Vehicle based in part on FCA's representations that it was an

27   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on

28   the Ram website and other online sources in which the Class Vehicles were represented to be

1    environmentally friendly, reliable, have great torque, and have good fuel economy.  When

2    Plaintiff went to Mountain View Chrysler Dodge Jeep Ram to purchase the Class Vehicle, the

3    sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy,

4    towing power, reliability, and performance, all without the typical diesel smell.  These

5    representations, along with the advertised fuel economy, towing power, and/or performance were

6    among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

7    did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

8    that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

9    Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

10   cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

11   the Class Vehicle, or would have paid less for it, had he known that it did not comply with

12   emission standards; that its emission treatment system was designed to de-activate during real-

13   world driving conditions; and that it could not achieve the advertised towing power, performance,

14   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

15   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

16   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

17   control devices.

18          60.     Plaintiff **Jake Gunderson** (for the purpose of this paragraph, "Plaintiff"), a citizen

19   of New Mexico residing in Los Alamos, New Mexico, bought a 2015 Ram 1500 EcoDiesel® (for

20   the purpose of this paragraph, the "Class Vehicle") on or about March 7, 2015 at Lithia Chrysler

21   Dodge Jeep Ram Fiat of Santa Fe, an authorized FCA dealer in Santa Fe, New Mexico.  Plaintiff

22   decided to buy the Class Vehicle based in part on FCA's representations that it was an

23   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw an online

24   advertisement for the Class Vehicle through social media, then researched the vehicle on the Ram

25   website in which the Class Vehicles were represented as having good fuel economy while also

26   meeting low emissions requirements.  Plaintiff was also informed through the Ram website of the

27   Class Vehicle's towing capacity and power.  When Plaintiff went to Lithia Chrysler Dodge Jeep

28   Ram Fiat of Santa Fe to purchase the Class Vehicle, he spoke at length with the sales associate

1    about the Class Vehicle's features, including its towing capability.  Plaintiff was concerned about

2    the Class Vehicle's usage of DEF and the sales associate assured Plaintiff of the Class Vehicle's

3    ability to meet emissions standards and use very little DEF while still being able to achieve good

4    fuel economy in all driving conditions.  The sales associate also assured Plaintiff of the Class

5    Vehicle's performance as it aged and the dealership's commitment to servicing the vehicle. These

6    representations, along with the advertised fuel economy, towing power, performance, and comfort

7    were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

8    Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

9    levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his

10   Class Vehicle was equipped with undisclosed and unauthorized emission control devices

11   designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not

12   have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

13   comply with emission standards; that its emission treatment system was designed to de-activate

14   during real-world driving conditions; and that it could not achieve the advertised towing power,

15   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

16   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

17   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

18   unauthorized emission control devices.

19          61.     Plaintiffs **Kyle and Jessica Heidlebaugh** (for the purpose of this paragraph,

20   "Plaintiffs"), citizens of Pennsylvania, residing in Spring Grove, Pennsylvania, purchased a 2014

21   Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or

22   about May 3, 2014 at Don White's Chrysler Dodge Jeep Ram, an authorized FCA dealer in

23   Cockeysville, Maryland.  Plaintiffs decided to purchase the Class Vehicle based in part on FCA's

24   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

25   Plaintiffs previously owned a Jeep, and while at the dealership they asked a sales person for

26   information about the EcoDiesel. The sales person provided Plaintiffs with a brochure about the

27   EcoDiesel.  Plaintiffs also saw a poster about the Class Vehicles in the showroom.  Prior to

28   purchasing the Class Vehicle, Plaintiffs viewed information on Jeep's website in which the Class

1   Vehicles were represented as environmentally friendly with low emissions and good fuel

2   economy.  When Plaintiffs went to Don White's Chrysler Dodge Jeep Ram to purchase the Class

3   Vehicle, the sales person touted the Class Vehicle's EcoDiesel® attributes, including its fuel

4   economy, towing power, and performance. These representations, along with the advertised fuel

5   economy and performance, were among the primary reasons Plaintiffs chose the Class Vehicle.

6   At the time of purchase, Plaintiffs did not know that the Class Vehicle could perform as

7   advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

8   Nor were Plaintiffs aware that their Class Vehicle was equipped with undisclosed and

9   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

10  and regulators.  Plaintiffs would not have purchased the Class Vehicle, or would have paid less

11  for it, had they known that it did not comply with emission standards; that its emission treatment

12  system was designed to de-activate during real-world driving conditions; and that it could not

13  achieve the advertised towing power, performance, and/or fuel economy without cheating

14  emission tests.  Plaintiffs have suffered a concrete injury as a direct and proximate result of

15  Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

16  less for it, had Defendants not concealed the unauthorized emission control devices.

17        62.     Plaintiff **Brian Hiner** (for the purpose of this paragraph, "Plaintiff") a citizen of

18  Virginia, residing in Covington, Virginia, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for

19  the purpose of this paragraph, the "Class Vehicle") in or about March 25, 2014 at Alleghany

20  Chrysler Dodge Jeep Ram, an authorized FCA dealer in Covington, Virginia.  Plaintiff decided to

21  buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

22  (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on the Jeep website in

23  which the Class Vehicles were represented to be fuel efficient and environmentally friendly.

24  Plaintiff also saw a brochure for his Class Vehicle in which it was represented to have reduced

25  emissions and "display reverence for the environment." When Plaintiff went to Alleghany

26  Chrysler Dodge Jeep Ram to purchase the Class Vehicle the salesperson compared the gasoline

27  model to the EcoDiesel model, and touted the Class Vehicle's EcoDiesel® attributes, including

28  its fuel efficiency.  These representations, along with the advertised fuel economy and low

1    emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

2    purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

3    emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff

4    aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

5    devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would

6    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

7    comply with emission standards; that its emission treatment system was designed to de-activate

8    during real-world driving conditions; and that it could not achieve the advertised towing power,

9    performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

10   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

11   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

12   unauthorized emission control devices.

13          63.     Plaintiff **Charles Patrick Hissey** (for the purpose of this paragraph, "Plaintiff"), a

14   citizen of Texas, residing in Montgomery, Texas, bought a 2015 Jeep Grand Cherokee

15   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about May 30, 2015 at

16   DeMontrond Chrysler Dodge Jeep Ram, an authorized FCA dealer in Conroe, Texas.  Plaintiff

17   decided to buy the Class Vehicle based in part on FCA's representations that it was an

18   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff thoroughly researched

19   the Class Vehicle—specifically the engine—prior to purchasing it, and spoke with several

20   individuals at DeMontrond Chrysler Dodge Jeep Ram, Northwest Chrysler Jeep Dodge Ram, and

21   AutoNation Chrysler Dodge Jeep Ram in Spring, Texas.  When Plaintiff went to DeMontrond

22   Chrysler Dodge Jeep Ram, the sales associate touted the fuel efficiency and low emissions of the

23   Class Vehicle. These representations, along with the advertised fuel economy, towing power,

24   and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the

25   time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only

26   by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

27   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

28   control devices designed to cheat emission tests and to deceive consumers and regulators.

1   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

2   known that it did not comply with emission standards; that its emission treatment system was

3   designed to de-activate during real-world driving conditions; and that it could not achieve the

4   advertised towing power, performance, and/or fuel economy without cheating emission tests.

5   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

6   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

7   Defendants not concealed the unauthorized emission control devices.

8        64.    Plaintiff **Lee Holland** (for the purpose of this paragraph, "Plaintiff"), a citizen of

9   Oklahoma, residing in Lexington, Oklahoma, bought a 2015 Ram 1500 EcoDiesel® (for the

10  purpose of this paragraph, the "Class Vehicle") on or about September 10, 2015 at David Stanley

11  Chrysler Jeep Dodge Ram, an authorized FCA dealer in Midwest City, Oklahoma.  Plaintiff

12  decided to buy the Class Vehicle based in part on FCA's representations that it was an

13  "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw a representation on

14  Ram's website and commercials on television in which the Class Vehicles were represented to be

15  environmentally friendly with low emissions and good fuel economy.  When Plaintiff went to

16  David Stanley Chrysler Jeep Dodge Ram in Midwest City, Oklahoma to purchase the Class

17  Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel

18  economy and performance.  These representations, along with the advertised fuel economy,

19  towing power, and performance were among the primary reasons Plaintiff chose the Class

20  Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

21  advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

22  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

23  emission control devices designed to cheat emission tests and to deceive consumers and

24  regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

25  had he known that it did not comply with emission standards; that its emission treatment system

26  was designed to de-activate during real-world driving conditions; and that it could not achieve the

27  advertised towing power, performance, and/or fuel economy without cheating emission tests.

28  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

1    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

2    Defendants not concealed the unauthorized emission control devices.

3         65.    Plaintiff **Ronald Holm** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4    Montana, residing in Butte, Montana, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of

5    this paragraph, the "Class Vehicle") in or about January 26, 2016 at Butte's Mile High Chrysler

6    Jeep Dodge Ram, an authorized FCA dealer in Butte, Montana. Plaintiff decided to buy the Class

7    Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

8    emissions and fuel efficient).  When Plaintiff went to Mile High Motors to purchase the Class

9    Vehicle, the salesperson touted the Class Vehicle's attributes, including its fuel economy, towing

10   power, and performance.  These representations, along with the advertised fuel economy and low

11   emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

12   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

13   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

14   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

15   devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would

16   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

17   comply with emission standards; that its emission treatment system was designed to de-activate

18   during real-world driving conditions; and that it could not achieve the advertised towing power,

19   performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

20   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

21   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

22   unauthorized emission control devices.

23        66.    Plaintiff **Connie Hood** (for the purpose of this paragraph, "Plaintiff"), a citizen of

24   Nebraska, residing in Hallam, Nebraska, purchased a 2014 Jeep Grand Cherokee EcoDiesel® (for

25   the purpose of this paragraph, the "Class Vehicle") on or about June  18, 2014 at Sid Dillon Auto

26   Group in Crete, Nebraska. Plaintiff decided to purchase the Class Vehicle based in part on FCA's

27   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

28   Plaintiff first learned about the Class Vehicle through a television commercial she saw in late

2013 or early 2014.  Plaintiff began to research the Class Vehicle online and viewed the Jeep

website while conducting her research.  Plaintiff also reviewed a brochure on the Jeep EcoDiesel

at the Sid Dillon Auto Group in the spring of 2014.  From the Jeep television commercial,

brochure, and website, Plaintiff was led to believe the Jeep EcoDiesel was an environmentally

friendly vehicle.  When Plaintiff went to the Sid Dillon Auto Group to purchase the Class

Vehicle, the salesperson made representations as to the Class Vehicle's attributes, including its

fuel economy and compliance with emission standards.  These representations, along with the

advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the

Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

perform as advertised only by emitting NOx at levels that are greater than advertised and above

legal limits. Nor was Plaintiff aware that her Class Vehicle was equipped with undisclosed and

unauthorized emission control devices designed to cheat emission tests and to deceive consumers

and regulators. Plaintiff would not have purchased the Class Vehicle, or would have paid less for

it, had she known that it did not comply with emission standards; that its emission treatment

system was designed to de-activate during real-world driving conditions; and that it could not

achieve the advertised towing power, performance, and/or fuel economy without cheating

emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

less for it, had Defendants not concealed the unauthorized emission control devices.

67.     Plaintiffs **Matthew Johnson and Amanda Kobussen** (for the purpose of this

paragraph, "Plaintiffs"), citizens of Alaska, currently residing in University Place, Washington,

bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class

Vehicle") on or about March 12, 2016 at Lithia Chrysler Dodge Jeep Ram FIAT of Anchorage,

Alaska, an authorized FCA dealer in Anchorage, Alaska. Plaintiffs decided to buy the Class

Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

emissions and fuel efficient).  Plaintiffs saw a representation on Jeep's webpage and print

material inside the dealership in which the Class Vehicles were represented to be environmentally

friendly and having good fuel economy while maintaining advertised towing power.  When

Plaintiff went to Lithia Chrysler Dodge Jeep Ram FIAT of Anchorage, Alaska to purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy, towing power, performance, and that it did not have the attributes of a typical diesel (smelly, loud, emissions of black smoke).  These representations, along with the advertised fuel economy and low emissions were among the primary reasons Plaintiffs chose the Class Vehicle.  At the time of purchase, Plaintiffs did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor were Plaintiffs aware that their Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiffs would not have purchased the Class Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

68.     Plaintiff **Michael R. Johnson** (for the purpose of this paragraph, "Plaintiff"), a citizen of Georgia, residing in Mableton, Georgia, bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about August 1, 2015 at Big O Dodge, an authorized FCA dealer in Greenville, South Carolina. Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff went to Atlanta West Dodge Jeep Ram to test drive the Class Vehicle. The sales associate there touted the Class Vehicle's EcoDiesel® attributes, telling him that the truck had good gas mileage. Plaintiff later exchanged emails with a sales associate at Big O Dodge. Plaintiff asked if the truck would emit black smoke because it was a diesel. The sales associate wrote back that although the truck was a diesel, it did not emit black smoke like diesels historically did and was also good for the environment. The sales associate explained that the truck was environmentally friendly and emitted little to no emissions because the truck used DEF,

1    which breaks down certain chemicals to minimize pollutants. The sales associate also discussed

2    the truck's towing capability with Plaintiff and explained that the truck had better torque than

3    other trucks on the lot.  These representations, along with the advertised fuel economy and low

4    emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

5    purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

6    emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

7    aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

8    devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

9    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

10   comply with emission standards; that its emission treatment system was designed to de-activate

11   during real-world driving conditions; and that it could not achieve the advertised towing power,

12   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

13   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

14   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

15   unauthorized emission control devices.

16        69.    Plaintiff **Donald Korrell II** (for the purpose of this paragraph, "Plaintiff"), a

17   citizen of Maryland residing in Hagerstown, MD, bought a 2014 Jeep Grand Cherokee

18   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about May 20, 2014 at

19   Apple Chrysler Dodge Jeep Ram, an authorized FCA dealer in Hanover, PA.  Plaintiff decided to

20   buy and market the Class Vehicle based in part on FCA's representations that it was an

21   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on

22   Jeep's website in which the Class Vehicles were represented to have good fuel economy.  In

23   addition, Plaintiff visited several dealerships that sold the EcoDiesel vehicles prior to purchasing

24   the Class Vehicle. At one of the dealerships, he was provided a brochure for the Class Vehicle

25   that touted the EcoDiesel's fuel economy and "clean operation."   These representations, along

26   with the other representations about fuel economy and low emissions, were among the primary

27   reasons Plaintiffs chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that

28   the Class Vehicle could not perform as advertised and in fact emitted NOx at levels that are

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    greater than advertised and above legal limits.  Nor was Plaintiff aware that its Class Vehicle was

2    equipped with undisclosed and unauthorized emission control devices designed to cheat emission

3    tests and to deceive consumers and regulators.  Plaintiff would not have purchased and marketed

4    for resale the Class Vehicle, or would have paid less for it, had it known that the Class Vehicle

5    did not comply with emission standards; that its emission treatment system was designed to de-

6    activate during real-world driving conditions; or that it could not achieve the advertised towing

7    power, performance, and/or fuel economy without cheating emission tests.  Plaintiff also would

8    not have invested additional resources to increase the value of the Class Vehicle for resale had it

9    known that the Class Vehicle did not comply with emission standards; that its emission treatment

10   system was designed to de-activate during real-world driving conditions; or that it could not

11   achieve the advertised towing power, performance, and/or fuel economy without cheating

12   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

13   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

14   less for it, had Defendants not concealed the unauthorized emission control devices.

15       70.     Plaintiff **Richard Lindholm** (for the purpose of this paragraph, "Plaintiff") a

16   citizen of Nebraska, residing in Papillion, Nebraska purchased a 2015 Ram 1500 EcoDiesel® (for

17   the purpose of this paragraph, the "Class Vehicle") on or about February 25, 2017 at Pro Chrysler

18   Dodge Jeep Ram, an authorized FCA dealer in Plattsmouth, Nebraska.  Plaintiff decided to buy

19   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

20   reduced emissions and fuel efficient).  Plaintiff visited the Ram website and saw a brochures in

21   which the Class Vehicles were represented to have good fuel economy, towing capacity, and

22   power all while being environmentally friendly with low emissions. When Plaintiff went to Pro

23   Chrysler Jeep Dodge Ram to purchase the Class Vehicle, the sales associate touted the Class

24   Vehicle's EcoDiesel® attributes, including its low emissions, fuel economy, towing power, and

25   performance.  These representations, along with the advertised fuel economy and low emissions

26   were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase,

27   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at

28   levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

1    Class Vehicle was equipped with undisclosed and unauthorized emission control devices

2    designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

3    have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

4    comply with emission standards; that its emission treatment system was designed to de-activate

5    during real-world driving conditions; and that it could not achieve the advertised towing power,

6    performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

7    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

8    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

9    unauthorized emission control devices.

10           71.     Plaintiff **Andrew Loescher** (for the purpose of this paragraph, "Plaintiff"), a

11   citizen of Washington, residing in Vancouver, Washington, purchased a 2015 Ram 1500

12   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about December 27,

13   2016 at Marketplace Motors in Devils Lake, North Dakota.  Plaintiff decided to purchase the

14   Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

15   reduced emissions and fuel efficient).  These representations, along with the advertised fuel

16   economy and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At

17   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

18   only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

19   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

20   control devices designed to cheat emission tests and to deceive consumers and regulators.

21   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

22   known that it did not comply with emission standards; that its emission treatment system was

23   designed to de-activate during real-world driving conditions; and that it could not achieve the

24   advertised towing power, performance, and/or fuel economy without cheating emission tests.

25   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

26   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

27   Defendants not concealed the unauthorized emission control devices.

28

-43-

72.     Plaintiff **Christopher Mattingly** (for the purpose of this paragraph, "Plaintiff"), a citizen of Nevada, residing in Las Vegas, Nevada, bought a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about November 7, 2016 at Chapman Las Vegas Dodge Chrysler Jeep Ram, an authorized FCA dealer in Las Vegas, Nevada.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw representations on Ram's website in which the Class Vehicles were represented to have good fuel economy and towing power. Plaintiff also saw representations about his Class Vehicle on television. When Plaintiff went to Chapman Las Vegas Dodge Chrysler Jeep Ram to purchase the Class Vehicle, the sales representative touted the Class Vehicle's EcoDiesel® attributes when comparing it to the 2016 Ram 1500 Hemi. The sales representative told Plaintiff that the EcoDiesel® had almost as much power as the Hemi, but that it was a "cleaner" vehicle because of its low emissions. The sales representative also told Plaintiff that the Class Vehicle had better fuel economy than the Hemi. These representations, along with the advertised fuel economy, towing power, and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

73.     Plaintiff **Thomas McGann, Jr.** (for the purpose of this paragraph, "Plaintiff"), a citizen of New York, residing in North Tonawanda, New York, bought a 2016 Ram 1500

1  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September 24,

2  2016 at Lessord Dodge, an authorized FCA dealer in Sodus, New York.  Plaintiff decided to buy

3  the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

4  reduced emissions and fuel efficient).  Plaintiff visited the Ram website, on which the Class

5  Vehicle was represented to be fuel efficient and high performing.  When Plaintiff went to Lessord

6  Dodge to purchase the Class Vehicle, he discussed the "great" fuel economy and towing

7  capability of the EcoDiesel® with a salesman at the dealership. Plaintiff and the sales associate

8  also talked about the basics of the emissions system, including the use of DEF.  These

9  representations, along with the advertised fuel economy, towing power, and performance were

10  among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

11  did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

12  that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

13  Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

14  cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

15  the Class Vehicle, or would have paid less for it, had he known that it did not comply with

16  emission standards; that its emission treatment system was designed to de-activate during real-

17  world driving conditions; and that it could not achieve the advertised towing power, performance,

18  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

19  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

20  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

21  control devices.

22       74.     Plaintiff **Ernest Melin, Jr.** (for the purpose of this paragraph, "Plaintiff"), a

23  citizen of South Carolina, residing in Mount Pleasant, South Carolina, bought a 2016 Ram 1500

24  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about February 3, 2016

25  at Rick Hendrick Dodge Chrysler Jeep, an authorized FCA dealer in Charleston, South Carolina.

26  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an

27  "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff recalls viewing a

28  television commercial on or about January 2016 touting the performance, fuel economy and

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    environmental friendliness of the one half ton Ram 1500 with a diesel engine.  Upon visiting Rick

2    Hendrick Jeep Chrysler Dodge Ram and inquiring about the 3.0-liter EcoDiesel® engine, a sales

3    associate said it was Italian made and had been in service for "10 or so years" and was purchased

4    by Chrysler to put into the Ram 1500 pickup and a Jeep Cherokee.  Furthermore, the sales

5    associate confirmed the towing capacity Plaintiff had seen in the advertisement, and stated that

6    this diesel engine was "proven in Europe," had good fuel economy and was "environmentally

7    friendly" with "low emissions."  These representations, along with the advertised fuel economy,

8    towing power, and/or performance were among the primary reasons Plaintiff chose the Class

9    Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

10   advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

11   Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

12   emission control devices designed to cheat emission tests and to deceive consumers and

13   regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

14   had he known that it did not comply with emission standards; that its emission treatment system

15   was designed to de-activate during real-world driving conditions; and that it could not achieve the

16   advertised towing power, performance, and/or fuel economy without cheating emission tests.

17   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

18   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

19   Defendants not concealed the unauthorized emission control devices.

20          75.     Plaintiff **George Milner** (for the purpose of this paragraph, "Plaintiff"), a citizen

21   of New York, residing in Mechanicville, New York, purchased a 2014 Ram 1500 EcoDiesel®

22   (for the purpose of this paragraph, the "Class Vehicle") on or about October 6, 2014 at Zappone

23   Chrysler Jeep Dodge Ram, an authorized FCA dealer in Clifton Park, New York.  Plaintiff

24   decided to purchase the Class Vehicle based in part on FCA's representations that it was an

25   "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  In 2014 Plaintiff purchased a

26   travel trailer that his mid-size Nissan Pioneer truck was not capable of pulling.  After looking at

27   the Ford, Chevrolet, and Ram websites, Plaintiff decided that the Ram 1500 EcoDiesel® was the

28   best choice based on the information presented on the website, because: (1) it had the torque and

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

towing capacity to easily handle the trailer that Plaintiff had purchased; (2) it claimed an

impressive 27 mpg, a fuel efficiency better than most sedans; (3) it touted a suspension design

that would provide more ride comfort than the leafspring systems in use on other trucks; and (4) it

was powered by an EcoDiesel®.  When Plaintiff went to the Zappone Chrysler Jeep Dodge Ram

dealership in Clifton Park to purchase the Class Vehicle, the sales person stated that Plaintiff was

making a great choice by buying a truck equipped with an EcoDiesel®, telling him that the Class

Vehicle would get high mileage and easily pull Plaintiff's trailer.  During price negotiations for

the Class Vehicle, the sales person stressed that there was a high demand for these vehicles

because they were powered by a quiet, smooth running, clean-burning, highly efficient engine.

These representations, along with the advertised fuel economy and performance, were among the

primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

equipped with undisclosed and unauthorized emission control devices designed to cheat emission

tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

Vehicle, or would have paid less for it, had he known that it did not comply with emission

standards; that its emission treatment system was designed to de-activate during real-world

driving conditions; and that it could not achieve the advertised towing power, performance,

and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

direct and proximate result of Defendants' misconduct, and would not have purchased the Class

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

control devices.

76.     Plaintiff **Ryan Montgomery** (for the purpose of this paragraph, "Plaintiff"), a

citizen of Colorado, residing in Durango, Colorado, purchased a 2014 Ram 1500 EcoDiesel® (for

the purpose of this paragraph, the "Class Vehicle") on or about August 22, 2014 at Morehart

Murphy Regional Auto Center, an authorized FCA dealer in Durango, Colorado.  Plaintiff

decided to buy the Class Vehicle based in part on FCA's representations that it was an

"EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw television

commercials for the EcoDiesel in which the Class Vehicles were represented to be fuel efficient and eco-friendly. Plaintiff also researched the Class Vehicle by visiting the Ram website. The Ram website represented the Class Vehicles to be a fuel efficient and eco-friendly. When Plaintiff went to Morehart Murphy Regional Auto Center to purchase the Class Vehicle, the salesperson confirmed Plaintiff's understanding that the Vehicle would be fuel efficient and eco-friendly. These representations, along with the advertised fuel economy and low emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

77.     Plaintiff **Bryan Thomas Muckenfuss** (for the purpose of this paragraph, "Plaintiff"), a citizen of South Carolina, residing in Ravenel, South Carolina, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about November 5, 2015 at Rick Hendrick Dodge Chrysler Jeep Ram, an authorized FCA dealer in Charleston, South Carolina.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff conducted online research on the fuel economy and torque of the EcoDiesel engine prior to purchasing his Class Vehicle.  Upon visiting Rick Hendrick Jeep Chrysler Dodge Ram, he discussed the overall efficiency of the Class vehicle with the sales associate, and recalls seeing a Ram brochure at the dealership that mentioned the EcoDiesel® engine.  These representations, along with the

-48-

1    advertised fuel economy, towing power, and/or performance were among the primary reasons

2    Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class

3    Vehicle could perform as advertised only by emitting NOx at levels that are greater than

4    advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

5    with undisclosed and unauthorized emission control devices designed to cheat emission tests and

6    to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

7    would have paid less for it, had he known that it did not comply with emission standards; that its

8    emission treatment system was designed to de-activate during real-world driving conditions; and

9    that it could not achieve the advertised towing power, performance, and/or fuel economy without

10   cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

11   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

12   less for it, had Defendants not concealed the unauthorized emission control devices.

13          78.    Plaintiff **Michael K. Norton** (for the purpose of this paragraph, "Plaintiff"), a

14   citizen of New Jersey, residing in Riverdale, New Jersey, bought a 2014 Jeep Grand Cherokee

15   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July 30, 2014 at

16   Precision Jeep, an authorized FCA dealer in Butler, New Jersey. Plaintiff decided to buy the Class

17   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

18   emissions and fuel efficient).  Plaintiff saw representations on Jeep's website and reviewed

19   window stickers for the EcoDiesel Jeep, noting that it was represented to be friendly for the

20   environment, had good gas mileage, and offered good towing performance. When Plaintiff went

21   to Precision Jeep to purchase the Class Vehicle, he also reviewed brochures and discussed with a

22   sales associate the advertised best-in-class fuel economy, range, torque, towing, and the "new,

23   clean, 3.0 EcoDiesel."  These representations, along with the advertised fuel economy and low

24   emissions were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

25   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

26   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

27   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

28   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

-49-

1    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

2    comply with emission standards; that its emission treatment system was designed to de-activate

3    during real-world driving conditions; and that it could not achieve the advertised towing power,

4    performance, and/or fuel economy without cheating emission tests.  Plaintiff sold the Class

5    Vehicle in or about May 2017, after the defeat device allegations became public, to Precision

6    Chrysler Jeep Dodge Ram in Butler, New Jersey.  Plaintiff has suffered a concrete injury as a

7    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

8    Vehicle, or would have paid less for it, and/or would have been able to sell it for more, had

9    Defendants not concealed the unauthorized emission control devices.

10         79.    Plaintiff **Kirk Petersen** (for the purpose of this paragraph, "Plaintiff"), a citizen of

11   Iowa, residing in Muscatine, Iowa, bought a 2015 Ram 1500 EcoDiesel® (for the purpose of this

12   paragraph, the "Class Vehicle") on or about August 28, 2015 at Deery Brothers Chrysler Dodge

13   Jeep Ram, an authorized FCA dealer in Iowa City, Iowa.  Plaintiff decided to buy the Class

14   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

15   emissions and fuel efficient).  Plaintiff saw television commercials and online advertisements in

16   which the Class Vehicles were represented to be fuel efficient and emissions compliant. When

17   plaintiff went to Deery Brothers Chrysler Dodge Jeep Ram to purchase the Class Vehicle, the

18   salesperson and vehicle brochure confirmed Plaintiff's understanding of the Class Vehicle's

19   features and fuel efficiency.  These representations, advertised fuel economy, towing power, and

20   performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

21   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

22   emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff

23   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

24   devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would

25   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

26   comply with emission standards; that its emission treatment system was designed to de-activate

27   during real-world driving conditions; and that it could not achieve the advertised towing power,

28   performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

1    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

2    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

3    unauthorized emission control devices.

4         80.    Plaintiff **Melvin Phillips** (for the purpose of this paragraph, "Plaintiff"), a citizen

5    of Missouri, residing in Aurora, Missouri, bought a 2015 Ram 1500 EcoDiesel® (for the purpose

6    of this paragraph, the "Class Vehicle") on or about October 23, 2015, at Ramsey Motor

7    Company, an authorized FCA dealer in Harrison, Arkansas.  Plaintiff decided to buy the Class

8    Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

9    emissions and fuel efficient).  Plaintiff conducted extensive internet research, including viewing

10   Ram advertisements and user blogs prior to purchasing the Class Vehicle.  He also saw television

11   commercials and other advertisements in which the Class Vehicles were represented to be

12   environmentally friendly, with low emissions and good gas mileage. When Plaintiff went to

13   Ramsey Motor Company to purchase the Class Vehicle, the salesperson represented the Class

14   Vehicle as "eco-friendly" and as having great towing power.  These representations, along with

15   the advertised fuel economy, towing power, and performance were among the primary reasons

16   Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class

17   Vehicle could perform as advertised only by emitting NOx at levels that are greater than

18   advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

19   with undisclosed and unauthorized emission control devices designed to cheat emission tests and

20   to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

21   would have paid less for it, had he known that it did not comply with emission standards; that its

22   emission treatment system was designed to de-activate during real-world driving conditions; and

23   that it could not achieve the advertised towing power, performance, and/or fuel economy without

24   cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

25   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

26   less for it, had Defendants not concealed the unauthorized emission control devices.

27        81.    Plaintiff **Samuel Price** (for the purpose of this paragraph, "Plaintiff"), a citizen of

28   Louisiana, residing in Fort Polk City, Louisiana purchased a 2014 Ram 1500 EcoDiesel® (for the

1    purpose of this paragraph, the "Class Vehicle") on or about July 30, 2014 at Crown Dodge, an

2    authorized FCA dealer in Fayetteville, North Carolina.  Prior to purchasing the Class Vehicle,

3    Plaintiff researched the Class Vehicle by reviewing online and print materials, and speaking with

4    a salesperson at the dealership.  Plaintiff decided to purchase the Class Vehicle based on his

5    research and the representations from the dealership, which led Plaintiff to believe that the Class

6    Vehicle had good towing capacity, high gas mileage, and had lower emissions than the black

7    smoke of early diesel models.  These representations, along with the advertised fuel economy and

8    performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

9    purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

10   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

11   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

12   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

13   not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

14   comply with emission standards; that its emission treatment system was designed to de-activate

15   during real-world driving conditions; and that it could not achieve the advertised towing power,

16   performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

17   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

18   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

19   unauthorized emission control devices.

20          82.     Plaintiff **John James Radziewicz** (for the purpose of this paragraph, "Plaintiff"), a

21   citizen of Louisiana, residing in New Orleans, Louisiana, bought a 2014 Jeep Grand Cherokee

22   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about June 24, 2015 at

23   Banner Chevrolet, an authorized FCA dealer in New Orleans, Louisiana.  Plaintiff decided to buy

24   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

25   reduced emissions and fuel efficient).  Plaintiff watched "The Fast Lane" Truck Review videos on

26   YouTube, conducted extensive Internet research on the fuel economy of the EcoDiesel engine,

27   and visited the Jeep website and various general discussion forums online prior to purchasing his

28   Class Vehicle.  Plaintiff specifically recalls seeing a very persuasive, interactive webpage on the

1    Jeep website that showed a circle with a roughly 750-mile radius that one could move around the

2    country in order to see how far he could travel in a straight line on one tank of gas.  Plaintiff was

3    also influenced by other advertisements available on the Jeep website, particularly those dealing

4    with fuel efficiency.  These representations, along with the advertised fuel economy, towing

5    power, and/or performance were among the primary reasons Plaintiff chose the Class Vehicle.  At

6    the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

7    only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

8    Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

9    control devices designed to cheat emission tests and to deceive consumers and regulators.

10   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

11   known that it did not comply with emission standards; that its emission treatment system was

12   designed to de-activate during real-world driving conditions; and that it could not achieve the

13   advertised towing power, performance, and/or fuel economy without cheating emission tests.

14   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

15   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

16   Defendants not concealed the unauthorized emission control devices.

17         83.     Plaintiff **Bobby Gene Reichert** (for the purpose of this paragraph, "Plaintiff"), a

18   citizen of Florida, residing in Boca Raton, Florida, bought a 2016 Ram 1500 EcoDiesel® (for the

19   purpose of this paragraph, the "Class Vehicle") on or about December 12, 2015 at Arrigo Dodge

20   Chrysler Jeep Sawgrass, an authorized FCA dealer in Tamarac, Florida.  Plaintiff decided to buy

21   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

22   reduced emissions and fuel efficient).  Plaintiff saw television commercials, read a print

23   advertisement in a diesel truck magazine, and reviewed Ram's website in which the Class Vehicle

24   was represented to have low emissions, good fuel economy, and a proven engine with great

25   towing capacity.  When Plaintiff went to Arrigo Dodge Chrysler Jeep Sawgrass to purchase the

26   Class Vehicle, the sales associate and sales manager touted the Class Vehicle's EcoDiesel®

27   attributes, including its low emissions, fuel economy, and towing capacity, and Plaintiff reviewed

28   the brochure for the Class Vehicle that touted those same attributes.  These representations, along

with the advertised towing power, were among the primary reasons Plaintiff chose the Class

Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

emission control devices designed to cheat emission tests and to deceive consumers and

regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

had he known that it did not comply with emission standards; that its emission treatment system

was designed to de-activate during real-world driving conditions; and that it could not achieve the

advertised towing power, performance, and/or fuel economy without cheating emission tests.

Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

Defendants not concealed the unauthorized emission control devices.

84.     Plaintiff **Mark Richards** (for the purpose of this paragraph, "Plaintiff"), a citizen

of Indiana, residing in Franklin, Indiana, bought a 2016 Ram 1500 EcoDiesel® (for the purpose

of this paragraph, the "Class Vehicle") on or about March 5, 2016 at Champion Chrysler Jeep

Dodge Ram, an authorized FCA dealer in Indianapolis, Indiana.  Plaintiff decided to buy the

Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

reduced emissions and fuel efficient).  Plaintiff saw representations on Ram's website in which

the Class Vehicles were represented to have good fuel economy and dependable diesel engines.

When Plaintiff went to Champion Chrysler Jeep Dodge Ram to purchase the Class Vehicle, the

sales associate touted the Class Vehicle's EcoDiesel® attributes, including its low emissions and

fuel economy.  These representations, along with the advertised fuel economy, were among the

primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

equipped with undisclosed and unauthorized emission control devices designed to cheat emission

tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

Vehicle, or would have paid less for it, had he known that it did not comply with emission

1    standards; that its emission treatment system was designed to de-activate during real-world

2    driving conditions; and that it could not achieve the advertised towing power, performance,

3    and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

4    direct and proximate result of Defendants' misconduct, and would not have purchased the Class

5    Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

6    control devices.

7            85.    Plaintiff **Jon Roberts** (for the purpose of this paragraph, "Plaintiff") a citizen of

8    Ohio, residing in Amherst, Ohio, bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this

9    paragraph, the "Class Vehicle") in or about June 2014 at Sliman's Sales & Services, an

10   authorized FCA dealer in Amherst, Ohio.  Plaintiff decided to buy the Class Vehicle based in part

11   on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel

12   efficient).  Plaintiff saw television commercials and other advertisements in which the Class

13   Vehicles were represented to have good fuel economy. When Plaintiff went to Sliman's Sales &

14   Services to purchase the Class Vehicle, the salesperson confirmed Plaintiff's understanding of the

15   Class Vehicle's fuel economy.  These representations regarding fuel economy, along with the

16   represented low emissions, were among the primary reasons Plaintiff chose the Class Vehicle. At

17   the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

18   only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was

19   Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

20   control devices designed to cheat emission tests and to deceive consumers and regulators.

21   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

22   known that it did not comply with emission standards; that its emission treatment system was

23   designed to de-activate during real-world driving conditions; and that it could not achieve the

24   advertised towing power, performance, and/or fuel economy without cheating emission tests.

25   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

26   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

27   Defendants not concealed the unauthorized emission control devices.

28

86.     Plaintiff **Kelly Ruiz** (for the purpose of this paragraph, "Plaintiff"), a citizen of Wyoming residing in Cheyenne, Wyoming, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about April 19, 2014  at Cowboy Dodge in Cheyenne, Wyoming.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). When Plaintiff went to Cowboy Dodge to purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes.  When Plaintiff went to Cowboy Dodge to purchase a vehicle, she expressed concern about gas mileage. The sales associate then suggested the Plaintiff consider the EcoDiesel® because of its fuel economy, touting the Class Vehicle's EcoDiesel® attributes. After Plaintiff noted the higher price of the diesel over the gas model, the sales associate assured her the diesel would run more efficiently and more economically and would thus pay for itself, in addition to being cleaner for the environment.  These representations, along with the advertised fuel economy and performance were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

87.     Plaintiff **Jesse Sandifer** (for the purpose of this paragraph, "Plaintiff"), a citizen of Washington, residing in Olalla, Washington, purchased a 2016 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about September 24, 2016 at West Hills Chrysler Jeep Dodge, an authorized FCA dealer in Bremerton, Washington.  Plaintiff decided to

1    purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel"

2    vehicle (i.e., reduced emissions and fuel efficient).  Prior to purchasing the Class Vehicle,

3    Plaintiff read an article published in a magazine explaining why Chrysler Dodge opted to use the

4    EcoDiesel® that is currently used in the Ram 1500 EcoDiesel® instead of a Cummins® diesel

5    motor.  The article stated that Chrysler Dodge was looking for a diesel engine that was

6    ecofriendly and was able to obtain 28 mpg or better.  Plaintiff does not recall the title of the

7    article or the publication in which the article was published.  After reading the article, Plaintiff

8    went to West Hills Chrysler Jeep Dodge, in Bremerton, Washington, to test drive the Class

9    Vehicle.  Prior to purchasing the Class Vehicle, Plaintiff also researched and read other articles

10   pertaining to Class Vehicle published on the web.  These representations, along with the

11   advertised fuel economy and performance, were among the primary reasons Plaintiff chose the

12   Class Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

13   perform as advertised only by emitting NOx at levels that are greater than advertised and above

14   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

15   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

16   and regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for

17   it, had he known that it did not comply with emission standards; that its emission treatment

18   system was designed to de-activate during real-world driving conditions; and that it could not

19   achieve the advertised towing power, performance, and/or fuel economy without cheating

20   emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

21   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

22   less for it, had Defendants not concealed the unauthorized emission control devices.

23       88.    Plaintiff **Miguel Silio** (for the purpose of this paragraph, "Plaintiff"), a citizen of

24   Florida, residing in Auburndale, Florida, purchased a 2015 Jeep Grand Cherokee EcoDiesel® (for

25   the purpose of this paragraph, the "Class Vehicle") on or about June 11, 2015 at Arrigo Dodge

26   Chrysler, an authorized FCA dealer in West Palm Beach, Florida.  Plaintiff decided to purchase

27   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

28   reduced emissions and fuel efficient).  These representations, along with the advertised fuel

1    economy and performance, were among the primary reasons Plaintiff chose the Class Vehicle.  At

2    the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

3    only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was

4    Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission

5    control devices designed to cheat emission tests and to deceive consumers and regulators.

6    Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had he

7    known that it did not comply with emission standards; that its emission treatment system was

8    designed to de-activate during real-world driving conditions; and that it could not achieve the

9    advertised towing power, performance, and/or fuel economy without cheating emission tests.

10   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

11   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

12   Defendants not concealed the unauthorized emission control devices.

13          89.     Plaintiff **Satyanam Singh** (for the purpose of this paragraph, "Plaintiff"), a citizen

14   of California, residing in Sacramento, California, bought a 2016 Ram 1500 EcoDiesel® (for the

15   purpose of this paragraph, the "Class Vehicle") on or about May 1, 2016 at Roseville Automall in

16   Roseville, California.  Plaintiff decided to buy the Class Vehicle based in part on FCA's

17   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

18   Plaintiff saw commercials in which the Class Vehicles were represented as to have good fuel

19   economy and to be durable.  Plaintiff also saw a representation on the Ram website in which the

20   Class Vehicles were represented to be environmentally friendly, have low emissions, to have

21   good fuel economy, and to be reliable.  When Plaintiff went to the Roseville Automall to

22   purchase the Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes,

23   including its environmental friendliness, fuel economy, towing power, and performance.  These

24   representations were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of

25   purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

26   emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff

27   aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control

28   devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would

1    not have purchased the Class Vehicle, or would have paid less for it, had he known that it did not

2    comply with emission standards; that its emission treatment system was designed to de-activate

3    during real-world driving conditions; and that it could not achieve the advertised towing power,

4    performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a

5    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

6    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

7    unauthorized emission control devices.

8            90.     Plaintiff **Nelson John Stephens** (for the purpose of this paragraph, "Plaintiff"), a

9    citizen of Georgia, residing in Fortson, Georgia bought a 2014 Ram 1500 EcoDiesel® (for the

10   purpose of this paragraph, the "Class Vehicle") on or about June 21, 2014, at Opelika Chrysler,

11   Dodge, Jeep, an authorized FCA dealer in Opelika, Alabama.  Plaintiff decided to buy the Class

12   Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced

13   emissions and fuel efficient).  Plaintiff saw representations on Jeep's website and print

14   advertisements that indicated the Class Vehicles were emissions compliant and had superior fuel

15   economy to gasoline vehicles.  When Plaintiff went to Opelika Chrysler, Dodge, Jeep, the sales

16   manager explained that the Class Vehicles were cleaner than gas engines.  Plaintiff was also told

17   that the Class Vehicles had good fuel economy.  These representations were among the primary

18   reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know that the

19   Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than

20   advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped

21   with undisclosed and unauthorized emission control devices designed to cheat emission tests and

22   to deceive consumers and regulators.  Plaintiff would not have purchased the Class Vehicle, or

23   would have paid less for it, had he known that it did not comply with emission standards; that its

24   emission treatment system was designed to de-activate during real-world driving conditions; and

25   that it could not achieve the advertised towing power, performance, and/or fuel economy without

26   cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of

27   Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

28   less for it, had Defendants not concealed the unauthorized emission control devices.

-59-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1        91.     Plaintiff **Wayne Tonnesen** (for the purpose of this paragraph, "Plaintiff"), a

2  citizen of New Jersey, residing in Tuckerton, New Jersey, purchased a 2016 Ram 1500

3  EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about November 29,

4  2016 at Johnson Motors, an authorized FCA dealer in Columbia, Wisconsin.  Plaintiff decided to

5  purchase the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel"

6  vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff read about the Ram 1500

7  EcoDiesel® on the Ram website as well as in several automotive review sites in which the Class

8  Vehicles were represented as environmentally friendly with great gas mileage.  When Plaintiff

9  went to Johnson Motors in Wisconsin to purchase the Class Vehicle, the sales person touted the

10  Class Vehicle's EcoDiesel® attributes, including its fuel economy, towing power, and

11  performance, and the window sticker for the Class Vehicle that represented the EcoDiesel's fuel

12  economy.  These representations, along with the advertised fuel economy and performance, were

13  among the primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff

14  did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels

15  that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class

16  Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

17  cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have purchased

18  the Class Vehicle, or would have paid less for it, had he known that it did not comply with

19  emission standards; that its emission treatment system was designed to de-activate during real-

20  world driving conditions; and that it could not achieve the advertised towing power, performance,

21  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

22  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

23  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

24  control devices.

25        92.     Plaintiff **William "Bill" Turner, III** (for the purpose of this paragraph,

26  "Plaintiff"), a citizen of Georgia, residing in Columbus, Georgia, leased a 2014 Jeep Grand

27  Cherokee EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about July

28  22, 2014, at Newnan Peachtree Chrysler, an authorized FCA dealer in Newnan, Georgia.  Plaintiff

decided to lease the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw information on an online blog in which the Class Vehicles were represented to be environmentally friendly, have low emissions, and have good fuel economy.  These attributes were confirmed by the sales associate when Plaintiff went to lease the Class Vehicle at Newnan Peachtree Chrysler.  These representations, along with the low emissions and environmental friendliness, were among the primary reasons Plaintiff chose the Class Vehicle.  These representations, along with the advertised fuel economy, environmental cleanliness and the longevity of a diesel, were among the primary reasons Plaintiff chose the Class Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have leased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

93.     Plaintiff **WEB Farms, Inc.** (for the purpose of this paragraph, "Plaintiff") is a citizen of New Mexico, with its principal place of business in Melrose, New Mexico.  WEB Farms, Inc. is owned by Wendell Bostwick, a citizen of Texas, residing in Lubbock, Texas.  Plaintiff bought a 2014 Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about October 6, 2014 at Texas Dodge, an authorized FCA dealer in Amarillo, Texas.  Plaintiff decided to buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).  Plaintiff saw television commercials in which the Class Vehicles were represented as the best towing pickup with a 10,000-pound payload, which was sufficient power for what Plaintiff needed.  Plaintiff later

1   visited Bender Chrysler Dodge Jeep Ram in Clovis, NM to pick up a brochure for more

2   information.  This brochure represented the Class Vehicle as achieving approximately 27 MPG.

3   Mr. Bostwick also saw information on the Ram website that represented the Class Vehicle as

4   achieving approximately 27 MPG, being good for towing, and providing reasonable torque.

5   These representations, along with the advertised fuel economy and low emissions were among the

6   primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

7   that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

8   than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

9   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

10   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

11   Vehicle, or would have paid less for it, had he known that it did not comply with emission

12   standards; that its emission treatment system was designed to de-activate during real-world

13   driving conditions; and that it could not achieve the advertised towing power, performance,

14   and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

15   direct and proximate result of Defendants' misconduct, and would not have purchased the Class

16   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

17   control devices

18        94.     Plaintiff **John Webb** (for the purpose of this paragraph, "Plaintiff"), a citizen of

19   Colorado, residing in Denver, Colorado, leased a 2016 Ram 1500 EcoDiesel® (for the purpose of

20   this paragraph, the "Class Vehicle") on or about May 26, 2016, at AutoNation Chrysler, Dodge,

21   Jeep, Ram Southwest, an authorized FCA dealer in Littleton, Colorado.  Plaintiff decided to lease

22   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

23   reduced emissions and fuel efficient).  Plaintiff saw representations on Ram's website in which

24   the Class Vehicles were represented to be environmentally friendly, have low emissions, and have

25   good fuel economy.  When Plaintiff went to AutoNation Chrysler Dodge Jeep Ram to lease the

26   Class Vehicle, the sales associate touted the Class Vehicle's EcoDiesel® attributes, including its

27   fuel economy and low emissions.  These representations, along with the advertised fuel economy,

28   environmental cleanliness and the longevity of a diesel, were among the primary reasons Plaintiff

1   chose the Class Vehicle.  At the time of lease, Plaintiff did not know that the Class Vehicle could

2   perform as advertised only by emitting NOx at levels that are greater than advertised and above

3   legal limits.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and

4   unauthorized emission control devices designed to cheat emission tests and to deceive consumers

5   and regulators.  Plaintiff would not have leased the Class Vehicle, or would have paid less for it,

6   had he known that it did not comply with emission standards; that its emission treatment system

7   was designed to de-activate during real-world driving conditions; and that it could not achieve the

8   advertised towing power, performance, and/or fuel economy without cheating emission tests.

9   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

10   misconduct, and would not have leased the Class Vehicle, or would have paid less for it, had

11   Defendants not concealed the unauthorized emission control devices.

12          95.     Plaintiff **Stonewall J. Webster III** (for the purpose of this paragraph, "Plaintiff"),

13   a citizen of North Carolina, residing in Mayodan, North Carolina, bought a 2016 Ram 1500

14   EcoDiesel® (for the purpose of this paragraph, the "Class Vehicle") on or about January 4, 2017

15   at Victory Dodge, an authorized FCA dealer in Shallotte, North Carolina. Plaintiff decided to buy

16   the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

17   reduced emissions and fuel efficient).  Plaintiff saw a representation on the Ram's website

18   regarding the fuel economy of the EcoDiesel® engine before he purchased the Class Vehicle.

19   When Plaintiff went to Victory Dodge to purchase the Class Vehicle, the sales associate touted

20   the Class Vehicle's EcoDiesel® attributes, telling him the truck would get MPG in the high

21   twenties and was equipped with the new "eco-friendly" turbocharged V6 diesel engine.  These

22   representations, along with the advertised fuel economy and low emissions were among the

23   primary reasons Plaintiff chose the Class Vehicle.  At the time of purchase, Plaintiff did not know

24   that the Class Vehicle could perform as advertised only by emitting NOx at levels that are greater

25   than advertised and above legal limits.  Nor was Plaintiff aware that his Class Vehicle was

26   equipped with undisclosed and unauthorized emission control devices designed to cheat emission

27   tests and to deceive consumers and regulators.  Plaintiff would not have purchased the Class

28   Vehicle, or would have paid less for it, had he known that it did not comply with emission

1  standards; that its emission treatment system was designed to de-activate during real-world

2  driving conditions; and that it could not achieve the advertised towing power, performance,

3  and/or fuel economy without cheating emission tests.  Plaintiff has suffered a concrete injury as a

4  direct and proximate result of Defendants' misconduct, and would not have purchased the Class

5  Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

6  control devices.

7      96.    Plaintiff **John Casey Wilson** (for the purpose of this paragraph, "Plaintiff"), a

8  citizen of Utah, residing in Sandy, Utah, bought a 2016 Ram 1500 EcoDiesel® (for the purpose

9  of this paragraph, the "Class Vehicle") on or about November 13, 2015 at Ken Garff West Valley

10  Dodge Chrysler Jeep Ram, an authorized FCA dealer in West Valley, Utah.  Plaintiff decided to

11  buy the Class Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle

12  (i.e., reduced emissions and fuel efficient).  Prior to purchasing the Class Vehicle, Plaintiff visited

13  the Ram website, and related consumer review websites, in which the Class Vehicles were

14  represented to be environmentally friendly with low emissions and good fuel economy.  When

15  Plaintiff went to Ken Garff West Valley Dodge Chrysler Jeep Ram to purchase the Class Vehicle,

16  the sales associates touted the Class Vehicle's EcoDiesel® attributes, including its fuel economy,

17  towing power, and performance.  These representations, along with the advertised fuel economy,

18  towing power, and/or performance were among the primary reasons Plaintiff chose the Class

19  Vehicle.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as

20  advertised only by emitting NOx at levels that are greater than advertised and above legal limits.

21  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and unauthorized

22  emission control devices designed to cheat emission tests and to deceive consumers and

23  regulators.  Plaintiff would not have purchased the Class Vehicle, or would have paid less for it,

24  had he known that it did not comply with emission standards; that its emission treatment system

25  was designed to de-activate during real-world driving conditions; and that it could not achieve the

26  advertised towing power, performance, and/or fuel economy without cheating emission tests.

27  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

28

1  misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

2  Defendants not concealed the unauthorized emission control devices.

3  **JURISDICTION AND VENUE**

4  97.     This Complaint is filed as an original action in this District and as the

5  Consolidated Consumer Class Action Complaint in the MDL No. 2777 proceedings, pursuant to

6  Pretrial Order No. 3 therein.

7  98.     This Court has original subject-matter jurisdiction over this action under 28 U.S.C.

8  § 1331 (federal question) and 18 U.S.C. § 1964 (RICO).  The Court also has original subject-

9  matter jurisdiction over this action under 28 U.S.C. § 1332(d), because this is a proposed class

10  action, the amount in controversy exceeds $5,000,000, and there is the required diversity of

11  citizenship pursuant to 28 U.S.C. § 1332(d)(2).  In addition, the Court has supplemental

12  jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

13  99.     This Court has personal jurisdiction over Defendants under California Code of

14  Civil Procedure section 410.10, as well as 18 U.S.C. § 1965(b) and (d).  The Court also possesses

15  pendent personal jurisdiction over Defendants.

16  100.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

17  part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

18  Defendants have marketed, advertised, sold, and leased the Class Vehicles, and otherwise

19  conducted extensive business, within this District.  In addition, or in the alternative, venue is

20  proper under 28 U.S.C. § 1407(a), which authorizes the Judicial Panel on Multidistrict Litigation

21  to transfer consolidated multidistrict litigation "to any district."

22  **INTRADISTRICT ASSIGNMENT**

23  101.     This action is properly assigned to the San Francisco Division of this District

24  pursuant to Civ. L.R. 3-2 because a substantial part of the events or omissions giving rise to

25  Plaintiffs' claims arose in the counties served by the San Francisco Division. Several named

26  Plaintiffs and proposed Class representatives, and many more Class members, purchased and

27  maintain their Class Vehicles in the counties served by this Division.  Moreover, FCA conducts

28  substantial business in the counties served by this Division, has marketed, advertised, sold and

-65-

leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties.  Furthermore, this Complaint is filed as an original action in this District and as the Consolidated Consumer Class Action Complaint in the MDL No. 2777 proceedings, which have been consolidated before Judge Edward M. Chen, presiding in the San Francisco Division of this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S. "CLEAN" DIESEL MARKET

102.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler.  In November of that year, CEO Marchionne unveiled an ambitious five-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a "refresh/facelift."[6]

103.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long time supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies.  In May of that year, Marchionne announced another five-year plan at FCA's headquarters in Auburn Hills, Michigan, to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to 7 million vehicles by 2018, up from 4.4 million in 2013.[7]  Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."[8]

104.    During this same time frame, emission standards in the United States were ratcheting up.  In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took

---

[6] Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan*, MotorTrend (Nov. 6, 2009), http://www.motortrend.com/news/chrysler-five-year-plan/.

[7] Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, Los Angeles Times (May 6, 2014), http://www.latimes.com/business/la-fi-chrysler-revamp-20140507-story.html.

[8] Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, MotorTrend (May 6, 2014), http://www.motortrend.com/news/ram-and-ferraris-place-in-fiat-chryslers-five-year-plan/.

1    another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet
2    another route that focuses less on electrification and ***more heavily on light-duty diesels*** and
3    compressed natural gas."[9]

4         105.    Indeed, as early as July 2010, Chrysler commissioned and presented research to
5    "[i]dentify the trade-offs that consumers make relative to powertrain technologies"—including
6    diesel—and "[i]dentify possible conquest opportunities associated with offering a RAM light-
7    duty Diesel engine."  FCA-MDL-001184465-524.  Among other things, the study
8    "recommend[ed] . . . [c]apitalizing on improved fuel economy to increase interest in a Light Duty
9    Diesel engine among L[ight] D[uty] owners."  *Id.*

10        106.    In December 2010, Chrysler requested a meeting with Bosch and Fiat to discuss
11   "Chrysler's main motivation" of "captur[ing] the developing N[orth] A[merican] diesel market."
12   RBL-MDL2777-PE-300169862-64.  Bosch's notes of the meeting indicate that the projected
13   "profitability status" for SUVs (and other vehicle segments) was "medium to high (+$300 to
14   +$800 margin per diesel vehicle)."  *Id.*  An additional meeting was planned for December 8, 2010
15   with "Chrysler, VM, [and] Bosch" to "discuss further," and a "Chrysler NA diesel decision
16   meeting with Marchionne" was "scheduled for" December 11, 2010.  *Id.*

17        107.    In 2012, Marchionne was quoted as saying, "with 2016 'just around the corner'
18   and 2025 not far away given the auto industry's long product-development lead times, 'there are
19   big choices to be made[.]'"[10]  Marchionne explained that "Chrysler, which is starting to share
20   platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in
21   ***diesels*** and CNG-powered vehicles."[11]  As one commentator put it at the time, "[f]uel-efficient
22   towing remains a strong point of diesels, and Marchionne says he still is optimistic about the
23   potential of light-duty diesels in the U.S. despite significant emissions challenges."[12]

24

25

---

26   [9] Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, WardsAuto (Aug.
     29, 2012), http://wardsauto.com/technology/chrysler-eyes-different-path-meeting-new-cafe-
27   standards.
     [10] *Id.*
28   [11] *Id.* (emphasis added).
     [12] *Id.*

108.     This is further reflected in a March 2013 Chrysler research document entitled "Alternative Powertrain" in which the company sought to better understand the "needs, wants, expectations and functional requirements relative to . . . alternative powertrain technologies such as hybrids, electric, diesel, and compressed natural gas."  FCA-MDL-001239766-774.  The research concluded that "consumers want their next vehicle to do everything their current vehicle does, with better fuel economy and no sacrifice in usability," and further noted that "[l]arge segments (Pickups) with a need to tow and haul show most interest in Alternative fuels/technology for internal combustion engines."  *Id.* at 9.

109.     FCA ultimately decided to push into this market beyond its existing heavy-duty diesel trucks (which use engines from a different supplier, Cummins) and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®."  These are the Class Vehicles at issue here.

110.     Fiat Chrysler was not alone.  Seeing an opportunity for growth in the U.S. market, other major automakers rushed to develop and market "clean diesel" engines.  Volkswagen, Mercedes-Benz, General Motors, and other manufacturers also began selling diesel cars and trucks as a more efficient (and thus environmentally-friendly) alternative to gasoline vehicles with no loss of power or performance: the advertised difference was that new emission control technology could make small diesel engines (long regarded by American consumers as fuel efficient but foul-smelling polluters) powerful and clean in addition to fuel-efficient.  The marketing worked, and millions of diesel vehicles were sold and leased in the United States between 2007 and 2016.

111.     The green bubble for diesel vehicles first popped on September 18, 2015, when the EPA issued a Notice of Violation of the CAA to Volkswagen and Audi for installing illegal "defeat devices" in 2009–2015 2.0-liter diesel vehicles.  A defeat device, as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emission control systems under normal driving conditions.  The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emission testing while polluting far in excess of emission standards, revealing the new "clean diesel" technology to be illusory.  CARB also announced that it had

-68-

1    initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the

2    Notice of Violation.  On September 22, 2015, Volkswagen admitted that 11 million diesel cars

3    worldwide were installed with the same defeat device software.[13]  Volkswagen wasn't alone—

4    soon after, government agencies began to reveal that other automakers sold dozens of models

5    exceeding allowable emission levels under applicable standards.  Nevertheless, the Defendants in

6    this action continued with business as usual, concealing from regulators and consumers their

7    Class Vehicles' emissions-related behavior and performance.

8    **II.    DEFENDANTS' DIRTY "ECODIESEL®" SCHEME**

9         112.    Federal and state emission standards are in place to protect Americans from

10   pollution and certain chemicals known to cause disease in humans.  Automobile manufacturers

11   must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in

12   California and 14 other states that have adopted California's standards).  The CAA requires

13   vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet

14   applicable federal emission standards to control air pollution.  Every vehicle sold in the United

15   States must be covered by an EPA-issued COC, and every vehicle sold in the State of California

16   must be covered by a CARB-issued EO.

17        113.    There is a very good reason that these laws and regulations exist and apply to

18   vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle

19   emissions to be carcinogenic and about as dangerous as asbestos.

20        114.    Diesel engines pose a unique challenge because they have an inherent trade-off

21   between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the

22   dirtier and more harmful the emissions.  Instead of using a spark plug to combust highly refined

23   fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of

24   liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to

25   combust.  This causes a more powerful compression of the pistons, which can produce greater

26   engine torque (that is, more power).  Diesel engines are able to do this both because they operate

27

28   _____

[13] *See* Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

1    at a higher compression ratio than gasoline engines and because diesel fuel contains more energy

2    than gasoline.

3         115.    But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier

4    and more dangerous emissions.  Diesel combustion produces NOx, a variety of nitrogen and

5    oxygen chemical compounds that only form at high temperatures.  NOx pollution contributes to

6    nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form

7    ozone.  Exposure to these pollutants has been linked with serious health dangers, including

8    asthma attacks and other respiratory illnesses serious enough to send people to the hospital.

9    Ozone and particulate matter exposure have been associated with premature death due to

10   respiratory-related or cardiovascular-related effects.  Children, the elderly, and people respiratory

11   illnesses are at acute risk of health effects from these pollutants.

12        116.    Given the risks, minimizing NOx is paramount.  But removing these pollutants

13   from untreated exhaust is difficult, and diesel automakers have reacted by trying to remove NOx

14   from the exhaust using catalysts.  Modern turbodiesel engines use ceramic diesel filters to trap

15   particulates before they are emitted.  Many also use a technology called "selective catalytic

16   reduction" ("SCR") to reduce NOx emissions.  SCR systems inject a measured amount of urea

17   solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious

18   substances before they are emitted.  SCR-equipped vehicles must carry an onboard tank of fluid

19   for this purpose, and injection of the fluid is controlled by the same engine control module that

20   manages the fuel-air mixture and other aspects of engine operation.

21        117.    FCA's response to this challenge was the EcoDiesel® engine.  Emission

22   reductions start in the cylinder with advanced fuel injection strategies.  After the byproducts of

23   combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel

24   oxidation catalyst, diesel particulate filter, and SCR.

25        118.    The Class Vehicles use engine management computers to monitor sensors

26   throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated

27   programming that can sense and vary factors like steering, combustion, and emissions

28   performance for different driving situations.  To manage engine and emission controls, the Class

Vehicles use a Bosch EDC system.  Bosch GmbH and Bosch LLC designed, tested, customized, manufactured, and sold these EDC systems, including software code, to Fiat Chrysler (along with other automakers including Volkswagen, Mercedes, and General Motors) for use in the Class Vehicles.

119.    The system used in the Class Vehicles is Bosch's EDC Unit 17 (also called "EDC17").  A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion."  The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets."  In the press release, Bosch touted the EDC17 as follows:

> **EDC17: Ready for future demands**
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets.  In addition to controlling the precise timing of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.  The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary.  This improves the precision of injection throughout the vehicle's entire service life.  The system therefore makes an important contribution to observing future exhaust gas emission limits.[14]

120.    Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal.[15]  Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear.  Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[16]

---

[14] *See* Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-resse.de/presseforum/details.htm?txtID=2603&locale=en.

[15] Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz, and Stefan Savage, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles* (2017), https://cseweb.ucsd.edu/~klevchen/diesel-sp17.pdf.

[16] *Id.*

121.    In 2010 or 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans.  This engine had been under development for use in a General Motors automobile for the European market.[17] However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in FCA vehicles to be sold in the United States.

122.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. . . .We combined resources and developed them together."[18]

123.    According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[19]

124.    In fact, VM Motori boasts of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)."[20]  VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[21]

125.    The engine originally was developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in the United States.  Rather than make the engine compliant with U.S. emissions standards, FCA opted to cheat on the emission test.

126.    In January 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter

---

[17] Chad Westfall, *An Inside Look At The Ram 1500 3.0L EcoDiesel*, Engine Labs (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.
[18] *Id.*
[19] *Research and Development*, VM Motori, http://www.vmmotori.com/r-s/vm-motori/r-s-2.htm.
[20] *Id.*
[21] *Id.*

1    EcoDiesel®.[22]  As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand

2    Cherokee features a Bosch emission system compliant with the most stringent emission

3    regulations in the world.  From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with

4    top technologies to give consumers a great driving experience requiring fewer stops at the

5    pump."[23]  Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee

6    would be assembled at Bosch's facility in Kentwood, Michigan.

7          127.    In reality, Fiat Chrysler—working with VM Italy and VM America on the design

8    of the EcoDiesel®'s engines and Bosch GmbH and Bosch LLC on the design of the EDC Unit

9    17—was either unable or unwilling to devise a solution within the constraints of the law.  And so,

10   like their rivals at Volkswagen, they devised one outside of it.  Instead of cutting their losses on

11   "EcoDiesel," delaying the production of the Class Vehicles, or coming clean, Fiat Chrysler

12   worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize

13   the EDC Unit 17 to allow Class Vehicles to simulate "passing" the EPA and CARB testing.

14   Unlike during testing, the software disables or restricts certain of the emission controls during

15   real-world driving conditions.  When the emission controls are de-activated on the road, the Class

16   Vehicles emit up to 20 times the legal limits of NOx.

17         128.    These software controls designed and implemented by Bosch GmbH and Bosch

18   LLC were concealed from regulators on COC and EO applications for the Class Vehicles, thus

19   deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United

20   States and California.  Of course, consumers, who have no way of discerning that the emission

21   control technology de-activated during real-world driving conditions, were likewise deceived.

22         129.    Specifically, Bosch GmbH and Bosch LLC worked hand-in-glove with Fiat

23   Chrysler and VM Motori to develop and implement a specific set of software algorithms for

24   implementation in the Class Vehicles, which enabled FCA to adjust fuel levels, exhaust gas

25   recirculation, air pressure levels, and even urea injection rates.[24]

26   _____

[22] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, *supra* note 5.
27   [23] *Id.*
[24] *See generally Engine management*, Bosch Auto Parts, http://de.bosch-
28   automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1/  (describing capabilities of Bosch EDC units).

130.     A study recently published by researchers at the University of California, San Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that Bosch code was used in a so-called defeat device for a Fiat vehicle.  The study described the software as setting one mode for when a vehicle is being tested for emissions, but then allowing tailpipe pollution to spike in real-world driving conditions.[25]  The study described Bosch's role in building the electronic control unit ("ECU") hardware and developing the software running on the ECU and found there was "no evidence that automobile manufacturers write any of the code running on the ECU."[26]  To the contrary:  "All code we analyzed in this work was documented in documents copyrighted by Bosch and identified automakers as the intended customers."[27]  The study concluded:  "We find strong evidence that both defeat devices were created by Bosch and then enabled by Volkswagen and Fiat for their respective vehicles."

131.     For context, when carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform a series of specific maneuvers prescribed by federal regulations to simulate driving and test emissions in a controlled environment.  Bosch's EDC Unit 17 gave Fiat Chrysler the ability to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel.  For example, given that the steering wheel cannot be turned on a dynamometer, Bosch programmed a sensor which detected whether or not the steering wheel turned.  When the EDC Unit 17's detection algorithm detected an emission test was complete, the EDC Unit 17 could de-activate or reduce the emission control systems' performance, causing the Class Vehicle to spew illegal amounts of NOx emissions when out on the road.

132.     This workaround was illegal.  The CAA expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission

---

[25] *See* Ryan Been, *Study of VW's Cheating on Diesels Examines Role of Bosch Code*, Bloomberg Technology (June 9, 2017), https://www.bloomberg.com/news/articles/2017-06-09/study-of-vws-cheating-on-diesels-examines-role-of-bosch-code.
[26] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, *supra* note 15.
[27] *Id.*

control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."  42 U.S.C. § 7522(a)(3).  Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

133.    As the EPA has now alleged against Fiat, FCA, VM Italy, and VM America, Defendants did not disclose, and affirmatively concealed, the presence of performance-altering software code developed with Bosch GmbH and Bosch LLC from government regulators.  In other words, FCA lied to the government, its customers, its dealers, and the public at large.

134.    Because FCA lied on the COC and EO applications, these COCs and EOs were fraudulently obtained.  And because the Class Vehicles did not conform "in all material respects" to the specifications provided in the COC and EO applications, the Class Vehicles were never covered by a valid COC or EO, and thus were *never* legal for sale—nor were they EPA and/or CARB compliant, as represented.  With the complicity of Bosch and VM Motori, Fiat Chrysler hid these facts from the EPA, CARB, and other regulators, from FCA dealers and consumers, and FCA continued to sell and lease the Class Vehicles to the driving public, despite their illegality.

135.    Fiat Chrysler's illegal workaround was enabled by a close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Class Vehicles and other "clean" diesel vehicles.[28]  Bosch GmbH and Bosch LLC were aware that Fiat Chrysler used its emission control technology as a concealed auxiliary (or defeat) device and, in

---

[28] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

1    fact, worked together with Fiat Chrysler and VM Motori to develop and implement software

2    algorithms specifically tailored to allow the Class Vehicles to evade detection.

3        136.    Bosch GmbH and Bosch LLC worked closely with Fiat Chrysler and VM Motori

4    to create specifications and software code for each Class Vehicle model.  Indeed, customizing a

5    road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence

6    at an automaker's facility.  VM Italy and VM America likewise worked closely with Bosch

7    GmbH, Bosch LLC, and Fiat Chrysler in designing, installing, and calibrating the engines for the

8    Class Vehicles.

9        137.    All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine

10   management software over which Bosch exerts near-total control.  In fact, the software is

11   typically locked to prevent customers, like Fiat Chrysler, from making significant changes on

12   their own.  Accordingly, both the design and implementation are interactive processes, requiring

13   Bosch's close collaboration with the automaker from beginning to end.

14       138.    Bosch GmbH and Bosch LLC's security measures further confirm that its

15   customers cannot make significant changes to Bosch software without their involvement.  Bosch

16   boasts that its security modules protect vehicle systems against unauthorized access in every

17   operating phase, meaning that no alteration could have been made without either a breach of that

18   security—and no such claims have been advanced—or Bosch's knowing participation.[29]

19       139.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch

20   maintains absolute control over its software as part of its regular business practices:[30]

21       I've had many arguments with Bosch, and they certainly own the dataset software
         and let their customers tune the curves.  Before each dataset is released it goes
22       back to Bosch for its own validation.

23       Bosch is involved in all the development we ever do.  They insist on being present
         at all our physical tests and they log all their own data, so someone somewhere at
24       Bosch will have known what was going on.

25

26   _____

27   [29] *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016), https://www.escrypt.com/en/news-events/protection-for-ecus.
     [30] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver
28   (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….

The car company is *never* entitled by Bosch to do something on their own.

140.    Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them.  As they did with Volkswagen, the units required the work of numerous Bosch coders for a period of more than ten years.[31]  Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[32]

141.    Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating.  As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch warned Volkswagen by letter that using the emission-altering software in production vehicles would constitute an "offense."[33]  Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicles, including the Class Vehicles, from U.S. regulators and consumers.

142.    Bosch LLC worked closely with Bosch GmbH and diesel automakers both in the United States and in Germany, to ensure that the "clean" diesels, like the Class Vehicles, passed emission testing.  Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel vehicles were approved for sale in the United States.  For example, we now know that employees of Bosch LLC and Bosch GmbH provided specific information to regulators in the United States about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emission standards.  Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from regulators in the United States about those vehicles.  On information and

---

[31] Again, approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch.  *See Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, *supra* note 28.

[32] *See The brain of diesel injection: New Bosch EDC17 engine management system*, *supra* note 14.

[33] *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept. 27, 2015), http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software-use-in-diesel-cars-report-says; *see also VW Scandal: Company Warned over Test Cheating Years Ago*, BBC (Sept. 27, 2015), http://www.bbc.com/news/business-34373637.

1   belief, Bosch LLC also assisted in concealing the true nature of the emission control technology

2   from regulators in the United States with respect to the Class Vehicles at issue here.

3        143.    Bosch not only kept the dirty secret safe, it went a step further and actively lobbied

4   lawmakers to push "clean diesel" in the United States.  As early as 2004, Bosch announced a push

5   to convince U.S. automakers that its diesel technology could meet tougher 2007 emission

6   standards in the United States.[34]  Bosch engaged in a multi-year, multi-million dollar effort

7   involving key players from Bosch in both Germany and the United States.  In its efforts to

8   promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its

9   global group of affiliated companies, including Bosch LLC.

10       144.    Bosch's promotion of diesel technology specifically targeted the United States.

11   For example, Bosch put on "Diesel Days in California"[35] and "SAE World Congress in

12   Detroit."[36]  In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second

13   Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with

14   the aim of providing a venue for "stakeholders to gain insight into the latest technology trends,

15   and to engage in a vital dialogue with industry leaders and policymakers."[37]

16       145.    Bosch LLC hosted multi-day conferences open to regulators and legislators and

17   held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean"

18   diesel technology, including the calibrations necessary for the vehicles to comply with emission

19   regulations.

20       146.    In April 2009, for example, Bosch organized and hosted a two-day "California

21   Diesel Days" event in Sacramento, California.  Bosch invited a roster of lawmakers, journalists,

22

23

---

24   [34] Edmund Chew, *Bosch boosts US diesel lobbying*, Automotive News (Mar. 8, 2004),
http://www.autonews.com/article/20040308/SUB/403080876/bosch-boosts-us-diesel-lobbying.

25   [35] *Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/
html/734_4066.htm?section=28799C0E86C147799E02226E942307F2.

26   [36] *See, e.g.*, *Bosch Brings Innovation, Green Technology to SAE 2009 World Congress*, Bosch,
http://www.bosch.us/content/language1/html/734_7432.htm?section=CDAF31A468D9483198E

27   D8577060384B3.
[37] *Bosch: Clean Diesel is Key Part of Future Technology Mix*, Bosch, http://us.bosch-press.com/

28   tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=59743263&CFTOKEN=b0c61c28412924c-
BCBB064E-FD22-FC33-50650318A8803D2B&nh=00&Search=0&id=364.

executives, regulators, and non-governmental organizations[38] with the aim of changing

perceptions of diesel from "dirty" to "clean."  The event featured "clean diesel" vehicles as

ambassadors of "clean diesel" technology.  The stated goals were to "build support for light-duty

diesel as a viable solution for achieving California's petroleum and emission reduction

objectives."

147.    Bosch also joined in events promoting the Class Vehicles.  At one such event

hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements

regarding the 3.0-liter EcoDiesel V6's performance.  It stated that the "Bosch emissions control

system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the

tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy

that is "30% better than a comparable gasoline engine."[39]

148.    In 2009, Bosch also became a founding member of the U.S. Coalition for

Advanced Diesel Cars.[40]  One of this advocacy group's purposes included "promoting the energy

efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles

in the U.S. marketplace."[41]  This group lobbies Congress, U.S. regulators, and CARB in

connection with rules affecting "clean diesel" technology.[42]

## III.    FCA'S MISLEADING MARKETING

### A.    Fiat Chrysler Identifies and Combats the "Dirty Diesel" Stigma.

149.    As described above, Fiat Chrysler, VM Motori, and Bosch began investigating

strategies to develop and market diesel vehicles in the North American market in at least July

2010.  FCA-MDL-001184465.  As early as February 2012, Chrysler had already commissioned

---

[38] *Bosch drives clean diesel in California*, *supra* note 35; *see also California Diesel Days*, The U.S. Coalition for Advanced Diesel Cars, http://www.californiadieseldays.com/.

[39] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, Objects in the Mirror… (blog operated by FCA Digital Media) (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

[40] Chrissie Thompson, *New Coalition Aims To Promote Diesel Cars*, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to-promote-diesel-cars.

[41] *About the Coalition*, The U.S. Coalition for Advanced Diesel Cars (May 22, 2015), http://cleandieseldelivers.com/about/.

[42] *Id.*; s*ee also, e.g.*, Letter to Mary T. Nichols & the California Air Resources Board concerning a statement made about diesel technology (Jan. 8, 2016), http://cleandieseldelivers.com/media/Mary-Nichols-Letter-01082016.pdf.

1    and presented research to understand how to market the diesel vehicles to consumers.  FCA-

2    MDL-001182796-821.

3         150.    This research confirmed that the Defendants had a significant obstacle to

4    overcome: consumers associated diesel engines with old technology and, more importantly, with

5    "negative images of smog and dirt."  *Id.*

6         151.    This "dirty diesel" stigma was considerable.  During Fiat Chrysler's 2012 focus

7    group addressing "diesel perceptions," one consumer noted "[I] can't stand diesel"; another felt

8    "[diesel] has an image problem"; another explained that "when somebody says diesel, I just think

9    of that black smoke"; to another, diesel evoked image of "smoke, exhaust"; another associated

10   diesel with "old images of a truck letting off all of these emissions"; and, summing it up, one

11   focus group participant noted "you just think dirty when you think diesel."  FCA-MDL-

12   001422127.

13        152.    Unsurprisingly, then, Fiat Chrysler worked hard to rebut the dirty diesel stigma in

14   communications directly with consumers and in training materials for dealers (to help the dealers

15   persuade consumers to purchase the Class Vehicles).  In a Jeep EcoDiesel "Product Brief," for

16   example, Fiat Chrysler noted "[b]uyers can be resistant to consider a diesel purchase due to

17   several perceptions that are no longer true" including that "diesels are filthy . . . [and] too loud

18   and smelly."  FCA-MDL-000517246-53.  The brief combats these perceptions by stating that

19   "diesel engines are surprisingly responsible in view of ecological concerns."  *Id.*  It also includes

20   a "key messages" for prospective consumers including: "Diesel engines offer clean operation

21   with typically 25% less emissions than a gasoline engine."  *Id.*  It also notes that the "3.0L

22   EcoDiesel V6 uses Selective Catalyst Reduction (SCR) with DEF to help minimize exhaust

23   emissions" and uses "NOx modules and sensors . . . to help control tailpipe emissions."  *Id.*

24        153.    Similarly, a Ram 1500 "Targeted In-Dealership Training" guide notes that the two

25   "most common misconceptions about diesel engines" are that "Diesels are noisy" and "Diesels

26   are dirty."  FCA-MDL-000517194-203.  As to the latter, the guide instructs dealers that the

27   "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of

28   diesel engines."  *Id.*  It later explains that DEF "reduce[s] nitrous oxides coming out of the

1   tailpipe" and "helps to create **non-harmful** emissions." *Id.* (emphasis in original).  The guide

2   then states that "[o]ur EcoDiesel runs extremely clean for a truck powerplant." *Id.*

3       154.    In a "news" document, again presumably targeting Ram and Jeep dealers, Fiat

4   Chrysler explained that "[w]hen pitching the EcoDiesel, it may help you to keep in mind a few

5   advantages to driving a diesel engine." FCA-MDL-000518525.  One advantage was that "Diesels

6   Are Getting Greener." *Id.*  The document then explained that "[i]n the past, diesels were seen as

7   polluters – a hindrance to environmentally conscious customers. Today's diesels, however, run

8   cleaner than they ever have before. For its part, the ecologically responsible EcoDiesel V6 is the

9   cleanest light-duty engine available." *Id.*

10      **B.      The EcoDiesel Name and Badge Communicate Environmental Friendliness
               and Fuel Efficiency.**

11

12      155.    Fiat Chrysler also understood that a key component of overcoming the diesel

13   stigma, and of marketing the Class Vehicles' purported environmental friendliness and fuel

14   economy, was the naming and labeling of the diesel technology.  As noted above, Fiat Chrysler

15   conducted research in February 2012 to address this very issue.  FCA-MDL-001182796-821.

16   That research concluded that the "[b]est names [for Fiat Chrysler's diesel engine] highlight

17   'green' theme." *Id.*  It further concluded that "***[f]uel efficiency and environmental friendliness***

18   ***are important; names connected with these will be most well-received***." *Id.* (emphasis added).

19   An excerpt from the research presentation is shown below.

20

21

22

23

24

25

26

27

28

156. The highest-ranked name, in terms of both appeal and preference, was "Eco-Diesel." The research explained that "'Eco' encompasses green, efficient, and economic . . . and is strongly associated with being environmentally friendly." Similarly, the research concluded that the EcoDiesel "[n]ame [i]mplies a variety of positive meanings – green, efficient, economic, etc." Unsurprisingly, the "imagery" most associated with the name "EcoDiesel" was "Environmentally-Friendly" and "Fuel Efficient." *Id.*

157. Although other potential names (*e.g.*, "Clean Diesel" and "Enviro Diesel") had slightly higher associations with environmental friendliness, "EcoDiesel" communicated the combination of "green" credentials and fuel economy the best. Fiat Chrysler had found its winner.

158. Fiat Chrysler adopted and trademarked the "EcoDiesel" name and used it in virtually every advertisement for the Class Vehicles. It also branded every single Class Vehicle with an EcoDiesel badge. The two versions of the badge, used on Jeep Grand Cherokees and Ram 1500s, respectively, are shown below:

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

159. This badging was *extremely important* to Fiat Chrysler.  Jim Morrison, then the head of Jeep Brand Product marketing, gave a presentation some 20-30 times in which he explained that "consumers are immediately receptive to the EcoDiesel badging/logo" and "suggest that 'Eco-diesel badging can initially change the impression of diesel vehicles."  FCA-MDL-001166458-533; Morrison Dep. Tr. 131:5-6.  As the notes below the slide confirm, "[c]onsumers further believe that *the word 'Eco- Diesel' can change the perception of a diesel engine to something denoting ecologically conscious and economical to own and operate*."  *Id.* (emphasis added).  The full slide with notes is shown below:



160.    Mr. Morrison also confirmed the meaning and importance of the EcoDiesel name and badge in a sworn declaration he submitted in connection with a trademark dispute.  There, he declared that "Chrysler decided to combine the terms 'Eco,' 'Diesel,' and '3.0L' . . . to refer to the engine because the engine is an economical, fuel-efficient, more environmentally friendly 3.0 liter diesel engine."  *Unitek Solvent Services, Inc. v. Chrysler Group*, LLC, No. 1:12-cv-00794, Dkt. 86-35 at ¶ 8 (June 4, 2013).  He further explained that "Chrysler [also] based its decision to use the descriptive terms 'eco' and 'ecodiesel' on the fact that numerous third parties in a variety

1  of industries use the term 'eco' to describe ecologically or environmentally friendly products or

2  services that have been developed to reduce carbon emission, energy consumption, or otherwise

3  preserver the environment." *Id.* at ¶ 10.

4      161.   Many additional documents confirm that Fiat Chrysler intended the name

5  "EcoDiesel" and the EcoDiesel badge to convey both environmental friendliness and fuel

6  economy.  A September 2013 press release, for example, included a heading entitled "**Putting the**

7  **'Eco' in EcoDiesel**" under which it claimed that "[t]he new EcoDiesel V6 achieves 50-state

8  emissions compliance for both tier II and BIN 5."  FCA-MDL-000519022-24 (emphasis in

9  original).  In other words, the "Eco" in EcoDiesel means not just environmental friendliness,

10  generally, but also emissions compliance, specifically.

11      162.   A later Ram press release entitled "Ram has 'turned up the ECO' on fullsize truck

12  MPGs . . . to 29" further demonstrates that the "Eco" in EcoDiesel also refers to fuel economy.

13  FCA-MDL-001344885-86; FCA-MDL-001401873.

14      163.   Again, the EcoDiesel badge was placed prominently on every single Class

15  Vehicle, and the word "EcoDiesel" was used in virtually every consumer-facing communication.

16  That word and badge represented to consumers that the Class Vehicles were environmentally

17  friendly and fuel efficient.  Both representations, it turns out, were based on a lie: the Class

18  Vehicles were not, in fact, environmentally friendly, and could achieve their fuel economy only

19  through concealed emissions apparatuses that caused the vehicles to pollute excessively in real-

20  world driving conditions.

21      C.    **FCA Misrepresents the Class Vehicles to Consumers in a Consistent and**
22            **Pervasive Marketing Campaign.**

23      164.   Fiat Chrysler's misleading representations about the Class Vehicles—including

24  their purported "green" credentials, superior fuel economy, and other performance

25  characteristics—were not limited to EcoDiesel badge.  Indeed, FCA engaged in a full court press

26  to market the Class Vehicles, and to communicate to consumers the purported benefits of the

27  EcoDiesel engine.  These communication efforts included, among other things: (1) press releases

28  aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive

1    dealer training materials that taught dealers how to sell the Class Vehicles with false and

2    misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere;

3    (4) information and interactive features on FCA's websites and blogs; and (5) print and television

4    marketing.

5             **1.    Press Releases and Media Communications**

6             165.    As early as 2013, FCA began issuing press releases that were sent directly to

7    consumers and were also intended to generate consumer-facing articles and reviews about the

8    EcoDiesel engine.  There are many such examples.  A representative sampling includes:

9             a.    A January 2013 press release announcing a "new, clean, 3.0-liter EcoDiesel
                    V-6 engine" in the Jeep Grand Cherokee.  The release touts the "30 mpg
10                   highway with driving range of more than 730 miles," and the "class-
                    leading 240 horsepower and massive 420lb.-ft of torque."  Notably, it also
11                   states that the "Selective Catalytic Reduction (SCR) help[s] the new
                    engine" be "clean" and "50-state legal."  FCA-MDL-001134988-90.
12

13            b.    An October 2013 press release notifying the media that the "[n]ew 2014
                    Jeep Grand Cherokee EcoDiesel wins 'Green' category" of the 2014
14                   Active Lifestyle Vehicle Awards.  The release claims the Jeep EcoDiesel
                    includes "clean-diesel technology" and delivers "best-in-class fuel
15                   economy and driving range."  FCA-MDL-000519206-07.

16            c.    A February 2014 press release proclaiming that the "2014 Ram 1500
                    EcoDiesel sets new fuel-economy benchmark of 28 MPG."  The release
17                   repeatedly touts the EcoDiesel's fuel economy and claims that its SCR and
                    EGR systems—both of which were compromised by the AECDs described
18                   herein—"contribute to 50-state compliance with Tier2/Bin 5 emissions
                    regulations."  FCA-MDL-001142520-21.

19            d.    A November 2014 press release announcing that the "Ram 1500 EcoDiesel
                    [was] named 2015 Green Truck of the Year by Green Car Journal."  The
20                   release states that the "Ram 1500 delivers an outstanding combination of
                    best-in-class fuel efficiency, unsurpassed torque and a surplus of towing
21                   capacity."  It also quotes the editor of Green Car Journal who noted that
                    "[t]he Ram 1500 EcoDiesel exemplifies what a 'green' truck should be."
22                   FCA-MDL-000519290-01.

23            e.    A January 2015 press release announcing that the "Jeep Grand Cherokee
                    EcoDiesel [was] named 2015 Green SUV of the Year by Green Car
24                   Journal."  The release again boasts the EcoDiesel's "best-in-class" fuel
                    economy, "untouched" range, "class-leading" horsepower, "massive"
25                   torque, and its "clean-diesel technology."  FCA-MDL-001377187-88.

26            f.    A November 2016 press release boasting "best-in-class fuel economy and
                    longest range with exclusive EcoDiesel – 29 mpg and 754 miles with Ram
27                   1500."  FCA-MDL-001185732-34.

28

166.    Notably, Marchionne himself was asked to approve, and did approve, a draft press release from February 2013 announcing that "Ram [was the] first to build light-duty diesel pickup."  The release promoted an "outstanding combination of best-in-class fuel efficiency, best-in-class torque and impressive capability."  It also stated that the "EcoDiesel . . . emissions are 60 percent less than those produced by diesel powertrains 25 years ago."  FCA-MDL-001367858-59.

167.    In some instances, these press releases were sent directly to consumers in "hand raiser" communications, as evidenced by a 2014 email to a prospective customer.  That email "thanks [the prospective customer] for asking about the 2014 Ram 1500 EcoDiesel,"—which it says is "capable, efficient, and easy on the environment"—and links to a Ram "press release for more information."  FCA-MDL-001180641.

168.    Even when not sent directly to consumers, all the press releases—and the consistent representations about environmental friendliness, fuel economy, and performance contained in them—were intended to, and did in fact, result in significant buzz and media attention for the EcoDiesel vehicles, to which Plaintiffs and the Class Members were exposed. The representations that resulted were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 2.    Dealer Training Materials

169.    As noted above, FCA disseminated to its dealers comprehensive training materials to help them communicate the EcoDiesel attributes to consumers, and ultimately, to sell more Class Vehicles.  Those materials consistently emphasized the (supposed) environmental friendliness, fuel efficiency, and power of the EcoDiesel engine, among other attributes.

170.    Ram, for example, held a "targeted in-dealership training" through its dealer-focused "Chrysler Academy" and disseminated an accompanying "participant reference guide." The document explains that the training is "focuse[d] on features of Ram 1500 and will help you sell down your 2014 model year vehicles while it also helps you prepare for the 2015s."  This training document includes an entire section on EcoDiesel, and as discussed above, it addresses

1    the "common misconception" that "[d]iesels are dirty" and instructs that "Diesel Exhaust Fluid

2    (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines."  Then,

3    answering the question "How clean is the 3.0L EcoDiesel V6?" the guide explains that "[o]ur

4    EcoDiesel runs extremely clean."  It also states that the engine "[c]omplies with all diesel-related

5    emissions standards," and notes that selling points of the diesel include its "Fuel efficiency,"

6    "Power (Torque)," and "Quality, Reliability and Durability (QRD)."  Finally, the guide includes

7    an "in the media section" highlighting positive reviews and articles.  FCA-MDL-000517194-245.

8          171.    Jeep held a similar Chrysler Academy event for dealers and also disseminated an

9    accompanying "product reference guide" with eight pages devoted exclusively to the EcoDiesel

10   engine.  FCA-MDL-000518573-620.  As with the Ram guide, the Jeep guide addresses the dirty

11   diesel stigma, and offers selling points to rebut it.  The guide explains that the EcoDiesel engine

12   exhibits "confident power, surprisingly clean operation" and claims that "it is going to convert a

13   host of new customers to the impressive benefits of pulse-quickening acceleration and efficient

14   and ecological clean diesel operation."  It highlights the "clean operation and effective emissions

15   control," specifically noting that the SCR and EGR systems combine to mitigate NOx and

16   produce "clean diesel operation."  Finally, as shown below, it includes a "Key messages" section

17   emphasizing the importance of fuel efficiency, "clean operation," and "torque":

-88-

1      172.    These themes are echoed almost verbatim in another, 13-page Chrysler Academy

2  "Product Brief" focused exclusively on the EcoDiesel engine.  FCA-MDL-001183753-65.  As

3  shown below, that product brief includes almost identical "key messages for your prospects," and

4  notes that the engine is "surprisingly responsible in view of ecological concerns."

173.     Yet another Chrysler Academy "Web Launch" training session explains that its purpose was "to help participants" better understand the vehicles and, critically, to "[u]nderstand elements for effective presentations to shoppers."  It includes similar language about fuel economy, power, and environmental friendliness.  It also explains that "for buyers who respect the environment, they should know this is a very clean diesel . . . very green without question." FCA-MDL-001183766-901.

174.     These are but a few examples that highlight the comprehensive training that FCA provided for its dealers.  The objective of these trainings was to arm the dealers with selling points that they could relay to consumers—and they did just that.  For the Class Vehicles, the consistent selling point was the no-compromise combination of fuel efficiency, environmental friendliness, and power.  This selling point was false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 3.     Vehicle Brochures

175.     FCA also communicated directly with consumers through its vehicle brochures, available both online and at the dealerships.  These brochures are chock full of representations about the EcoDiesel engine's fuel economy, environmental friendliness, and power.

176.     The brochure for the 2014 Jeep Grand Cherokee, for example, devotes an entire page to the EcoDiesel engine.  That page depicts the EcoDiesel badge and also an image of the engine with a green leaf on top.  It states that the engine achieves "best-in class: 30 MPG fuel economy[,] 730-mile driving range[,] 420 lb-ft of torque[, and] 7400-lb maximum towing."  It further claims that "its reduced CO2 emissions display reverence for the environment" and even goes so far as to state that "*[p]roudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states*."  Excerpts from the two-page brochure spread are shown below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Thirty miles per gallon? True story. Grand Cherokee's new, available 3.0L EcoDiesel V6 engine delivers best-in-class economies* that treat your fuel budget with respect, while its reduced $CO_2$ emissions display reverence for the environment. Proudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states. Best-in-class fuel economy* arrives with an estimated 22 city/30 hwy mpg,¹ and a driving range of more than 730 highway miles per tank.¹ That's because, compared to gasoline, a gallon of diesel fuel converts to a greater amount of useable energy. So you can leave Detroit, MI, with a full tank and arrive in New York City without ever stopping to refuel. And with its command of 240 hp and a hefty 420 lb-ft of torque, the EcoDiesel provides a surge of towing strength that can haul up to 7,400 lb when properly equipped. Stats so good, they're worth repeating every chance you get.

177.    The 2015 brochure makes similar claims.  It again features the EcoDiesel badge and environmental imagery.  And it again boasts "best-in-class . . . 30 hwy mpg fuel economy"

and "a driving range of 730 highway miles."  It also states that the vehicles are "clean" and 50-state compliant, and even opens with this environmentally-focused introduction:  "Love the planet along with great fuel economy?  Then the Jeep Brand's Diesel engine will ring true.  It lets you adhere to your principles and get extra points for embracing innovative technology."



1528982.7

178.     The 2016 brochure also features the EcoDiesel badge, and touts best-in-class fuel economy, range, horsepower, and torque.  And it too states that "[t]he EcoDiesel exceeds the low-emissions requirements in all 50-states":



**3.0L ECODIESEL V6 ENGINE:**  *Best-in-class[1] fuel economy treats your fuel budget with respect, while reduced $CO_2$ emissions display reverence for the environment. The EcoDiesel exceeds the low-emissions requirements in all 50 states. Best-in-class[1] fuel economy arrives with an estimated 22 city/30 hwy mpg,\* and a best-in-class[4] driving range of more than 730 highway miles per tank. That's because, compared to gasoline, a gallon of diesel fuel converts to a greater amount of usable energy. And with its command of 240 hp and a hefty 420 lb-ft of torque, the EcoDiesel provides a surge of towing strength that can haul up to 7,400 lb when properly equipped. Available.*

179.     The Ram 1500 brochures make similar claims.  Like the Jeep Brochures, the 2014 Ram 1500 brochure devotes an entire page to the EcoDiesel engine, depicts the EcoDiesel badge, and repeatedly touts the truck's "best-in-class" fuel economy and "impressive" range.  It also boasts that the truck is "clean by nature" with "minimal $CO_2$ levels" and a "[t]op-notch DEF system."

180.    The 2015 brochure also advertises "top-tier mpg ratings," "superb driving range and best-in-class 28 mpg highway," and claims the truck is "clean by nature" with "minimal $CO_2$ levels" and a "zero-hassle DEF system."

181.    The 2016 brochure again boasts "best-in-class 29 mpg highway fuel economy," "up to 754-mile range," "240 horsepower," "420 lb-ft of torque," "minimal $CO_2$ levels" and a "zero-hassle DEF system."

182.    The brochures are tied together by common themes and sometimes identical language.  The key representations made throughout were that the Class Vehicles delivered a no-compromise combination of fuel efficiency, environmental friendliness, and performance.  Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 4.    FCA Websites

183.    FCA hosted a number of blogs and websites that promoted the EcoDiesel technology, including the official Ram and Jeep websites, which many named Plaintiffs and Class Members visited before making their purchase/lease decisions.  Both company sites reiterated FCA's consistent messaging for the Class Vehicles—i.e., that they were clean, fuel efficient, and high performing.

184.    A February 9, 2014, capture of the Jeep website, for example, includes a diesel tab, under which it displays the EcoDiesel badge and tells viewers to "[f]orget everything you thought you knew about diesel.  The all-new jeep EcoDiesel engine offers innovative technology that is efficient, increases range, and improves power – all while leaving little trace of being there."[43]

---

[43] Available at:
http://web.archive.org/web/20140209113901/http://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#introduction (last visited April 19, 2018).

185.    The Jeep website also includes separate pages featuring its supposed "Best-in-Class maximum towing capacity," "incredible 730-mile highway driving range," and "superior fuel economy."  As to fuel economy, the website also includes (and has included since at least 2014) a "savings calculator" that allows consumers to enter their miles driven per day and then calculates their annual fuel savings using "Clean Diesel."[44]

---

[44] Available at: https://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#savings (last visited April 19, 2018).

186.    Ram's website made similar representations, touting the fuel economy, horsepower, torque, and towing capacity of the EcoDiesel engine, and claiming that it was

"[e]quipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction so it is emissions-compliant in all 50-states."[45]



187.    Like Jeep, Ram also included a fuel savings calculator, as well as graphics comparing the best-in-class fuel economy to the competition:[46]

---

[45] Available at:
http://web.archive.org/web/20160316042712/http://www.ramtrucks.com/en/ram_1500/capability/#link-3 (March 2016 web archive);
http://web.archive.org/web/20150215044120/http://www.ramtrucks.com:80/en/ram_1500/capability#link-3 (Feb. 2015 web archive);
http://web.archive.org/web/20140214053830/http://www.ramtrucks.com:80/en/ram_1500/capability/#link-3 (Feb. 2014 web archive) (all visited last on April 19, 2018).
[46] FCA-MDL-001184455-62; *EcoDiesel – Ram 1500 HFE*, Ram Trucks (FCA), available at https://www.ramtrucks.com/en/ecodiesel/ (last accessed July 19, 2017).





188.    FCA made many similar representations throughout the many websites it operated, including but not limited to the following:

a.  The EcoDiesel engine is designed for those "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."[47]

b.  The Ram 1500 EcoDiesel is "the NAFTA market's first and only light-duty pickup powered by *clean diesel* technology."[48]

c.  "Thanks to advanced emissions-control technology . . . [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."

d.  "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel® V6 engine will be emissions-compliant in all 50 states."[49]

e.  "Chrysler Group engineers adapted the engine—manufactured by Fiat-owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations. The new EcoDiesel® V-6 is Tier 2/Bin 5 compliant."[50]

f.  The emissions on the EcoDiesel® engine data sheet meet Tier2 Bin5 requirements.[51]

g.  "[T]he Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[52]

189.   Many named Plaintiffs and Class Members visited FCA's websites to learn about the Class Vehicles. On those websites, as in all the other ways FCA communicated to consumers, FCA's message was clear and consistent: the EcoDiesel engine delivers a no-compromise package of fuel economy, range, performance, and environmental-friendliness. Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive

---

[47] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013), https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[48] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorth america.com/News/ChryslerDocuments/ChryslerGroupLLC_Sustain2013Dec12.pdf (emphasis added).

[49] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, *supra* note 47.

[50] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, *supra* note 48.

[51] L630 Specification Sheet, VM Motori S.p.A., available at http://www.vmmotori.com/images/data_sheet/L630_DOHC-NEW.pdf (last accessed July 19, 2017).

[52] *EcoDiesel: An Essential Tool for Every Outdoorsman*, *supra* note 39.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1528982.7

1    (because the vehicles could not perform as represented without the concealed emission control

2    components).

3              **5.       Print Media and Television**

4        190.    FCA reiterated its consistent representations—particularly the fuel economy

5    representations—through print media and television commercials.

6        191.    The print ad campaign was robust.  One FCA-produced document identifies over

7    250 Ram print ad buys in several dozen publications from June 2014 to October 2016.  FCA-

8    MDL-000519349.  Another document shows expenditures of almost $300,000 to place Jeep

9    EcoDiesel print ads in a variety of magazines in June through August 2013.  FCA-MDL-

10   001360559.  Yet another document identifies additional ad buys for 14 newspapers across the

11   country.  FCA-MDL-000519351.  And Plaintiffs' own investigation has revealed even more print

12   ad placements in additional publications.

13       192.    Critically, virtually all of the print ads for the Class Vehicles contain the same or

14   similar relevant representations, including: (1) the word "EcoDiesel" and/or the EcoDiesel badge,

15   and (2) fuel economy claims such as specific MPG ratings, "most fuel efficient," and "best-in-

16   class" fuel economy.  Three illustrative examples, one for the Jeep Grand Cherokee Class

17   Vehicles and two for the Ram 1500 Class Vehicles, are shown below:

18

19

20

21

22

23

24

25

26

27

28



SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1528982.7



1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25   193.   The television commercial campaign was also extensive, and also conveyed

26   consistent messages.  One FCA document shows 17,595 discrete commercial buys between

27   January 2014 and September 2016, including during prominent and widely-viewed programing.

28   FCA-MDL-000519350.

194.   Some examples of the relevant commercials (a portion of which are not included in the chart described above) include:

a.   A commercial entitled "West" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "9,200 lbs towing."  FCA-MDL-000512961.

b.   A commercial entitled "Roar" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "420 lb-ft torque."  FCA-MDL-000512962.

c.   A commercial entitled "Runaway" that prominently features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "best-in-class 30 MPG hwy" and "730-mile driving range."  FCA-MDL-000518756.  Per the commercial buy document described above, this commercial ran approximately 1,000 times in January 2014.

d.   A commercial entitled "Take Every Mile" that features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "730-mile driving range."  FCA-MDL-000518759.  Per the commercial buy document described above, this commercial ran approximately 400 times in two weeks in February 2016.

e.   A commercial entitled "The Truth About Diesel" that "bust[s] some myths about diesel engines," including that "all SUVs get bad gas mileage, diesel engines are dirty, and they run sluggish."  All three myths were "totally busted," and the video specifically boasts the Jeep Grand Cherokee EcoDiesel's "30 MPG and a 730-mile driving range."  It also depicts a man "check[ing] the data" on the emissions from the tailpipe and remarking "Wow, the greenhouse gas emissions are lower than a regular gasoline engine."  FCA-MDL-001418576.

195.   Like the rest of Fiat Chrysler's consumer communications, these commercials represented that the Class Vehicles were green (both through explicit representations and depictions of the EcoDiesel name and badge) and fuel efficient.  These representations were pervasive and consistent.  They were also false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

* * *

196.   The Defendants saw the EcoDiesel technology as a huge opportunity to increase their sales and profits.  They understood that to realize this goal, they would have to overcome the "dirty diesel" stigma, and convince consumers that the Class Vehicles offered a no-compromise

1   package of fuel efficiency, environmental friendliness, and power.  Fiat Chrysler's efforts to

2   communicate this message to consumers were far reaching and consistent.  They were also false

3   and deceptive.

4          197.    Defendants had multiple opportunities, and obligations, throughout their marketing

5   communications to disclose the uniform truth about the Class Vehicles—namely, that all their

6   emissions, fuel economy, and performance claims were predicated on concealed emissions

7   control components and software that caused the Class Vehicles to pollute excessively in real-

8   world driving conditions.  This uniform omission and unvarying concealment prevented any and

9   all consumers from making a purchase based on all material facts.

10         **D.      The Defendants Knew These Representations Were False and Misleading.**

11         198.    Unfortunately, the EcoDiesel technology did not work as represented.  In

12  developing the Class Vehicles, the Defendants came to understand that they could not make the

13  vehicles environmentally friendly or "50-state compliant"—as they represented to consumers

14  through consistent and pervasive communications—and that the vehicles could not achieve the

15  fuel economy and performance that were central to Fiat Chrysler's marketing efforts without

16  installing components and software that de-activated or reduced the emission control system

17  during real-world driving conditions.  The Defendants concealed this fact from the regulators and

18  consumers alike, and cheated Plaintiffs and Class Members of the vehicles they thought they were

19  buying.

20         199.    The Defendants' scheme focused on at least two of the emissions control systems

21  in the Class Vehicles—both of which Fiat Chrysler pitched to consumers as enablers of the Class

22  Vehicles purported "clean" operation: (1) the Exhaust Gas Recirculation ("EGR") system and (2)

23  the Selective Catalytic Reduction ("SCR") system.

24         200.    The EGR system reduces NOx in diesel emissions by lowering the temperature of

25  the exhaust gas exiting the engine.  The SCR system takes the NOx leftover from the EGR

26  System and converts it into harmless nitrogen and water.  Together, the EGR and SCR systems

27  are vital to mitigating the pollution from the Class Vehicles' diesel emissions.

28

201.    As identified in the EPA's NOV, the Defendants installed a number of undisclosed auxiliary emission control devices ("AECDs") in the Class Vehicles that compromised the EGR and SCR systems and resulted in substantially increased NOx emissions during real-world driving conditions.  As exemplified herein, the Defendants knew that these AECDs were not allowed, but that the Class Vehicles could not achieve the fuel economy or performance that the Defendants marketed without them.

### 1.    EGR AECD Strategy: EGR Rate Reduction

202.    Burning diesel fuel creates NOx.  The amount of NOx produced by a diesel vehicle is a function of temperature: the hotter the exhaust gas is when it exits the engine, the more NOx it emits.

203.    The EGR system minimizes NOx by lowering the temperature of the engine exhaust through a recirculation process.  The higher the rate of exhaust gas recirculation (the EGR rate), the lower the exhaust gas temperature.  The lower the exhaust temperature, the lower the NOx.  But, critically, the higher the EGR rate in a vehicle, the worse fuel economy it achieves.  Defendants employed the EGR AECDs in the Class Vehicles to either reduce the EGR rate or shut it off entirely, thereby artificially and secretly increasing the Class Vehicles' fuel economy and drivability at the expense of increased NOx.

204.    One of the strategies Defendants used to reduce the EGR rate was through what the EPA has named AECD 5, which detects the engine temperature in the Class Vehicles and reduces the EGR rate during the vehicles' "warm-up phase" (the phase when the engine is heating up after a cold start).  The EPA described AECD 5 as "EGR rate reduction based on engine temperature model."  Defendants referred to it as "T_Eng" and various derivatives thereof (e.g., "t_engine" and "tEng").

205.    VM Motori knew as early as 2010 that T_Eng was an AECD (FCA-MDL-000456083) that, if concealed, would be illegal.  In April 2010, a Fiat Chrysler powertrain division employee attempted to assure VM Motori's Controls and Calibration Director, Sergio Pasini, that T_Eng did not employ "cycle detection" FCA-MDL-000452591.  "Cycle detection" refers to any mechanism that allows a vehicle to detect when it is undergoing regulatory

1    emissions testing, and modify its emissions accordingly.  But Pasini knew better.  Just two

2    months later, he told his VM Motori colleagues, "the [EGR] rate will be managed mainly on

3    t_engine which is, no matter what FIAT says, a cycle detection." *Id.*  VM Motori regularly

4    admitted that the T_Eng function employed "cycle detection" (12/2011 correspondence—FCA-

5    MDL-000168161); "cycle recognition" (1/2012 correspondence—FCA-MDL-000377513; FCA-

6    MDL-000377513_T001 (English translation)); and "cycle beating" (02/2013 correspondence—

7    FCA-MDL-000430441-44; 06/2013—FCA-MDL-000295256).  Pasini also understood that this

8    AECD was not being disclosed to the EPA.  FCA-MDL-000377499; FCA-MDL-

9    000377499_T001-02 (English translation).  In a May 2013 email, for example, Pasini told more

10   than a dozen of his VM Motori colleagues that the T_Eng function was not active during

11   emission testing and "has not been declared to regulators." *Id.*

12       206.    Fiat Chrysler also knew that T_Eng was an AECD, and critically, all the

13   Defendants understood that it was necessary to achieve the desired fuel economy.  In December

14   2011, VM Motori identified T_Eng as a "sort of 'cycle detection" to increase fuel economy

15   (FCA-MDL-000168161) and said Fiat Chrysler gave them approval to use it (FCA-MDL-

16   000377211).  In January 2012, FCA Executive Bob Lee connected T_Eng to FCA's objective of

17   achieving greater fuel economy in a presentation entitled "Fuel Economy Status Target."  FCA-

18   MDL-000000116.  In February 2012, VM Motori directed Bosch to implement T_Eng, and told

19   Bosch that VM Motori would explain to Fiat Chrysler that ***T_Eng was "what you need if you***

20   ***want 30 mpg*.**"  FCA-MDL-000015652 (emphasis added).  Fiat Chrysler later explored ideas to

21   replace T_Eng with a different strategy, but it abandoned that process after ***VM Motori informed***

22   ***FCA's Diesel Calibration Manager that the "F[uel] E[conomy] impact [of replacing T_Eng] is***

23   ***probably around 2 mpg highway*.**"  FCA-MDL-000430044 (emphasis added).  In an email sent

24   the next day, VM Motori's Emanuele Palma told colleagues that "***Chrysler knows tEng is the***

25   ***only way to get to 30 mpg, so don't worry about this topic*.**" *Id.* (emphasis added).

26       207.    Like VM Motori and Fiat Chrysler, Bosch also knew that T_Eng was an AECD

27   that likely qualified as an "defeat device" under applicable regulations.  FCA-MDL-000015652.

28   In February 2012, Bosch warned VM Motori that T_Eng is an emissions "defeat device" and that

they risked "serious penalties" if regulators found T_Eng to be cycle detection.  *Id.*  VM Motori

refused to abandon T_Eng, however, and told Bosch "we are working closely with Chrysler [and]

the feedback we've had so far about [using T_Eng] is positive."  *Id.*  The same month, Bosch

sought to limit its liability from VM Motori's use of T_Eng, and even considered asking VM

Motori to sign a risk release.  RBL-MDL2777-PE-300402775-78.  Yet, Bosch not only

incorporated T_Eng into the emissions software for the Class Vehicles (FCA-MDL-000351953),

Bosch appears to gone so far as to have advised VM Motori not to disclose T_Eng to regulators,

if it planned to use the function (*see, e.g.*, RBL-MDL2777-PE-300530521-23).  Of course, this is

exactly what they did.

208.  On December 2, 2015, Morrie Lee of FCA Regulatory Affairs asked FCA Senior

Manager Emanuele Palma "[w]hat compelling or driving reason does a[n] [automobile

manufacturer] have to reduce EGR operation in the field?"  FCA-MDL-000002857.  Palma

responded simply: **"Low EGR → low soot, good drivability, F[uel] E[conomy]**."  *Id.* (emphasis

added).  Two days later, Lee told the EPA that Fiat Chrysler's failure to document T_Eng as an

AECD was "an oversight of understanding."  FCA-MDL-000002011.  The documents cited

herein show otherwise.

## 2.   SCR AECD Strategy: Dosing Disablement

209.  The SCR system uses DEF—a solution of urea and water—to convert NOx into

harmless nitrogen and water after it exits the EGR system and before it is emitted from the

tailpipe.  The part of the emissions system where this process occurs is called the SCR catalyst.

In theory, the SCR system injects or "doses" measured quantities of DEF into the exhaust stream

based on a software program that injects the right amount of DEF to neutralize the amount of

NOx being emitted by the engine.

210.  However, Defendants employed the SCR AECDs to either reduce the DEF dosing

amount or shut it down entirely.  With the DEF dosing reduced or disabled, the Class Vehicles

emit more NOx.

211.  Reduced DEF dosing was important to Defendants for at least two reasons.  First,

the more DEF the Class Vehicles consumed, the more frequently consumers would have to refill

1    the DEF tank—an inconvenience that would make the vehicles less marketable.  Second, by the

2    time the first Class Vehicles hit the market, the Defendants realized that the chemicals in the DEF

3    were breaking down the materials in the SCR catalyst and causing these components to fail

4    prematurely, which could be mitigated by reducing DEF dosing (at the expense of increased

5    emissions).

6         212.    The Defendants relied heavily on an alternative DEF dosing mode called "online

7    dosing," which limited the injection of DEF into the SCR catalyst, thereby compromising the

8    SCR system.  The EPA identified this alternative dosing functionality as AECD 7.[53]  Bosch and

9    VM Motori first discussed "online dosing" in March 2011.  FCA-MDL-000281212-14.  Both

10   parties acknowledged that, if used, online dosing would have to be disclosed as an AECD.  *Id.*

11   ("online dosing . . . could also be used outside cert cycle [but] needs to be declared at CARB").

12   Yet, in November 2012, Bosch implemented a software change to prevent online dosing from

13   activating during EGR diagnostic monitoring (RBL-MDL2777-PE-300068645-48), and in

14   February 2013, Kasser Jaffri of FCA's On Board Diagnostic group expressed concern to VM

15   Motori that CARB might see online dosing as "cycle beating" (FCA-MDL-000430441).  Jaffri

16   concluded that, if applied, online dosing would have to be disclosed as an AECD.  FCA-MDL-

17   000478134 ("Chrysler will request an AECD for [online dosing]").  It did not do so.

18        213.    VM Motori then told Fiat Chrysler in March 2013 that it was not going to use the

19   online dosing strategy.  FCA-MDL-000433186.  They used it anyway.  In September 2013, Jaffri

20   reported to FCA Senior Manager Dan Hennessey, head of the On Board Diagnostic group, that

21   online dosing was (1) active in the vehicles; (2) had not been disclosed to CARB or the EPA; and

22   (3) "reduces the conversion efficiency effectiveness," thereby resulting in increased NOx

23   emissions.  FCA-MDL-000740696.  Understandably, Jaffri observed that this "continues to be an

24   area of concern."  *Id.*  He also told Hennessy that when online dosing was active, diagnostic

25

26

---

27   [53] Defendants also employed related strategies to reduce DEF dosing, including tying the dosing
     to SCR adaptation (the process by which the SCR system modifies the dosing rate based on in-
28   use monitoring) (FCA-MDL-000383765), and the load governor (the component that controls the
     flow of DEF into the SCR catalyst) (FCA-MDL-000750062).

1    monitoring meant to track the performance of the SCR system "cannot be run", because, if active,

2    the diagnostic monitoring would reveal that the SCR system was not functioning.  *Id.*

3        214.    In September 2014, Fiat Chrysler senior management, including March Shost and

4    Dan Hennessey, received a presentation from Emanuele Palma entitled "WK/DS MY15 DEF

5    dosing strategy."  One slide in that presentation labeled "online dosing strategy" noted that Fiat

6    Chrysler's competitors were using online dosing and that Fiat Chrysler could too—but, critically,

7    that the dosing strategy needed "to be agreed with the agencies."  FCA-MDL-000417114-25.  No

8    such agreement was reached, because Fiat Chrysler never disclosed the functionality.

9        215.    In July 2015, Fiat Chrysler acknowledged that tests conducted on the Model Year

10   2014 Class Vehicles showed that the vehicles were not meeting NOx emissions standards because

11   the SCR catalysts—which Bosch provided for the Class Vehicles (RBL-MDL2777-PE-

12   300160491-504)—were failing (FCA-MDL-000713128).  In a presentation given that month

13   entitled "SCR Catalyst Responsibility Share," Bosch noted in its "investigation history"

14   chronology  that it began to investigate the SCR catalyst as the reason FCA development vehicles

15   were experiencing excess NOx emissions in February 2013.  RBL-MDL2777-PE-300166279-

16   362.  The investigation chronology further identified a "dosing calibration strategy change" to

17   reduce dosing rates.  *Id.*  Bosch admitted that VM Motori made the change on Bosch's

18   recommendation.  *Id.*

19       216.    In sum, the Defendants all knew that the Class Vehicles contained undisclosed

20   apparatuses that reduced or disabled the emissions control systems in real-world driving

21   conditions, and they knew that without those undisclosed apparatuses, the Class Vehicles could

22   not deliver the fuel economy and performance that Fiat Chrysler promised.  Defendants concealed

23   this fact from consumers and regulators and, in so doing, cheated Plaintiffs and Class Members of

24   the vehicles they thought they were buying.

25   **IV.    "DIESELGATE" SCANDALIZES THE GLOBAL AUTO INDUSTRY.**

26       217.    The world was shocked to learn that Volkswagen had manufactured over

27   11 million diesel cars that were on the roads in violation of European emission standards, and

28

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    over 565,000 vehicles operating in the United States in violation of EPA and state emission

2    standards.  But Volkswagen was not the only one.

3        218.    In the wake of the Volkswagen "defeat device" scandal,[54] scientific literature and

4    reports and testing indicate that many other so-called "clean diesel" vehicles emit far more

5    pollution on the road than in lab tests.  The EPA has since widened its probe of diesel emissions

6    to include the Class Vehicles at issue here.

7        219.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure

8    and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers,

9    when tested, emitted significantly more NOx on real-world trips but nevertheless passed

10   laboratory tests.  The report concluded that "[i]n most circumstances arising in normal situations

11   on the road, the system scarcely succeeded in any effective reduction of NOx emissions."[55]

12       220.    The report further remarked:[56]

13       It is remarkable that the NOx emission under real-world conditions exceeds the
       type approval value by [so much].  It demonstrates that the settings of the engine,
14       the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are
       such that they do not result in low NOx emissions in practice.  In other words: ***In***
15   ***most circumstances arising in normal situations on the road, the systems***
       ***scarcely succeed in any effective reduction of NOx emissions***.

16

17   The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel"

18   advertising, including that for the Class Vehicles at issue here.

19       221.    Other organizations are beginning to take notice of the emission deception.  The

20   Transportation and Environment ("T&E") organization, a European group aimed at promoting

21   sustainable transportation, compiled data from "respected testing authorities around Europe."

22

23   _____
     [54] The EPA's Sept. 18, 2015 Notice of Violation to Volkswagen Group of America, Inc.,
24   available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-
     15.pdf.  As detailed therein, software detects when the vehicle is undergoing official emission
25   testing and turns full emission controls on only during the test.  But otherwise, while the vehicle
     is running, the emission controls are suppressed.  This results in cars that meet emission standards
26   in the laboratory or at the state testing station, but during normal operation they emit NOx at up to
     40 times the standard allowed under U.S. laws and regulations.  Volkswagen has admitted to
27   installing a defeat device in its diesel vehicles.
     [55] *Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*,
     TNO (May 18, 2015), http://publications.tno.nl/publication/34616868/a1Ug1a/TNO-2015-
28   R10702.pdf.
     [56] *Id.* at 6 (emphasis added).

T&E stated in September 2015 that real-world emission testing showed drastic differences from laboratory tests, such that models tested emitted more pollutants on the road than in the lab.  "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.[57]

222.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers to meet emission standards:[58]



[57] *VW's cheating is just the tip of the iceberg*, Transport & Environment (Sept. 21, 2015), http://www.transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.
[58] *Five facts about diesel the car industry would rather not tell you*, Transport & Environment (Sept. 2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_about_diesel_FINAL.pdf.

223.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results,"[59] because manufacturers like Fiat Chrysler can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions.

224.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles."  With regard to its recent on-road emission testing, the company explains:[60]

> [I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory.  Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures.  For car buyers, this means that fuel economy on average is one quarter worse than advertised.  This matters, even if no illegal activity is found.

## V.    DEFENDANTS ARE CAUGHT CHEATING.

### A.    Plaintiffs' Testing Reveals Cheating.

225.    In late 2016, counsel for Plaintiffs tested the 2015 Ram 1500 pickup using a Portable Emissions Measurement System ("PEMS").  Testing revealed that Fiat Chrysler also cheated in that it had concealed the fact that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

226.    The applicable standard both at the federal and state level is 50 mg/mile of NOx for "FTP Style" driving: *i.e.*, city driving.  Testing was conducted with a PEMS unit to simulate driving conditions under both the FTP certification cycle and the highway certification cycle. The Ram 1500 emits an average of 159 mg/mile of NOx and a maximum of 1,283 mg/mile on flat roads, and 222 mg/mile of NOx with a maximum of 1,859 mg/mile on hills.  For highway driving, the average was 232 mg/mile and a maximum of 1,615 mg/mile, compared to the 70 mg/mile standard.  On hills, the numbers are 353 mg/mile and 3,240 mg/mile.  Testing also revealed a device triggered by ambient temperature that significantly derates the performance of the NOx emission reduction system, with ambient threshold temperatures above approximately

---

[59] *Id.*

[60] Emissions Analytics Press Release, (Sept. 28, 2015), available at http://www.abvwc.com/home/emissions-analytics.(last accessed July 19, 2017).

95°F and below 40-50°F.  The resulting NOx emissions increase by a factor of 10 when above or below these threshold temperatures.  Testing also revealed the presence of a device that is triggered when ascending hills, as the emission control system appears to be significantly derated after a short period of steady driving on hills.  As a result, NOx emissions increase after about 500-1000 seconds on hills with grades as low as 1%, where emissions are often 10 times the highway standard.  For grades as little as 0.4%, emissions were found to be as high as 6 times the highway standard.

227.     The Ram 1500's emission software is a "Bosch EDC17," as is the Jeep Grand Cherokee's emission software.  The same basic emission system is in the Grand Cherokee EcoDiesel® and the engines are identical.

228.     In separate testing by counsel for Plaintiffs, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road.  In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS from Horiba®.

229.     The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (*i.e.*, in the laboratory).  On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times.  When tested on a highway, the average NOx emissions measured ***35 times*** the EPA Tier 2 Bin 5 standard.

**B.      The EPA Issues A Notice of Violation to Fiat and FCA.**

230.     On January 12, 2017, the EPA issued a NOV to Fiat and FCA for failing to justify or disclose defeat devices in model year 2014–2016 Ram 1500 EcoDiesel® and 2014–2016 Jeep Grand Cherokee EcoDiesel® vehicles (the Class Vehicles at issue here).  CARB also issued a Notice of Violation to Fiat and FCA.  Since then, the EPA, by and through the Department of Justice, has sued Fiat, FCA, VM Italy, and VM America for violations of the CAA.

231.    The EPA's NOV and lawsuit arose in part from emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory.  The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device."

232.    The EPA identified at least eight AECDs in the Class Vehicles that were concealed on COC applications:

- AECD 1 (Full EGR Shut-Off at Highway Speed)
- AECD 2 (Reduced EGR with Increasing Vehicle Speed)
- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)
- AECD 4 (DEF Dosing Disablement during SCR Adaptation)
- AECD 5 (EGR Reduction due to Modeled Engine Temperature)
- AECD 6 (SCR Catalyst Warm-Up Disablement)
- AECD 7 (Alternative SCR Dosing Modes)
- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

233.    The EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use."  For example:

a.    AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system.  Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system.  The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b.    AECD 5 & 6 together reduce the effectiveness of the NOx emission control system, using a timer to discontinue warming of the SCR after-treatment system, which reduces its effectiveness.

c.    AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use.  The operation of AECD 1, AECD 2, and/or AECD 5 increase the frequency of occurrence of AECD 4.

d.    AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

234.    The EPA further found that Fiat and FCA did not disclose or justify these control devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce, or imported one of the approximately 103,828 Class Vehicles.  The EPA is now seeking injunctive relief and penalties.

### C.    Bosch Software Documentation Further Verifies the Violations

235.    Researchers have obtained Bosch software documentation describing the functions, modules, structure, variables and calibration parameters believed to be installed in Class Vehicles. The documentation is over 10,000 pages long and contains hundreds of functions and thousands of variables developed by Bosch that describe the operation of the engine.  These parameters and functions correlate with many of the violations alleged by the EPA and CARB. Critically, these functions, designed and implemented by Bosch, have elements that have no legitimate purpose in normal use.  At the same time, these same elements, when enabled, allow the functions to reduce the effectiveness of emission controls in real world driving conditions, but not during an emission test cycle.

### 1.    AECDs 1 and 2:  Reducing or Disabling EGR at Highway Speeds

236.    The function named *"AirCtl_RatDesValCalc"* described in the Bosch documentation as *"Exhaust gas recirculation control - EGR ratio setpoint calculation"* is used to calculate the desired EGR rate. The software documentation contains figures with flow diagrams describing the inputs, outputs, and calculation performed by this software function. Bosch has included vehicle speed as an input used by the EGR control function to modify the EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate reason for the EGR rate to depend directly on vehicle speed.

237.    By allowing EGR rate to depend directly on vehicle speed, Bosch provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.  This function may be, and is likely to have been, used to implement the undisclosed AECDs 1 and 2 identified in the EPA NOV to Fiat and FCA.

## 2.      **AECD 3: EGR Shut-Off for Exhaust Valve Cleaning**

238.      AECD 3 identified in the EPA NOV has also been identified in Bosch's software documentation in the function named "*AirCtl_Mon*" described in the Bosch documentation as "*Exhaust gas recirculation control – Monitoring and shut-off.*"  Bosch described this AECD as ostensibly providing a cleaning mechanism for the engine exhaust valves when the Class Vehicle is in overrun (*i.e.*, the engine is turning without combustion, such as when the vehicle is going downhill).  To accomplish this cleaning, the function created by Bosch closes the EGR valve (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch also programmed a software switch (named "*AirCtl_swtOvrRunOff_C*") that allowed Fiat and FCA to enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

239.      Together with an activation delay added by Bosch—controlled by *AirCtl_tiEngRunDrvCycMin_C*, which is described as "*Calibration time after which exhaust valve cleaning routine can start*"—the *AirCrl_Mon* function can be readily used as a defeat device.  To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun (*AirCtl_swtOvrRunOff_C* = TRUE), but only after the duration of a typical emission test cycle (*AirCtl_tiEngRunDrvCycMin_C* = 1800 seconds).  This would disable EGR after an emission test cycle, resulting in increased NOx emission.  This function may be, and is likely to have been, used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

## 3.      **AECD 7: Alternative SCR Dosing Modes**

240.      Bosch included a timer in another function, without a legitimate purpose.  The Bosch function named "*SCRFFC_Main*," described in documentation as "*Calculation of the NH3 precontrol quantity*" has an input variable timer entitled "*CoEng_tiNormal,*" which holds the time duration since the engine was started.  This variable can be used to reduce SCR efficiency, and, therefore, increase NOx emission, after a certain time has elapsed.  In particular, this timer may be set to the duration of a typical emission test cycle.  There is no legitimate reason for SCR control to depend directly on the time duration since engine start.  By making SCR control depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world

1   driving conditions.  This function may be, and is likely to have been, used to implement

2   undisclosed AECD 7 identified in the EPA and CARB NOVs.

3       **D.**       **West Virginia University Testing of the Class Vehicles**

4       241.    Beginning in 2015, researchers at the West Virginia University Center for

5   Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering

6   Volkswagen's fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA.  The test

7   vehicles comprised the Class Vehicles at issue here: Jeep Grand Cherokees and Ram 1500 diesel

8   vehicles, all equipped with the 3.0L EcoDiesel® engine, and featuring SCR NOx after-treatment

9   technology.[61]

10      242.    All test vehicles were evaluated on a vehicle chassis dynamometer representing the

11  test conditions for regulatory compliance.  Each vehicle was also tested over-the-road using a

12  PEMS device during a variety of driving conditions including urban/suburban and highway

13  driving.

14      243.    One of the Jeep Grand Cherokees and one of the Ram 1500 vehicles was tested

15  prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which

16  included a software "reflash" by FCA that concerned the vehicles' emission control systems.

17      244.    Results indicated that both Jeep Grand Cherokee and Ram 1500 in MY 2014

18  exhibited significantly increased NOx emissions during on-road operation as compared to the

19  results observed through testing on the chassis dynamometer.  For MY 2015, Jeep vehicles

20  produced from 4 to 8 times more NOx emissions during urban/rural on-road operation than the

21  certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx

22  permitted by EPA Tier2-Bin5 standard for highway driving conditions.

23      245.    The researchers noted that for the vehicles tested post-recall using the

24  dynamometer, NOx emissions were similar or slightly lower than that observed for vehicles tested

25  pre-recall.  But on-road emissions were still very different from emissions observed through

26  _____

27  [61] Marc C. Besch, Sri Hari Chalagalla, and Dan Carder, *On-Road & Chassis Dynamometer Testing of Light-Duty Diesel Passenger Cars*, Center for Alternative Fuels, Engines, and Emissions, West Virginia University, available at http://www.cafee.wvu.edu/files/d/c586c1dd-

28  b361-410d-a88d-d34e8834eda6/testing-of-light-duty-diesel-passenger-cars.pdf (last accessed July 19, 2017). . .

1    chassis dynamometer testing, even though they were slightly improved from the levels observed

2    during pre-recall testing.

3          **E.      European Investigation and Testing**

4          246.    Fiat Chrysler and Bosch have both found themselves in trouble with German

5    regulators in the wake of the Volkswagen scandal.

6          247.    German prosecutors have launched an investigation into Bosch, reportedly raiding

7    Bosch's offices in Stuttgart.[62]  In April 2016, Bosch GmbH representatives met with Germany's

8    Federal Motor Transport Authority ("KBA") on at least two occasions.  In an April 14, 2016

9    meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control

10   units provided to Fiat Chrysler for diesel vehicles sold in Europe.  Bosch confirmed that it had

11   delivered the control units for the vehicles as well as the associated software and that Bosch

12   employees had integrated the emission-related applications into the software.  Bosch admitted

13   that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after

14   an elapsed period of driving time or number of cycles.  Specifically, 22 minutes after the start of

15   the engine (the estimated duration of emission testing), the software reduced the EGR rate to

16   nearly zero and de-activated NSC regeneration.  Another trigger for de-activation of the NSC

17   regeneration occurred after the vehicle had been driven a distance of 100 kilometers.  Bosch

18   confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5.

19   The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles

20   and Bosch shared responsibility for the defeat device with Fiat Chrysler.  Media reports have

21   confirmed the same.[63]

22

23

24   [62]   *See* Edward Taylor, *Stuttgart prosecutor targets Bosch in Daimler diesel investigation*,
      Reuters (May 26, 2017), http://www.reuters.com/article/us-daimler-emissions-bosch-
25   idUSKBN18M172.
      [63] Media reports similarly said that Bosch had confirmed to German regulators that certain Fiat
26   vehicles were cheating on emission testing.  *See, e.g., Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat
      Is Next to be Accused"; *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*,
27   Reuters (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-
      idUSKCN0XL0MT; David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests:
28   Report,* Jalopnik (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on-
      emissions-test-1772948181.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

248.     After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time, causing the vehicles to emit more than 10 times the legal limit of NOx.  The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes.[64] As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models."[65]  In August 2016, the German government formally concluded that Fiat vehicles sold in the EU had used defeat devices.

249.     More recently, 17-page long-form article published by the German weekly investigative news magazine *Der Spiegel*, on April 20, 2018, details the central role Bosch played in the "diesel scandal." The article reports that prosecutors in Germany are investigating Bosch for providing and programming illegal software for use in Fiat vehicles, among many others.[66]

**F.       Joint University of California, San Diego and German Study of the Fiat 500X**

250.     The testing of European regulators has been confirmed by independent testing conducted here in the United States.  A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage catalyst regeneration.[67]  Unlike the Volkswagen defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started.  (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

251.     According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle.  The researchers

---

[64] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, *supra* note 61.
[65] *Here's How Fiat Might also be Cheating on Emissions Tests: Report*, *supra* note 61.
[66] Frank Dohmen, et al., *A Sinister Alliance: The automobile supplier Bosch is on its way to taking center stage in the Diesel scandal*, Der Spiegel, Issue 17 (April 20, 2018), https://magazin.spiegel.de/SP/2018/17/156941296/index.html?utm_source=spon&utm_campaign=vorab (paywall, German language).
[67] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, *supra* note 15.

-120-

1    obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of

2    conditions using the terms "during homologation cycle" and "during real driving."  The term

3    "homologation" is commonly used in Europe to describe the process of testing an automobile for

4    regulatory conformance.  Bosch's authorship of the document and use of the terms

5    "homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate

6    that it not only created the mechanism for Fiat Chrysler but was also aware of the mechanism's

7    intended purpose of circumventing emission testing.

8         252.    Together, these facts reveal that Defendants have fraudulently concealed the

9    functions of its emission control technology from regulators and consumers alike.  Further, they

10   demonstrate that Fiat Chrysler's claims about its EcoDiesel® Class Vehicles as "clean diesel"

11   with "ultralow emissions" and "no NOx" emitted through the tailpipe is false or misleading.

12   **VI.    THE DAMAGE CAUSED BY DEFENDANTS' DIRTY DIESEL SCHEME**

13        253.    Class members paid a significant premium for the EcoDiesel features that FCA

14   falsely advertised.  Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel

15   option than for the comparable gasoline vehicles.[68]  In return, FCA promised power, performance,

16   fuel economy, and environmental friendliness (and vehicles that were legal to drive).  FCA could

17   not deliver on that promise.  Plaintiffs and Class members suffered significant harm as a result.

18        254.    FCA may not be able to bring the Class Vehicles into compliance with emissions

19   standards.  If that is the case, those vehicles will have to be removed from the road.

20        255.    But even if FCA can bring the Class Vehicles into compliance with emission

21   standards, it will not be able to do so without substantially degrading their performance

22   characteristics, including their horsepower and/or fuel efficiency and/or maintenance

23   requirements.  Consequently, Class members will not possess the vehicles they thought they

24   purchased and will not have received the benefit of the bargain.  This will also result in a

25

26   _____

[68] John Lamm, *2014 Jeep Grand Cherokee EcoDiesel® V-6, First Drive* Review, Car and Driver
27   (February 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-
first-drive-review; Andrew Wendler, *2015 Ram 1500 EcoDiesel® 4x4, Instrumented Test*, Car
28   and Driver (August 2015), http://www.caranddriver.com/reviews/2015-ram-1500-4x4-ecodiesel-
4x4-test-review.

1    diminution in value of every Class Vehicle, and it will cause owners and lessees of Class Vehicles

2    to pay more for the use of their Class Vehicles.

3         256.    Assuming, for the sake of argument, that the Class Vehicles could be brought into

4    compliance with emission standards without any material degradation to performance or

5    maintenance characteristics—and if that were the case, it begs the question as to why FCA

6    cheated in the first place—Class members would still have been deprived of the benefit of the

7    bargain for all the years they owned and/or leased the Class Vehicles that could not and did not

8    deliver all of the characteristics for which Class members paid a premium, and were not

9    compliant with U.S. law.

10        257.    In sum, had regulators or the public known the true facts, Plaintiffs and the Class

11   would not have purchased or leased the Class Vehicles (in fact, they could not have legally been

12   sold), or would have paid substantially less for them.

13                              **CLASS ACTION ALLEGATIONS**

14   **I.    CLASS DEFINITIONS**

15        258.    Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of

16   Civil Procedure, Plaintiffs bring this action on behalf of themselves and Nationwide Class and

17   Statewide Classes (collectively, "the Class"), defined as:

18       **Nationwide Class:**

19       All persons or entities in the United States (including its territories and the District
         of Columbia) that purchased or leased a Class Vehicle.  Class Vehicles include all
20       FCA EcoDiesel® vehicles equipped with SCR to control NOx emissions,
         including but not limited to the Model Year 2014-2016 Ram 1500 and the Model
21       Year 2014-2016 Jeep Grand Cherokee.

22        259.    The phrase, "persons or entities," as used in this Complaint and the Nationwide

23   and State Class definitions, includes, but is not limited to, independent (non-FCA franchise)

24   automobile dealers in the United States (including its territories and the District of Columbia)

25   with one or more previously-owned Class Vehicles in their inventory on or after January 12,

26   2017.

27        260.    In addition to the Nationwide Class, and pursuant to Federal Rules of Civil

28   Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes or subclasses as

well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Alabama State Class:**

All persons or entities that purchased or leased a Class Vehicle within Alabama or that purchased or leased a Class Vehicle and reside in Alabama.

**Alaska State Class:**

All persons or entities that purchased or leased a Class Vehicle within Alaska or that purchased or leased a Class Vehicle and reside in Alaska.

**Arizona State Class:**

All persons or entities that purchased or leased a Class Vehicle within Arizona or that purchased or leased a Class Vehicle and reside in Arizona.

**Arkansas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Arkansas or that purchased or leased a Class Vehicle and reside in Arkansas.

**California State Class:**

All persons or entities that purchased or leased a Class Vehicle within California or that purchased or leased a Class Vehicle and reside in California.

**Colorado State Class:**

All persons or entities that purchased or leased a Class Vehicle within Colorado or that purchased or leased a Class Vehicle and reside in Colorado.

**Connecticut State Class:**

All persons or entities that purchased or leased a Class Vehicle within Connecticut or that purchased or leased a Class Vehicle and reside in Connecticut.

**Delaware State Class:**

All persons or entities that purchased or leased a Class Vehicle within Delaware or that purchased or leased a Class Vehicle and reside in Delaware.

**District of Columbia Class:**

All persons or entities that purchased or leased a Class Vehicle within the District of Columbia or that purchased or leased a Class Vehicle and reside in the District of Columbia.

**Florida State Class:**

All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

**Georgia State Class:**

All persons or entities that purchased or leased a Class Vehicle within Georgia or that purchased or leased a Class Vehicle and reside in Georgia.

**Hawaii State Class:**

All persons or entities that purchased or leased a Class Vehicle within Hawaii or that purchased or leased a Class Vehicle and reside in Hawaii.

**Idaho State Class:**

All persons or entities that purchased or leased a Class Vehicle within Idaho or that purchased or leased a Class Vehicle and reside in Idaho.

**Illinois State Class:**

All persons or entities that purchased or leased a Class Vehicle within Illinois or that purchased or leased a Class Vehicle and reside in Illinois.

**Indiana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Indiana or that purchased or leased a Class Vehicle and reside in Indiana.

**Iowa State Class:**

All persons or entities that purchased or leased a Class Vehicle within Iowa or that purchased or leased a Class Vehicle and reside in Iowa.

**Kansas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Kansas or that purchased or leased a Class Vehicle and reside in Kansas.

**Louisiana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Louisiana or that purchased or leased a Class Vehicle and reside in Louisiana.

**Maine State Class:**

All persons or entities that purchased or leased a Class Vehicle within Maine or that purchased or leased a Class Vehicle and reside in Maine.

**Maryland State Class:**

All persons or entities that purchased or leased a Class Vehicle within Maryland or that purchased or leased a Class Vehicle and reside in Maryland.

**Massachusetts State Class:**

All persons or entities that purchased or leased a Class Vehicle within Massachusetts or that purchased or leased a Class Vehicle and reside in Massachusetts.

**Michigan State Class:**

All persons or entities that purchased or leased a Class Vehicle within Michigan or that purchased or leased a Class Vehicle and reside in Michigan.

**Minnesota State Class:**

All persons or entities that purchased or leased a Class Vehicle within Minnesota or that purchased or leased a Class Vehicle and reside in Minnesota.

**Mississippi State Class:**

All persons or entities that purchased or leased a Class Vehicle within Mississippi or that purchased or leased a Class Vehicle and reside in Mississippi.

**Missouri State Class:**

All persons or entities that purchased or leased a Class Vehicle within Missouri or that purchased or leased a Class Vehicle and reside in Missouri.

**Montana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Montana or that purchased or leased a Class Vehicle and reside in Montana.

**Nebraska State Class:**

All persons or entities that purchased or leased a Class Vehicle within Nebraska or that purchased or leased a Class Vehicle and reside in Nebraska.

**Nevada State Class:**

All persons or entities that purchased or leased a Class Vehicle within Nevada or that purchased or leased a Class Vehicle and reside in Nevada.

**New Hampshire State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Hampshire or that purchased or leased a Class Vehicle and reside in within New Hampshire.

**New Jersey State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Jersey or that purchased or leased a Class Vehicle and reside in New Jersey.

**New Mexico State Class:**

All persons or entities that purchased or leased a Class Vehicle within New Mexico or that purchased or leased a Class Vehicle and reside in New Mexico.

**New York State Class:**

All persons or entities that purchased or leased a Class Vehicle within New York or that purchased or leased a Class Vehicle and reside in New York.

**North Carolina State Class:**

All persons or entities that purchased or leased a Class Vehicle within North Carolina or that purchased or leased a Class Vehicle and reside in North Carolina.

**North Dakota State Class:**

All persons or entities that purchased or leased a Class Vehicle within North Dakota or that purchased or leased a Class Vehicle and reside in North Dakota.

**Ohio State Class:**

All persons or entities that purchased or leased a Class Vehicle within Ohio or that purchased or leased a Class Vehicle and reside in Ohio.

**Oklahoma State Class:**

All persons or entities that purchased or leased a Class Vehicle within Oklahoma or that purchased or leased a Class Vehicle and reside in Oklahoma.

**Oregon State Class:**

All persons or entities that purchased or leased a Class Vehicle within Oregon or that purchased or leased a Class Vehicle and reside in Oregon.

**Pennsylvania State Class:**

All persons or entities that purchased or leased a Class Vehicle within Pennsylvania or that purchased or leased a Class Vehicle and reside in Pennsylvania.

**Rhode Island State Class:**

All persons or entities that purchased or leased a Class Vehicle within Rhode Island or that purchased or leased a Class Vehicle and reside in Rhode Island.

**South Carolina State Class:**

All persons or entities that purchased or leased a Class Vehicle within South Carolina or that purchased or leased a Class Vehicle and reside in South Carolina.

**South Dakota State Class:**

All persons or entities that purchased or leased a Class Vehicle within South Dakota or that purchased or leased a Class Vehicle and reside in South Dakota.

**Tennessee State Class:**

All persons or entities that purchased or leased a Class Vehicle within Tennessee or that purchased or leased a Class Vehicle and reside in Tennessee.

**Texas State Class:**

All persons or entities that purchased or leased a Class Vehicle within Texas or that purchased or leased a Class Vehicle and reside in Texas.

1528982.7

**U.S. Territory Class:**

All persons or entities that purchased or leased a Class Vehicle within a U.S. Territory or that purchased or leased a Class Vehicle and reside in U.S. Territory.

**Utah State Class:**

All persons or entities that purchased or leased a Class Vehicle within Utah or that purchased or leased a Class Vehicle and reside in Utah.

**Vermont State Class:**

All persons or entities that purchased or leased a Class Vehicle within Vermont or that purchased or leased a Class Vehicle and reside in Vermont.

**Virginia State Class:**

All persons or entities that purchased or leased a Class Vehicle within Virginia or that purchased or leased a Class Vehicle and reside in Virginia.

**Washington State Class:**

All persons or entities that purchased or leased a Class Vehicle within Washington or that purchased or leased a Class Vehicle and reside in Washington.

**West Virginia State Class:**

All persons or entities that purchased or leased a Class Vehicle within West Virginia or that purchased or leased a Class Vehicle and reside in West Virginia.

**Wisconsin State Class:**

All persons or entities that purchased or leased a Class Vehicle within Wisconsin or that purchased or leased a Class Vehicle and reside in Wisconsin.

**Wyoming State Class:**

All persons or entities that purchased or leased a Class Vehicle within Wyoming or that purchased or leased a Class Vehicle and reside in Wyoming.

261.    Excluded from the Class are individuals who have personal injury claims resulting from the conduct alleged herein.  Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

262.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

263.     This action has been brought and may be properly maintained on behalf of the Nationwide Class and/or State Class proposed herein under Federal Rule of Civil Procedure 23.

264.     Plaintiffs reserve the right to modify the definition of the Nationwide and/or any State Class prior to class certification.

## II.     CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF CIVIL PROCEDURE 23

265.     ***Numerosity: Rule 23(a)(1).***  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe, based on available information on the volume of sales and registrations of Class Vehicles, that there are no fewer than 100,000 members of the Class. The precise number of Class members may be ascertained from Defendants' records and vehicle registration records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

266.     ***Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).***  This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

    a.     Whether Defendants engaged in the conduct alleged herein;

    b.     Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c.     Whether Defendants knew or should have known that the Class Vehicles emitted NOx at levels above those reasonably assumed by consumers and, if so, how long Defendants have known or should have known;

    d.     Whether the true nature of the Class Vehicles' performance, emissions levels, fuel economy, and emissions software constitute material facts that

reasonable consumers would have considered in deciding whether to purchase and/or lease a Class Vehicle;

e.  Whether Defendants' EcoDiesel® engine system in the Class Vehicles can be made to comply with emission standards without substantially degrading the performance and/or efficiency of the Class Vehicles;

f.  Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of Defendants' deception;

g.  Whether Defendants made material misrepresentations regarding the Class Vehicles;

h.  Whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

i.  Whether Defendants omitted, concealed, and/or failed to disclose material facts about the Class Vehicles;

j.  Whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

k.  Whether Bosch designed and manufactured the emissions software present in the Class Vehicles;

l.  Whether Bosch supplied the emissions software to FCA with the knowledge that FCA would use it in production of the Class Vehicles;

m.  Whether Bosch acted in concert with FCA;

n.  Whether VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Class Vehicles, knowing, they would be used to evade emission laws and deceive the consuming public;

o.  Whether Defendant FCA designed, manufactured, marketed, and distributed Class Vehicles with the alleged emissions software;

p.  Whether Defendants' conduct violates RICO, consumer protection statutes, false advertising laws, warranty laws, and other laws as asserted herein;

q.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

r.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

s.  Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

267.     ***Typicality: Rule 23(a)(3).***  Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and each Class member purchased a Class Vehicle and were similarly injured through Defendants' wrongful conduct as described above.  Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants.  Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members.  Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

268.     ***Adequacy: Rule 23(a)(4).***  Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation.  Plaintiffs intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members.  Therefore, the interests of the Class members will be fairly and adequately protected.

269.     ***Declaratory and Injunctive Relief: Rule 23(b)(2).***  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

270.     ***Superiority: Rule 23(b)(3).***  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

271.     Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and

increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

**I.      DISCOVERY RULE**

272.    The tolling doctrine was made for cases of concealment like this one.  Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants had conspired to install software that would evade emission regulations, and that Defendants were concealing and misrepresenting the true emission levels of the Class Vehicles to regulators and the driving public.

273.    Defendants' fraud was elaborate and well concealed.  Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

274.    Plaintiffs and Class members had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through their respective Notices of Violation.

275.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

**II.     FRAUDULENT CONCEALMENT**

276.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

277.    Defendants have known of the emission control software installed in the Class Vehicles since at least 2014, when Defendants began installing them.  Since then Defendants have intentionally concealed from, or failed to notify, regulators, Plaintiffs, Class members, and the driving public of the  undisclosed auxiliary (or defeat) devices and the true level of emissions and performance of the Class Vehicles.

278.    Despite knowing about the emission control software and unlawful emissions during real-world driving conditions, Defendants did not acknowledge the problem, and in fact

1   actively concealed it, until after the EPA and CARB issued their Notices of Violation.  Even to

2   present day, Defendants have denied any wrongdoing.

3       279.    Any otherwise-applicable statutes of limitation have therefore been tolled by

4   Defendants' exclusive knowledge and concealment of the facts alleged herein.

5   **III.    ESTOPPEL**

6       280.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs and

7   Class members the true character, quality, and nature of the Class Vehicles, including their

8   emission systems and their compliance with applicable federal and state law, particularly given

9   their misleading advertising statements.  Instead, Defendants actively concealed the true

10  character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about

11  the quality, reliability, characteristics, and performance of the Class Vehicles.

12      281.    Plaintiffs and Class members reasonably relied upon Defendants' active

13  concealment of these facts that rendered their statements misleading.

14      282.    Based on the foregoing, Defendants are estopped from relying on any statutes of

15  limitation in defense of this action.

16                      **CLAIMS FOR RELIEF**

17  **I.    CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS**

18                      **NATIONWIDE COUNT I**
    **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
19                 **Violation of 18 U.S.C. § 1962(c)-(d)**

20      283.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

21  forth herein.

22      284.    Plaintiffs bring this action on behalf of the Nationwide Class against Defendants

23  Fiat, FCA, Marchionne, VM Italy, VM America, Bosch GmbH, and Bosch LLC (inclusively, for

24  purpose of this Count, Defendants are referred to as "RICO Defendants").

25      285.    Fiat conducts its business—legitimate and illegitimate—through various affiliates

26  and subsidiaries, like FCA, VM Italy, and VM America, each of which is a separate legal entity.

27  The Bosch Group also conducts its business, both legitimate and illegitimate, through hundreds of

28

1  companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC.[69]  At all relevant

2  times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each

3  was capable of holding "a legal or beneficial interest in property."

4         286.    Section 1962(c) makes it "unlawful for any person employed by or associated with

5  any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

6  conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

7  pattern of racketeering activity."  18 U.S.C. § 1962(c).

8         287.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section

9  1962(c), among other provisions.  *See* 18 U.S.C. § 1962(d).

10        288.    As part of a strategy to expand its North American presence, in 2009, Fiat began

11  its acquisition of one of the "Big 3" U.S. automakers, Chrysler.  In November of that year, CEO

12  Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel

13  variants" of Jeep and to give Ram "Light duty (1500)" a "refresh/facelift."[70]

14        289.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA,

15  and VM Motori, a longtime supplier, was now part of the Fiat Chrysler sprawling family of

16  affiliated companies.  In May of that year, Marchionne announced another five-year plan at

17  Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global

18  auto behemoths, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to

19  7 million vehicles by 2018, up from 4.4 million in 2013.[71]  Integral to the strategy was the

20  expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including

21  "diesel engines."[72]

22        290.    During this same time frame, emission standards in the United States were

23  ratcheting up.  In contrast to other global automakers, like Toyota and Ford, which were focusing

24  on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took

25

26  _____
[69] *See generally* https://www.bosch.com/bosch-group/ (last accessed on July 19, 2017).
[70] *See* Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan*, *supra* note 6.

27  [71] *See* Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, *supra* note 7.

28  [72] *See* Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, *supra* note 8.

1  another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet

2  another route that focuses less on electrification and ***more heavily on light-duty diesels*** and

3  compressed natural gas."[73]  In 2012, Marchionne observed, "with 2016 'just around the corner'

4  and 2025 not far away given the auto industry's long product-development lead times, 'there are

5  big choices to be made[.]'"[74]  Marchionne explained that "Chrysler, which is starting to share

6  platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in

7  ***diesels*** and CNG-powered vehicles."[75]  As one commenter put it at the time, "[f]uel-efficient

8  towing remains a strong point of diesels, and Marchionne says he still is optimistic about the

9  potential of light-duty diesels in the U.S. despite significant emissions challenges."[76]

10      291.    As it turned out, however, Fiat Chrysler was either unable or unwilling to devise a

11  solution within the constraints of the law.  And so, like Volkswagen, they devised one outside of

12  it.  Instead of cutting their losses, holding up the Class Vehicle roll outs, or coming clean, they

13  conspired with VM Italy and VM America and Bosch GmbH and Bosch LLC to install

14  customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel controls so

15  that the Class Vehicles could "pass" the EPA and CARB testing.  The software disabled or

16  restricted certain of the emission controls during real-world driving conditions, however, causing

17  the Class Vehicles to spew up to 25 times the legal limits of NOx.  These software controls were

18  concealed from regulators on COC and EO applications for the Class Vehicles by FCA, thus

19  deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United

20  States and California.

21      292.    To accomplish their scheme or common course of conduct, Fiat, FCA,

22  Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Denner, along with others,

23  had to work together to conceal the truth.  Each Defendant was employed by or associated with,

24  and conducted or participated in the affairs of, one or several RICO enterprises (defined below

25  and referred to collectively as the "EcoDiesel® RICO Enterprise").  The purpose of the

26  _____

[73] *See* Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, *supra* note

27  9.
[74] *Id.*

28  [75] *Id.*
[76] *Id.*

1    EcoDiesel® RICO Enterprise was to deceive regulators into believing that the Class Vehicles

2    were eligible for coverage by a COC and/or EO and compliant with emission standards.  The

3    motivation was simple:  to increase Defendants' revenues and profits and minimize their losses

4    from the design, manufacture, distribution and sale of the Class Vehicles and their component

5    parts.  As a direct and proximate result of their fraudulent scheme and common course of

6    conduct, the RICO Defendants were able to extract over a billion dollars from consumers.  As

7    explained below, their years-long misconduct violated Sections 1962(c) and (d).

8           A.      **Description of the EcoDiesel® RICO Enterprise**

9           293.    In an effort to expand its market share in the United States and beyond, Fiat, a

10   publicly-traded Italian-controlled, Dutch-registered company headquartered in London, bought

11   then-Chrysler (now FCA), a separate Delaware company, headquartered in Michigan.  Fiat uses

12   FCA to design, market, manufacture and sell the Class Vehicles and other vehicles under the

13   Chrysler, Dodge, Jeep, Ram, and Fiat brands throughout the United States.  FCA also submitted

14   the COC and EO applications for the Class Vehicles.  Fiat used VM Italy and VM America to

15   design and manufacture the EcoDiesel® engines for the Class Vehicles, which were calibrated in

16   Michigan with Bosch's hidden software.  Fiat, FCA, VM Italy, and VM America maintained tight

17   control over the design, manufacture, calibration, and testing of the Class Vehicles.  Bosch also

18   participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing,

19   writing the software code customized for the Class Vehicles, and concealing the hidden software

20   installed in the Class Vehicles in order to allow them to "pass" testing but then disable or restrict

21   certain emission controls during real-world driving conditions.

22          294.    At all relevant times, the RICO Defendants, along with other individuals and

23   entities, including unknown third parties involved in the design, calibration, manufacture, testing,

24   marketing, and sale of the Class Vehicles or the emission controls therein, operated an

25   association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs

26   from the EPA (and EOs from CARB) in order to sell the Class Vehicles throughout the United

27   States (and California), and through which enterprise they conducted a pattern of racketeering

28   activity under 18 U.S.C. § 1961(4).  The enterprise is called the "EcoDiesel® RICO Enterprise."

295.    At all relevant times, the EcoDiesel® RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' unlawful profit-making scheme.

296.    The association-in-fact EcoDiesel® RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1.    The Fiat Chrysler Defendants

297.    Fiat Chrysler is the seventh-largest automaker in the world based on total annual vehicle sales and is an international automotive group.  Fiat is listed on the New York Stock Exchange under the symbol "FCAU" and on the Mercato Telematico Azionario under the symbol "FCA."[77]  FCA is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of Delaware.  FCA is a distinct legal entity, controlled and owned (indirectly) by Defendant Fiat.  Marchionne is the CEO and Chairman of Fiat Chrysler and oversees the board of directors for FCA.  Along with other members of Fiat Chrysler's leadership, Marchionne played a pivotal role in the scheme, common course of conduct, and conspiracy.  Marchionne set an aggressive plan for Fiat Chrysler to increase the sales and market share of FCA, relying, in part, on incorporating its diesel experience from the European to the U.S. market.  FCA's day-to-day operations are managed by employees of both Fiat and FCA.  Fiat's Group Executive Committee are based in FCA's Michigan headquarters.  Fiat and FCA worked closely with VM Italy and VM America to develop and calibrate the EcoDiesel® engines for the Class Vehicles and to gather information for submission to regulators in the COC and EO applications by FCA.  Each of these Defendants knew or recklessly disregarded that the Class Vehicles were unable to (and did not) comply with U.S. emission standards and yet concealed this information from regulators.

298.    Working with other members of the EcoDiesel® RICO Enterprise, Fiat and FCA, with Marchionne at the helm, conspired to install and conceal emission control software in the

---

[77] *See About Us – FCA US LLC*, available at http://www.fcanorthamerica.com/company/AboutUs/Pages/AboutUs.aspx (last accessed on July 17, 2017).

EcoDiesel® engines to illegally circumvent stringent U.S. emission standards.  Employing this technology, Fiat Chrysler fraudulently obtained COCs and EOs for the Class Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions.  Further, they concealed this information from regulators once questions were raised.

### 2.   The VM Motori Defendants

299.    As explained above, Fiat bought 50% of VM Italy in 2011 and the remaining 50% stake from General Motors in 2013.  Fiat Chrysler used VM Italy and VM America to design, calibrate, and manufacture the EcoDiesel® engine to be used in the Class Vehicles.  Fiat and FCA worked with, and oversaw, VM Italy and VM America in the development and calibration of the engines at Michigan headquarters.  Employees from VM Italy and VM America worked jointly on the manufacturing and/or assembling the engines for the Class Vehicles in the United States.  And VM Italy and VM America performed engine calibrations, including calibrations involving the concealed emission control technology for the Class Vehicles.  For example, VM Motori's Calibration Leader for the Class Vehicles was based in Michigan and reported to management at both VM Italy and VM America.  Finally, VM Italy and VM America provided information to FCA for inclusion in the COC and EO applications.  VM Italy and VM America knew or recklessly disregarded that the EcoDiesel® engines in the Class Vehicles were unable to comply with U.S. emission standards and yet concealed this information from regulators.

### 3.   The Bosch Defendants

300.    As explained above, the Bosch Defendants supplied the emission control technology at issue—EDC Unit 17s—which were installed in the Class Vehicles.  Bosch GmbH is a multinational engineering and electronics company headquartered in Germany, which has hundreds of subsidiaries and companies, including in the United States.  It wholly owns Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.  Bosch's sectors and divisions are grouped by subject matter, not location.  Mobility Solutions is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of both Bosch GmbH and Bosch LLC.  These individuals were responsible for the design, manufacture, development, customization, and supply of the EDC units for the Class Vehicles.

-137-

301.    Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that were installed in the Class Vehicles. Denner fostered Bosch's relationship with key corporate partners, such as Fiat, which brought in millions of dollars in annual revenue for Bosch.

302.    Bosch worked with Fiat and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions.  Bosch was well aware that the EDC Unit 17 would be used for this purpose.  Bosch was also critical to the concealment of these software functions in communications with regulators.

**B.    The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues.**

303.    The EcoDiesel® RICO Enterprise began as early as 2009, when Fiat began to acquire FCA and later VM Motori.  On information and belief, Fiat Chrysler and Bosch entered into an agreement to develop and install EDC Unit 17's into over a hundred thousand Class Vehicles sold in the United States.  It was not until September 2015 that the scheme began to unravel, when U.S. regulators uncovered Volkswagen's defeat devices provided by Bosch and questions were raised as to whether other diesel automakers were cheating, too.

304.    At all relevant times, the EcoDiesel® RICO Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Fiat and FCA, their network of dealerships, Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Class Vehicles to consumers in the Nationwide Class through fraudulent COCs and EOs, false emissions tests, false or misleading sales tactics and materials, and deriving profits and revenues from those activities.  Each member of the EcoDiesel® RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the

1  benefit derived from increased sales revenue generated by the scheme to defraud Class members

2  nationwide.[78]

3          305.    The EcoDiesel® RICO Enterprise functioned by selling vehicles and component

4  parts to the consuming public.  Many of these products are legitimate, including vehicles that do

5  not contain concealed AECDs.  However, the RICO Defendants and their co-conspirators,

6  through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a

7  fraudulent scheme to increase revenue for Defendants and the other entities and individuals

8  associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class

9  Vehicles.

10         306.    The EcoDiesel® RICO Enterprise engaged in, and its activities affected, interstate

11  and foreign commerce, because it involved commercial activities across state boundaries, such as

12  the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the

13  country, and the receipt of monies from the sale of the same.

14         307.    Within the EcoDiesel® RICO Enterprise, there was a common communication

15  network by which co-conspirators shared information on a regular basis.  The enterprise used this

16  common communication network for the purpose of manufacturing, marketing, testing, and

17  selling the Class Vehicles to the general public nationwide.

18         308.    Each participant in the EcoDiesel® RICO Enterprise had a systematic linkage to

19  each other through corporate ties, contractual relationships, financial ties, and continuing

20  coordination of activities.  Through the EcoDiesel® RICO Enterprise, the RICO Defendants

21  functioned as a continuing unit with the purpose of furthering the illegal scheme and their

22  common purposes of increasing their revenues and market share, and minimizing losses.

23         309.    The RICO Defendants participated in the operation and management of the

24  EcoDiesel® Enterprise by directing its affairs, as described herein.  While the RICO Defendants

25  participated in, and are members of, the enterprise, they have a separate existence from the

26

27  _____
    [78] Fiat and FCA sold more Class Vehicles, and was able to charge consumers a premium price, by
28  advertising the Class Vehicles as "clean," "environmentally friendly," and "fuel efficient."  As a
    result, VM Motori sold more "EcoDiesel®" engines and Bosch sold more EDC Units to equip the
    Class Vehicles.

enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

310.    Fiat, FCA, and Marchionne exerted substantial control over the EcoDiesel® RICO Enterprise, and participated in the affairs of the Enterprise, by:

        A.    installing emission control software that deactivates or restricts one or more of the controls during real-world driving conditions;

        B.    concealing these software functions from regulators;

        C.    failing to correct or disable the hidden software when warned;

        D.    manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

        E.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

        F.    introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

        G.    concealing the existence of the emission controls and the unlawfully high emissions from regulators and the public;

        H.    persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emission testing and discrepancies concerning the same;

        I.    misleading government regulators as to the nature of the emission control technology and the defects in the Class Vehicles;

        J.    misleading the driving public as to the nature of the emission control technology and the defects in the Class Vehicles;

        K.    designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

        L.    otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

        M.    illegally selling and/or distributing the Class Vehicles;

N.      collecting revenues and profits from the sale of such products; and/or

O.      ensuring that the other RICO Defendants and unnamed co-conspirators complied with the scheme or common course of conduct.

311.    VM Italy and VM America also participated in, operated and/or directed the EcoDiesel RICO Enterprise by developing an engine that emits high levels of toxic pollutants, calibrating the emission controls to deactivate or diminish during real-world driving conditions, and providing false or misleading information for purposes of supplying it to regulators on COC and/or EO applications.

312.    Bosch GmbH, Bosch LLC, and Denner also participated in, operated and/or directed the EcoDiesel® RICO Enterprise.  On information and belief, Denner formed a partnership with Fiat to provide engine management and emission control technology for the Class Vehicles.  Bosch GmbH and Bosch LLC participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 for the Class Vehicles.  Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects of the software and closely collaborated with Fiat, FCA, VM Italy, and VM America to develop, customize, and calibrate the software for the Class Vehicles.  Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the other RICO Defendants to ensure that the EDC Unit 17 was fully integrated into the Class Vehicles.  Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators and actively lobbying regulators on behalf of "clean diesel."  Bosch collected millions of dollars in revenues and profits from the hidden software installed in the Class Vehicles.

313.    Without the RICO Defendants' willing participation, including Bosch GmbH and Bosch LLC's active involvement in developing and supplying the critical emission control software for the Class Vehicles, the Enterprise's scheme and common course of conduct would have been unsuccessful.

314.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

1   Similarly, because the defendants often refer to themselves as a group (*i.e.*, "Bosch" rather than

2   "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the full extent of each individual

3   corporate entity's involvement in the wrongdoing prior to having access to discovery.

4   **C.     Mail And Wire Fraud**

5   315.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants,

6   each of whom is a person associated-in-fact with the EcoDiesel® RICO Enterprise, did

7   knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the

8   Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1),

9   1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of

10  18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

11  316.    Specifically, as alleged herein, the RICO Defendants have committed and/or

12  conspired to commit at least two predicate acts of racketeering activity (*i.e.*, violations of 18

13  U.S.C. §§ 1341 and 1343), within the past ten years.  The multiple acts of racketeering activity

14  that the RICO Defendants committed were related to each other, posed a threat of continued

15  racketeering activity, and therefore constitute a "pattern of racketeering activity."  The

16  racketeering activity was made possible by the RICO Defendants' regular use of the facilities,

17  services, distribution channels, and employees of the EcoDiesel® RICO Enterprise.  The RICO

18  Defendants participated in the scheme to defraud by using mail, telephone and the Internet to

19  transmit mailings and wires in interstate or foreign commerce.

20  317.    The RICO Defendants used, directed the use of, and/or caused to be used,

21  thousands of interstate mail and wire communications in service of their scheme through virtually

22  uniform misrepresentations, concealments and material omissions.

23  318.    In devising and executing the illegal scheme, the RICO Defendants devised and

24  knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide

25  Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or

26  fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of

27  executing the illegal scheme, the RICO Defendants committed these racketeering acts, which

28

1    number in the thousands, intentionally and knowingly with the specific intent to advance the

2    illegal scheme.

3          319.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

4    include, but are not limited to:

5                  A.    Mail Fraud:  The RICO Defendants violated 18 U.S.C. § 1341 by sending

6                        or receiving, or by causing to be sent and/or received, materials via U.S.

7                        mail or commercial interstate carriers for the purpose of executing the

8                        unlawful scheme to design, manufacture, market, and sell the Class

9                        Vehicles by means of false pretenses, misrepresentations, promises, and

10                        omissions.

11                  B.    Wire Fraud:  The RICO Defendants violated 18 U.S.C. § 1343 by

12                        transmitting and/or receiving, or by causing to be transmitted and/or

13                        received, materials by wire for the purpose of executing the unlawful

14                        scheme to defraud and obtain money on false pretenses,

15                        misrepresentations, promises, and omissions.

16          320.    The RICO Defendants' uses of the mails and wires include, but are not limited to,

17    the transmission, delivery, or shipment of the following by the RICO Defendants or third parties

18    that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

19                  A.    the Class Vehicles themselves;

20                  B.    component parts for the EcoDiesel® engines;

21                  C.    component parts for the Bosch emission control hardware and software;

22                  D.    false or misleading emission test results;

23                  E.    applications for EPA COCs and CARB EOs that concealed AECDs;

24                  F.    fraudulently-obtained EPA COCs and CARB EOs;

25                  G.    vehicle registrations and plates as a result of the fraudulently-obtained EPA

26                        COCs and CARB EOs;

27                  H.    documents and communications that facilitated "passing" emission tests;

28

-143-

I.      false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emission controls and/or AECDs;

J.      sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Class Vehicles;

K.     documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.      documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

M.    payments to VM Italy and VM America;

N.    payments to Bosch GmbH and Bosch LLC;

O.    millions of dollars in compensation to Marchionne and Denner;

P.     deposits of proceeds; and/or

Q.    other documents and things, including electronic communications.

321.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
| --- | --- | --- | --- |
| FCA | Bosch LLC | January 2013 | Documents related to agreement to purchase Bosch EDC Unit 17 for 2014 Jeep Grand Cherokee. |
| VM Motori | FCA | January 2013 | Documents related to EcoDiesel® engine for 2014 Jeep Grand Cherokee. |
| FCA, Michigan | FCA Dealerships | July 2013 | Marketing Documents for 2014 Ram 1500 Class Vehicles. |
| EPA | FCA | September 2013 | COC and related documents for 2014 Jeep Grand Cherokee. |

| From | To | Date | Description |
|------|-----|------|-------------|
| EPA | FCA | September 2014 | COC and related documents for 2015 Jeep Grand Cherokee. |
| FCA Warren Truck Assembly | Arrigo Dodge dealership, Sunrise, Florida | November 2015 | Shipment of 2016 Ram 1500 Class Vehicles. |

322.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Bosch LLC | PR Newswire, New York (and media network around United States) | January 2013 | Press release that Bosch's "clean diesel" technology will be featured in 2014 Jeep Grand Cherokee. |
| FCA, Michigan | Driving Public Throughout All 50 States | July 2013 | Ram Zone Blog: *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You.* |
| Bosch LLC | FCA | October 2013 | Software and calibration documentation for emission control technology. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2014 | Certification Summery Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram 1500. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2015 | Certification Summery Information Report with emission test results for 2015 Jeep Grand Cherokee and 2015 Ram 1500. |
| FCA, Michigan | EPA, Washington, DC | February 2, 2016 | Email correspondence re: FCA lulling press release concerning compliance of diesel vehicles with applicable emission regulations. |

| From | To | Date | Description |
|------|-----|------|-------------|
| EPA, Washington DC | FCA, Michigan | November 30, 2016 | Email correspondence re: conference call between EPA officials and Defendant Marchionne. |

323.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.  Specifically, FCA, under the direction and control of Fiat and Marchionne, made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics.

324.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

325.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

326.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

327.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in

1   these offenses and have performed acts in furtherance of the conspiracy to increase or maintain

2   revenues, increase market share, and/or minimize losses for the Defendants and their unnamed

3   co-conspirators throughout the illegal scheme and common course of conduct.

4       328.   To achieve their common goals, the RICO Defendants hid from the general public

5   the excessive and unlawful emissions of the Class Vehicles and obfuscated the true nature and

6   level of the emissions even after regulators raised concerns.  The RICO Defendants suppressed

7   and/or ignored warnings from third parties, whistleblowers, and governmental entities about the

8   discrepancies in emissions testing and the concealed auxiliary (or defeat) devices present in the

9   Class Vehicles.

10      329.   With knowledge and intent, the RICO Defendants and each member of the

11  conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy,

12  and have participated in the common course of conduct, to commit acts of fraud and indecency in

13  designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and

14  the emission control technology contained therein).

15      330.   Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-

16  conspirators had to agree to implement and use the similar devices and fraudulent tactics.

17  Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Class

18  Vehicles.

19      331.   The RICO Defendants knew and intended that government regulators would rely

20  on their material omissions made about the Class Vehicles to approve them for importation,

21  marketing, and sale in the United States and each state.  The RICO Defendants knew and

22  intended that consumers would purchase the Class Vehicles and incur costs as a result.  Plaintiffs'

23  reliance on this ongoing concealment is demonstrated by the fact that they purchased illegal and

24  defective vehicles that never should have been introduced into the U.S. stream of commerce.  In

25  addition, the EPA, CARB, and other regulators relied on the misrepresentations and material

26  concealment and omissions made or caused to be made by the RICO Defendants; otherwise, FCA

27  could not have obtained valid COCs and EOs to sell the Class Vehicles.

28

332.     As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

333.     The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the EcoDiesel® RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

334.     During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared among themselves technical, marketing, and financial information that revealed the existence of the AECDs contained therein.  Nevertheless, the RICO Defendants chose and agreed to disseminate information that deliberately misrepresented the Class Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient" in their concerted efforts to market and sell them to consumers.

335.     By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

        A.     Purchase or lease of illegal, defective Class Vehicles;

        B.     Overpayment at the time of purchase or lease for Class Vehicles purportedly having "EcoDiesel" properties and benefits, and meeting applicable federal and state emissions standards, that did not have these properties or meet these standards;

        C.     The value of the Class Vehicles has diminished;

1    D. Other, ongoing out-of-pocket and loss-of-use expenses;

2    E. Payment for alternative transportation; and

3    F. Loss of employment due to lack of transportation.

4  336. The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and

5 proximately caused economic damage to Plaintiffs' and Class members' business and property,

6 and Plaintiffs and Class members are entitled to bring this action for three times their actual

7 damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to

8 18 U.S.C. § 1964(c).

NATIONWIDE COUNT II<br>FRAUD<br>(Common Law)

11  337. Plaintiffs incorporate by reference all preceding allegations as though fully set

12 forth herein.

13  **A.**  <u>**Affirmative Misrepresentation**</u>

14  338. Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of

15 themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against

16 the Fiat Chrysler and VM Motori Defendants.

17  339. Fiat Chrysler branded each Class Vehicle with the EcoDiesel badge.  Through the

18 badge, Fiat Chrysler communicated to each Class Member that the Class Vehicles were, among

19 other things, environmentally friendly.

20  340. This was a material fact, as Fiat Chrysler's own research and communications

21 demonstrate.  Fiat Chrysler's representations were false because the Class Vehicles contain

22 undisclosed emission cheating components that cause them to pollute excessively in real-world

23 driving conditions.

24  341. Fiat Chrysler and VM Motori knew the representations were false and intended

25 Plaintiffs and Class Members to rely on them.

26  342. Each named Plaintiff decided to buy a Class Vehicle based in part on the

27 representations communicated through the EcoDiesel badge.  *See, e.g.*, ¶¶ 34-96.  Because each

28 Class Vehicle included the badge and each Class Member was exposed to it, a "plausible . . .

1    inference of reliance" can be made for the entire Class.  Dkt. 290 at 103 (citing *Tobacco II Cases*,

2    207 P.3d 20, 40 (Cal. 2009)).

3         **B.    Fraudulent Concealment: Fuel Economy and Performance Representations**

4         343.    Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the

5    Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

6         344.    Again, Fiat Chrysler branded each Class Vehicle with the EcoDiesel badge, which

7    communicated not only that the Class Vehicles were environmentally friendly, but also that they

8    were fuel efficient.

9         345.    The fuel economy and performance representations were also the centerpiece of

10   Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and

11   consumer communication.  As detailed above , through dealership training materials leading to

12   representations at the point of sale, vehicle brochures, the manufacturer websites, print

13   advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and

14   consistently represented that the Class Vehicles had best in class fuel economy and touted their

15   specific MPG and range, as well as their supposedly superior torque and performance.  *See, e.g.*,

16   ¶¶ 149-216.

17        346.    Defendants concealed and suppressed the fact that the Class Vehicles could

18   achieve their fuel efficiency and power only through undisclosed cheating components that cause

19   them to pollute excessively.  This was a material fact about which the Defendants had knowledge,

20   and that they concealed from Plaintiffs and Class Members to mislead them.

21        347.    Plaintiffs and Class Members did not know this fact and could not have discovered

22   it through reasonably diligent investigation.

23        348.    Defendants had a duty to disclose that the emission treatment technology in the

24   Class Vehicles is de-activated or reduced under real-world driving conditions because (1) the

25   Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took

26   affirmative actions to conceal the material facts, including by not identifying them for the EPA

27   and CARB; and (3) Fiat Chrysler made partial representations about the environmental

28   friendliness, fuel economy, and performance of the Class Vehicles that were misleading without

1    disclosure of the fact that the Class Vehicles contained hidden emission cheating components that

2    caused the Class Vehicles to pollute excessively in real-world driving conditions.

3         349.    Each named Plaintiff decided to buy a Class Vehicle based in part on the fuel

4    economy and power representations made through the EcoDiesel badge and other consumer

5    communications to consumers. *See, e.g.*, ¶¶ 34-96.  Because each Class Vehicle included the

6    badge and each Class Member was exposed to it, and because the fuel economy and performance

7    representations were consistent and pervasive, a "plausible . . . inference of reliance" can be made

8    for the entire Class.  Dkt. 290 at 103 (citing *Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009)).

9         **C.    Fraudulent Concealment: Installing and Concealing the Defeat Devices**

10        350.    Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the

11   Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

12        351.    Each Defendant committed fraud by installing and calibrating emission control

13   devices in the Class Vehicles, which were unlawfully concealed from regulators and consumers

14   alike.  In uniform advertising and materials provided with each Class Vehicle, the Fiat Chrysler

15   Defendants concealed from Plaintiffs and the Nationwide Class that the emission treatment

16   technology de-activated under real-world driving conditions. *See, e.g.*, ¶¶ 149-216.

17        352.    The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to

18   disclose the facts that the Class Vehicles had defective emission controls and/or emitted

19   unlawfully high levels of pollutants such as NOx.  These Defendants, along with VM Motori and

20   the Bosch Defendants, knew or should have known the true facts, due to their involvement in the

21   design, installment, and calibration of the emission treatment technology in the Class Vehicles.

22   And yet, at no time did any of these Defendants reveal the truth to Plaintiffs or the Class.  To the

23   contrary, each Defendant concealed the truth, intending for Plaintiffs and the Class to rely—

24   which they did.

25        353.    A reasonable consumer would not have expected that the emission treatment

26   technology in the Class Vehicles de-activated under real-world driving conditions or that the

27   Class Vehicle would spew unmitigated NOx during city or highway driving.  Plaintiffs and the

28   members of the Class did not know of the facts which were concealed from them by Defendants.

1    Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel

2    the deception on their own.

3            354.    Defendants had a duty to disclose that the emission treatment technology is de-

4    activated under real-world driving conditions and that the Class Vehicles spewed unmitigated

5    NOx during real-world conditions.  Defendants had such a duty because the true facts were

6    known and/or accessible only to them and because they knew these facts were not known to or

7    reasonably discoverable by Plaintiffs or the members of the Class.

8            355.    Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the

9    emission controls in light of their statements about the qualities of the EcoDiesel® engines and

10   the Class Vehicles' emissions levels, which were misleading, deceptive, and incomplete without

11   the disclosure of the fact that the emission treatment technology is de-activated under real-world

12   driving conditions and that the Class Vehicles spewed unmitigated NOx during real-world

13   conditions.  Fiat Chrysler held out the Class Vehicles as ***reduced emission*** diesel vehicles, when

14   in fact, they were ***unlawfully high*** emission vehicles.  Having volunteered to provide information

15   to Plaintiffs and the members of the Class, Fiat Chrysler and VM Motori had the duty to disclose

16   the whole truth.  On information and belief, Fiat Chrysler has still not made full and adequate

17   disclosures and continues to defraud Plaintiffs and the members of the Class by concealing

18   material information regarding the emissions qualities of the Class Vehicles.

19                                              *  *  *

20           356.    But for Defendants' fraud, Plaintiffs and the members of the Class would not have

21   purchased the Class Vehicles, or would have paid less for them.  Plaintiffs and the members of

22   the Class have sustained damage because purchased vehicles that were not as represented and

23   because they own Class Vehicles that should never have been placed in the stream of commerce

24   and are diminished in value as a result of Defendants' fraud.  Accordingly, Defendants are liable

25   to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

26           357.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with

27   intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich

28   themselves.  Their misconduct warrants an assessment of punitive damages in an amount

1    sufficient to deter such conduct in the future, which amount shall be determined according to

2    proof at trial.

3                              **NATIONWIDE COUNT III**
                        **IMPLIED AND WRITTEN WARRANTY**
4              **Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

5            358.    Plaintiffs incorporate by reference all preceding allegations as though fully set

6    forth herein.

7            359.    Plaintiffs bring this action on behalf of themselves and the Nationwide Class

8    against FCA US LLC.

9            360.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by

10   virtue of 28 U.S.C. § 1332 (a)-(d).

11           361.    Plaintiffs and members of the Class are "consumers" within the meaning of

12   15 U.S.C. § 2301(3).

13           362.    FCA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)

14   and (5), respectively.

15           363.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C.

16   § 2301(1).

17           364.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

18   damaged by the failure of a warrantor to comply with a written or implied warranty.

19           365.    The amount in controversy of Plaintiffs' individual claims meets or exceeds

20   $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value

21   (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

22           366.    FCA provided Plaintiffs and each member of the Class with "written warranties"

23   and "implied warranties," as identified above, which are covered under 15 U.S.C. § 2301(6) and

24   (7), respectively.

25           367.    The terms of these warranties became part of the basis of the bargain when

26   Plaintiffs and each member of the Class purchased their Class Vehicles.

27           368.    FCA breached these written and implied warranties as described in detail above.

28   Without limitation, the Class Vehicles share a common design defect in that they emit more

1    pollutants than: (a) is allowable under the applicable regulations, and (b) was revealed to

2    regulators, consumers, and the driving public.

3        369.    Plaintiffs and each member of the Class have had sufficient direct dealings with

4    either FCA or its agents (including dealerships) to establish privity of contract between FCA, on

5    the one hand, and Plaintiffs and each member of the Class, on the other hand.  Nonetheless,

6    privity is not required here because Plaintiffs and each member of the Class are intended third-

7    party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied

8    warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and

9    have no rights under the warranty agreements provided with the Class Vehicles; the warranty

10   agreements were designed for and intended to benefit consumers only.

11       370.    Affording FCA a reasonable opportunity to cure its breach of written warranties

12   would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle, FCA knew,

13   or should have known, of its misrepresentations and/or material omissions concerning the Class

14   Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or

15   disclose the design defect.  Under the circumstances, the remedies available under any informal

16   settlement procedure would be inadequate and any requirement that Plaintiffs or members of the

17   Class resort to an informal dispute resolution procedure and/or afford FCA a reasonable

18   opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

19       371.    In addition, given the conduct described herein, any attempts by FCA, in its

20   capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage

21   of the defect is unconscionable and any such effort to disclaim, or otherwise limit, liability for the

22   defect is null and void.

23       372.    As a direct and proximate result of FCA's breach of the written and implied

24   warranties, Plaintiffs and each member of the Class have suffered damages.

25       373.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by

26   law, including compensation for the monetary difference between the Class Vehicles as warranted

27   and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or

28

1528982.7

renting replacement vehicles, along with all other incidental and consequential damages, statutory

attorney fees, and all other relief allowed by law.

374.    The warranty laws of each state, which are incorporated into this Count, are set

forth below.

### 1.    Alabama

**BREACH OF EXPRESS WARRANTY**
**(Ala. Code §§ 7-2-313 and 7-2A-210)**

375.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

fully set forth herein.

376.    Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John

Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves

and the Alabama State Class against Fiat and FCA.

377.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under

§ 7-2-103(1)(d).

378.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

motor vehicles under Ala. Code. § 7-2A-103(1)(p).

379.    The Class Vehicles are and were at all relevant times "goods" within the meaning

of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

380.    Federal law requires manufacturers of light-duty vehicles to provide two federal

emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

The Performance Warranty applies to repairs that are required during the first two years or 24,000

miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

major emission control components are covered for the first eight years or 80,000 miles,

whichever comes first.  These major emission control components subject to the longer warranty

include the catalytic converters, the electronic engine control unit (ECU), and the onboard

emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

emission control or emission related parts which fail to function or function improperly due to a

1    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

2    miles, whichever comes first, or, for the major emission control components, for eight years or

3    80,000 miles, whichever comes first.

4          381.    Fiat and FCA provided these warranties to Plaintiffs and the Alabama State Class.

5    These warranties formed the basis of the bargain that was reached when Plaintiffs and the

6    Alabama State Class purchased or leased their Class Vehicles.

7          382.    However, Fiat and FCA knew or should have known that the warranties were false

8    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

9    sold and leased to Plaintiffs and the Alabama State Class were designed to deactivate under real-

10   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

11   emissions testing, and therefore, knew that the emission systems contained defects.

12         383.    Plaintiffs and the Alabama State Class reasonably relied on Fiat's and FCA's

13   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

14   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

15   Alabama State Class, the Class Vehicles were designed to pollute at higher than legal limits

16   during normal driving, and could not achieve advertised performance and efficiency metrics

17   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

18   FCA therefore breached their express warranty by providing a product containing defects that

19   were never disclosed to Plaintiffs and the Alabama State Class.

20         384.    Any opportunity to cure the express breach is unnecessary and futile.

21         385.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

22   Plaintiffs and the Alabama State Class suffered significant damages, and seek damages in an

23   amount to be determined at trial.

24                 **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                   **(Ala. Code §§ 7-2-314 and 7-2A-212)**
25

26         386.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

27   paragraphs as though fully set forth herein.

28

387.    Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alabama State Class against Fiat and FCA.

388.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

389.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

390.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

391.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

392.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

393.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs and the Alabama State Class.  The amount of damages due will be proven at trial.

**2.    Alaska**

**BREACH OF EXPRESS WARRANTY**
**(Alaska Stat. Ann. §§ 45.02.313 and 45.12.210)**

394.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

395.     Plaintiffs Matthew Johnson and Amanda Kobussen (for purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Alaska State Class against Fiat and FCA.

396.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles under § 45.02.103(a)(4).

397.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

398.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8)).

399.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

400.     Fiat and FCA provided these warranties to Plaintiffs and the Alaska State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Alaska State Class members purchased or leased their Class Vehicles.

401.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Alaska State Class were designed to deactivate under real-

1   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2   emissions testing, and therefore, knew that the emission systems contained defects.

3       402.    Plaintiffs and the Alaska State Class reasonably relied on Fiat's and FCA's express

4   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

5   Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Alaska State

6   Class, the Class Vehicles were designed to pollute at higher than legal limits during normal

7   driving, and could not achieve advertised performance and efficiency metrics without this

8   cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

9   therefore breached their express warranty by providing a product containing defects that were

10   never disclosed to Plaintiffs and the Alaska State Class.

11       403.    Any opportunity to cure the express breach is unnecessary and futile.

12       404.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13   Plaintiffs and the Alaska State Class suffered significant damages, and seek damages in an

14   amount to be determined at trial.

15   **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
    **(Alaska Stat. Ann. §§ 45.02.314 and 45.12.212)**

16

17       405.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

18   paragraphs as though fully set forth herein.

19       406.    Plaintiffs Matthew Johnson and Amanda Kobussen (for purposes of this section,

20   "Plaintiffs") bring this action on behalf of themselves and the Alaska State Class against Fiat and

21   FCA.

22       407.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

23   under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles

24   under § 45.02.103(a)(4).

25       408.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

26   motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

27       409.    The Class Vehicles are and were at all relevant times "goods" within the meaning

28   of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8).

410.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat. §§ 45.02.314 and 45.12.212.

411.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

412.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs and the Alaska State Class.  The amount of damages due will be proven at trial.

### 3.   **Arizona**

**BREACH OF EXPRESS WARRANTY**
**(Ariz. Rev. Stat. §§ 47-2313 and 47-2A210)**

413.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

414.   Plaintiff Gregory Giauque (for the purpose of this section, "Plaintiff") bring this action on behalf of himself and the Arizona State Class against Fiat and FCA.

415.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under § 47-2103(A)(4).

416.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

417.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

418.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000

1    miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

2    major emission control components are covered for the first eight years or 80,000 miles,

3    whichever comes first.  These major emission control components subject to the longer warranty

4    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

5    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

6    emission control or emission related parts which fail to function or function improperly due to a

7    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

8    miles, whichever comes first, or, for the major emission control components, for eight years or

9    80,000 miles, whichever comes first.

10           419.    Fiat and FCA provided these warranties to Plaintiff and the Arizona State Class.

11   These warranties formed the basis of the bargain that was reached when Plaintiff and the Arizona

12   State Class purchased or leased their Class Vehicles.

13           420.    However, Fiat and FCA knew or should have known that the warranties were false

14   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

15   sold and leased to Plaintiff and the Arizona State Class were designed to deactivate under real-

16   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

17   emissions testing, and therefore, knew that the emission systems contained defects.

18           421.    Plaintiff and the Arizona State Class reasonably relied on Fiat's and FCA's

19   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

20   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

21   Arizona State Class, the Class Vehicles were designed to pollute at higher than legal limits during

22   normal driving, and could not achieve advertised performance and efficiency metrics without this

23   cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

24   therefore breached their express warranty by providing a product containing defects that were

25   never disclosed to Plaintiff and the Arizona State Class.

26           422.    Any opportunity to cure the express breach is unnecessary and futile.

27

28

423.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Arizona State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212)

424.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

425.     Plaintiff Gregory Giauque (for the purpose of this section, "Plaintiff") bring this action on behalf of himself and the Arizona State Class against Fiat and FCA.

426.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under § 47-2103(A)(4).

427.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

428.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

429.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

430.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

431.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Arizona State Class.  The amount of damages due will be proven at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**4.    Arkansas**

**BREACH OF EXPRESS WARRANTY**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-210)**

432.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

433.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Arkansas State Class against Fiat and FCA.

434.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

435.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

436.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

437.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

438.    Fiat and FCA provided these warranties to Plaintiff and the Arkansas State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Arkansas State Class purchased or leased their Class Vehicles.

439.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Arkansas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

440.    Plaintiff and the Arkansas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Arkansas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Arkansas State Class.

441.    Any opportunity to cure the express breach is unnecessary and futile.

442.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Arkansas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ark. Code Ann. §§ 4-2-314 and 4-2A-212)

443.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

444.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Arkansas State Class against Fiat and FCA.

445.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

446.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

447.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

448.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code Ann. §§ 4-2-314 and 4-2A-212.

449.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

450.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Arkansas State Class.  The amount of damages due will be proven at trial.

### 5.    California

**BREACH OF EXPRESS WARRANTY**
**(Cal. Com. Code §§ 2313 and 10210)**

451.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

452.    Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

453.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

454.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

455.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8)).

456.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

457.    Fiat and FCA provided these warranties to Plaintiffs and the California State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the California State Class purchased or leased their Class Vehicles.

458.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the California State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1    459.    Plaintiffs and the California State Class reasonably relied on Fiat's and FCA's

2    express warranties concerning emissions when purchasing or leasing the Class Vehicles.

3    However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

4    California State Class, the Class Vehicles were designed to pollute at higher than legal limits

5    during normal driving, and could not achieve advertised performance and efficiency metrics

6    without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

7    FCA therefore breached their express warranty by providing a product containing defects that

8    were never disclosed to Plaintiffs and the California State Class.

9    460.    Any opportunity to cure the express breach is unnecessary and futile.

10    461.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

11    Plaintiffs and the California State Class suffered significant damages, and seek damages in an

12    amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Com. Code §§ 2314 and 10212)

15    462.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

16    paragraphs as though fully set forth herein.

17    463.    Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh

18    (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the

19    California State Class against Fiat and FCA.

20    464.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

21    under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under

22    § 2103(1)(d).

23    465.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

24    motor vehicles under Cal. Com. Code § 10103(a)(16).

25    466.    The Class Vehicles are and were at all relevant times "goods" within the meaning

26    of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

27

28

467.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

468.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

469.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the California State Class.  The amount of damages due will be proven at trial.

## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
### (Cal. Civ. Code §§ 1791.2 & 1793.2(d))

470.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

471.     Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

472.     Plaintiffs and the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

473.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

474.     Fiat Chrysler is a "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

475.     Plaintiffs and the California State Class bought/leased new motor vehicles manufactured by Fiat Chrysler.

476.     Fiat Chrysler made express warranties to Plaintiffs and the California State Class within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

-168-

477.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

478.    Fiat and FCA provided these warranties to Plaintiffs and the California State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the California State Class purchased or leased their Class Vehicles.

479.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the California State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

480.    Plaintiffs and the California State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the California State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the California State Class.

481.  Any opportunity to cure the express breach is unnecessary and futile.

482.  As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the California State Class suffered significant damages, and seek damages in an amount to be determined at trial.

483.  Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, CA Plaintiffs and the other California State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR
BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Cal. Civ. Code §§ 1791.1 and 1792)**

484.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

485.  Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

486.  Plaintiffs and the other California State Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

487.  The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

488.  Fiat Chrysler is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

489.  Fiat Chrysler impliedly warranted to Plaintiffs and the other California State Class members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

490.  Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.      Pass without objection in the trade under the contract description.

B.      Are fit for the ordinary purposes for which such goods are used.

C.      Are adequately contained, packaged, and labeled.

D.      Conform to the promises or affirmations of fact made on the container or label.

491.    The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' "clean" diesel engine system.  Because of the defects in the Class Vehicles' EcoDiesel® engine systems, they are not in merchantable condition and thus not fit for ordinary purposes.

492.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' diesel engine system.  The Class Vehicles do not conform to the promises and affirmations made by Fiat Chrysler.

493.    Fiat Chrysler's breach of the implied warranty of merchantability caused damage to Plaintiffs and the California State Class members who purchased or leased the defective vehicles.  The amount of damages due will be proven at trial.

494.    Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the California State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES**
**(Cal. Civ. Code § 1793.2, *et seq.*)**

495.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

496.    Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against Fiat and FCA.

497.    Each class vehicle is covered by express California Emissions Warranties as a matter of law.  *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

498. The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." This provision applies without any time or mileage limitation.

499. The California Emissions Warranties also specifically warrant Class members against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.

500. California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

501. Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

502. Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Fiat Chrysler is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

503. This complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id.*

504. In addition to all other damages and remedies, Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1). Any "third-party dispute resolution process" offered by Defendants does not relieve Defendants from the civil penalty imposed because Defendants are not offering the process to Class members for resolution of these California Emissions

1    Warranties issues and the process is not "substantially" compliant.  *See* Cal. Civ. Code

2    § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

3                              **6.      Colorado**

4                      **BREACH OF EXPRESS WARRANTY**
                       **(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)**
5

6         505.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

7    fully set forth herein.

8         506.    Plaintiffs Tommy Feist, Ryan Montgomery, and John Webb (for the purpose of

9    this section, "Plaintiffs") bring this action on behalf of themselves and the Colorado State Class

10   against Fiat and FCA.

11        507.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

12   vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles

13   under § 4-2-103(1)(d).

14        508.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

15   motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

16        509.    The Class Vehicles are and were at all relevant times "goods" within the meaning

17   of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

18        510.    Federal law requires manufacturers of light-duty vehicles to provide two federal

19   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

20   The Performance Warranty applies to repairs that are required during the first two years or 24,000

21   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

22   major emission control components are covered for the first eight years or 80,000 miles,

23   whichever comes first.  These major emission control components subject to the longer warranty

24   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

25   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

26   emission control or emission related parts which fail to function or function improperly due to a

27   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

28

1    miles, whichever comes first, or, for the major emission control components, for eight years or

2    80,000 miles, whichever comes first.

3        511.    Fiat and FCA provided these warranties to Plaintiffs and the Colorado State Class.

4    These warranties formed the basis of the bargain that was reached when Plaintiffs and the

5    Colorado State Class purchased or leased their Class Vehicles.

6        512.    However, Fiat and FCA knew or should have known that the warranties were false

7    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

8    sold and leased to Plaintiffs and the Colorado State Class were designed to deactivate under real-

9    world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

10   emissions testing, and therefore, knew that the emission systems contained defects.

11       513.    Plaintiffs and the Colorado State Class reasonably relied on Fiat's and FCA's

12   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

13   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

14   Colorado State Class, the Class Vehicles were designed to pollute at higher than legal limits

15   during normal driving, and could not achieve advertised performance and efficiency metrics

16   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

17   FCA therefore breached their express warranty by providing a product containing defects that

18   were never disclosed to Plaintiffs and the Colorado State Class.

19       514.    Any opportunity to cure the express breach is unnecessary and futile.

20       515.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

21   Plaintiffs and the Colorado State Class suffered significant damages, and seek damages in an

22   amount to be determined at trial.

23              **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
                **(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212)**
24

25       516.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

26   paragraphs as though fully set forth herein.

27

28

517.    Plaintiff Tommy Feist, Ryan Montgomery, and John Webb (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Colorado State Class against Fiat and FCA.

518.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

519.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

520.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

521.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

522.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

523.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Colorado State Class.  The amount of damages due will be proven at trial.

**7.    Connecticut**

**BREACH OF EXPRESS WARRANTY**
**(Conn. Gen. Stat. Ann. § 42A-2-313)**

524.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

525.    Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Connecticut State Class against Fiat and FCA.

526.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

527.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

528.     Fiat and FCA provided these warranties to Plaintiff and the Connecticut State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Connecticut State Class purchased or leased their Class Vehicles.

529.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Connecticut State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

530.     Plaintiff and the Connecticut State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Connecticut State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

-176-

1   FCA therefore breached their express warranty by providing a product containing defects that

2   were never disclosed to Plaintiffs and the California State Class.

3        531.    Any opportunity to cure the express breach is unnecessary and futile.

4        532.    Due to Fiat and FCA's breach of warranty as set forth herein, Plaintiff and the

5   Connecticut State Class assert as an additional and/or alternative remedy, as set forth in Conn.

6   Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods and for a return to

7   Plaintiff and the Connecticut State Class of the purchase price of all Class Vehicles currently

8   owned or leased, and for such other incidental and consequential damages as allowed under

9   Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

10       533.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

11  Plaintiff and the Connecticut State Class suffered significant damages, and seek damages in an

12  amount to be determined at trial.

13              **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                **(Conn. Gen. Stat. Ann. § 42A-2-314)**
14

15       534.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

16  paragraphs as though fully set forth herein.

17       535.    Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this

18  action on behalf of himself and the Connecticut State Class against Fiat and FCA.

19       536.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

20  under Conn. Gen. Stat. Ann. § 42a-2-104(1).

21       537.    A warranty that the Class Vehicles were in merchantable condition and fit for the

22  ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann.

23  § 42a-2-314.

24       538.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

25  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

26  Vehicles were not in merchantable condition because their design violated state and federal laws.

27  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

28  federal emission standards.

539.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Connecticut State Class.  The amount of damages due will be proven at trial.

**8.     Delaware**

**BREACH OF EXPRESS WARRANTY**
**(6 Del. Code §§ 2-313 and 2A-210)**

540.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

541.     This Count is brought on behalf of the Delaware State Class against Fiat and FCA.

542.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

543.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

544.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

545.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000

1528982.7

1    miles, whichever comes first, or, for the major emission control components, for eight years or

2    80,000 miles, whichever comes first.

3        546.    Fiat and FCA provided these warranties to the Delaware State Class. These

4    warranties formed the basis of the bargain that was reached when the Delaware State Class

5    purchased or leased their Class Vehicles.

6        547.    However, Fiat and FCA knew or should have known that the warranties were false

7    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

8    sold and leased to the Delaware State Class were designed to deactivate under real-world driving

9    conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions

10   testing, and therefore, knew that the emission systems contained defects.

11       548.    The Delaware State Class reasonably relied on Fiat's and FCA's express

12   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

13   Class Vehicles did not perform as warranted.  Unbeknownst to the Delaware State Class, the

14   Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

15   could not achieve advertised performance and efficiency metrics without this cheating design.

16   This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

17   express warranty by providing a product containing defects that were never disclosed to the

18   Delaware State Class.

19       549.    Any opportunity to cure the express breach is unnecessary and futile.

20       550.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

21   the Delaware State Class suffered significant damages, and seek damages in an amount to be

22   determined at trial.

23                    **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
                              **(6 Del. Code §§ 2-314 and 2A-212)**
24

25       551.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

26   paragraphs as though fully set forth herein.

27       552.    This Count is brought on behalf of the Delaware State Class against Fiat and FCA.

28

553.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

554.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

555.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

556.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

557.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

558.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Delaware State Class.  The amount of damages due will be proven at trial.

**9.    District of Columbia**

**BREACH OF EXPRESS WARRANTY**
**(D.C. Code §§ 28:2-313 and 28:2A-210)**

559.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

560.    This count is brought on behalf of the District of Columbia Class against Fiat and FCA.

561.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

562.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

563.    The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

564.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

565.    Fiat and FCA provided these warranties to the District of Columbia Class. These warranties formed the basis of the bargain that was reached when the District of Columbia Class purchased or leased their Class Vehicles.

566.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the District of Columbia Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

567.    The District of Columbia Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the District of Columbia Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

1   express warranty by providing a product containing defects that were never disclosed to the

2   District of Columbia Class.

3        568.    Any opportunity to cure the express breach is unnecessary and futile.

4        569.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

5   the District of Columbia Class suffered significant damages, and seek damages in an amount to

6   be determined at trial.

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(D.C. Code §§ 28:2-314 and 28:2A-212)**

9        570.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

10   paragraphs as though fully set forth herein.

11        571.    This count is brought on behalf of the District of Columbia Class against Fiat and

12   FCA.

13        572.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

14   under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under

15   § 28:2-103(1)(d).

16        573.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

17   motor vehicles under D.C. Code § 28:2A-103(a)(16).

18        574.    The Class Vehicles are and were at all relevant times "goods" within the meaning

19   of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

20        575.    A warranty that the Class Vehicles were in merchantable condition and fit for the

21   ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-

22   314 and 28:2A-212.

23        576.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

24   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

25   Vehicles were not in merchantable condition because their design violated state and federal laws.

26   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

27   federal emission standards.

28

577.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the District of Columbia Class.  The amount of damages due will be proven at trial.

### 10.    Florida

**BREACH OF EXPRESS WARRANTY**
**(Fla. Stat. §§ 672.313 and 680.21)**

578.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

579.    Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida State Class against Fiat and FCA.

580.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

581.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

582.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

583.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000

miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

584.    Fiat and FCA provided these warranties to Plaintiffs and the Florida State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Florida State Class purchased or leased their Class Vehicles.

585.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Florida State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

586.    Plaintiffs and the Florida State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Florida State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Florida State Class.

587.    Any opportunity to cure the express breach is unnecessary and futile.

588.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Florida State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Fla. Stat. §§ 672.314 and 680.212)

589.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

590.    Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida State Class against Fiat and FCA.

591.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

592.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

593.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

594.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

595.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

596.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Florida State Class.  The amount of damages due will be proven at trial.

### 11.    Georgia

**BREACH OF EXPRESS WARRANTY**
**(Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)**

597.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

598.    Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespie, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section,

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1  "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against Fiat and

2  FCA.

3       599.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

4  vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles

5  under § 11-2-103(1)(d).

6       600.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

7  motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

8       601.    The Class Vehicles are and were at all relevant times "goods" within the meaning

9  of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

10       602.    Federal law requires manufacturers of light-duty vehicles to provide two federal

11  emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

12  The Performance Warranty applies to repairs that are required during the first two years or 24,000

13  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

14  major emission control components are covered for the first eight years or 80,000 miles,

15  whichever comes first.  These major emission control components subject to the longer warranty

16  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

17  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

18  emission control or emission related parts which fail to function or function improperly due to a

19  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

20  miles, whichever comes first, or, for the major emission control components, for eight years or

21  80,000 miles, whichever comes first.

22       603.    Fiat and FCA provided these warranties to Plaintiffs and the Georgia State Class.

23  These warranties formed the basis of the bargain that was reached when Plaintiffs and the

24  Georgia State Class purchased or leased their Class Vehicles.

25       604.    However, Fiat and FCA knew or should have known that the warranties were false

26  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

27  sold and leased to Plaintiffs and the Georgia State Class were designed to deactivate under real-

28

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2    emissions testing, and therefore, knew that the emission systems contained defects.

3         605.    Plaintiffs and the Georgia State Class reasonably relied on Fiat's and FCA's

4    express warranties concerning emissions when purchasing or leasing the Class Vehicles.

5    However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

6    Georgia State Class, the Class Vehicles were designed to pollute at higher than legal limits during

7    normal driving, and could not achieve advertised performance and efficiency metrics without this

8    cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

9    therefore breached their express warranty by providing a product containing defects that were

10   never disclosed to Plaintiffs and the Georgia State Class.

11        606.    Any opportunity to cure the express breach is unnecessary and futile.

12        607.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13   Plaintiffs and the Georgia State Class suffered significant damages, and seek damages in an

14   amount to be determined at trial.

15               **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                 **(Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)**
16

17        608.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

18   paragraphs as though fully set forth herein.

19        609.    Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespie, Jeffrey Griggs,

20   Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section,

21   "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against Fiat and

22   FCA.

23        610.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

24   under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under

25   § 11-2-103(1)(d).

26        611.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

27   motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

28

612. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

613. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

614. Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

615. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Georgia State Class. The amount of damages due will be proven at trial.

### 12. Hawaii

**BREACH OF EXPRESS WARRANTY**
**(Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210)**

616. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

617. This count is brought on behalf of the Hawaii State Class against Fiat and FCA.

618. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

619. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

620. The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

621. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

622.     Fiat and FCA provided these warranties to the Hawaii State Class. These warranties formed the basis of the bargain that was reached when the Hawaii State Class purchased or leased their Class Vehicles.

623.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Hawaii State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

624.     The Hawaii State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Hawaii State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Hawaii State Class.

625.     Any opportunity to cure the express breach is unnecessary and futile.

626.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Hawaii State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212)

627.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

628.     This count is brought on behalf of the Hawaii State Class against Fiat and FCA.

629.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

630.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

631.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

632.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212.

633.     Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

634.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Hawaii State Class.  The amount of damages due will be proven at trial.

-190-

1    **13.    Idaho**

2    **BREACH OF EXPRESS WARRANTY**
     **(Idaho Code §§ 28-2-313 and 28-12-210)**

3

4    635.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6    636.    Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of

7    this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class

8    against Fiat and FCA.

9    637.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

10   vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles

11   under § 28-2-103(1)(d).

12   638.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

13   motor vehicles under Idaho Code § 28-12-103(1)(p).

14   639.    The Class Vehicles are and were at all relevant times "goods" within the meaning

15   of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h)).

16   640.    Federal law requires manufacturers of light-duty vehicles to provide two federal

17   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

18   The Performance Warranty applies to repairs that are required during the first two years or 24,000

19   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

20   major emission control components are covered for the first eight years or 80,000 miles,

21   whichever comes first.  These major emission control components subject to the longer warranty

22   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

23   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

24   emission control or emission related parts which fail to function or function improperly due to a

25   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

26   miles, whichever comes first, or, for the major emission control components, for eight years or

27   80,000 miles, whichever comes first.

28

641.    Fiat and FCA provided these warranties to Plaintiffs and the Idaho State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Idaho State Class purchased or leased their Class Vehicles.

642.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Idaho State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

643.    Plaintiffs and the Idaho State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Idaho State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Idaho State Class.

644.    Any opportunity to cure the express breach is unnecessary and futile.

645.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Idaho State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Idaho Code §§ 28-2-314 and 28-12-212)

646.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

647.    Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class against Fiat and FCA.

648.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

649.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

650.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

651.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant Idaho Code §§ 28-2-314 and 28-12-212.

652.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

653.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Idaho State Class.  The amount of damages due will be proven at trial.

### 14.    Illinois

**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**

654.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

655.    Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Illinois State Class against Fiat and FCA.

656.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

657.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

658.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

659.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

660.    Fiat and FCA provided these warranties to Plaintiff and the Illinois State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Illinois State Class purchased or leased their Class Vehicles.

661.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Illinois State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

662.    Plaintiff and the Illinois State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Illinois State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal

-194-

1    driving, and could not achieve advertised performance and efficiency metrics without this

2    cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

3    therefore breached their express warranty by providing a product containing defects that were

4    never disclosed to Plaintiff and the Illinois State Class.

5    663.    Any opportunity to cure the express breach is unnecessary and futile.

6    664.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

7    Plaintiff and the Illinois State Class suffered significant damages, and seek damages in an amount

8    to be determined at trial.

9    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
     **(810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)**

10

11   665.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

12   paragraphs as though fully set forth herein.

13   666.    Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this

14   action on behalf of himself and the Illinois State Class against Fiat and FCA.

15   667.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

16   under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under

17   § 5/2-103(1)(d).

18   668.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

19   motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

20   669.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h)).

22   670.    A warranty that the Class Vehicles were in merchantable condition and fit for the

23   ordinary purpose for which vehicles are used is implied by law pursuant 810 Ill. Comp. Stat.

24   §§ 28-2-314 and 28-12-212.

25   671.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

26   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

27   Vehicles were not in merchantable condition because their design violated state and federal laws.

28

1528982.7

1    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2    federal emission standards.

3        672.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

4    damage to the Plaintiff and the Illinois State Class.  The amount of damages due will be proven at

5    trial.

6                    **15.    <u>Indiana</u>**

7                    **BREACH OF EXPRESS WARRANTY**
                     **(Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)**
8

9        673.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

10   fully set forth herein.

11       674.    Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this

12   action on behalf of himself and the Indiana State Class against Fiat and FCA.

13       675.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

14   vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles

15   under § 26-1-2-103(1)(d).

16       676.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

17   motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

18       677.    The Class Vehicles are and were at all relevant times "goods" within the meaning

19   of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

20       678.    Federal law requires manufacturers of light-duty vehicles to provide two federal

21   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

22   The Performance Warranty applies to repairs that are required during the first two years or 24,000

23   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

24   major emission control components are covered for the first eight years or 80,000 miles,

25   whichever comes first.  These major emission control components subject to the longer warranty

26   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

27   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

28   emission control or emission related parts which fail to function or function improperly due to a

1    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

2    miles, whichever comes first, or, for the major emission control components, for eight years or

3    80,000 miles, whichever comes first.

4         679.    Fiat and FCA provided these warranties to Plaintiff and the Indiana State Class.

5    These warranties formed the basis of the bargain that was reached when Plaintiff and the Indiana

6    State Class purchased or leased their Class Vehicles.

7         680.    However, Fiat and FCA knew or should have known that the warranties were false

8    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

9    sold and leased to Plaintiff and the Indiana State Class were designed to deactivate under real-

10   world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

11   emissions testing, and therefore, knew that the emission systems contained defects.

12        681.    Plaintiff and the Indiana State Class reasonably relied on Fiat's and FCA's express

13   warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

14   Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Indiana State

15   Class, the Class Vehicles were designed to pollute at higher than legal limits during normal

16   driving, and could not achieve advertised performance and efficiency metrics without this

17   cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

18   therefore breached their express warranty by providing a product containing defects that were

19   never disclosed to Plaintiff and the Indiana State Class.

20        682.    Any opportunity to cure the express breach is unnecessary and futile.

21        683.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

22   Plaintiff and the Indiana State Class suffered significant damages, and seek damages in an amount

23   to be determined at trial.

24                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                          **(Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)**
25

26        684.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

27   paragraphs as though fully set forth herein.

28

1528982.7

685.   Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Indiana State Class against Fiat and FCA.

686.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

687.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

688.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

689.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

690.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

691.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Indiana State Class.  The amount of damages due will be proven at trial.

## 16.   Iowa

### BREACH OF EXPRESS WARRANTY
### (Iowa Code §§ 554.2313 and 554.13210)

692.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

693.   Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Iowa State Class against Fiat and FCA.

694.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

695.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

696.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

697.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Iowa Code §§ 554.2314 and 554.13212)

698.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

699.    Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Iowa State Class against Fiat and FCA.

700.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1    701.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

2    motor vehicles under Iowa Code § 554.13103(1)(p).

3    702.   The Class Vehicles are and were at all relevant times "goods" within the meaning

4    of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

5    703.   A warranty that the Class Vehicles were in merchantable condition and fit for the

6    ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code

7    §§ 554.2314 and 554.13212.

8    704.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

9    condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

10   Vehicles were not in merchantable condition because their design violated state and federal laws.

11   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

12   federal emission standards.

13   705.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

14   damage to Plaintiff and the Iowa State Class.  The amount of damages due will be proven at trial.

### 17.   Kansas

**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210)**

18   706.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

19   fully set forth herein.

20   707.   This count is brought on behalf of the Kansas State Class against Fiat and FCA.

21   708.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

22   vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles

23   under § 84-2-103(1)(d).

24   709.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

25   motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

26   710.   The Class Vehicles are and were at all relevant times "goods" within the meaning

27   of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

28

711.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

712.     Fiat and FCA provided these warranties to the Kansas State Class. These warranties formed the basis of the bargain that was reached when the Kansas State Class purchased or leased their Class Vehicles.

713.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Kansas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

714.     The Kansas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Kansas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Kansas State Class.

715.     Any opportunity to cure the express breach is unnecessary and futile.

716.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Kansas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

717.     Fiat and FCA provided these warranties to the Kansas State Class. These warranties formed the basis of the bargain that was reached when the Kansas State Class purchased or leased their Class Vehicles.

718.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Kansas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

719.     The Kansas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Kansas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Kansas State Class.

720.     Any opportunity to cure the express breach is unnecessary and futile.

721.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Kansas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)

722.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

723.    This count is brought on behalf of the Kansas State Class against Fiat and FCA.

724.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

725.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

726.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

727.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212.

728.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

729.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Kansas State Class.  The amount of damages due will be proven at trial.

**18.    Kentucky**

**BREACH OF EXPRESS WARRANTY**
**(KY. REV. STAT. §§ 335.2-313 and 355.2A-210)**

730.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

731.    Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Kentucky State Class against Fiat and FCA.

732.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

733.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

734.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

735.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

736.    Fiat and FCA provided these warranties to Plaintiff and the Kentucky State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Kentucky State Class purchased or leased their Class Vehicles.

737.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Kentucky State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

738.    Plaintiff and the Kentucky State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Kentucky State Class, the Class Vehicles were designed to pollute at higher than legal limits

1    during normal driving, and could not achieve advertised performance and efficiency metrics

2    without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

3    FCA therefore breached their express warranty by providing a product containing defects that

4    were never disclosed to Plaintiff and the Kentucky State Class.

5         739.    Any opportunity to cure the express breach is unnecessary and futile.

6         740.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

7    Plaintiff and the Kentucky State Class suffered significant damages, and seek damages in an

8    amount to be determined at trial.

9                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                        **(KY. REV. STAT. §§ 335.2-314 and 355.2A-212)**
10

11        741.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

12   paragraphs as though fully set forth herein.

13        742.    Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action

14   on behalf of himself and the Kentucky State Class against Fiat and FCA.

15        743.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

16   under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under

17   § 355.2-103(1)(d).

18        744.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

19   motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

20        745.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

22        746.    A warranty that the Class Vehicles were in merchantable condition and fit for the

23   ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat.

24   §§ 335.2-314 and 355.2A-212.

25        747.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

26   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

27   Vehicles were not in merchantable condition because their design violated state and federal laws.

28

1    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2    federal emission standards.

3        748.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

4    damage to the Plaintiff and the Kentucky State Class.  The amount of damages due will be proven

5    at trial.

6                    **19.    Louisiana**

7            **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
             **WARRANTY AGAINST REDHIBITORY DEFECTS**
8                    **(La. Civ. Code Art. 2520, 2524)**

9        749.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

10   paragraphs as though fully set forth herein.

11       750.    Plaintiffs Jamie Broom, Samuel Price, and John Radziewicz (for the purpose of

12   this section, "Plaintiffs") bring this action on behalf of themselves and the Louisiana State Class

13   against Fiat and FCA.

14       751.    Fiat and FCA were at all relevant times "merchants" with respect to motor

15   vehicles.

16       752.    A warranty that the Class Vehicles were in merchantable condition and fit for the

17   ordinary purpose for which vehicles are used is implied by law in the instant transactions.

18       753.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

19   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

20   Vehicles were not in merchantable condition because their design violated state and federal laws.

21   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

22   federal emission standards.

23       754.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

24   damage to the Plaintiffs and the Louisiana State Class.  The amount of damages due will be

25   proven at trial.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 20.    **Maine**

**BREACH OF EXPRESS WARRANTY**
**(ME. REV. STAT. TIT. 11 §§ 2-313 and 2-1210)**

755.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

756.    Plaintiff Edward Devault (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against Fiat and FCA.

757.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

758.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

759.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

760.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

761.    Fiat and FCA provided these warranties to Plaintiff and the Maine State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Maine State Class purchased or leased their Class Vehicles.

762.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Maine State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

763.    Plaintiff and the Maine State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Maine State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Maine State Class.

764.    Any opportunity to cure the express breach is unnecessary and futile.

765.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Maine State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)

766.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

767.    Plaintiff Edward Devault (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against Fiat and FCA.

-208-

768.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

769.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

770.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

771.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

772.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

773.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Maine State Class.  The amount of damages due will be proven at trial.

### 21.    Maryland

**BREACH OF EXPRESS WARRANTY**
**(Md. Code, Com. Law §§ 2-313 and 2a-210)**

774.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

775.    Plaintiffs Kyle and Jessica Heidlebaugh and Donald Korrell II (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against Fiat and FCA.

776.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1)  and "sellers" of motor vehicles under § 2-103(1)(d).

777.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

778.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

779.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

780.    Fiat and FCA provided these warranties to Plaintiffs and the Maryland State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Maryland State Class purchased or leased their Class Vehicles.

781.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Maryland State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

782.    Plaintiffs and the Maryland State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Maryland State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Maryland State Class.

783.    Any opportunity to cure the express breach is unnecessary and futile.

784.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Maryland State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Md. Code Com. Law §§ 2-314 and 2A-212)

785.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

786.    Plaintiffs Kyle and Jessica Heidlebaugh and Donald Korrell II (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against Fiat and FCA.

787.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1)  and "sellers" of motor vehicles under § 2-103(1)(d).

788.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

789.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

790.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314 and 2a-212.

791.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

792.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Maryland State Class.  The amount of damages due will be proven at trial.

### 22.    Massachusetts

### BREACH OF EXPRESS WARRANTY
### (Mass. Gen. Laws Ch. 106 §§ 2-313 and 2A-210)

793.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

794.    Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against Fiat and FCA.

795.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

796.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

797.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

798.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

799.    Fiat and FCA provided these warranties to Plaintiff and the Massachusetts State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Massachusetts State Class purchased or leased their Class Vehicles.

800.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Massachusetts State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

801.    Plaintiff and the Massachusetts State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Massachusetts State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Massachusetts State Class.

802.    Any opportunity to cure the express breach is unnecessary and futile.

803.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Massachusetts State Class suffered significant damages, and seek damages in an amount to be determined at trial.

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mass. Gen. Laws Ch. 106 §§ 2-314 and 2A-212)**

804.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

805.    Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against Fiat and FCA.

806.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

807.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

808.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

809.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

810.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

811.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Massachusetts State Class.  The amount of damages due will be proven at trial.

1

2

3

**23.   Michigan**

**BREACH OF EXPRESS WARRANTY**
**(Mich. Comp. Laws §§ 440.2313 and 440.2860)**

4        812.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6        813.    Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action

7    on behalf of himself and the Michigan State Class against Fiat and FCA.

8        814.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

9    vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under

10   § 440.2103(1)(c).

11       815.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

12   motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

13       816.    The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

15       817.    Federal law requires manufacturers of light-duty vehicles to provide two federal

16   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

17   The Performance Warranty applies to repairs that are required during the first two years or 24,000

18   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

19   major emission control components are covered for the first eight years or 80,000 miles,

20   whichever comes first.  These major emission control components subject to the longer warranty

21   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

22   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

23   emission control or emission related parts which fail to function or function improperly due to a

24   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

25   miles, whichever comes first, or, for the major emission control components, for eight years or

26   80,000 miles, whichever comes first.

27

28

818. Fiat and FCA provided these warranties to Plaintiff and the Michigan State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Michigan State Class purchased or leased their Class Vehicles.

819. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Michigan State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

820. Plaintiff and the Michigan State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiff and the Michigan State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Michigan State Class.

821. Any opportunity to cure the express breach is unnecessary and futile.

822. As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Michigan State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Mich. Comp. Laws §§ 440.2314 and 440.2860)

823. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

824. Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Michigan State Class against Fiat and FCA.

825. Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

826.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

827.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

828.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

829.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

830.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Michigan State Class. The amount of damages due will be proven at trial.

### 24.    Minnesota

**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**

831.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

832.    Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against Fiat and FCA.

833.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

834.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

835.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

836.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

837.     Fiat and FCA provided these warranties to Plaintiff and the Minnesota State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Minnesota State Class purchased or leased their Class Vehicles.

838.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Minnesota State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

839.     Plaintiff and the Minnesota State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Minnesota State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

-218-

FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Minnesota State Class.

840.    Any opportunity to cure the express breach is unnecessary and futile.

841.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Minnesota State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)

842.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

843.    Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against Fiat and FCA.

844.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

845.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

846.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

847.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

848.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

849.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Minnesota State Class.  The amount of damages due will be proven at trial.

### 25.     Mississippi

**BREACH OF EXPRESS WARRANTY**
**(Miss. Code §§ 75-2-313 and 75-2A-210)**

850.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

851.     Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Mississippi State Class against Fiat and FCA.

852.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

853.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

854.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

855.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

856.    Fiat and FCA provided these warranties to Plaintiff and the Mississippi State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Mississippi State Class purchased or leased their Class Vehicles.

857.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Mississippi State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

858.    Plaintiff and the Mississippi State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Mississippi State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Mississippi State Class.

859.    Any opportunity to cure the express breach is unnecessary and futile.

860.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Mississippi State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Miss. Code §§ 75-2-314 and 75-2A-212)

861.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

862.    Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Mississippi State Class against Fiat and FCA.

863.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

864.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

865.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

866.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

867.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

868.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Mississippi State Class.  The amount of damages due will be proven at trial.

### 26.    Missouri

**BREACH OF EXPRESS WARRANTY**
**(Mo. Stat. §§ 400.2-313 and 400.2A-210)**

869.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

870.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Missouri State Class against Fiat and FCA.

871.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

872.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

873.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

874.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

875.     Fiat and FCA provided these warranties to Plaintiff and the Missouri State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Missouri State Class purchased or leased their Class Vehicles.

876.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Missouri State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

877.     Plaintiff and the Missouri State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Missouri State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Missouri State Class.

1        878.    Any opportunity to cure the express breach is unnecessary and futile.

2        879.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

3   Plaintiff and the Missouri State Class suffered significant damages, and seek damages in an

4   amount to be determined at trial.

5                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                           **(Mo. Stat. §§ 400.2-314 and 400.2A-212)**
6

7        880.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

8   paragraphs as though fully set forth herein.

9        881.    Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this

10   action on behalf of himself and the Missouri State Class against Fiat and FCA.

11        882.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

12   under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

13        883.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

14   motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

15        884.    The Class Vehicles are and were at all relevant times "goods" within the meaning

16   of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

17        885.    A warranty that the Class Vehicles were in merchantable condition and fit for the

18   ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314

19   and Mo. Stat. § 400.2A-212.

20        886.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

21   condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class

22   Vehicles were not in merchantable condition because their design violated state and federal laws.

23   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

24   federal emission standards.

25        887.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

26   damage to Plaintiff and the Missouri State Class. The amount of damages due will be proven at

27   trial.

28

27.     **Montana**

**BREACH OF EXPRESS WARRANTY**
**(Mont. Code §§ 30-2-313 and 30-2A-210)**

888.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

889.     Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Montana State against Fiat and FCA.

890.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

891.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

892.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

893.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

894.     Fiat and FCA provided these warranties to Plaintiff and the Montana State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Montana State Class purchased or leased their Class Vehicles.

1    895.    However, Fiat and FCA knew or should have known that the warranties were false

2    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

3    sold and leased to Plaintiff and the Montana State Class were designed to deactivate under real-

4    world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

5    emissions testing, and therefore, knew that the emission systems contained defects.

6    896.    Plaintiff and the Montana State Class reasonably relied on Fiat's and FCA's

7    express warranties concerning emissions when purchasing or leasing the Class Vehicles.

8    However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

9    Montana State Class, the Class Vehicles were designed to pollute at higher than legal limits

10   during normal driving, and could not achieve advertised performance and efficiency metrics

11   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

12   FCA therefore breached their express warranty by providing a product containing defects that

13   were never disclosed to Plaintiff and the Montana State Class.

14   897.    Any opportunity to cure the express breach is unnecessary and futile.

15   898.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

16   Plaintiff and the Montana State Class suffered significant damages, and seek damages in an

17   amount to be determined at trial.

18   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
     **(Mont. Code §§ 30-2-314 and 30-2A-212)**
19

20   899.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

21   paragraphs as though fully set forth herein.

22   900.    Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this

23   action on behalf of himself and the Montana State against Fiat and FCA.

24   901.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

25   under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

26   902.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

27   motor vehicles under Mont. Code § 30-2A-103(1)(p).

28

903.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

904.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

905.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

906.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Montana State Class.  The amount of damages due will be proven at trial.

## 28.    Nebraska

### BREACH OF EXPRESS WARRANTY
### (Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210)

907.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

908.    Plaintiffs Connie Hood and Richard Lindholm (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Nebraska State Class against Fiat and FCA.

909.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

910.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

911.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

912.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

913.    Fiat and FCA provided these warranties to Plaintiffs and the Nebraska State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Nebraska State Class purchased or leased their Class Vehicles.

914.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Nebraska State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

915.    Plaintiffs and the Nebraska State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Nebraska State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Nebraska State Class.

916.    Any opportunity to cure the express breach is unnecessary and futile.

917.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Nebraska State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212)

918.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

919.    Plaintiffs Connie Hood and Richard Lindholm (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Nebraska State Class against Fiat and FCA.

920.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

921.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

922.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

923.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

924.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

925.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs and the Nebraska State Class.  The amount of damages due will be proven at trial.

1

**29.   Nevada**

2

**BREACH OF EXPRESS WARRANTY**
**(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)**

3

4       926.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6       927.    Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings

7    this action on behalf of himself and the Nevada State Class against Fiat and FCA.

8       928.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

9    vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under

10   § 104.2103(1)(c).

11      929.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

12   motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

13      930.    The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

15      931.    Federal law requires manufacturers of light-duty vehicles to provide two federal

16   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

17   The Performance Warranty applies to repairs that are required during the first two years or 24,000

18   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

19   major emission control components are covered for the first eight years or 80,000 miles,

20   whichever comes first.  These major emission control components subject to the longer warranty

21   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

22   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

23   emission control or emission related parts which fail to function or function improperly due to a

24   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

25   miles, whichever comes first, or, for the major emission control components, for eight years or

26   80,000 miles, whichever comes first.

27

28

932.    Fiat and FCA provided these warranties to Plaintiff and the Nevada State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Nevada State Class purchased or leased their Class Vehicles.

933.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Nevada State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

934.    Plaintiff and the Nevada State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Nevada State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Nevada State Class.

935.    Any opportunity to cure the express breach is unnecessary and futile.

936.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Nevada State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Nev. Rev. Stat. §§ 104.2314 and 104A.2212)

937.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

938.    Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Nevada State Class against Fiat and FCA.

939.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

940.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

941.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

942.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

943.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

944.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Nevada State Class.  The amount of damages due will be proven at trial.

### 30.   New Hampshire

**BREACH OF EXPRESS WARRANTY**
**(N.H. Rev. Stat. §§ 382-A:2-313 and 2A-210)**

945.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

946.   This count is brought on behalf of the New Hampshire State Class against Fiat and FCA.

947.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

948.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

949.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

950.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

951.    Fiat and FCA provided these warranties to the New Hampshire State Class. These warranties formed the basis of the bargain that was reached when the New Hampshire State Class purchased or leased their Class Vehicles.

952.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the New Hampshire State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

953.    The New Hampshire State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the New Hampshire State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

1  express warranty by providing a product containing defects that were never disclosed to the New

2  Hampshire State Class.

3        954.    Any opportunity to cure the express breach is unnecessary and futile.

4        955.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

5  the New Hampshire State Class suffered significant damages, and seek damages in an amount to

6  be determined at trial.

7                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                    **(N.H. Rev. Stat. §§ 382-A:2-314 and 2A-212)**
8

9        956.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

10  paragraphs as though fully set forth herein.

11        957.    This count is brought on behalf of the New Hampshire State Class against Fiat and

12  FCA.

13        958.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

14  under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-

15  103(1)(d).

16        959.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

17  motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

18        960.    The Class Vehicles are and were at all relevant times "goods" within the meaning

19  of N.H. Rev. Stat. §§ 382-A:2-105(1) and  382-A:2A-103(1)(h).

20        961.    A warranty that the Class Vehicles were in merchantable condition and fit for the

21  ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat.

22  §§ 382-A:2-314 and 382-A:2A-212.

23        962.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

24  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

25  Vehicles were not in merchantable condition because their design violated state and federal laws.

26  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

27  federal emission standards.

28

1528982.7

963.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the New Hampshire State Class.  The amount of damages due will be proven at trial.

**31.    New Jersey**

**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. § 12A:2-313 and 2A-210)**

964.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

965.    Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against Fiat and FCA.

966.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

967.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

968.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h),

969.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

970.    Fiat and FCA provided these warranties to Plaintiffs and the New Jersey State

Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

New Jersey State Class purchased or leased their Class Vehicles.

971.    However, Fiat and FCA knew or should have known that the warranties were false

and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

sold and leased to Plaintiffs and the New Jersey State Class were designed to deactivate under

real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

undergoing emissions testing, and therefore, knew that the emission systems contained defects.

972.    Plaintiffs and the New Jersey State Class reasonably relied on Fiat's and FCA's

express warranties concerning emissions when purchasing or leasing the Class Vehicles.

However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

New Jersey State Class, the Class Vehicles were designed to pollute at higher than legal limits

during normal driving, and could not achieve advertised performance and efficiency metrics

without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

FCA therefore breached their express warranty by providing a product containing defects that

were never disclosed to Plaintiffs and the New Jersey State Class.

973.    Any opportunity to cure the express breach is unnecessary and futile.

974.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

Plaintiffs and the New Jersey State Class suffered significant damages, and seek damages in an

amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. Stat. Ann. § 12A:2-314 and 2A-212)

975.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

976.    Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section,

"Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against Fiat

and FCA.

1528982.7

1    977.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

2    under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

3    978.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

4    motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

5    979.    The Class Vehicles are and were at all relevant times "goods" within the meaning

6    of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

7    980.    A warranty that the Class Vehicles were in merchantable condition and fit for the

8    ordinary purpose for which vehicles are used is implied by law pursuant to N.J. Stat. Ann.

9    §§ 12A:2-314 and 2A-212.

10    981.    Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

11    condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

12    Vehicles were not in merchantable condition because their design violated state and federal laws.

13    The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

14    federal emission standards.

15    982.    Fiat's and FCA's breaches of the implied warranty of merchantability caused

16    damage to the Plaintiffs and the New Jersey State Class.  The amount of damages due will be

17    proven at trial.

18    **32.**    **New Mexico**

19    **BREACH OF EXPRESS WARRANTY**
**(N.M. Stat. §§ 55-2-313 and 55-2A-210)**

20

21    983.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

22    fully set forth herein.

23    984.    Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section,

24    "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against

25    Fiat and FCA.

26    985.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

27    vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

28

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

986.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

987.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

988.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

989.     Fiat and FCA provided these warranties to Plaintiffs and the New Mexico State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the New Mexico State Class purchased or leased their Class Vehicles.

990.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the New Mexico State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

991.     Plaintiffs and the New Mexico State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the New Mexico State Class, the Class Vehicles were designed to pollute at higher than legal limits

1   during normal driving, and could not achieve advertised performance and efficiency metrics

2   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

3   FCA therefore breached their express warranty by providing a product containing defects that

4   were never disclosed to Plaintiffs and the New Mexico State Class.

5        992.   Any opportunity to cure the express breach is unnecessary and futile.

6        993.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

7   the Plaintiffs and New Mexico State Class suffered significant damages, and seek damages in an

8   amount to be determined at trial.

9
                     **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
10                            **(N.M. Stat. §§ 55-2-314 and 55-2A-212)**

11       994.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

12  paragraphs as though fully set forth herein.

13       995.   Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section,

14  "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against

15  Fiat and FCA.

16       996.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

17  under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

18       997.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

19  motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

20       998.   The Class Vehicles are and were at all relevant times "goods" within the meaning

21  of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

22       999.   A warranty that the Class Vehicles were in merchantable condition and fit for the

23  ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-

24  314 and 55-2A-212.

25       1000.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

26  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

27  Vehicles were not in merchantable condition because their design violated state and federal laws.

28

1528982.7

1   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2   federal emission standards.

3       1001.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

4   damage to Plaintiffs and the New Mexico State Class.  The amount of damages due will be

5   proven at trial.

6           **33.    New York**

7           **BREACH OF EXPRESS WARRANTY**
           **(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**
8

9       1002.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

10   fully set forth herein.

11      1003.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the

12   purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York

13   State Class against Fiat and FCA.

14      1004.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

15   vehicles under N.Y. UCC Law §  2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

16      1005.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

17   motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

18      1006.   The Class Vehicles are and were at all relevant times "goods" within the meaning

19   of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

20      1007.   Federal law requires manufacturers of light-duty vehicles to provide two federal

21   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

22   The Performance Warranty applies to repairs that are required during the first two years or 24,000

23   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

24   major emission control components are covered for the first eight years or 80,000 miles,

25   whichever comes first.  These major emission control components subject to the longer warranty

26   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

27   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

28   emission control or emission related parts which fail to function or function improperly due to a

defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1008.   Fiat and FCA provided these warranties to Plaintiffs and the New York State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the New York State Class purchased or leased their Class Vehicles.

1009.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the New York State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1010.   Plaintiffs and the New York State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the New York State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the New York State Class.

1011.   Any opportunity to cure the express breach is unnecessary and futile.

1012.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the New York State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)

1013.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1014.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York State Class against Fiat and FCA.

1015.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law §  2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1016.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1017.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1018.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

1019.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1020.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the New York State Class.  The amount of damages due will be proven at trial.

### 34.   North Carolina

#### BREACH OF EXPRESS WARRANTY
#### (N.C. Gen. Stat. §§ 25-2-313 and 252A-210)

1021.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1022.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against Fiat and FCA.

1023.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1024.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1025.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).5.

1026.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1027.   Fiat and FCA provided these warranties to Plaintiffs and the North Carolina State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the North Carolina State Class purchased or leased their Class Vehicles.

1028.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the North Carolina State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1029.   Plaintiffs and the North Carolina State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the North Carolina State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the North Carolina State Class.

1030.   Any opportunity to cure the express breach is unnecessary and futile.

1031.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the North Carolina State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. §§ 25-2-314 AND 252A-212)

1032.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1033.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster III (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against Fiat and FCA.

1034.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1035.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1036.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).5.

1037.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. § 25-2-314 and § 25-2A-212.

-244-

1038.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1039.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the North Carolina State Class.  The amount of damages due will be proven at trial.

### 35.   North Dakota

**BREACH OF EXPRESS WARRANTY**
**(N.D. Cent. Code §§ 41-02-30 and 41-02.1-19)**

1040.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1041.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the North Dakota State Class against Fiat and FCA.

1042.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1043.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1044.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).5.

1045.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

1    include the catalytic converters, the electronic engine control unit (ECU), and the onboard

2    emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

3    emission control or emission related parts which fail to function or function improperly due to a

4    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

5    miles, whichever comes first, or, for the major emission control components, for eight years or

6    80,000 miles, whichever comes first.

7    1046.   Fiat and FCA provided these warranties to Plaintiff and the North Dakota State

8    Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the

9    North Dakota State Class purchased or leased their Class Vehicles.

10   1047.   However, Fiat and FCA knew or should have known that the warranties were false

11   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

12   sold and leased to Plaintiff and the North Dakota State Class were designed to deactivate under

13   real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

14   undergoing emissions testing, and therefore, knew that the emission systems contained defects.

15   1048.   Plaintiff and the North Dakota State Class reasonably relied on Fiat's and FCA's

16   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

17   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

18   North Dakota State Class, the Class Vehicles were designed to pollute at higher than legal limits

19   during normal driving, and could not achieve advertised performance and efficiency metrics

20   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

21   FCA therefore breached their express warranty by providing a product containing defects that

22   were never disclosed to Plaintiff and the North Dakota State Class.

23   1049.   Any opportunity to cure the express breach is unnecessary and futile.

24   1050.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

25   Plaintiff and the North Dakota State Class suffered significant damages, and seek damages in an

26   amount to be determined at trial.

27

28

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.D. Cent. Code §§ 41-02-31 and 41-02.1-21)**

1051.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1052.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the North Dakota State Class against Fiat and FCA.

1053.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1054.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1055.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).5.

1056.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code §§ 41-02-31 and 41-02.1-21.

1057.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1058.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the North Dakota State Class.  The amount of damages due will be proven at trial.

**36.    Ohio**

**BREACH OF EXPRESS WARRANTY**
**(Ohio Rev. Code § 1302.26, *et seq.*) (U.C.C. §2-313))**

1059.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1060.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Ohio State Class against Fiat and FCA.

1061.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

1062.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

1063.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

1064.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1065.   Fiat and FCA provided these warranties to Plaintiff and the Ohio State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Ohio State Class purchased or leased their Class Vehicles.

1066.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Ohio State Class were designed to deactivate under real-world

1  driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

2  emissions testing, and therefore, knew that the emission systems contained defects.

3      1067.  Plaintiff and the Ohio State Class reasonably relied on Fiat's and FCA's express

4  warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

5  Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Ohio State Class,

6  the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

7  could not achieve advertised performance and efficiency metrics without this cheating design.

8  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

9  express warranty by providing a product containing defects that were never disclosed to Plaintiff

10  and the Ohio State Class.

11      1068.  Any opportunity to cure the express breach is unnecessary and futile.

12      1069.  As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13  Plaintiff and the Ohio State Class suffered significant damages, and seek damages in an amount

14  to be determined at trial.

15  **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)**

16

17      1070.  Plaintiffs reallege and incorporate by reference all allegations of the preceding

18  paragraphs as though fully set forth herein.

19      1071.  Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

20  on behalf of himself and the Ohio State Class against Fiat and FCA.

21      1072.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

22  under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under

23  § 1302.01(4).

24      1073.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

25  motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

26      1074.  The Class Vehicles are and were at all relevant times "goods" within the meaning

27  of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

28

1075.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

1076.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1077.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Ohio State Class.  The amount of damages due will be proven at trial.

### 37.   **Oklahoma**

**BREACH OF EXPRESS WARRANTY**
**(Okla. Stat. Tit. 12A §§ 2-313 and 2A-210)**

1078.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1079.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Oklahoma State Class against Fiat and FCA.

1080.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1081.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1082.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1083.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

1  major emission control components are covered for the first eight years or 80,000 miles,

2  whichever comes first.  These major emission control components subject to the longer warranty

3  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

4  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

5  emission control or emission related parts which fail to function or function improperly due to a

6  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

7  miles, whichever comes first, or, for the major emission control components, for eight years or

8  80,000 miles, whichever comes first.

9       1084.   Fiat and FCA provided these warranties to Plaintiff and the Oklahoma State Class.

10  These warranties formed the basis of the bargain that was reached when Plaintiff and the

11  Oklahoma State Class purchased or leased their Class Vehicles.

12       1085.   However, Fiat and FCA knew or should have known that the warranties were false

13  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

14  sold and leased to Plaintiff and the Oklahoma State Class were designed to deactivate under real-

15  world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

16  emissions testing, and therefore, knew that the emission systems contained defects.

17       1086.   Plaintiff and the Oklahoma State Class reasonably relied on Fiat's and FCA's

18  express warranties concerning emissions when purchasing or leasing the Class Vehicles.

19  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the

20  Oklahoma State Class, the Class Vehicles were designed to pollute at higher than legal limits

21  during normal driving, and could not achieve advertised performance and efficiency metrics

22  without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

23  FCA therefore breached their express warranty by providing a product containing defects that

24  were never disclosed to Plaintiff and the Oklahoma State Class.

25       1087.   Any opportunity to cure the express breach is unnecessary and futile.

26       1088.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

27  Plaintiff and the Oklahoma State Class suffered significant damages, and seek damages in an

28  amount to be determined at trial.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)**

1089.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1090.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Oklahoma State Class against Fiat and FCA.

1091.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1092.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1093.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1094.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

1095.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1096.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Oklahoma State Class.  The amount of damages due will be proven at trial.

1528982.7

1      **38.    Oregon**

2      **BREACH OF EXPRESS WARRANTY**
3      **(Or. Rev. Stat. §§ 72.3130 and 72A.2100)**

4      1097.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

5      fully set forth herein.

6      1098.   Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section,

7      "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against Fiat and

8      FCA.

9      1099.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

10     vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles

11     under § 72.1030(1)(d).

12     1100.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

13     motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

14     1101.   The Class Vehicles are and were at all relevant times "goods" within the meaning

15     of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

16     1102.   Federal law requires manufacturers of light-duty vehicles to provide two federal

17     emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

18     The Performance Warranty applies to repairs that are required during the first two years or 24,000

19     miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

20     major emission control components are covered for the first eight years or 80,000 miles,

21     whichever comes first.  These major emission control components subject to the longer warranty

22     include the catalytic converters, the electronic engine control unit (ECU), and the onboard

23     emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

24     emission control or emission related parts which fail to function or function improperly due to a

25     defect in materials or workmanship.  This warranty provides protection for two years or 24,000

26     miles, whichever comes first, or, for the major emission control components, for eight years or

27     80,000 miles, whichever comes first.

28

1528982.7

1103.   Fiat and FCA provided these warranties to Plaintiffs and the Oregon State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Oregon State Class purchased or leased their Class Vehicles.

1104.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Oregon State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1105.   Plaintiffs and the Oregon State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Oregon State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Oregon State Class.

1106.   Any opportunity to cure the express breach is unnecessary and futile.

1107.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Oregon State Class suffered significant damages, and seek damages in an amount to be determined at trial

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Or. Rev. Stat. § 72.3140 and 72A.2120)

1108.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1109.   Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against Fiat and FCA.

1110.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1111.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1112.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1113.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

1114.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1115.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Oregon State Class.  The amount of damages due will be proven at trial.

**39.    Pennsylvania**

**BREACH OF EXPRESS WARRANTY**
**(13 PA. CONS. STAT.  §§ 2313 and 2A210)**

1116.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1117.   Plaintiffs Kyle and Jessica Heidlebaugh and Donald Korrell II (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against Fiat and FCA.

1118.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

1119.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1120.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1121.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1122.   Fiat and FCA provided these warranties to Plaintiffs and the Pennsylvania State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Pennsylvania State Class purchased or leased their Class Vehicles.

1123.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Pennsylvania State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1124.   Plaintiffs and the Pennsylvania State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Pennsylvania State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Pennsylvania State Class.

1125.   Any opportunity to cure the express breach is unnecessary and futile.

1126.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Pennsylvania State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 Pa. Cons. Stat. §§ 2314 and 2A212)

1127.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1128.   Plaintiffs Kyle and Jessica Heidlebaugh and Donald Korrell II (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against Fiat and FCA.

1129.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

1130.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1131.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1132.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

1133.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1134.  Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Pennsylvania State Class.  The amount of damages due will be proven at trial.

### 40.  Rhode Island

**BREACH OF EXPRESS WARRANTY**
**(R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210)**

1135.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1136.  This count is brought on behalf of the Rhode Island State Class against Fiat and FCA.

1137.  Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1138.  With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1139.  The Class Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1140.  Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

1   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

2   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

3   emission control or emission related parts which fail to function or function improperly due to a

4   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

5   miles, whichever comes first, or, for the major emission control components, for eight years or

6   80,000 miles, whichever comes first.

7       1141.   Fiat and FCA provided these warranties to the Rhode Island State Class. These

8   warranties formed the basis of the bargain that was reached when the Rhode Island State Class

9   purchased or leased their Class Vehicles.

10      1142.   However, Fiat and FCA knew or should have known that the warranties were false

11  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

12  sold and leased to the Rhode Island State Class were designed to deactivate under real-world

13  driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

14  emissions testing, and therefore, knew that the emission systems contained defects.

15      1143.   The Rhode Island State Class reasonably relied on Fiat's and FCA's express

16  warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

17  Class Vehicles did not perform as warranted.  Unbeknownst to the Rhode Island State Class, the

18  Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

19  could not achieve advertised performance and efficiency metrics without this cheating design.

20  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

21  express warranty by providing a product containing defects that were never disclosed to the

22  Rhode Island State Class.

23      1144.   Any opportunity to cure the express breach is unnecessary and futile.

24      1145.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

25  the Rhode Island State Class suffered significant damages, and seek damages in an amount to be

26  determined at trial.

27

28

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212)**

1146.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1147.   This count is brought on behalf of the Rhode Island State Class against Fiat and FCA.

1148.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1149.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1150.   The Class Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1151.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

1152.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1153.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Rhode Island State Class.  The amount of damages due will be proven at trial.

41.   **South Carolina**

**BREACH OF EXPRESS WARRANTY**
**(S.C. Code §§ 36-2-313 and 36-2A-210)**

1154.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1    1155.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose

2    of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State

3    Class against Fiat and FCA.

4    1156.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

5    vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles

6    under § 36-2-103(1)(d).

7    1157.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

8    motor vehicles under S.C. Code § 36-2A-103(1)(p).

9    1158.   The Class Vehicles are and were at all relevant times "goods" within the meaning

10   of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

11   1159.   Federal law requires manufacturers of light-duty vehicles to provide two federal

12   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

13   The Performance Warranty applies to repairs that are required during the first two years or 24,000

14   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

15   major emission control components are covered for the first eight years or 80,000 miles,

16   whichever comes first.  These major emission control components subject to the longer warranty

17   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

18   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

19   emission control or emission related parts which fail to function or function improperly due to a

20   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

21   miles, whichever comes first, or, for the major emission control components, for eight years or

22   80,000 miles, whichever comes first.

23   1160.   Fiat and FCA provided these warranties to Plaintiffs and the South Carolina State

24   Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

25   South Carolina State Class purchased or leased their Class Vehicles.

26   1161.   However, Fiat and FCA knew or should have known that the warranties were false

27   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

28   sold and leased to Plaintiffs and the South Carolina State Class were designed to deactivate under

-261-

1    real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

2    undergoing emissions testing, and therefore, knew that the emission systems contained defects.

3        1162.   Plaintiffs and the South Carolina State Class reasonably relied on Fiat's and FCA's

4    express warranties concerning emissions when purchasing or leasing the Class Vehicles.

5    However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

6    South Carolina State Class, the Class Vehicles were designed to pollute at higher than legal limits

7    during normal driving, and could not achieve advertised performance and efficiency metrics

8    without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

9    FCA therefore breached their express warranty by providing a product containing defects that

10   were never disclosed to Plaintiffs and the South Carolina State Class.

11       1163.   Any opportunity to cure the express breach is unnecessary and futile.

12       1164.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

13   Plaintiffs and the South Carolina State Class suffered significant damages, and seek damages in

14   an amount to be determined at trial.

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.C. Code §§ 36-2-314 and 36-2A-212)**

17       1165.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

18   paragraphs as though fully set forth herein.

19       1166.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose

20   of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State

21   Class against Fiat and FCA.

22       1167.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

23   under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-

24   2-103(1)(d).

25       1168.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

26   motor vehicles under S.C. Code § 36-2A-103(1)(p).

27       1169.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28   of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1170.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

1171.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1172.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the South Carolina State Class.  The amount of damages due will be proven at trial.

### 42.   South Dakota

### BREACH OF EXPRESS WARRANTY
### (S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210)

1173.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1174.   Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Dakota State Class against Fiat and FCA.

1175.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

1176.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

1177.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1178.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1   The Performance Warranty applies to repairs that are required during the first two years or 24,000
2   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain
3   major emission control components are covered for the first eight years or 80,000 miles,
4   whichever comes first.  These major emission control components subject to the longer warranty
5   include the catalytic converters, the electronic engine control unit (ECU), and the onboard
6   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of
7   emission control or emission related parts which fail to function or function improperly due to a
8   defect in materials or workmanship.  This warranty provides protection for two years or 24,000
9   miles, whichever comes first, or, for the major emission control components, for eight years or
10   80,000 miles, whichever comes first.

11       1179.   Fiat and FCA provided these warranties to Plaintiffs and the South Dakota State
12   Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the
13   South Dakota State Class purchased or leased their Class Vehicles.

14       1180.   However, Fiat and FCA knew or should have known that the warranties were false
15   and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles
16   sold and leased to Plaintiffs and the South Dakota State Class were designed to deactivate under
17   real-world driving conditions, and to emit oxides of nitrogen within legal limits only when
18   undergoing emissions testing, and therefore, knew that the emission systems contained defects.

19       1181.   Plaintiffs and the South Dakota State Class reasonably relied on Fiat's and FCA's
20   express warranties concerning emissions when purchasing or leasing the Class Vehicles.
21   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the
22   South Dakota State Class, the Class Vehicles were designed to pollute at higher than legal limits
23   during normal driving, and could not achieve advertised performance and efficiency metrics
24   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and
25   FCA therefore breached their express warranty by providing a product containing defects that
26   were never disclosed to Plaintiffs and the South Dakota State Class.

27       1182.   Any opportunity to cure the express breach is unnecessary and futile.

28

1  1183.  As a direct and proximate result of Fiat's and FCA's breach of express warranties,

2  Plaintiffs and the South Dakota State Class suffered significant damages, and seek damages in an

3  amount to be determined at trial.

4  **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212)**
5

6  1184.  Plaintiffs reallege and incorporate by reference all allegations of the preceding

7  paragraphs as though fully set forth herein.

8  1185.  Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section,

9  "Plaintiffs") bring this action on behalf of themselves and the South Dakota State Class against

10  Fiat and FCA.

11  1186.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

12  under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles

13  under § 57A-104(1)(d).

14  1187.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

15  motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

16  1188.  The Class Vehicles are and were at all relevant times "goods" within the meaning

17  of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

18  1189.  A warranty that the Class Vehicles were in merchantable condition and fit for the

19  ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws

20  §§ 57A-2-314 and 57A-2A-212.

21  1190.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

22  condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

23  Vehicles were not in merchantable condition because their design violated state and federal laws.

24  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

25  federal emission standards.

26  1191.  Fiat's and FCA's breaches of the implied warranty of merchantability caused

27  damage to the Plaintiffs and the South Dakota State Class.  The amount of damages due will be

28  proven at trial.

1      **43.    Tennessee**

2      **BREACH OF EXPRESS WARRANTY**
       **(Tenn. Code §§ 47-2-313 and 47-2A-210)**

3

4      1192.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

5      fully set forth herein.

6      1193.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section,

7      "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against Fiat

8      and FCA.

9      1194.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

10     vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles

11     under § 47-2-103(1)(d).

12     1195.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

13     motor vehicles under Tenn. Code § 47-2A-103(1)(p).

14     1196.   The Class Vehicles are and were at all relevant times "goods" within the meaning

15     of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

16     1197.   Federal law requires manufacturers of light-duty vehicles to provide two federal

17     emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

18     The Performance Warranty applies to repairs that are required during the first two years or 24,000

19     miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

20     major emission control components are covered for the first eight years or 80,000 miles,

21     whichever comes first.  These major emission control components subject to the longer warranty

22     include the catalytic converters, the electronic engine control unit (ECU), and the onboard

23     emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

24     emission control or emission related parts which fail to function or function improperly due to a

25     defect in materials or workmanship.  This warranty provides protection for two years or 24,000

26     miles, whichever comes first, or, for the major emission control components, for eight years or

27     80,000 miles, whichever comes first.

28

1528982.7

1198.   Fiat and FCA provided these warranties to Plaintiffs and the Tennessee State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Tennessee State Class purchased or leased their Class Vehicles.

1199.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Tennessee State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1200.   Plaintiffs and the Tennessee State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Tennessee State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Tennessee State Class.

1201.   Any opportunity to cure the express breach is unnecessary and futile.

1202.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Tennessee State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tenn. Code §§ 47-2-314 and 47-2A-212)

1203.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1204.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against Fiat and FCA.

1528982.7

1205.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

1206.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1207.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1208.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

1209.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1210.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Tennessee State Class.  The amount of damages due will be proven at trial.

**44.   Texas**

**BREACH OF EXPRESS WARRANTY**
**(Tex. Bus. & Com. Code §§ 2.313 and 2A.210)**

1211.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1212.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against Fiat and FCA.

1213. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1214. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1215. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1216. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1217. Fiat and FCA provided these warranties to Plaintiffs and the Texas State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Texas State Class purchased or leased their Class Vehicles.

1218. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Texas State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1219.   Plaintiffs and the Texas State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Texas State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and the Texas State Class.

1220.   Any opportunity to cure the express breach is unnecessary and futile.

1221.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs and the Texas State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)

1222.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1223.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against Fiat and FCA.

1224.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1225.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1226.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1528982.7

1227.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

1228.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1229.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Texas State Class.  The amount of damages due will be proven at trial.

### 45.   Utah

### BREACH OF EXPRESS WARRANTY
### (Utah Code Ann. §§ 70A-2-313 and 70A-2A-210)

1230.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1231.   Plaintiff John Wilson (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Utah State Class against Fiat and FCA.

1232.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1233.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1234.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1235.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000

1  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

2  major emission control components are covered for the first eight years or 80,000 miles,

3  whichever comes first.  These major emission control components subject to the longer warranty

4  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

5  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

6  emission control or emission related parts which fail to function or function improperly due to a

7  defect in materials or workmanship.  This warranty provides protection for two years or 24,000

8  miles, whichever comes first, or, for the major emission control components, for eight years or

9  80,000 miles, whichever comes first.

10       1236.   Fiat and FCA provided these warranties to Plaintiff and the Utah State Class.

11  These warranties formed the basis of the bargain that was reached when Plaintiff and the Utah

12  State Class purchased or leased their Class Vehicles.

13       1237.   However, Fiat and FCA knew or should have known that the warranties were false

14  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

15  sold and leased to Plaintiff and the Utah State Class were designed to deactivate under real-world

16  driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

17  emissions testing, and therefore, knew that the emission systems contained defects.

18       1238.   Plaintiff and the Utah State Class reasonably relied on Fiat's and FCA's express

19  warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the

20  Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Utah State Class,

21  the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and

22  could not achieve advertised performance and efficiency metrics without this cheating design.

23  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their

24  express warranty by providing a product containing defects that were never disclosed to Plaintiff

25  and the Utah State Class.

26       1239.   Any opportunity to cure the express breach is unnecessary and futile.

1240.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Utah State Class suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Utah Code Ann. §§ 70A-2-314 and 70A-2A-212)

1241.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1242.   Plaintiff John Wilson (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Utah State Class against Fiat and FCA.

1243.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1244.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1245.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1246.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

1247.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1248.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Utah State Class.  The amount of damages due will be proven at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46.   **Vermont**

**BREACH OF EXPRESS WARRANTY**
**(Vt. Stat. Tit. Ann. 9A, §§ 2-313 and 2A-210)**

1249.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1250.   This Count is brought on behalf of the Vermont State Class against Fiat and FCA.

1251.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

1252.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1253.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1254.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1255.   Fiat and FCA provided these warranties to the Vermont State Class. These warranties formed the basis of the bargain that was reached when the Vermont State Class purchased or leased their Class Vehicles.

1256.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the Vermont State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1257.   The Vermont State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the Vermont State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Vermont State Class.

1258.   Any opportunity to cure the express breach is unnecessary and futile.

1259.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Vermont State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2A-212)

1260.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1261.   This Count is brought on behalf of the Delaware State Class against Fiat and FCA.

1262.  Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

1263.  With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1264.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1265.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-314 and 2A-212.

1266.  Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1267.  Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Vermont State Class.  The amount of damages due will be proven at trial.

### 47.  <u>Virginia</u>

**BREACH OF EXPRESS WARRANTY**
**(Va. Code Ann. §§ 8.2-313 and 8.2A-210)**

1268.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1269.  Plaintiffs James Boykin and Brian Hiner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Virginia State Class against Fiat and FCA.

1270.  Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

-276-

1271.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1272.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1273.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1274.   Fiat and FCA provided these warranties to Plaintiffs and the Virginia State Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the Virginia State Class purchased or leased their Class Vehicles.

1275.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiffs and the Virginia State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1276.   Plaintiffs and the Virginia State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the Virginia State Class, the Class Vehicles were designed to pollute at higher than legal limits during

-277-

1    normal driving, and could not achieve advertised performance and efficiency metrics without this

2    cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA

3    therefore breached their express warranty by providing a product containing defects that were

4    never disclosed to Plaintiffs and the Virginia State Class.

5        1277.   Any opportunity to cure the express breach is unnecessary and futile.

6        1278.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

7    Plaintiffs and the Virginia State Class suffered significant damages, and seek damages in an

8    amount to be determined at trial.

9                  **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                        **(Va. Code Ann. §§ 8.2-314 and 8.2A-212)**
10

11       1279.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

12   paragraphs as though fully set forth herein.

13       1280.   Plaintiffs James Boykin and Brian Hiner (for the purpose of this section,

14   "Plaintiffs") bring this action on behalf of themselves and the Virginia State Class against Fiat

15   and FCA.

16       1281.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

17   under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-

18   103(1)(d).

19       1282.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of

20   motor vehicles under Va. Code § 8.2A-103(1)(p).

21       1283.   The Class Vehicles are and were at all relevant times "goods" within the meaning

22   of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

23       1284.   A warranty that the Class Vehicles were in merchantable condition and fit for the

24   ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314

25   and 8.2A-212.

26       1285.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable

27   condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class

28   Vehicles were not in merchantable condition because their design violated state and federal laws.

-278-

1   The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and

2   federal emission standards.

3       1286.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

4   damage to Plaintiffs and the Virginia State Class.  The amount of damages due will be proven at

5   trial.

6           **48.**   **Washington**

7           **BREACH OF EXPRESS WARRANTY**
            **(Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210)**
8

9       1287.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

10  fully set forth herein.

11      1288.   Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of

12  this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State

13  Class against Fiat and FCA.

14      1289.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

15  vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor

16  vehicles under § 2.103(a)(4).

17      1290.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

18  motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

19      1291.   The Class Vehicles are and were at all relevant times "goods" within the meaning

20  of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

21      1292.   Federal law requires manufacturers of light-duty vehicles to provide two federal

22  emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

23  The Performance Warranty applies to repairs that are required during the first two years or 24,000

24  miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

25  major emission control components are covered for the first eight years or 80,000 miles,

26  whichever comes first.  These major emission control components subject to the longer warranty

27  include the catalytic converters, the electronic engine control unit (ECU), and the onboard

28  emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

1    emission control or emission related parts which fail to function or function improperly due to a

2    defect in materials or workmanship.  This warranty provides protection for two years or 24,000

3    miles, whichever comes first, or, for the major emission control components, for eight years or

4    80,000 miles, whichever comes first.

5         1293.   Fiat and FCA provided these warranties to Plaintiffs and the Washington State

6    Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

7    Washington State Class purchased or leased their Class Vehicles.

8         1294.   However, Fiat and FCA knew or should have known that the warranties were false

9    and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

10   sold and leased to Plaintiffs and the Washington State Class were designed to deactivate under

11   real-world driving conditions, and to emit oxides of nitrogen within legal limits only when

12   undergoing emissions testing, and therefore, knew that the emission systems contained defects.

13        1295.   Plaintiffs and the Washington State Class reasonably relied on Fiat's and FCA's

14   express warranties concerning emissions when purchasing or leasing the Class Vehicles.

15   However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

16   Washington State Class, the Class Vehicles were designed to pollute at higher than legal limits

17   during normal driving, and could not achieve advertised performance and efficiency metrics

18   without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

19   FCA therefore breached their express warranty by providing a product containing defects that

20   were never disclosed to Plaintiffs and the Washington State Class.

21        1296.   Any opportunity to cure the express breach is unnecessary and futile.

22        1297.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

23   Plaintiffs and the Washington State Class suffered significant damages, and seek damages in an

24   amount to be determined at trial.

25                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                      **(Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212)**
26

27        1298.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

28   paragraphs as though fully set forth herein.

1299.   Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State Class against Fiat and FCA.

1300.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1301.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1302.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1303.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

1304.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1305.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Washington State Class.  The amount of damages due will be proven at trial.

### 49.   West Virginia

### BREACH OF EXPRESS WARRANTY
### (W. Va. Code §§ 46-2-313 and 46-2A-210)

1306.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1307.   This count is brought on behalf of the West Virginia State Class against Fiat and FCA.

1308.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1309.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1310.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1311.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1312.   Fiat and FCA provided these warranties to the West Virginia State Class. These warranties formed the basis of the bargain that was reached when the West Virginia State Class purchased or leased their Class Vehicles.

1313.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to the West Virginia State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1314.   The West Virginia State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted.  Unbeknownst to the West Virginia State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the West Virginia State Class.

1315.   Any opportunity to cure the express breach is unnecessary and futile.

1316.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the West Virginia State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. Va. Code §§ 46-2-314 and 46-2A-212)

1317.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1318.   This count is brought on behalf of the West Virginia State Class against Fiat and FCA.

1319.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1320.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1321.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1322.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

1323.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1324.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the West Virginia State Class.  The amount of damages due will be proven at trial.

### 50.   Wisconsin

### BREACH OF EXPRESS WARRANTY
### (Wis. Stat. §§ 402.313 and 411.210)

1325.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1326.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against Fiat and FCA.

1327.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1328.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1329.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1330.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty

-284-

1   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

2   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

3   emission control or emission related parts which fail to function or function improperly due to a

4   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

5   miles, whichever comes first, or, for the major emission control components, for eight years or

6   80,000 miles, whichever comes first.

7       1331.   Fiat and FCA provided these warranties to Plaintiffs and the Wisconsin State

8   Class. These warranties formed the basis of the bargain that was reached when Plaintiffs and the

9   Wisconsin State Class purchased or leased their Class Vehicles.

10      1332.   However, Fiat and FCA knew or should have known that the warranties were false

11  and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles

12  sold and leased to Plaintiffs and the Wisconsin State Class were designed to deactivate under real-

13  world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing

14  emissions testing, and therefore, knew that the emission systems contained defects.

15      1333.   Plaintiffs and the Wisconsin State Class reasonably relied on Fiat's and FCA's

16  express warranties concerning emissions when purchasing or leasing the Class Vehicles.

17  However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiffs and the

18  Wisconsin State Class, the Class Vehicles were designed to pollute at higher than legal limits

19  during normal driving, and could not achieve advertised performance and efficiency metrics

20  without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and

21  FCA therefore breached their express warranty by providing a product containing defects that

22  were never disclosed to Plaintiffs and the Wisconsin State Class.

23      1334.   Any opportunity to cure the express breach is unnecessary and futile.

24      1335.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

25  Plaintiffs and the Wisconsin State Class suffered significant damages, and seek damages in an

26  amount to be determined at trial.

27

28

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wis. Stat. §§ 402.314 and 411.212)**

1336.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1337.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against Fiat and FCA.

1338.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1339.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1340.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1341.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

1342.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws.  The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1343.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs and the Wisconsin State Class.  The amount of damages due will be proven at trial.

1

2

3

**51.** <u>Wyoming</u>

**BREACH OF EXPRESS WARRANTY**
**(Wyo. Stat. § 34.1-2-313)**

4    1344.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6    1345.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action

7    on behalf of herself and the Wyoming State Class against Fiat and FCA.

8    1346.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

9    vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor

10   vehicles under § 34.1-2-103(a)(iv).

11   1347.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

12   motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

13   1348.   The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

15   1349.   Federal law requires manufacturers of light-duty vehicles to provide two federal

16   emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

17   The Performance Warranty applies to repairs that are required during the first two years or 24,000

18   miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain

19   major emission control components are covered for the first eight years or 80,000 miles,

20   whichever comes first.  These major emission control components subject to the longer warranty

21   include the catalytic converters, the electronic engine control unit (ECU), and the onboard

22   emissions diagnostic device or computer.  The Design and Defect Warranty covers repair of

23   emission control or emission related parts which fail to function or function improperly due to a

24   defect in materials or workmanship.  This warranty provides protection for two years or 24,000

25   miles, whichever comes first, or, for the major emission control components, for eight years or

26   80,000 miles, whichever comes first.

27

28

1350.   Fiat and FCA provided these warranties to Plaintiff and the Wyoming State Class. These warranties formed the basis of the bargain that was reached when Plaintiff and the Wyoming State Class purchased or leased their Class Vehicles.

1351.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading.  Fiat and FCA were aware that the emissions systems in the Class Vehicles sold and leased to Plaintiff and the Wyoming State Class were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1352.   Plaintiff and the Wyoming State Class reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted.  Unbeknownst to Plaintiff and the Wyoming State Class, the Class Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design.  This design and the devices that effectuate it are defects.  Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and the Wyoming State Class.

1353.   Any opportunity to cure the express breach is unnecessary and futile.

1354.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff and the Wyoming State Class suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212)

1355.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1356.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Wyoming State Class against Fiat and FCA.

1357.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1358.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1359.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1360.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

1361.   Fiat and FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.  The Class Vehicles were not in merchantable condition because their design violated state and federal laws. The Class Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1362.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff and the Wyoming State Class.  The amount of damages due will be proven at trial.

## II.   STATE CLASS CONSUMER PROTECTION CLAIMS

### VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
### (Ala. Code § 8-19-1, *et seq.*)

1363.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1364.   Plaintiffs Chatom Motor Company, Inc., Victor Feldman, and Nelson John Stephens (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alabama State Class against all Defendants.

1365.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Alabama State Class members are "persons" within the meaning

-289-

1   of Ala. Code § 8-19-3(5).  Plaintiffs and the Alabama State Class members are "consumers"

2   within the meaning of Ala. Code § 8-19-3(2).

3       1366.   The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

4       1367.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

5   Marchionne are engaged in "trade" or "commerce" within the meaning of Ala. Code § 8-19-3(8).

6       1368.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") makes unlawful

7   several specific acts, including:"(5) Representing that goods or services have sponsorship,

8   approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7)

9   Representing that goods or services are of a particular standard, quality, or grade, or that goods

10  are of a particular style or model, if they are of another," and "(27) Engaging in any other

11  unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or

12  commerce."  Ala. Code § 8-19-5.

13      1369.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

14  Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alabama

15  DTPA.

16      1370.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

17  misrepresented the environmental friendliness and emissions of the Class Vehicles through the

18  EcoDiesel badge—a material fact that was false because the Defendants developed and installed

19  emission cheating components in the Class Vehicles that caused them to pollute excessively in

20  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

21  pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

22  the Defendants concealed that the fuel efficiency and performance could be achieved only

23  through emission control devices in the Class Vehicles that caused them to pollute excessively in

24  real-world conditions; and (3) the Defendants developed and installed emission cheating

25  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

26  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

27  337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

28

Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ala. Code § 8-19-5:

      A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      B.    Representing that the Class Vehicles have approval, characteristics, uses, benefits, or qualities that they do not have;

      C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

      D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1371.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Alabama State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Alabama State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1372.   Plaintiffs and Alabama State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Alabama State Class members did not, and could not, unravel Defendants' deception on their own.

1373.   Defendants had an ongoing duty to Plaintiffs and the Alabama State Class to refrain from unfair and deceptive practices under the Alabama DTPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Alabama State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Alabama State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-291-

1374.   Plaintiffs and Alabama State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1375.   Defendants' violations present a continuing risk to Plaintiffs and the Alabama State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1376.   Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the Alabama DTPA.

1377.   On June 12, 2017, Plaintiff Stephens sent a notice letter to FCA US LLC complying with Ala. Code § 8-19-10(e).  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public. Moreover, Plaintiffs sent a second notice letter pursuant to Ala. Code § 8-19-10(e) to all Defendants on July 19, 2017.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alabama State Class are entitled.

### VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (Alaska Stat. Ann. § 45.50.471, *et seq.*)

1378.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1379.   Plaintiffs Matthew Johnson and Amanda Kobussen (for purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Alaska State Class against all Defendants.

1380.   The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of

1  trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship,

2  approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

3  person has a sponsorship, approval, status, affiliation, or connection that the person does not

4  have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or

5  that goods are of a particular style or model, if they are of another;" "(8) advertising goods or

6  services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud,

7  false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or

8  omitting a material fact with intent that others rely upon the concealment, suppression or

9  omission in connection with the sale or advertisement of goods or services whether or not a

10  person has in fact been misled, deceived or damaged."  Alaska Stat. Ann. § 45.50.471.

11      1381.  In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

12  Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alaska

13  CPA.

14      1382.  As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

15  misrepresented the environmental friendliness and emissions of the Class Vehicles through the

16  EcoDiesel badge—a material fact that was false because the Defendants developed and installed

17  emission cheating components in the Class Vehicles that caused them to pollute excessively in

18  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

19  pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

20  the Defendants concealed that the fuel efficiency and performance could be achieved only

21  through emission control devices in the Class Vehicles that caused them to pollute excessively in

22  real-world conditions; and (3) the Defendants developed and installed emission cheating

23  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

24  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

25  337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

26  Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

27  practices as defined in Alaska Stat. Ann. § 45.50.471:

28

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1383.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Alaska State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Alaska State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1384.   Plaintiffs and Alaska State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Alaska State Class members did not, and could not, unravel Defendants' deception on their own.

1385.   Defendants had an ongoing duty to Plaintiffs and the Alaska State Class to refrain from unfair and deceptive practices under the Alaska CPA in the course of their business. Specifically, Defendants owed Plaintiffs and Alaska State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Alaska State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1386.   Plaintiffs and Alaska State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1387.   Defendants' violations present a continuing risk to Plaintiffs and the Alaska State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1388.   Pursuant to Alaska Stat. Ann. §§ 45.50.531 and 45.50.535, Plaintiffs and the Alaska State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, treble damages, and any other just and proper relief available under the Alaska CPA.

1389.   On November 28, 2016, a notice letter was sent to FCA US LLC complying with Alaska Stat. § 45.50.535(b)(1).  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Plaintiffs sent a second notice letter pursuant to Alaska Stat. § 45.50.535(b)(1) to all Defendants on July 19, 2017.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs and the Alaska State Class members seek all damages and relief to which they are entitled.

**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. § 44-1521, *et seq.*)**

1390.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1391.   Plaintiff Gregory Giauque, (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves and the Arizona State Class against all Defendants.

1392.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Arizona State Class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

1393.   The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

1394.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

1395.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Arizona CFA.

1396.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating

1    components that caused the Class Vehicles to pollute excessively in real-world conditions, and

2    fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

3    337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

4    Vehicles, Defendants engaged in deceptive acts or practices, as outlined in Ariz. Rev. Stat. § 44-

5    1522(A), including using or employing deception, fraud, false pretense, false promise or

6    misrepresentation, or the concealment, suppression or omission of a material fact with intent that

7    others rely upon such concealment, suppression or omission, in connection with the

8    advertisement and sale/lease of the Class Vehicles.

9         1397.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

10   emission control system were material to Plaintiff and the Arizona State Class, as Defendants

11   intended.  Had they known the truth, Plaintiff and the Arizona State Class would not have

12   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

13   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

14   them.

15        1398.   Plaintiff and Arizona State Class members had no way of discerning that

16   Defendants' representations were false and misleading, or otherwise learning the facts that

17   Defendants had concealed or failed to disclose, because Defendants' emission control software

18   was extremely sophisticated technology.  Plaintiff and Arizona State Class members did not, and

19   could not, unravel Defendants' deception on their own.

20        1399.   Defendants had an ongoing duty to Plaintiff and the Arizona State Class to refrain

21   from unfair and deceptive practices under the Arizona CFA in the course of their business.

22   Specifically, Defendants owed Plaintiff and Arizona State Class members a duty to disclose all

23   the material facts concerning the EcoDiesel® emission control system because they possessed

24   exclusive knowledge, they intentionally concealed it from Plaintiff and the Arizona State Class,

25   and/or they made misrepresentations that were rendered misleading because they were

26   contradicted by withheld facts.

27

28

1400.   Plaintiff and Arizona State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1401.   Defendants' violations present a continuing risk to Plaintiff and the Arizona State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1402.   Plaintiff and the Arizona State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arizona CFA.

**ARKANSAS COUNT I**
**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT**
**(Ark. Code Ann. § 4-88-101, *et seq*.)**

1403.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1404.   Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Arkansas State Class against all Defendants.

1405.   Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Arkansas State Class are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

1406.   The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

1407.   The Arkansas Deceptive Trade Practice Act ("Arkansas DTPA") makes unlawful "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]"  Ark. Code Ann. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  Ark. Code Ann. § 4-88-108.

1408.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Arkansas DTPA.

1409.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ark. Code Ann. §§ 4-88-107 -108:

A.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

D.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and

1                 sale/lease of the Class Vehicles, whether or not any person has in fact been

2                 misled, deceived or damaged thereby.

3        1410.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4   emission control system were material to Plaintiff and the Arkansas State Class, as Defendants

5   intended.  Had they known the truth, Plaintiff and the Arkansas State Class would not have

6   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

7   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

8   them.

9        1411.   Plaintiff and Arkansas State Class members had no way of discerning that

10   Defendants' representations were false and misleading, or otherwise learning the facts that

11   Defendants had concealed or failed to disclose, because Defendants' emission control software

12   was extremely sophisticated technology.  Plaintiff and Arkansas State Class members did not, and

13   could not, unravel Defendants' deception on their own.

14        1412.   Defendants had an ongoing duty to Plaintiff and the Arkansas State Class to refrain

15   from unfair and deceptive practices under the Arkansas DTPA in the course of their business.

16   Specifically, Defendants owed Plaintiff and the Arkansas State Class members a duty to disclose

17   all the material facts concerning the EcoDiesel® emission control system because they possessed

18   exclusive knowledge, they intentionally concealed it from the Arkansas State Class, and/or they

19   made misrepresentations that were rendered misleading because they were contradicted by

20   withheld facts.

21        1413.   Plaintiff and Arkansas State Class members suffered ascertainable loss and actual

22   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

23   failure to disclose material information.

24        1414.   Defendants' violations present a continuing risk to the Arkansas State Class, as

25   well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

26   the public interest.

27

28

1415.   Plaintiff and the Arkansas State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages pursuant to Ark. Code Ann. § 4-88-13(f), and any other just and proper relief available under the Arkansas DTPA.

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

1416.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1417.   Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California State Class against all Defendants.

1418.   Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the California State Class members are "persons" within the meaning of Cal. Civ. Code § 1761(c).  Plaintiffs and the California State Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

1419.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

1420.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the CLRA.

1421.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating

1    components that caused the Class Vehicles to pollute excessively in real-world conditions, and

2    fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216;

3    337-357.  In so doing, and by Defendants engaged in one or more of the following unfair or

4    deceptive acts or practices as defined in Cal. Civ. Code § 1770(a):

5              A.    Representing that the Class Vehicles have approval, characteristics, uses,

6                    or benefits that they do not have;

7              B.    Representing that the Class Vehicles are of a particular standard, quality

8                    and grade when they are not; and/or

9              C.    Advertising the Class Vehicles with the intent not to sell or lease them as

10                   advertised.

11        1422.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

12   emission control system were material to Plaintiffs and the California State Class, as Defendants

13   intended.  Had they known the truth, Plaintiffs and the California State Class would not have

14   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

15   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

16   them.

17        1423.  Plaintiffs and California State Class members had no way of discerning that

18   Defendants' representations were false and misleading, or otherwise learning the facts that

19   Defendants had concealed or failed to disclose, because Defendants' emission control software

20   was extremely sophisticated technology.  Plaintiffs and California State Class members did not,

21   and could not, unravel Defendants' deception on their own.

22        1424.  Defendants had an ongoing duty to Plaintiffs and the California State Class to

23   refrain from unfair and deceptive practices under the California CLRA in the course of their

24   business.  Specifically, Defendants owed Plaintiffs and California State Class members a duty to

25   disclose all the material facts concerning the EcoDiesel® emission control system because they

26   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the California

27   State Class, and/or they made misrepresentations that were rendered misleading because they

28   were contradicted by withheld facts.

1425.   Plaintiffs and California State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1426.   Defendants' violations present a continuing risk to Plaintiffs and the California State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1427.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs and the California State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the CLRA.  Under Cal. Civ. Code § 1780(b), Plaintiff seeks an additional award against Defendants of up to $5,000 for each California State Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Defendants knew or should have known that their conduct was directed to one or more California State Class members who are senior citizens or disabled persons.  Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more California State Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

1428.   On November 28, 2016, Plaintiff Chavez sent a notice letter to FCA US LLC complying with Cal. Civ. Code § 1780(b).  On January 17, a second notice letter was sent to FCA US LLC and Fiat Chrysler. Plaintiffs sent yet another notice letter pursuant to Cal. Civ. Code § 1780(b) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1  Because Defendants failed to remedy their unlawful conduct within the requisite time period,

2  Plaintiff seek all damages and relief to which Plaintiffs and the California State Class are entitled.

3  **UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE
CALIFORNIA UNFAIR COMPETITION LAW**

4  **(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

5  1429.  Plaintiff incorporates by reference each preceding paragraph as though fully set

6  forth herein.

7  1430.  Plaintiffs Leslie Bernstein, Jose Chavez, Gregory Giauque, and Satyanam Singh

8  (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the

9  California State Class against all Defendants.

10  1431.  California's Unfair Competition Law ("UCL"), Business and Professions Code

11  § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

12  1432.  As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

13  misrepresented the environmental friendliness and emissions of the Class Vehicles through the

14  EcoDiesel badge—a material fact that was false because the Defendants developed and installed

15  emission cheating components in the Class Vehicles that caused them to pollute excessively in

16  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

17  pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

18  the Defendants concealed that the fuel efficiency and performance could be achieved only

19  through emission control devices in the Class Vehicles that caused them to pollute excessively in

20  real-world conditions; and (3) the Defendants developed and installed emission cheating

21  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

22  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

23  337-357.  In so doing, Fiat, FCA, VM Motori, Bosch GmbH, Bosch LLC, and Marchionne have

24  engaged in at least the following unlawful, fraudulent, and unfair business acts and practices in

25  violation of the UCL:

26          A.    by knowingly and intentionally concealing from Plaintiffs and the other

27                 California State Class members that the Class Vehicles suffer from a

28                 design defect while obtaining money from Plaintiffs and Class members;

B. by marketing Class Vehicles as possessing functional and defect-free, "clean" diesel engine systems; and

C. by violating both federal and California laws, including the federal RICO statute and California laws governing vehicle emissions and emission testing requirements.

1433. Defendants' cheating scheme and concealment of the true characteristics of the EcoDiesel emission control system were material to Plaintiffs and the California State Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the California State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1434. Plaintiffs and California State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.  Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs and the California State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to Plaintiffs and California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345, and any other just and proper relief available under the California UCL.

**FALSE ADVERTISING UNDER THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

1435. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1436. Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the

1    California State Class against FCA, Fiat, Marchionne, Bosch LLC, Bosch GmbH, and VM

2    Motori.

3         1437.   California Bus. & Prof. Code § 17500 states:  "It is unlawful for any person, …

4    corporation …or any employee thereof with intent directly or indirectly to dispose of real or

5    personal property… or to induce the public to enter into any obligation relating thereto, to make

6    or disseminate or cause to be made or disseminated … before the public in this state or from this

7    state before the public in any state, in any newspaper or other publication, or any advertising

8    device, … or in any other manner or means whatever, including over the Internet, any statement

9    … which is untrue or misleading, and which is known, or which by the exercise of reasonable

10   care should be known, to be untrue or misleading."

11        1438.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

12   misrepresented the environmental friendliness and emissions of the Class Vehicles through the

13   EcoDiesel badge—a material fact that was false because the Defendants developed and installed

14   emission cheating components in the Class Vehicles that caused them to pollute excessively in

15   real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

16   pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

17   the Defendants concealed that the fuel efficiency and performance could be achieved only

18   through emission control devices in the Class Vehicles that caused them to pollute excessively in

19   real-world conditions; and (3) the Defendants developed and installed emission cheating

20   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

21   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

22   337-357.

23        1439.   FCA, Fiat, and Marchionne; Bosch LLC and Bosch GmbH; and VM Motori, each

24   made or caused to be made and disseminated throughout California and the United States,

25   through advertising, marketing, and other publications, numerous statements that were untrue or

26   misleading, and which were known, or which by the exercise of reasonable care should have been

27   known to each Defendant, to be untrue and misleading to consumers, including Plaintiff and the

28

-306-

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1   other California State Class members. Numerous examples of these statements and

2   advertisements appear throughout this Complaint.

3       1440.   Pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiffs and the California State

4   Class seek an order enjoining Defendants' false advertising, any such orders or judgments as may

5   be necessary to restore to Plaintiffs and the California State Class members any money acquired

6   by unfair competition, including restitution and/or restitutionary disgorgement, and any other just

7   and proper relief available under the false advertising provisions of the UCL.

8   **FAILURE TO RECALL/RETROFIT UNDER CALIFORNIA LAW**

9       1441.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

10  fully set forth herein.

11      1442.   Plaintiffs Jose Chavez, Leslie Bernstein, Gregory Giauque, and Satyanam Singh

12  (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the

13  California State Class against Fiat and FCA.

14      1443.   Fiat Chrysler manufactured, marketed, distributed, sold, or otherwise placed into

15  the stream of U.S. commerce the Class Vehicles, as set forth above.

16      1444.   Defendants knew or reasonably should have known that the Class Vehicles were

17  dangerous when used in a reasonably foreseeable manner, and posed an unreasonable risk.

18      1445.   Fiat Chrysler became aware that the Class Vehicles were dangerous when used in

19  a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

20      1446.   Fiat Chrysler failed to recall the Class Vehicles in a timely manner or warn of the

21  dangers posed by Class Vehicles.

22      1447.   A reasonable manufacturer in same or similar circumstances would have timely

23  and properly recalled the Class Vehicles.

24      1448.   Plaintiffs and the California State Class were harmed by Fiat Chrysler's failure to

25  recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages,

26  including their out-of-pocket costs, losses, and inconvenience, and caused by Fiat Chrysler's

27  ongoing failure to properly recall, retrofit, and fully repair the Class Vehicles.

28

1    1449.   Even in the event of a recall, Plaintiffs and the California State Class have suffered

2    and continue to damages for each day that a recall is delayed.

3    1450.   Fiat Chrysler's failure to timely recall the Class Vehicles was a substantial factor

4    in causing the harm to Plaintiffs and the California State Class as alleged herein.

5                  **VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
                          **(Colo. Rev. Stat. § 6-1-101, *et seq.*)**

6

7    1451.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

8    forth herein.

9    1452.   Plaintiffs Tommy Feist, Ryan Montgomery, and John Webb (for the purpose of

10   this section, "Plaintiffs") bring this action on behalf of themselves and the Colorado State Class

11   against all Defendants.

12   1453.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

13   Marchionne, Plaintiffs, and the Colorado State Class members are "persons" within the meaning

14   of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat.

15   § 6-1-101, *et seq.*  Plaintiffs and the Colorado State Class members are "consumers" within the

16   meaning of Col. Rev. Stat § 6-1-113(1)(a).

17   1454.   The Colorado CPA makes unlawful deceptive trade practices in the course of a

18   person's business.  Defendants engaged in deceptive trade practices prohibited by the Colorado

19   CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and

20   benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class

21   members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade

22   even though FCA knew or should have known they are not; (3) advertising the Class Vehicles

23   with the intent not to sell them as advertised; and (4) failing to disclose material information

24   concerning the Class Vehicles that was known to FCA at the time of advertisement or sale with

25   the intent to induce Colorado State Class members to purchase, lease or retain the Class Vehicles.

26   1455.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

27   Marchionne, through their agents, employees, and/or subsidiaries, violated the Colorado CPA.

28

1456.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by  marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Colo. Rev. Stat. § 6-1-105:

      A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

      C.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

      D.    Failing to disclose material information concerning the Class Vehicles known to Defendants at the time of advertisement or sale, with the intention of inducing Plaintiffs and Class members to purchase or lease the vehicles.

1457.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Colorado State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Colorado State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

1  and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

2  them.

3      1458.   Plaintiffs and Colorado State Class members had no way of discerning that

4  Defendants' representations were false and misleading, or otherwise learning the facts that

5  Defendants had concealed or failed to disclose, because Defendants' emission control software

6  was extremely sophisticated technology.  Plaintiffs and Colorado State Class members did not,

7  and could not, unravel Defendants' deception on their own.

8      1459.   Defendants had an ongoing duty to Plaintiffs and the Colorado State Class to

9  refrain from unfair and deceptive practices under the Colorado CPA in the course of their

10  business.  Specifically, Defendants owed Plaintiffs and Colorado State Class members a duty to

11  disclose all the material facts concerning the EcoDiesel® emission control system because they

12  possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Colorado

13  State Class, and/or they made misrepresentations that were rendered misleading because they

14  were contradicted by withheld facts.

15      1460.   Plaintiffs and Colorado State Class members suffered ascertainable loss and actual

16  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

17  failure to disclose material information.

18      1461.   Defendants' violations present a continuing risk to Plaintiffs and the Colorado

19  State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

20  of herein affect the public interest.

21      1462.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs and the Colorado State Class

22  seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

23  damages, treble or punitive damages, and any other just and proper relief available under the

24  Colorado CPA

25             **VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
                  **(Conn. Gen. Stat. § 42-110a, *et seq*.)**

26

27      1463.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28  forth herein.

1464.   Plaintiff Giuseppe Carillo (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Connecticut State Class against all Defendants.

1465.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Connecticut State Class members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

1466.   The Connecticut provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

1467.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Connecticut UTPA.

1468.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by  Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1469.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Connecticut State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Connecticut State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1470.   Plaintiff and Connecticut State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Connecticut State Class members did not, and could not, unravel Defendants' deception on their own.

1471.   Defendants had an ongoing duty to Plaintiff and the Connecticut State Class to refrain from unfair and deceptive practices under the Connecticut UTPA in the course of their business.  Specifically, Defendants owed Plaintiff and Connecticut State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Connecticut State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1472.   Plaintiff and Connecticut State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1473.   Defendants' violations present a continuing risk to Plaintiff and the Connecticut State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1474.   Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff and the Connecticut State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Connecticut UTPA.

## VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT AND DECEPTIVE TRADE PRACTICES ACT
### (6 Del. Code § 2513, *et seq.*, and 6 Del. Code § 2531, *et seq.*)

1475.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1476.   This Count is brought on behalf of the Delaware State Class against all Defendants.

1477.   FCA Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the Delaware State Class members are "persons" within the meaning of 6 Del. Code § 2511(7) and § 2531(5).

1478.   The Delaware Consumer Fraud Act ("Delaware CFA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise,

1   misrepresentation, or the concealment, suppression, or omission of any material fact with intent

2   that others rely upon such concealment, suppression or omission, in connection with the sale,

3   lease or advertisement of any merchandise, whether or not any person has in fact been misled,

4   deceived or damaged thereby."  6 Del. Code § 2513(a).

5       1479.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

6   Marchionne, through their agents, employees, and/or subsidiaries, violated the Delaware CFA.

7       1480.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

8   misrepresented the environmental friendliness and emissions of the Class Vehicles through the

9   EcoDiesel badge—a material fact that was false because the Defendants developed and installed

10  emission cheating components in the Class Vehicles that caused them to pollute excessively in

11  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

12  pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

13  the Defendants concealed that the fuel efficiency and performance could be achieved only

14  through emission control devices in the Class Vehicles that caused them to pollute excessively in

15  real-world conditions; and (3) the Defendants developed and installed emission cheating

16  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

17  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

18  337-357.  In so doing, and by Defendants engaged in one or more of the following unlawful acts

19  or practices prohibited by 6 Del. Code § 2513(a): using or employing deception, fraud, false

20  pretense, false promise or misrepresentation, or the concealment, suppression or omission of a

21  material fact with intent that others rely upon such concealment, suppression or omission, in

22  connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person

23  has in fact been misled, deceived or damaged thereby.

24      1481.   Defendants also engaged in one or more of the following deceptive trade practices

25  enumerated by the Delaware Deceptive Trade Practices Act at 6 Del. Code § 2532:

26          a.      Causing likelihood of confusion or of misunderstanding as to the approval
                    or certification of the Class Vehicles;

27

28          b.      Representing that the Class Vehicles have approval, characteristics, uses,
                    or benefits that they do not have;

1528982.7

c.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

d.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1482.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Delaware State Class, as Defendants intended.  Had they known the truth, the Delaware State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1483.   Delaware State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Delaware State Class members did not, and could not, unravel Defendants' deception on their own.

1484.   Defendants had an ongoing duty to the Delaware State Class to refrain from unfair and deceptive practices under the Delaware CFA in the course of their business.  Specifically, Defendants owed Delaware State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Delaware State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1485.   Delaware State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1486.   Defendants' violations present a continuing risk to the Delaware State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1487.   The Delaware State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive or treble damages, and any other just and proper relief available under the Delaware CFA and DTPA (6 Del. Code §§ 2525 and 2533). *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).

### VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
**(D.C. Code § 28-3901, *et seq.*)**

1488.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1489.   This count is brought on behalf of the District of Columbia Class against all Defendants.

1490.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the District of Columbia Class members are "persons" within the meaning of D.C. Code § 28-3901(a)(1).  The District of Columbia Class members are "consumers" within the meaning of D.C. Code § 28-3901(1)(2).

1491.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade practices" within the meaning of D.C. Code § 28-3901.

1492.   The District of Columbia Consumer Protection Procedures Act ("District of Columbia CPPA") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  D.C. Code § 28-3901, *et seq.*

1493.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the District of Columbia CPPA.

1494.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

-316-

the Defendants concealed that the fuel efficiency and performance could be achieved only

through emission control devices in the Class Vehicles that caused them to pollute excessively in

real-world conditions; and (3) the Defendants developed and installed emission cheating

components that caused the Class Vehicles to pollute excessively in real-world conditions, and

fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

337-357.  In so doing, and by Defendants engaged in one or more of the following unfair or

deceptive acts or practices as defined in D.C. Code § 28-3901, *et seq.*:

> A.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

> C.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1495.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the District of Columbia Class, as Defendants intended. Had they known the truth, the District of Columbia Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1496.  District of Columbia Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  District of Columbia Class members did not, and could not, unravel Defendants' deception on their own.

1497.  Defendants had an ongoing duty to the District of Columbia Class to refrain from unfair and deceptive practices under the District of Columbia CPPA in the course of their business.  Specifically, Defendants owed District of Columbia Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the District of Columbia Class, and/or

1    they made misrepresentations that were rendered misleading because they were contradicted by

2    withheld facts.

3        1498.   District of Columbia Class members suffered ascertainable loss and actual

4    damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

5    failure to disclose material information.

6        1499.   Defendants' violations present a continuing risk to the District of Columbia Class,

7    as well as to the general public.  Defendants' unlawful acts and practices complained of herein

8    affect the public interest.

9        1500.   Pursuant to D.C. Code § 28-3901, the District of Columbia Class seek an order

10   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble

11   and/or punitive damages, and any other just and proper relief available under the District of

12   Columbia CPPA.

**VIOLATION OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**

15       1501.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

16   forth herein.

17       1502.   Plaintiffs James Boykin, James DeBerry, GN Systems, Inc., Bobby Reichert, and

18   Miguel Silio (for the purpose of this section, "Plaintiffs") bring this action on behalf of

19   themselves and the Florida State Class against all Defendants.

20       1503.   Plaintiffs and the Florida State Class members are "consumers" within the

21   meaning of Fla. Stat. § 501.203(7).

22       1504.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

23   Marchionne are engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8).

24       1505.   The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") makes

25   unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or

26   deceptive acts or practices in the conduct of any trade or commerce …"  Fla. Stat. § 501.204(1).

27       1506.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

28   Marchionne, through their agents, employees, and/or subsidiaries, violated the FUDTPA.

1507.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by Fla. Stat. § 501.204(1):

      A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

      D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

      E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

      F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and

1    sale/lease of the Class Vehicles, whether or not any person has in fact been

2    misled, deceived or damaged thereby.

3    1508.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4    emission control system were material to Plaintiffs and the Florida State Class, as Defendants

5    intended.  Had they known the truth, Plaintiffs and the Florida State Class would not have

6    purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

7    and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

8    them.

9    1509.   Plaintiffs and Florida State Class members had no way of discerning that

10   Defendants' representations were false and misleading, or otherwise learning the facts that

11   Defendants had concealed or failed to disclose, because Defendants' emission control software

12   was extremely sophisticated technology.  Plaintiffs and Florida State Class members did not, and

13   could not, unravel Defendants' deception on their own.

14   1510.   Defendants had an ongoing duty to Plaintiffs and the Florida State Class to refrain

15   from unfair and deceptive practices under the FUDTPA in the course of their business.

16   Specifically, Defendants owed Plaintiffs and Florida State Class members a duty to disclose all

17   the material facts concerning the EcoDiesel® emission control system because they possessed

18   exclusive knowledge, they intentionally concealed it from Plaintiffs and the Florida State Class,

19   and/or they made misrepresentations that were rendered misleading because they were

20   contradicted by withheld facts.

21   1511.   Plaintiffs and Florida State Class members suffered ascertainable loss and actual

22   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

23   failure to disclose material information.

24   1512.   Defendants' violations present a continuing risk to Plaintiffs and the Florida State

25   Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

26   herein affect the public interest.

27

28

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1513.   Pursuant to Fla. Stat. §§ 501.2105(1)-(2), Plaintiffs and the Florida State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the FUDTPA.

**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Ga. Code Ann. § 10-1-370, *et seq.*)**

1514.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

1515.   Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespie, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner III (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against all Defendants.

1516.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Georgia State Class members are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

1517.   The Georgia UDTPA prohibits any "deceptive trade practices," which include misrepresenting the "standard, quality, or grade" of goods or services, and engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  Ga. Code. Ann. § 10-1-372(a).

1518.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating

components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  Defendants' deceptive conduct violates the Georgia UDPTA in at least the following ways:

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and

    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1519.   Defendants' cheating scheme and concealment of the true characteristics of the EcoDiesel emission control system were material to Plaintiffs and the Georgia State Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the Georgia State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1520.   Plaintiffs and Georgia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

1521.   Pursuant to Ga. Code. Ann § 10-1-373, Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and any other just and proper relief available under the Georgia UDPTA.

## VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (Ga. Code Ann. § 10-1-390, *et seq.*)

1522.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1523.   Plaintiffs Marius Bihorean, James DeBerry, Tom Gillespie, Jeffrey Griggs, Michael Johnson, Nelson John Stephens, and William Turner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia State Class against all Defendants.

1524.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.  Ga. Code. Ann. § 10-1-393(a).

1525.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Georgia FBPA.

1526.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ga. Code. Ann. § 10-1-393(b):

A.      Causing confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1527.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Georgia State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Georgia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1528.   Plaintiffs and Georgia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Georgia State Class members did not, and could not, unravel Defendants' deception on their own.

1529.   Defendants had an ongoing duty to Plaintiffs and the Georgia State Class to refrain from unfair and deceptive practices under the Georgia FBPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Georgia State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Georgia State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1530.   Plaintiffs and Georgia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1531.   Defendants' violations present a continuing risk to Plaintiffs and the Georgia State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1532.   Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

1533.   On June 12, 2017, Plaintiff Turner sent a notice letter to FCA US LLC complying with Ga. Code. Ann. § 10-1-399(b).  Plaintiffs sent a second notice letter pursuant to Ga. Code. Ann. § 10-1-399(b) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Georgia State are entitled.

### UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
#### (Haw. Rev. Stat. § 480, *et seq.*)

1534.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1535.   This count is brought on behalf of the Hawaii State Class against all Defendants.

1536.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the Hawaii State Class members are "persons" within the meaning of Haw. Rev. Stat. § 480-1.  The Hawaii State Class members are "consumers" within the meaning of Haw. Rev. Stat. § 480-1.

1537.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in trade or commerce.

1538.   The Hawaii Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  Haw. Rev. Stat. § 480-2(a).

1539.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Hawaii Act.

1540.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of § 480-2(a):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

1528982.7

1
2

      E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

3
4
5
6
7
8

      F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

9
10
11
12
13

    1541.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Hawaii State Class, as Defendants intended.  Had they known the truth, the Hawaii State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

14
15
16
17
18

    1542.   Hawaii State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Hawaii State Class members did not, and could not, unravel Defendants' deception on their own.

19
20
21
22
23
24

    1543.   Defendants had an ongoing duty to the Hawaii State Class to refrain from unfair and deceptive practices under the Hawaii Act in the course of their business.  Specifically, Defendants owed Hawaii State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Hawaii State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

25
26
27

    1544.   Hawaii State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

28

1545.   Defendants' violations present a continuing risk to the Hawaii State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1546.   Pursuant to Haw. Rev. Stat. § 480-13, the Hawaii State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Hawaii Act.

1547.   Under Haw. Rev. Stat. § 480-13.5, the Hawaii State class seek an additional award against Defendants of up to $10,000 for each Hawaii State Class member who qualifies as a Hawaiian elder under the Hawaii Act.  Defendants knew or should have known that their conduct was directed to one or more Hawaii State Class members who are elders.  Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  One or more Hawaii State Class members who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

## VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Idaho Code § 48-601, *et seq.*)

1548.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1549.   Plaintiffs Adam Burwell, Karl Calhoun, and Mathue Fasching (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho State Class against all Defendants.

1550.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Idaho State Class members are "persons" within the meaning Idaho Code § 48-602(1).

1551.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Idaho Code § 48-602(2).

1    1552.   The Idaho Consumer Credit and Protection Act ("Idaho CPA") makes unlawful

2    misleading, false, or deceptive acts.

3    1553.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

4    Marchionne, through their agents, employees, and/or subsidiaries, violated the Idaho CPA.

5    1554.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

6    misrepresented the environmental friendliness and emissions of the Class Vehicles through the

7    EcoDiesel badge—a material fact that was false because the Defendants developed and installed

8    emission cheating components in the Class Vehicles that caused them to pollute excessively in

9    real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

10   pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

11   the Defendants concealed that the fuel efficiency and performance could be achieved only

12   through emission control devices in the Class Vehicles that caused them to pollute excessively in

13   real-world conditions; and (3) the Defendants developed and installed emission cheating

14   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

15   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

16   337-357.  In so doing, and by  marketing, offering for sale, and selling the defective Class

17   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

18   practices proscribed by Idaho Code § 48-603:

19        A.    Causing likelihood of confusion or of misunderstanding as to the approval

20              or certification of the Class Vehicles;

21        B.    Representing that the Class Vehicles have approval, characteristics, uses,

22              or benefits that they do not have;

23        C.    Representing that the Class Vehicles are of a particular standard, quality

24              and grade when they are not;

25        D.    Advertising the Class Vehicles with the intent not to sell or lease them as

26              advertised; and/or

27        E.    Engaging in other conduct which created a likelihood of confusion or of

28              misunderstanding.

-329-

1528982.7

1      1555.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

2  emission control system were material to Plaintiffs and the Idaho State Class, as Defendants

3  intended.  Had they known the truth, Plaintiffs and the Idaho State Class would not have

4  purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

5  and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

6  them.

7      1556.   Plaintiffs and Idaho State Class members had no way of discerning that

8  Defendants' representations were false and misleading, or otherwise learning the facts that

9  Defendants had concealed or failed to disclose, because Defendants' emission control software

10  was extremely sophisticated technology.  Plaintiffs and Idaho State Class members did not, and

11  could not, unravel Defendants' deception on their own.

12      1557.   Defendants had an ongoing duty to Plaintiffs and the Idaho State Class to refrain

13  from unfair and deceptive practices under the Idaho CPA in the course of their business.

14  Specifically, Defendants owed Plaintiffs and Idaho State Class members a duty to disclose all the

15  material facts concerning the EcoDiesel® emission control system because they possessed

16  exclusive knowledge, they intentionally concealed it from Plaintiffs and the Idaho State Class,

17  and/or they made misrepresentations that were rendered misleading because they were

18  contradicted by withheld facts.

19      1558.   Plaintiffs and Idaho State Class members suffered ascertainable loss and actual

20  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

21  failure to disclose material information.

22      1559.   Defendants' violations present a continuing risk to Plaintiffs and the Idaho State

23  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

24  herein affect the public interest.

25      1560.   Pursuant Idaho Code § 48-608, Plaintiffs and the Idaho State Class seek an order

26  enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive

27  damages, and any other just and proper relief available under the Idaho CPA.

28

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *et seq.* and 510/2)**

1561.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1562.   Plaintiff Aaron Carter (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Illinois State Class against all Defendants.

1563.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Illinois State Class members are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5).  Plaintiff and the Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

1564.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

1565.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Illinois CFA.

1566.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in

real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

A. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C. Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D. Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1567.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Illinois State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Illinois State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1568.   Plaintiff and Illinois State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Illinois State Class members did not, and could not, unravel Defendants' deception on their own.

1569.   Defendants had an ongoing duty to Plaintiff and the Illinois State Class to refrain from unfair and deceptive practices under the Illinois CFA in the course of their business. Specifically, Defendants owed Plaintiff and Illinois State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Illinois State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1570.   Plaintiff and Illinois State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1571.   Defendants' violations present a continuing risk to Plaintiff and the Illinois State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1572.   Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff and the Illinois State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (Ind. Code § 24-5-0.5-3)

1573.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1574.   Plaintiff Mark Richards (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Indiana State Class against all Defendants.

1575.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Indiana State Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

1576.   Plaintiff's and Indiana State Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

1577.   The Indiana Deceptive Consumer Sales Act ("Indiana DCSA prohibits a person from engaging in a "deceptive act," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."  Ind. Code § 24-5-0.5-3.

1578.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA.

1579.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only

through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ind. Code § 24-5-0.5-3:

       A.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

       B.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

       C.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1580.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Indiana State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Indiana State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1581.  Plaintiff and Indiana State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Indiana State Class members did not, and could not, unravel Defendants' deception on their own.

1582.  Defendants had an ongoing duty to Plaintiff and the Indiana State Class to refrain from unfair and deceptive practices under the Indiana DCSA in the course of their business.  Specifically, Defendants owed Plaintiff and Indiana State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed

1    exclusive knowledge, they intentionally concealed it from Plaintiff and the Indiana State Class,

2    and/or they made misrepresentations that were rendered misleading because they were

3    contradicted by withheld facts.

4         1583.   Plaintiff and Indiana State Class members suffered ascertainable loss and actual

5    damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

6    failure to disclose material information.

7         1584.   Defendants' violations present a continuing risk to Plaintiff and the Indiana State

8    Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

9    herein affect the public interest.

10        1585.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Indiana State Class seek an

11   order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

12   punitive damages, and any other just and proper relief available under the Indiana DCSA.

13        1586.   On November 8, 2016, a notice letter was sent to FCA US LLC complying with

14   Ind. Code § 24-5-0.5-5(a).  Plaintiffs sent a second notice letter pursuant to Ind. Code § 24-5-0.5-

15   5(a) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the

16   issues raised in this count and this Complaint by the governmental investigations, the numerous

17   complaints filed against them, and the many individual notice letters sent by Plaintiffs within a

18   reasonable amount of time after the allegations of Class Vehicle defects became public.  Because

19   Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek

20   all damages and relief to which Plaintiff and the Indiana State Class are entitled.

21                    **VIOLATIONS OF THE PRIVATE RIGHT OF ACTION**
                          **FOR CONSUMER FRAUDS ACT**
22                            **(Iowa Code § 714h.1, *et seq.*)**

23        1587.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

24   forth herein.

25        1588.   Plaintiff Kirk Petersen (for the purpose of this section, "Plaintiff") brings this

26   action on behalf of himself and the Iowa State Class against all Defendants.

27

28

1589.   Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Iowa State Class members are "persons" within the meaning Iowa Code § 714H.2(7).

1590.   Plaintiff and the Iowa State Class members are "consumers" within the meaning of Iowa Code § 714H.2(3).

1591.   The Iowa Deceptive Consumer Sales Act ("Iowa DCSA") prohibits a person from engaging in a "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

1592.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Iowa DCSA.

1593.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants violated Iowa Code § 714H.3 by using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a

1   material fact with intent that others rely upon such concealment, suppression or omission, in

2   connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person

3   has in fact been misled, deceived or damaged thereby.

4       1594.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

5   emission control system were material to Plaintiff and the Iowa State Class, as Defendants

6   intended.  Had they known the truth, Plaintiff and the Iowa State Class would not have purchased

7   or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and

8   mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

9       1595.   Plaintiff and Iowa State Class members had no way of discerning that Defendants'

10  representations were false and misleading, or otherwise learning the facts that Defendants had

11  concealed or failed to disclose, because Defendants' emission control software was extremely

12  sophisticated technology.  Plaintiff and Iowa State Class members did not, and could not, unravel

13  Defendants' deception on their own.

14      1596.   Defendants had an ongoing duty to Plaintiff and the Iowa State Class to refrain

15  from unfair and deceptive practices under the Iowa DCSA in the course of their business.

16  Specifically, Defendants owed Plaintiff and Iowa State Class members a duty to disclose all the

17  material facts concerning the EcoDiesel® emission control system because they possessed

18  exclusive knowledge, they intentionally concealed it from Plaintiff and the Iowa State Class,

19  and/or they made misrepresentations that were rendered misleading because they were

20  contradicted by withheld facts.

21      1597.   Plaintiff and Iowa State Class members suffered ascertainable loss and actual

22  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

23  failure to disclose material information.

24      1598.   Defendants' violations present a continuing risk to Plaintiff and the Iowa State

25  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

26  herein affect the public interest.

27

28

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1599.   On March 26, 2018, Plaintiffs sought approval from the Iowa Attorney General to file a class action claim under the Iowa DCSA.  Plaintiffs received approval from the Office of the Attorney General in a letter dated April 2, 2018.

1600.   Pursuant to Iowa Code § 714H.5, Plaintiff and the Iowa State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Iowa DCSA.

### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (Kan. Stat. Ann. § 50-623, *et seq.*)

1601.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1602.   This count is brought on behalf of the Kansas State Class against all Defendants.

1603.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are "suppliers" within the meaning of Kan. Stat. Ann. § 50-624(l).  The Kansas State Class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

1604.   The sale of the Class Vehicles to the Kansas State Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1605.   The Kansas Consumer Credit and Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).

1606.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Kansas CPA.

1607.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only

through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Kan. Stat. Ann. § 50-627(a):

        A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

        C.     Exaggerating and providing falsehoods regarding the material facts concerning the Class Vehicles; and/or

        D.     Failing to state, willfully concealing, suppressing, and/or omitting material facts relating to the Class Vehicles.

     1608.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Kansas State Class, as Defendants intended.  Had they known the truth, the Kansas State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

     1609.  Kansas State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Kansas State Class members did not, and could not, unravel Defendants' deception on their own.

     1610.  Defendants had an ongoing duty to the Kansas State Class to refrain from unfair and deceptive practices under the Kansas CPA in the course of their business.  Specifically, Defendants owed Kansas State Class members a duty to disclose all the material facts concerning

the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Kansas State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1611.  Kansas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1612.  Defendants' violations present a continuing risk to the Kansas State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1613.  Pursuant to Kan. Stat. Ann §§ 50-634 and 50-636, the Kansas State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Kansas CPA.

**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
(La. Rev. Stat. § 51:1401, *et seq*.)**

1614.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1615.  Plaintiffs Jamie Broom, Samuel Price, and John Radziewicz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Louisiana State Class against all Defendants.

1616.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Louisiana State Class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).  Plaintiffs and the Louisiana State Class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

1617.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

1618.  The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).

1619.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Louisiana CPL.

1620.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in La. Rev. Stat. § 51:1405(A):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a

material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the advertisement and

sale/lease of the Class Vehicles, whether or not any person has in fact been

misled, deceived or damaged thereby.

1621.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Louisiana State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Louisiana State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1622.   Plaintiffs and Louisiana State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Louisiana State Class members did not, and could not, unravel Defendants' deception on their own.

1623.   Defendants had an ongoing duty to Plaintiffs and the Louisiana State Class to refrain from unfair and deceptive practices under the Louisiana CPL in the course of their business.  Specifically, Defendants owed Plaintiffs and Louisiana State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Louisiana State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1624.   Plaintiffs and Louisiana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1625.   Defendants' violations present a continuing risk to Plaintiffs and the Louisiana State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1626.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Louisiana CPL.

### VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
#### (Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*)

1627.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1628.   Plaintiff Edward Devault (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maine State Class against all Defendants.

1629.   Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the Maine State Class members are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(2).

1630.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(3.

1631.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  Me. Rev. Stat. Ann. Tit. 5 § 207.

1632.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Maine UTPA.

1633.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating

components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Me. Rev. Stat. Ann. Tit. 5 § 207:

A. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C. Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D. Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1634. Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Maine State Class, as Defendants intended. Had they known the truth, Plaintiff and the Maine State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1635.   Plaintiff and Maine State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Maine State Class members did not, and could not, unravel Defendants' deception on their own.

1636.   Defendants had an ongoing duty to Plaintiff and the Maine State Class to refrain from unfair and deceptive practices under the Maine UTPA in the course of their business. Specifically, Defendants owed Plaintiff and Maine State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Maine State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1637.   Plaintiff and Maine State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1638.   Defendants' violations present a continuing risk to Plaintiff and the Maine State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1639.   Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiff and the Maine State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Maine UTPA.

1640.   On November 28, 2016, a notice letter was sent to FCA US LLC complying with Me. Rev. Stat. Ann. Tit. 5 § 213(1-A).  Plaintiffs sent a second notice letter pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213(1-A) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite

1    time period, Plaintiff and the Maine State Class members seek all damages and relief to which

2    they are entitled.

### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
#### (Md. Code Com. Law § 13-101, *et seq.*)

5    1641.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

6    forth herein.

7    1642.   Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section,

8    "Plaintiffs") bring this action on behalf of themselves and the Maryland State Class against all

9    Defendants.

10    1643.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

11    Marchionne, Plaintiffs, and the Maryland State Class members are "persons" within the meaning

12    of Md. Code Com. Law § 13-101(h).

13    1644.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person

14    may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md.

15    Code Com. Law § 13-303.

16    1645.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

17    Marchionne, through their agents, employees, and/or subsidiaries, violated the Maryland CPA.

18    1646.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

19    misrepresented the environmental friendliness and emissions of the Class Vehicles through the

20    EcoDiesel badge—a material fact that was false because the Defendants developed and installed

21    emission cheating components in the Class Vehicles that caused them to pollute excessively in

22    real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

23    pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

24    the Defendants concealed that the fuel efficiency and performance could be achieved only

25    through emission control devices in the Class Vehicles that caused them to pollute excessively in

26    real-world conditions; and (3) the Defendants developed and installed emission cheating

27    components that caused the Class Vehicles to pollute excessively in real-world conditions, and

28    fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

practices as prohibited by Md. Code Com. Law § 13-303:

        A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

        C.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

        D.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1647.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Maryland State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Maryland State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1648.  Plaintiffs and Maryland State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Maryland State Class members did not, and could not, unravel Defendants' deception on their own.

1649.  Defendants had an ongoing duty to Plaintiffs and the Maryland State Class to refrain from unfair and deceptive practices under the Maryland CPA in the course of their

business.  Specifically, Defendants owed Plaintiffs and Maryland State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Maryland State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1650.  Plaintiffs and Maryland State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1651.  Defendants' violations present a continuing risk to Plaintiffs and the Maryland State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1652.  Pursuant to Md. Code Com. Law § 13-408, Plaintiffs and the Maryland State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Maryland CPA.

**DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW**
**(Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)**

1653.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1654.  Plaintiff Benjamin Greenberg (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Massachusetts State Class against all Defendants.

1655.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Massachusetts State Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1656.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1657.   The Massachusetts consumer protection law ("Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

1658.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act.

1659.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws ch. 93A, § 2:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1660.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Massachusetts State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Massachusetts State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1661.   Plaintiff and Massachusetts State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Massachusetts State Class members did not, and could not, unravel Defendants' deception on their own.

1662.   Defendants had an ongoing duty to Plaintiff and the Massachusetts State Class to refrain from unfair and deceptive practices under the Massachusetts Act in the course of their business.  Specifically, Defendants owed Plaintiff and Massachusetts State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Massachusetts State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-351-

1663.   Plaintiff and Massachusetts State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1664.   Defendants' violations present a continuing risk to Plaintiff and the Massachusetts State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1665.   Plaintiff and the Massachusetts State Class seek an order pursuant to Mass. Gen. Laws ch. 93A § 9 enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Massachusetts Act.

1666.   On November 28, 2017, a notice letter was sent to FCA US LLC pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  Plaintiffs sent a second notice letter pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Massachusetts State Class are entitled.

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, *et seq.*)

1667.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1668.   Plaintiff Doru Bali (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Michigan State Class against all Defendants.

1669.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Michigan State Class members are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

1670. FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

1671. The Michigan Consumer Protection Act ("Michigan CPA") makes unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903(1).

1672. In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Michigan CPA.

1673. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Mich. Comp. Laws § 445.903(1):

    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1674.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Michigan State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Michigan State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1675.   Plaintiff and Michigan State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Michigan State Class members did not, and could not, unravel Defendants' deception on their own.

1676.   Defendants had an ongoing duty to Plaintiff and the Michigan State Class to refrain from unfair and deceptive practices under the Michigan CPA in the course of their business.  Specifically, Defendants owed Plaintiff and Michigan State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Michigan State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1677.   Plaintiff and Michigan State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1678.   Defendants' violations present a continuing risk to Plaintiff and the Michigan State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1679. Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the Michigan State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Michigan CPA.

**VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(Minn. Stat. § 325f.68, *et seq.*)**

1680. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1681. Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against all Defendants.

1682. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1683. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...."  Minn. Stat. § 325F.69(1).

1684. In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA.

1685. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in

1   real-world conditions; and (3) the Defendants developed and installed emission cheating

2   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

3   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

4   337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

5   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

6   practices as prohibited by Minn. Stat. § 325F.69(1): using or employing deception, fraud, false

7   pretense, false promise or misrepresentation, or the concealment, suppression or omission of a

8   material fact with intent that others rely upon such concealment, suppression or omission, in

9   connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person

10  has in fact been misled, deceived or damaged thereby.

11      1686.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

12  emission control system were material to Plaintiff and the Minnesota State Class, as Defendants

13  intended.  Had they known the truth, Plaintiff and the Minnesota State Class would not have

14  purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

15  and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

16  them.

17      1687.   Plaintiff and Minnesota State Class members had no way of discerning that

18  Defendants' representations were false and misleading, or otherwise learning the facts that

19  Defendants had concealed or failed to disclose, because Defendants' emission control software

20  was extremely sophisticated technology.  Plaintiff and Minnesota State Class members did not,

21  and could not, unravel Defendants' deception on their own.

22      1688.   Defendants had an ongoing duty to Plaintiff and the Minnesota State Class to

23  refrain from unfair and deceptive practices under the Minnesota CFA in the course of their

24  business.  Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to

25  disclose all the material facts concerning the EcoDiesel® emission control system because they

26  possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Minnesota

27  State Class, and/or they made misrepresentations that were rendered misleading because they

28  were contradicted by withheld facts.

1689.   Plaintiff and Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1690.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1691.   Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), Plaintiff and the Minnesota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices and any other just and proper relief available under the Minnesota CFA.

**VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325d.43, *et seq.*)**

1692.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1693.   Plaintiff Josh Claflin (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Minnesota State Class against all Defendants.

1694.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices.  Minn. Stat. § 325D.44.

1695.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA.

1696.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in

real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Minn. Stat. § 325D.44:

        A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

        B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

        D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

        E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1697.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Minnesota State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Minnesota State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1698.  Plaintiff and Minnesota State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Minnesota State Class members did not, and could not, unravel Defendants' deception on their own.

1699.   Defendants had an ongoing duty to Plaintiff and the Minnesota State Class to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of their business.  Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Minnesota State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1700.   Plaintiff and Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1701.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1702.   Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Plaintiff and the Minnesota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota DTPA.

## VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
### (Miss. Code. Ann. § 75-24-1, *et seq.*)

1703.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1704.   Plaintiff Anthony Alley (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Mississippi State Class against all Defendants.

1705.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  Miss. Code. Ann. § 75-24-5(1).

1706.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Mississippi CPA.

1707.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Miss. Code. Ann. § 75-24-5(1):

A.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

C.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1708.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Mississippi State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Mississippi State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1709.   Plaintiff and Mississippi State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that

1    Defendants had concealed or failed to disclose, because Defendants' emission control software

2    was extremely sophisticated technology.  Plaintiff and Mississippi State Class members did not,

3    and could not, unravel Defendants' deception on their own.

4         1710.   Defendants had an ongoing duty to Plaintiff and the Mississippi State Class to

5    refrain from unfair and deceptive practices under the Mississippi CPA in the course of their

6    business.  Specifically, Defendants owed Plaintiff and Mississippi State Class members a duty to

7    disclose all the material facts concerning the EcoDiesel® emission control system because they

8    possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Mississippi

9    State Class, and/or they made misrepresentations that were rendered misleading because they

10   were contradicted by withheld facts.

11        1711.   Plaintiff and Mississippi State Class members suffered ascertainable loss and

12   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

13   and/or failure to disclose material information.

14        1712.   Defendants' violations present a continuing risk to Plaintiff and the Mississippi

15   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

16   of herein affect the public interest.

17        1713.   Plaintiff has made, and continues to make, a reasonable attempt to resolve their

18   claims under the Mississippi CPA through an informal dispute program approved by the

19   Mississippi Attorney General.  Miss. Code. Ann. § 75-24-15(2).  Plaintiffs have contacted the

20   Office of the Attorney General and followed the procedures prescribed by the Consumer

21   Protection Division.  On March 29, 2018, Plaintiffs sent Defendants a Letter of Complaint by

22   certified mail. Defendants did not respond within ten days.  Accordingly, on April 17, 2018,

23   Plaintiffs filed their Complaint with the Mississippi Attorney General.  The Office of the Attorney

24   General has three weeks to review the Complaint from the date it was filed, after which time, a

25   mediator will be assigned.  If the Attorney General can give formal approval if that mediation

26   fails.

27

28

1714.   The Mississippi State Class seek an under Miss. Code Ann. § 75-25-9 enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, including restitution under § 75-24-11, and any other just and proper relief available under the Mississippi CPA.

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

1715.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1716.   Plaintiff Melvin Phillips (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Missouri State Class against all Defendants.

1717.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Missouri State Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1718.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1719.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise. Mo. Rev. Stat. § 407.020.

1720.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Missouri MPA.

1721.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in

1    real-world conditions; and (3) the Defendants developed and installed emission cheating

2    components that caused the Class Vehicles to pollute excessively in real-world conditions, and

3    fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

4    337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

5    Vehicles, Defendants engaged in the following unfair or deceptive acts or practices prohibited by

6    Mo. Rev. Stat. § 407.020: using or employing deception, fraud, false pretense, false promise or

7    misrepresentation, or the concealment, suppression or omission of a material fact with intent that

8    others rely upon such concealment, suppression or omission, in connection with the

9    advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been

10   misled, deceived or damaged thereby.

11          1722.   By failing to disclose these defects or facts about the defects described herein

12   known to it or that were available to Defendants upon reasonable inquiry, Defendants deprived

13   consumers of all material facts about the safety and functionality of their vehicles.  By failing to

14   release material facts about the defect, Defendants curtailed or reduced the ability of consumers to

15   take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep

16   those facts from consumers.  15 Mo. Code of State Reg. § 60-9.110.

17          1723.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

18   emission control system were material to Plaintiff and the Missouri State Class, as Defendants

19   intended.  Had they known the truth, Plaintiff and the Missouri State Class would not have

20   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

21   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

22   them.

23          1724.   Plaintiff and Missouri State Class members had no way of discerning that

24   Defendants' representations were false and misleading, or otherwise learning the facts that

25   Defendants had concealed or failed to disclose, because Defendants' emission control software

26   was extremely sophisticated technology.  Plaintiff and Missouri State Class members did not, and

27   could not, unravel Defendants' deception on their own.

28

1      1725.   Defendants had an ongoing duty to Plaintiff and the Missouri State Class to refrain

2   from unfair and deceptive practices under the Missouri MPA in the course of their business.

3   Specifically, Defendants owed Plaintiff and Missouri State Class members a duty to disclose all

4   the material facts concerning the EcoDiesel® emission control system because they possessed

5   exclusive knowledge, they intentionally concealed it from Plaintiff and the Missouri State Class,

6   and/or they made misrepresentations that were rendered misleading because they were

7   contradicted by withheld facts.

8      1726.   Plaintiff and Missouri State Class members suffered ascertainable loss and actual

9   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

10  failure to disclose material information.

11     1727.   Defendants' violations present a continuing risk to Plaintiff and the Missouri State

12  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

13  herein affect the public interest.

14     1728.   Pursuant to Mo. Rev. Stat. § 407.025, Plaintiff and the Missouri State Class seek

15  an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

16  punitive damages, and any other just and proper relief available under the Missouri MPA.

17
18
**VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION ACT OF 1973
(Mont. Code Ann. § 30-14-101, *et seq.*)**

19     1729.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

20  forth herein.

21     1730.   Plaintiff Ronald Holm (for the purpose of this section, "Plaintiff") brings this

22  action on behalf of himself and the Montana State against all Defendants.

23     1731.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

24  Marchionne, Plaintiff and the Montana State Class members are "persons" within the meaning of

25  Mont. Code Ann. § 30-14-102(6).  Plaintiff and the Montana State Class members are

26  "consumers" within the meaning of Mont. Code Ann. § 30-14-102(1).

27     1732.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne

28  are engaged in "trade" or "commerce" within the meaning of Mont. Code Ann. § 30-14-102(8).

1    1733.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana

2    CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or

3    practices in the conduct of any trade or commerce."  Mont. Code Ann. § 30-14-103.

4    1734.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

5    Marchionne, through their agents, employees, and/or subsidiaries, violated the Montana CPA.

6    1735.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

7    misrepresented the environmental friendliness and emissions of the Class Vehicles through the

8    EcoDiesel badge—a material fact that was false because the Defendants developed and installed

9    emission cheating components in the Class Vehicles that caused them to pollute excessively in

10   real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

11   pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

12   the Defendants concealed that the fuel efficiency and performance could be achieved only

13   through emission control devices in the Class Vehicles that caused them to pollute excessively in

14   real-world conditions; and (3) the Defendants developed and installed emission cheating

15   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

16   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

17   337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

18   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

19   practices as prohibited by Mont. Code Ann. § 30-14-103:

20        A.    Causing likelihood of confusion or of misunderstanding as to the approval

21              or certification of the Class Vehicles;

22        B.    Representing that the Class Vehicles have approval, characteristics, uses,

23              or benefits that they do not have;

24        C.    Representing that the Class Vehicles are of a particular standard, quality

25              and grade when they are not;

26        D.    Advertising the Class Vehicles with the intent not to sell or lease them as

27              advertised;

28

E.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1736.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Montana State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Montana State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1737.   Plaintiff and Montana State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Montana State Class members did not, and could not, unravel Defendants' deception on their own.

1738.   Defendants had an ongoing duty to Plaintiff and the Montana State Class to refrain from unfair and deceptive practices under the Montana CPA in the course of their business. Specifically, Defendants owed Plaintiff and Montana State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Montana State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-366-

1739.   Plaintiff and Montana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1740.   Defendants' violations present a continuing risk to Plaintiff and the Montana State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1741.   Pursuant to Mont. Code Ann. § 30-14-133, Plaintiff and the Montana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Montana CPA.

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
#### (Neb. Rev. Stat. § 59-1601, *et seq.*)

1742.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1743.   Plaintiffs Connie Hood and Richard Lindholm (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Nebraska State Class against all Defendants.

1744.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Nebraska State Class members are "persons" within the meaning of Neb. Rev. Stat. § 59-1601(1).

1745.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Neb. Rev. Stat. § 59-1601(2).

1746.   The Nebraska Consumer Protection Act ("Nebraska CPA") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602.

1747.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Nebraska CPA.

1748.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Neb. Rev. Stat. § 59-1602:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and

1        sale/lease of the Class Vehicles, whether or not any person has in fact been

2        misled, deceived or damaged thereby.

3        1749.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4    emission control system were material to Plaintiffs and the Nebraska State Class, as Defendants

5    intended.  Had they known the truth, Plaintiffs and the Nebraska State Class would not have

6    purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

7    and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

8    them.

9        1750.   Plaintiffs and Nebraska State Class members had no way of discerning that

10   Defendants' representations were false and misleading, or otherwise learning the facts that

11   Defendants had concealed or failed to disclose, because Defendants' emission control software

12   was extremely sophisticated technology.  Plaintiffs and Nebraska State Class members did not,

13   and could not, unravel Defendants' deception on their own.

14       1751.   Defendants had an ongoing duty to Plaintiffs and the Nebraska State Class to

15   refrain from unfair and deceptive practices under the Nebraska CPA in the course of their

16   business.  Specifically, Defendants owed Plaintiffs and Nebraska State Class members a duty to

17   disclose all the material facts concerning the EcoDiesel® emission control system because they

18   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Nebraska

19   State Class, and/or they made misrepresentations that were rendered misleading because they

20   were contradicted by withheld facts.

21       1752.   Plaintiffs and Nebraska State Class members suffered ascertainable loss and actual

22   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

23   failure to disclose material information.

24       1753.   Defendants' violations present a continuing risk to Plaintiffs and the Nebraska

25   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

26   of herein affect the public interest.

27

28

1528982.7

1754.   Pursuant to Neb. Rev. Stat. § 59-1609, Plaintiffs and the Nebraska State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Nebraska CPA.

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (Nev. Rev. Stat. § 598.0903, *et seq.*)

1755.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1756.   Plaintiff Christopher Mattingly (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Nevada State Class against all Defendants.

1757.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq*. prohibits deceptive trade practices.

1758.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Nevada DTPA.

1759.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Nev. Rev. Stat. §§ 598.0915, 598.0923, and 598.0925:

A.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

D.     Violating state and federal statutes and regulations relating to the sale of the Class Vehicles; and/or

E.     Intending to injure competitors and destroy or substantially lessen competition.

1760.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Nevada State Class, as Defendants intended. Had they known the truth, Plaintiff and the Nevada State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1761.   Plaintiff and Nevada State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiff and Nevada State Class members did not, and could not, unravel Defendants' deception on their own.

1762.   Defendants had an ongoing duty to Plaintiff and the Nevada State Class to refrain from unfair and deceptive practices under the Nevada DTPA in the course of their business. Specifically, Defendants owed Plaintiff and Nevada State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Nevada State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

-371-

1763.   Plaintiff and Nevada State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1764.   Defendants' violations present a continuing risk to Plaintiff and the Nevada State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1765.   Pursuant to Nev. Rev. Stat. §§ 41.600 and 598.0977, Plaintiff and the Nevada State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Nevada DTPA.

### VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq*.)

1766.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1767.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1768.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the New Hampshire State Class members are "persons" within the meaning of N.H. Rev. Stat. § 358-A:1.

1769.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of N.H. Rev. Stat. § 358-A:1.

1770.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes unfair or deceptive trade practices unlawful. N.H. Rev. Stat. Ann. § 358-A:2.

1771.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Hampshire CPA.

1772.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed

emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in N.H. Rev. Stat. § 358-A:2:

      A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      B.     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      C.     Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

      D.     Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1773.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the New Hampshire State Class, as Defendants intended.  Had they known the truth, the New Hampshire State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1774.  New Hampshire State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely

1    sophisticated technology.  New Hampshire State Class members did not, and could not, unravel

2    Defendants' deception on their own.

3         1775.  Defendants had an ongoing duty to the New Hampshire State Class to refrain from

4    unfair and deceptive practices under the New Hampshire CPA in the course of their business.

5    Specifically, Defendants owed New Hampshire State Class members a duty to disclose all the

6    material facts concerning the EcoDiesel® emission control system because they possessed

7    exclusive knowledge, they intentionally concealed it from the New Hampshire State Class, and/or

8    they made misrepresentations that were rendered misleading because they were contradicted by

9    withheld facts.

10        1776.  New Hampshire State Class members suffered ascertainable loss and actual

11   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

12   failure to disclose material information.

13        1777.  Defendants' violations present a continuing risk to the New Hampshire State

14   Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

15   herein affect the public interest.

16        1778.  Pursuant to N.H. Rev. Stat. § 358-A:10, the New Hampshire State Class seek an

17   order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

18   punitive damages, and any other just and proper relief available under the New Hampshire CPA.

19                  **VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
                            **(N.J. Stat. Ann. § 56:8-1, *et seq*.)**
20

21        1779.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

22   forth herein.

23        1780.  Plaintiffs Michael Norton and Wayne Tonnesen (for the purpose of this section,

24   "Plaintiffs") bring this action on behalf of themselves and the New Jersey State Class against all

25   Defendants.

26        1781.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

27   Marchionne, Plaintiffs, and the New Jersey State Class members are "persons" within the

28   meaning of N.J. Stat. Ann. § 56:8-1(d).

1782.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "sales" of "merchandise" within the meaning of N.J. Stat.  Ann. § 56:8-1(c), (e).

1783.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…"  N.J. Stat. Ann. § 56:8-2.

1784.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA.

1785.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the

1    advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been

2    misled, deceived or damaged thereby.

3        1786.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4    emission control system were material to Plaintiffs and the New Jersey State Class, as Defendants

5    intended.  Had they known the truth, Plaintiffs and the New Jersey State Class would not have

6    purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

7    and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

8    them.

9        1787.   Plaintiff and New Jersey State Class members had no way of discerning that

10   Defendants' representations were false and misleading, or otherwise learning the facts that

11   Defendants had concealed or failed to disclose, because Defendants' emission control software

12   was extremely sophisticated technology.  Plaintiff and New Jersey State Class members did not,

13   and could not, unravel Defendants' deception on their own.

14       1788.   Defendants had an ongoing duty to Plaintiffs and the New Jersey State Class to

15   refrain from unfair and deceptive practices under the New Jersey CFA in the course of their

16   business.  Specifically, Defendants owed Plaintiff and New Jersey State Class members a duty to

17   disclose all the material facts concerning the EcoDiesel® emission control system because they

18   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the New

19   Jersey State Class, and/or they made misrepresentations that were rendered misleading because

20   they were contradicted by withheld facts.

21       1789.   Plaintiff and New Jersey State Class members suffered ascertainable loss and

22   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

23   and/or failure to disclose material information.

24       1790.   Defendants' violations present a continuing risk to Plaintiffs and the New Jersey

25   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

26   of herein affect the public interest.

27       1791.   Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey State Class

28   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

1  damages, punitive damages, and any other just and proper relief available under the New Jersey

2  CFA.

3              **VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT**
               **(N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**
4

5        1792.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

6  forth herein.

7        1793.   Plaintiffs Jake Gunderson and WEB Farms, Inc. (for the purpose of this section,

8  "Plaintiffs") bring this action on behalf of themselves and the New Mexico State Class against all

9  Defendants.

10       1794.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

11  Marchionne, Plaintiffs, and the New Mexico State Class members are "persons" within the

12  meaning of N.M. Stat. Ann. § 57-12-2.

13       1795.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne

14  are engaged in trade or commerce within the meaning of N.M. Stat. Ann. § 57-12-2.

15       1796.   The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes

16  unlawful "a false or misleading oral or written statement, visual description or other

17  representation of any kind knowingly made in connection with the sale, lease, rental or loan of

18  goods or services … by a person in the regular course of the person's trade or commerce, that

19  may, tends to or does deceive or mislead any person," including but not limited to "failing to state

20  a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D).

21       1797.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

22  Marchionne, through their agents, employees, and/or subsidiaries, violated the New Mexico

23  UTPA.

24       1798.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

25  misrepresented the environmental friendliness and emissions of the Class Vehicles through the

26  EcoDiesel badge—a material fact that was false because the Defendants developed and installed

27  emission cheating components in the Class Vehicles that caused them to pollute excessively in

28  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.M. Stat. Ann. § 57-12-2(D) and § 57-12-2(E):

  A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

  B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

  C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

  D.   Using exaggeration as to a material fact and/or failing to state the material facts concerning the Class Vehicles in a way that tended to deceive; and/or

  E.   Acting in a manner that resulted in a gross disparity between the true value of the Class Vehicles and the price paid.

1799.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the New Mexico State Class, as Defendants intended. Had they known the truth, Plaintiffs and the New Mexico State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1800.  Plaintiffs and New Mexico State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software

1    was extremely sophisticated technology.  Plaintiffs and New Mexico State Class members did

2    not, and could not, unravel Defendants' deception on their own.

3        1801.   Defendants had an ongoing duty to Plaintiffs and the New Mexico State Class to

4    refrain from unfair and deceptive practices under the New Mexico UTPA in the course of their

5    business.  Specifically, Defendants owed Plaintiffs and New Mexico State Class members a duty

6    to disclose all the material facts concerning the EcoDiesel® emission control system because they

7    possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the New

8    Mexico State Class, and/or they made misrepresentations that were rendered misleading because

9    they were contradicted by withheld facts.

10       1802.   Plaintiffs and New Mexico State Class members suffered ascertainable loss and

11   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

12   and/or failure to disclose material information.

13       1803.   Defendants' violations present a continuing risk to Plaintiffs and the New Mexico

14   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

15   of herein affect the public interest.

16       1804.   Pursuant to N.M. Stat. Ann. § 57-12-10, Plaintiffs and the New Mexico State Class

17   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

18   damages, punitive damages, and any other just and proper relief available under the New Mexico

19   UTPA.

20              **VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
                        **(N.Y. Gen. Bus. Law § 349)**
21

22       1805.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

23   forth herein.

24       1806.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the

25   purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York

26   State Class against all Defendants.

27

28

1807.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the New York State Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

1808.   The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

1809.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the New York DAPA.

1810.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1811.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the New York State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the New York State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1812.   Plaintiffs and New York State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and New York State Class members did not, and could not, unravel Defendants' deception on their own.

1813.   Defendants had an ongoing duty to Plaintiffs and the New York State Class to refrain from unfair and deceptive practices under the New York DAPA in the course of their business.  Specifically, Defendants owed Plaintiffs and New York State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the New York

1    State Class, and/or they made misrepresentations that were rendered misleading because they

2    were contradicted by withheld facts.

3        1814.   Plaintiffs and New York State Class members suffered ascertainable loss and

4    actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

5    and/or failure to disclose material information.

6        1815.   Defendants' violations present a continuing risk to Plaintiffs and the New York

7    State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

8    of herein affect the public interest.

9        1816.   Plaintiffs and the New York State Class seek an order enjoining Defendants'

10   unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other

11   just and proper relief available under the New York DAPA.

12   **VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**

**(N.Y. Gen. Bus. Law § 350)**

13

14       1817.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

15   forth herein.

16       1818.   Plaintiffs Giuseppe Carillo, Thomas McGann, Jr., and George Milner (for the

17   purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York

18   State Class against all Defendants.

19       1819.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

20   Marchionne are engaged in the "conduct of business, trade or commerce," within the meaning of

21   N.Y. Gen. Bus. Law § 350.

22       1820.   The New York False Advertising Act ("NY FAA") makes unlawful "[f]alse

23   advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.  False

24   advertising includes "advertising, including labeling, of a commodity . . . if such advertising is

25   misleading in a material respect," taking into account "the extent to which the advertising fails to

26   reveal facts material in light of … representations [made] with respect to the commodity …."

27   N.Y. Gen. Bus. Law § 350-a.

28

1821. Defendants caused to be made or disseminated through New York and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and the other New York State Class members.

1822. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357.

1823. Defendants violated the NY FAA by: representing that the Class Vehicles had characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; engaging in other conduct creating a likelihood of confusion or of misunderstanding; and employing concealment, suppression, or omission of material facts in connection with the advertisement and sale of the Class Vehicles. Defendants knew or should have known that their conduct violated the NY FAA.

1824. Plaintiffs and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations, deceptions, and their concealment of and failure to disclose material information.

1825.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of New York and nationwide.

1826.   Pursuant to the NY FAA, Plaintiffs and the New York State Class seek injunctive relief, as well as monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class member. Because Defendants' conduct was committed willingly and knowingly, Plaintiffs and the New York State Class are entitled to recover three times actual damages, up to $10,000.

**VIOLATIONS OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT
(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**

1827.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1828.   Plaintiffs Marius Bihorean, Miguel Fragoso, Samuel Price, and Stonewall Webster (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina State Class against all Defendants.

1829.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the North Carolina State Class members are "persons" within the meaning of N.C. Gen. Stat. § 75-1.1, *et seq.*

1830.   FCA's, Fiat's, VM Italy's, VM America's, Bosch GmbH's, Bosch LLC's, and Sergio Marchionne's acts and practices complained of herein were performed in the course of their trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

1831.   The North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[,]" and the North Carolina UDTPA

1    provides a private right of action for any person injured "by reason of any act or thing done by

2    any other person, firm or corporation in violation of" the law.  N.C. Gen. Stat. § 75-16.

3         1832.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

4    Marchionne, through their agents, employees, and/or subsidiaries, violated the North Carolina

5    UDTPA.

6         1833.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

7    misrepresented the environmental friendliness and emissions of the Class Vehicles through the

8    EcoDiesel badge—a material fact that was false because the Defendants developed and installed

9    emission cheating components in the Class Vehicles that caused them to pollute excessively in

10   real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

11   pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

12   the Defendants concealed that the fuel efficiency and performance could be achieved only

13   through emission control devices in the Class Vehicles that caused them to pollute excessively in

14   real-world conditions; and (3) the Defendants developed and installed emission cheating

15   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

16   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

17   337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

18   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

19   practices prohibited by the North Carolina UDTPA:

20            A.    Causing likelihood of confusion or of misunderstanding as to the approval

21                  or certification of the Class Vehicles;

22            B.    Representing that the Class Vehicles have approval, characteristics, uses,

23                  or benefits that they do not have;

24            C.    Representing that the Class Vehicles are of a particular standard, quality

25                  and grade when they are not;

26            D.    Advertising the Class Vehicles with the intent not to sell or lease them as

27                  advertised;

28

1    E.  Engaging in other conduct which created a likelihood of confusion or of

2       misunderstanding; and/or

3    F.  Using or employing deception, fraud, false pretense, false promise or

4       misrepresentation, or the concealment, suppression or omission of a

5       material fact with intent that others rely upon such concealment,

6       suppression or omission, in connection with the advertisement and

7       sale/lease of the Class Vehicles, whether or not any person has in fact been

8       misled, deceived or damaged thereby.

9    1834.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

10 emission control system were material to Plaintiffs and the North Carolina State Class, as

11 Defendants intended.  Had they known the truth, Plaintiffs and the North Carolina State Class

12 would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

13 been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

14 significantly less for them.

15    1835.  Plaintiffs and North Carolina State Class members had no way of discerning that

16 Defendants' representations were false and misleading, or otherwise learning the facts that

17 Defendants had concealed or failed to disclose, because Defendants' emission control software

18 was extremely sophisticated technology.  Plaintiffs and North Carolina State Class members did

19 not, and could not, unravel Defendants' deception on their own.

20    1836.  Defendants had an ongoing duty to Plaintiffs and the North Carolina State Class to

21 refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of

22 their business.  Specifically, Defendants owed Plaintiffs and North Carolina State Class members

23 a duty to disclose all the material facts concerning the EcoDiesel® emission control system

24 because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and

25 the North Carolina State Class, and/or they made misrepresentations that were rendered

26 misleading because they were contradicted by withheld facts.

27

28

1    1837.   Plaintiffs and North Carolina State Class members suffered ascertainable loss and

2    actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

3    and/or failure to disclose material information.

4    1838.   Defendants' violations present a continuing risk to Plaintiffs and the North

5    Carolina State Class, as well as to the general public.  Defendants' unlawful acts and practices

6    complained of herein affect the public interest.

7    1839.   Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs and the North Carolina State Class

8    seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

9    damages, punitive damages, and any other just and proper relief available under the North

10   Carolina UDTPA.

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
#### (N.D. Cent. Code § 51-15-02)

13   1840.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

14   forth herein.

15   1841.   Plaintiff Andrew Loescher (for the purpose of this section, "Plaintiff") brings this

16   action on behalf of himself and the North Dakota State Class against all Defendants.

17   1842.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

18   Marchionne, Plaintiff, and the North Dakota State Class members are "persons" within the

19   meaning of N.D. Cent. Code § 51-15-02(4).

20   1843.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

21   Marchionne are engaged in the "sale" of "merchandise" within the meaning of N.D. Cent Code

22   §§ 51-15-02(3), (5).

23   1844.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful

24   "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false

25   pretense, false promise, or misrepresentation, with the intent that others rely thereon in

26   connection with the sale or advertisement of any merchandise…."  N.D. Cent. Code § 51-15-02.

27

28

1845.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the North Dakota CFA.

1846.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by N.D. Cent. Code § 51-15-02: using or employing deception, fraud, false pretense, false promise or misrepresentation, with intent that others rely thereon, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1847.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the North Dakota State Class, as Defendants intended.  Had they known the truth, Plaintiff and the North Dakota State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1848.   Plaintiff and North Dakota State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that

1  Defendants had concealed or failed to disclose, because Defendants' emission control software

2  was extremely sophisticated technology.  Plaintiff and North Dakota State Class members did not,

3  and could not, unravel Defendants' deception on their own.

4       1849.   Defendants had an ongoing duty to Plaintiff and the North Dakota State Class to

5  refrain from unfair and deceptive practices under the North Dakota CFA in the course of their

6  business.  Specifically, Defendants owed Plaintiff and North Dakota State Class members a duty

7  to disclose all the material facts concerning the EcoDiesel® emission control system because they

8  possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the North

9  Dakota State Class, and/or they made misrepresentations that were rendered misleading because

10 they were contradicted by withheld facts.

11      1850.   Plaintiff and North Dakota State Class members suffered ascertainable loss and

12 actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

13 and/or failure to disclose material information.

14      1851.   Defendants' violations present a continuing risk to Plaintiff and the North Dakota

15 State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

16 of herein affect the public interest.

17      1852.   Pursuant to N.D. Cent. Code Ann. §§ 51-15-07 and 51-15-09, Plaintiff and the

18 North Dakota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or

19 practices and awarding damages, treble damages, and any other just and proper relief available

20 under the North Dakota CFA.

21              **VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
               **(Ohio Rev. Code §§ 1345.01, *et seq.*)**
22

23      1853.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

24 forth herein.

25      1854.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action

26 on behalf of himself and the Ohio State Class against all Defendants.

27      1855.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

28 Marchionne, Plaintiff, and the Ohio State Class members are "persons" within the meaning of

1  Ohio Rev. Code § 1345.01(B).  Defendants are so "supplier[s]" as defined by Ohio Rev. Code

2  § 1345.01(C).

3      1856.  Plaintiff and the Ohio State Class members are "consumers" within the meaning of

4  Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles are "consumer

5  transactions" within the meaning of Ohio Rev. Code § 1345.01(A)

6      1857.  The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits unfair or

7  deceptive acts or practices in connection with a consumer transaction.  Ohio Rev. Code

8  § 1345.02.

9      1858.  In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

10  Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio CSPA.

11      1859.  As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

12  misrepresented the environmental friendliness and emissions of the Class Vehicles through the

13  EcoDiesel badge—a material fact that was false because the Defendants developed and installed

14  emission cheating components in the Class Vehicles that caused them to pollute excessively in

15  real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

16  pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

17  the Defendants concealed that the fuel efficiency and performance could be achieved only

18  through emission control devices in the Class Vehicles that caused them to pollute excessively in

19  real-world conditions; and (3) the Defendants developed and installed emission cheating

20  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

21  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

22  337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

23  Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

24  practices as prohibited by Ohio Rev. Code § 1345.02:

25      A.  Representing that the Class Vehicles have approval, characteristics, uses,

26          or benefits that they do not have; and/or

27      B.  Representing that the Class Vehicles are of a particular standard, quality

28          and grade when they are not.

1860.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Ohio State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Ohio State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1861.   Plaintiff and Ohio State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Ohio State Class members did not, and could not, unravel Defendants' deception on their own.

1862.   Defendants had an ongoing duty to Plaintiff and the Ohio State Class to refrain from unfair and deceptive practices under the Ohio CSPA in the course of their business. Specifically, Defendants owed Plaintiff and Ohio State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Ohio State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1863.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1864.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1865.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio CSPA.

## VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
### (Ohio Rev. Code § 4165.01, *et seq.*)

1866.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1867.   Plaintiff Jon Roberts (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Ohio State Class against all Defendants.

1868.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Ohio State Class members are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

1869.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "the course of [their] business" within the meaning of Ohio Rev. Code § 4165.02(A).

1870.   The Ohio Deceptive Trade Practices Act ("Ohio DTPA") makes unlawful deceptive trade practices.  Ohio Rev. Code § 4165.02(A).

1871.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio DTPA.

1872.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ohio Rev. Code § 4165.02(A):

      A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

      D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1873.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Ohio State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Ohio State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1874.   Plaintiff and Ohio State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiff and Ohio State Class members did not, and could not, unravel Defendants' deception on their own.

1875.   Defendants had an ongoing duty to the Plaintiff and Ohio State Class to refrain from unfair and deceptive practices under the Ohio DTPA in the course of their business. Specifically, Defendants owed Plaintiff and Ohio State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Ohio State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1876.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1877.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1878.   Pursuant to Ohio Rev. Code §§ 2727.02 and 4165.03, Plaintiff and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio DTPA.

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
**(Okla. Stat. Tit. 15 § 751, *et seq.*)**

1879.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1880.   Plaintiff Lee Holland (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Oklahoma State Class against all Defendants.

1881.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Oklahoma State Class members are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

1882.   At all relevant times, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are and were engaged in "the course of business" within the meaning of Okla. Stat. Tit. 15 § 753.

1883.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits numerous unlawful acts, including misleading representations, false advertisements, and false statements. Okla. Stat. Tit. 15 § 753.

1884.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Oklahoma CPA.

1885.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the

EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Okla. Stat. Tit. 15 § 753:

> A.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

> C.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1886.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Oklahoma State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Oklahoma State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1887.   Plaintiff and Oklahoma State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software

1    was extremely sophisticated technology.  Plaintiff and Oklahoma State Class members did not,

2    and could not, unravel Defendants' deception on their own.

3        1888.  Defendants had an ongoing duty to Plaintiff and the Oklahoma State Class to

4    refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their

5    business.  Specifically, Defendants owed Plaintiff and Oklahoma State Class members a duty to

6    disclose all the material facts concerning the EcoDiesel® emission control system because they

7    possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Oklahoma

8    State Class, and/or they made misrepresentations that were rendered misleading because they

9    were contradicted by withheld facts.

10       1889.  Plaintiff and Oklahoma State Class members suffered ascertainable loss and actual

11   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

12   failure to disclose material information.

13       1890.  Defendants' violations present a continuing risk to Plaintiff and the Oklahoma

14   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

15   of herein affect the public interest.

16       1891.  Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff and the Oklahoma State Class seek

17   an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

18   punitive damages, and any other just and proper relief available under the Oklahoma CPA.

19            **VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
                        **(Or. Rev. Stat. §§ 646.605, *et seq*.)**
20

21       1892.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

22   forth herein.

23       1893.  Plaintiffs Adam Burwell and Mathue Fasching (for the purpose of this section,

24   "Plaintiffs") bring this action on behalf of themselves and the Oregon State Class against all

25   Defendants.

26       1894.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

27   Marchionne, Plaintiffs, and the Oregon State Class members are "persons" within the meaning of

28   Or. Rev. Stat. § 646.605(4).

1895.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

1896.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).

1897.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Oregon UTPA.

1898.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357.   In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unlawful practices as defined in Or. Rev. Stat. § 646.608(1):

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

        D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

1899.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Oregon State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Oregon State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1900.  Plaintiffs and the Oregon State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and the Oregon State Class members did not, and could not, unravel Defendants' deception on their own.

1901.  Defendants had an ongoing duty to Plaintiffs and the Oregon State Class to refrain from unfair and deceptive practices under the Oregon UTPA in the course of their business. Specifically, Defendants owed Plaintiffs and the Oregon State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Oregon State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1902.  Plaintiffs and the Oregon State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1903.  Defendants' violations present a continuing risk to Plaintiffs and the Oregon State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1904.   Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs and the Oregon State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oregon UTPA.

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
(73 Pa. Stat. Ann. § 201-1,** *et seq.***)**

1905.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1906.   Plaintiffs Kyle and Jessica Heidlebaugh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania State Class against all Defendants.

1907.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Pennsylvania State Class members are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2.(2).

1908.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

1909.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 Pa. Stat. Ann. § 201 3.

1910.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Pennsylvania UTPA.

1911.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

A.      Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1912.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Pennsylvania State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Pennsylvania State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

1    been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

2    significantly less for them.

3          1913.   Plaintiffs and Pennsylvania State Class members had no way of discerning that

4    Defendants' representations were false and misleading, or otherwise learning the facts that

5    Defendants had concealed or failed to disclose, because Defendants' emission control software

6    was extremely sophisticated technology.  Plaintiffs and Pennsylvania State Class members did

7    not, and could not, unravel Defendants' deception on their own.

8          1914.   Defendants had an ongoing duty to Plaintiffs and the Pennsylvania State Class to

9    refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of their

10   business.  Specifically, Defendants owed Plaintiffs and Pennsylvania State Class members a duty

11   to disclose all the material facts concerning the EcoDiesel® emission control system because they

12   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the

13   Pennsylvania State Class, and/or they made misrepresentations that were rendered misleading

14   because they were contradicted by withheld facts.

15         1915.   Plaintiffs and Pennsylvania State Class members suffered ascertainable loss and

16   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

17   and/or failure to disclose material information.

18         1916.   Defendants' violations present a continuing risk to Plaintiffs and the Pennsylvania

19   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

20   of herein affect the public interest.

21         1917.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), Plaintiffs and the Pennsylvania State

22   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

23   damages, punitive and/or treble damages, and any other just and proper relief available under the

24   Pennsylvania UTPA.

25         **VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT**
       **(R.I. Gen. Laws § 6-13.1, *et seq*.)**
26

27         1918.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28   forth herein.

1919.   This count is brought on behalf of the Rhode Island State Class against all Defendants.

1920.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the Rhode Island State Class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

1921.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

1922.   The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  R.I. Gen. Laws § 6-13.1-2.

1923.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Rhode Island DTPA.

1924.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in R.I. Gen. Laws § 6-13.1-1(6):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1925.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Rhode Island State Class, as Defendants intended. Had they known the truth, the Rhode Island State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1926.  Rhode Island State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Rhode Island State Class members did not, and could not, unravel Defendants' deception on their own.

1927.  Defendants had an ongoing duty to the Rhode Island State Class to refrain from unfair and deceptive practices under the Rhode Island DTPA in the course of their business. Specifically, Defendants owed Rhode Island State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Rhode Island State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1928.   Rhode Island State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1929.   Defendants' violations present a continuing risk to the Rhode Island State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1930.   Pursuant to R.I. Gen. Laws § 6-13.1-5.2(a), the Rhode Island State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Rhode Island DTPA.

**VIOLATIONS OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT
(S.C. Code Ann. § 39-5-10, *et seq.*)**

1931.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1932.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State Class against all Defendants.

1933.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the South Carolina State Class members are "persons" within the meaning of S.C. Code § 39-5-10(a).

1934.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

1935.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

1936.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Carolina UTPA.

1937.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of S.C. Code § 39-5-20(a):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and

1                     sale/lease of the Class Vehicles, whether or not any person has in fact been

2                     misled, deceived or damaged thereby.

3         1938.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

4 emission control system were material to Plaintiffs and the South Carolina State Class, as

5 Defendants intended.  Had they known the truth, Plaintiffs and the South Carolina State Class

6 would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

7 been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

8 significantly less for them.

9         1939.   Plaintiffs and South Carolina State Class members had no way of discerning that

10 Defendants' representations were false and misleading, or otherwise learning the facts that

11 Defendants had concealed or failed to disclose, because Defendants' emission control software

12 was extremely sophisticated technology.  Plaintiffs and South Carolina State Class members did

13 not, and could not, unravel Defendants' deception on their own.

14         1940.   Defendants had an ongoing duty to Plaintiffs and the South Carolina State Class to

15 refrain from unfair and deceptive practices under the South Carolina UTPA in the course of their

16 business.  Specifically, Defendants owed Plaintiffs and South Carolina State Class members a

17 duty to disclose all the material facts concerning the EcoDiesel® emission control system because

18 they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the South

19 Carolina State Class, and/or they made misrepresentations that were rendered misleading because

20 they were contradicted by withheld facts.

21         1941.   Plaintiffs and South Carolina State Class members suffered ascertainable loss and

22 actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

23 and/or failure to disclose material information.

24         1942.   Defendants' violations present a continuing risk to Plaintiffs and the South

25 Carolina State Class, as well as to the general public.  Defendants' unlawful acts and practices

26 complained of herein affect the public interest.

27         1943.   Pursuant to S.C. Code § 39-5-140(a), Plaintiffs and the South Carolina State Class

28 seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

1    damages, treble and/or punitive damages, and any other just and proper relief available under the

2    South Carolina UTPA.

3    **VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS,**
     **DISTRIBUTORS, AND DEALERS ACT**

4    **(S.C. Code Ann. § 56-15-10, *et seq*.)**

5    1944.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

6    forth herein.

7    1945.   Plaintiffs Michael Johnson, Ernest Melin, and Bryan Muckenfuss (for the purpose

8    of this section, "Plaintiffs") bring this action on behalf of themselves and the South Carolina State

9    Class against FCA, Fiat, VM Italy, and VM America.

10   1946.   FCA, Fiat, VM Italy, and VM America are "manufacturer[s]" as set forth in S.C.

11   Code Ann. § 56-15-10(b), as they were engaged in the business of manufacturing or assembling

12   new and unused motor vehicles.  FCA and Fiat are also "distributors" and/or "wholesalers" as set

13   forth in S.C. Code Ann. § 56-15-10(g), (p).

14   1947.   The South Carolina Regulation of Manufacturers, Distributors, and Dealers Act

15   ("Manufacturers Act") prohibits "unfair or deceptive acts or practices" as defined in S.C. Code

16   Ann. § 56-15-40. S.C. Code Ann. § 56-15-30(a). Accordingly, the Manufacturers Act prohibits

17   any manufacturer from engaging in bad faith and unconscionable actions that cause damage to the

18   parties or the public; it also prohibits manufacturers from using false or misleading advertising in

19   connection with their business. S.C. Code Ann. § 56-15-40(1), (3)(d).

20   1948.   FCA, Fiat, VM Italy, and VM America committed unfair or deceptive acts or

21   practices that violated the Manufacturers Act.

22   1949.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

23   misrepresented the environmental friendliness and emissions of the Class Vehicles through the

24   EcoDiesel badge—a material fact that was false because the Defendants developed and installed

25   emission cheating components in the Class Vehicles that caused them to pollute excessively in

26   real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

27   pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

28   the Defendants concealed that the fuel efficiency and performance could be achieved only

through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.

1950.   In so doing, Defendants committed bad faith and unconscionable actions including but not limited to: misrepresenting, concealing, and/or failing to disclose the true emissions and performance characteristics of the Class Vehicles, and failing to disclose the Class Vehicles' defective emissions control systems.

1951.   Defendants also violated the Manufacturers' Act by using false and misleading advertisements in connection with the sale and lease of Class Vehicles.  As alleged above, Defendants made numerous material statements about the safety, cleanliness, efficiency and reliability of the Class Vehicles that were either false or misleading.  Each of these statements— and the failure to disclose the truth—contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.  Had they known the truth, Plaintiffs and the South Carolina State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1952.   Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiff brings this action on behalf of themselves and the South Carolina State Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1953.   Plaintiffs and South Carolina State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1954.   Plaintiffs and the South Carolina State Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110.  Plaintiff also seeks injunctive relief under S.C. Code Ann. § 56-15-110.  Plaintiff also seeks treble damages because the Defendants acted maliciously.

**VIOLATION OF THE SOUTH DAKOTA**
**DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(S.D. Codified Laws § 37-24-6)**

1955.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1956.   Plaintiffs Elmer and Barbara Brinkman (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Dakota State Class against all Defendants.

1957.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the South Dakota State Class members are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

1958.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

1959.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

1960.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Dakota CPA.

1961.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and

1   the Defendants concealed that the fuel efficiency and performance could be achieved only

2   through emission control devices in the Class Vehicles that caused them to pollute excessively in

3   real-world conditions; and (3) the Defendants developed and installed emission cheating

4   components that caused the Class Vehicles to pollute excessively in real-world conditions, and

5   fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

6   337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

7   Vehicles, Defendants used or employed deception, fraud, false pretense, false promise or

8   misrepresentation, or the concealment, suppression or omission of a material fact with intent that

9   others rely upon such concealment, suppression or omission, in connection with the

10  advertisement and sale/lease of the Class Vehicles.

11      1962.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

12  emission control system were material to Plaintiffs and the South Dakota State Class, as

13  Defendants intended.  Had they known the truth, Plaintiffs and the South Dakota State Class

14  would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had

15  been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid

16  significantly less for them.

17      1963.  Plaintiffs and South Dakota State Class members had no way of discerning that

18  Defendants' representations were false and misleading, or otherwise learning the facts that

19  Defendants had concealed or failed to disclose, because Defendants' emission control software

20  was extremely sophisticated technology.  Plaintiffs and South Dakota State Class members did

21  not, and could not, unravel Defendants' deception on their own.

22      1964.  Defendants had an ongoing duty to Plaintiffs and the South Dakota State Class to

23  refrain from unfair and deceptive practices under the South Dakota CPA in the course of their

24  business.  Specifically, Defendants owed Plaintiffs and South Dakota State Class members a duty

25  to disclose all the material facts concerning the EcoDiesel® emission control system because they

26  possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the South

27  Dakota State Class, and/or they made misrepresentations that were rendered misleading because

28  they were contradicted by withheld facts.

1965.   Plaintiffs and South Dakota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1966.   Defendants' violations present a continuing risk to Plaintiffs and the South Dakota State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1967.   Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the South Dakota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the South Dakota CPA.

**VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977**
**(Tenn. Code Ann. § 47-18-101, *et seq*.)**

1968.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1969.   Plaintiffs Anthony Edwards and Jeffrey Griggs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee State Class against all Defendants.

1970.   Plaintiffs and the Tennessee State Class members are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2).

1971.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

1972.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Tenn. Code § 47-18-104.

1973.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Tennessee CPA.

1974.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the

EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Tenn. Code § 47-18-104:

> A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

> B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

> C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

> D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

> E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1975.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Tennessee State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Tennessee State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1976.   Plaintiffs and Tennessee State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Tennessee State Class members did not, and could not, unravel Defendants' deception on their own.

1977.   Defendants had an ongoing duty to Plaintiffs and the Tennessee State Class to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Tennessee State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Tennessee State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1978.   Plaintiffs and Tennessee State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1979.   Defendants' violations present a continuing risk to Plaintiffs and the Tennessee State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1980.   Pursuant to Tenn. Code §§ 47-18-109, 47-18-109, and 47-18-109(a)(3), Plaintiffs and the Tennessee State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Tennessee CPA.

**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES
ACT – CONSUMER PROTECTION ACT
(Tex. Business & Commercial Code §§ 17.41, *et seq.*)**

1981.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1982.   Plaintiffs Anthony Alley, WEB Farms, Inc., Jamie Broom, Victor Feldman, and Charles Hissey (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas State Class against all Defendants.

1983.   Plaintiffs and the Texas State Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

1984.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

1985.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

1986.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

1987.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Texas DTPA.

1988.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in

1  real-world conditions; and (3) the Defendants developed and installed emission cheating

2  components that caused the Class Vehicles to pollute excessively in real-world conditions, and

3  fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

4  337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

5  Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

6  practices as defined in Tex. Bus. & Com. Code § 17.46(a):

7         A.     Causing likelihood of confusion or of misunderstanding as to the approval

8                  or certification of the Class Vehicles;

9         B.     Representing that the Class Vehicles have approval, characteristics, uses,

10                  or benefits that they do not have;

11         C.     Representing that the Class Vehicles are of a particular standard, quality

12                  and grade when they are not; and/or

13         D.     Advertising the Class Vehicles with the intent not to sell or lease them as

14                  advertised.

15      1989.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

16  emission control system were material to Plaintiffs and the Texas State Class, as Defendants

17  intended.  Had they known the truth, Plaintiffs and the Texas State Class would not have

18  purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

19  and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

20  them.

21      1990.  Plaintiffs and Texas State Class members had no way of discerning that

22  Defendants' representations were false and misleading, or otherwise learning the facts that

23  Defendants had concealed or failed to disclose, because Defendants' emission control software

24  was extremely sophisticated technology.  Plaintiffs and Texas State Class members did not, and

25  could not, unravel Defendants' deception on their own.

26      1991.  Defendants had an ongoing duty to Plaintiffs and the Texas State Class to refrain

27  from unfair and deceptive practices under the Texas DTPA in the course of their business.

28  Specifically, Defendants owed Plaintiffs and Texas State Class members a duty to disclose all the

1   material facts concerning the EcoDiesel® emission control system because they possessed

2   exclusive knowledge, they intentionally concealed it from Plaintiffs and the Texas State Class,

3   and/or they made misrepresentations that were rendered misleading because they were

4   contradicted by withheld facts.

5       1992.   Plaintiffs and Texas State Class members suffered ascertainable loss and actual

6   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

7   failure to disclose material information.

8       1993.   Defendants' violations present a continuing risk to Plaintiffs and the Texas State

9   Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

10  herein affect the public interest.

11      1994.   Pursuant to Tex. Bus. & Com. Code §§ 17.50 and 17.50(b)(1), Plaintiffs and the

12  Texas State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices,

13  and awarding damages, punitive damages, and any other just and proper relief available under the

14  Texas DTPA.

15      1995.   On November 28, 2017, a notice letter was sent to FCA US LLC complying with

16  Tex. Bus. & Com. Code § 17.505(a).  A second notice letter complying with Tex. Bus. & Com.

17  Code § 17.505(a) was sent on July 17, 2017 to Bosch LLC, Bosch GmbH.  Plaintiffs sent another

18  notice letter pursuant to Tex. Bus. & Com. Code § 17.505(a) to all Defendants on July 19, 2017.

19  Additionally, all Defendants were provided notice of the issues raised in this count and this

20  Complaint by the governmental investigations, the numerous complaints filed against them, and

21  the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the

22  allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their

23  unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which

24  Plaintiffs and the Texas State Class are entitled.

25              **VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT**
                        **(Utah Code Ann. § 13-11-1, *et seq.*)**
26

27      1996.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28  forth herein.

1997.   Plaintiff John Wilson (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Utah State Class against Fiat and FCA.

1998.   FCA and Fiat are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

1999.   Plaintiff and the Utah State Class members are "persons" under Utah Code § 13-11-3(5).

2000.   The sales and leases of the Class Vehicles to the Plaintiff and Utah State Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

2001.   The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction."  Utah Code § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  Utah Code § 13-11-5.

2002.   In connection with a consumer transaction, Fiat and FCA, through their agents, employees, and/or subsidiaries, violated the Utah CSPA.

2003.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, Fiat and FCA engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11-4:

A.   Indicating that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

1          B.     Indicating that the Class Vehicles are of a particular standard, quality and

2               grade when they are not; and/or

3          C.     Indicating that the Class Vehicles were supplied in accordance with

4               Defendants' prior representations, although they were not as represented.

5       2004.  Plaintiff and Utah State Class members suffered ascertainable loss and actual

6  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

7  failure to disclose material information.

8       2005.  Defendants' violations present a continuing risk to Plaintiff and the Utah State

9  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

10  herein affect the public interest.

11       2006.  Plaintiff and the Utah State Class seek an order enjoining Defendants' unfair

12  and/or deceptive acts or practices, and awarding damages and any other just and proper relief

13  available under the Utah CSPA.

**VIOLATION OF UTAH TRUTH IN ADVERTISING LAW**
**(Utah Code Ann. § 13-11a-1, *et seq.*)**

16       2007.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

17  forth herein.

18       2008.  Plaintiff John Wilson (for the purpose of this section, "Plaintiff") brings this action

19  on behalf of himself and the Utah State Class against all Defendants.

20       2009.  Plaintiff, the Utah State Class, FCA, Fiat, VM Italy, VM America, Bosch GmbH,

21  Bosch LLC, and Sergio Marchionne are "person[s]" within the meaning of Utah Code § 13-11a-

22  1(7).

23       2010.  Utah's Truth In Advertising law makes unlawful any deceptive practice

24  undertaken in the course of a person's business.  Utah Code § 13-11a-3.

25       2011.  In the course of their business, FCA, Fiat, VM Italy, VM America, Bosch GmbH,

26  Bosch LLC, and Sergio Marchionne, through their agents, employees, and/or subsidiaries,

27  violated Utah Truth In Advertising Law.

28

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

2012.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11a-3:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;
>
> B.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding about the true characteristics of the Class Vehicles.

2013.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff and the Utah State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Utah State Class would not have purchased

1528982.7

1    or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and

2    mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

3         2014.   Plaintiff and Utah State Class members had no way of discerning that Defendants'

4    representations were false and misleading, or otherwise learning the facts that Defendants had

5    concealed or failed to disclose, because Defendants' emission control software was extremely

6    sophisticated technology.  Plaintiff and Utah State Class members did not, and could not, unravel

7    Defendants' deception on their own.

8         2015.   Defendants had an ongoing duty to Plaintiff and the Utah State Class to refrain

9    from unfair and deceptive practices in the course of their business.  Specifically, Defendants

10   owed Plaintiff and Utah State Class members a duty to disclose all the material facts concerning

11   the EcoDiesel® emission control system because they possessed exclusive knowledge, they

12   intentionally concealed it from Plaintiff and the Utah State Class, and/or they made

13   misrepresentations that were rendered misleading because they were contradicted by withheld

14   facts.

15        2016.   Plaintiff and Utah State Class members suffered ascertainable loss and actual

16   damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

17   failure to disclose material information.

18        2017.   Defendants' violations present a continuing risk to Plaintiff and the Utah State

19   Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

20   herein affect the public interest.

21        2018.   Plaintiff and the Utah State Class seek an order enjoining Defendants' unfair

22   and/or deceptive acts or practices pursuant to Utah Code Ann. § 13-11a-4, and awarding

23   damages, punitive damages, and any other just and proper relief available under the Utah Truth In

24   Advertising law.

25   **VIOLATION OF VERMONT CONSUMER PROTECTION ACT**
**(Vt. Stat. Ann. Tit. 9, § 2451 *et seq*.)**
26

27        2019.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28   forth herein.

2020.   This Count is brought on behalf of the Vermont State class against all Defendants.

2021.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are "persons" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).  The Vermont State Class members are "consumers" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).

2022.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

2023.   The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce…." Vt. Stat. Tit. 9, § 2453(a).

2024.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Vermont CPA.

2025.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Vt. Stat. Tit. 9, § 2453(a):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2026.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Vermont State Class, as Defendants intended.  Had they known the truth, the Vermont State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2027.   Vermont State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Vermont State Class members did not, and could not, unravel Defendants' deception on their own.

2028.   Defendants had an ongoing duty to the Vermont State Class to refrain from unfair and deceptive practices under the Vermont CPA in the course of their business.  Specifically, Defendants owed Vermont State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

1    knowledge, they intentionally concealed it from the Vermont State Class, and/or they made

2    misrepresentations that were rendered misleading because they were contradicted by withheld

3    facts.

4        2029.   Vermont State Class members suffered ascertainable loss and actual damages as a

5    direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

6    disclose material information.

7        2030.   Defendants' violations present a continuing risk to the Vermont State Class, as

8    well as to the general public.  Defendants' unlawful acts and practices complained of herein affect

9    the public interest.

10       2031.   Pursuant to Vt. Stat. Tit. 9, § 2461(b), the Vermont State Class seek an order

11   enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages,

12   exemplary damages, and any other just and proper relief available under the Vermont CPA.

13                      **VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
                              **(Va. Code Ann. §§ 59.1-196, *et seq.*)**
14

15       2032.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

16   forth herein.

17       2033.   Plaintiffs James Boykin and Brian Hiner (for the purpose of this section,

18   "Plaintiffs") bring this action on behalf of themselves and the Virginia State Class against all

19   Defendants.

20       2034.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

21   Marchionne, Plaintiffs, and the Virginia State Class members are "persons" within the meaning of

22   Va. Code § 59.1-198.

23       2035.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne

24   are "supplier[s]" within the meaning of Va. Code § 59.1-198.

25       2036.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful

26   "fraudulent acts or practices."  Va. Code § 59.1-200(A).

27       2037.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

28   Marchionne, through their agents, employees, and/or subsidiaries, violated the Virginia CPA.

2038.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Va. Code § 59.1-200(A):

> A.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> B.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or
>
> C.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

2039.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Virginia State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Virginia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2040.   Plaintiffs and Virginia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that

1   Defendants had concealed or failed to disclose, because Defendants' emission control software

2   was extremely sophisticated technology.  Plaintiffs and Virginia State Class members did not, and

3   could not, unravel Defendants' deception on their own.

4          2041.   Defendants had an ongoing duty to Plaintiffs and the Virginia State Class to refrain

5   from unfair and deceptive practices under the Virginia CPA in the course of their business.

6   Specifically, Defendants owed Plaintiffs and Virginia State Class members a duty to disclose all

7   the material facts concerning the EcoDiesel® emission control system because they possessed

8   exclusive knowledge, they intentionally concealed it from Plaintiffs and the Virginia State Class,

9   and/or they made misrepresentations that were rendered misleading because they were

10  contradicted by withheld facts.

11         2042.   Plaintiffs and Virginia State Class members suffered ascertainable loss and actual

12  damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

13  failure to disclose material information.

14         2043.   Defendants' violations present a continuing risk to Plaintiffs and the Virginia State

15  Class, as well as to the general public.  Defendants' unlawful acts and practices complained of

16  herein affect the public interest.

17         2044.   Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiffs and the Virginia State Class

18  seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

19  damages, punitive damages, and any other just and proper relief available under the Virginia

20  CPA.

21              **VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
                      **(Wash. Rev. Code Ann. §§ 19.86.010,** *et seq.***)**
22

23         2045.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

24  forth herein.

25         2046.   Plaintiffs Karl Calhoun, Andrew Loescher, and Jesse Sandifer (for the purpose of

26  this section, "Plaintiffs") bring this action on behalf of themselves and the Washington State

27  Class against all Defendants.

28

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

2047.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs, and the Washington State Class members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

2048.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(1).

2049.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code § 19.86.020.

2050.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Washington CPA.

2051.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.020:

      A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

      B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC

C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2052.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Washington State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Washington State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2053.   Plaintiffs and Washington State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  Plaintiffs and Washington State Class members did not, and could not, unravel Defendants' deception on their own.

2054.   Defendants had an ongoing duty to Plaintiffs and the Washington State Class to refrain from unfair and deceptive practices under the Washington CPA in the course of their business.  Specifically, Defendants owed Plaintiffs and Washington State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the

1    Washington State Class, and/or they made misrepresentations that were rendered misleading

2    because they were contradicted by withheld facts.

3        2055.   Plaintiffs and Washington State Class members suffered ascertainable loss and

4    actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

5    and/or failure to disclose material information.

6        2056.   Defendants' violations present a continuing risk to Plaintiffs and the Washington

7    State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

8    of herein affect the public interest.

9        2057.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington State

10   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

11   damages, treble damages, and any other just and proper relief available under the Washington

12   CPA.

13            **VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**
             **(W. Va. Code § 46A-1-101, *et seq*.)**
14

15       2058.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

16   forth herein.

17       2059.   This count is brought on behalf of the West Virginia State Class against all

18   Defendants.

19       2060.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio

20   Marchionne, and the West Virginia State Class members are "persons" within the meaning of W.

21   Va. Code § 46A-1-102(31).  The West Virginia State Class members are "consumers" within the

22   meaning of W. Va. Code §§ 46A-6-102(2) and 46A-1-102(12).

23       2061.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio

24   Marchionne are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-

25   102(6).

26       2062.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA")

27   makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the

28   conduct of any trade or commerce."  W. Va. Code § 46A-6-104.

2063.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the West Virginia CCPA.

2064.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216; 337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in W. Va. Code § 46A-6-102(7):

>    A.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

>    B.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

>    C.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

>    D.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

>    E.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2065.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the West Virginia State Class, as Defendants intended. Had they known the truth, the West Virginia State Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2066.   West Virginia State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology.  West Virginia State Class members did not, and could not, unravel Defendants' deception on their own.

2067.   Defendants had an ongoing duty to the West Virginia State Class to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of their business. Specifically, Defendants owed West Virginia State Class members a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the West Virginia State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2068.   West Virginia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2069.   Defendants' violations present a continuing risk to the West Virginia State Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2070.   Pursuant to W. Va. Code § 46A-6-106(a), the West Virginia State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the West Virginia CCPA.

2071.   On November 28, 2017, a notice letter was sent to FCA US LLC complying with W. Va. Code § 46A-6-106(c).  A second notice letter was sent to FCA US LLC and Fiat Chrysler complying with W. Va. Code § 46A-6-106(c) on January 17, 2017.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which the West Virginia State Class are entitled.

## VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### (Wis. Stat. § 100.18)

2072.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2073.   Plaintiffs Josh Claflin and Wayne Tonnesen (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin State Class against all Defendants.

2074.   Plaintiffs and the Wisconsin State Class are members of "the public" and are "persons" within the meaning of Wis. Stat. § 100.18(1).

2075.   FCA, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

2076. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

2077. In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Wisconsin DTPA.

2078. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Wis. Stat. § 100.18(1):

        A.      Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

        B.      Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

        C.      Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

2079. Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs and the Wisconsin State Class, as Defendants

1    intended.  Had they known the truth, Plaintiffs and the Wisconsin State Class would not have

2    purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

3    and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

4    them.

5           2080.   Plaintiffs and Wisconsin State Class members had no way of discerning that

6    Defendants' representations were false and misleading, or otherwise learning the facts that

7    Defendants had concealed or failed to disclose, because Defendants' emission control software

8    was extremely sophisticated technology.  Plaintiffs and Wisconsin State Class members did not,

9    and could not, unravel Defendants' deception on their own.

10          2081.   Defendants had an ongoing duty to Plaintiffs and the Wisconsin State Class to

11   refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of their

12   business.  Specifically, Defendants owed Plaintiffs and Wisconsin State Class members a duty to

13   disclose all the material facts concerning the EcoDiesel® emission control system because they

14   possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and the Wisconsin

15   State Class, and/or they made misrepresentations that were rendered misleading because they

16   were contradicted by withheld facts.

17          2082.   Plaintiffs and Wisconsin State Class members suffered ascertainable loss and

18   actual damages as a direct and proximate result of Defendants' concealment, misrepresentations,

19   and/or failure to disclose material information.

20          2083.   Defendants' violations present a continuing risk to Plaintiffs and the Wisconsin

21   State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

22   of herein affect the public interest.

23          2084.   Pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs and the Wisconsin State Class

24   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding

25   damages, punitive damages, and any other just and proper relief available under the Wisconsin

26   DTPA.

27

28

**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT**
**(Wyo. Stat. §§ 40-12-101, *et seq.*)**

2085.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2086.   Plaintiff Kelly Ruiz (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Wyoming State Class against all Defendants.

2087.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and the Wyoming State Class members are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

2088.   The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

2089.   Each sale or lease of a Class Vehicle to a Wyoming State Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii).  These consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-12-105(a).

2090.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits deceptive trade practices.  Wyo. Stat. § 40-12-105(a).

2091.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Wyoming CPA.

2092.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Class Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Class Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Class Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Class Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Class Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Class Members alike.  *See, e.g.*, ¶¶ 149-216;

1   337-357.  In so doing, and by marketing, offering for sale, and selling the defective Class

2   Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or

3   practices as defined in Wyo. Stat. §§ 40-12-105(a):

4            A.     Representing that the Class Vehicles have approval, characteristics, uses,

5                    or benefits that they do not have;

6            B.     Representing that the Class Vehicles are of a particular standard, quality

7                    and grade when they are not;

8            C.     Advertising the Class Vehicles with the intent not to sell or lease them as

9                    advertised; and/or

10          D.     Engaging in other conduct which created a likelihood of confusion or of

11                    misunderstanding.

12   2093.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

13   emission control system were material to Plaintiff and the Wyoming State Class, as Defendants

14   intended.  Had they known the truth, Plaintiff and the Wyoming State Class would not have

15   purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed

16   and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for

17   them.

18   2094.  Plaintiff and Wyoming State Class members had no way of discerning that

19   Defendants' representations were false and misleading, or otherwise learning the facts that

20   Defendants had concealed or failed to disclose, because Defendants' emission control software

21   was extremely sophisticated technology.  Plaintiff and Wyoming State Class members did not,

22   and could not, unravel Defendants' deception on their own.

23   2095.  Defendants had an ongoing duty to Plaintiff and the Wyoming State Class to

24   refrain from unfair and deceptive practices under the Wyoming CPA in the course of their

25   business.  Specifically, Defendants owed Plaintiff and Wyoming State Class members a duty to

26   disclose all the material facts concerning the EcoDiesel® emission control system because they

27   possessed exclusive knowledge, they intentionally concealed it from Plaintiff and the Wyoming

28

1    State Class, and/or they made misrepresentations that were rendered misleading because they

2    were contradicted by withheld facts.

3        2096.   Plaintiff and Wyoming State Class members suffered ascertainable loss and actual

4    damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or

5    failure to disclose material information.

6        2097.   Defendants' violations present a continuing risk to Plaintiff and the Wyoming

7    State Class, as well as to the general public.  Defendants' unlawful acts and practices complained

8    of herein affect the public interest.

9        2098.   Pursuant to Wyo. Stat. §§ 40-12-108(a) and 40-12-108(b), Plaintiff and the

10   Wyoming State Class seek an order enjoining Defendants' unfair and/or deceptive acts or

11   practices, and awarding damages, punitive damages, and any other just and proper relief available

12   under the Wyoming CPA.

13       2099.   On November 28, 2016, a notice letter was sent to FCA US LLC complying with

14   Wyo. Stat. § 40-12-109. Plaintiffs sent a second notice letter pursuant to Wyo. Stat. § 40-12-109

15   to all Defendants on July 19, 2017.  Additionally, all Defendants were provided notice of the

16   issues raised in this count and this Complaint by the governmental investigations, the numerous

17   complaints filed against them, and the many individual notice letters sent by Plaintiffs within a

18   reasonable amount of time after the allegations of Class Vehicle defects became public.  Because

19   Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek

20   all damages and relief to which Plaintiff and the Wyoming State Class are entitled.

21   **III.    PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class

23   and State Classes, respectfully request that the Court grant certification of the proposed

24   Nationwide Class and State Classes, including the designation of Plaintiffs as the named

25   representatives of the Nationwide Class and respective State Classes, the appointment of the

26   undersigned as Class Counsel, and the designation of any appropriate issue classes and/or

27   subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter

28   judgment in their favor and against Defendants, as follows:

1    A.    A declaration that any applicable statutes of limitation are tolled due to the

2    fraudulent concealment alleged in this complaint, and that Defendants are estopped from relying

3    on any statutes of limitations in defense;

4    B.    An order enjoining Defendants from continuing the unlawful, deceptive,

5    fraudulent, and unfair business practices alleged in this Complaint;

6    C.    Injunctive and equitable relief in the form of a comprehensive program to repair,

7    modify, and/or buy back all Class Vehicles, and to fully reimburse and make whole all Class

8    members for all costs and economic losses, and degradation of mileage performance, durability,

9    and reliability that the Class Vehicles could incur by being brought into compliance with federal

10   and state law;

11   D.    Environmental reparations, mitigation, and remediation to offset the harm caused

12   by the Class Vehicles, based on the mileage driven by all Class Vehicles and/or other appropriate

13   measures of environmental harm;

14   E.    Costs, restitution, compensatory damages for economic loss and out-of-pocket

15   costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive

16   and exemplary damages under applicable law;

17   F.    Rescission of all Class Vehicle purchases or leases, including reimbursement

18   and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and

19   other fees;

20   G.    A determination that Defendants are financially responsible for all Class notice

21   and administration of Class relief;

22   H.    Any and all applicable statutory and civil penalties;

23   I.    An order requiring Defendants to pay both pre- and post-judgment interest on any

24   amounts awarded;

25   J.    An award of costs and attorneys' fees;

26   K.    Leave to amend this Complaint to conform to the evidence produced in discovery

27   and at trial; and

28   L.    Such other or further relief as the Court may deem appropriate, just, and equitable.

1   IV.   **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

3   and all issues in this action so triable of right.

4
    DATED this 23rd day of April, 2018.          Respectfully submitted,
5
                                                 LIEFF CABRASER HEIMANN &
6                                                BERNSTEIN, LLP

7
                                                 By /s/
8
                                                      Elizabeth Cabraser (SBN 083151)
9                                                     275 Battery Street, 29th Floor
                                                      San Francisco, CA 94111-3339
10                                                    Telephone: 415.956.1000
                                                      Facsimile: 415.956.1008
11                                                    Email:  ecabraser@lchb.com

12                                               *Plaintiffs' Lead Counsel*

13   Roland K. Tellis                            W. Daniel ("Dee") Miles, III
     BARON & BUDD, P.C.                          BEASLEY, ALLEN, CROW, METHVIN,
14   15910 Ventura Boulevard, Suite 1600        PORTIS & MILES P.C.
     Encino, CA 91436                            218 Commerce Street
15   Telephone: 818.839.2320                     Montgomery, AL 36104
     Facsimile: 818.986.9698                     Telephone: 800.898.2034
16   Email: trellis@baronbudd.com                Facsimile: 334.954.7555
                                                 Email: dee.miles@beasleyallen.com
17
     Lesley E. Weaver (SBN 191305)               David S. Casey, Jr.
18   BLEICHMAR FONTI & AULD, LLP                 CASEY GERRY SCHENK
     1999 Harrison Street, Suite 670            FRANCAVILLA BLATT & PENFIELD
19   Oakland, CA 94612                           LLP
     Telephone: 415.445.4003                     110 Laurel Street
20   Facsimile: 415.445.4020                     San Diego, CA 92101-1486
     Email:  lweaver@bfalaw.com                  Telephone: 619.238.1811
21                                               Facsimile: 619.544.9232
                                                 Email: dcasey@cglaw.com
22
     Steve W. Berman                             Lynn Lincoln Sarko
23   HAGENS BERMAN                               KELLER ROHRBACK L.L.P.
     1918 8th Avenue, Suite 3300                 1201 Third Avenue, Suite 3200
24   Seattle, WA 98101                           Seattle, WA 98101
     Telephone: 206.623.7292                     Telephone: 206.623.1900
25   Facsimile: 206.623.0594                     Facsimile: 206.623.3384
     Email: steve@hbsslaw.com                    Email:  lsarko@kellerrohrback.com
26

27

28

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
Email:  jrice@motleyrice.com

Rachel L. Jensen
ROBBINS GELLER RUDMAN &
DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 98101
Telephone: 619.231.1058
Facsimile: 619.231.7423
Email:  rachelj@rgrdlaw.com

Stacey P. Slaughter
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612.349.8500
Facsimile: 612.339.4181
Email: sslaughter@robinskaplan.com

*Plaintiffs' Steering Committee*

1528982.7

SECOND AMENDED CONSOLIDATED CONSUMER
CLASS ACTION COMPLAINT
CASE NO. 3:17-MD-02777-EMC