1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE CHRYSLER-DODGE-JEEP
ECODIESEL MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION.

Case No.  17-md-02777-EMC

**ORDER GRANTING MOTION FOR
PRELIMINARY APPROVAL OF
CLASS SETTLEMENT**

Docket Nos. 487, 491, 508

The above-referenced case is a multidistrict litigation ("MDL").  The MDL includes cases

brought by Private Plaintiffs (hereinafter, "Plaintiffs"), the United States, and California.

Currently pending before the Court is a motion concerning a proposed settlement of all cases

brought by Plaintiffs.  There are also proposed settlements with respect to the cases brought by the

United States and the state of California, *see* Docket Nos. 484-86 (proposed consent decrees), but

those proposed settlements are technically not pending before the Court at this time.

Plaintiffs are individuals or companies who purchased certain trucks marketed under the

model names of Ram 1500 and Jeep Grand Cherokee.  More specifically, these trucks (2014-2016

models) had diesel engines that were branded "EcoDiesel."  Plaintiffs have brought class action

claims against (1) the manufacturers of the cars and their chief executive (the FCA Defendants);

(2) the companies who manufactured the EcoDiesel engines (the VM Defendants); and (3) the

companies who supplied the electronic diesel control ("EDC") units that were used to control the

emissions from the engines (the Bosch Defendants).  The gist of Plaintiffs' class action complaint

is that Defendants installed "defeat devices" in the vehicles at issue – *i.e.*, devices that reduced the

effectiveness of the emissions control system under conditions which may reasonably be expected

1   to be encountered in normal vehicle operation and use.  According to Plaintiffs, they did not know

2   about the defeat devices and purchased the vehicles, at least in part, based on the representation

3   that the vehicles were environmentally friendly.  Plaintiffs have brought (1) fraud-based claims

4   (including a federal RICO claim and claims based on the laws of all fifty states, plus the District of

5   Columbia) and (2) warranty-based claims (including a federal MMWA claim and claims based on

6   the laws of all fifty states, plus the District of Columbia).[1]

7          As indicated above, Plaintiffs' cases are not the only ones comprising the MDL.  There are

8   also parallel cases brought by the United States and California.  *See United States v. Fiat Chrysler*

9   *Autos. N.V.*, No. C-17-3446 EMC (N.D. Cal.); *People of the St. of Cal. v. Fiat Chrysler Autos.*

10  *N.V.*, No. C-19-0151 EMC (N.D. Cal.).  The United States alleges that the FCA entities violated

11  the Clean Air Act ("CAA") by failing to disclose the defeat devices.  California also alleges

12  violations of the CAA as well as violations of provisions in the California Health & Safety Code

13  and the California Business & Professions Code.

14         Finally, the Court takes note that, outside of the MDL, all remaining states, as well as the

15  District of Columbia, Puerto Rico, and Guam have been meeting and discussing with the FCA

16  entities the same alleged failures to disclose.  *See, e.g.*, Docket No. 518 (letter from New York's

17  Office of the Attorney General).

18         With respect to the cases brought by Plaintiffs, Plaintiffs and Defendants have now agreed

19  to settle their dispute and, because the cases at issue are class actions, approval of the Court is

20  required.  *See* Fed. R. Civ. P. 23(e) (providing that the claims of "a class proposed to be certified

21  for purposes of settlement . . . may be settled, voluntarily dismissed, or compromised only with the

22  court's approval").  At this juncture, the parties ask for preliminary approval of their class action

23  settlement.  If the Court grants preliminary approval, then notice of the settlement will be given to

24  the class, the class will be given an opportunity to respond, and the parties may then ask for final

25  approval.[2]

26

27  [1] RICO stands for Racketeer Influenced and Corrupt Organizations Act.  MMWA stands for the
    Magnuson-Moss Warranty Act.

28  [2] As noted above, the FCA entities have also reached settlements with the United States and
    California (resulting in proposed consent decrees).  In addition, the FCA entities appear to have

1          Having considered the parties' briefs and accompanying submissions, as well as the oral

2    argument of counsel, the Court hereby **GRANTS** the motion for preliminary approval.  The

3    settlement is sufficiently fair, adequate, and reasonable to move forward with class notice.

4                        **I.          FACTUAL & PROCEDURAL BACKGROUND**

5    A.    Factual Allegations

6          As alleged in the operative pleading, on January 12, 2017, the Environmental Protection

7    Agency ("EPA") and California Air Resources Board ("CARB") issued notices of violation

8    ("NOVs") to the two FCA entities alleging that the vehicles at issue were equipped with eight

9    undisclosed auxiliary emissions control devices ("AECDs") and that the AECDs were potentially

10   defeat devices.  According to Plaintiffs, the AECDs were, in fact, defeat devices and Defendants

11   concealed such from both government regulators and consumers; moreover, the FCA Defendants

12   marketed the vehicles as being environmentally friendly even though they were not.

13   B.    Procedural History

14         Following the issuance of the NOVs, lawsuits began to be filed against Defendants.  In

15   April 2017, the Judicial Panel on Multidistrict Litigation ("JPML") created this MDL and

16   transferred cases to this Court for coordinated or consolidated pretrial proceedings.  *See* Docket

17   No. 1 (JPML transfer order).  As noted above, cases that comprise this MDL include cases filed by

18   Plaintiffs as well as cases filed by the United States and California.

19         With respect to the cases filed by Plaintiffs, the Court appointed Lead Counsel and a

20   Steering Committee (collectively, the "PSC").  *See* Docket No. 173 (order).  The Court also

21   appointed Kenneth Feinberg as Settlement Master for all cases comprising the MDL.  *See* Docket

22   No. 184 (order).  The PSC thereafter filed a consolidated class action complaint which Defendants

23   challenged through 12(b)(6) motions to dismiss.  *See* Docket No. 225 (complaint); Docket Nos.

24   231-32 (motions).  In March 2018, the Court granted in part and denied in part Defendants'

25   motions and gave Plaintiffs leave to amend.  *See* Docket No. 290 (order).  Plaintiffs filed an

26   amended complaint, which Defendants again contested through 12(b)(6) motions to dismiss.  *See*

27

28   reached settlements with the remaining states, the District of Columbia, Puerto Rico, and Guam.
     *See* Docket No. 518 (letter from New York's Office of the Attorney General).

1    Docket No. 310 (complaint); Docket Nos. 314-15 (motions).  While the motions were pending,

2    Plaintiffs filed a motion for class certification; extensive briefing on class certification followed

3    thereafter, and multiple motions related to class certification were also filed.  Hearings on the

4    motions to dismiss were held in August and October 2018.  *See* Docket No. 356, 454 (minutes).

5    Before the Court ruled on the motions to dismiss and before the hearing on Plaintiffs' class

6    certification motion (and related motions) could be held, Plaintiffs and Defendants informed the

7    Court that they had settled their dispute with the assistance of Mr. Feinberg.

8    **II.      SETTLEMENT TERMS**

9        Currently the Court is being asked to address the fairness of the proposed settlement

10   between Plaintiffs and Defendants only.  However, as all parties have conceded, the proposed

11   settlement is part of a global settlement that Defendants (more specifically, the FCA entities) have

12   reached with, *e.g.*, the federal and state governments.  Indeed, the parties have emphasized that the

13   proposed settlement between Plaintiffs and Defendants work in tandem with the proposed consent

14   decrees between the FCA entities and the United States and California.  Under the proposed

15   consent decrees, the FCA entities will pay a civil penalty and provide certain injunctive relief,

16   including a repair for the vehicles at issue (also known as the "AEM" or approved emissions

17   modification) and an extended warranty related thereto.  As described below, the proposed

18   settlement between Plaintiffs and Defendants provides additional relief for affected consumers – in

19   particular, a cash payment as well as a repair to the emissions system (for current owners and

20   lessees) as set forth in the proposed consent decree with the United States and California.  The

21   discussion below focuses on the settlement terms between Plaintiffs and Defendants.

22   A.    Settlement Class

23       In the operative complaint filed by Plaintiffs, Plaintiffs asserted both a nationwide RICO

24   class as well as a California class and a multistate class.  *See* SAC ¶ 134.  The definitions of the

25   classes are similar.  For example, the nationwide RICO class is defined as follows:  "All persons

26   or entities in the United States who owned or leased an 'Affected Vehicle.'"  SAC ¶ 134.

27       The Court notes that the definition of the settlement class differs from the definition of the

28   class as pled in the operative complaint.  The latter definition is simpler than the former.

4

Nevertheless, as explained below, the definition of the settlement class is fair, reasonable, and

adequate.[3]

The definition of the settlement class is as follows:

> [A]ll Persons (this includes individuals who are United States
> citizens, residents, or United States military, or diplomatic personnel
> that are living or stationed overseas, as well as entities) who (1) on
> January 12, 2017 owned or leased a Ram 1500 or Jeep Grand
> Cherokee 3.0-liter diesel vehicle in the United States or its territories
> (an "Eligible Vehicle," defined more fully in Section 2.35); or who
> (2) between January 12, 2017 and the Claim Submission Deadline
> for Eligible Owners and Eligible Lessees become the owner or
> lessee of an Eligible Vehicle in the United States or its territories; or
> who (3) own or lease an Eligible Vehicle in the United States or its
> territories at the time of participation in the Repair Program. The
> Class does not include Authorized Dealers, but does include
> automobile dealers who are not Authorized Dealers and who
> otherwise meet the definition of the Class.

Am. Sett. Agmt. ¶ 2.19 (available at Docket No. 508).

There are several exclusions from the class, including the following:

> (a) Owners or lessees who acquired an Eligible Vehicle after
> January 12, 2017, and transferred ownership or terminated their
> lease before the Opt-Out Deadline;
>
> (b) Owners or lessees who acquired an Eligible Vehicle after
> January 12, 2017, and transferred ownership or terminated their
> lease after the Opt-Out Deadline, as a result of a total loss, but
> before the Claim Submission Deadline for Eligible Owners and
> Eligible Lessees;
>
> (c) Owners who acquired an Eligible Vehicle on or before January
> 12, 2017, and transferred ownership after January 10, 2019, but
> before the Opt-Out Deadline, unless ownership was transferred as a
> result of a total loss;
>
> (d) Lessees who leased their Eligible Vehicles on or before January
> 12, 2017, acquire ownership after January 10, 2019, and transfer
> ownership before the AEM [approved emissions modification] is
> performed on the Eligible Vehicle.

Am. Sett. Agmt. ¶ 2.19. The exclusions above concern former owners or lessees. At the hearing,

the parties represented that the number of people who would fall within an exclusion is likely

---

[3] *See* Proc. Guidance for Class Action Sett. ¶ 1.a ("If a litigation class has not been certified, any
differences between the settlement class and the class proposed in the operative complaint and an
explanation as to why the differences are appropriate in the instant case.").

United States District Court
Northern District of California

1    small because 75% of the vehicles at issue have only a single owner or lessee (*i.e.*, there are no

2    former owners or lessees).

3         As explained by the parties, the exclusions are intended in part "to limit the number of

4    claims on a particular vehicle" so that "sufficient compensation remains available for the current

5    owners and current lessees whose participation in the Repair Program is essential to the goal of

6    managing any future environmental harm." Docket No. 507 (Supp. Br. at 2-3). Also, the

7    exclusions give notice to class members of the consequences of certain actions (*e.g.*, transferring

8    ownership). Those excluded from the class do not, of course, release any claims against

9    Defendants. Importantly, all current owners and lessees of an Eligible Vehicle who can obtain the

10   AEM are included in the class.

11   B.    Consumer Remedies

12        A class member who does not exclude herself from the settlement is entitled to one or

13   more of the following remedies: (1) a repair of the vehicle through an emissions modification

14   approved by EPA and CARB ("AEM" or approved emissions modification), (2) an extended

15   warranty for the parts and systems affected by the emissions modification, and (3) a cash payment.

16        The first two remedies are generally available for current owners or lessees of the vehicles

17   but not former owners or lessees (as they no longer have possession). The last remedy is available

18   to both current owners or lessees and former owners or lessees. Current owners or lessees must

19   get their vehicles repaired before receiving cash payment. Current owners are paid either $3,075

20   or $2,460 (the lesser amount applies if there is a former owner or lessee who submits a claim).

21   Current lessees, former owners, and former lessees – *i.e.*, those who no longer possess the vehicle

22   and thus cannot obtain the AEM – are paid $990.

23        There are approximately 100,000 vehicles at issue in this MDL. Thus, if all class members

24   participate in the settlement and submit claims, then the maximum amount that Defendants will

25   pay to the class is approximately $307,500,000 (*i.e.*, $3,075 x 100,000 vehicles). (This excludes

26   the cost of the repairs to the vehicles and the cost of the extended warranty.)

27        It is, of course, unlikely that the claims rate will be 100%. However, under the proposed

28   consent decrees with the United States and California, the FCA entities have a strong incentive to

1    get a high claims rate because "any money [they] could potentially save by not compensating

2    Class Members would be lost, in the form of penalties of more than $6,000 per vehicle, for failing

3    [to] achieve the 85% participation rate required by the Consent Decree [with the United

4    States/California]." Mot. at 22; *see also* Sett. Agmt. ¶ 4.12 (stating that the "Settlement is

5    specifically designed, in conjunction with the US-CA Consent Decree, to incentivize and to

6    facilitate the achievement of a minimum claims rate of 85%, and the parties are committed to

7    achieving the highest claims rate possible in connection with this Class Action Settlement").[4]  The

8    incremental cost to FCA of the AEM is relatively small since it consists largely of a software

9    update.

10   C.    Release of Claims

11       In exchange for obtaining the consumer remedies above, class members release, in effect,

12   claims that were asserted in the operative complaint or that could have been asserted based on the

13   underlying facts.[5]  *See* Am. Sett. Agmt. ¶ 9.3 (titled "Class Release").  In addition, "[e]ach Class

14   Member who receives a Class Member Payment shall be required to execute an Individual Release

15   . . . as a precondition to receiving such payment." Am. Sett. Agmt. ¶ 9.7.  The Individual Release

16   is coextensive with the Class Release and "remain[s] effective even if the Final Approval Order is

17   reversed and/or vacated on appeal, or if [the] Class Action [Settlement] Agreement is abrogated or

18   otherwise voided in whole or in part." Am. Sett. Agmt. ¶ 9.7.  The reason for the latter provision

19

20   [4] The proposed consent decree with the United States/California provides that "the Recall Program
     [*i.e.*, the program to get the vehicles repaired] shall have the goal of implementing the Approved
21   Emissions Modification on at least 85 percent of all Subject Vehicles, both in the United States
     and in the State of California, by no later than the 2-year anniversary of the Effective Date ('Recall
22   Target Deadline')." Prop. Consent Decree ¶ 37.

23       If, by the Recall Target Deadline, Defendants have not performed the fix on at least 85% of
     the Subject Vehicles, then Defendants have to make certain payments:

24
     •  "For failure to reach the National Recall Target [85%], Defendants shall make a payment
25       of $5,500,000 for each 1% that the National Recall Rate falls short of the National Recall
         Target." Prop. Consent Decree ¶ 41.a.i.
26   •  "For failure to reach the California Recall Target [85%], Defendants shall make a payment
         of $825,000 for each 1% that the California Recall Rate falls short of the California Recall
27       Target." Prop. Consent Decree ¶ 41.a.ii.
     [5] *See* Proc. Guidance for Class Action Sett. ¶ 1.c ("If a litigation class has not been certified, any
28   differences between the claims to be released and the claims in the operative complaint and an
     explanation as to why the differences are appropriate in the instant case.").

7

is that the settlement "provides immediate relief upon final approval by [the] Court" – *i.e.*,

> Class Members do not have to wait for the appellate process to run
> its course before receiving the Approved Emissions Modification,
> Extended Warranty, or cash compensation. [Also,] because the
> Class Release does not become final until any appeals have
> concluded, Class Members who obtain cash compensation must
> execute an Individual Release to prevent them from maintaining or
> asserting claims after receiving that consideration.

Docket No. 507 (Supp. Br. at 6) (adding that a similar process was used in the Volkswagen MDL).

### III.     LEGAL STANDARD

> "'[T]here is a strong judicial policy that favors settlements,
> particularly where complex class action litigation is concerned.'"
> *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *In re
> Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)).
> Nevertheless, Federal Rule of Civil Procedure 23(e) requires courts
> to approve any class action settlement. "[S]ettlement class actions
> present unique due process concerns for absent class members."
> *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). As
> such, "the district court has a fiduciary duty to look after the
> interests of those absent class members." *Allen*, 787 F.3d at 1223
> (collecting cases).

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB

(JSC), 2017 U.S. Dist. LEXIS 22775, at \*735-36 (N.D. Cal. Feb. 16, 2017).

Where a court is presented with a motion for preliminary approval of a class action

settlement, it must first evaluate whether certification of a settlement class is appropriate under

Federal Rule of Civil Procedure 23(a) and (b). The court must then determine whether the

settlement is fundamentally fair, adequate, and reasonable. *See id.* at \*736-37; Fed. R. Civ. P.

23(e)(2) (providing that, if a "proposal would bind class members, the court may approve it only

after a hearing and only on finding that it is fair, reasonable, and adequate after considering

various factors).

### IV.     RULE 23(A) AND (B) CONSIDERATIONS

A.     Rule 23(a)

Rule 23(a) provides that a class action is proper only if four requirements are met: (1)

numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ.

P. 23(a)(1)-(4). In the instant case, there is a sufficient showing that all four requirements have

1 | been satisfied for purposes of preliminary approval.

2 |       1.    Numerosity

3 | "Rule 23(a)(1) requires the class to be 'so numerous that joinder of all parties is

4 | impracticable.'" *Volkswagen*, 2017 U.S. Dist. LEXIS 22775, at \*737 (quoting Rule 23(a)(1)). In

5 | the instant case, there are approximately 100,000 vehicles that were sold or leased to consumers in

6 | the United States. Therefore, the number of owners or lessees (current and former) is likely in the

7 | thousands. The numerosity requirement has thus been met. *See id.* (reaching the same conclusion

8 | in the Volkswagen MDL where there were over 500,000 vehicles at issue).

9 |       2.    Commonality

10 | Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.

11 | R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of classwide

12 | resolution – which means that determination of its truth of falsity will resolve an issue that is

13 | central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

14 | 564 U.S. 338, 350 (2011). In the case at bar, the commonality requirement is satisfied because

15 | Plaintiffs' claims "arise from [FCA's] and Bosch's common course of conduct." *Volkswagen*,

16 | 2017 U.S. Dist. LEXIS 22775, at \*738.

17 |       3.    Typicality

18 | Under Rule 23(a)(3), the claims of the representative parties must be "typical of the claims

19 | . . . of the class." Fed. R. Civ. P. 23(a)(3). "Typicality 'assure[s] that the interest of the named

20 | representative aligns with the interests of the class.'" *Volkswagen*, 2017 U.S. Dist. LEXIS 22775,

21 | at \*739. Here, Plaintiffs meet the typicality requirement because their claims "are based on the

22 | same pattern of [FCA's] and Bosch's wrongdoing as those brought on behalf of Class Members."

23 | *Id.* at \*740. Plaintiffs and the class were subject to the same misconduct and suffered the same

24 | injury. *See id.*

25 |       4.    Adequacy

26 | Finally, Rule 23(a)(4) requires that the named plaintiffs, who seek to be class

27 | representatives, "will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

28 | 23(a)(4).

9

1

2

3

4

"This requirement is rooted in due-process concerns – 'absent class members must be afforded adequate representation before entry of a judgment which binds them.'" Courts engage in a dual inquiry to determine adequate representation and ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

5

*Volkswagen*, 2017 U.S. Dist. LEXIS 22775, at \*740-41.

6

7

In the instant case, there is nothing in the record suggesting that there is a conflict or that

Plaintiffs and the PSC have not or will not prosecute the action vigorously. The PSC was selected

8

after a vigorous and careful selection process. Indeed, on the latter, the Court notes that this

9

litigation has been hard fought as demonstrated by the briefing on the motions to dismiss as well

10

as the briefing on the motion for class certification and related motions. Thus, the adequacy

11

requirement has been met.

12

B.      Rule 23(b)

13

The parties ask for certification of a settlement class pursuant to Rule 23(b)(3). Rule 23(b)

14

requires that (1) "the questions of law or fact common to class members predominate over any

15

questions affecting only individual members" and that (2) "a class action [be] superior to any other

16

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

17

23(b)(3).

18

1.      Predominance

19

"'Rule 23(b)(3)'s predominance criterion is even more demanding'" than Rule 23(a)(2)'s

20

commonality requirement. *Volkswagen*, 2017 U.S. Dist. LEXIS 22775, at \*743 (adding that

21

commonality alone does not establish predominance under Rule 23(b)(3)).

22

23

24

25

26

"[T]he 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation'" and requires "courts to give careful scrutiny to the relation between common and individual questions in a case." Predominance is found "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication[.]"

27

*Volkswagen*, 2017 U.S. Dist. LEXIS 22775, at \*743.

28

In the case at bar, the predominance requirement is satisfied as "Bosch and [FCA]

10

1    perpetrated the same fraud in the same manner against all Class Members." *Id.* at \*744.

2    "Plaintiffs also allege a common and unifying injury, as their and other Class Members' injuries

3    arise solely from Bosch's and [FCA's] use of the defeat device[s]." *Id.*

4         The panel decision in *In re Hyundai & Kia Fuel Economy Litigation*, 881 F.3d 679 (9th

5    Cir. 2018), which addresses predominance in a settlement context, is not binding on this Court

6    because that decision is currently under en banc review. Moreover, as noted by Plaintiffs, the

7    instant case is distinguishable from *Hyundai* in that it involves a federal RICO claim, not just

8    claims pursuant to the laws of multiple states. Finally, while there are some variations in state

9    law, Plaintiffs have made at least a fair argument (in their class certification briefing) that such

10   variations are not so extensive or complicated that they defeat predominance. *Cf. In re*

11   *Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 895 F.3d 597, 609 n.17

12   (9th Cir. 2018) (holding that district court "provided a thorough predominance analysis under Rule

13   23(b)(3), sufficient under *In re Hyundai*"). Moreover, the Court, in adjudicating the first motion

14   to dismiss, carefully examined and analyzed salient aspects of the law of each of the states

15   involved. Because there are common patterns on the certain key elements among the various state

16   laws, predominance is satisfied.

17        2.    Superiority

18        The superiority requirement focuses on "'whether maintenance of [the] litigation as a class

19   action is efficient and whether it is fair.'" *Volkswagen*, 2017 U.S. Dist. LEXIS 22775, at \*744.

20   The instant case meets the superiority requirement because,

21            [i]f Class Members were to bring individual lawsuits against
              [Defendants], each Member would be required to prove the same
22            wrongful conduct to establish liability and thus would offer the same
              evidence. Given that Class Members number in the . . . thousands,
23            there is the potential for just as many lawsuits with the possibility of
              inconsistent rulings and results. Thus, classwide resolution of their
24            claims is clearly favored over other means of adjudication, and the
              proposed Settlement resolves Class Members' claims at once. As
25            such, class action treatment is superior to other methods and will
              efficiently and fairly resolve the controversy.
26

27   *Id.* at \*744-45. The Court also notes that manageability of a class action for purposes of Rule

28   23(b)(3) is not an issue in the settlement context because the case will not be tried. *See Amchem*

1    *Prods. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class

2    certification, a district court need not inquire whether the case, if tried, would present intractable

3    management problems, for the proposal is that there be no trial."); *Sullivan v. DB Invs., Inc.*, 667

4    F.3d 273, 335 (3d Cir. 2011) ("A key question in a litigation class action is manageability – how

5    the case will or can be tried, and whether there are questions of fact or law that are capable of

6    common proof.  But the settlement class presents no management problems because the case will

7    not be tried.").  Moreover, having examined the relevant state laws, the Court believes that

8    management and trial of a class action would be manageable, at least for most if not all claims.

9    ### V.        PRELIMINARY FAIRNESS DETERMINATION

10        Rule 23(e) (2) provides as follows:

11        > If the proposal would bind class members, the court may approve it
         > only after a hearing and only on finding that it is fair, reasonable,
12       > and adequate after considering whether:

13       > (A) the class representatives and class counsel have adequately
         > represented the class;
14
         > (B) the proposal was negotiated at arm's length;
15
         > (C) the relief provided for the class is adequate, taking into account:
16
         >     (i) the costs, risks, and delay of trial and appeal;
17
         >     (ii) the effectiveness of any proposed method of distributing
18       > relief to the class, including the method of processing class-member
         > claims;
19
         >     (iii) the terms of any proposed award of attorney's fees,
20       > including timing of payment; and

21       >     (iv) any agreement required to be identified under Rule
         > 23(e)(3); and
22
         > (D) the proposal treats class members equitably relative to each
23       > other.

24    Fed. R. Civ. P. 23(e)(2).

25        The Ninth Circuit has also identified certain factors that should be considered when a court

26    evaluates a settlement is fair, reasonable, and adequate:

27       > (1) the strength of the plaintiff's case; (2) the risk, expense,
         > complexity, and likely duration of further litigation; (3) the risk of
28       > maintaining class action status throughout the trial; (4) the amount

12

United States District Court
Northern District of California

1

2

> offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel;
> (7) the presence of a governmental participant; and (8) the reaction
> of the class members of the proposed settlement.

3  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). The Ninth Circuit

4  has also instructed that, where a settlement is reached before a class is certified, the settlement

5  "must withstand an even higher level of scrutiny," *i.e.*, to ensure there is "no collusion or other

6  conflicts of interest." *Id.*

7  Here, the considerations identified above, even under the higher level of scrutiny, weigh in

8  favor of preliminary approval. First, the procedural indicators confirm adequacy. The settlement

9  was vigorously negotiated at arm's length and with the assistance of one of the country's

10  preeminent settlement masters, Mr. Feinberg. Also, although the settlement is formally between

11  Plaintiffs and Defendants alone, it was negotiated alongside and in conjunction with government

12  entities, including the United States and California (as well as other states). Indeed, the settlement

13  between the parties works in tandem with the proposed consent decrees with the United States and

14  California. Furthermore, even though the settlement is a claims-made settlement, it does not

15  appear to be illusory in nature because, as noted above, Defendants have a strong incentive to

16  ensure that there is a high participation/claims rate (*i.e.*, because of the terms of the consent

17  decrees). The proposed consent decrees set an 85% target rate with substantial penalties if that

18  target is not met within two (2) years. And the benefits to individual class members are

19  substantial and likely to gain their attention. The Court notes a similarly structured settlement in

20  the Volkswagen MDL yielded a very high participation rate.[6]

21  Second, the risks that Plaintiffs would face should the cases continue to be litigated were

22  not insignificant.[7] Difficult issues were raised, *e.g.*, on Plaintiffs' RICO claim, as evidenced in the

23  briefing on the motions to dismiss. As the Court noted in earlier hearings, the standing issue was

24  far from clear. Moreover, class certification (and continued certification) was not guaranteed,

25

26  _____

27  [6] *See* Proc. Guidance for Class Action Sett. ¶ 1.g-h (asking for "an estimate of the number and/or percentage of class members who are expected to submit a claim" and expressing disfavor for reversionary settlements).

28  [7] *See* Proc. Guidance for Class Action Sett. ¶ 1.e (asking for "an explanation of the factors bearing on the amount of the compromise").

13

1    particularly given the number of state law claims being brought and the pendency of en banc

2    review in *Hyundai*. Damages were potentially problematic in light of Defendants' position that

3    there was an easy repair for the vehicles at issue. Given these risks, a compromise was not

4    unreasonable, particularly where, in exchange for the release, class members will obtain not

5    insignificant remedies, including a substantial cash payment. In this regard, the Court takes note

6    that, as stated above, if all class members were to participate and submit claims, then the

7    maximum amount that Defendants will pay to the class is approximately $307,500,000 (*i.e.*,

8    $3,075 x 100,000 vehicles) – excluding attorney's fees and costs and settlement administration

9    fees and costs. This is not an insignificant figure taking into account the litigation risks and the

10    amount that Plaintiffs theoretically could obtain if they were to fully prevail at trial. *See* Docket

11    No. 327-4 (Weir Expert Report ¶¶ 8, 60, 63) (Plaintiffs' expert estimating more than $223 million

12    in overpayment damages for Jeep trucks and more than $707 million for RAM trucks;

13    alternatively, estimating more than $115 million in premium damages for Jeep trucks and more

14    than $356 million for RAM trucks).[8]

15        Third, the settlement reasonably differentiates among class members (*e.g.*, providing more

16    of an incentive for current owners to bring their vehicles in for repair while providing some

17    compensation for former owners).

18        Fourth, the parties' agreement on attorneys' fees and costs – $59 million and $7 million,

19    respectively – is not, on its face, unreasonable. *See* Docket No. 523 (notice). If Defendants pay

20    out the maximum of $307,500,000, then the attorneys' fees of $59 million will represent

21    approximately 19% of that amount. This is less than the 25% benchmark approved by the Ninth

22    Circuit, although the Court acknowledges that, in "megafund" situations, smaller percentages have

23    been awarded and the lodestar cross-check assumes particular importance. *See In re Bluetooth*

24    *Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (noting that "where awarding 25%

25    of a 'mega-fund' would yield windfall profits for class counsel in light of the hours spent on the

26    case, courts should adjust the bench-mark percentage or employ the lodestar method instead"); *see*

27

28    [8] *See* Proc. Guidance for Class Action Sett. ¶ 1.e (asking for "the potential class recovery if
      plaintiffs had fully prevailed on each of their claims").

1    *also Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038-EMC, 2016 U.S. Dist. LEXIS

2    78087, at \*5-6 (N.D. Cal. June 15, 2016) (discussing megafund cases).

3       Fifth, Plaintiffs' request for an incentive award is reasonable.[9]  Plaintiffs ask for an

4    incentive award of $5,000 for each of the 60 class representatives (a total of $300,000).  *See*

5    Cabraser Decl. ¶ 15.  The request of $5,000 is reasonable as that amount is the presumptive

6    incentive award in this District.  Although there is a large number of class representatives, that is

7    largely a reflection of the scope of the lawsuit – covering all the states, plus the District of

8    Columbia.  Moreover, Defendants will be paying for the incentive awards, in addition to the class

9    payments.  *See* Mot. at 13.

10       Accordingly, the Court concludes that the proposed settlement between the parties is

11    sufficiently fair, adequate, and reasonable to warrant preliminary approval.  There is a sufficient

12    "record supporting the conclusion that the proposed settlement will likely earn final approval after

13    notice and an opportunity to object."  Fed. R. Civ. P. 23(e)(1), 2018 advisory committee notes.

14       **VI.**   **PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS**

15       Finally, the Court notes that it has reviewed the proposed settlement in light of the

16    District's updated Procedural Guidance for Class Action Settlements.  The Court finds that the

17    parties have sufficiently followed the Procedural Guidance and that the proposed settlement

18    sufficiently meets the standards articulated therein.

19       For example, the parties have provided the necessary information about the settlement for

20    the Court to evaluate it for fairness, reasonableness, and adequacy and, as discussed above, the

21    Court finds the terms sufficiently fair, reasonable, and adequate.  *See* Proc. Guidance for Class

22    Action Sett. ¶ 1.

23       Also, the parties went through a sufficiently rigorous selection process to select a

24    settlement administrator.  *See* Proc. Guidance for Class Action Sett. ¶ 2; *see also* Cabraser Decl.

25    ¶¶ 9-10.  While the settlement administration costs are significant – an estimated $1.5 million –

26    they are adequately justified given the size of the class and the relief being provided.

27

28    _____

  [9] *See* Proc. Guidance for Class Action Sett. ¶ 7.

1        In addition, the Court finds that the language of the class notices (short and long-form) is

2   appropriate and that the means of notice – which includes mail notice, electronic notice,

3   publication notice, and social media "marketing" – is the "best notice . . . practicable under the

4   circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also* Proc. Guidance for Class Action Sett. ¶¶ 3-

5   5, 9 (addressing class notice, opt-outs, and objections). The Court notes that the means of notice

6   has changed somewhat, as explained in the Supplemental Weisbrot Declaration filed on February

7   8, 2019, so that notice will be more targeted and effective. *See generally* Docket No. 525 (Supp.

8   Weisbrot Decl.) (addressing, *inter alia*, press release to be distributed via national newswire

9   service, digital and social media marketing designed to enhance notice, and "reminder" first-class

10   mail notice when AEM becomes available).

11        Finally, the parties have noted that the proposed settlement bears similarity to the

12   settlement in the Volkswagen MDL. *See* Proc. Guidance for Class Action Sett. ¶ 11.

### VII.     CONCLUSION

14        For the foregoing reasons, the Court grants the motion for preliminary approval and

15   authorizes issuance of the class notice. The parties have satisfied the requisites of Rule 23(e) as

16   well as this District's Procedural Guidance for Class Action Settlements. The Court shall also

17   enter, forthwith, the proposed order submitted by the parties on preliminary approval.

18        This order disposes of Docket Nos. 487, 491, and 508.

20   **IT IS SO ORDERED**.

22   Dated: February 11, 2019

_____

EDWARD M. CHEN
United States District Judge

16