Robert J. Giuffra, Jr. (admitted *pro hac vice*)
William B. Monahan (admitted *pro hac vice*)
C. Megan Bradley (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Attorneys for Defendants Fiat Chrysler
Automobiles N.V., FCA US LLC, VM
Motori S.p.A., and VM North America, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CHRYSLER-DODGE-JEEP ECODIESEL MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:17-md-02777-EMC |
| | The Honorable Edward M. Chen |
| This Document Relates to: | **THE FCA DEFENDANTS' MOTION TO DISMISS THE OPT-OUT BELLWETHER PLAINTIFFS' AMENDED COMPLAINTS** |
| ALL OPT-OUT CASES | ORAL ARGUMENT REQUESTED |
| | Courtroom:  5<br>Hearing Date:  October 8, 2020<br>Hearing Time:  1:30 p.m. |

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2
TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3
    PLEASE TAKE NOTICE THAT, on October 8, 2020 at 1:30 p.m., in

4
Courtroom 5 of the United States District Court for the Northern District of California, located at

5
450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102-3489, Defendants

6
Fiat Chrysler Automobiles N.V., FCA US LLC, VM Motori S.p.A., and VM North America, Inc.

7
will, and hereby do, move the Court to dismiss the Consolidated Amended Complaints of the

8
California, Florida and Texas Opt-Out Bellwether Plaintiffs for failure to state a claim and for

9
lack of subject matter jurisdiction.  This Motion is made pursuant to Rules 8(a), 9(b), 12(b)(1),

10
and 12(b)(6) of the Federal Rules of Civil Procedure, and this Court's February 27, 2020 Order

11
Regarding FCA Emissions Opt-Out Parties' Bellwether Agreement (ECF No. 686), and is based

12
on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the

13
Declaration of William B. Monahan, dated July 3, 2020, and the exhibits annexed thereto, all

14
pleadings and papers filed herein, oral argument of counsel, and any matter that may be

15
submitted at the hearing.

16

17
Dated:  July 3, 2020                    Respectfully submitted,

18

19
                              */s/  Robert J. Giuffra, Jr.*
                              Robert J. Giuffra, Jr. (admitted *pro hac vice*)

20
                              William B. Monahan (admitted *pro hac vice*)
                              C. Megan Bradley (admitted *pro hac vice*)

21
                              SULLIVAN & CROMWELL LLP
                              125 Broad Street

22
                              New York, New York  10004-2498
                              Telephone:     (212) 558-4000

23
                              Facsimile:     (212) 558-3588

24
                              *Attorneys for Defendants Fiat Chrysler*
                              *Automobiles N.V., FCA US LLC, VM Motori*

25
                              *S.p.A., and VM North America, Inc.*

26

27

28

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ......................................................................................................1

ISSUES TO BE DECIDED .............................................................................................................5

FACTUAL BACKGROUND ..........................................................................................................6

    A.    The EPA and Class Action Lawsuits ...................................................................6

    B.    Defendants' Motions To Dismiss the Class Complaint .........................................7

    C.    Court-Approved Settlements with the Agencies and the Class Plaintiffs...............8

    D.    The Bellwether Opt-Outs ......................................................................................9

ARGUMENT .................................................................................................................................12

I.    BECAUSE PLAINTIFFS HAVE NOT PLED A LEGALLY COGNIZABLE
INJURY, THE COURT SHOULD DISMISS THEIR CLAIMS FOR LACK
OF STANDING ....................................................................................................12

    A.    The AEM Bars the Opt-Outs' "Overpayment" Theory of Injury as a
Matter of Law .....................................................................................................12

    B.    Plaintiffs Do Not Plead that the AEM Caused Them Any Injury.........................15

    C.    Plaintiffs Do Not Plead an Injury-In-Fact from the Various Other Recalls .........16

II.    THE RICO CLAIM MUST BE DISMISSED .....................................................17

    A.    Plaintiffs' RICO Claim Should Be Dismissed Because Plaintiffs Did Not
Purchase or Lease Their Trucks Directly from the FCA Defendants...................18

    B.    Plaintiffs Have Not Pled an Injury Proximately Caused by a RICO
Enterprise ...........................................................................................................19

    C.    The Opt-Outs Are Pursuing an Impermissible Fraud-on-the-Regulators
Theory of RICO Liability ...................................................................................20

        1.    Plaintiffs Have Not Alleged an Indictable Predicate Act .........................20

        2.    Plaintiffs' RICO Claim Also Falls Outside the "Zone of Interest"
Protected by the CAA ...............................................................................22

III.    PLAINTIFFS HAVE NOT STATED VIABLE COMMON LAW FRAUD
CLAIMS...............................................................................................................23

    A.    The Court Should Dismiss the Complaints' AEM-Related Fraud Claims ...........24

**TABLE OF CONTENTS**
(continued)

Page

1. Plaintiffs Do Not Plead Facts Demonstrating Falsity ..............................24

2. Plaintiffs Do Not Plead Facts Establishing Scienter................................25

3. Plaintiffs Do Not Adequately Plead Reliance...........................................25

B. Plaintiffs' Fraud Claims Based on Alleged Misrepresentations At the Time of Purchase Should Be Dismissed ...........................................................26

1. Plaintiffs Have Not Pled Individual Reliance............................................26

2. The Complaints Do Not Plead Falsity .......................................................30

3. The CAA Preempts Plaintiffs' Claims About Compliance with Emissions Standards ..................................................................................31

4. Fraud Claims Based on Statements Made by Independent Dealerships Are Not Actionable ...............................................................32

IV. PLAINTIFFS DO NOT ALLEGE LEGALLY COGNIZABLE STATUTORY CONSUMER PROTECTION CLAIMS ..............................................34

A. California Plaintiffs' Statutory Consumer Protection Claims .............................35

B. Texas Plaintiffs' Statutory Consumer Protection Claim..................................36

C. Florida Plaintiffs' Statutory Consumer Protection Claims .............................37

V. PLAINTIFFS' WARRANTY CLAIMS SHOULD BE DISMISSED ........................38

A. Plaintiffs Have Failed To State Claims Under the MMWA .................................38

1. Plaintiffs Cannot Bring MMWA Claims Based on the Federal Emissions Warranties Provided by the CAA............................................39

2. The Other Statements Alleged in the Complaints Are Not "Warranties" Actionable Under the MMWA ............................................40

a) Statements in FCA's Marketing Were Not "Written Warranties" ......................................................................................41

b) Statements by Dealership Salespersons Were Not "Written Warranties" ......................................................................................42

c) FCA's Challenged Statement About the AEM Is Not Actionable ......................................................................................42

**TABLE OF CONTENTS**
(continued)

Page

      d)     Plaintiffs Have Not Sufficiently Alleged Reliance on the Alleged "Written Warranties"...........................................................43

      e)     Plaintiffs Have Not Alleged that FCA Breached Many of the Alleged Written Warranties ....................................................43

   3.     Plaintiffs' MMWA Claims Based on an Alleged Breach of Implied Warranty Fail .......................................................................44

      a)     Plaintiffs Have Not Pled Facts Demonstrating that the Alleged "Defeat Device" Made Their Trucks Unmerchantable ......................................................................44

      b)     Plaintiffs Do Not Allege that They Experienced Any Issues with Their Trucks' EGR Coolers....................................................45

      c)     The California and Florida Plaintiffs Have Not Pled the Privity Required for Their MMWA Claim Based on Implied Warranty ..................................................................45

   4.     FCA Stood Behind Its Warranties and Provided a Cure for the Alleged Defects, Barring All of Plaintiffs' MMWA Claims ...................47

  B.    The California Plaintiffs' Song-Beverly Claim Should Be Dismissed.................48

   1.     Plaintiffs' Song-Beverly Express Warranty Claims Fail ...........................48

      a)     FCA's General Statements in Its Advertising and Marketing Are Not Actionable "Express Warranties" Under Song-Beverly ...................................................................48

      b)     The Alleged "Defeat Device" Did Not Substantially Impair the Use, Value or Safety of Plaintiffs' Trucks ..............................49

      c)     Plaintiffs Do Not Allege They Afforded FCA a "Reasonable Number of Attempts" To Repair Their Trucks.........50

   2.     Plaintiffs' Song-Beverly Implied Warranty Claims Fail ...........................50

      a)     Plaintiffs' Implied Warranty of Merchantability Claim Is Preempted by the CAA ................................................................50

      b)     Plaintiffs Fail To Allege that Their Trucks Were Not Merchantable.............................................................................51

VI.   **PLAINTIFFS DO NOT ADEQUATELY STATE CLAIMS FOR RESCISSION** .............................................................................................52

**TABLE OF CONTENTS**
**(continued)**

*Page*

A.  Plaintiffs Have Waived Any Right To Rescind ......................................................52

B.  Plaintiffs' Rescission Claims Also Must Be Dismissed Because Plaintiffs Did Not Enter Into Any Sales Or Lease Contracts With the FCA Defendants ................................................................................................53

C.  Florida and Texas Plaintiffs' Rescission Claims Also Must Be Dismissed Because There Is An Adequate Remedy At Law ..................................................54

VII. **PLAINTIFFS' UNJUST ENRICHMENT CLAIMS MUST BE DISMISSED** ..........54

**CONCLUSION** ............................................................................................................55

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Agar Corp.* v. *Electro Circuits Int'l, LLC*,
  580 S.W.3d 136 (Tex. 2019) ................................................ 20

*Am. Suzuki Motor Corp.* v. *Superior Court*,
  44 Cal. Rptr. 2d 526 (Cal. Ct. App. 1995) ........................... 44

*Anderson* v. *Jamba Juice Co.*,
  888 F. Supp. 2d 1000 (N.D. Cal. 2012) ................................ 41

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  802 F. Supp. 2d 1070 (N.D. Cal. 2011) ................................ 36

*Arlington Pebble Creek, LLC* v. *Campus Edge Condo. Ass'n*,
  232 So. 3d 502 (Fla. Dist. Ct. App. 2017) ........................... 26

*Arnson* v. *Gen. Motors Corp.*,
  377 F. Supp. 209 (N.D. Ohio 1974) ..................................... 33

*Arroyo* v. *Chattem, Inc.*,
  926 F. Supp. 2d 1070 (N.D. Cal. 2012) ................................ 23

*Arthur Anderson & Co.* v. *Perry Equip. Co.*,
  945 S.W.2d 812 (Tex. 1997) .............................................. 37

*ASARCO Inc.* v. *Kadish*,
  490 U.S. 605 (1989) .................................................... 3, 15

*Ayres* v. *Gen. Motors Corp.*,
  234 F.3d 514 (11th Cir. 2000) .......................................... 23

*Balaschak* v. *Royal Caribbean Cruises*,
  2009 WL 8659594 (S.D. Fla. Sept. 14, 2009) ...................... 34, 35

*Barber* v. *Am. Wholesale Lender*,
  542 Fed. Appx. 832 (11th Cir. 2013) .................................. 53

*Bates* v. *Kashi Co.*,
  2012 WL 12847001 (S.D. Cal. July 16, 2012) ....................... 41

*Bell Atlantic* v. *Twombly*,
  550 U.S. 544 (2007) ............................................ 15, 28, 30

*Benipayo* v. *Volkswagen Grp. of Am., Inc.*,
  2020 WL 553884 (N.D. Cal. Feb. 4, 2020) ...................... 44, 49, 51

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*In re Bextra*,
    2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ........................................................ 18

*Birdsong* v. *Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009) ............................................................................... 51

*Blackmon* v. *Am. Home Prod. Corp.*,
    346 F. Supp. 2d 907 (S.D. Tex. 2004) ................................................................ 25

*Boris* v. *Wal-Mart Stores*,
    35 F. Supp. 3d 1163 (C.D. Cal. 2014) ........................................................... 28, 35

*Briehl* v. *Gen. Motors*,
    172 F.3d 623 (8th Cir. 1999) ............................................................................... 17

*Brod* v. *Jernigan*,
    188 So. 2d 575 (Fla. Dist. Ct. App. 1966) .......................................................... 25

*Brown* v. *Allstate Ins. Co.*,
    17 F. Supp. 2d 1134 (S.D. Cal. 1998) ................................................................. 35

*Brownfield* v. *Jaguar Land Rover N. Am.*,
    2012 WL 12887766 (C.D. Cal. Aug. 14, 2012) .................................................. 50

*Bush* v. *Palm Beach Imps.*,
    610 So. 2d 68 (Fla. Dist. Ct. App. 1992) ....................................................... 54, 55

*Bushendorf* v. *Freightliner Corp.*,
    13 F.3d 1024 (7th Cir. 1993) ............................................................................... 33

*Butler* v. *Porsche Cars N. Am., Inc.*,
    2016 WL 4474630 (N.D. Cal. Aug. 25, 2016) .................................................... 18

*Cadena* v. *Am. Honda Motor Co.*,
    2019 WL 3059931 (C.D. Cal. May 29, 2019) ..................................................... 33

*Cansino* v. *Bank of Am.*,
    169 Cal. Rptr. 3d 619 (Cal. Ct. App. 2014) ........................................................ 24

*Carlton* v. *Paccar Inc.*,
    2016 WL 6921127 (C.D. Cal. May 2, 2016) ....................................................... 51

*Carter* v. *Underwriters at Lloyd's*,
    2018 WL 10483811 (N.D. Tex. Apr. 13, 2018) ............................................. 37, 38

*Charles* v. *Fla. Foreclosure Placement Ctr.*,
    988 So. 2d 1157 (Fla. Dist. Ct. App. 2008) ........................................................ 20

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*Cheng* v. *BMW of N. Am.*,
2013 WL 3940815 (C.D. Cal. July 26, 2013) ........................................................ 14

*Chowning* v. *Kohl's Dep't Stores*,
2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ....................................................... 35

*Clancy* v. *Bromley Tea Co.*,
308 F.R.D. 564 (N.D. Cal. 2013) ............................................................................ 39

*Clemens* v. *DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ......................................................................... 45, 46

*Cleveland* v. *United States*,
531 U.S. 12 (2000) .................................................................................................. 21

*Coffey* v. *Fort Wayne Pools, Inc.*,
24 F. Supp. 2d 671 (N.D. Tex. 1998) ..................................................................... 33

*Cohen* v. *Porsche Cars N. Am., Inc.*,
2019 WL 6700941 (C.D. Cal. Dec. 6, 2019) .......................................................... 50

*Cross* v. *Mayo*,
140 P. 283 (Cal. 1914) ........................................................................................... 52

*Cruz* v. *Andrews Restoration, Inc.*,
364 S.W.3d 817 (Tex. 2012) ................................................................................... 37

*Danielsen* v. *Burnside-Ott Aviation Training Ctr.*,
941 F.2d 1220 (D.C. Cir. 1991) .............................................................................. 23

*David* v. *Am. Suzuki Motor Corp.*,
629 F. Supp. 2d 1309 (S.D. Fla. 2009) ................................................................... 46

*Davis* v. *Estridge*,
85 S.W.3d 308 (Tex. App. 2001) ............................................................................ 54

*Douse* v. *Bos. Sci. Corp.*,
314 F. Supp. 3d 1251 (M.D. Fla. 2018) .................................................................. 25

*Durkee* v. *Ford Motor Co.*,
2014 WL 4352184 (N.D. Cal. Sept. 2, 2014) ......................................................... 49

*Dzielak* v. *Whirlpool Corp.*,
120 F. Supp. 3d 409 (D.N.J. 2015) ........................................................................ 39

*Edwards* v. *Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) ............................................................................... 16

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*Elias* v. *Hewlett-Packard Co.*,
    903 F. Supp. 2d 843 (N.D. Cal. 2012) ..................................................... 34

*Emmons* v. *Durable Mobile Homes, Inc.*,
    521 S.W.2d 153 (Tex. Civ. App. 1974) ................................................... 53

*Everett* v. *TK-Taito, LLC*,
    178 S.W.3d 844 (Tex. App. 2005) ........................................................... 45

*First United Pentecostal Church* v. *Parker*,
    514 S.W.3d 214 (Tex. 2017) .................................................................... 20

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liability Litig.*,
    2019 WL 7185524 (C.D. Cal. Oct. 29, 2019) .......................................... 53

*Fujikawa* v. *One W. Bank*,
    2011 WL 3021331 (D. Haw. July 21, 2011) ............................................ 30

*Garcia* v. *Harley-Davidson Motor Co.*,
    2019 WL 6050768 (N.D. Cal. Nov. 15, 2019) ......................................... 46

*Gayou* v. *Celebrity Cruises, Inc.*,
    2012 WL 2049431 (S.D. Fla. June 5, 2012) ....................................... 28, 35

*In re Gen. Motors Corp.*,
    385 F. Supp. 2d 1172 (W.D. Okla. 2005) ................................................ 55

*In re Gen. Motors Corp. "Piston Slap" Prods. Liab. Litig.*,
    385 F. Supp. 2d 1181 (W.D. Okla. 2005) ................................................ 55

*In re Gen. Motors LLC Ignition Switch Litig.*,
    407 F. Supp. 3d 212 (S.D.N.Y. 2019) ..................................................... 14

*Gilbert Fin. Corp.* v. *Steelform Contracting Co.*,
    145 Cal. Rprtr. 448 (Cal. Ct. App. 1978) ................................................ 46

*Ginsburg* v. *ICC Holdings*,
    2017 WL 5467688 (N.D. Tex. Nov. 13, 2017) ........................................ 24

*Gonzalez* v. *Mazda Motor Corp.*,
    2017 WL 3283957 (N.D. Cal. Aug. 1, 2017) ........................................... 33

*Green* v. *AILNH, LLC*,
    2019 WL 1883910 (C.D. Cal. Feb. 14, 2019) .......................................... 54

*Grouse River Outfitters Ltd.* v. *NetSuite, Inc.*,
    2018 WL 306719 (N.D. Cal. Jan. 5, 2018) .............................................. 25

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*Gunn Infiniti, Inc.* v. *O'Byrne*,
996 S.W.2d 854 (Tex. 1999) ................................................. 37

*Hadley* v. *Chrysler Group*,
2014 WL 988962 (E.D. Mich. Mar. 13, 2014) ....................... 17

*Hairston* v. *S. Beach Beverage Co.*,
2012 WL 1893818 (C.D. Cal. May 18, 2012) ......................... 41

*Hambrick* v. *Healthcare Partners Med. Grp.*,
189 Cal. Rptr. 3d 31 (Cal. Ct. App. 2015) ............................ 35

*Hemi Grp.* v. *City of New York*,
559 U.S. 1 (2010) ................................................................ 19

*Herremans* v. *BMW of N. Am., LLC*,
2014 WL 5017843 (C.D. Cal. Oct. 3, 2014) ..................... 32, 33

*Hesterly* v. *Royal Caribbean Cruises, Ltd.*,
2008 WL 11406184 (S.D. Fla. Aug. 6, 2008) ........................ 38

*Hobco, Inc.* v. *Tallahassee Assocs.*,
807 F.2d 1529 (11th Cir. 1987) ........................................... 43

*Hoffman* v. *Zenith Ins. Co.*,
487 F. App'x 365 (9th Cir. 2012) ......................................... 18

*Holmes* v. *Secs. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) .............................................................20

*Hydro-Mill Co.* v. *Hayward, Tilton & Rolapp Ins. Assocs.*,
10 Cal. Rptr. 3d 582 (Cal. Ct. App. 2004) ............................ 26

*Illinois Brick Co.*. v. *Illinois*,
431 U.S. 720 (1977) .............................................................18

*J.B. Colt Co.* v. *Head*,
292 S.W. 198 (Tex. Comm'n App. 1927) .......................... 52, 53

*Jackson* v. *Fischer*,
931 F. Supp. 2d 1049 (N.D. Cal. 2013) ................................ 33

*Jeffcoat* v. *Phillips*,
534 S.W.2d 168 (Tex. Civ. App. 1976) ................................ 24

*Johnson* v. *Nissan N. Am., Inc.*,
2018 WL 905850 (N.D. Cal. Feb. 15, 2018) ......................... 46

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*Kansas* v. *Utilicorp United, Inc.*,
   497 U.S. 199 (1990) ................................................................................................. 18

*Kearney* v. *Hyundai*,
   2010 WL 8251077 (C.D. Cal. Dec. 17, 2010) ....................................................... 43

*Kearns* v. *Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ............................................................................... 35

*Keegan* v. *Am. Honda Motor Co.*,
   284 F.R.D. 504 (C.D. Cal. 2012) .......................................................................... 43

*Kelley* v. *Microsoft Corp.*,
   2007 WL 2600841 (W.D. Wash. Sept. 10, 2007) ........................................... 41, 42

*Klein* v. *Marvin Lumber & Cedar Co.*,
   575 F. App'x 347 (5th Cir. 2014) .......................................................................... 34

*Knight* v. *Cook*,
   28 Cal. Rptr. 273 (Cal. Ct. App. 1963) ................................................................. 19

*Korea Supply Co.* v. *Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003) .................................................................................... 35, 36

*Kramer* v. *Toyota Motor Corp.*,
   668 F. App'x 765 (9th Cir. 2016) .......................................................................... 14

*Kuns* v. *Ford Motor Co.*,
   543 F. App'x 572 (6th Cir. 2013) .......................................................................... 48

*L.A. Taxi Coop., Inc.* v. *Uber Techs., Inc.*,
   114 F. Supp. 3d 852 (N.D. Cal. 2015) ................................................................... 34

*Lake* v. *Cravens*,
   488 S.W.3d 867 (Tex. App. 2016) ......................................................................... 25

*Lang* v. *Horne*,
   23 So. 2d 848 (Fla. 1945) ...................................................................................... 54

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
   572 U.S. 118 (2014) .............................................................................................. 22

*Locke* v. *Wells Fargo Home Mortg.*,
   2010 WL 4941456 (S.D. Fla. Nov. 30, 2010) ....................................................... 38

*Lomeli* v. *Jackson Hewitt, Inc.*,
   2017 WL 4773099 (C.D. Cal. Oct. 19, 2017) ....................................................... 33

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*LSR Joint Venture No. 2* v. *Callewart*,
    837 S.W.2d 693 (Tex. App. 1992) ......................................................................... 36

*Lundy* v. *Ford Motor Co.*,
    104 Cal. Rptr. 2d 545 (Cal. Ct. App. 2001) .......................................................... 49

*Macias* v. *Integrity Nationwide Investigations*,
    2013 WL 2155343 (C.D. Cal. May 17, 2013) ...................................................... 28

*Marks* v. *Ocwen Loan Servicing*,
    2008 WL 344210 (N.D. Cal. Feb. 6, 2008) .......................................................... 30

*Marlborough Holdings Grp.* v. *Azimut-Benetti*,
    505 F. App'x 899 (11th Cir. 2013) ....................................................................... 20

*Marsikian* v. *Mercedes-Benz USA*,
    2009 WL 10673466 (C.D. Cal. Aug. 13, 2009) ................................................... 46

*McCarthy* v. *Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996) ................................................................................... 18

*McClellan* v. *I-Flow Corp.*,
    776 F.3d 1035 (9th Cir. 2015) .............................................................................. 32

*McCulloch* v. *PNC Bank*,
    298 F.3d 1217 (11th Cir. 2002) ............................................................................ 23

*McGee* v. *Mercedes-Benz USA, LLC*,
    2020 WL 1530921 (S.D. Cal. Mar. 30, 2020) ........................................... 45, 51, 52

*McKissic* v. *Country Coach, Inc.*,
    2008 WL 616093 (M.D. Fla. Mar. 3, 2008) .......................................................... 46

*MDVIP, Inc.* v. *Beber*,
    222 So. 3d 555 (Fla. Dist. Ct. App. 2017) ........................................................... 34

*Mejia* v. *Jurich*,
    781 So. 2d 1175 (Fla. Dist. Ct. App. 2001) .......................................................... 24

*Mena* v. *Wells Fargo Bank*,
    2009 WL 10673737 (C.D. Cal. June 1, 2009) ...................................................... 30

*Mesa* v. *BMW of N. Am.*,
    904 So. 2d 450 (Fla. Dist. Ct. App. 2005) ............................................... 46, 53, 54

*Milicevic* v. *Fletcher Jones Imps.*,
    402 F.3d 912 (9th Cir. 2005) ................................................................................ 42

# TABLE OF AUTHORITIES
(continued)

*Page(s)*

*Miller* v. *Showcase Homes, Inc.*,
 1999 WL 199605 (N.D. Ill. Mar. 31, 1999) .......................................................................... 43

*In re MyFord Touch Consumer Litig.*,
 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ..................................................................... 13

*In re MyFord Touch Consumer Litig.*,
 46 F. Supp. 3d 936 (N.D. Cal. 2014) ........................................................................... 34, 46

*N. Brevard Hosp. Dist.* v. *McKesson Techs.*,
 2017 WL 951672 (M.D. Fla. Mar. 10, 2017) ........................................................................ 38

*Neal* v. *SMC Corp.*,
 99 S.W.3d 813 (Tex. App. 2003) ......................................................................................... 53

*In re Nexus 6P Prod. Liab. Litig.*,
 293 F. Supp. 3d 888 (N.D. Cal. 2018) ................................................................................. 36

*Norman* v. *Niagara Mohawk Power Corp.*,
 873 F.2d 634 (2d Cir. 1989) ................................................................................................ 23

*O'Neil* v. *Simplicity*, *Inc.*,
 553 F. Supp. 2d 1110 (D. Minn. 2008) ............................................................................... 17

*Ocana* v. *Ford Motor Co.*,
 992 So. 2d 319 (Fla. Dist. Ct. App. 2008) .................................................................... 33, 34

*Ogner* v. *Sea Ray Boats, Inc.*,
 2013 WL 12153502 (S.D. Fla. Feb. 12, 2013) ................................................................... 43

*Ohlweiler* v. *Bank of Am. Corp.*,
 2015 WL 8484526 (S.D. Cal. Dec. 9, 2015) ....................................................................... 47

*Orosco* v. *Sun-Diamond Corp.*,
 60 Cal. Rptr. 2d 179 (Cal. Ct. App. 1997) .................................................................... 19, 20

*Oscar* v. *Univ. Students Co-op. Ass'n*,
 965 F.2d 783 (9th Cir. 1992) ............................................................................................... 20

*Padilla* v. *Porsche Cars N. Am., Inc.*,
 391 F. Supp. 3d 1108 (S.D. Fla. 2019) ............................................................................... 47

*Paduano* v. *Am. Honda Motor Co.*,
 88 Cal. Rptr. 90 (Cal. Ct. App. 2009) ................................................................................. 49

*Parkway Co.* v. *Woodruff*,
 901 S.W.2d 434 (Tex. 1995) ............................................................................................... 37

# TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*Patel* v. *Holiday Hosp. Franchising, Inc.*,
172 F. Supp. 2d 821 (N.D. Tex. 2001) .................................................................. 34

*PB Prop. Mgmt., Inc.* v. *Goodman Mfg. Co.*,
2016 WL 7666179 (M.D. Fla. May 12, 2016) ...................................................... 45

*Perales* v. *Bank of Am.*,
2014 WL 3907793 (S.D. Tex. Aug. 11, 2014) ..................................................... 55

*Phillips* v. *Arnold*,
329 S.W.2d 108 (Tex. Civ. App. 1959) ................................................................ 53

*In re Porsche Cars N. Am., Inc.*,
880 F. Supp. 2d 801 (S.D. Ohio 2012) ................................................................ 55

*PPG Indus.* v. *JMB/Houston Ctrs. Partners Ltd.*,
146 S.W.3d 79 (Tex. 2004) .................................................................................. 43

*Priddy* v. *Bus. Men's Oil Co.*,
241 S.W. 770 (Tex. Civ. App. 1922) .................................................................... 54

*Punie* v. *Achong*,
765 So. 2d 823 (Fla. Dist. Ct. App. 2000) ........................................................... 54

*R.M. Dudley Const. Co.* v. *Dawson*,
258 S.W.3d 694 (Tex. App. 2008) ....................................................................... 55

*Resnick* v. *Hyundai*,
2016 WL 9455016 (C.D. Cal. Nov. 14, 2016) ..................................................... 51

*Richard B. LeVine, Inc.* v. *Higashi*,
32 Cal. Rptr. 3d 244 (Cal. Ct. App. 2005) ........................................................... 20

*Rickman* v. *BMW of North America*,
2020 WL 3468250 (D.N.J. June 25, 2020) ...................................................... 3, 19

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ............................................................................... 25

*Rivera* v. *Ford Motor Co.*,
2017 WL 3485815 (E.D. Mich. Aug. 15, 2017) .................................................. 40

*Rodas* v. *Porsche Cars N. Am., Inc.*,
2014 WL 12596315 (C.D. Cal. Sept. 17, 2014) .................................................. 27

*Rollins, Inc.* v. *Butland*,
951 So. 2d 860 (Fla. Dist. Ct. App. 2006) ........................................................... 38

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Rood Co.* v. *Bd. of Public Instruction of Dade Cty.*,
   102 So. 2d 139 (Fla. 1958) ................................................................. 52

*Sater* v. *Chrysler Grp.*,
   2016 WL 7377126 (C.D. Cal. Oct. 25, 2016) ................................ 14

*Schmidt* v. *Ford Motor Co.*,
   972 F. Supp. 2d 712 (E.D. Pa. 2013) ............................................. 40

*Sciortino* v. *Pepsico, Inc.*,
   108 F. Supp. 3d 780 (N.D. Cal. 2015) ............................................. 2

*In re Seagate Tech. LLC Litig.*,
   233 F. Supp. 3d 776 (N.D. Cal. 2017) .......................................... 46

*Shields* v. *Barrow*,
   58 U.S. 130 (1854) ......................................................................... 53

*In re Software Toolworks, Inc. Sec. Litig.*,
   1991 WL 319033 (N.D. Cal. June 17, 1991) ................................ 26

*In re Sony Grand Wega*,
   758 F. Supp. 2d 1077 (S.D. Cal 2010) .................................... 35, 36

*Spokeo, Inc.* v. *Robins*,
   136 S. Ct. 1540 (2016) ..................................................... 12, 15, 16

*Sprewell* v. *Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ......................................................... 13

*Stewart* v. *Electrolux Home Prod., Inc.*,
   304 F. Supp. 3d 894 (E.D. Cal. 2018) ........................................... 46

*Stires* v. *Carnival Corp.*,
   243 F. Supp. 2d 1313 (M.D. Fla. 2002) ........................................ 34

*Strauss* v. *Ford Motor Co.*,
   439 F. Supp. 2d 680 (N.D. Tex. 2006) ......................................... 45

*Tae Hee Lee* v. *Toyota*,
   992 F. Supp. 2d 962 (C.D. Cal. 2014) ........................................... 25

*Taragan* v. *Nissan N. Am., Inc.*,
   2013 WL 3157918 (N.D. Cal. June 20, 2013) ...................... 45, 51, 52

*Thompson* v. *Cal. Fair Plan Ass'n*,
   270 Cal. Rptr. 590 (Cal. Ct. App. 1990) ...................................... 20

# TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*Tietsworth* v. *Sears*,
720 F. Supp. 2d 1123 (N.D. Cal. 2010) .................................................. 47

*In re Toyota Motor Corp.*,
2012 WL 12929769 (C.D. Cal. May 4, 2012) ........................................ 46

*In re Toyota Motor Corp.*,
790 F. Supp. 2d 1152 (C.D. Cal. 2011) ........................................... 15, 17

*Trollinger* v. *Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004) ................................................................ 18

*TWM* v. *Am. Med. Sys., Inc.*,
886 F. Supp. 842 (N.D. Fla. 1995) ....................................................... 38

*United Food & Commercial Workers* v. *Amgen, Inc.*,
400 F. App'x 255 (9th Cir. 2010) ......................................................... 18

*United States* v. *Ali*,
620 F.3d 1062 (9th Cir. 2010) .............................................................. 22

*United States* v. *Kato*,
878 F.2d 267 (9th Cir. 1989) ................................................................ 21

*United States* v. *Lew*,
875 F.2d 219 (9th Cir. 1989) ................................................................ 22

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004) ................................................ 26

*Vess* v. *Ciba-Geigy Corp.*,
317 F.3d 1097 (9th Cir. 2003) .............................................................. 23

*Viggiano* v. *Hansen Nat'l Corp.*,
944 F. Supp. 2d 877 (C.D. Cal. 2013) .................................................. 41

*Virgilio* v. *Ryland Grp.*,
680 F.3d 1329 (11th Cir. 2012) ............................................................ 55

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ...................................... 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
2019 WL 2493369  (N.D. Cal. June 14, 2019) ....................................... 27

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
2020 WL 3316116 (N.D. Cal. June 18, 2020) ...................................... 28

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*Walker* v. *Cotter Props., Inc.*,
    181 S.W.3d 895 (Tex. App. 2006) ........................................................................ 55

*Waller* v. *Hewlett-Packard Co.*,
    295 F.R.D. 472 (S.D. Cal. 2013) ........................................................................ 14

*Walsh* v. *Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ........................................................................ 42

*Warth* v. *Seldin*,
    422 U.S. 490 (1975) ........................................................................ 16

*Williams* v. *Yamaha Motor Corp.*,
    2015 WL 13626022 (C.D. Cal. Jan. 7, 2015) ........................................................................ 32

*Willis* v. *Marshall*,
    401 S.W.3d 689 (Tex. App. 2013) ........................................................................ 26

*Winzler* v. *Toyota Motor Sales U.S.A., Inc.*,
    681 F.3d 1208 (10th Cir. 2012) ........................................................................ 17

*Wisdom* v. *Easton Diamond Sports*,
    2019 WL 580670 (C.D. Cal. Feb. 11, 2019) ........................................................................ 48

*Zarrella* v. *Pac. Life Ins. Co.*,
    755 F. Supp. 2d 1231 (S.D. Fla. 2011) ........................................................................ 24, 25

*Zetz* v. *Bos. Sci. Corp.*,
    398 F. Supp. 3d 700 (E.D. Cal. 2019) ........................................................................ 27

*Zhang* v. *Superior Court*,
    304 P.3d 163 (Cal. 2013) ........................................................................ 36

**STATUTES**

15 U.S.C. § 2301 ........................................................................ 40, 41, 42

15 U.S.C. § 2310 ........................................................................ 47

15 U.S.C. § 2311 ........................................................................ 39

18 U.S.C. § 1962 ........................................................................ 19

18 U.S.C. § 1964 ........................................................................ 19

42 U.S.C. § 7521 ........................................................................ 22

# TABLE OF AUTHORITIES
### (continued)

*Page(s)*

42 U.S.C. § 7522 ........................................................................................... 22

42 U.S.C. § 7541 ........................................................................................... 39

42 U.S.C. § 7543 ..................................................................................... 22, 32

Cal. Civ. Code § 1780 ................................................................................. 4, 36

Cal. Civ. Code § 1791 ..................................................................................... 50

Cal. Civ. Code § 1791.2 ........................................................................... 48, 50

Cal. Civ. Code § 1793.2 ................................................................................. 50

Cal. Civ. Code § 1793.22 ............................................................................... 49

Cal. Com. Code § 2314 .................................................................................. 44

Fla. Stat. § 501.201 ........................................................................................ 34

Fla. Stat. § 672.314 ........................................................................................ 44

Tex. Bus. & Com. Code § 2.314(b)(3) ........................................................... 44

## REGULATIONS

16 C.F.R. § 700.3 ........................................................................................... 41

40 C.F.R. § 85.2101 ....................................................................................... 39

40 C.F.R. § 85.2103 ....................................................................................... 40

## RULES

Fed. R. Civ. P. 8 ...................................................................................... 28, 30

Fed. R. Civ. P. 9(b) ................................................................................. *passim*

Fed. R. Evid. 201 ............................................................................................. 2

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Fiat Chrysler Automobiles N.V., FCA US LLC ("FCA"), VM Motori S.p.A., and VM North America, Inc. (collectively, the "FCA Defendants") respectfully submit this memorandum in support of their motion to dismiss the Opt-Out Bellwether Plaintiffs' Consolidated Amended Complaints (collectively, the "Complaints").[1]

## PRELIMINARY STATEMENT

Plaintiffs are 26 of the approximately 3,200 individuals who opted out of the nationwide class action settlement approved by this Court in May 2019 (the "Class Settlement"). Through their individual actions, Plaintiffs (the "Opt-Outs" or "Plaintiffs") seek windfall damages for their alleged economic injuries concerning their 2014–2016 Jeep Grand Cherokee and Ram 1500 light duty trucks equipped with the 3.0L V6 EcoDiesel engine (the "Trucks"). Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Magnuson-Moss Warranty Act ("MMWA"), as well as state law fraud, statutory consumer protection, and warranty claims.

Even though Plaintiffs may properly assert only individual claims, requiring individualized pleading, their Complaints seek to turn these cases into an impermissible follow-on class action. Their Complaints largely mirror—sometimes verbatim—the class-wide allegations from the Class Action Complaint filed by the Plaintiffs' Steering Committee (the "PSC"). Like the Class Plaintiffs, the Opt-Outs allege that they "overpaid" for an alleged "no-compromise package of fuel economy, range, performance, and environmental-friendliness," but did not receive just one feature at the time of purchase: legally compliant NOx emissions. (*E.g.*, CA Compl. ¶ 188.) Plaintiffs concede that they received all of the other advertised features, including the advertised fuel economy, range, and other performance characteristics. (*See, e.g.*, *id.* ¶¶ 8, 18, 188, 461.)

---

[1] This Motion concerns three Consolidated Amended Complaints, one for the Texas opt-outs, one for the California opt-outs, and one for the Florida opt-outs. (*See* ECF No. 720 (the "Texas Complaint" or "TX Compl."); ECF No. 721 (the "California Complaint" or "CA Compl."); ECF No. 722 (the "Florida Complaint" or "FL Compl.").)

This case is now in a fundamentally different posture than when the Court ruled on the Class Plaintiffs' motion to dismiss:  the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB"; together with the EPA, the "Agencies") have now approved, and the FCA Defendants have implemented, an emissions modification (the "AEM") that brings the Trucks into *full* compliance with their *original* NOx emissions standards.  As the EPA concluded following extensive testing, the AEM "replace[s] the vehicles' software so that [the Trucks] *comply with EPA and California emission standards*."  (Ex. 1 at 3 (emphasis added).) [2]  CARB similarly found that the AEM "bring[s] the vehicles into *emissions compliance*."  (Ex. 2 at 2 (emphasis added).)

***No Standing.***  In 2018, prior to the Agencies' approval of the AEM, this Court held that the Class Plaintiffs had standing because they had adequately pled a "*current universal vehicle defect*."  295 F. Supp. 3d 927, 950 (N.D. Cal. 2018) (emphasis in original) ("Class MTD Order").  But, as a result of the AEM recall, the Opt-Outs cannot plead "a *current universal vehicle defect*," because the newly approved AEM provides Truck owners and lessees with the one feature the Opt-Outs allege they did not receive at the time of purchase (legally compliant NOx emissions).  Where, as here, a recall has fixed the only claimed "defect" at the time of purchase, Plaintiffs lack standing to proceed on their "overpayment" theory of injury dating back to the time of purchase or lease.  (*See infra* Section I.A.)

The Opt-Outs have not plausibly pled any other theory of standing.  Although the Opt-Outs generally allege that the AEM "has resulted in numerous additional problems" (*e.g.*, CA Compl. ¶ 253), 20 of the 26 Opt-Outs have *not* even obtained the AEM, and thus could not possibly have experienced any injury.  The six Plaintiffs who obtained the AEM have not pled any specific facts showing that *his or her* Truck suffered any performance issues from the AEM.

---

[2]     All references herein to exhibits are to the exhibits attached to the Declaration of William B. Monahan, dated July 3, 2020 (the "Monahan Decl.").  This Court may take judicial notice of the documents cited in the Monahan Decl. either because they are incorporated by reference in the Complaints or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201; *see also Sciortino* v. *Pepsico, Inc.*, 108 F. Supp. 3d 780, 791 n.2 (N.D. Cal. 2015) (Chen, J.) (statements "issued by a public administrative body and accessed from a government website . . . cannot reasonably be questioned").

(*See, e.g.*, *id.* ¶ 375 (alleging that the AEM caused unspecified "performance issues").)  The Opt-Outs cannot meet their pleading burden by alleging that the AEM caused *some other consumers* to experience specific issues with their Trucks, as "[t]he doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs." *ASARCO Inc.* v. *Kadish*, 490 U.S. 605, 615 (1989).  (*See infra* Section I.B.)

Because the Opt-Outs have pled no legally cognizable injury—and, therefore, do not have standing—the Court should dismiss all of the Opt-Outs' claims.  Beyond standing, the Opt-Outs' claims fail for several additional, independent reasons:[3]

***No RICO Injury, Causation, or Enterprise.***  As indirect purchasers who did not purchase their Trucks directly from the FCA Defendants, Plaintiffs face an "absolute bar to RICO standing," as recently confirmed in *Rickman* v. *BMW of North America*, 2020 WL 3468250, at *8-9 (D.N.J. June 25, 2020).  Plaintiffs also cannot proceed on their theory of RICO injury based on an alleged "overpayment" at the time of purchase, because the AEM—which the Agencies had *not* approved when the Court considered the Class Plaintiffs' "overpayment" theory—brings the Trucks into full compliance with their original NOx certification standards.  Even if the Opt-Outs adequately alleged facts establishing some new injury due to the AEM (they have not), that injury could not have been caused by the conduct of a RICO enterprise, as the Opt-Outs do not allege that Bosch had *any* role in designing, releasing, or obtaining Agency approval for the AEM.  The Opt-Outs' RICO claim also rests on purported actions to defraud *the regulators*, which, as this Court previously recognized, cannot form the basis of consumer RICO claims:  "if the theory is the one who is deceived is only the EPA . . . that's a problem" (ECF No. 455 at 25:22-25).  (*See infra* Section II.)

***No Common Law Fraud Claims.***  Plaintiffs allege two theories of common law fraud, both of which fail.  *First*, the Opt-Outs do not adequately plead individual reliance or, for most of the alleged misrepresentations, falsity.  The Clean Air Act ("CAA") preempts their

---

[3]     Rather than repeat arguments made by the Bosch Defendants in their motion to dismiss, the FCA Defendants incorporate the Bosch Defendants' arguments by reference herein.

claims based on statements about 50-state emissions compliance are preempted, and Plaintiffs may not sustain fraud claims against the FCA Defendants based on statements allegedly made by independent dealerships.  *Second*, the Opt-Outs allege that FCA falsely stated in the Agency-approved AEM disclosure that the AEM "*is not expected* to change (i) any key vehicle attributes, such as reliability, durability, vehicle performance, drivability, engine noise or vibration, or other driving characteristics; (ii) the Diesel Exhaust Fluid tank refill interval; or (iii) average fuel economy." (*E.g.*, FL Compl. ¶ 240 (emphasis added).)  Even assuming the AEM affected any of those vehicle attributes, the Opt-Outs have failed to plead particularized facts demonstrating that FCA did not have that "expect[ation]" when it implemented the AEM.  The Opt-Outs also fail adequately to allege reliance, both for the 20 Plaintiffs who have not obtained the AEM and for the six Plaintiffs who received the AEM but do not plead that they saw or relied on the challenged statement.  (*See infra* Section III.)

       ***No Statutory Consumer Protection Claims.***  The Opt-Outs' consumer protection claims also fail for a number of additional, state-specific reasons:  *First*, as a matter of law, the California Opt-Outs cannot recover damages or attorneys' fees on their claims under the Unfair Competition Law ("Cal. UCL") and False Advertising Law ("Cal. FAL").  *Second*, the California Opt-Outs' claims under the Consumer Legal Remedies Act ("Cal. CLRA") must be dismissed for non-compliance with the statute's strict affidavit requirements, with which the Opt-Outs have made no attempt to comply.  *See* Cal. Civ. Code § 1780(d).  *Third*, Texas's Deceptive Trade Practices Act ("Tex. DTPA") does not allow for the recovery of Plaintiffs' full purchase price or mental anguish damages.  *Fourth*, Florida law does not permit recovery of mental anguish damages on Plaintiffs' claims under the False, Misleading and Deceptive Advertising Statute ("Fla. FMDA").  (*See infra* Section IV.)

       ***No Warranty Claims.***  The Opt-Outs' MMWA claims fail for four reasons:  (1) consumers may not bring MMWA claims for warranties otherwise governed by federal law, including the federal emissions warranty provided by the CAA;  (2) FCA's alleged statements in its marketing and advertising are not actionable "warranties";  (3) Plaintiffs fail adequately to allege that FCA breached the alleged warranties; and (4) Plaintiffs concede that the Trucks are—

and have always been—fit for their ordinary purpose (transportation), and so their claims based on breach of the implied warranty of merchantability must be dismissed.  The California Opt-Outs' claims under the Song-Beverly Act ("Song-Beverly") based on supposed express warranties should be dismissed for three reasons:  (1) the statements on which they rely were not actionable written warranties; (2) the Opt-Outs fail to allege that any defect covered by an express warranty substantially impaired the use, value or safety of their Trucks; and (3) Plaintiffs do not allege the requisite number of repair attempts.  With respect to their Song-Beverly implied warranty claims, those claims should be dismissed for two reasons:  (1) the Court has already held that the CAA preempts Opt Outs' implied warranty claims; and (2) Plaintiffs fail to allege that their Trucks were not "merchantable," for substantially the same reasons as Judge Breyer correctly held in the *Volkswagen* opt-out litigation.  (*See infra* Section V.)

*No Rescission or Unjust Enrichment Claims.*  All the Opt-Outs seek to recover the ***full*** purchase price of their vehicles, despite years and tens (or even hundreds) of thousands of miles of use.  By continuing to use and drive the vehicles, Opt-Outs have waived their right (if they had one) to rescind their contracts.  Moreover, rescission remedies are available only against a party to the original contract—here, the dealer—and no dealer is a party to this litigation.  (*See infra* Section VI.)  Unjust enrichment is an equitable remedy that is unavailable where, as here, an adequate remedy at law exists.  (*See infra* Section VII.)

## ISSUES TO BE DECIDED

1.      Do the Opt-Outs lack standing for all of their claims under Article III of the U.S. Constitution and Section 1964(c) of RICO, because (a) the only feature of the Trucks Plaintiffs allege they did not receive at the time of purchase or lease was compliant NOx emissions, which the Agency-approved AEM has now fully addressed, and (b) the Opt-Outs have not pled with particularity that they have personally experienced an actual and concrete injury caused by the AEM?  (*See infra* Section I.)

2.      Should Plaintiffs' RICO claim be dismissed because (i) Plaintiffs did not purchase or lease their Trucks directly from the FCA Defendants, which is a categorical bar to their RICO claim, (ii) Plaintiffs have not plausibly pled that any injury they experienced from the

AEM was caused by the conduct of a RICO enterprise, since Bosch is not alleged to have had anything to do with the AEM, and (iii) even if the Opt-Outs had standing to proceed on their "overpayment" claim dating back to the time of purchase, that claim is impermissibly based on purported actions to defraud the Agencies, not consumers?  (*See infra* Section II.)

3. Have the Opt-Outs failed to plead their fraud-based claims, including with the particularity required by the Bellwether Order and under Rule 9(b), where Plaintiffs (a) have not adequately alleged falsity, scienter or reliance concerning the *only* statement they challenge regarding the AEM (*i.e.*, the AEM "is not expected to change" key vehicle attributes), (b) have not plausibly and specifically alleged reliance or falsity with respect to the alleged misrepresentations on which they base their flawed "overpayment" theory of injury, and (c) may not rely on statements allegedly made by independent dealerships to support a fraud claim against the FCA Defendants?  (*See infra* Section III.)

4. Should Plaintiffs' statutory consumer protection claims be dismissed to the extent they seek damages or attorneys' fees unavailable under those statutes and for failure to comply with the statutes' procedural requirements to state a claim?  (*See infra* Section IV.)

5. Should the Opt-Outs' warranty claims under the MMWA and Song-Beverly be dismissed where (i) Plaintiffs have failed to identify actionable express warranties, (ii) the Opt-Outs do not plead that their Trucks are unfit for their intended purpose of transportation, and (iii) the Opt-Outs do not allege that the FCA Defendants failed to repair any excess NOx from their Trucks after a reasonable number of attempts?  (*See infra* Section V.)

6. Should Plaintiffs' unjust enrichment and rescission claims be dismissed where Plaintiffs concede they obtained value from their Trucks, the dealers are not parties to this litigation, and Plaintiffs have an adequate remedy at law?  (*See infra* Sections VI-VII.)

## FACTUAL BACKGROUND

### A.   The EPA and Class Action Lawsuits

On January 12, 2017, the Agencies issued Notices of Violation ("NOVs") alleging that the FCA Defendants failed to disclose certain auxiliary emissions control devices ("AECDs") in their certification applications to the Agencies for the Trucks.  (Ex. 3 at 1; Ex. 4

at 1.)  On May 23, 2017, the DOJ, on behalf of the EPA, filed suit against the FCA Defendants, alleging that one or more of the AECDs, "alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the [Trucks'] emissions control system."  No. 2:17-cv-11633 (E.D. Mich.), ECF No. 1, ¶¶ 2, 122.

Various owners and lessees of the Trucks also filed suit, and the Judicial Panel on Multidistrict Litigation established this MDL.  (ECF No. 1 at 3.)  In July 2017, the Court-appointed PSC filed the Class Complaint on behalf of the consumer class.  (ECF No. 186.)  The Class Plaintiffs alleged that the Trucks "could not achieve the fuel economy and performance . . . without cheating on emissions," and sought damages based on their purported "[o]verpayment at the time of purchase or lease" for "a no-compromise package of fuel economy, range, performance, and environmental-friendliness."  (ECF No. 310 ¶¶ 7-8, 189, 335.)

## B.      Defendants' Motions To Dismiss the Class Complaint

On October 6, 2017, the FCA Defendants moved to dismiss the Class Complaint arguing, among other things, that the Class Plaintiffs had not alleged a cognizable injury, because the value of the Trucks had not diminished following the NOVs, and, other than allegedly noncompliant NOx emissions, the Class Plaintiffs had obtained all the Trucks' advertised benefits.  (ECF No. 232 at 21, 24.)  Although dismissing certain of the Class Plaintiffs' claims, the Court declined to dismiss the entirety of the Class Complaint, in part because the Class Complaint contained "concrete allegations of a *current universal* vehicle defect"—*i.e.*, NOx emissions that exceeded regulatory standards—which "plausibly and specifically support[ed] an overpayment theory of injury."  (Class MTD Order at 950.)

On May 16, 2018, the Class Plaintiffs amended their Complaint.  (ECF No. 310.)  Defendants then moved to dismiss certain claims, including the RICO claim, on the grounds that the Class Plaintiffs pled only a fraud on the regulators, *not* on consumers.  (ECF No. 315 at 2.)  The Court never ruled on that motion as a result of the parties' settlements, but the Court observed at oral argument that "if [Plaintiffs'] theory is [that] the one who is deceived is only the EPA . . . that's a problem."  (ECF No. 455 at 25:22-25.)

**C.      Court-Approved Settlements with the Agencies and the Class Plaintiffs**

On January 10, 2019, the FCA Defendants, the DOJ (on behalf of the EPA), and the California Attorney General (on behalf of CARB) announced settlements in a series of Consent Decrees.  (ECF Nos. 484-86.)  Without any admission of wrongdoing by the FCA Defendants, the comprehensive settlements resolved all of the Agencies' claims, including their claim that the Trucks emitted NOx in excess of regulatory standards.

The centerpiece of the Consent Decrees was the Agencies' approval of the AEM. Following more than eight months of testing by FCA, "as well as independent testing conducted by EPA and CARB at their own facilities," the Agencies "determined the [AEM] . . . to be an appropriate repair for the [Trucks]."  (ECF No. 562 at 2-3.)  As the EPA stated, the AEM "replace[s] the vehicles' software so that [the Trucks] *comply with EPA and California emission standards*."  (Ex. 1 at 3 (emphasis added); *see also* Ex. 2 at 2 (CARB press release stating that the AEM "bring[s] the vehicles into emissions compliance").)  The AEM ensures that the Trucks are compliant with their *original* NOx certification standards, not—as in *Volkswagen*—a lower standard that the Agencies approved as part of resolving their claims against Volkswagen.[4]  The Agency-approved consumer disclosures for the AEM state that "[a]verage fuel economy is not expected to change as a result of this AEM," and that that the AEM "is not expected to change any of [the] key vehicle attributes, such as reliability, durability, vehicle performance, drivability, engine noise or vibration, or other driving characteristics."  (ECF No. 562 App'x D.)

The FCA Defendants agreed in the Consent Decrees to:

- offer for free the AEM to all current owners and lessees of the Trucks;

- pay civil penalties of $262.3 million to the United States and $42.7 million to California; and

---

[4]      The approved emissions modification in *Volkswagen* did *not* bring most of the cars into compliance with their originally certified NOx emissions standards.  *See* Partial Consent Decree at 3, App'x B, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 15-md-2672 (N.D. Cal. June 28, 2016), ECF No. 1605-1.

- pay more than $19 million to California for NOx remediation and to fund a program to improve the efficiency of 200,000 aftermarket catalytic converters nationwide, which "is intended to *fully mitigate* the total lifetime excess NOx emissions from [the Trucks]."

(ECF No. 562 ¶¶ 9-13, 38, 66 (emphasis added); ECF No. 563 ¶ 8.)

Also on January 10, 2019, the FCA Defendants announced the Class Settlement, which provided compensation to class members ranging from $990 to $3,075.  (ECF No. 487.) Truck owners or lessees who obtain the AEM also receive a valuable extended warranty that covers all parts and labor for systems affected by the AEM for 4 years or 48,000 miles (whichever comes first), which the PSC estimated to be worth nearly $2,400 per Truck.  (ECF No. 491 at 2, 7; ECF No. 562 ¶ 45.a.)  The Court approved the Class Settlement on May 3, 2019, holding that it was "very adequate" and a "reasonable and fair resolution."  (ECF No. 561; ECF No. 519 at 33:13; *see also* ECF No. 566 at 30.)

On November 4, 2019, after a small fraction of customers who received the AEM noted a lag in acceleration within approximately five minutes of starting their engines, FCA applied to the Agencies to update the AEM.  (ECF No. 657 at 2-3.)  The Agencies approved the updated AEM on December 17, 2019.  (*Id.*)  The Agency-approved disclosures for the updated AEM, as with the original AEM, state that "[a]verage fuel economy is not expected to change as a result of this AEM," and that the updated AEM is "not expected to change any of [the] key vehicle attributes, such as reliability, durability, vehicle performance, drivability, engine noise or vibration, or other driving characteristics."  (ECF No. 562 App'x D; ECF No. 657 Attach. 1.)

## D. The Bellwether Opt-Outs

Approximately 3,200 individuals (around 2% of the Class) opted out of the Class Settlement.  The majority of opt-outs are represented by six firms, most of which also represented the *Volkswagen* opt-outs.  The parties originally selected 30 opt-outs from three states (Texas, California and Florida) as bellwether plaintiffs.  Those Opt-Outs filed the three Complaints at issue on this Motion.  The Court's Bellwether Order required the Opt-Outs to

include in their Complaints "individualized allegations for each Bellwether Plaintiff." (ECF No. 686 ¶ 9.) Defendants have since settled the claims of 4 of the 30 Opt-Outs.

The claims of the remaining 26 Opt-Outs differ in significant respects, including:

- 23 have Ram 1500s, but only three have Jeep Grand Cherokees;

- only one Plaintiff was a lessee, but that individual (Allen Peacock) purchased his Truck in October 2019—*after the NOVs* and when the Trucks' alleged emissions issues were public (FL Compl. ¶ 61); and

- only six of the Opt-Outs (Dale Gillette, Brian Perry, Corey Ringer, Max Snyder, James Dresser, and the Paynes) have had the AEM installed.

By contrast, *all* Opt-Outs allege that they purchased or leased their Trucks from independent dealerships (*see, e.g.*, CA Compl. ¶¶ 12, 358), not directly from any of the FCA Defendants.

***Alleged Injury.*** Like the Class Plaintiffs, the Opt-Outs allege that they "overpaid" for the "EcoDiesel properties and benefits" of the Trucks. (CA Compl. ¶ 345; FL Compl. ¶ 335; TX Compl. ¶ 321.) But the *only* advertised feature of the Trucks that Plaintiffs allege they did not receive at the time of purchase was compliant NOx emissions. (*See, e.g.*, CA Compl. ¶¶ 8, 18, 188, 461.) Separately, the Opt-Outs allege that the AEM "has resulted in numerous additional problems . . . including a serious acceleration lag, a loss of gas mileage and increased DEF usage" (CA Compl. ¶ 253; FL Compl. ¶ 242; TX Compl. ¶ 231), but not one of the Opt-Outs who has obtained the AEM alleges that he or she has personally experienced any of these issues. (*See* CA Compl. ¶ 375; FL Compl. ¶ 362.)

***Alleged Misrepresentations.*** Like the Class Complaint, the Complaints generally allege that there was a "pervasive" marketing campaign touting "efficient, environmentally friendly truck[s] without sacrificing capability or performance." (*E.g.*, TX Compl. ¶ 165.) Defendants allegedly "concealed and suppressed the fact that the [Trucks] could achieve their fuel economy and power only through undisclosed cheating components that cause them to pollute excessively." (*E.g.*, *id*. ¶ 373.) The alleged misstatements appeared in vehicle brochures, television advertisements, press releases, and on FCA websites (including corporate websites like FCANorthAmerica.com). (*E.g.*, *id*. ¶ 142.) The Complaints also allege that the "EcoDiesel"

1   badges were misleading because they conveyed "environmental friendliness" (*e.g.*, *id*. ¶ 139),

2   although Plaintiffs fail to note that the Ram Trucks—23 of the 26 Trucks at issue—featured the

3   word "EcoDiesel" in bold red and white lettering on a black background, *not* green lettering.

4          Most Plaintiffs also allege that they relied on statements made by dealership

5   salespersons.  (*E.g.*, TX Compl. ¶¶ 14, 37; CA Compl. ¶¶ 14, 21; FL Compl. ¶¶ 15, 20.)   For

6   instance, while only four of the 26 Plaintiffs claim they saw any marketing materials directly

7   from FCA that used the term "environmentally friendly," 24 of the 26 Opt-Outs generally claim

8   that a dealership salesperson told them the Trucks were "good for the environment,"

9   "environmentally friendly" or words to that effect.  (*See, e.g.*, FL Compl. ¶¶ 15, 20.)

10          The only misrepresentation Plaintiffs allege with respect to the AEM is FCA's

11   statement in the Agency-approved disclosure for the original AEM that the AEM "*is not

12   expected to* change (i) any key vehicle attributes, such as reliability, durability, vehicle

13   performance, drivability, engine noise or vibration, or other driving characteristics; (ii) the Diesel

14   Exhaust Fluid tank refill interval; or (iii) average fuel economy."  (CA Compl. ¶ 252; TX Compl.

15   ¶ 230; FL Compl. ¶ 240 (emphasis added).)  The Complaints allege that "some of the Plaintiffs"

16   relied on that statement.  (CA Compl. ¶¶ 252-53; TX Compl. ¶¶ 230-31; FL Compl. ¶¶ 241-42.)

17          ***Other, Unrelated Allegations.***  The Opt-Outs allege that the Trucks "have been

18   subject to a high number of recalls that FCA has been unable to timely and effectively remedy,"

19   listing a series of recalls unrelated to emissions.  (*E.g.*, TX Compl. ¶ 236.)  Included in Plaintiffs'

20   list are:  a recall to address a sensor that could cause inadvertent seatbelt locking, a recall

21   regarding the steering wheel wire harness, a recall to address the potential for electronic hacking,

22   and a recall to fix a tailgate latch.  (*Id.*)  No Opt-Out has pled (i) that the FCA Defendants made

23   any misstatement about these recalls, (ii) that any of the Opt-Outs suffered an injury from these

24   recalls, or (iii) that the recalls did not fully address the underlying issues.

25          The Complaints attempt to link one of these recalls to the Trucks' alleged

26   emissions issues, claiming that the Trucks "suffer from a defect with the EGR cooler that makes

27   them prone to catching fire," because "undisclosed cheat devices caused excessive engine heat,

28   increased engine pressure, decreased oil viscosity and decreased coolant levels, all of which has

caused thermal fatigue to the . . . EGR Cooler." (*E.g.*, TX Compl. ¶ 237.)  Setting aside that it is implausible that undisclosed AECDs that supposedly *decreased* EGR usage (*e.g.*, *id*.) somehow caused the EGR coolers to wear down *sooner*, FCA has already issued a recall for the EGR cooler.  (Ex. 5 at 1.)  None of the Opt-Outs alleges that he or she suffered any injury from the EGR cooler defect, or that FCA's recall does not fully remedy the thermal fatigue issue.

**ARGUMENT**

**I.      BECAUSE PLAINTIFFS HAVE NOT PLED A LEGALLY COGNIZABLE INJURY, THE COURT SHOULD DISMISS THEIR CLAIMS FOR LACK OF STANDING.**

Injury-in-fact is "the 'first and foremost' of standing's three elements," and "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547-48 (2016) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  RICO's statutory standing requirement is heightened.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *4 (N.D. Cal. Oct. 30, 2017) (Breyer, J.) ("Congress has narrowed the scope of injuries that can trigger a civil RICO violation.").  Plaintiffs must not only plausibly allege "a harm to a specific business or property interest," but must also "plausibly plead that their injury has resulted in 'concrete financial loss.'"  (Class MTD Order at 957.)

**A.      The AEM Bars the Opt-Outs' "Overpayment" Theory of Injury as a Matter of Law.**

As in the Class Complaint, Plaintiffs claim they "overpaid" for their Trucks by paying a "premium" for "EcoDiesel features" in consideration for "a no-compromise package of fuel economy, range, performance, and environmental-friendliness." (*E.g.*, CA Compl. ¶¶ 188, 264-65.)  Of that alleged "no-compromise package," the ***only*** feature Plaintiffs allege they did not receive at the time of purchase or lease was legally compliant NOx emissions.  (*See, e.g.*, *id*. ¶ 8 (FCA was able to achieve "fuel economy and performance that it promised," but at the expense of emissions); *id*. ¶ 18 (Trucks received advertised fuel economy and performance by "cheating emission tests"); *id*. ¶ 461 (Trucks achieved "fuel efficiency and power").)

When the Court declined to dismiss the Class Plaintiffs' claims on standing grounds, **no AEM had been approved for the Trucks**.  Thus, this Court determined that the Class Plaintiffs had plausibly pled an "overpayment" injury, because "when a complaint includes concrete allegations of a *current universal* vehicle defect . . . those allegations plausibly and specifically support an overpayment theory of injury."  (Class MTD Order at 950.)  Now, however, the only alleged defect at the time of purchase—alleged NOx non-compliance—has been fully remedied by the Agency-approved AEM recall.  The Agencies "determined that the fix was a viable technical solution for . . . bringing the [Trucks] **into compliance** with emission standards" and that FCA's subsequent update to the AEM "**maintain[s] compliance with the standards to which these vehicles were originally certified**."  (ECF No. 542 at 8; ECF No. 643 at 3 (emphasis added).)  Although Plaintiffs complain about certain new performance issues allegedly caused by the AEM (and those allegations are addressed in Section I.A below), the Opt-Outs cannot dispute that, with the AEM, the Trucks do *not* emit "higher amounts of polluting [NOx] than is permitted by [applicable] law, was advertised to consumers and what a reasonable consumer would expect."  (*E.g.*, CA. Compl. ¶ 2.)  Because FCA has repaired the alleged NOx noncompliance, the Opt-Outs cannot point to any "*current universal* vehicle defect" to support their "overpayment" theory of injury, and they lack standing to proceed on any claims dating back to the time of purchase or lease.  *See In re MyFord Touch Consumer Litig.*, 2016 WL 7734558, at *19 (N.D. Cal. Sept. 14, 2016) (Chen, J.) ("Plaintiffs are incorrect in arguing their damages cannot be reduced by post-purchase mitigation.").[5]

For instance, in *In re Toyota Motor Corp.*, the court rejected a similar theory because the defendant had remedied the defect through a recall.  288 F.R.D. 445 (C.D. Cal.

---

[5]     Plaintiffs' unsupported assertion, without citation, that "FCA has admitted that the Subject Vehicles will emit excess levels of NOx as a result of the second AEM" (*e.g.*, CA Compl. ¶ 257) is not only false, but belied by the Agencies' statement that the modified AEM "maintain[s] compliance with the standards to which these vehicles were originally certified." (ECF No. 643 at 3.)  The Court should give no weight to Plaintiffs' conclusory and unsupported allegation.  *See Sprewell* v. *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (courts need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or that are "conclusory unwarranted deductions of fact, or unreasonable inferences").

2013).  Plaintiffs in that case sought benefit-of-the-bargain damages under California law based on alleged deficiencies in Toyota's anti-lock braking system, contending "they would not have paid the same purchase price for each of their vehicles had they known" of the defect.  *Id*. at 450.  The court rightly rejected this theory because, "[a]fter the updated software was installed in their vehicles, [the plaintiffs] had no problem with the braking performance of their vehicles." *Id*.  The court concluded that plaintiffs were not entitled to benefit-of-the-bargain damages because they "received exactly what they paid for—that is a vehicle with a safe and operable [anti-lock brake system]."  *Id*.  The Ninth Circuit affirmed.  *Kramer* v. *Toyota Motor Corp.*, 668 F. App'x 765 (9th Cir. 2016).

Other courts have similarly rejected claims where a defendant resolved the defect that allegedly existed at the time of purchase.  *See Sater* v. *Chrysler Grp.*, 2016 WL 7377126, at *7 (C.D. Cal. Oct. 25, 2016) ("Permitting [plaintiff] to retain benefit-of-the-bargain damages for the difference in value between a non-defective truck and the defective truck, even though Defendant has repaired his truck, would afford him precisely the type of double-recovery windfall Texas courts have held is impermissible."); *Waller* v. *Hewlett-Packard Co.*, 295 F.R.D. 472, 487-88 (S.D. Cal. 2013) (rejecting benefit-of-the-bargain injury claim where defendants introduced free software fix remedying the alleged defect and plaintiffs received "just what they paid for"); *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 226 (S.D.N.Y. 2019) ("[W]here a defendant has already repaired the defect, that fact may reduce plaintiff's benefit-of-the-bargain damages to zero."); *Cheng* v. *BMW of N. Am.*, 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (claims mooted because "it is unclear how Plaintiff can demonstrate injury in light of BMW's offer to completely repair the roll away defect").

Because the AEM recall provides Plaintiffs with the only feature of the Trucks they allege they did not receive at the time of purchase—compliant NOx emissions—Plaintiffs lack standing to proceed on their "overpayment" theory of injury and cannot recover damages based on their purchase or lease of the Trucks.

### B.   Plaintiffs Do Not Plead that the AEM Caused Them Any Injury.

To try to create some injury, Plaintiffs attack the AEM and claim that it affected the Trucks' performance.  (*E.g.*, CA Compl. ¶¶ 252-58.)   Specifically, Plaintiffs allege that "[n]umerous" or "many" consumers (*id.* ¶¶ 254, 256) have experienced performance issues with their Trucks following installation of the AEM, including "acceleration lag, a loss of gas mileage and increased DEF usage" (*id.* ¶ 253).  These amorphous, class-style allegations fall far short of establishing that any of *these Plaintiffs* experienced any issues resulting from the AEM "in a personal and individual way," as required to confer standing in these *individual* consumer actions.  *Spokeo*, 136 S. Ct. at 1548; *see ASARCO*, 490 U.S. at 615-16 ("The doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves."); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) (plaintiffs' allegations of injury "fatally undermined" where "Plaintiffs' allegations were predicated solely on the harm experienced by other Toyota owners").

Although the six Plaintiffs who have received the AEM vaguely assert that they have experienced "issues, including performance issues," from the AEM (CA Compl. ¶ 375; FL Compl. ¶ 362), they fail to allege any specific information regarding the "performance issues" their Trucks allegedly experienced.  Such allegations are inadequate to plead that any Plaintiff actually suffered a "concrete and particularized" injury.  *Lujan*, 504 U.S. at 560; *see Bell Atlantic* v. *Twombly*, 550 U.S. 544, 555 (2007) (pleading "labels and conclusions" "will not do").

In *In re Apple Processor Litigation*, Judge Davila rejected a similar argument that plaintiffs could establish an injury-in-fact based on allegations that "some but not all users experienced" performance issues following a remedial software update.  2019 WL 3533876, at *5 (N.D. Cal. Aug. 2, 2019).   The plaintiffs alleged that Apple's attempt to remedy a design defect allowing third parties to access sensitive data "materially slowed down the performance of their iDevices."  *Id.* at *1.  In support, plaintiffs pointed to testing of certain iPhones that showed diminished performance following the software update.  *Id.* at *6.  The court determined that such pleading was insufficient because "the testing provided by Plaintiffs with regards to a

degradation in performance of some iDevices after the software updates were installed" did not

establish "a universal-type injury." *Id.* at *5.  As Judge Davila stated, "[w]hat is fatal to

Plaintiffs' [complaint] is that no facts support a showing that any named plaintiff noticed any

slowdown or performance degradation after downloading Apple's updates." *Id.*; *see also Warth*

v. *Seldin*, 422 U.S. 490, 501 (1975) ("[T]he plaintiff still must allege a distinct and palpable

injury to himself, even if it is an injury shared by a large class of other possible litigants.").

Here too, because Plaintiffs have not pled facts showing that any specific

performance issues related to the AEM "affect[ed] [any] plaintiff in a personal and individual

way," *Spokeo*, 136 S. Ct. at 1548, and Plaintiffs' injury allegations relating to the AEM are based

on complaints about the AEM *from others*, they have failed to establish constitutional standing.

Because Plaintiffs' allegations do not comply even with the pleading requirements to establish

Article III standing, they also necessarily fall short of establishing the "concrete financial loss"

required to sufficiently plead a RICO injury.  Class MTD Order at 957; *Edwards* v. *Marin Park,*

*Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) (Rule 9(b) "applies to civil RICO fraud claims").[6]

### C.     Plaintiffs Do Not Plead an Injury-In-Fact from the Various Other Recalls.

Plaintiffs seek to inject a variety of unrelated recalls into this case that have no

relation to emissions, such as "inadvertent seatbelt pretension," hacking, and a "tailgate latch."

(*E.g.*, TX Compl. ¶ 236.)  Plaintiffs also advance allegations about the EGR cooler defect, which

Plaintiffs attempt to link to this action merely because the EGR cooler is an emissions-related

component of the Trucks (*id.* ¶¶ 237-41).

All claims based on these extraneous recalls should be dismissed for at least two

reasons:  *First*, no Plaintiff alleges that he or she actually experienced any of the issues

underlying the various recalls.  For instance, with respect to the EGR cooler, Plaintiffs plead only

---

[6]     If the Court concludes that one or more of the Plaintiffs have adequately pled a
cognizable injury caused by the AEM, this Court should hold (1) that only that Plaintiff's, or
those Plaintiffs', claims may proceed, given the individualized injury required on these
individual claims, and (2) that even that Plaintiff (or those Plaintiffs) may *only* recover for the
injury they actually experienced as a result of the AEM, not for the claimed "overpayment"
injury dating back to the time of purchase or lease.  (*See supra* Section I.A.)

1    that "problems with the EGR Cooler in the [Trucks] *could* cause a vehicle fire," and "dozens of

2    such fires have been reported to NHTSA."  (*E.g.*, TX Compl. ¶ 240 (emphasis added).)   But

3    Plaintiffs' allegations about fires allegedly experienced *by others* are insufficient as a matter of

4    law.  *See In re Toyota*, 790 F. Supp. 2d at 1165 n.11 ("When the economic loss is predicated

5    solely on how a product functions, and the product has not malfunctioned . . . something more is

6    required than simply alleging an overpayment for a 'defective' product."); *Briehl* v. *Gen.*

7    *Motors*, 172 F.3d 623, 627 (8th Cir. 1999) (dismissing claims where "Plaintiffs failed to allege

8    that any defect had actually manifested itself in their vehicles"); *O'Neil* v. *Simplicity, Inc.*, 553 F.

9    Supp. 2d 1110, 1115 (D. Minn. 2008) (collecting cases dismissing claims where the defect "ha[s]

10   not manifested itself in the plaintiffs' products").

11          *Second*, Plaintiffs do not allege that any of the underlying issues, including the

12   EGR cooler defect, were not fully addressed by the recalls.  *See Hadley* v. *Chrysler Group*, 2014

13   WL 988962, at *6 (E.D. Mich. Mar. 13, 2014) (no standing where "Plaintiffs do not allege that a

14   repair has not cured the defect"); *Winzler* v. *Toyota Motor Sales U.S.A.*, 681 F.3d 1208, 1212

15   (10th Cir. 2012) (case dismissed under prudential mootness doctrine where defendant "set into

16   motion the statutorily mandated and administratively overseen national recall process").

17   **II.     THE RICO CLAIM MUST BE DISMISSED.**

18          Plaintiffs lack RICO standing for an additional reason:  they did not purchase or

19   lease their Trucks from any of the Defendants, and their RICO claims are thus barred under

20   *Illinois Brick*'s indirect purchaser rule.  Plaintiffs' RICO claims should be dismissed for three

21   other independent reasons:  *First,* because Plaintiffs' only plausible injury (if any) is an injury

22   they actually and personally sustained from the installation of the AEM (*see supra* Section I)—

23   but Bosch is *not* alleged to have had anything to do with the AEM—Plaintiffs have not pled that

24   any injury was proximately caused by a RICO enterprise.  *Second*, Plaintiffs' RICO claim is

25   based on an improper fraud-on-the-regulators theory of mail and wire fraud.  *Third*, like

26   Plaintiffs' other fraud-based claims, the RICO claim fails for failure to plead an actionable

27

28

misrepresentation or reliance, both with the particularity required by Rule 9(b).  (*See* Section III *infra*.)[7]

### A. Plaintiffs' RICO Claim Should Be Dismissed Because Plaintiffs Did Not Purchase or Lease Their Trucks Directly from the FCA Defendants.

Because Plaintiffs acquired their Trucks from third-party dealerships and not directly from the FCA Defendants (or the other alleged RICO conspirator, Bosch), Plaintiffs cannot satisfy the "direct purchaser" requirement established in *Illinois Brick Co.* v. *Illinois*.  *See* 431 U.S. 720, 737 (1977) (the "overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property'"); *see also Butler* v. *Porsche Cars N. Am., Inc.*, 2016 WL 4474630, at *1, *7 (N.D. Cal. Aug. 25, 2016) (Koh, J.) (plaintiffs who purchase vehicles from a dealer have not purchased "directly from the manufacturer").  Although the Ninth Circuit has not ruled on this issue, at least two Circuit Courts have expressly held that the *Illinois Brick* direct purchaser requirement "appl[ies] to RICO claims, thereby denying RICO standing to indirect victims."  *McCarthy* v. *Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *Trollinger* v. *Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("*[I]ndirect* purchasers lack standing under RICO . . . to sue for overcharges passed on to them by middlemen.").  The indirect purchaser bar applies with full force even where an indirect purchaser alleges that "the full cost of the product (and hence one hundred percent of any overcharge) had been passed on" to him. *McCarthy*, 80 F.3d at 849 (citing *Kansas* v. *Utilicorp United, Inc.*, 497 U.S. 199, 216 (1990)).

Last month, in substantively identical circumstances involving claims related to diesel emissions issues, a New Jersey district court held that the "indirect purchaser rule" serves

---

[7]    *See United Food & Commercial Workers* v. *Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming dismissal of RICO claims that "failed to satisfy Rule 9(b) with respect to . . . an adequate theory of causation or reliance"); *Hoffman* v. *Zenith Ins. Co.*, 487 F. App'x 365, 365 (9th Cir. 2012) ("Although proximate cause, not reliance, is the essential element of statutory standing under RICO, proving reliance is necessary where it is integral to Plaintiffs' theory of causation."); *In re Bextra*, 2012 WL 3154957, at *4 (N.D. Cal. 2012) (Breyer, J.) ("[W]here the RICO violation involves misrepresentations, such as in mail and wire fraud cases, courts often determine whether proximate cause exists by asking whether there was actual reliance.").

1    as an "absolute bar to RICO standing." *Rickman*, 2020 WL 3468250, at *8.  Because "none of

2    the subject vehicles were acquired directly from BMW (or Bosch, for that matter)," the court

3    held that "[e]ach Plaintiff here is an indirect purchaser and therefore lacks standing to maintain a

4    RICO claim against Defendants." *Id*. at *9-10.  The Court should reach the same result here.

5        **B.    Plaintiffs Have Not Pled an Injury Proximately Caused by a RICO**
6        **Enterprise.**

7        A private plaintiff may proceed under RICO only if he or she has been "injured in

8    his business or property *by reason of* a violation of section 1962."  18 U.S.C. § 1964(c)

9    (emphasis added).  Thus, Plaintiffs must plausibly plead that "a RICO predicate offense not only

10   was a but for cause of his injury, but was the proximate cause as well."  Class MTD Order at 957

11   (quoting *Hemi Grp.* v. *City of New York*, 559 U.S. 1, 9 (2010)).

12       For the reasons explained above (*see supra* Section I), the only plausible injury

13   Plaintiffs could have suffered (if any) is an injury they actually experienced *from the installation*

14   *of the AEM*.  But any such injury could *not* have been proximately caused *by the purported RICO*

15   *conspiracy*, because Plaintiffs do not allege that Bosch had anything to do with the AEM.  (*See*

16   CA Compl. ¶¶ 252-58; FL Compl. ¶¶ 240-48; TX Compl. ¶¶ 230-36.)  Plaintiffs do not allege

17   that the AEM was introduced as part of the purported "EcoDiesel® RICO Enterprise," or that

18   Bosch had any role whatsoever in designing, releasing or obtaining regulatory approval for the

19   AEM.  Any injuries experienced by Plaintiffs as a result of the AEM therefore could have been

20   caused only by FCA's independent actions in designing and implementing the AEM, not

21   anything relating to Bosch or any FCA/Bosch RICO enterprise.  Further, Plaintiffs do not and

22   cannot tie these independent acts by FCA back to the alleged fraudulent activities of the RICO

23   enterprise years earlier, because the "general tendency" of the law with respect to "proximate

24   cause inquiries under RICO" is "not to go beyond the first step." *Hemi Grp.*, 559 U.S. at 10.[8]

---

25

26   [8]    The California Plaintiffs also allege a "claim" for "joint venture." (CA Compl. ¶¶ 481-83.)  No such "claim" exists under California law; joint venture is simply a theory for imputing

27   joint liability on multiple defendants. *See Knight* v. *Cook*, 28 Cal. Rptr. 273, 275 (Cal. Dist. Ct. App. 1963).  In any event, the Complaints do not plead that Bosch, an FCA vendor, had an actual

28   ownership interest in or shared profits from the production and sale of the Trucks, which also requires dismissal of this "claim." *See Orosco* v. *Sun-Diamond Corp.*, 60 Cal. Rptr. 2d 179, 184

1    Thus, even if Plaintiffs could plead an injury caused by the AEM for purposes of

2    their common law fraud claims (and they have not), they still could not plead a RICO injury

3    proximately caused by the purported RICO conspiracy.   "[I]t is well-established that not all

4    injuries are compensable under [RICO]."   *Oscar* v. *Univ. Students Co-op. Ass'n*, 965 F.2d 783,

5    785 (9th Cir. 1992); *see also Holmes* v. *Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 259 (1992)

6    (recognizing the "very unlikelihood that Congress meant to allow all factually injured plaintiffs

7    to recover" under RICO).[9]

8    
9        **C.    The Opt-Outs Are Pursuing an Impermissible Fraud-on-the-Regulators Theory of RICO Liability.**

10       **1.    Plaintiffs Have Not Alleged an Indictable Predicate Act.**

        Plaintiffs also cannot recover under RICO because they allege an improper fraud-

11   on-the-regulators claim.   Although Plaintiffs assert in conclusory fashion that they are bringing

12   their RICO claim "under a 'fraud on the consumer' theory and not under a 'fraud on the

13   regulators' theory" (*e.g.*, CA Compl. ¶ 284), Plaintiffs have simply repackaged the Class

14   Plaintiffs' RICO allegations, with many paragraphs copied from the Class Complaint and related

15   

16   

17   _____

18   (Cal. Ct. App. 1997) (no joint venture where cooperative did not share in any savings or efficiencies developed by member and did not own the product prior to its sale by member).

19   [9]      Plaintiffs also allege civil conspiracy claims under state law (*see* CA Compl. ¶¶ 484-91; FL Compl. ¶¶ 430-38; TX Compl. ¶¶ 405-12), but those claims fail for the same reason:
20   Plaintiffs have not established the existence of any injury *caused by the alleged conspiracy*.  *See Thompson* v. *Cal. Fair Plan Ass'n*, 270 Cal. Rptr. 590, 593-94 (Cal. Ct. App. 1990) (conspiracy
21   requires resulting damages, and "liability attaches only for action taken pursuant to the conspiracy"); *First United Pentecostal Church* v. *Parker*, 514 S.W.3d 214, 222 (Tex. 2017)
22   (conspiracy requires damages that occur as a proximate result of the conspiracy); *Charles* v. *Fla. Foreclosure Placement Ctr.,* 988 So. 2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (conspiracy
23   requires "damage to plaintiff as a result of the acts done under the conspiracy").   Further, because a claim for civil conspiracy is dependent on the existence of an underlying tort, the civil
24   conspiracy claims must be dismissed for the same reasons as Plaintiffs' common law fraud and statutory consumer protection claims.  *See, e.g.*, *Richard B. LeVine, Inc.* v. *Higashi*, 32 Cal. Rptr.
25   3d 244, 249 (Cal. Ct. App. 2005) ("[T]here is *no separate tort* of civil conspiracy, and there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful act* itself is
26   committed and damage results therefrom." (emphasis in original)); *Agar Corp.* v. *Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) ("Civil conspiracy requires an underlying
27   tort that has caused damages."); *Marlborough Holdings Grp.* v. *Azimut-Benetti*, 505 F. App'x 899, 907 (11th Cir. 2013) (under Florida law, "a claim that is found not to be actionable cannot
28   serve as the basis for a conspiracy claim").

1   filings made by the PSC.[10]  The Class Plaintiffs expressly disavowed a fraud-on-the-consumer

2   theory of RICO liability.  (ECF No. 249 at 26.)

3           Plaintiffs' allegations reveal that their claims are impermissibly based on

4   purported actions to defraud the regulators.  They acknowledge in their Complaints that the

5   alleged RICO scheme comprised of—and that their RICO claim is based on—"fraud carried out

6   through misrepresentations made *to the regulators*."  (*E.g.*, Cal. Compl. ¶ 284 (emphasis

7   added).)  Plaintiffs allege that the emissions controls at issue were "concealed from Plaintiffs and

8   regulators on [governmental certification] applications for the Vehicles by FCA" (*e.g.*, *id.* ¶ 292),

9   and "Defendants deceived regulators into believing that the Fraudulent Vehicles were eligible for

10  coverage by a [certificate of conformity] and compliant with emission standards" (*id.* ¶ 293).

11  Plaintiffs' RICO allegations are also replete with purported predicate acts of mail and wire fraud

12  that were directed at the regulators, including "applications for EPA [certificates of conformity]

13  and CARB [executive orders] that concealed AECDs" and "documents and communications that

14  facilitated 'passing' emission tests."  (*Id.* ¶ 325 E-F, H.)

15          This Court has already recognized that "if the theory is the one who is deceived is

16  only the EPA . . . that's a problem."  (ECF No. 455 at 25:22-25.)  Acts aimed at defrauding

17  regulators are not indictable predicate mail and wire fraud offenses, and therefore cannot form

18  the basis of Plaintiffs' RICO claim.  To plead mail or wire fraud, "the thing obtained must be

19  property in the hands of the victim."  *Cleveland* v. *United States*, 531 U.S. 12, 15 (2000).  The

20  statutes do not "reach[] false statements made in an application for a . . . license," *id.*, and thus

21  the certificates that the FCA Defendants sought to obtain are not "property" for purposes of the

22  mail and wire fraud statutes.  *See id.*; *United States* v. *Kato,* 878 F.2d 267, 269 (9th Cir. 1989)

23  (scheme to fraudulently obtain private pilots licenses from FAA not indictable as mail fraud).

24

25  [10]     *Compare, e.g.*, CA Compl. ¶ 341 ("The RICO Defendants knew and intended that

26  government regulators would rely on their material omissions made about the Fraudulent
    Vehicles to approve them for importation, marketing, and sale in the United States and each

27  state[.]") *with* Class Compl. ¶ 331 ("The RICO Defendants knew and intended that government
    regulators would rely on their material omissions made about the Class Vehicles to approve them

28  for importation, marketing, and sale in the United States and each state.").

Although Plaintiffs assert that "[c]onsumers (including Plaintiffs), and not the regulators, were the direct and intended victims of, and intended target of, the RICO Defendants' fraudulent scheme" (*e.g.*, CA Compl. ¶ 284), that conclusory pleading—even if accepted—still would run afoul of the Ninth Circuit's convergence requirement.  Mail fraud requires proof of "an intent to obtain money or property from the victim of the deceit." *United States* v. *Lew*, 875 F.2d 219, 222 (9th Cir. 1989) (no indictable mail fraud where immigration attorney allegedly filed fraudulent statements with the government in order to obtain money from clients); *see United States* v. *Ali,* 620 F.3d 1062, 1071 (9th Cir. 2010) (recognizing that the victim of the deceit "must be the victim from whom property was taken").  Plaintiffs thus cannot base their RICO claims on predicate acts aimed at deceiving the ***regulators*** with the purpose of obtaining money or property from ***consumers***.

> **2.**  **Plaintiffs' RICO Claim Also Falls Outside the "Zone of Interest" Protected by the CAA.**

The alleged fraud directed at the Agencies, whether to obtain certifications from the Agencies or to obtain money from consumers, cannot form the basis of Plaintiffs' RICO claim for the separate reason that such a claim is impermissibly based on purported violations of the CAA's regulatory requirements, and therefore falls outside RICO's "zone of interests."

The Supreme Court has "made clear" that the zone of interests limitation "applies to all statutorily created causes of action; that it is a requirement of general application; and that Congress is presumed to legislat[e] against the background of the zone-of-interests limitation, which applies unless it is expressly negated." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).  Here, the CAA's statutory scheme vests the EPA with the exclusive authority to set and enforce emissions standards for new motor vehicles.  42 U.S.C. §§ 7521, 7522.  The CAA also contains a broad preemption provision that states in pertinent part:  "No state or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engine subject to this part." *Id*. § 7543(a).

Plaintiffs' RICO claim is an impermissible attempt to end-run the CAA and is inconsistent with the comprehensive and remedial statutory scheme established by the CAA.

1    Courts repeatedly have held that private plaintiffs may not transform violations of

2    comprehensive regulatory regimes into treble-damages claims under RICO.  *See Ayres* v. *Gen.*

3    *Motors Corp.*, 234 F.3d 514, 521-22 (11th Cir. 2000) ("Congress did not intend for a violation of

4    the Safety Act's notification requirements to be the basis for a private civil RICO action, which

5    would permit unlimited, treble damages."); *Danielsen* v. *Burnside-Ott Aviation Training Ctr.*,

6    941 F.2d 1220, 1227-29 (D.C. Cir. 1991) (dismissing RICO claim as inconsistent with the

7    administrative scheme of the Service Contract Act); *Norman* v. *Niagara Mohawk Power Corp.*,

8    873 F.2d 634, 637-38 (2d Cir. 1989) (dismissing RICO claim for intruding upon exclusive

9    remedy provision of Energy Reorganization Act); *McCulloch* v. *PNC Bank*, 298 F.3d 1217,

10   1226-27 (11th Cir. 2002) (rejecting "Plaintiffs' mail and wire fraud claims [as] nothing more

11   than purported [Higher Education Act] violations pled in RICO terms").

12   **III.    PLAINTIFFS HAVE NOT STATED VIABLE COMMON LAW FRAUD CLAIMS.**

13              Plaintiffs allege two categories of common law fraud claims, both of which

14   should be dismissed.[11]  *First*, although the Opt-Outs allege that the FCA Defendants defrauded

15   them into obtaining the AEM, they have not pled (i) that FCA made any misstatement about the

16   AEM, (ii) that FCA knew that any such statement was false, or (iii) with the particularity

17   required by Rule 9(b), that any of the Plaintiffs relied on the alleged misstatement in deciding to

18   obtain the AEM.    *Second*, even if the Opt-Outs could proceed based on alleged

19   misrepresentations that allegedly induced them into buying or leasing their Trucks (and they

20   cannot because the AEM fully addressed the only claimed "defect" existing at the time of

21   purchase or lease, for the reasons explained *supra* Section I.A), those claims fail for additional

22   reasons, including Plaintiffs' failure to adequately allege reliance and falsity.

23

24   _____

25   [11]    All of Plaintiffs' common law fraud claims are subject to Rule 9(b)'s heightened pleading
     standard.  *See Vess* v. *Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of
26   fraud must be accompanied by the who, what, when, where, and how of the misconduct charged
     [and] must set forth what is false or misleading about a statement, and why it is false."); *Arroyo*
27   v. *Chattem, Inc.*, 926 F. Supp. 2d 1070, 1078 (N.D. Cal. 2012) (Breyer, J.) ("[T]he [complaint] is
     deficient in alleging with particularity the circumstances surrounding . . . Plaintiff's reliance on
28   both the alleged affirmative misrepresentations and omissions.").

**A.    The Court Should Dismiss the Complaints' AEM-Related Fraud Claims.**

**1.    Plaintiffs Do Not Plead Facts Demonstrating Falsity.**

By its terms, the sole statement Plaintiffs challenge in connection with the AEM provided FCA's **opinion** that the AEM "is not **expected** to" change certain key features of the Trucks.  Thus, the statement could be false *only* if FCA did not, in fact, "expec[t]" at the time FCA made the statement that the AEM would not change those features.  *See Cansino* v. *Bank of Am.*, 169 Cal. Rptr. 3d 619, 262 (Cal. Ct. App. 2014) ("actionable misrepresentations must pertain to past or existing material facts, and [s]tatements or predictions regarding future events are deemed to be mere opinions which are not actionable"); *Mejia* v. *Jurich*, 781 So. 2d 1175, 1177 (Fla. Dist. Ct. App. 2001) ("An action for fraud generally may not be predicated on statements of opinion or promises of future action," unless "the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false."); *Jeffcoat* v. *Phillips*, 534 S.W.2d 168, 171 (Tex. Civ. App. 1976) ("[T]he misrepresentation complained of must concern a material fact as distinguished from a mere matter of opinion, judgment, probability, or expectation.").

Instead of pleading the required particularized *facts* demonstrating that FCA did not then have that "expectation," the Opt-Outs merely allege that "[t]his representation was false because [FCA] knew that the first AEM would cause serious issues."  (FL Compl. ¶¶ 361, 380.) This circular and conclusory pleading, which does not provide the basis for FCA's claimed knowledge or who at FCA had such knowledge, is inadequate.  *See Ginsburg* v. *ICC Holdings*, 2017 WL 5467688, at *13 (N.D. Tex. Nov. 13, 2017) (dismissing fraud claims where the plaintiff "has pleaded only a prediction of future events, or an inactionable opinion—or he has failed to plead that defendants made the alleged misstatements with knowledge that the statements were false or without knowledge of their truth"); *Zarrella* v. *Pac. Life Ins. Co.*, 755 F. Supp. 2d 1231, 1238 (S.D. Fla. 2011) (dismissing fraud claims "based on statements of opinion regarding future events," where pleading was "insufficient to support the conclusory allegation" that defendant "knew or should have known that the statements were false"); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 882 & n.11 (9th Cir. 2012) (affirming dismissal of fraud claims

and holding that because the allegations "concerned the Defendants' statements about their *expectations*, Defendants' mental states were at issue when analyzing falsity," and the complaint did "not allege any specific facts that would show that Defendants did not really expect to enter into a partnership") (emphasis in original).

Moreover, qualified, future-focused predictions, such as FCA's "expectation" of what the AEM would not do to the Trucks, cannot form the basis of a fraud claim even if those predictions later turn out to have been incorrect. *See Brod* v. *Jernigan*, 188 So. 2d 575, 579 (Fla. Dist. Ct. App. 1966) ("[F]raud cannot be predicated on statements which are . . . unfulfilled predictions or expectations, or erroneous conjectures as to future events."); *Lake* v. *Cravens*, 488 S.W.3d 867, 894 (Tex. App. 2016) ("The generally accepted rule is that predictions and conjectures relating to future events cannot serve as actionable fraud."); *Grouse River Outfitters Ltd.* v. *NetSuite, Inc.*, 2018 WL 306719, at *4 (N.D. Cal. Jan. 5, 2018) (Beeler, J.) ("Statements that are predictions of future events or commitments to take some action in the future generally are not actionable fraud.").

### 2.   Plaintiffs Do Not Plead Facts Establishing Scienter.

For similar reasons, Plaintiffs also have not pled facts demonstrating the required knowledge by FCA, *i.e.*, that some individual at FCA *knew* the AEM would affect the Trucks' key vehicle attributes at the time FCA made the statement regarding its "expectation." *See Tae Hee Lee* v. *Toyota*, 992 F. Supp. 2d 962, 977 (C.D. Cal. 2014) (dismissing fraud claim where plaintiffs failed to allege facts showing that the "misrepresentations were made with knowledge of their falsity"); *Blackmon* v. *Am. Home Prod. Corp.*, 346 F. Supp. 2d 907, 920 (S.D. Tex. 2004) (dismissing fraud claim where "Plaintiffs ha[d] not shown that Lilly knew of the falsity of its statement"); *Douse* v. *Bos. Sci. Corp.*, 314 F. Supp. 3d 1251, 1262 (M.D. Fla. 2018) ("Rule 9(b) demands more" than "merely stat[ing]" that a defendant "knew [its] representations were false.").

### 3.   Plaintiffs Do Not Adequately Plead Reliance.

None of the Opt-Outs alleges with the particularity required by Rule 9(b) or the Court's Bellwether Order that he or she saw and relied on FCA's alleged misstatement in

1    deciding to obtain the AEM.  *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d

2    1173, 1187 (N.D. Cal. 2004) (White, J.) ("[G]eneral allegations of reliance [are] insufficient"

3    because "all averments of fraud must be pled with particularity."); Bellwether Order ¶ 9

4    (complaints must include "individualized allegations for each Bellwether Plaintiff").  Although

5    Plaintiffs vaguely allege that "*[c]onsumers, including some of the Plaintiffs* herein, relied on this

6    representation" (FL Compl. ¶ 241 (emphasis added); *see* CA Compl. ¶ 252; TX Compl. ¶ 230),

7    only six of the 26 Opt-Outs even obtained the AEM, and none of those six Plaintiffs specifically

8    alleges that he or she saw and relied on the challenged statement, let alone when or how.  *See In*

9    *re Software Toolworks, Inc. Sec. Litig.*, 1991 WL 319033, at *6 (N.D. Cal. June 17, 1991)

10   (Smith, J.) ("Absent a detailed factual allegation of how and when a specific plaintiff relied on a

11   specific false statement in making his or her decision to buy, no claim for fraud . . . is stated.").

12
13   **B.    Plaintiffs' Fraud Claims Based on Alleged Misrepresentations At the Time of Purchase Should Be Dismissed.**

14           In addition to the absence of standing (*see supra* Section I), Plaintiffs' fraud

15   claims based on alleged misrepresentations at the time of their purchase or lease decisions fail

16   for the following four reasons:  (i) Plaintiffs cannot use generalized, group-pleading to allege

17   individual reliance; (ii) the Complaints do not allege facts showing falsity of many of the FCA

18   Defendants' alleged misstatements; (iii) statements that the Trucks were "50-state emissions

19   compliant" are preempted by the CAA; and (iv) FCA cannot be liable for the statements of

20   independent dealership personnel.[12]

21           **1.    Plaintiffs Have Not Pled Individual Reliance.**

22           Plaintiffs try to allege reliance through generic and implausible class-style

23   pleading.  For instance, almost all of the California Plaintiffs generically allege that "[i]n the

24

25   _____
     [12]    Plaintiffs' negligent misrepresentation claims, which only concern alleged
26   misrepresentations made in connection with the purchase or lease decision (not the AEM),
     should be dismissed for the same reasons.  *See, e.g.*, *Hydro-Mill Co.* v. *Hayward, Tilton &*
27   *Rolapp Ins. Assocs.*, 10 Cal. Rptr. 3d 582, 590 (Cal. Ct. App. 2004); *Willis* v. *Marshall*, 401
     S.W.3d 689, 698 (Tex. App. 2013); *Arlington Pebble Creek, LLC* v. *Campus Edge Condo. Ass'n*,
28   232 So. 3d 502, 505 (Fla. Dist. Ct. App. 2017).

months before purchasing the [Truck], Plaintiff recalls hearing and seeing radio, print, and television advertisements that touted how the . . . trucks were clean, efficient, and had good fuel economy." (*E.g.*, CA Compl. ¶¶ 17, 25.)[13]  But Plaintiffs do not identify a single radio or television advertisement that they heard or saw, much less allege the specific content of those advertisements—including whether the referenced statements concerned $CO_2$ rather than $NOx$. *See, e.g.*, *Rodas* v. *Porsche Cars N. Am., Inc.*, 2014 WL 12596315, at *4 (C.D. Cal. Sept. 17, 2014) (dismissing fraud-based claims where plaintiff "mention[ed] that the misrepresentations included 'statements made in Defendant's television, radio, and print advertising, websites, brochures' but she never tie[d] a single statement to a particular advertisement or publication"); *Zetz* v. *Bos. Sci. Corp.*, 398 F. Supp. 3d 700, 713 (E.D. Cal. 2019) (dismissing fraud claims where "generalized allegations of misrepresentation, concealment, and unspecified sales and marketing materials lack[ed] sufficient particularity under Rule 9(b)").[14]

Plaintiffs also do not allege when they saw or heard many of the alleged misrepresentations.  For instance, 15 Plaintiffs allege that "[s]hortly before purchasing the [Truck]," they visited the Jeep or Ram brand websites as well as FCA's North America Region corporate website.  (*See* CA Compl. ¶¶ 15, 22, 36, 43, 50, 57, 72, 78; TX Compl. ¶¶ 15, 22, 27, 42, 56; FL Compl. ¶¶ 21, 66.) But "[t]o adequately state with particularity the circumstances constituting fraud, Plaintiffs would have to specify *when* they were exposed to the defendant's misrepresentations." *Volkswagen,* 2020 WL 3316116, at *7 (N.D. Cal. June 18, 2020).  Because "[w]ebsite content is updated and changed all the time," vague temporal statements (*e.g.*, "shortly before purchasing the [Truck]") are inadequate under Rule 9(b).  *See, e.g.*, *Gayou* v.

---

[13]    The Texas and Florida Plaintiffs make substantively identical allegations equally as vague.  (*See, e.g.*, TX Compl. ¶ 17 ("In the months before purchasing the vehicle, Plaintiff recalls seeing television advertisements that touted the fuel economy for the vehicle."); FL Compl. ¶ 19 ("[I]n the months before purchasing the vehicle, Plaintiff also heard and saw radio, print, and television advertisements that touted how the Dodge Ram 1500 EcoDiesel trucks were clean, efficient, and had good fuel economy.").)

[14]    Plaintiff Allen Peacock has not pled reliance or causation for an additional reason:  he purchased his Truck off lease in *October 2019*, long after the alleged emissions issues were publicly known (FL Compl. ¶ 61).  *See Volkswagen*, 2019 WL 2493369, at *3 (N.D. Cal. June 14, 2019) (Breyer, J.) ("Claimants bought the cars at issue after VW's emissions fraud became public knowledge, so they didn't suffer harm directly from the fraud.").

1   *Celebrity Cruises, Inc.*, 2012 WL 2049431, at *7 (S.D. Fla. June 5, 2012) (dismissing fraud-

2   based claim under Rule 9(b) where plaintiff did "not particularly identify the timing" of alleged

3   misrepresentations, noting timing "is especially significant as to the representations he claims

4   were present on [defendant's] website"); *Boris* v. *Wal-Mart Stores*, 35 F. Supp. 3d 1163, 1174-

5   75 (C.D. Cal. 2014), *aff'd*, 649 F. App'x 424 (9th Cir. 2016) (dismissing fraud-based claims

6   under Rule 9(b) where plaintiff did "not specify when he viewed [defendant's] website," stating

7   that "because the content of its website changes from time to time, [defendant] needs to know

8   when [plaintiff] viewed the website in order to defend against this claim").[15]

9         Plaintiffs' reliance allegations are also implausible.  *See Macias* v. *Integrity*

10  *Nationwide Investigations*, 2013 WL 2155343, at *4 (C.D. Cal. May 17, 2013) ("The Court is

11  not required to accept as true implausible allegations." (citing *Twombly*, 550 U.S. at 555-56)).

12  With the benefit of all of FCA's advertisements (through discovery taken by the Class Plaintiffs),

13  Plaintiffs have identified the very small number of statements by FCA that make *any* claims

14  about "cleanliness" at all.  Remarkably, Plaintiffs allege reliance on virtually all of those

15  statements.  For instance, 18 of the Opt-Outs allege that they relied on information about

16  emissions compliance available on FCA's North America Region *corporate website*—a website

17  devoted almost exclusively to financial and investment disclosures and job postings, not

18  consumer-facing information.  Similarly, 17 Opt-Outs allege that they saw a "press release" by

19  FCA that the Ram 1500 EcoDiesel had been named "Green Truck of the Year" by *Green Car*

20  *Journal*.  While it is not specifically identified, Plaintiffs are presumably referring to the press

21  release posted on *PR Newswire* in *November 2014*.[16]  Plaintiffs ask this Court to accept the

22

---

23  [15]    Plaintiffs also do not adequately plead how or when they saw and relied on (i) vehicle
24  brochures; (ii) the Green Truck award press release; and (iii) other unspecified "radio, print, and television advertisements."  (*See, e.g.*, CA Compl. ¶ 13 ("shortly before purchasing the Fraudulent Vehicle"); *see also id.* ¶¶ 16-17, 20, 23, 25, 28, 31, 34, 37-38, 41, 44-45; FL Compl.
25  ¶¶ 13, 18-19, 22-23, 64, 67; TX Compl. ¶¶ 13, 16-17, 21, 23, 26, 36, 43, 50.)  *See Volkswagen*, 2020 WL 3316116, at *7 (dismissing fraud claims under Rule 9(b) and holding that allegations
26  that plaintiff saw or heard misstatements "in or about 2011" did "not adequately specify when [plaintiff was] exposed to the false claims").

27  [16]    *See*  https://www.prnewswire.com/news-releases/ram-1500-ecodiesel-named-2015-green-
28  truck-of-the-year-by-green-car-journal-281809501.html.

implausible notion that eight Opt-Outs who bought their Trucks *in 2016* saw and relied on that press release issued *more than a year earlier*.[17]

These relatively obscure materials all "happen to" coincide with materials identified by the PSC in its Class Complaint.[18]  Tellingly, many Plaintiffs did *not* allege reliance on these statements in their earlier complaints.[19]  Perhaps even more remarkably, to the extent that Plaintiffs' reliance allegations do vary, they vary *by counsel*, rather than *by Plaintiff*. Although Plaintiffs were randomly selected from a pool of over 3,000 opt-outs, their reliance allegations directly correlate to the attorneys representing them.  For example:

- 9 of the 10 Plaintiffs represented by Consumer Legal Remedies ("CLR") and 9 of the 10 Plaintiffs represented by Heygood, Orr & Pearson ("HOP") allege that they relied on FCA's North America Region corporate website, but *none* of the Plaintiffs represented by Melkersen Law Group, LLC ("MLG") allege that they visited that corporate website;

- 9 of the 10 Plaintiffs represented by CLR and 9 of the 10 Plaintiffs represented by HOP allege that they relied on the Ram or Jeep brand website in purchasing their Trucks, and allegedly saw on the website "statements about how the [Truck] had low *CO2 emissions*" (*e.g.*, CA Compl. ¶¶ 15, 22, 36, 43; FL Compl. ¶¶ 21, 66; TX Compl. ¶¶ 15, 22, 27,

---

[17]   *See* CA Compl. ¶¶ 12, 16 (Plaintiffs Corbett purchased on Mar. 21, 2016), ¶¶ 19, 23 (Plaintiffs Cowger purchased on July 2, 2016), ¶¶ 47, 51 (Plaintiff McKee purchased on Feb. 28, 2016), ¶¶ 61, 66 (Plaintiff Ringer purchased on June 24, 2016), ¶¶ 69, 73 (Plaintiff Smith purchased on Jan. 16, 2016); TX Compl. ¶¶ 12, 16 (Plaintiff Gloyna purchased on Aug. 25, 2016); FL Compl. ¶¶ 17, 22 (Plaintiff Cahill purchased on Nov. 25, 2016), ¶¶ 63, 67 (Plaintiff Schindler purchased on Feb. 20, 2016).

[18]   *See, e.g.*, Class Complaint ¶ 165(d) (citing a "November 2014 press release announcing that the 'Ram 1500 EcoDiesel [was] named 2015 Green Truck of the Year'"), ¶ 188(b) (citing statement about "clean diesel technology" on FCA's North America Region corporate website).

[19]   For example, California Plaintiffs Brian and Muriel Ann Corbett, Texas Plaintiff Keith Green, and Florida Plaintiff Patrick Cahill all now allege that they relied on FCA's North America Region corporate website and the "Green Truck of the Year" press release, neither of which was mentioned in their original complaints.  (*Compare* CA Compl. ¶¶ 15-16 *with* Complaint for Damages ¶ 39, *Iskenderian* v. FCA US LLC, No. 3:19-cv-03024 (N.D. Cal. May 15, 2019) (ECF No. 1-2); *compare* TX Compl. ¶¶ 22-23 *with* Complaint and Jury Trial Demand ¶ 96, *Crane* v. FCA US LLC, No. 3:19-cv-06080 (N.D. Cal. Aug. 23, 2019) (ECF No. 1-2); *compare* FL Compl. ¶¶ 21-22 *with* Complaint and Jury Trial Demand ¶ 34, *Crane* v. FCA US LLC, No. 3:19-cv-06080 (N.D. Cal. Aug. 23, 2019) (ECF No. 1-2).)

34), but none of the Plaintiffs represented by MLG alleges that they saw this statement, even though 4 of the 6 MLG Plaintiffs allege that they visited a brand website; and

- every Plaintiff represented by CLR and HOP alleges that they relied on a vehicle brochure in purchasing their Truck, and saw in the brochure the "EcoDiesel badge" and "statements that the vehicle had low *CO2 emissions*" (*e.g.*, CA Compl. ¶¶ 13, 20, 28, 34; FL Compl. ¶¶ 13, 18, 64; TX Compl. ¶¶ 13, 21, 26, 33), but *none* of the Plaintiffs represented by MLG allege seeing the badge or statements about $CO_2$ emissions in a vehicle brochure, even though 3 of the 6 MLG Plaintiffs allege that they reviewed a brochure.

Regrettably, these pleadings raise serious questions about whether counsel has manufactured their clients' "recollections" in violation of this Court's Bellwether Order, which expressly required "individualized allegations *for each Bellwether Plaintiff*," not allegations *by the lawyers at each opt-out firm.*

The Court need not accept implausible, boilerplate allegations as true on a motion to dismiss. *Twombly*, 550 U.S. at 555-56; *Fujikawa* v. *One W. Bank*, 2011 WL 3021331, at *3 (D. Haw. July 21, 2011) (plaintiff's counsel "filed several virtually identical complaints" that "assert[ed] the same counts with the same wording, and with little variation other than the names of the parties involved"); *Mena* v. *Wells Fargo Bank*, 2009 WL 10673737, at *1 (C.D. Cal. June 1, 2009) (dismissing "boilerplate pleading" where plaintiff's counsel "filed an almost identical" pleading "asserting essentially the same claims" in other cases).

## 2. The Complaints Do Not Plead Falsity.

Numerous statements cited in the Complaints were *not* challenged in the Class Complaint and were *not* the subject of Defendants' prior motions to dismiss.[20]  The Opt-Outs do not sufficiently allege that any of those statements were false.

---

[20]     The FCA Defendants are not rearguing the falsity question for any of the statements the Court ruled on in connection with the Class Complaint.

- **Black Smoke.** Most Opt-Outs claim to have relied on statements that, unlike older diesel trucks, the Trucks did not "blow black smoke." (*E.g.*, TX Compl. ¶ 37.) But no Plaintiff alleges that his or her Truck emitted black smoke.

- **Low CO$_2$ Emissions.** Over 75% of the Opt-Outs allegedly relied on "statements that the [Trucks] had low CO$_2$ emissions." (*See, e.g.*, TX Compl. ¶ 13.) But no Plaintiff alleges that his or her Truck emitted more CO$_2$ than permitted by regulations, or that the amount of CO$_2$ was anything but "low."

- **Press Releases Concerning Awards.** Many Opt-Outs allegedly relied on press releases stating that the Ram 1500 EcoDiesel was named Motor Trend's 2014 "Truck of the Year" and Green Car Journal's 2015 "Green Truck of the Year." (*E.g.*, TX Compl. ¶ 16.) But Plaintiffs do not allege that these Trucks did not receive those awards.

- **Fuel Economy and Performance.** Virtually every Plaintiff allegedly relied on statements about the Trucks' fuel economy and performance, including that the Trucks averaged 28-30 miles per gallon on the highway. (*See, e.g.*, TX Compl. ¶ 21.) Plaintiffs have not alleged, however, much less with Rule 9(b) particularity, how these statements were false. Indeed, not a single Plaintiff alleges that his or her Truck failed to achieve the advertised fuel economy or performance.

3. **The CAA Preempts Plaintiffs' Claims About Compliance with Emissions Standards.**

All but two of the Opt-Outs conclusorily claim to have heard or read a statement that the Trucks complied with emissions standards in all 50 states. (*E.g.*, TX Compl. ¶ 34.) Beyond the implausibility, claims based on such statements are preempted by Section 209(a) of the CAA, which provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). Unlike the Class Plaintiffs' misrepresentation claim based on the "EcoDiesel" logo, which this Court previously held was not preempted, these 50-state-compliant claims are explicitly and necessarily based on statements regarding federal emissions standards and therefore "arise 'solely by virtue of' noncompliance with . . . emissions

1    rules."  (Class MTD Order at 995 (citing *McClellan* v. *I-Flow Corp.*, 776 F.3d 1035, 1040 (9th

2    Cir. 2015)).)  Thus, to prove their fraud claims based on these statements, Plaintiffs would need

3    to demonstrate that the Trucks were not compliant with the emissions standards promulgated by

4    the EPA, which falls exclusively within the EPA's enforcement authority—and is therefore

5    preempted.

6              **4.    Fraud Claims Based on Statements Made by Independent Dealerships**
                      **Are Not Actionable.**
7

8              Many of Plaintiffs' claims are based on statements made by employees of the

9    independent dealerships that sold the Trucks to Plaintiffs.  For example, while only 4 Opt-Outs

10   claim to have seen any FCA "marketing materials" (here, webpages) using the term

11   "environmentally friendly," 24 Opt-Outs allege that a dealership salesperson told them the

12   Trucks were "good for the environment," "environmentally friendly" or words to that effect.

13   (*See, e.g.*, FL Compl. ¶¶ 15, 20.)  Similarly, 22 Opt-Outs allege that a dealer salesperson told

14   them the Trucks had "low emissions."  (*E.g.*, TX Compl. ¶¶ 28, 37.)

15             FCA cannot be liable for statements allegedly made by employees of independent

16   dealerships.  "[T]he relationship between automobile manufacturers and their dealers has been

17   examined by a host of courts throughout the country, all of which have agreed that dealers are

18   not 'agents' of manufacturers."  *Williams* v. *Yamaha Motor Corp.*, 2015 WL 13626022, at *6-7

19   & *6 n.9 (C.D. Cal. Jan. 7, 2015) (collecting cases); *see Herremans* v. *BMW of N. Am., LLC*,

20   2014 WL 5017843, at *6-7 (C.D. Cal. Oct. 3, 2014) (dismissing fraud claims where plaintiff

21   "contend[ed] that an authorized dealer [wa]s an agent of BMW" but "such authority as the court

22   ha[d] found [wa]s to the contrary"); *Coffey* v. *Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 679

23   (N.D. Tex. 1998) ("[I]t is well-settled that dealers in new automobiles are purchasers from the

24   manufacturer and not agents of the manufacturer." (citations omitted)).[21]

25   _____

26   [21]    *Accord Bushendorf* v. *Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (Posner, J.)
27   ("[A]n automobile dealer or other similar type of dealer, who . . . merely buys goods from
     manufacturers or other suppliers for resale to the consuming public, is not his supplier's agent.");
28   *Arnson* v. *Gen. Motors Corp.*, 377 F. Supp. 209, 212 (N.D. Ohio 1974) ("[T]he weight of
     authority, including decisions reviewing similar dealer agreements and dealership operations,

1   "[W]here a plaintiff alleges that a defendant is liable for fraud under an agency

2   theory, Rule 9(b) requires that the existence of the agency relationship be pled with

3   particularity." *Jackson* v. *Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013) (Hamilton, J.).

4   Plaintiffs were required to plead particularized facts demonstrating that FCA exercised control

5   over "factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day

6   aspects of the workplace behavior" of the employees of the independent dealerships. *Lomeli* v.

7   *Jackson Hewitt, Inc.*, 2017 WL 4773099, at *5 (C.D. Cal. Oct. 19, 2017).

8   The Opt-Outs' allegations fall far short. Plaintiffs offer generalized, conclusory

9   allegations that "Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler

10  name and disseminating vehicle information provided by Fiat Chrysler." (*E.g.*, CA Compl.

11  ¶ 84.) These allegations are insufficient as a matter of law. *See Gonzalez* v. *Mazda Motor*

12  *Corp.*, 2017 WL 3283957, at *3-4 (N.D. Cal. Aug. 1, 2017) (Chesney, J.) (dismissing Florida

13  UDTPA claim and concluding that allegations that an auto manufacturer "sell[s] . . . vehicles

14  through a network of dealerships that are [the manufacturer's ] agents [are] not, without factual

15  support, sufficient to allege an agency relationship by which [the manufacturer] would be liable

16  for the acts of [the dealership]"); *Cadena* v. *Am. Honda Motor Co*., 2019 WL 3059931, at *10

17  (C.D. Cal. May 29, 2019) (under California law, "mere allegation that [manufacturer] provides

18  training, materials, and repair instructions to dealerships and compensates the dealerships for

19  performing warranty repairs" insufficient to establish agency relationship); *Ocana* v. *Ford Motor*

20  *Co.*, 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008) (affirming dismissal of complaint "devoid of

21  any allegation of some of the tell-tale signs of a principal-agent relationship, such as the ability

22  of the principal to hire, fire, or supervise dealership employees or dealer ownership").[22]

23

24  _____

    support the view that a franchised automobile dealer, with regard to the sale of new vehicles, is

25  an independent merchant and not an agent of the manufacturer." (collecting cases)).

    [22]   This Court's ruling in *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D.

26  Cal. 2014), does not compel a different conclusion here. There, plaintiffs had "made sufficient
    allegations of agency to withstand the motion to dismiss" based, in particular, on 13 paragraphs

27  in their complaint detailing the numerous "[Technical Service Bulletins] and software updates
    sent by Ford to dealers" over the course of several years that "directed dealerships" to perform

28  specific repairs. *Id.* at 955-56; First Amended Class Action Complaint ¶¶ 274-87. Here,

1

## IV.   PLAINTIFFS DO NOT ALLEGE LEGALLY COGNIZABLE STATUTORY CONSUMER PROTECTION CLAIMS.

2

3          For the same reasons they have not pled common law fraud claims (*see supra*

4   Section III), Plaintiffs have not pled viable statutory consumer protection claims:[23]   their failure

5   to allege reliance plausibly is fatal to all of their statutory claims, except their Florida UDTPA

6   claim.[24]   Additionally, Plaintiffs have failed to plead their statutory claims, which sound in

7   fraud,[25] with the particularity required by Rule 9(b).[26]   In addition to these flaws, there are

8   statute-specific grounds for dismissal of each of these claims.

9

10   Plaintiffs rely entirely on "conclusory allegations of an agency relationship," which this Court
11   recognized in *MyFord* are "not enough."  46 F. Supp. 3d at 956 & n.2.

12   [23]      Plaintiffs allege violations of (i) the Tex. DTPA; (ii) Florida's Unfair and Deceptive
     Trade Practices Act, Fla. Stat. § 501.201 ("Fla. UDTPA"); (iii) the Fla. FMDA; (iv) the Cal.
13   CLRA; (v) the Cal. UCL; and (vi) the Cal. FAL.

14   [24]      *See, e.g.*, *Klein* v. *Marvin Lumber & Cedar Co.*, 575 F. App'x 347, 349 (5th Cir. 2014)
     (affirming dismissal of Tex. DTPA claim where plaintiff "identifie[d] no allegedly deceptive
15   representations by Marvin that he relied upon in deciding to buy his house"); *MDVIP, Inc.* v.
     *Beber*, 222 So. 3d 555, 563 (Fla. Dist. Ct. App. 2017) (dismissing Fla. FMDA claim where the
16   alleged misstatement "was not shown to have been known to be false or to have been relied upon
     to Plaintiff's detriment"); *L.A. Taxi Coop., Inc.* v. *Uber Techs., Inc.*, 114 F. Supp. 3d 852, 866-67
17   (N.D. Cal. 2015) (Tigar, J.) ("[B]ecause Plaintiffs do not plead their own reliance on Uber's
     allegedly false advertising, they lack standing to seek relief" under the Cal. UCL); *Elias* v.
18   *Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 855 n.3 (N.D. Cal. 2012) (Koh, J.) (dismissing Cal.
     CLRA and Cal. FAL claims where plaintiff did "not allege with any particularity how Plaintiff
     relied on Defendants' representations").

19   [25]      *See, e.g.*, TX Compl. ¶ 398 (alleging FCA "violated the DTPA by *affirmatively
20   misrepresenting* the environmental friendliness, emissions, and fuel economy of the Fraudulent
     Vehicles . . . and installed emission cheating components that caused the Fraudulent Vehicles to
21   pollute excessively in real-world conditions, and *fraudulently concealed* that fact from Plaintiffs"
     (emphasis added)); *accord* FL Compl. ¶¶ 418, 428 (Fla. UDTPA and Fla. FMDA claims); CA
     Compl. ¶¶ 427, 439, 447 (Cal. CLRA, UCL and FAL claims).

22   [26]      *See Patel* v. *Holiday Hosp. Franchising, Inc.*, 172 F. Supp. 2d 821, 825 (N.D. Tex. 2001)
23   ("[Plaintiffs' Tex.] DTPA allegations are insufficient under Rule 9(b)'s heightened pleading
     requirements for the same reasons that their allegations of fraudulent and negligent
24   misrepresentation are insufficient under Rule 9(b)."); *Stires* v. *Carnival Corp.*, 243 F. Supp. 2d
     1313, 1322 (M.D. Fla. 2002) ("[Fla. UDTPA] claim should be plead with particularity . . . .");
25   *Balaschak* v. *Royal Caribbean Cruises*, 2009 WL 8659594, at *7 (S.D. Fla. Sept. 14, 2009)
     (rejecting Fla. FMDA claim where complaint did "not meet the requirements of Rule 9(b)");
26   *Gayou*, 2012 WL 2049431, at *7 (same); *Kearns* v. *Ford Motor Co.*, 567 F.3d 1120, 1125 (9th
     Cir. 2009) (affirming dismissal of Cal. CLRA and UCL claims for failure to satisfy "Rule 9(b)'s
27   heightened pleading standards"); *In re Sony Grand Wega*, 758 F. Supp. 3d 1077, 1088 (S.D. Cal.
     2010) (dismissing Cal. FAL claim on Rule 9(b) grounds); *Boris*, 35 F. Supp. 3d at 1174-75
28   (dismissing Cal. CLRA, UCL and FAL claims for failure to plead with Rule 9(b) particularity).

## A.   California Plaintiffs' Statutory Consumer Protection Claims

The California Plaintiffs' statutory consumer protection claims should be dismissed for four additional reasons:

*First*, Plaintiffs' claims for damages under the UCL and FAL must be dismissed because "prevailing plaintiffs are generally limited to injunctive relief and restitution." *Korea Supply Co.* v. *Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003); *see Brown* v. *Allstate Ins. Co.*, 17 F. Supp. 2d 1134, 1140 (S.D. Cal. 1998) (FAL "does not authorize recovery of damages by private individuals").  In addition to restitution, the California Plaintiffs seek on their UCL and FAL claims "economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress)."  (CA Compl. ¶¶ 442, 451.)  These are "improper[ ] money damages" and are not recoverable under the UCL or FAL. *See Marks* v. *Ocwen Loan Servicing*, 2008 WL 344210, at *6 (N.D. Cal. Feb. 6, 2008) (Illston, J.) (dismissing UCL claim "because it improperly seeks money damages," including for "emotional distress," "rather than restitution or injunctive relief"); *Brown*, 17 F. Supp. 2d at 1140 (dismissing UCL and FAL claims because "[p]rivate individuals cannot seek damages for unfair business practices under [these] statute[s]").

*Second*, Plaintiffs may not recover attorneys' fees under the UCL or FAL.[27]  *See Hambrick* v. *Healthcare Partners Med. Grp.*, 189 Cal. Rptr. 3d 31, 56 (Cal. Ct. App. 2015) ("[C]ourts have consistently held that attorneys' fees are not recoverable in a UCL or FAL action."); *Chowning* v. *Kohl's Dep't Stores*, 2016 WL 1072129, at *5 (C.D. Cal. Mar. 15, 2016) ("[A]ttorney fees . . . are not available under the UCL or FAL.").

*Third*, although the California Plaintiffs seek punitive damages on their UCL and FAL claims (CA Compl. ¶¶ 442, 451), punitive damages are not recoverable.  *See Chowing*, 2016 WL 1072129, at *5 ("[P]unitive damages . . . are not available under the UCL or FAL."); *Korea Supply*, 29 Cal. 4th at 1148 ("[A]ttorney fees and damages, including punitive damages,

---

[27]     The California Plaintiffs vaguely allege that they are seeking on their UCL and FAL claims "costs of court and attorneys."  (CA Compl. ¶¶ 442, 451.)  It is not clear whether Plaintiffs intend "costs of . . . attorneys" to include attorneys' fees.

1   are not available under the UCL."); *Zhang* v. *Superior Court*, 304 P.3d 163, 171 (Cal. 2013)

2   ("[N]o claim for compensatory or punitive damages can be recovered in a UCL action.").

3         *Finally*, the California Plaintiffs' CLRA claim should be dismissed for

4   noncompliance with Cal. Civ. Code § 1780(d), which provides that, "concurrently with the filing

5   of the complaint, the plaintiff shall file an affidavit stating facts showing that the action has been

6   commenced in a county described in this section as a proper place for the trial of the action."

7   The California Plaintiffs have not filed the required affidavit, mandating dismissal.  *See In re*

8   *Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011)

9   (Whyte, J.) (dismissing CLRA claim "as to all plaintiffs because they did not file the required

10  affidavits"); *In re Sony Grand Wega*, 758 F. Supp. 2d at 1094 (same); *In re Nexus 6P Prod. Liab.*

11  *Litig.*, 293 F. Supp. 3d 888, 929 (N.D. Cal. 2018) (Freeman, J.) ("[T]his Court and multiple other

12  California district courts have required submission of the CLRA affidavit." (citing cases)).

13  **B.      Texas Plaintiffs' Statutory Consumer Protection Claim**

14        The Texas DTPA claim should be dismissed for two additional reasons:

15        *First*, unlike the California and Florida Plaintiffs, the Texas Plaintiffs seek to

16  recover "the full purchase price of the vehicle."  (TX Compl. ¶ 404.)  As explained above (*see*

17  *supra* Section I.A), the only feature of the Trucks that Plaintiffs allege they did not receive at the

18  time of purchase was compliant NOx emissions.  As a result of Agency approval of the AEM,

19  the Texas Plaintiffs have now received (or are able to receive) everything they bargained for,

20  precluding any plausible recovery of "the full purchase price."

21        Additionally, under Texas law, damages under the DTPA must account for "any

22  value [Plaintiffs] may have received" from the Trucks.  *LSR Joint Venture No. 2* v. *Callewart*,

23  837 S.W.2d 693, 702 (Tex. App. 1992).  This Court previously held in connection with the Class

24  Complaint that "it is not plausible that Plaintiffs have been injured in an amount equal to the

25  entire purchase price of the [Trucks] because they have presumably been using the vehicles and

26  obtaining value from them."  Class MTD Order at 958; *see also* Transcript, *In re Volkswagen*,

27  MDL No. 2672 (N.D. Cal. Feb. 18, 2020) (Breyer, J.) (Ex. 6), at 193:6-16 ("[I]f somebody sold a

28  house that was purportedly designed by Frank Lloyd Wright and it wasn't, [d]id he get anything

1  of value?  Because he got four walls, a roof, glass, bedrooms, kitchen, appliances, garage . . . .

2  [A]nybody with any common sense knows it has some value.").  Plaintiffs indisputably received

3  value from driving their Trucks for tens, if not hundreds, of thousands of miles, and that value

4  precludes them from recovering "the full purchase price."  *See Cruz* v. *Andrews Restoration,*

5  *Inc.*, 364 S.W.3d 817, 824-25 (Tex. 2012) (Tex. DTPA plaintiff "is not entitled to an order

6  restoring all amounts paid under the contracts without deducting the value received under those

7  agreements"); *Arthur Anderson & Co.* v. *Perry Equip. Co.*, 945 S.W.2d 812, 817 (Tex. 1997)

8  ("[T]o allow the plaintiff to transfer the entire risk of loss . . . would unfairly transform the

9  defendant into an insurer of the plaintiff's entire investment.").

10      *Second*, the Texas Plaintiffs may not recover mental anguish damages (*see* TX

11  Compl. ¶¶ 399, 404).  Under Texas law, mental anguish "implies a relatively high degree of

12  mental pain and distress" that "is more than mere disappointment, anger, resentment or

13  embarrassment"—"[i]t includes a mental sensation of pain resulting from such painful emotions

14  as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public

15  humiliation." *Parkway Co.* v. *Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995); *see also Gunn*

16  *Infiniti, Inc.* v. *O'Byrne*, 996 S.W.2d 854, 861 (Tex. 1999) ("[R]idicule" and

17  "embarrass[ment] . . . does not rise to the level of 'a high degree of mental pain and distress' that

18  is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'").  The Texas Plaintiffs

19  do not allege any facts about their supposed "mental anguish," much less facts showing a "high

20  degree of mental pain and distress."  Instead, they rely exclusively on boilerplate (*see* TX Compl.

21  ¶ 399 (alleging conclusorily that Plaintiffs suffered "damages for embarrassment, humiliation,

22  inconvenience, mental anguish and emotional distress")), which is not enough.  *See Carter* v.

23  *Underwriters at Lloyd's*, 2018 WL 10483811, at *6 (N.D. Tex. Apr. 13, 2018) (dismissing

24  "claims for mental anguish damages" where complaint did not "allege any facts in support of his

25  claimed mental anguish or emotional distress").

26  **C.    Florida Plaintiffs' Statutory Consumer Protection Claims**

27

28      The Florida UDTPA and FMDA claims suffer from two additional deficiencies:

*First*, the Florida Plaintiffs may not recover damages for "embarrassment, humiliation, inconvenience, mental anguish and emotional distress" (FL Compl. ¶¶ 424, 429). *See TWM* v. *Am. Med. Sys., Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995) (dismissing Fla. UDTPA claim where the plaintiff sought to recover for mental anguish, because Fla. UDTPA specifically excludes personal injury damages); *Hesterly* v. *Royal Caribbean Cruises, Ltd.*, 2008 WL 11406184, at *6 (S.D. Fla. Aug. 6, 2008) ("Actual damages do not include consequential damage, such as pain and suffering . . . .").

*Second*, the Florida Plaintiffs may not recover damages for the claimed "diminished value" of their Trucks (FL Compl. ¶ 419). *See Hesterly*, 2008 WL 11406184, at *6 ("Actual damages do not include . . . diminution in value."); *Rollins, Inc.* v. *Butland*, 951 So. 2d 860, 870 (Fla. Dist. Ct. App. 2006) ("[T]he recovery afforded under FDUTPA does not include diminution in value . . . ."). Even if damages for diminished value were recoverable, "[t]here are no factual allegations in the [complaint] that support these . . . theories of injury." Class MTD Order at 958 (holding "diminished value" theory of injury "not plausible").[28]

## V.     PLAINTIFFS' WARRANTY CLAIMS SHOULD BE DISMISSED.

### A.     Plaintiffs Have Failed To State Claims Under the MMWA.

Plaintiffs allege that FCA violated the MMWA by breaching:  (i) the federal and California emissions warranties provided under the CAA and California law; (ii) other "written warranties" allegedly created by statements FCA made in the marketing of the Trucks and in

---

[28]     Additionally, Plaintiff Allen Peacock (a dealership salesperson) has not adequately pled a Fla. FMDA claim because he alleges that he relied solely on training from FCA.  (FL Compl. ¶¶ 39-42, 57-62.)  Under the FMDA, a plaintiff must "establish that the defendant made or disseminated a misleading advertisement to the general public or to a portion of the general public, as opposed to targeting a sales pitch to a specific buyer."  *N. Brevard Hosp. Dist.* v. *McKesson Techs.*, 2017 WL 951672, at *4 (M.D. Fla. Mar. 10, 2017).  Training for dealership personnel are not advertisements to the "general public," and thus cannot form the basis to plead reliance to sustain a claim under the Fla. FMDA.  *See Locke* v. *Wells Fargo Home Mortg.*, 2010 WL 4941456, at *5 (S.D. Fla. Nov. 30, 2010) ("[S]tatements allegedly made to the Plaintiff by Wells Fargo's employees were not public statements and could not be construed as advertising.").

connection with the AEM; and (iii) the implied warranty of merchantability created under the UCC.  Each claim fails as a matter of law.

### 1.    Plaintiffs Cannot Bring MMWA Claims Based on the Federal Emissions Warranties Provided by the CAA.

Plaintiffs base their MMWA claims on the allegation that "[f]ederal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a 'Performance Warranty' and a 'Design and Defect Warranty.'"  (CA Compl. ¶ 368; FL Compl. ¶ 356; TX Compl. ¶ 343.)  This claim fails for two reasons.

*First*, the MMWA expressly provides that it "shall be *inapplicable* to any written warranty the making or content of which is *otherwise governed by Federal law*."  15 U.S.C. § 2311(d) (emphasis added).  Accordingly, if another federal statute mandates the provision of a warranty or governs the content of written statements accompanying the sale of products, a plaintiff cannot assert MMWA claims based on those warranties or statements.  *See, e.g.*, *Clancy* v. *Bromley Tea Co.*, 308 F.R.D. 564, 577 (N.D. Cal. 2013) (Tigar, J.) (Food, Drug and Cosmetic Act regulations governing content of beverage labels were "fatal to any Magnuson-Moss claim" based on labeling); *Dzielak* v. *Whirlpool Corp.*, 120 F. Supp. 3d 409, 424 (D.N.J. 2015) (alleged misuse of EPA-regulated "Energy Star" logo not actionable under MMWA, because "federal law and regulations . . . specify the criteria that a product must meet to earn the Energy Star logo").  As Plaintiffs correctly note (*e.g.*, TX Compl. ¶ 343), federal law—the CAA and its implementing regulations—mandates the provision and contents of the federal emissions warranties.  *See* 42 U.S.C. § 7541; 40 C.F.R. §§ 85.2101-2111.   Accordingly, because the federal emissions warranties are "otherwise governed by Federal law" (here, the CAA), any breach of them cannot form the basis of a claim under the MMWA.

*Second*, even if Section 2311(d) of the MMWA were not an absolute bar, Plaintiffs' MMWA claims based on the federal emissions Performance Warranty should still be dismissed, because a manufacturer can be liable under the Performance Warranty only when both:  (i) a vehicle fails an emissions test; and (ii) that failure subjects the vehicle's owner to a sanction.  40 C.F.R. § 85.2103; *see also Schmidt* v. *Ford Motor Co.*, 972 F. Supp. 2d 712, 718

1  (E.D. Pa. 2013) (emissions performance warranty could not form basis of claim where plaintiffs

2  did "not allege that the vehicles at issue failed [emissions] tests"); *Rivera* v. *Ford Motor Co.*,

3  2017 WL 3485815, at *2 (E.D. Mich. Aug. 15, 2017) (emission performance warranty covers

4  "repairs necessitated due to a failed emissions test").   None of the Plaintiffs alleges that their

5  Trucks failed an emissions test, let alone that such failure subjected him or her to a penalty or

6  other sanction under applicable law.

7
8
   **2.      The Other Statements Alleged in the Complaints Are Not "Warranties" Actionable Under the MMWA.**

9  Plaintiffs allege that FCA "engaged in a pervasive advertising campaign and, in

10  doing so, made numerous express warranties to Plaintiffs concerning the emissions, fuel

11  economy, and environmental friendliness of the [Trucks]."  (CA Compl. ¶¶ 370, 394; FL Compl.

12  ¶ 358; TX Compl ¶ 344.)

13  The MMWA defines a "written warranty" as either "any undertaking in

14  writing . . . to refund, repair, replace, or take other remedial action with respect to" a defective

15  product or:

16
17
18
   any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

19  . . .

20
21
   which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

22  15 U.S.C. § 2301(6).  As shown below, the purported "written warranties" are general statements

23  about the performance and attributes of the Trucks, none of which constitutes a promise that the

24  Trucks were "*defect free* or will meet a *specified level of performance* over a *specified period of*

25  *time*."  *Id.*; *see Viggiano* v. *Hansen Nat'l Corp.,* 944 F. Supp. 2d 877, 898 (C.D. Cal. 2013)

26  ("Courts have declined to extend the term 'written warranty' beyond its statutory definition.").

27  Nor did any of the statements include an undertaking by the FCA Defendants "in writing" to

28  "refund, repair, replace, or take other remedial action."  15 U.S.C. § 2301(6).

a)      **Statements in FCA's Marketing Were Not "Written Warranties."**

The statements made by FCA in its advertising and marketing were not "written warranties" under the MMWA.  For example, the "EcoDiesel" badge makes no guarantee of performance, let alone at a "specified level . . . over a specified period of time."  *See Hairston* v. *S. Beach Beverage Co.*, 2012 WL 1893818, at *6 (C.D. Cal. May 18, 2012) ("names of various . . . flavors" contained on beverage labels not actionable under MMWA).  Similarly, generalized statements in the advertising—such as that the Trucks "offer[ed] innovative technology that is efficient, increases range, and improves power – all while leaving little trace of being there" (FL Compl. ¶ 171) and that the Trucks were "clean" and "environmentally friendly" (*id.* ¶ 175)—do not promise "specified levels of performance over a specified period of time."  *See Bates* v. *Kashi Co.*, 2012 WL 12847001, at *7 (S.D. Cal. July 16, 2012) ("phrases [which] describe[d] the products to which they are attached" not actionable under MMWA); *Anderson* v. *Jamba Juice Co.*, 888 F. Supp. 2d 1000, 1004 (N.D. Cal. 2012) (Gonzalez Rogers, J.) ("A product description does not constitute a written warranty under the MMWA.").

Plaintiffs also allege that statements describing the Trucks' average fuel economy and range created written warranties.  (*See, e.g.,* TX Compl. ¶ 154 (referencing statements in brochures regarding "'30 hwy mpg fuel economy' and 'a driving range of 730 highway miles'").)  But these figures are simply performance estimates "based on . . . EPA estimates," not absolute statements of performance.  (*See, e.g.,* Ex. 7 at 11.)  Further, these statements contain no temporal element (*i.e.*, they do not guarantee performance over a period of time or miles, as would be provided in an actual vehicle warranty)—a requirement to state an MMWA claim.  *See* 16 C.F.R. § 700.3 ("A product information disclosure without a specified time period to which the disclosure relates is . . . not a written warranty."); *Kelley* v. *Microsoft Corp.*, 2007 WL 2600841, at *5 (W.D. Wash. Sept. 10, 2007) (statement that computer was "Windows Vista Capable" not a written warranty under MMWA because it contained "no temporal element").

*b)* **Statements by Dealership Salespersons Were Not "Written Warranties."**

Plaintiffs also base their MMWA claim on oral statements purportedly made by dealership salespeople. (*E.g.*, CA Compl. ¶¶ 14, 21, 29, 35, 42, 49, 56, 63, 71, 77.) Even if these statements could be imputed to FCA, which they cannot (*see supra* Section III.B.4), it is settled that "[t]he [MMWA's] consumer-suit provision . . . supplies a federal remedy for breach of written and implied warranties, but *not for oral express warranties*." *Milicevic* v. *Fletcher Jones Imps.*, 402 F.3d 912, 918 (9th Cir. 2005) (emphasis added); *see also Walsh* v. *Ford Motor Co.*, 807 F.2d 1000, 1015 (D.C. Cir. 1986) ("Congress ultimately decided that oral warranties need not be covered in the federal legislation."). Further, the oral statements described in the Complaints (*see, e.g.*, FL Compl. ¶ 51 (alleging that salesperson represented "that the vehicle was very 'clean' and 'environmentally friendly'")) are substantively identical in content to the challenged statements from FCA's marketing and advertising, which, for the reasons explained above, do not constitute cognizable "warranties" under the MMWA.

*c)* **FCA's Challenged Statement About the AEM Is Not Actionable.**

The six Plaintiffs who received the AEM appear to assert MMWA claims based on the allegation that FCA "warranted that the first AEM for the [Trucks] would not change (i) any key vehicle attributes, such as reliability, durability, vehicle performance, drivability, engine noise or vibration, or other driving characteristics; (ii) the Diesel Exhaust Fluid tank refill interval; or (iii) average fuel economy." (*E.g.*, FL Compl. ¶ 357.) Even if Plaintiffs' factual recitation were correct, and it is not,[29] the MMWA's definition of "written warranty" only covers warranties made "*in connection with the sale* of a consumer product." 15 U.S.C. § 2301 (emphasis added). FCA's statements about the AEM were made "in connection with the repairs of the [Trucks] and not in connection with the sale of the [Trucks]," and therefore are not actionable under the MMWA. *Ogner* v. *Sea Ray Boats, Inc.*, 2013 WL 12153502, at *4 (S.D.

---

[29]     The AEM disclosure stated that the AEM *was "not expected" to* change certain key vehicle attributes. Further, it also listed potential circumstances under which DEF consumption and fuel economy could be affected in particular driving conditions. (ECF No. 562, App'x D.)

1   Fla. Feb. 12, 2013); *see Miller* v. *Showcase Homes, Inc.*, 1999 WL 199605, at *7 (N.D. Ill. Mar.

2   31, 1999) ("[A] written promise made after a bargain is struck cannot be considered a written

3   warranty for purposes of the [MMWA].").

4           **d)      Plaintiffs Have Not Sufficiently Alleged Reliance on the Alleged**
              **"Written Warranties."**
5

6           Plaintiffs must sufficiently allege that they saw and relied on the terms of the

7   alleged express warranty.[30]   Although Plaintiffs make the generic, group-wide allegation that

8   they "reasonably relied on these warranties" (*e.g.*, CA Compl. ¶ 396), Plaintiffs do not

9   specifically allege that they relied on each of the alleged warranties described above.   This

10  pleading deficiency is particularly notable in light of the Bellwether Order, which required

11  "individualized allegations for each Bellwether Plaintiff."  (ECF No. 686 ¶ 9.)  Plaintiffs do not

12  adequately allege that the specific statements "incorporated by reference into their breach of

13  express warranty claim . . . were the express warranties that they relied on in purchasing their

14  vehicles."  *Kearney* v. *Hyundai*, 2010 WL 8251077, at *9 (C.D. Cal. Dec. 17, 2010).

15          **e)      Plaintiffs Have Not Alleged that FCA Breached Many of the**
              **Alleged Written Warranties.**
16

17          As discussed in Section III.B.2. *supra*, Plaintiffs have not alleged that their Trucks

18  failed to meet the fuel economy and performance estimates contained in FCA's advertising.

19  Because Plaintiffs rely on those same statements to form the basis of their express warranty

20  claims, those claims fail for the same reasons.

21

22

23

---

24  [30]     *See Keegan* v. *Am. Honda Motor Co.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012) ("[I]n the

25  absence of privity, California law requires a showing that a plaintiff relied on an alleged
    omission or misrepresentation" to establish "an express warranty claim against a non-selling

26  manufacturer of a product."); *PPG Indus.* v. *JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79,
    99 (Tex. 2004) ("[R]eliance is . . . an element of proof of, plaintiffs' claims of breach of express

27  warranty."); *Hobco, Inc.* v. *Tallahassee Assocs.*, 807 F.2d 1529, 1533 (11th Cir. 1987) ("Under
    Florida law, an express warranty may arise only where justifiable reliance upon assertions or

28  affirmations is part of the basis of the bargain.").

**3.  Plaintiffs' MMWA Claims Based on an Alleged Breach of Implied Warranty Fail.**

Plaintiffs assert MMWA claims based on a breach of the implied warranty of merchantability under California, Florida and Texas law.  (CA Compl. ¶¶ 379-86; FL Compl. ¶¶ 366-74; TX Compl. ¶¶ 353-62.)  Plaintiffs allege their Trucks were not merchantable because of (i) the emissions issues with their Trucks caused by the alleged "defeat device," and (ii) the EGR cooler defect.[31]  The "defeat device" claim should be dismissed for the same reasons that Judge Breyer dismissed substantively identical claims in the *Volkswagen* bellwether opt-out cases.  *See Benipayo* v. *Volkswagen Grp. of Am., Inc.*, 2020 WL 553884, at *3-5 (N.D. Cal. Feb. 4, 2020).  Plaintiffs cannot proceed on their EGR cooler theory, because none of the Plaintiffs alleges that he or she experienced any issues with their Trucks' EGR coolers, let alone one that made their Trucks "unmerchantable."

*a)     Plaintiffs Have Not Pled Facts Demonstrating that the Alleged "Defeat Device" Made Their Trucks Unmerchantable.*

A seller breaches the implied warranty of merchantability when its product is not "fit for the *ordinary purposes* for which such goods are used."  Cal. Com. Code § 2314(2)(c); Fla. Stat. § 672.314(2)(c); Tex. Bus. & Com. Code § 2.314(b)(3) (emphasis added).  Plaintiffs have not pled facts showing that the alleged "defeat device" rendered their Trucks unfit for their ordinary purpose:  *transportation*.  *See Strauss* v. *Ford Motor Co.*, 439 F. Supp. 2d 680, 685 (N.D. Tex. 2006) ("The sole ordinary purpose of a vehicle is to provide transportation."); *Benipayo*, 2020 WL 553884, at *4 ("[T]he implied warranty of merchantability will be breached by 'a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation.'" (quoting *Am. Suzuki Motor Corp.* v. *Superior Court*, 44 Cal. Rptr. 2d 526, 529 (Cal. Ct. App. 1995))); *Weiss* v. *Gen. Motors*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019) ("Cars are fit for the ordinary purpose of transportation.").

Judge Breyer analyzed similar claims in the *Volkswagen* opt-out litigation and concluded that the presence of a defeat device (admitted there by Volkswagen) was "unlike

---

[31]     Plaintiffs do not allege express warranty claims with respect to the EGR cooler defect.

[defects] that previous courts have found sufficient to render a car unmerchantable."  2020 WL 553884, at *4.  Judge Breyer correctly held that the vehicles were merchantable notwithstanding the presence of the defeat device, because "[i]ncreased emissions do not implicate the ability to provide transportation."  *Id.* at *5.  The same reasoning applies here.

> b)      *Plaintiffs Do Not Allege that They Experienced Any Issues with Their Trucks' EGR Coolers.*

"To cause redressable injuries in the breach of the implied warranty of merchantability context, a 'defect' must either have manifested during the product's normal use or such manifestation must be inevitable when the defective feature of the product is used." *Everett* v. *TK-Taito, LLC*, 178 S.W.3d 844, 855 (Tex. App. 2005); *see also McGee* v. *Mercedes-Benz USA, LLC*, 2020 WL 1530921, at *6 (S.D. Cal. Mar. 30, 2020) ("existence of . . . [r]ecall, without any related malfunction" insufficient to support implied warranty claim under California law); *PB Prop. Mgmt., Inc.* v. *Goodman Mfg. Co.*, 2016 WL 7666179, at *20 (M.D. Fla. May 12, 2016) ("Florida courts have clearly held that manifestation of a defect is required to maintain a claim for breach of warranty.").

None of the Plaintiffs alleges that he or she experienced any issues with the Trucks' EGR coolers.   Instead, Plaintiffs merely allege that "dozens" of vehicle fires, purportedly related to the EGR cooler defect, have been reported to NHTSA **by others**.  (*See, e.g.*, CA Compl. ¶ 262; FL Compl. ¶ 252; TX Compl. ¶ 240.)  Plaintiffs have therefore alleged, at best, that their Trucks were "at risk for manifesting this defect," which is legally insufficient.  *See Taragan* v. *Nissan N. Am., Inc.*, 2013 WL 3157918, at *4 (N.D. Cal. June 20, 2013) (Armstrong, J.) (risk of rollaway accident insufficient to support implied warranty claim where no rollaway occurred for plaintiffs); *McGee*, 2020 WL 1530921, at *6 (allegation that "airbag *may* not deploy properly" insufficient to establish implied warranty claim).

> c)      *The California and Florida Plaintiffs Have Not Pled the Privity Required for Their MMWA Claim Based on Implied Warranty.*

California and Florida law require privity of contract between the plaintiff-purchaser and the defendant for a claim for breach of implied warranty.   *See Clemens* v.

1  *DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("[A] plaintiff asserting breach of

2  [implied] warranty claims must stand in vertical contractual privity with the defendant."); *In re*

3  *Toyota Motor Corp.*, 2012 WL 12929769, at *30 (C.D. Cal. May 4, 2012) ("Florida implied

4  warranty law unequivocally requires privity of contract." (citing cases).

5  Plaintiffs concede that they did not purchase their Trucks from FCA.  (*See, e.g.,*

6  CA Compl. ¶¶ 12, 19, 27, 33, 40, 47, 54, 61, 69, 75.)  The Complaints do not plead (nor could

7  they) that any sales contract exists between Plaintiffs and FCA.  Although Plaintiffs allege

8  conclusorily that the dealers acted as FCA's agents, numerous cases applying California and

9  Florida law have rejected such agency pleading in dismissing similar implied warranty claims.[32]

10 Plaintiffs' allegations that they are third-party beneficiaries of "contracts between FCA and its

11 dealers, and specifically, of FCA's implied warranties" (*see* CA Compl. ¶ 358; FL Compl. ¶ 371)

12 also fail under California and Florida law.[33]  Nonetheless, even if a third-party-beneficiary

13 exception did exist, Plaintiffs' allegations that they are "intended third party beneficiaries of

14 contracts between [FCA] and its dealers" and "[FCA's] implied warranties" are legal conclusions

15

16 [32]     *See Marsikian* v. *Mercedes-Benz USA*, 2009 WL 10673466, at *3 (C.D. Cal. Aug. 13,
   2009) ("Courts have routinely recognized that auto dealerships are not the agents of
17 manufacturers or national distributors."); *Garcia* v. *Harley-Davidson Motor Co.*, 2019 WL
   6050768, at *7 (N.D. Cal. Nov. 15, 2019) (Spero, M.J.) (no privity under California law where
18 motorcycle purchased from dealership); *David* v. *Am. Suzuki Motor Corp.*, 629 F. Supp. 2d
   1309, 1313, 1322 (S.D. Fla. 2009) (no privity where Plaintiff purchased from "an authorized
19 Suzuki dealer"); *McKissic* v. *Country Coach, Inc.*, 2008 WL 616093, at *4 (M.D. Fla. Mar. 3,
   2008) (no privity where Plaintiff purchased from "an authorized seller of Manufacturer's RVs");
20 *Mesa* v. *BMW of N. Am.*, 904 So. 2d 450, 458 (Fla. Dist. Ct. App. 2005) (lessee could not assert
   implied warranty claim against manufacturer when it leased through dealership).

21 [33]     *See, e.g., In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 787 (N.D. Cal. 2017)
22 (Spero, M.J.) (third-party beneficiary exception would be "inconsistent with the Ninth Circuit
   authority"); *Stewart* v. *Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 915 (E.D. Cal. 2018)
23 ("The Court is persuaded that *Clemens* forecloses a third-party-beneficiary exception to the rule
   of privity."); *Johnson* v. *Nissan N. Am., Inc.*, 2018 WL 905850, at *5 (N.D. Cal. Feb. 15, 2018)
24 ("[T]he weight of the authority from modern Florida courts is consistent" and gives "clear
   guidance that Florida law does not recognize [the third-party beneficiary] exception." (citing
25 cases)).  FCA recognizes that this Court stated in *In re MyFord Touch Consumer Litig.*, 46 F.
   Supp. 3d 936, 984 (N.D. Cal. 2014) that a third-party beneficiary exception may be viable under
26 California law under *Gilbert Fin. Corp.* v. *Steelform Contracting Co.*, 145 Cal. Rprtr. 448 (Cal.
   Ct. App. 1978).  FCA respectfully refers the Court to the discussion of *Gilbert* in the cases cited
27 above, which concluded that, "[s]tanding alone, *Gilbert* is not sufficient to establish that the
   third-party-beneficiary exception is within the scope of the privity exceptions California courts
28 have 'painstakingly established.'"  *E.g., Stewart*, 304 F. Supp. 3d at 915.

entitled to no weight—and therefore insufficient. *See Padilla* v. *Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1119 (S.D. Fla. 2019) (third-party beneficiary exception failed due to "conclusory allegations"); *Ohlweiler* v. *Bank of Am. Corp.*, 2015 WL 8484526, at *3 (S.D. Cal. Dec. 9, 2015) (stating that a "conclusory statement that 'these agreements were made for the benefit of the Plaintiff and Plaintiff was the intended third party beneficiary of these agreements' does not suffice").

### 4. FCA Stood Behind Its Warranties and Provided a Cure for the Alleged Defects, Barring All of Plaintiffs' MMWA Claims.

Under the MMWA, "[n]o action . . . may be brought . . . for failure to comply with any obligation under any written or implied warranty or service contract . . . unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply." 15 U.S.C. § 2310(e). Accordingly, "[t]he MMWA requires that a plaintiff provide a defendant with an opportunity to cure the alleged breach, and *the defendant itself must have refused directly to provide a cure*." *Tietsworth* v. *Sears*, 720 F. Supp. 2d 1123, 1143 (N.D. Cal. 2010) (emphasis added).

Here, FCA (i) developed the AEM, approved by both the EPA and CARB following testing, to address the alleged NOx noncompliance, and (ii) issued a recall for the EGR cooler that involves the replacement of that part in affected Trucks. None of the Plaintiffs alleges any facts showing that they presented their Trucks for repair at a dealership and were denied one.[34] Instead, Plaintiffs allege that "[a]ffording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile." (CA Compl. ¶¶ 359, 377; FL Compl. ¶¶ 348, 364; TX Compl ¶¶ 335, 351.) Plaintiffs offer no explanation why an attempt to

---

[34] The California Plaintiffs include the conclusory allegation (as part of their Song-Beverly claim, but not as part of their MMWA claim) that they "delivered the [Trucks] to Defendants' authorized repair facilities for repairs on numerous occasions," but do not allege which Plaintiffs made attempts, to what dealerships (or other repair facilities) they delivered the Trucks for repair, when these alleged attempts were made, or what alleged defects Plaintiffs sought to have repaired. As discussed further in Section V.B.1.c *infra*, these vague allegations are insufficient, particularly in light of the Court's direction in its Bellwether Order to provide "individualized allegations for each Bellwether Plaintiff." (Bellwether Order ¶ 9.)

repair the alleged defects would be "futile."  In any event, the MMWA does *not* contain a "futility exception."  *See, e.g.*, *Kuns* v. *Ford Motor Co.*, 543 F. App'x 572, 576 (6th Cir. 2013) ("[Plaintiff] does not cite—and we cannot locate—any case law indicating that this statutory requirement can be waived if a plaintiff subjectively determines that demand would be futile.").

### B.    The California Plaintiffs' Song-Berly Claim Should Be Dismissed.

The California Plaintiffs have asserted claims under Song-Berly for breach of express warranties (namely, the California emissions warranty and alleged statements in advertising and marketing materials) and the implied warranty of merchantability.  (CA Compl. ¶¶ 387-419.)  Both claims fail.

### 1.    Plaintiffs' Song-Berly Express Warranty Claims Fail.

#### a)    *FCA's General Statements in Its Advertising and Marketing Are Not Actionable "Express Warranties" Under Song-Berly.*

Like the MMWA, Song-Berly contains a definition of "express warranty":

> A written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer *undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation* if there is a failure in utility or performance . . . .

Cal. Civ. Code § 1791.2(a)(1) (emphasis added).

Plaintiffs' try to base their Song-Berly express warranty claims on the same advertising and marketing statements they have invoked in support of their MMWA claims (*see* CA Compl. ¶ 394) fails for the same reasons:  these statements were not undertakings to "preserve or maintain" the "utility or performance" of the Trucks or to "provide compensation" in the event of a "failure in utility or performance."  *See Wisdom* v. *Easton Diamond Sports*, 2019 WL 580670, at *4 (C.D. Cal. Feb. 11, 2019) (label identifying size and weight of baseball bat did "not constitute a specific and unequivocal promise to preserve or maintain the utility or performance of the bat" under Song-Berly).  To the extent Plaintiffs assert that FCA's statements regarding the estimated fuel economy of the Trucks constitute express warranties, these statements merely "reiterated . . . EPA mileage estimates," and "[FCA's] provision of those

1  estimates does not constitute an independent warranty that [Plaintiffs' Trucks] would achieve the

2  EPA fuel economy estimates or a similar level of fuel economy." *Paduano* v. *Am. Honda Motor*

3  *Co.*, 88 Cal. Rptr. 90, 103 (Cal. Ct. App. 2009).

4                                   **b)**        **The Alleged "Defeat Device" Did Not Substantially Impair the**

5                                                **Use, Value or Safety of Plaintiffs' Trucks.**

6          To plead a claim for breach of express warranty under Song-Beverly, Plaintiffs

7  must allege their Trucks suffered from a "nonconformity" that "substantially impair[ed]" their

8  "use, value, or safety." Cal. Civ. Code § 1793.22(e)(1). "[N]ot every impairment is sufficient to

9  satisfy the statute," and "the requirement is not satisfied by any impairment, however

10  insignificant, that affects use, value, or safety." *Lundy* v. *Ford Motor Co.*, 104 Cal. Rptr. 2d 545,

11  549 (Cal. Ct. App. 2001).

12          Plaintiffs do not allege the "defeat device" prevented them from driving or

13  otherwise using their Trucks. As the EPA stated in connection with the issuance of its NOV, the

14  Trucks were "safe and legal to drive." (Ex. 8.) Further, as Judge Breyer stated in a similar

15  context in the *Volkswagen* opt-out litigation, "the defeat devices and increased emissions did not

16  render Plaintiffs' cars inoperable . . . or affect the cars' performance in any way Plaintiffs were

17  aware of before the emissions scandal came to light." *Benipayo*, 2020 WL 553884, at *4.

18  Although Plaintiffs allege conclusorily that their Trucks' value has been "substantially

19  impair[ed]" or "diminished" (CA Compl. ¶ 418), none alleges that he or she attempted to sell or

20  trade in his or her Truck and was offered an unacceptable price. Nor does any Plaintiff allege a

21  specific amount by which his or her Truck has purportedly declined in value. Plaintiffs have

22  thus failed to plead facts sufficient to allege that their Trucks' value was impaired, let alone

23  "substantially," as required to state a claim. *See Durkee* v. *Ford Motor Co.*, 2014 WL 4352184,

24  at *5 (N.D. Cal. Sept. 2, 2014) (Hamilton, J.) (allegations of substantial impairment which are

25  "conclusory and merely repeat the language of the statute" insufficient under Song-Beverly).

26          Additionally, no Plaintiff has alleged that the claimed "defeat device" or

27  associated NOx emissions issues affected the safety of their Trucks, and the EPA confirmed after

28  the NOVs that the Trucks are "safe and legal to drive." (Ex. 8.) Although Plaintiffs make

scattered allegations regarding safety hazards allegedly posed by *the AEM* elsewhere in their Complaints, and certain Plaintiffs attempt to assert claims based on representations which accompanied the release of *the AEM*, Plaintiffs' express warranty claims can only properly be based on warranties provided with the *initial sale* of the Trucks. *See* Cal. Civ. Code § 1791.2 (Song-Beverly only covers express warranties made "arising out of a sale to the consumer"); *id.* § 1791(n)(1) (defining "sale" as "[t]he passing of title from the seller to the buyer for a price").

### c) Plaintiffs Do Not Allege They Afforded FCA a "Reasonable Number of Attempts" To Repair Their Trucks.

A plaintiff must plead under Song-Beverly that "the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts." Cal. Civ. Code § 1793.2. Instead of alleging, as required, which Plaintiffs made repair attempts, at which dealerships, when, or how many times, Plaintiffs allege only that they collectively "delivered the [Trucks] to Defendants' authorized repair facilities for repairs on numerous occasions in attempts to have the existing express warranties satisfied." (CA Compl. ¶ 401.) This conclusory pleading is inadequate and fails to establish the requisite elements of the claim for each Plaintiff specifically. *See Cohen* v. *Porsche Cars N. Am., Inc.*, 2019 WL 6700941, at *2 (C.D. Cal. Dec. 6, 2019) (allegations of repair attempts that were "vague and not direct" failed to state Song-Beverly claims). Plaintiffs' vague allegations are also insufficient to establish that any Plaintiff presented his or her Truck for repair more than once, a requirement under Song-Beverly. *See Brownfield* v. *Jaguar Land Rover N. Am.*, 2012 WL 12887766, at *2 (C.D. Cal. Aug. 14, 2012) ("'Attempts' is plural. The statute does not require the manufacturer to make restitution or replace a vehicle if it has had only one opportunity to repair that vehicle.").

### 2. Plaintiffs' Song-Beverly Implied Warranty Claims Fail.

### a) Plaintiffs' Implied Warranty of Merchantability Claim Is Preempted by the CAA.

This Court previously held that the CAA preempts the Class Plaintiffs' state law implied warranty claims, including under Song-Beverly: "Based on the factual predicate of the

warranty claims"—namely, that "the [Trucks] are allegedly not in merchantable condition because their design violated state and federal laws"—"the warranty claims are expressly preempted by the CAA."  (ECF No. 290 at 124.)  Plaintiffs' Song-Beverly implied warranty claims here are based on the same factual predicate as the Class Plaintiffs' claims, and the Court should dismiss Plaintiffs' Song-Beverly claims as preempted for the same reason.

> b)     **Plaintiffs Fail To Allege that Their Trucks Were Not Merchantable.**

A breach of the implied warranty of merchantability occurs only "if the product lacks even the most basic degree of fitness for ordinary use."  *Birdsong* v. *Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009).  As California courts have repeatedly held, "in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle *unfit for its ordinary purpose of providing transportation*."  *Am. Suzuki*, 37 Cal. App. 4th at 1296 (emphasis added); *Carlton* v. *Paccar Inc.*, 2016 WL 6921127, at *3 (C.D. Cal. May 2, 2016) ("In the case of automobiles, courts have found that the implied warranty of merchantability requires only that a vehicle is fit for driving."); *Resnick* v. *Hyundai*, 2016 WL 9455016, at *11 (C.D. Cal. Nov. 14, 2016) (Song-Beverly claim failed where Plaintiffs did not allege defect rendered vehicle "inoperable, useless, or unsafe").

Plaintiffs' theory that their Trucks are not merchantable because they "do not comply with California state . . . emissions standards" mirrors the argument Judge Breyer recently rejected in the *VW* opt-out litigation, as discussed in Section V.B.1.b *supra*.  *Benipayo*, 2020 WL 553884, at *5.  The Court should dismiss these Plaintiffs' claims for the same reasons.

Similarly, none of the Plaintiffs has alleged that they experienced any issues with their Trucks' EGR coolers.  "In asserting a warranty claim . . . [i]t is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their product actually exhibited the alleged defect*."  *Taragan*, 2013 WL 3157918, at *4 (emphasis in original) (dismissing Song-Beverly implied warranty claim).  The mere "existence of a safety recall does not adequately allege a substantial safety hazard existed."  *McGee*, 2020 WL 1530921, at *6.  Although Plaintiffs allege that FCA's EGR cooler

recall notices stated that "problems with the EGR Cooler in the subject vehicles *could* cause a vehicle fire" (CA Compl. ¶ 262 (emphasis added)), allegations that a defect "may" cause a malfunction or create a "risk" of a safety issue are insufficient to support a claim for breach of the implied warranty of merchantability in the absence of a specific allegation (absent here) that the defect actually manifested in Plaintiffs' Trucks.  *See McGee*, 2020 WL 1530921, at *6 (allegation that airbag "*may* not deploy properly"); *Taragan*, 2013 WL 3157918, at *4 (allegation that there was a "'risk' that vehicles . . . . [would] roll away").  To allow Plaintiffs to recover for an unmanifested defect "would, in effect, contemplate indemnity for a potential injury that never, in fact, materialized." *Am. Suzuki*, 37 Cal. App. 4th at 1299.

## VI.    PLAINTIFFS DO NOT ADEQUATELY STATE CLAIMS FOR RESCISSION.

All Plaintiffs seek rescission as a remedy for certain of their claims, including their RICO, MMWA, fraud and negligent misrepresentation claims.  (CA Compl. ¶¶ 346, 362, 472; FL Compl. ¶¶ 336, 397, 442; TX Compl. ¶¶ 322, 363, 384, 389, 404, 412.)  In addition, the Florida Plaintiffs have brought a stand-alone claim for rescission.  (FL Compl. ¶¶ 400-10.)

### A.    Plaintiffs Have Waived Any Right To Rescind.

Despite conceding that they first had the "ability . . . [to] learn of the fraud . . . [when] it was discovered by the EPA and CARB and revealed to the public through their respective [NOVs]" on January 12, 2017 (CA Compl. ¶¶ 229, 272; FL Compl. ¶¶ 217, 262, 409; TX Compl. ¶¶ 207, 250), Plaintiffs continued to use their Trucks.  Because Plaintiffs here continued to accept the benefits of their purchase or lease contracts for their Trucks, and did not promptly reject those contracts upon learning of the alleged NOx emissions defect, they have waived any right or claim to rescission.  *See Rood Co.* v. *Bd. of Public Instruction of Dade Cty.,* 102 So. 2d 139, 141-42 (Fla. 1958) (a party waives the right to rescind where it does not reject a contract "with reasonable promptness" after discovering basis for rescission); *Cross* v. *Mayo*, 140 P. 283, 288 (Cal. 1914) (rescission waived through continued use of property for more than ten months after learning of basis for rescission); *J.B. Colt Co.* v. *Head*, 292 S.W. 198, 199 (Tex. Comm'n App. 1927) (rescission waived through continued use of property for "some four months" after learning of basis for rescission).

1       In addition, the Florida and Texas Plaintiffs have failed to plead or provide

2    adequate notice of rescission.  The Texas Plaintiffs do not plead any notice of rescission while

3    the Florida Plaintiffs merely allege (a) that they "wanted to return the [Trucks]" when they

4    learned of the alleged fraud, and (b) that they provided adequate notice through the filing of a

5    lawsuit.  (FL Compl. ¶ 409.)  Under Florida and Texas law, however, notice of rescission is not

6    established by the desire to return a vehicle or the filing of a complaint asserting rescission.  *See*

7    *Barber* v. *Am. Wholesale Lender*, 542 Fed. Appx. 832, 836 (11th Cir. 2013) (rescission not

8    adequately pled where plaintiffs relied on the filing of their lawsuit to meet the notice

9    requirement); *Phillips* v. *Arnold*, 329 S.W.2d 108, 111 (Tex. Civ. App. 1959) (plaintiff

10   "abandoned or waived any right to rescind" "by failing to give notice of rescission until the

11   amended pleading was filed").

12
13    **B.**    **Plaintiffs' Rescission Claims Also Must Be Dismissed Because Plaintiffs Did Not Enter Into Any Sales Or Lease Contracts With the FCA Defendants.**

14       Plaintiffs' rescission claims also fail because they admit that they purchased or

15   leased their vehicles from independent dealerships, not from the FCA Defendants.  (CA Compl.

16   ¶ 358; FL Compl. ¶ 402; TX Compl. ¶ 334.)  Rescission is available only against a party to the

17   contract to be rescinded.  *See In re Ford Motor Co. DPS6 Powershift Transmission Prod.*

18   *Liability Litig.*, 2019 WL 7185524, at *6 (C.D. Cal. Oct. 29, 2019) (no rescission claim against

19   Ford where plaintiff purchased his new vehicle from a dealer, not directly from Ford); *Mesa*, 904

20   So. 2d at 458-59 (absence of contractual privity with manufacturer precludes revocation—*i.e.*

21   rescission claim); *Emmons* v. *Durable Mobile Homes, Inc.*, 521 S.W.2d 153, 154 (Tex. Civ. App.

22   1974) (same); *Neal* v. *SMC Corp.*, 99 S.W.3d 813, 817-18 (Tex. App. 2003) (bare allegations of

23   agency due to dealer's sale of cars and issuance of manufacturer's warranty are insufficient to

24   obtain rescission, as rescission is available only against the immediate seller, not the

25   manufacturer).[35]

26

27   [35]    Plaintiffs' rescission claims also must be dismissed because all contracting parties— including, here, the dealers—must be named in a rescission action.  *See Shields* v. *Barrow*, 58

28   U.S. 130, 132 (1854) (all parties to a contract must be joined in the litigation in an action for rescission); *Green* v. *AILNH, LLC*, 2019 WL 1883910, at *2 (C.D. Cal. Feb. 14, 2019) ("It is a

Plaintiffs attempt to avoid dismissal of their rescission claims by alleging privity through manufacturer's warranties and an alleged agency relationship between the FCA Defendants and the independent dealerships.  (FL Compl. ¶¶ 72, 371, 402-07, 417; TX Compl. ¶¶ 62, 334, 396.)   Under Texas and Florida law, however, agency between the dealer and manufacturer for the purpose of delivering the manufacturer's warranties does not establish privity or form the basis for rescission.  *Mesa*, 904 So. 2d at 458-49; *Gen. Motors Corp.*, 300 S.W.2d at 718.

### C.  Florida and Texas Plaintiffs' Rescission Claims Also Must Be Dismissed Because There Is An Adequate Remedy At Law.

Under Florida and Texas law, Plaintiffs must plead the absence of an adequate remedy at law.  *Punie* v. *Achong*, 765 So. 2d 823, 824 (Fla. Dist. Ct. App. 2000) (absence of an adequate remedy at law must be pled and proven); *Davis* v. *Estridge,* 85 S.W.3d 308, 310 (Tex. App. 2001) (same).  The Texas Plaintiffs do not even attempt to allege that they lack an adequate remedy at law.  Although the Florida Plaintiffs assert that they have no adequate remedy at law, damages are the appropriate remedy where, as here, fraud is the alleged basis for rescission. *Bush* v. *Palm Beach Imps.*, 610 So. 2d 68, 70 (Fla. Dist. Ct. App. 1992).

Further, the equitable remedy of rescission is only appropriate under Florida law where it will serve to return the contracting parties to the pre-contracting status quo.  *E.g.*, *Lang* v. *Horne,* 23 So. 2d 848, 853 (Fla. 1945).  Florida courts have therefore found that rescission is not appropriate in automobile cases, as it cannot return the parties to their pre-contracting positions due to depreciation and use of the vehicle.  *Bush*, 610 So. 2d at 70 (collecting cases).

## VII.  PLAINTIFFS' UNJUST ENRICHMENT CLAIMS MUST BE DISMISSED.

The Florida and Texas Plaintiffs assert equitable claims for unjust enrichment. (FL Compl. ¶¶ 443-44; TX Compl. ¶¶ 413-14.)[36]  These claims must be dismissed because unjust

---

'fundamental principle' that 'a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract.'"); *Allman*, 592 So. 2d at 1263 (same); *Priddy* v. *Bus. Men's Oil Co.*, 241 S.W. 770, 775 (Tex. Civ. App. 1922), *aff'd*, 250 S.W. 156 (Tex. Comm'n App. 1923, judgm't adopted) (same).

[36]  Under Florida law, "[a] claim for unjust enrichment has three elements:  (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that

1 | enrichment is not available when there is an adequate remedy at law. *R.M. Dudley Const. Co.* v.
2 | *Dawson*, 258 S.W.3d 694, 704 (Tex. App. 2008). Here, Plaintiffs have an adequate remedy at
3 | law through their other claims, including for common law fraud and under the Texas DTPA.
4 | Likewise, numerous courts applying Florida law have held that where, as here, a plaintiff asserts
5 | claims for both unjust enrichment and violations of the Fla. UDTPA, that plaintiff "cannot
6 | advance an unjust enrichment claim that is predicated on the same wrongful conduct as that
7 | which the [Fla.] UDTPA is designed to prevent." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp.
8 | 2d 801, 843 (S.D. Ohio 2012).

9 | Additionally, under both Texas and Florida law, unjust enrichment, which is a
10 | quasi-contractual theory of recovery, is not available where a contract exists between the parties.
11 | Here, Plaintiffs have alleged the existence of express federal emissions warranties. The
12 | existence of these warranties bars Plaintiffs from proceeding on an unjust enrichment theory.
13 | *See In re Gen. Motors Corp.*, 385 F. Supp. 2d 1172, 1176 (W.D. Okla. 2005) ("Under Texas law
14 | an unjust enrichment claim fails upon a showing that an express contract exists."); *In re Gen.*
15 | *Motors Corp. "Piston Slap" Prods. Liab. Litig.*, 385 F. Supp. 2d 1181, 1184 (W.D. Okla. 2005)
16 | (same, applying Florida law).

17 | **CONCLUSION**

18 | The Court should dismiss the Complaints with prejudice.

19 | Respectfully submitted,

20 |

21 | */s/* Robert J. Giuffra, Jr.
   | Robert J. Giuffra, Jr. (admitted *pro hac vice*)
22 | William B. Monahan (admitted *pro hac vice*)
   | C. Megan Bradley (admitted *pro hac vice*)
23 | SULLIVAN & CROMWELL LLP
   | 125 Broad Street
24 | New York, New York  10004-2498

25 | benefit; and (3) the circumstances are such that it would be inequitable for the defendants to
26 | retain it without paying the value thereof." *Virgilio* v. *Ryland Grp.*, 680 F.3d 1329, 1337 (11th
   | Cir. 2012). Under Texas law, "[u]njust enrichment is an implied-contract basis for requiring
27 | restitution when it would be unjust to retain benefits received." *Perales* v. *Bank of Am.*, 2014
   | WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014) (citing *Walker* v. *Cotter Props., Inc.,* 181 S.W.3d
28 | 895, 900 (Tex. App. 2006)).

1   Telephone:   (212) 558-4000
    Facsimile:   (212) 558-3588

2

3   *Attorneys for Defendants Fiat Chrysler Automobiles N.V., FCA US LLC, VM Motori S.p.A., and VM North America, Inc.*

4

5   July 3, 2020

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28